CAUSE NO. 2017-86034

| | | |
|---|---|---|
| JANICE BARNES Individually, as Personal Representative of the Estate of ASHTIAN BARNES Deceased, and as Heir to the Estate OF ASTIAN BARNES, Deceased; and Tommy Duane Barnes | § § § § | IN THE DISTRICT COURT |
| *Plaintiffs,* | § § | |
| vs. | § § | OF HARRIS COUNTY, TEXAS |
| HARRIS COUNTY; and DEPUTY ROBERTO FELIX JR; *Defendants.* | § § § § | 129th JUDICIAL DISTRICT |

## AFFIDAVIT OF JARED L. ZWICKEY

THE STATE OF CALIFORNIA    §
                           §
COUNTY OF SAN JOAQUIN      §

BEFORE ME, the undersigned authority, on this day personally appeared Jared L. Zwickey, who being first duly sworn by me, deposed and said:

1.    "My name is Jared L. Zwickey. I am over the age of eighteen, and have never been convicted of a crime. Each of the following statements is based on my personal knowledge, and each fact is true and correct.

2.    I have been designated as an expert in the above captioned case by Defendants Harris County and Harris County Precinct 5 Deputy Constable Roberto Felix in his Individual Capacity. A true and correct copy of my Amended Expert Opinion Report in this case is attached hereto as *Exhibit "1"* and incorporated by reference for all purposes herein. My Amended Expert Opinion Report sets out each of my opinions in this case.

3.    Included in my Amended Expert Opinion Report is a summary of my professional background. I have thirty-eight years of law enforcement experience, and forty-four years of training experience as an administration of justice instructor at the community college level.

Affidavit of Jared L. Zwickey
Page | **2**

4.      I hold a majority of the certifications from the Commissions on Peace Officer Standards and Training ("POST") that can be issued to a law enforcement officer in the State of California, which certify my multiple areas of expertise. Specifically, as a retired law enforcement officer, I hold a Basic, Intermediate, Advanced, Supervision, Management, Executive, California Command College, Firearms Instructor, Defensive Tactics/Impact and Less Lethal Weapons, Narcotics and Dangerous Drugs, Advanced Narcotics and Dangerous Drugs, Basic Academy Director and Academy Instructor of Perishable Skills Certificates.

5.      I graduated from the FBI National Academy in 1988 after being nominated to attend.  The FBI National Academy is a program of the FBI for active U.S. law enforcement personnel and also for international law enforcement personnel who seek to enhance their credentials in their field and to raise law enforcement standards, knowledge and also cooperation worldwide.  I am also a graduate of the Force Science Institute in Mankato, Minnesota, and I am certified as a Human Factors Analyst by the Force Science Institute, which involves the analysis of the controversial use of force, including the use of video to identify the human factors involved in a chaotic and rapidly unfolding critical incident where force is used. I have been so certified since 2009. I am also certified as an Agitated-Excited Delirium Instructor by the Institute for the Prevention of In Custody Deaths, and have been so certified since 2013, when I successfully completed the Excited Delirium Instructor's Course.

6.      I have a Bachelor's Degree in Administration of Justice from Golden Gate University.  I am currently licensed by the California Department of Consumer Affairs, Bureau of Security and Investigation Services as a private investigator.

Affidavit of Jared L. Zwickey
Page | **3**

7.      I have served as a member of the California Peace Officer Standards and Training
(POST) Consortium Advisory Committee and subject matter expert evaluation team, which has as
its mission ensuring consistency between training specifications and student workbook training
materials for the Basic Academy Course among the multiple training academies in the State of
California, based on state and federal statutes and current case law.  I have also served on numerous
POST committees as a use of force, K-9, tactics, firearms and scenario training expert, and as a
subject matter expert for Basic Academy Course training materials.  The POST committees focus
on developing program guidelines for basic and in-service law enforcement certification programs.
I also serve on several POST training committees as a subject matter expert and participate in focus
training groups to develop in-service and basic training programs for the California Basic
Academy training academies, California Penal Code Section 832 programs and K-12 regional
occupational programs.

8.      I am an Associate Professor at the San Joaquin Delta College District in Stockton,
California, where I teach administration of justice, use of force, criminal law and criminal
evidence, and firearms courses.  In addition to writing curriculum and teaching college courses for
the San Joaquin Community College District over the past twenty-one years, I teach firearms,
report writing, defensive tactics, administrative investigations, criminal law, criminal evidence,
search and seizure and use of force in the Basic Police Officer Academy program and for numerous
state and federal law enforcement agencies.  I have instructed law enforcement officers tactics and
arrest strategies at the California Department of Corrections, the U.S. Marshal's Office, FBI
Agents, civilians, and members of the United States military service.

Affidavit of Jared L. Zwickey
Page | **4**

9.      I am also employed by the Yosemite Community College District, where I teach administration of justice courses at Modesto Junior College.

10.      I have taken thousands of hours of continuing law enforcement training during my career as a law enforcement officer.  A list of the training classes I have taken is attached to my Amended Expert Opinion Report as *Exhibit "2"* and incorporated by reference for all purposes herein.  In addition to the hours of training set out on *Exhibit "2"* I attended daily briefing training, along with community presentations from citizens and members of the law enforcement community during my law enforcement career.

11.      I first taught on the subject of use of force, tactics and arrest strategies in the early 1970's, continuing through my years as a strategy and tactics as a S.W.A.T team member, traffic stops, drug recognition, use of force, firearms and arrest/control defensive tactics instructor at the POST Police Academy in Pittsburg, California in 1993, and at Delta College through 2019.

12.      My teaching in strategies and tactics was not geared toward teaching police officers how to respond to every set of unknown circumstances that they may possibly encounter during their patrol duties.  Rather, my teaching was geared toward instructing law enforcement officers to reasonably understand the various basic strategies of awareness and being prepared for possible responses that other officers used to control a subject who might possibly attempt to harm them with personal weapons or with a variety of weapons, vehicles and other instrumentalities.  In addition to the teaching I have done in this area, I have personally dealt with armed and dangerous individuals who frequently obstructed, delayed, evaded and resisted arrest, attempted to conceal contraband and possessed dangerous weapons.

Affidavit of Jared L. Zwickey
Page | **5**

13.     During my career, I have arrested hundreds of individuals who were under the influence of dangerous drugs, including marijuana and or alcohol.  My training also includes minor and major accident investigation and reconstruction methodologies, including skid and speed analysis and metal deformation of damaged vehicles.

14.     On April 28, 2016, at approximately 2:40 pm, Harris County Toll Road Authority Dispatch center made a general radio broadcast to enforcement units that a prohibited vehicle was traveling on the tollway.  The vehicle had a number of outstanding toll violations and had just passed through the tool both.  The radio broadcast included the description of the vehicle and the vehicle license number.

15.     Precinct 5 Deputy Constable Felix located the vehicle traveling southbound on the tollway and confirmed the license plate number with the dispatcher.  The weather was warm and overcast with temperatures in the upper 80's and the visibility was good.

16.     The incident scene was located on the southbound main lanes of the West Sam Houston Parkway.  Mr. Barnes's vehicle and Deputy Felix's vehicle was parked on the east emergency lane at the 7500 block of the west Sam Houston Parkway southbound side.

17.      The 10000 block of Beechnut Street is the nearest intersection south from the incident location and is accessed via the service road.  West Sam Houston Parkway is a road that travels north and south having four lanes traveling in each direction and is divided by a concrete medium.  The 7500 block of the West Sam Houston Parkway is located inside the city limits of Houston, and in Harris County, Texas.

Affidavit of Jared L. Zwickey
Page | **6**

18.     The West Sam Houston Parkway southbound lanes of traffic are surrounded by the Arthur Story Park and the Brays Bayou on the west side.  The west Sam Houston Parkway northbound lanes of traffic are surrounded by a commercial shopping center and two apartment complexes.  The west Sam Houston Parkway is located in a residential and commercial neighborhood, and has a high traffic volume that is extremely loud.

19.     Investigators found Mr. Barnes's vehicle parked facing south in the emergency traffic lane, approximately 100 feet south of Deputy Felix's patrol vehicle.  The front and rear passenger tires were partially sitting on the yellow lane that divides the number one traffic lane and the emergency traffic lane.

20.     Based on the evidence located at the scene, Deputy Felix's patrol vehicle and Mr. Barnes Toyota Corolla were both traveling southbound in the 7500 block of the West Sam Houston Parkway South in the number 1 traffic lane, when Deputy Felix confirmed the driver's license with the dispatcher and conducted the traffic stop to determine if the vehicle was authorized to be on the toll road. Deputy Felix activated his overhead emergency lighting equipment and initiated an investigative traffic stop; he contacted the driver later identified as Ashtian Duane Barnes.

21.     Deputy Felix contacted Mr. Barnes, he identified himself and stated the reason for stopping him, and requested to see his driver's license and proof of insurance.  Mr. Barnes told the deputy that he rented the vehicle and then he said his girlfriend rented the vehicle; he did not present his driver's license as requested.  After Deputy Felix asked Mr. Barnes a second time to present his driver's license, he asked the dispatcher to send him a cover unit.

Affidavit of Jared L. Zwickey
Page | **7**

22.     As Deputy Felix spoke with Mr. Barnes, he smelled what he believed to be the strong odor of marijuana coming from the interior of the vehicle.  The deputy told Mr. Barnes that he smelled the strong odor of marijuana and asked him if there was anything in the vehicle that Deputy Felix should be concerned about; he responded that there wasn't anything in the vehicle.

23.     Deputy Felix became concerned when Mr. Barnes began making furtive movements that caused Deputy Felix to become highly concerned about his personal safety, and he told him multiple times to stop digging around the interior of the vehicle for fear he may be trying to distract him to hide or destroy contraband or obtain a firearm.   Even after being told 4 times to stop "digging" around the vehicle, Mr. Barnes grabbed a handful of papers from the right front passenger's seat and the right front floorboard, and fumbled through them while focusing his eyes on the deputy and not on what he was trying to find.

24.     When Deputy Felix learned that Mr. Barnes did not have a driver's license on his person and was told that his license was reportedly in the trunk, Mr. Barnes told the deputy he could look in the trunk for it.  Deputy Felix asked Mr. Barnes to pop the trunk open, which he did, but Deputy Felix felt very unsafe walking back to the trunk while Mr. Barnes remained in the vehicle, because his personal safety could be compromised.

25.     Deputy Felix told Mr. Barnes to place the paperwork and the keys on the dashboard and he opened the door and asked him to step out of the car so that he could walk back to the trunk and recover his driver's license. Mr. Barnes put the paperwork on the dashboard, but he removed the ignition key and put it on the center console.

Affidavit of Jared L. Zwickey
Page | **8**

26.     Approximately 5 seconds after the driver's door was opened and Mr. Barnes was asked to step outside, Mr. Barnes leaned forward concealing the right side of his body as he surreptitiously grabbed the keys from the center console. Mr. Barnes put the key into the ignition, he stepped on the brake and started the engine.

27.     Approximately 1 second after the vehicle engine started, Deputy Felix stepped towards the V portion of the driver's door at the front roof A pillar and stepped up onto the door sill with his left foot as he removed his firearm from the holster and pointed it at Mr. Barnes; he told him don't move, in an attempt to prevent him from driving forward or in reverse.

28.     Approximately ¾ of a second after Deputy Felix stepped onto the door sill, Mr. Barnes put the vehicle in gear and began to rapidly drive forward.  Deputy Felix's right foot stepped up onto the door sill and his left hand grabbed onto the sloping "A" pillar that supports the windshield glass as he commanded Mr. Barnes a second time not to move as the vehicle accelerated in the emergency traffic lane.

29.     As Mr. Barnes' vehicle rapidly accelerated southbound on the emergency lane of the tollway, Deputy Felix felt the pressure of the driver's door against the left side of his body. Deputy Felix's left torso was out of the vehicle and his left arm was between the driver's door and the door frame trying to obtain a grip on the windshield.  Deputy Felix stated he felt his right arm that was holding his firearm being moved and he felt pressure being applied to his firearm by Mr. Barnes.

Affidavit of Jared L. Zwickey
Page | **9**

30.     Approximately 1 second after Mr. Barnes vehicle rapidly drove away from the scene, Deputy Felix moved his right arm backwards, and pulled his firearm out of the open driver's door window away from Mr. Barnes' ability to grab the weapon.  Deputy Felix feared that he was going to be thrown from the vehicle, or run over by vehicles on the tollway or crushed by the retaining wall, or that his firearm could be grabbed and used against him.

31.     Approximately 1 second later Deputy Felix reinserted the muzzle of the firearm into the vehicle, he pointed the muzzle at a downward angle towards Mr. Barnes and discharged his firearm twice at him.

32.     Approximately 1.5 seconds  after Deputy Felix's fired his second shot, Mr. Barnes applied the brakes to his vehicle and stopped its forward movement.  Deputy Felix stepped onto the pavement and kept his firearm pointed at Mr. Barnes as he notified the dispatcher several times that shots had been fired.  He ordered Mr. Barnes to put the car in park, which he complied,  and he requested immediate medical assistance to respond to his location.

33.     The first deputy to respond to Deputy Felix's location arrived at the scene, he pointed his firearm at Mr. Barnes and waited for additional deputies to respond to the scene. While waiting for additional assistance, Deputy Felix told his fellow deputy that he told Mr. Barnes to put the vehicle in park.  When additional deputies arrived at the scene, Deputy Felix told them that Mr. Barnes put the vehicle in park, and said Barnes drug him a little bit and he was reaching for his firearm.  He also told his fellow deputies that he shot Mr. Barnes and told them that he was not injured and was okay.

Affidavit of Jared L. Zwickey
Page | **10**

34.     As Deputy Felix was directed away from Mr. Barnes' vehicle he told his fellow deputies that he was alright, but that his right leg was injured.  As Mr. Barnes was removed from his vehicle he was given emergency CPR until the arrival of fire department personnel approximately 10 minutes after being shot by Deputy Felix. At 2:57 pm, Houston Fire Department personnel pronounced Mr. Barnes died at the scene.

35.     The Houston Police Department assigned homicide division detectives to conduct a thorough and non-bias criminal investigation into this incident. The detectives arrived at the incident scene on April 28, 2019, at 4:40 pm and found both vehicles parked on the southbound emergency lane of the Sam Houston Parkway facing south.

36.     Deputy Felix's patrol vehicle was parked approximately 25 meters (82.02997 feet) north of the silver Toyota Corolla with the vehicle's overhead emergency lights activated.  The Toyota Corolla was parked approximately 25 meters (82.02997 feet) north of a metal light pole and approximately 113 meters south of Deputy Felix's patrol car.

37.     The keys to the Toyota were in the ignition, but the engine was not running. The vehicle was towed from the scene to the Houston Police Department vehicle examination garage pending a search of the vehicle for evidence.

38.     Deputy Constable Felix was wearing a standard Harris County Precinct 5 approved uniform.  Deputy Felix did not have any visible injuries, but he told the investigators that he had sustained minor injuries to his lower legs and he appeared to be somewhat shaken by the incident.

Affidavit of Jared L. Zwickey
Page | **11**

39.     The investigation determined that the Mr. Barnes was identified by his Texas Identification number as Ashtian Duane Barnes.  At the time of the investigation it was not determined that Mr. Barnes had a Texas driver's license and could have resulted in him being in violation of Texas Code of Transportation Section 521.021, a class c misdemeanor.

40.     After a thorough review of the complete and thorough criminal investigation conducted by the Houston Police Department, Precinct 5 administrative investigation and procedures, audio and video evidence, deposition testimony, interviews of Precinct 5 command and training personnel and Deputy Felix, and  case file documents identified on pages 4, 5, and 6 of my Amended Expert Report, *Exhibit "1."*  I have provided my opinions regarding the use of deadly force in the context of the situation faced by Harris County Deputy Constable Roberto Felix Jr. when he encountered Asthian Barnes on April 26, 2016, on pages 14-18, 18-23, 26-35, 38-64 of my Amended Expert Report, *Exhibit "1"*, along with a video analysis of the time frame of the events, so that the fact finder will more completely understand the basis for my opinions.

41.     I am qualified to render an opinion as to the use of deadly force and law enforcement procedures based on my longstanding training as a police officer on this topic, my experience as a subject matter expert on use of force, tactics and law enforcement policies and procedures, and my qualification as an instructor in use of force, firearms and special tactical events for the past 44 years.

42.     As a retired peace officer with thirty-eight years of law enforcement experience, I very well understand the process a prosecutor goes through in evaluating a matter to determine whether a charge will be filed.  I have had hundreds of contacts with prosecutors with regard to the arrests I have made over the years.

Affidavit of Jared L. Zwickey
Page | **12**

43.     My purpose in presenting the material contained in my opinion about the investigation and/or review of the allegations in this case by the Harris County District Attorney's Office was simply to provide information to the fact finder that there had been a review of this incident from the criminal standpoint.

44.     During the past forty-two years, I have acted as a law enforcement procedures and use of force expert.  I have reviewed hundreds of criminal and internal affairs investigations conducted by numerous law enforcement agencies in California, Oregon, Connecticut, Mississippi, Alaska, Texas, the State of Washington, and Louisiana to determine if the criminal investigation were complete and thorough, and the administrative investigation met the objectives of being a fair and balanced investigation.

45.     I have been trained to conduct internal affairs investigations, including the evaluation of witness testimony to determination of inappropriate conduct, violations of department procedure, evaluation of patterns of conduct and failure to discipline.

46.     In conclusion, my review and analysis of the materials and documents provided, requested, and researched did not reveal any violations of clearly established laws, or department procedure.

47.     I have personal knowledge of the facts stated herein, and all stated facts are true and correct.

48.  I am prepared to testify to the opinions expressed in this report, in deposition or at trial if called upon to do so.  I may have additional opinions if I am provided with further documentation for review, and I reserve the right to amend my report as necessary.

Affidavit of Jared L. Zwickey
Page | **13**

49.    I declare under penalty of perjury under the laws of the State of California and of

the United States of America that the foregoing is true and correct.


FURTHER AFFIANT SAYETH NOT."

JARED L. ZWICKEY

SUBCRIBED AND SWORN TO before me on _July 23_, 2019, to certify which
witness my hand and seal of office.

Notary Public, State of California
My commission expires: _03/02/2022_

CATHY VAZQUEZ
COMM. # 2232921
NOTARY PUBLIC · CALIFORNIA
SAN JOAQUIN COUNTY
COMM. EXPIRES MARCH 2, 2022

# California All-Purpose Certificate of Acknowledgment

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

**State of California**

**County of** San Joaquin } s.s.

On 7/23/19 before me, Cathy Vazquez, Notary Public

Name of Notary Public, Title

personally appeared Jared L Zwickey

Name of Signer (1)

_____

Name of Signer (2)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Signature of Notary Public

CATHY VAZQUEZ
COMM. # 2232921
NOTARY PUBLIC - CALIFORNIA
SAN JOAQUIN COUNTY
COMM. EXPIRES MARCH 2, 2022

Seal

———— *OPTIONAL INFORMATION* ————

*Although the information in this section is not required by law, it could prevent fraudulent removal and reattachment of this acknowledgment to an unauthorized document and may prove useful to persons relying on the attached document.*

## Description of Attached Document

The preceding Certificate of Acknowledgment is attached to a document titled/for the purpose of AFFIDAVIT

_____

containing _____ pages, and dated _____.

The signer(s) capacity or authority is/are as:
- ☐ Individual(s)
- ☐ Attorney-in-fact
- ☐ Corporate Officer(s) _____
  Title(s)
  _____
- ☐ Guardian/Conservator
- ☐ Partner - Limited/General
- ☐ Trustee(s)
- ☐ Other: _____

representing: _____
Name(s) of Person(s) Entity(ies) Signer is Representing

### Additional Information

Method of Signer Identification

Proved to me on the basis of satisfactory evidence:
- ☐ form(s) of identification  ☐ credible witness(es)

Notarial event is detailed in notary journal on:

Page # _____ Entry # _____

Notary contact: _____

Other
- ☐ Additional Signer  ☐ Signer(s) Thumbprint(s)
- ☐ _____

© 2009-2015 Notary Learning Center - All Rights Reserved     You can purchase copies of this form from our web site at www.TheNotarysStore.com

*Amended Expert Opinion Report – Barnes v Harris County*

# AMENDED EXPERT OPINION REPORT

Court:         Harris County District Court – 129 Judicial District Court of Harris County, Texas
Case Number:  Cause No. 2017-86034
Case Name:    Janice Hughes Barnes, Individually as Representative of The Estate of Ashtian
                 Barnes, and Tommy Duane Barnes
Vs:            Deputy Roberto Felix Jr. and The County of Harris, Texas
Date:          July 30, 2019

A.  I, Jared L. Zwickey am an adult over 18 years of age and would be competent to testify if called as a witness in this matter.  I have prepared this report on behalf of Harris County in the matter of *Janice Hughes Barnes, Individually as Representative of The Estate of Ashtian Barnes, and Tommy Duane Barnes* in the District Court of Harris County, Texas.

B.  The San Joaquin Delta College District in Stockton, California employs me as an Associate Professor in the Administration of Justice Discipline.  I recently retired as the Director of Police Services and Public Safety Programs.  My duties included, but are not limited to, managing the Campus Police Department, the Basic Peace Officer Training program at Delta College and the Stanislaus Sheriff's Regional Training Center, the California Department of Corrections-Juvenile Justice Basic Institutions Academy, the Fire Technology program, and the Administration of Justice and Corrections academic programs.

C.  In addition to writing curriculum and teaching college courses for the San Joaquin Community College District, I teach firearms, defensive tactics, criminal law, search and seizure, and use of force in the Basic Peace Officer Academy program and for numerous law enforcement agencies, including the California Department of Corrections, Fire Service agencies, state and federal law enforcement personnel and members of the United States military service.

D.  The Yosemite Community College District in Modesto, California also employs me as an Administration of Justice adjunct instructor where I teach Administration of Justice courses at Modesto Junior College.  I am also employed by the Institute of Technology as a use of force and firearms instructor.

E.  I work closely with the California Commission on Basic Peace Officer Standards and Training (POST) as a consultant to develop Basic Peace Officer Academy course curriculum. I currently serve as the use of force subject matter expert representing the Basic Peace Officer Academy sponsored programs in the State of California.

F.  I hold all of the Commission of Peace Officer Standards and Training Certifications that can be issued to a law enforcement officer in the State of California, which certifies my multiple areas of expertise.

*Amended Expert Opinion Report – Barnes v. Harris County*

G.  I have a F.B.I. Firearms Instructor Certificate, a POST Defensive Tactics Instructor, Impact Weapon Instructor, and a Basic and Advanced Narcotics & Dangerous Drugs Certificate.  I also have been issued certificates for being a POST Test Proctor, Basic Course Academy Instructor of Perishable Skills and Racial Discrimination Profile Instructor.

H.  I have served on numerous POST committees during the past thirty-nine years as a use of force, K-9, tactics, firearms and scenario training expert, and as a subject matter expert for Basic Peace Officer Academy Course training materials.  The focus of these committees is to develop program guidelines for law enforcement basic and in-service certification programs.

I.  I am a member of the POST Consortium Advisory Committee and subject matter expert evaluation team to ensure consistency between training specifications and workbook training materials for the Basic Peace Officer Academy Course amongst the training academies in the State of California.

I serve on several POST training committees as a subject matter expert and participate in focus training groups to develop in-service and basic training programs for the Basic Peace Officer Academy training academies, PC 832 programs and K-12 regional occupational programs.

J.  As a retired law enforcement officer, I hold a Basic, Intermediate, Advanced, Supervision, Management, Executive, California Command College, Firearms Instructor, Defensive Tactics/Impact Weapon, Narcotics & Dangerous Drugs, Advanced Narcotics & Dangerous Drugs, Basic Peace Officer Academy Director, and Academy Instructor of Perishable Skills Certificate.  I am also a graduate of the Federal Bureau of Investigation National Academy.  I have a Bachelor's Degree in Administration of Justice from Golden Gate University and I am a graduate of the California Command College.  I am also a licensed private investigator.

K.  I have thirty-eight years of law enforcement experience, and forty-four years of training experience as an Administration of Justice Instructor at the Community College level. I have participated in thousands of hours of law enforcement related training programs during my tenure as a law enforcement officer.

L.  During the past forty-four years that I have acted as a law enforcement procedures and use of force expert, I reviewed hundreds of internal affairs investigations conducted by numerous California, Alaska, Texas, Washington State and Louisiana law enforcement agencies, to determine if the investigations were complete, thorough and met the objectives of a fair and balanced internal affairs investigation to determine inappropriate conduct, violations of department standard operating procedures, evaluation of patterns of conduct and failure to discipline.

M. During my twenty-eight years of law enforcement service with the City of Concord, I participated in the critical incident and internal affairs investigation processes involving alleged acts of officer/employee misconduct.

*Amended Expert Opinion Report – Barnes v Harris County*

In my capacity as a Patrol and Traffic Sergeant, Special Investigations, Operations and Administrative Lieutenant, Captain of the Operations Division and acting Chief of Police, I routinely reviewed citizen complaints and I investigated alleged acts of misconduct that required imposing progressive discipline in those matters that allegations were sustained.

N. During my tenure as Police Chief for the City of Tracy I conducted and directed internal affairs investigations into alleged acts of misconduct of civilian and city employees. Based on the sustained findings of the investigations I reviewed or conducted, I administered progressive discipline to police employees, to include, but not limited to letters of reprimand, demotions and terminations.

O. As the Director of Police Services at San Joaquin Delta College, I was responsible for the oversight of personnel in the police department, full-time and adjunct employees assigned to the Administration of Justice program and students attending the POST Basic Peace Officer Academy. During the past twenty-two years as an employee of San Joaquin Delta College, I have directed numerous internal affairs investigations into alleged acts of misconduct. In those incidents where, alleged acts of misconduct were sustained, I administered progressive discipline, including, but not limited to written letters of reprimand up to and including termination. The attached resume contains a more complete listing of my training and qualifications, and is provided for reference of my experience and skills.

P. I have thirty-eight years of law enforcement experience and forty-five years of training experience as a use of force, firearms and tactics instructor and a K9 trainer. My area of expertise is not limited to: establishing probable cause for arrest and use of force; laws of arrest and search and seizure; less-lethal alternatives to deadly force (equipment and tactics); modern police administration and supervision, including policies, procedures, and current law enforcement practices; firearms; internal affairs investigations and disciplinary matters; police K-9 administration, training, and tactics; special weapons and tactics administration and training.

Q. I have testified in approximately seventy-three cases over the past forty-five years involving, but not limited to, use of force, law enforcement policies and practices, and tactical and investigation procedures. I have reviewed thousands of incidents involving the use of force, defensive tactics and restraints, impact weapons and deadly force during my career as a law enforcement officer and use of force/tactics instructor and private investigator. I have testified in state and federal courts for the defense and for plaintiffs.

R. The Office of Harris County Attorney Vince Ryan retained me on July 22, 2018, as a law enforcement expert to review the facts and circumstances of Ashtian Barnes death on April 26, 2016, to reach an opinion on this matter.

S. On March 1, 2019, I met with Harris County Senior Attorney Mary Baker and Deputy Felix at the Harris County Attorney's Office to clarify portions of his deposition testimony.

*Amended Expert Opinion Report – Barnes v. Harris County*

T.  On March 22, 2019, I contacted Senior Harris County Attorney Mary Baker and Harris County Precinct 5 firearms instructor Sergeant Preston via a conference call regarding the Harris County Constable's Office Precinct 5 firearms training policies and procedures.

U.  On July 23, 2018, July 25, 2018, February 1, 2019, February 21, 2019, March 21, 2019, March 27, 2019, April 9, 10, 11, 16, 2019, May 14, 15, 17, 18, 27, 2019, June 24, 2019, and July 2, 15, 18, 2019, I received a variety of case materials from the Office of County Attorney Vince Ryan.

V.  Based on the materials reviewed, as well as other related opinions, I was requested to provide my opinion, favorable or unfavorable as to the law enforcement policies and practices employed when Harris County Constable's Office Precinct 5 Deputy Felix used deadly force in defense of his life, on April 26, 2016.

## DOCUMENTS AND THINGS REVIEWED

1.  Plaintiff's Original Petition
2.  Tollway video 4-28-2016 1 45 12 PM (UTC-05 00 .mkv
3.  2017-12-2 Plaintiffs Original Petition
4.  Video footage 126-8556
5.  Video footage 127-85T14
6.  Video footage 128-85P20
7.  Video footage 129-85P29
8.  Video footage 130-85P29
9.  Video footage 131-85T20
10.  Video footage 132-85T23
11.  Video footage 133-85T28
12.  Audio Recording 134-e690,  Audio Recording 135-e690
13.  Deposition of Chief Allbritton Rough Draft Taken on July 14, 2019
14.  136-190 IAD #16-717 C5 Disciplinary Investigation
15.  191-287 Ashtian Barnes Inmate and Medical Records
16.  288-316 Cause No. 1566248 Ashtian Barnes
17.  317-334 Cause No. 1566248A Ashtian Barnes
18.  335-353 Cause No. 1256304 Ashtian Barnes
19.  354-367 Cause No. 1256304A Ashtian Barnes
20.  368-376 Cause No. 1680151 Ashtian Barnes
21.  377-390 Cause No. 1744706 Ashtian Barnes
22.  391-454 Cause No. 1377156 Ashtian Barnes
23.  455-483 Cause No. 2005426 Ashtian Barnes
24.  484-504 Cause No. 2051558 Ashtian Barnes
25.  505-608 Constable Precinct 5 Procedures
26.  2018-07-20 Defendants Initial Disclosures
27.  2018-07-27 Plaintiffs Initial Disclosures
28.  609-639 Additional Constable Precinct 5 Procedures
29.  640-647 ROG #7 RFP#30 Hiring Process Instructions

*Amended Expert Opinion Report – Barnes v Harris County*

30.    648-651 RFP #3 PIA Request Emails
31.    Plaintiff's Expert Exhibits
32.    1411-1708 HCDA File re Ashtian Barnes
33.    Deputy Felix Deposition on February 18, 2019 & Grand Jury Testimony 8-26-16
34.    Deposition of Plaintiff Tommy and Janice Barnes 2-11, 12, 2019
35.    1709-1720 ARS 070119C461
36.    1721-1728 Roberto Felix Jr. TCOLE Records
37.    1729-1734 Felix Disciplinary Records & Drug Arrest recap 2005-2016
38.    2018-11-01 Final Deputy Felix 1st Set of Objections
39.    2018-11-01 Final Deputy Felix Obj 1st ROGS
40.    2018-11-01 Final HC Obj 1st RFP
41.    2018-11-01 Final HC Obj 1st ROGS
42.    652-776 HPD Homicide Report Case
43.    777-1087 Incident Scene Photographs
44.    1088 4 28 2016 2 45 12 PM Tollway Video
45.    1089 00015.MTS Video of the incident scene
46.    1090 00016.MTS Video of the incident scene
47.    0540366-16 HPD Video
48.    1091 e690 Audio file & 1092 3690 Audio file
49.    Deposition Testimony of Corporate Representative William Helfand on May 23, 2010
50.    1093 Precinct 5 & Chief Albritton Photographs
51.    1094 Audio interview of Maria Mora
52.    1095-1107 HCIFS Autopsy Report
53.    1108 MEO 3708 Autopsy Photos
54.    1109-1229 Autopsy Photos
55.    1230-1405 Scene & evidence photographs
56.    1406-1410 Ashtian Barnes X rays
57.    2018-11-0 Final Deputy Felix Obj&Response to Plaintiffs 1st RFA
58.    2018-11-01 Final Deputy Felix Obj&Response to Plaintiffs 1st RFP
59.    2018-11-01 Final Deputy Felix Obj&Response to Plaintiffs 1st ROGS with Verification
60.    2018-11-01 Final Deputy Felix Obj&Response to Plaintiffs 1st ROGS
61.    2018-11-01 Final HC Obj&Response to Plaintiffs 1st RFA
62.    Barnes Felix 00001.0019199
63.    Barnes Felix 00200.00210 Barnes Autopsy Report
64.    Barnes Felix 00211.00262 Precinct 5 IA
65.    Barnes Felix 00263.00573 Incident scene photographs
66.    Barnes Felix 00574.00694 Autopsy photographs
67.    C5 Disciplinary Review Board Investigation
68.    e690250084d000372d920822b400 audio file
69.     E690250084b000327233c9207c2b0400 audio file
70.    1709-1720 ARS 070119C461 Correspondence Regarding Deputy Felix prior shooting
71.    Expert report of Todd A. Maloney & CV
72.    HPD OIS- #540366-16 & DA File & Felix Grand Jury Testimony, Maria Mora Affidavit
73.    Photographs of the incident scene, audio statement and incident reports
74.    Harris County of Forensic Sciences Crime Scene Worksheet

*Amended Expert Opinion Report – Barnes v. Harris County*

75.  Harris County Institute of Forensic Science's Autopsy Report/photos of Mr. Barnes
76.  MVI 2264 On Scene Walkthrough video
77.  2017-12-29 Plaintiff's Original Petition
78.  2018-03-02 HC Original Answer
79.  2018-03-06 Deputy Felix Original Answer
80.  Tempe Study of Shooting Encounters
81.  Harris Constable Precinct Five Use of Deadly Force Procedures 200/2.14
82.  Texas Transportation Code Section 521.021 Driver's License Required
83.  Texas Transportation Code Section 521.025 License to be carried and exhibited
84.  Texas Transportation Code Section 708.104 Conviction for driving without license
85.  Texas Code of Criminal Procedure: 2.13
86.  Texas Code of Criminal Procedure: 14.03 [214] [249] [261]
87.  Texas Code of Criminal Procedure: 14.04 When Felony has been Committed
88.  Texas Health & Safety Code 481.121- Possession of Marijuana
89.  Texas Government Code 432.155 Driving While Under the Influence
90.  Texas Penal Code 9.51 Arrest and Search
91.  Texas Penal Code 15.01, Criminal Attempt
92.  Texas Penal Code 38.93, Resisting Arrest
93.  Texas Penal Code 38.04, Evading arrest or Detention
94.  Texas Penal Code 38.15, Interference with Public Duties
95.  Texas Penal Code 46.04, Unlawful Possession of a Firearm
96.  Texas Penal Code 9.22.02, Aggravated Assault
97.  NHTS on Vehicle Travel Speeds & Pedestrian Injures/Marijuana Use
98.  Texas Code of Criminal Procedure
99.  TCOLE Basic Police Officer Academy Standards
100.  TCOLE Training Mandates and Standards
101.  *United States v. Cortez*, 449 U.S. 411,418,101 S Ct. 690,66 L.Ed.2d 621 (1981)
102.  *Pennsylvania v Mimms* 434 U.S. 106 (1977) US Supreme Court
103.  *Arizona v. Johnson*, 129 S. Ct. 781, 786 (January 26, 2009)
104.  *Terry v. Ohio*, 382 U.S. 1, 88 S. Ct. 1868, 20 L. Ed.2d (1968)
105.  *Tennessee v. Garner*, 471 U.S. 1 105 S. Ct 1694, 85 L.Ed.2d 1 (1985)
105.  *Scott v Harris*, 550 U.S. 372 (2007)
106.  *Graham v. Connor*, 490 U.S. 386, 394 (19890
107.  *Kinney v Indiana Youth Center*, 950 F.2d 462 (7th Cir, 1994)
108.  *Davis v. Romer, 600 Fed. Appx 926 (5*th Cir)
109.  *Pearson v. Callahan*, 555 U. S. 223, 231 (2009)
110.  *Harlow v. Fitzgerald*, 457 U. S. 800, 818 (1982)
111.  *Long v. Slaton*, 508 F. 3d 576 11th Cir, (2007)
112.  *Chadrin Lee Mulliniz v Beatrice Luna* 577 U.S.  2015
113.  *Scott v. Heinrick* 39 F. 3d 912, 914 (9th Cir. 1994), cert. en 1995 U.S. Lexis 4312 (19585)
114.  *Plumhoff v. Rickard, U.S., 134 S. Ct. 2012, 2020 (2014)*
115.  *Brower v. County of Inyo*, 489 U.S. 593, 109 S. Ct. 1378, 103 L.Ed.2d 628 (1989)
116.  *Roell v. Hamilton County Ohio*, United States Court of Appeals, Sixth Circuit
117.  *Woolery v. City of Mineral Wells,* 2005 U.S. Dist. Lexis USDC Tex. April 1, 2005

*Amended Expert Opinion Report – Barnes v Harris County*

## THE COMPLAINT FOR DAMAGES

The plaintiff alleged on or about April 26, 2016, at approximately 2:40 p.m., Ashtian Barnes had just cleared a toll station in a rental vehicle on the Sam Houston Tollway when he saw the emergency lights of a police car behind him.  Mr. Barnes properly moved over the left shoulder of roadway and stopped.  Deputy Constable Felix reportedly discharged his .40 caliber service pistol twice, striking Mr. Barnes, who had been stopped originally for toll violations associated with a vehicle he did not own.

It is alleged that prior to and during the traffic stop, and at no time did Mr. Barnes present a threat to Deputy Constable Felix or any other person.  Mr. Barnes reportedly complied with Deputy Constable Felix's instructions up until the point that Deputy Felix pulled his pistol and shoved it point blank range in the direction of Mr. Barnes's head, all while shouting "Don't fucking move!"

Up to this point, Deputy Constable Felix had not advised Mr. Barnes that he was being arrested, detained for a search, or was suspected of violating any other law than minor toll violations. It is not entirely obvious what happened next.

Deputy Constable Felix claims that Mr. Barnes had previously turned off the car, removed the keys from the ignition and placed them on the center console.  He further claims that at this point, Mr. Barnes grabbed the keys, placed them back in the ignition, and restarted the car. The dash cam video of the incident only shows that at the 14:45:48 mark, Mr. Barnes apparently stepped on the car's brakes. At that moment, Deputy Constable Felix whipped out his service weapon and stepped with his left foot onto the door sill of the vehicle, leaning sharply forward and shoving the point of his gun mere inches from Mr. Barnes' face.

The dash cam video shows Mr. Barnes pulling back sharply away from Felix and toward the passenger side of the car, with Felix leaning even further into the video, the gun plainly visible an inch or so from Mr. Barnes' head. At some point during all of this the car was placed into drive, and as Felix leaned even further into the car and shouted "Don't fucking move!", the video shows the brake lights turning off and the car beginning to move forward, slowly at first, but accelerating to approximately the pace of a brisk jog.

Now, compounding his unreasonable and dangerous decision to engage physically with Ashtian Barnes with a loaded firearm unholstered and pointed at Barnes' face, Felix used his left hand that was placed on the outside of the windshield as leverage and pulled his right foot up onto the sill of the vehicle, as well, as the vehicle began to move forward.

Mr. Barnes' rental car traveled forward approximately 3 to 4 seconds, veering slightly, but steadily in the direction of the highway, away from the retaining wall. All this time, Deputy Constable Felix continued to stand on the driver's side sill of the car, unable to see inside the car, because his face was above the roofline, his left hand gripping the front jamb of the open car door and his right hand still shoved deep within the vehicle, holding the gun.

*Amended Expert Opinion Report – Barnes v. Harris County*

One second after the car began to move forward, the video shows Deputy Constable Felix shouting once again "Don't fucking move", then pulling his gun hand out of the vehicle. Immediately he shoved his gun back into the car, pointed blindly in the general direction of Ashtian Barnes, and without any hesitation or warning, fired two non-aimed shots, spaced approximately one second apart. The brake lights came on again (clearly an attempt by Ashtian Barnes to stop the vehicle, since he was the only person in a position to do so), and the car came to a quick stop. In the video you can hear someone, presumably Ashtian Barnes, say "I can't breathe."

It is not clear whether Deputy Constable Felix's intent was to actually kill Barnes or simply disable him, as Felix admits that he could not see into the vehicle at all when he fired. However, it is clear that Deputy Constable Felix twice fired without being able to see what he was firing at, from a moving car, into a moving car, in the direction of both Mr. Barnes and innumerable motorists on the other side of the vehicle.

The shooting resulted from the dangerous decision by Deputy Constable Felix to pull his gun without provocation, then point that gun in Ashtian Barnes' direction, then leaping onto a moving vehicle and firing twice into it without warning, with no clue as to what he was aiming at, and in clear and reckless disregard to the danger he created to the public and to Ashtian Barnes. These tactics represented an unnecessary and unreasonable use of deadly force that, at the very least, arose from Deputy Constable Felix's dangerous decision to escalate the confrontation with a person suspected of minor, non-violent infractions by reaching into a vehicle with a loaded weapon, leaping onto a moving vehicle with that loaded weapon, and then firing blindly into that moving vehicle, with no concern as to the danger such actions presented to Mr. Barnes or to the other drivers present on the highway.

Even assuming he was successful in limiting the injuries from his two shots to Ashtian Barnes, the driver of the vehicle, Deputy Constable Felix had no ability to control the vehicle after Mr. Barnes was fatally injured. Given the fact that the car was beginning to move back onto the highway at the time of the shootings, had Mr. Barnes been unable or unwilling to bring the car to a quick stop on the shoulder of the road, the car itself would have posed a real and significant danger to the other drivers on the highway that afternoon.

Widely accepted policing standards regarding use of force, including that of the Houston Police Department ("HPD"), prohibit shooting at a moving vehicle or attempting to go hand to hand with a suspect with a drawn weapon, much less attempting to engage in hand to hand combat in or on a moving vehicle with a fully drawn firearm, because it is extremely dangerous and can result in the officer being dragged by a vehicle, the unnecessary death of non-violent suspects, and unintended death and injury to the general public caused by missing the target or turning the vehicle into an unguided missile when a suspect is shot.

Deputy Constable Felix's poorly articulated and often inconsistent justifications for his use of force are objectively suspect and contrary to objective evidence such as the dash cam recording of the traffic stop and the shooting.

8

*Amended Expert Opinion Report – Barnes v Harris County*

First of all, Felix's explanations of his actions at the outset of the encounter are suspect. Felix states on the video and in his post-incident interview that he smelled a strong odor of marijuana emanating from the car. However, no marijuana was found at the scene, nor was any marijuana found within Ashtian Barnes' alimentary canal (so Mr. Barnes did not attempt to hide said marijuana by swallowing it.)

Further, although the autopsy revealed traces of THC in Ashtian Barnes' blood, the levels of THC are inconsistent with his having smoked any significant amount of marijuana immediately prior to his death. In addition, Mr. Barnes' immediate response to seeing the lights from the police car behind him, and his smooth and responsive control in bringing his car to a stop on the left-hand shoulder of the road, are inconsistent with Ashtian Barnes being intoxicated with marijuana.

Second, although Felix claimed that Barnes was reaching for his gun when he shot him, this is not borne out by the dash cam footage. Moreover, Deputy Constable Felix initially stated that Barnes was grabbing for his weapon. However, after admitting that he could not see into the car when the shooting occurred, Felix claimed that he felt some force on his hand from which he implied Barnes was reaching for his weapon.

Third, it is not credible that an officer would have made the decision to lean into a car supposedly to turn off the ignition as Felix claims if that officer thought that a suspect was armed or reaching for a weapon. Deputy Constable's decision to reach in to the vehicle with his gun in hand ready to fire is even more difficult to explain, since only the gun hand would have been available to reach the ignition and turn the key.

Fourth, the dashcam footage shows that Felix was able to completely pull his weapon from the car within one second of the car's initial movement and before Felix thrust it back into the open driver door and fired the two shots that cost Ashtian Barnes his life. And of course, this supposed attempt to grab Felix's weapon would be happening while Mr. Barnes was simultaneously steering the vehicle and putting the car in drive.

Based on information and belief, the subsequent investigation by HPD and Precinct 5, if any, resulted in a finding of no wrongdoing by Deputy Constable Felix, resulting in no discipline, no additional training, and not even administrative leave.

Furthermore, even though the investigation was conducted by the homicide department of the Houston police, the investigative reports show that the entire investigation was conducted as an "Aggravated Assault on a Police Officer", with Deputy Constable Felix as victim and Ashtian Barnes as the suspect, and on information and belief that investigation found Ashtian's shooting justified and no wrongdoing on the part of Deputy Constable Felix was indicated.

While it is unclear as to the extent Precinct 5 investigated this incident itself, based on information and belief, no action was taken, and Felix was back on duty and fully armed in days, long before his case was even heard by the grand jury that failed to indict Felix.

*Amended Expert Opinion Report – Barnes v. Harris County*

Despite clear discrepancies between Felix's walkthrough statement, his later written statement, and the dash cam video, the detectives found Ashtian's shooting justified. Defendants' failure to adequately train and supervise its officers on the use of force in a constitutionally permissible way in light of the circumstances and recurring situations facing traffic patrolmen and patrolwomen constitutes deliberate indifference, indifference that was a moving force behind the violations of Ashtian's rights and the resulting loss of his life.

## INCIDENT SUMMARY

On April 28, 2016, at approximately 2:40 pm, Harris County Toll Road Authority Dispatch center made a general radio broadcast to enforcement units that a prohibited vehicle was traveling on the tollway.  The vehicle had a number of outstanding toll violations and had just passed through the tool both.  The radio broadcast included the description of the vehicle and the vehicle license number.   Precinct 5 Deputy Constable Felix located the vehicle traveling southbound on the tollway and confirmed the license plate number with the dispatcher.  The weather was warm and overcast with temperatures in the upper 80's and the visibility was good.

The incident scene was located on the southbound main lanes of the West Sam Houston Parkway.  The Mr. Barnes's vehicle and Deputy Felix's vehicle was parked on the east emergency lane at the 7500 block of the west Sam Houston Parkway southbound side.  The 10000 block of Beechnut Street is the nearest intersection south from the incident location and is accessed via the service road.  West Sam Houston Parkway is a road that travels north and south having four lanes traveling in each direction and is divided by a concreate medium.  The 7500 block of the West Sam Houston Parkway is located inside the city limits of Houston, and in Harris County, Texas.

The West Sam Houston Parkway southbound lanes of traffic are surrounded by the Arthur Story Park and the Brays Bayou on the west side.  The west Sam Houston Parkway northbound lanes of traffic are surrounded by a commercial shopping center and two apartment complexes.  The west Sam Houston Parkway is located in a residential and commercial neighborhood.

Mr. Barnes's vehicle was parked facing south in the emergency lane approximately 100 feet south of Deputy Felix's patrol vehicle.  The front and rear passenger tires were partially sitting on the yellow lane that divides the number one traffic lane and the emergency traffic lane.

Based on the evidence at the scene, Deputy Felix's patrol vehicle and Mr. Barnes Toyota Corolla were both traveling southbound in the 7500 block of the West Sam Houston Parkway South in the number 1 traffic lane, when Deputy Felix confirmed the driver's license with the dispatcher and conducted the traffic stop. Deputy Felix activated his overhead emergency lighting equipment and initiated a traffic stop; he contacted the driver later identified as Ashtian Duane Barnes.

Deputy Felix contacted Mr. Barnes and requested to see his driver's license and proof of insurance.  Mr. Barnes did not have a driver's license and told the deputy that he rented the vehicle and then he said his girlfriend rented the vehicle.

*Amended Expert Opinion Report – Barnes v Harris County*

As Deputy Felix spoke with Mr. Barnes, he smelled what he believed to be the strong odor of marijuana coming from the interior of the vehicle.  The deputy told Mr. Barnes that he smelled the strong odor of marijuana and asked him if there was anything in the vehicle that Deputy Felix should be concerned about; he responded that there wasn't anything in the vehicle.

Deputy Felix became concerned when Mr. Barnes began making furtive movements that caused Deputy Felix to become highly concerned about his personal safety and told him multiple times to stop digging around the interior of the vehicle for fear he may be trying to distract him to hide or destroy contraband or obtain a firearm.   Even after being told to stop moving around the vehicle Mr. Barnes grabbed a handful of papers and started going through them while focusing his eyes on the deputy and not on what he was trying to find.

When Deputy Felix learned that Mr. Barnes did not have a driver's license on his person he was told that it was reportedly in the trunk and said the deputy could look for it.  Deputy Felix told Mr. Barnes to pop the trunk open, which he did, causing Deputy Felix to feel very unsafe that if he walked back to the trunk his safety could be compromised.

Deputy Felix told Mr. Barnes to place the paperwork and the keys on the dashboard and he opened the door and asked him to step out of the car so that he could walk back to the trunk and recover his driver's license. Mr. Barnes put paperwork on the dashboard, he removed the ignition key and put it on the center console. Approximately 5 seconds after the driver's door was opened and Mr. Barnes was asked to step outside, Mr. Barnes grabbed the keys off of the center console, he put the key into the ignition, he stepped on the brake as he started the vehicle, and he put the vehicle in gear and drove forward.

As the vehicle engine was started, Deputy Felix stepped towards the "V" portion of the driver's door at the front roof A pillar and stepped up onto the door sill with his left foot as he removed his firearm from the holster and pointed it at Mr. Barnes; he told him don't move, in an attempt to prevent him from driving forward or backwards.  As the vehicle started in motion and began to move forward, Deputy Felix's right foot stepped up onto the door sill and he grabbed onto the sloping "A" pillar that supports the windshield glass and commanded Mr. Barnes not to move.

As Mr. Barnes' vehicle accelerated southbound on the tollway, Deputy Felix's left torso and his arm were out of the vehicle trying to obtain a grip on the windshield, Deputy Felix felt the pressure of the driver's door on the left side of his body.  Deputy Felix stated his right arm that was holding his firearm was being moved and pressure was being applied to his firearm by Mr. Barnes.

Deputy Felix pulled his gun out of the open driver's door window away from Mr. Barnes' grasp. Fearing that he was going to be thrown from the vehicle, run over by vehicles on the tollway or crushed by the retaining wall, or that his firearm could be taken from him and used against him. Deputy Felix reinserted the muzzle of the firearm pointed at a downward angle towards Mr. Barnes and discharged his firearm twice at him.

*Amended Expert Opinion Report – Barnes v. Harris County*

Almost immediately after Deputy Felix's fired a second shot, Mr. Barnes applied the brakes to his vehicle and stopped its forward movement. Deputy Felix stepped onto the pavement and kept his firearm pointed at Mr. Barnes as he notified the dispatcher several times that shots had been fired. He ordered Mr. Barnes to put the car in park and contacted the dispatcher and requested immediate medical assistance to respond to his location.

The first deputy to respond to Deputy Felix's location arrived at the scene, he removed his firearm and pointed it at Mr. Barnes and waited for additional deputies to respond to the scene. While waiting for additional assistance, Deputy Felix told his fellow deputy that he told Mr. Barnes to put the vehicle in park. When additional deputies arrived at the scene, Deputy Felix told them that Mr. Barnes put the vehicle in park, and said Barnes dragged him and he was reaching for his firearm. He also told his fellow deputies that he shot Mr. Barnes and told them that he was not shot and was okay.

When Deputy Felix was directed away from Mr. Barnes' vehicle he told his fellow deputies that he was alright, but that his right leg was injured. Mr. Barnes was removed from his vehicle and was given emergency CPR until the arrival of fire department personnel approximately 10 minutes after being shot by Deputy Felix. At 2:57 pm, Houston Fire Department personnel pronounced Mr. Barnes died at the scene.

The Houston Police Department assigned homicide division detectives to conduct a thorough and non-bias criminal investigation into this incident. The detectives arrived at the incident scene on April 28, 2019, at 4:40 pm and found both vehicles parked on the southbound emergency lane of the Sam Houston Parkway facing south, approximately 100 feet from one another.

Deputy Felix's patrol vehicle was parked approximately 25 meters (82.02997 feet) north of the silver Toyota Corolla with the vehicle's overhead emergency lights activated. The Toyota Corolla was parked approximately 25 meters (82.02997 feet) north of a metal light pole and approximately 113 meters south of Deputy Felix's patrol car.

The keys to the Toyota were in the ignition, but the engine was not running. The vehicle was towed from the scene to the Houston Police Department vehicle examination garage pending a search of the vehicle for evidence.

Deputy Constable Felix was wearing a standard Harris County Precinct 5 approved uniform. Deputy Felix did not have any visible injuries, but he told the investigators that he had sustained minor injuries to his lower legs; he appeared to be somewhat shaken by the incident.

The investigation determined that the Mr. Barnes was identified by his Texas Identification number as Ashtian Duane Barnes. At the time of the investigation it was not determined that Mr. Barnes had a Texas driver's license and could have resulted in him being in violation of Texas Code of Transportation Section 521.021, a class c misdemeanor.

*Amended Expert Opinion Report – Barnes v Harris County*

Mr. Barnes body was laying supine on the concrete shoulder of the road immediately outside the driver's side of the Toyota Corolla.  He was wearing a black and white dress shirt that had been cut by EMS personnel in order to treat his wounds, blue jean pants and a white and pale green fabric belt with a large silver buckle.  Mr. Barnes had visible injuries that were consistent with bullet strikes, one on the upper left side of his back and one was on the middle of his sternum.

A check of Mr. Barnes' criminal history revealed prior arrests in 2008 for criminal trespass, for theft in 2008, criminal mischief in 2010, Forgery with a felony conviction, UUMV, and POM in 2013, and unlawful possession of a dangerous drugs in 2015.  A check of Mr. Barnes' mental health records did not show any history of mental illness, nor has the plaintiff produced any corroborating evidence that would show that Mr. Barnes was suffering from mental illness or was suffering from a mental crisis episode on the day of the incident.

Investigators learned that the Toyota Corolla Mr. Barnes was driving was not rented by him, or his girlfriend Lasharia Luchin, as he claimed, it was rented by his grandmother, later identified as Rita Felder.

When the vehicle was searched, investigators recovered $434 in U.S. Currency, the majority of which was recovered from the cup holder, three cell phones and a Luxor Pro folding straight razor with a 55 mm blade that was located on the right front seat. A search of the Toyota's interior revealed an expended .40 caliber shell casing that was recovered on the concrete roadway from underneath Mr. Barnes' body.  A second expended .40 caliber shell casing was recovered from the rear passenger seat.

A Taurus 9mm pistol, was found under the driver's seat of the Toyota Corolla with an empty chamber; it was loaded with a magazine with 12 9mm cartridges.  The pistol was reported stolen from the legal owner's vehicle in Columbia Lakes, Brazoria County Texas between June 7, 2015, to June 9, 2015.

On August 16, 2016, the Director of Physical Evidence at the Harris County Institute of Forensic Sciences, William M. Davis, Ph.D., D-ABC, submitted a report regarding the gun shot residue analysis of a sample from Ashtian Barnes' left hand.  The results of the analysis were confirmed as having a composition characteristic of GSR (Pb-Ba-Sb) which likely resulted from activities such as firing a weapon, being in close proximity to a firearm during discharge, or handling a firearm, a fired cartridge, or some other surface bearing GSR.

A DNA analysis from swabs taken from the magazine revealed there was insufficient data that did not permit comparison of the DNA mixture.  No DNA could be obtained from the 12 unfired 9mm cartridges. A mixture of DNA from three individuals, that was obtained from the top of the weapon's slide excluded the Mr. Barnes as a possible contributor to the major component of the DNA mixture.  A mixture of DNA from parts of the pistol when analyzed could not exclude the Mr. Barnes as a possible contributor to the major contributor.  The minor component of the DNA mixture is insufficient for comparison.  Based on Mr. Barnes' prior criminal history, it was unlawful for him to  possess a firearm in violation of Texas Penal Code Section 46.04, a felony crime.

*Amended Expert Opinion Report – Barnes v. Harris County*

On April 29, 2016, Harris County Institute of Forensic Sciences Assistant Medical Examiner Jennifer L. Ross, M.D. performed an autopsy on the Mr. Barnes.  It was determined that the Mr. Barnes suffered two gunshot wounds to his body. One entrance wound was located on the central chest, centered 18 inches below the top of the head. Gun Shot Residue analysis collected from Mr. Barnes showed characteristics of GSR on his left hand, being in close proximity to a firearm during discharge.

The direction is front to back, left to right and downward.  The bullet remained in the body in the lateral right lower back.  The second gunshot entrance wound on the lateral left back, centered 18 inches below the top of the head. The direction is left to right, back to front and slightly downward. The bullet was recovered from the eleventh thoracic vertebra.

At the conclusion of the criminal investigation by the Houston Police Department into the facts and circumstances surrounding Deputy Felix's shooting incident, Harris County Constable's Office Precinct 5 conducted an administrative investigation to determine if Deputy Felix violated Precinct 5 procedures.  Based on a review of the facts and circumstances of the shooting by the command staff, it was determined that Deputy Felix did not violate Precinct 5's Use of Force and Deadly Force Procedure, Section 11, B (1-8), nor did any of the Deputy Felix's prior disciplinary history for minor infractions have any impact on the deputy's actions when he shot Mr. Barnes on April 26, 2016.

On August 31, 2016, this peace officer  involved shooting incident was presented to the 183rd Judicial District Court Grand Jury.  The case was decided on August 31, 2016, and the Grand Jury returned a "No Bill" against Deputy Felix.

**OPINIONS:**

**DEPUTY FELIX IS EMPLOYED BY HARRIS COUNTY CONSTABLE'S OFFICE PRECINCT 5 AS A LICENSED AND EXPERIENCED PEACE OFFICER.  HE WAS ACTING IN HIS OFFICAL CAPACITY AS A PEACE OFFICER WHEN HE STOPPED AND DETAINED MR. BARNES FOR A TOLLWAY VIOLATION.**

**DEPUTY FELIX HAD PROBABLE CAUSE TO STOP AND DETAIN MR. BARNES TO DETERMINE IF THE VEHICLE HE WAS DRIVING WAS PROHIBITED FROM BEING ON THE TOLLWAY, A CLASS C VIOLATION.**

**DEPUTY FELIX WORE A DEPARTMENT AUTHORIZED UNIFORM THAT CLEARLY IDENTIFIED HIM AS A PEACE OFFICER WITH THE HARRIS COUNTY CONSTABLE'S OFFICE PRECINCT 5.**

*Amended Expert Opinion Report – Barnes v Harris County*

**DEPUTY FELIX CARRIED A DEPARTMENT AUTHORIZED FIREARM AND AN ELECTRONIC CONTROL DEVICE AND ADDITIONAL RELATED EQUIPMENT ON HIS DUTY BELT. ANY REASONABLE PERSON WHO SAW DEPUTY FELIX IN UNIFORM AND DRIVING A DISTINCTIVELY MARKED PATROL CAR EQUIPPED WITH EMERGENCY LIGHTING EQUIPMENT WOULD IMMEDATELY RECOGNIZE HIM AS A PEACE OFFICER.**

On April, 28, 2016, at approximately 2:40 pm, Deputy Felix was employed as a 13 year licensed and experienced peace officer with the Harris County Constable's Office Precinct 5.  He was working traffic enforcement on the tollway when he overheard a radio broadcast from the toll authority to locate a vehicle traveling southbound from the South Sam Plaza that was prohibited to be traveling on the Harris County Toll Road.

Deputy Felix advised the dispatcher to send him the information, and he began looking for the vehicle.  Deputy Felix was provided the license plate number for the vehicle a second time and he checked the color of the vehicle as being silver.

Deputy Felix stated he continued driving southbound on the tollway looking for the vehicle and was able to spot it driving in the number 1 traffic lane.  He confirmed the license plate with the dispatcher and provided the location where he was stopping the vehicle on his vehicle computer.

It should be noted that conducting vehicle pullovers can be one of the most dangerous duties a peace officer performs. Violence related to vehicle pullovers is among the leading causes of peace officer injuries and deaths. Peace officers handle all vehicle pullovers with caution and they always keep in mind that no vehicle pullover is "routine."

Deputy Felix told investigators that he approached the vehicle and identified himself, and informed the driver, later identified as Mr. Barnes, why he was being stopped. He then requested Mr. Barnes driver's license and proof of insurance, but was interrupted by Mr. Barnes who told him it was a rental car. Deputy Felix asked Mr. Barnes when he got the car he told him he got the car about a week ago, and then said the car was actually rented under his girlfriend's name. He said he was on his way to get the vehicle washed and to return it to the rental agency. Deputy Felix asked Mr. Barnes what was his girlfriend's name and he told him her name was Lasharia Luchin.  Deputy Felix then asked Mr. Barnes a second time to see his driver's license, but he replied that he didn't have it with him.

**OPINIONS:**

**DEPUTY FELIX HAD PROBABLE CAUSE TO DETAIN MR. BARNES TO DETERMINE HIS IDENTIFY TO LEARN IF HE POSSESSED A TEXAS DRIVER'S LICENSE, AND DETERMINE IF HE WAS LAWFULLY IN POSSESSION OF THE VEHICLE HE WAS DRIVING.**

*Amended Expert Opinion Report – Barnes v. Harris County*

**DEPUTY FELIX HAD REASONABLE SUSPICION TO BELIEVE THAT THE MR. BARNES MAY BE IN POSSESSION OF ILLEGAL DRUGS BASED ON A STRONG ODOR OF MARIJUANA COMING FROM THE INTERIOR OF THE VEHICLE.**

**THERE IS NO CORROBORATING EVIDENCE TO REFUTE THE DEPUTY'S TESTIMONY THAT HE SMELLED THE STRONG ODOR OF MARIJUANA IN MR. BARNES'S VEHICLE AT THE TIME HE SPOKE WITH MR. BARNES THROUGH THE OPEN DRIVER'S DOOR WINDOW.**

**THE ABSENCE OF MARIJUANA FOUND IN THE VEHICLE AT THE SCENE OR IN MR. BARNES' BODY AT THE TIME OF THE AUTOPSY DOES NOT REFUTE OR DISCREDIT DEPUTY FELIX'S TESTIMONY REGARDING WHAT HE SMELLED.**

**IT WAS REASONABLE FOR DEPUTY FELIX TO REQUEST MR. BARNES TO EXIT THE VEHICLE AND TO CONDUCT A PAT SEARCH OF HIS PERSON FOR ANY DANGEROUS WEAPONS TO ENSURE THE DEPUTY'S SAFETY AND TO DETERMINE IF HE LEGALLY POSSESSED THE TOYOTA COROLLA.**

Deputy Felix told investigators that he could smell a strong odor of marijuana coming from the vehicle shortly after contacting the driver, which is a class B misdemeanor crime for possession of 2 ounces or more.  He said he contacted the dispatcher on his portable microphone requesting a cover unit to respond to his location, as he knew he intended to get the driver out of the vehicle for further investigation.

Deputy Felix asked Mr. Barnes if he had anything in the vehicle that he was concerned about and Mr. Barnes said there wasn't anything.  He stated that Mr. Barnes grabbed a handful of papers from the right front floorboard and started to go through them, but he was actually looking at Deputy Felix.  Mr. Barnes then reached over towards a red plastic cup that appeared to have trash in located on the passengers right front floorboard, prompting Deputy Felix to tell Mr. Barnes not to reach over in that area, but he continued to pretend to fumble through the paperwork.  Deputy Felix reasonably believed Mr. Barnes was trying to distract him for some unknown reason.

Based on Mr. Barnes behavior clues, Deputy Felix became concerned for his personal safety and moved his right hand onto the grip of his firearm in the event to reduce his reaction time to respond to any possible threat from Mr. Barnes, because Mr. Barnes right hand was reaching towards the left front passenger's floorboard while his left hand was moving towards the driver's side floorboard.  Deputy Felix warned Mr. Barnes 3 more times in rapid succession to stop digging around the vehicle and then asked Mr. Barnes if he had any identification on him.

Deputy Felix asked the Mr. Barnes if he had anything in the vehicle that he should know about, because he smelled the odor of marijuana coming from the vehicle.  Possession of marijuana is a violation of Texas Health & Safety Code 481.121. Mr. Barnes stated he did not have anything that the deputy should be aware of, and said his driver's license was in the trunk. Mr. Barnes told Deputy Felix he could get it and search for it if he wanted to.

*Amended Expert Opinion Report – Barnes v Harris County*

It should be noted that a traffic stop "Must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (en banc). "If the officer develops reasonable suspicion of additional criminal activity during his investigation of the circumstances that originally caused the stop, such as smelling the strong odor of marijuana coming from the vehicle, he may further detain [the] occupants [of the vehicle] for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010).

The Fourth Amendment to the United States Constitution permits a warrantless detention of a person, short of a full-blown custodial arrest, if the detention is justified by reasonable suspicion. "[A] law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further." Reasonable suspicion to detain a person exists if an officer has specific, articulable facts that, combined with rational inferences from those facts, would lead him to reasonably conclude that the person detained is, has been, or soon will be engaged in criminal activity.

Reasonable suspicion exists when an officer has specific articulable facts that, when combined with rational inferences from those facts, would lead him reasonably to conclude that a particular person is, has been, or soon will be engaged in criminal activity. These facts must show unusual activity, some evidence that connects the detainee to the unusual activity, and some indication that the unusual activity is related to crime. "Although an officer's reliance on a mere 'hunch' is insufficient to justify an investigatory stop, the likelihood of criminal activity need not rise to the level required for probable cause."

The test for reasonable suspicion is an objective one that focuses solely on whether an objective basis exists for the detention and disregards the officer's subjective intent. A reasonable-suspicion determination requires looking at the totality of the circumstances and reasonable suspicion may exist even if those circumstances standing alone may be just as consistent with innocent activity as with criminal activity.

Circumstances that may indicate that a police-citizen interaction is a seizure, rather than a consensual encounter, include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or use of language or tone of voice indicating that compliance with the officer's requests might be compelled.

Deputy Felix agreed to look in the trunk as a ruse, and said he told the driver to open the trunk to give the Mr. Barnes the idea that he was going to walk back to the trunk and look for it. Approximately 10 seconds later, Deputy Felix opened the driver's door and asked Mr. Barnes to step out of the car.

**Peace Officers Can Require Passengers to Exit Vehicles**

The United States Supreme Court ruled that police officers do have the right to ask occupants of a vehicle to exit the vehicle to preserve their personal safety. (*Pennsylvania v. Mimms*, 434 U.S. 106, 98 S. Ct. 330, 54 L.Ed.2d 331 (1977)).

*Amended Expert Opinion Report – Barnes v. Harris County*

The Court held it is always reasonable during a valid vehicle stop for an officer to order the driver of a vehicle to get out of said vehicle for a face-to-face confrontation without reasonable suspicion that the driver is a threat to the officer.  This is so, because the Supreme Court is, in a way, officer-survival oriented: "...it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties."

The Court held that the action of the officers in ordering Mr. Mimms from the vehicle, even though he then did not appear to be a threat to them, was reasonable and thus constitutional. In every case such as this a balance must be made between the individual's right to be free from arbitrary interference by the police, and the public interest of the police in preventing and solving crimes.

When faced with stopping vehicles and detaining the occupants, peace officers are trained to keep in mind the following:

1.  When making contact with the driver the officer may always order the driver from the vehicle without any suspicion on the officer's part that such person is a threat to their safety.

2.  Once out of the vehicle officers may order the driver to stand or sit (within reason) where they believe it is the safest for the officer and individual during questioning of the driver.

3.  At any time an officer develops articulable and reasonable suspicion that the driver is possibly armed and dangerous, peace officers may frisk or pat down the driver for a weapon.

4.  A passenger may be ordered from the automobile always and every time without any suspicion on the officer's part that such a person is a threat to the officer's safety.

5.  Once out of the vehicle the officer may order the passenger to stand or sit (within reason) where it is believed that it is safest for both the individual and the officer.

6.  At any time an officer develops articulable and reasonable suspicion that the passenger is armed and dangerous, officers may frisk or pat down the passenger for a weapon.

**OPINIONS:**

**MR. BARNES KNEW OR SHOULD HAVE REASONABLY KNOWN THAT HE WAS BEING CONTACTED BY A PEACE OFFICER AND HAD A DUTY TO REFRAIN FROM IGNORING DEPUTY FELIX'S COMMANDS TO STOP MOVING ABOUT, TO EXIT THE VEHICLE AND TO STOP TRYING TO FLEE THE SCENE. A REFUSAL TO COMPLY WITH A PEACE OFFICER'S LAWFUL COMMANDS ADDS URGENCY AND A SENSE OF PERIL TO ANY ENCOUNTER.**

18

*Amended Expert Opinion Report – Barnes v Harris County*

**DEPUTY FELIX REASONABLY BELIEVED HIS LIFE WAS IN IMMINENT DANGER OF DEATH OR GREAT BODILY INJURY WHEN MR. BARNES REFUSED TO FOLLOW THE DEPUTY'S COMMANDS TO STOP THE VEHICLE FROM MOVING WHILE THE DEPUTY'S LEFT FOOT WAS STANDING PARTIALLY ON THE DOOR SILL OF THE VEHICLE.**

**THE AMOUNT AND THE TYPE OF FORCE USED BY DEPUTY FELIX TO PREVENT BEING SEVERELY INJURED OR KILLED, WAS CONSISTENT WITH HIS TRAINING AND EXPERIENCE TO OVERCOME MR. BARNES DEADLY ASSAULT.**

**THERE IS NO EVIDENCE THAT THE BULLETS FIRED FROM DEPUTY FELIX'S FIREARM POSED A CREDIBLE RISK OF HITTING OTHER MOTORISTS ON THE TOLLWAY.**

**THERE IS NO EVIDENCE THAT DEPUTY FELIX VIOLATED THE HARRIS COUNTY CONSTABLE'S OFFICE PRECINCT 5 ADMINISTRATIVE PROCEDURES.**

**THE USE OF DEADLY FORCE BY DEPUTY FELIX IS CONSISTENT WITH THE HARRIS COUNTY CONSTABLE'S OFFICE PRECINCT 5 USE OF DEADLY FORCE STANDING OPERATING PROCEDURES, THE HARRIS COUNTY SHERIFF'S OFFICE USE OF FORCE AND DEADLY FORCE PROCEDURES, AND CURRENT LAW ENFORCEMENT PROCEDURES AND PRACTICES.**

**AN OFFICER'S USE OF DEADLY FORCE IS NOT UNREASONABLE WHEN THE OFFICER HAS REASON TO BELIEVE THAT A "SUSPECT POSES A THREAT OF SERIOUS HARM TO THE OFFICER OR OTHERS."**

**ANY REASONABLE OFFICER, FACED WITH THE SAME OR SIMILAR FACTS AND CIRCUMSTANCES KNOWN TO DEPUTY FELIX AT THE TIME OF THIS INCIDENT, WOULD USE DEADLY FORCE TO PROTECT THEMSELVES FROM A CREDIBLE AND IMMEDIATE THREAT OF DEATH OR GREAT BODILY INJURY.**

**THERE IS NO EVIDENCE TO SUPPORT THE CONTENTION THAT DEPUTY FELIX'S BODY POSTURE, OR HIS POSITIONING AT THE DRIVER'S DOOR OF MR. BARNES' VEHICLE DURING HIS INVESTIGATION, RESULTED IN CAUSING MR. BARNES TO FLEE THE SCENE AND COMMIT AN AGGRAVATED ASSAULT ON THE DEPUTY.**

Deputy Felix said prior to opening the driver's door to allow Mr. Barnes to leave the vehicle, he told Mr. Barnes to put the paperwork on the dashboard and to step back with him to the rear of his vehicle. He then grabbed the door handle and opened the door and focused on Mr. Barnes hand and body movements as he was preparing to step out of the vehicle. Deputy Felix said he watched Mr. Barnes' hands carefully to ensure he didn't reach for a firearm or other dangerous weapon as he left the vehicle. He said Mr. Barnes was leaning forward towards the console when he opened the car door.

19

*Amended Expert Opinion Report – Barnes v. Harris County*

Deputy Felix  said when he opened the driver's door and asked Mr. Barnes to step out of the vehicle, Mr. Barnes leaned forward and bladed his body, blocking Deputy Felix's partial view of the right side of his body.  He said in a fraction of a second Mr. Barnes grabbed the ignition key from the console and started the vehicle; Mr. Barnes left hand was positioned by the driver's seat at his lap, and he put the gear shift in gear.

When Mr. Barnes grabbed the ignition key and inserted the key into the ignition switch, he had to step on the brake pedal to start the vehicle, causing the brake lights to illuminate in the rear window and at the right and left taillights. Deputy Felix stepped forward towards the sill of the driver's door and drew his weapon and pointed it at the Mr. Barnes as he placed his left foot on the door sill in less than a second.

Deputy Felix tried to get close to Mr. Barnes to convince him through his command presence and the presence of his firearm pointed at Mr. Barnes upper body, to stop him from trying to flee the scene.  Mr. Barnes put the vehicle in gear and began driving forward with Deputy Felix's left foot standing on the door sill in less than 1 second after Deputy Felix stepped forward towards the door sill.

Deputy Felix told investigators he held his firearm in his right hand partially into the vehicle and doesn't remember if he tried to reach into the car with his left hand to prevent Barnes from putting the vehicle in gear or not. He testified during his deposition that the main reason why he displayed his weapon and stepped forward into the door sill of the vehicle, and noted his body was partially in the vehicle as it accelerated away, was to keep the driver from driving away, a felony crime of evading a peace officer.

As the Mr. Barnes' vehicle accelerated forward, Deputy Felix felt the driver's door closing on the left side of his body, and he started to feel that he was being pinned by the pressure of the door and was going to be drug down the tollway; he said he quickly stepped onto the door sill with his right foot and held on so he wouldn't get run over.  He said his left arm and upper torso was out of the vehicle trying to keep a grip on the windshield for fear of being thrown off of the vehicle while the driver's door applied pressure on his body.

Deputy Felix said he believes he yelled at Mr. Barnes to stop as he drew his firearm from the holster, but during his deposition testimony he believes he yelled, "Don't do it, don't do it."  He testified that when he was standing on the door sill of the vehicle as it was moving, he said, "Fucking stop, fucking stop."  He said when Mr. Barnes didn't respond, he became fearful of either getting thrown from the vehicle or crushed by the retaining wall, or injured by Mr. Barnes gaining access to a weapon as Mr. Barnes was driving southbound on the tollway he was unable to see anything that Barnes was doing inside the vehicle, but he felt pressure on his right hand that was holding onto his service weapon that was being moved.

As the vehicle sped up Deputy Felix was fearful his weapon would be taken away, or he could be crushed, he quickly fired a second round at the driver and heard him scream. He said he believed if he fired his weapon at Mr. Barnes the bullet would strike him in the head, so he made a conscious decision to point the muzzle downward and shoot one round.

*Amended Expert Opinion Report – Barnes v Harris County*

Deputy Felix didn't know if the bullet struck him, and because the vehicle didn't slow down, he fired a second shot at Mr. Barnes approximately 1 second later. Mr. Barnes stopped the vehicle and was told to put the vehicle in park and he did.

Deputy Felix said he contacted the dispatcher and advised shots were fired and requested the Houston Fire Department respond immediately to the scene.  He said within a minute after notifying the dispatcher that shots were fired, he contacted the dispatcher to confirm the fire department was enroute to his location to provide medical care for Mr. Barnes; the dispatcher confirmed they were responding.

Deputy Felix said as he held the driver at gunpoint, Mr. Barnes said something to him, but he doesn't know what he said.  Deputy Felix said he held Mr. Barnes at gunpoint until a third deputy arrived at the scene and then returned his firearm to the holster.  He said he did not check Mr. Barnes wounds, because Mr. Barnes and the scene were not secure, and due to the fact that Mr. Barnes' eyes were open.  He said after the third officer arrived at the scene, he stood to the side, because of experiencing pain in his leg.  When additional patrol units arrived at the incident scene, he said he went back to his patrol vehicle and sat in the driver's seat.

Deputy Felix made a statement to investigators that he believed the vehicle slowed down almost to a stop when he jumped off of the vehicle door sill with his right foot and held the driver at gunpoint.  When Deputy Felix was asked during his deposition testimony if his statement regarding the vehicle was almost stopped when he stepped off the door sill, he said that his statement was a misstatement.  Deputy Felix said the Mr. Barnes was sitting upright in the driver's seat and said something to him, but he couldn't understand what he was saying.  Upon reviewing the video footage from Deputy Felix's patrol car video, it appears that Deputy Felix began to step off of the door sill of Mr. Barnes' vehicle with his right foot in approximately less than  a second after the vehicle came to a complete stop.

**De-Escalation Tactics**

De-escalation tactics is an essential tool for peace officers and is often portrayed by many critics as the only answer to reduce the use of force in nearly every encounter as a simple solution to a very complicated problem.  However, the situations that peace officers face daily is not simple and straight forward, and are often particularly challenging when involving individuals with mental health issues, those who are emotionally disturbed, and criminals who involve themselves in high risk behaviors and recklessly and willfully react when faced with possible arrest that frequently ends in tragedy to themselves or others.

The plaintiff's use of force expert suggests that if Deputy Felix had utilized de-escalation techniques, such as using a Taser before resorting to deadly force, it would have created a different outcome for Mr. Barnes.

*Amended Expert Opinion Report – Barnes v. Harris County*

If an electronic control device were used on Mr. Barnes as the vehicle was in motion, as the plaintiff's expert opines, the possibility of a high speed collision with other motorists on the roadway is highly probable. If one can considers the fact that Deputy Felix was anticipating Mr. Barnes was possibly going to arm himself as he exited the vehicle, instead of foolishly starting the vehicle and fleeing the scene.  There was absolutely no time for Deputy Felix to draw his Taser from the opposite side of his body, activate the safety and give Mr. Barnes a warning that if he didn't stop trying to flee he would be tased, because the vehicle was already in motion.

In order to better understand de-escalation philosophies, it is necessary to clarify the differences between rational and irrational individuals in crisis, and what use of force options peace officers have available that are reasonable under the facts and circumstances of each incident.

Dr. Bill Lewinski of the Force Science Institute in Mankato, Minnesota, distinguishes between conflict communications and crisis communications.  Conflict communications in general are used on criminal suspects, while crisis-communication tactics are associated with de-escalation strategies, and are used on noncriminal individuals including persons in crisis.  The most possible opportunity that limits risk to innocent people or officers is necessary for de-escalation strategies to be successful.

De-escalation is particularly applicable to individuals in crisis situations with limited risk.  It should be noted that an individual who is in severe emotional crisis or a state of "Excited Delirium" may not be able to comprehend or even hear attempts to hear or understand when attempts are made at de-escalation, which is based on a capacity for communications.  Therefore, the situation could exceed the limited risk necessary for effective de-escalation.

When addressing a peace officer's obligation, generally speaking the police are not expected to use de-escalation tactics in certain circumstances.  The following court case helps illustrate the tactics that peace officers employed under the facts and circumstances that they were confronted with.

<u>*Roell v. Hamilton County Ohio*</u>, United States Court of Appeals, Sixth Circuit: No. 16-4045

After a half-naked man in the throes of <u>excited delirium</u> died following a struggle with sheriff's deputies, his widow alleged in a federal civil rights legal action that:

- The officers should not have used any force against him until they first attempted de-escalation techniques;

- Their "excessive" force-first actions violated legal protections for the disabled and unnecessarily spiked the confrontation to spin bad; and

- Their agency was liable for inadequate training on mental health challenges and further at fault for a shoddy investigation.

The plaintiff alleged by moving to control him physically and mechanically, the officers "foreseeably caused" his resistance and "escalated the encounter by failing to use verbal and tactical de-escalation." The force applied was excessive, she charged, and resulted from a "lack of adequate policies and training."

*Amended Expert Opinion Report – Barnes v Harris County*

Moreover, the plaintiff added, the investigation of the encounter was "inadequate." It "merely rubber-stamped the deputies' unconstitutional conduct and failed to review whether the deputies' actions violated policies and procedures."

## Judicial Response

The appellate majority agreed that officers are "required to take into account [a subject's] diminished capacity before using force to restrain him." *But*, the decision emphasizes, no judicial precedent required the deputies "to use only verbal de-escalation techniques" and "no case law supports [the] assertion that [they] were prohibited from using *any* physical force...before first attempting alternative de-escalation techniques." Despite the subject's evident mental condition, they were permitted to use "a reasonable amount of force to bring him under control."

The man "had committed a series of property crimes that a reasonable officer could infer might escalate," the majority explains. "The fact that [he] had not yet committed a more serious felony did not preclude the deputies from using force to restrain him."

Although the subject yelled repeatedly that he was unarmed, "he was holding objects that could have been used as weapons amid a scene of property destruction," giving the deputies "a reasonable basis to believe that [he] presented an immediate threat," the majority states. The decision take's note of one deputy's testimony that "the hose and metal nozzle could have been used as a weapon to hit or to choke him."

Further, the decision characterizes as "dubious" the plaintiff's claim that the deputies themselves caused the confrontation to escalate. But even if true, the majority says, LEOs "cannot be held liable solely, because they created the circumstances requiring the application of force."

As to the allegation of inadequate training, the majority observes that the "record shows that the deputies received training on topics that included the use of force and Tasers, crisis intervention techniques, interacting with the special-needs population and mentally ill suspects, and recognizing the symptoms of excited delirium." No problems there.

Likewise, the majority endorses the investigation into the subject's death. Even the plaintiff's own expert, the decision notes, "testified that he could not think of any additional interviews that should have been conducted during the investigation, could not point to any physical evidence that was not preserved or test results that were not considered, and could not identify any specific inadequacies in the collection of testimonial or tangible evidence."

All said, the majority concludes, after more than 20 pages of written analysis and explanation, that its decision was inevitable: the District Court judge, Sandra Beckwith, had been right. Given the totality of circumstances, her granting of summary judgment for the deputies and their employer should stand.

## Law Enforcement Situational Awareness

Law Enforcement officers are trained to the highest level of proficiency and comprehension of the law and the knowledge and skillful application of arrest methods is less likely to panic and misuse force than a peace officer who is not effectively trained.

*Amended Expert Opinion Report – Barnes v. Harris County*

A thoughtful, well-trained peace officer is able to make good leadership decisions, intervene effectively, prevent potential conflict, and convey confidence during arrest situations.

Distractions by criminals can separate the mind from the body and reduce an officer's response. When peace officers become distracted, they become vulnerable as do subjects. Distractions may be a valuable part of the arrest/detention process. Peace officers across the United States are well aware of mental alertness, and they understand the concept of action and reaction, and the fact that if they are not attentive, criminals could gain the advantage over them that could result in the officer being injured or killed.

The late Jeffrey Cooper's "Color Code" has been taught by police instructors for many years. Jeff Cooper was a major who served in the United States Marine Corps.  During World War II he served in the Pacific on the USS Pennsylvania.  In 1949 major Cooper was involved in the irregular warfare, and was promoted to Lieutenant Colonel.

In 1976 Colonel Cooper founded the American Pistol Institute, later known at the Gunsite Academy where he began teaching shotgun and rifle classes to both law enforcement and military personnel, as well as civilians, and he provided on-site training for individuals and groups from around the world. Colonel Cooper's modern shooting techniques  defines pragmatic use of the pistol for personal protection. The modern technique emphasizes two-handed shooting using a specific stance competing with and eventually supplanting the one handed shooting technique whenever possible.

In addition to teaching handgun shooting techniques, Colonel Cooper broke down the mental aspects of situational awareness into 4 levels of escalating degrees of preparation for the use of deadly force. This system is a mental process, not a physical one, and is utilized whether or not an individual was armed, though being armed is always preferred. Being alert may help an individual to avoid a deadly threat in the first place, which is always the preferred outcome.

**CONDITION WHITE**

In condition white, an individual is relaxed and unaware of what is going on around them. Ideally, a police officer is only in white when asleep, but realistically they often drop our guard when at home or in some other non-threatening environment that is assumed to be safe.

A police officer who is in uniform and on duty or off, simply cannot be in condition white and if they are attacked that may suffer great bodily injury or my die.

**CONDITION YELLOW**

In condition yellow, individuals remain relaxed, but are aware of who and what is around them. This means the person is paying attention to the sights and sounds that surround them whether they are in their home or in and about their communities.

Condition yellow DOES NOT equate with paranoia or any other irrational fear of persons or places. Instead, a person simply has moved their alertness to a level of attention that will prevent them from being totally surprised by the actions of another person.

*Amended Expert Opinion Report – Barnes v Harris County*

If an individual is attacked in condition yellow, it should not come as a total surprise. A response to a threat should have been preplanned to some extent, allowing a person to simply run an existing plan rather than having to make one up quickly while under fire. A competent police officer MUST be in condition yellow whenever they are on duty.

## CONDITION ORANGE

In condition orange, a peace officer identifies something of interest that may or may not prove to be a threat. Until the officer determines the true nature of whatever has their focus, their "radar" is narrowed to concentrate on the possible threat, and they will remain so focused until they are confident the threat no longer exists.

If an officer is attacked in condition orange, they should be expecting the attack. The officer will hopefully be facing their attacker since they have already shifted their focus towards the threat direction.

If officers are well trained, they will respond in what is referred to as a closed loop where their subconscious mind identifies similar events or training they experienced, or any pre-visualization of situations that have been categorized as possible solutions should an attack take place.

## CONDITION RED

If the focus of an officer's attention in condition orange does something that is threatening, their mind will change to condition red, commonly referred to as a red flag warning that points out a serious problem, will cause the officer to progress into a body alarm response (fight or flight) to address the threat and stay ahead of the reactionary curve.

It should be noted that condition red is not strictly a deadly force response, it simply changes the focus of  attention from a potential threat to the individual who is the threat. An officer may draw their weapon, or may progress to consider the use of force if the threat increases, and it is reasonable to use force based on the totality of the facts and circumstances.

Once an officer shifts to condition red, they can still be surprised by what their advisory' conduct puts the officer in a life threatening position, but their intense concentration on the threat will lessen their ability to maintain some degree of 360-degree awareness for unknown threats that may come from other directions.

Effective scenario based in-service training under high-stress conditions help officers avoid the tunnel vision that some describe as like looking through a telescope.  The officer's vision will narrow to 2-3 degrees for 100 ms or longer as their attention to the threat becomes selective and intense. (Carl & Gellman, 1987; Carpenter, 1988; Fisher, 1987; Optican, 1985) Perception, Cognition and Decision Making; Joan N. Vickers.

If and officer finds themselves in a situation where their life is in immediate jeopardy of being seriously injured or killed in condition red, as Deputy Felix did, they are trained to be fully prepared to defend themselves.   Whether or not the officer has their firearm in hand or pointed at or in the direction of an individual will depend on the circumstances, but mentally, they are already ahead of the reactionary curve.

*Amended Expert Opinion Report – Barnes v. Harris County*

**Pre-Attack Indicators**

A total of **1,512** law enforcement officers died in the line of duty during the past 10 years, an average of one death every **63** hours or **151** per year. There were **86** law enforcement officers killed in the line of duty in 2015, but increased to **118** in 2016, and included **20** Texas Peace Officers.  There were **13** officers who did in vehicular assaults, **4** officers during vehicle pursuits, **10** officers after being struck by motor vehicles, and **64** officers were killed by gunfire.

Assaults on law enforcement officers in 2016 were more than **57,180** assaults, resulting in **30% of the officers** injured according to FBI crime statistics. Other types of dangerous weapons were used in **15.1 %** of assaults.  Many of the assaults could have resulted in grave injuries and even death if officers weren't alert for easily observed warning signs that often precede an attack as Deputy Felix identified in this incident.

Any veteran police officer, based on their experience and training, will recognize these assaultive behavior cues, that in many cases are signaled in advance.  If a well-trained officer is vigilant and understands the implications of what they are seeing and hearing, they may disrupt an offender's aggressive plans before he or she can complete an assault.

There are multiple behavior cues of a pending attack that police officers are trained to watch for:

1. **Overt Threats**
   When an individual makes a threatening statement that may contain words that would indicate they are willing to fight the officers such as "I am not going back to jail" or "Let's get in on" or "You are going to have to call for more officers." It is important for officers to consider what an individual is telling them even through the expletives.

2. **Non-compliance**
   This can take many forms: failing to obey repeated direct commands to stop, raise your hands or get down on the ground; repeating back simple questions that an officer may ask such as ("What's your name?" "You want me to get down on the ground?"); being argumentative can indicate stalling for time to formulate a plan to assault or escape.
   People may get upset when an officer asks them to do anything in their own home or on their property especially when they are a party to a domestic violence incident or when police action involves a significant other or property they cherish.

3. **Furtive Movements and Distractive Behavior**
   Individuals may try to remove illegal contraband and dangerous weapons and try to secrete them on their person or in a vehicle, or they may block an officer's view by body positioning or try to create a distraction or a ruse to lull an officer into a false sense of security.

4. **Removing Clothing**
   Individuals who are peeling off clothing or are naked may be reacting to a highly-elevated body temperature that is indicative of a chaotic emotional event that is consistent with a psychological meltdown also associated with enhanced strength, paranoia and assaults on authority figures. Other individuals may take off clothing, jewelry, glasses or set aside objects they especially value as a precursor to wanting to fight.

*Amended Expert Opinion Report – Barnes v Harris County*

5. **Tactical Maneuvering**
   An individual may triangulate to split an officer's focus, or engage an officer in arguments or conversation as a distraction while others move out of the officer's peripheral vision to flank or circle behind the officer.  Others will seize the opportunity to assault an officer during times of unexpected and rapidly unfolding events occurring in their presence.

6. **Mental Alternation**
   When subjects are under the influence of drugs, alcohol, and or have a mental health issue, such as being off of their medications, they may have a diminished capacity to think clearly and comply with lawful commands.

7. **Boiling Point Physiology**
   More that 80 percent of suspects who attack police officers use personal weapons such as hand, feet, head and other body parts.  Officers are trained to watch for signs that an angry looking and expletive person is reaching his/her boiling point and getting ready to fight or to flee.

   **Cues may include**:
   - Blading of the body
   - Verbally agreeing to follow an officer's direction, but acting the opposite
   - Creating a ruse
   - Distracting an officer to break the officer's focus and create opportunities for escape or assault
   - Furtive movements consistent with reaching into clothing or in or about a vehicle
   - Clenched fists
   - Quickened breathing and flared nostrils
   - Dilation of pupils from an adrenalin dump
   - Excessive animation, like waving arms
   - Profuse sweating
   - Use of profanity
   - Challenging statements

**OPINIONS:**

**THERE IS NO EVIDENCE THAT DEPUTY FELIX'S APPROACH AND POSITIONING ALONGSIDE MR. BARNES' VEHICLE WHEN CONDUCTING A LOW RISK TRAFFIC STOP, AND INVESTIGATION INTO A SUSPECTED CRIMINAL VIOLATION, WAS CONTRARY TO HIS TRAINING AND EXPERIENCE AND DEPARTMENT STANDARD OPERATING PROCEDURES.**

**ANY REASONABLE OFFICER CONDUCTING A TRAFFIC STOP USING THE SAME APPROACH THAT DEPUTY FELIX USED WOULD HAVE CONDUCTED THE TRAFFIC STOP IN THE SAME MANNER.  ASSUMING A POSITION AT A VEHICLE AS SUGGESTED BY THE PLAINTIFF'S EXPERT, UNDER THE FACTS AND CIRCUMSTANCES OF THIS CASE, WOULD JEOPARDIZE THE BASIC TENET OF OFFICER SAFETY PRINCIPALS.**

*Amended Expert Opinion Report – Barnes v. Harris County*

**THERE IS NO EVIDENCE THAT DEPUTY FELIX'S DEMEANOR, VERBIAGE OR COMMUNICATION SKILLS WHEN HE CONTACTED MR. BARNES, OR WHEN HE REQUESTED MR. BARNES TO STEP OUT OF THE VEHICLE, ALLEGEDLY CAUSED OR INCREASED THE INTENSITY OF THE TRAFFIC STOP TO THE DEGREE THAT IT CAUSED MR. BARNES TO FLEE THE SCENE OF THE DETENTION, RESULTING IN AN AGGRAVATED ASSAULT AGAINST DEPUTY FELIX.**

**THERE IS NO EVIDENCE THAT DEPUTY FELIX VIOLATED HARRIS COUNTY CONSTABLE'S OFFICE PRECINCT 5 STANDING OPERATING PROCEDURES FOR SHOOTING AT A VEHICLE, WHEN HE DISCHARGED HIS SERVICE WEAPON AT MR. BARNES WHILE STANDING ON THE VEHICLE'S DOOR SILL AS THE VEHICLE ACCELERATED FROM THE SCENE OF THE DETENTION.**

**THERE IS NO EVIDENCE THAT WHEN DEPUTY FELIX DISCHARGED HIS FIREARM AT MR. BARNES, THE SOLE OCCUPANT OF THE MOTOR VEHICLE, THE SAFETY OF OTHER MOTORISTS ON THE TOLLWAY WERE AT RISK FROM RICHOCHING BULLETS.**

**ANY REASONABLE OFFICER FACED WITH THE SAME FACTS AND CIRCUMSTANCES THAT DEPUTY FELIX FACED, WOULD HAVE USED DEADLY FORCE IN DEFENSE OF THEIR LIFE, IF THEY HAD A REASONABLE BELIEF THAT MR. BARNES POSED AN IMMEDIATE AND CREDIBLE THREAT OF CAUSING GREAT BODILY INJURY OR DEATH TO THE OFFICER.**

In my opinion, Deputy Felix's body posture and positioning during the initial stages of his contact with Mr. Barnes, was consistent with his training and experience, and was consistent with how peace officers across the United States are trained to position themselves at or near the driver's door to effectively communicate with the driver.

Deputy Felix was calm, he was respectful, he was alert and cautious, and he presented a professional command presence as he communicated with Mr. Barnes over the excessive traffic noise of passing motorists during the moments leading up Mr. Barnes flight from the scene.

Deputy Felix did not place himself in a position that created a higher probability of being injured or shot as the plaintiff's expert theorizes when he stopped Mr. Barnes, than it would have been for any other reasonable officers conducting traffic stops.

The video footage from Deputy Felix's vehicle clearly shows that the only place where Deputy Felix could safely stand is alongside the Toyota sedan next to the K-rail cement barrier during the initial phase of the traffic stop, and at or near the driver after the door was opened. By Deputy Felix positioning himself where he did, he could primarily surveil the movements of Mr. Barnes hands to ensure he would not gain access to a dangerous weapon, and prepare himself to counter any attempt by Mr. Barnes to start the vehicle and flee from the scene.

*Amended Expert Opinion Report – Barnes v Harris County*

If the plaintiff's expert believes Deputy Felix should have stood to the rear of the door post separating the front and rear driver's doors during the traffic stop and when the deputy opened the driver's door, it would prove be extremely difficult for the deputy to hear what Mr. Barnes says to traffic noise, and to see if Mr. Barnes' hands were grabbing the firearm that was located underneath the driver's seat; it would be impossible for the deputy to effective react fast enough to respond to the threat in time.

I have taught thousands of police officers during my career on tactics and strategies on how to conduct traffic stops, and I have personally made thousands of traffic stops as a motorcycle traffic officer and as a patrol officer. I have used a variety of vehicle approaches and positions when contacting drivers depending on the facts and circumstances of the traffic stop. I have found that during the initial phase of contact with the driver, it is advantageous for an officer to remain somewhat behind the center door pillar if possible, but a change of position that faces the driver may be appropriate to set the driver at ease, plus it provides the officer with a better view of the immediate area surrounding the driver's seat where firearms may be hidden.

I have always positioned myself facing the driver or a passenger whenever requesting them to step out of the vehicle for officer safety reasons and I have always had an exit strategy in the event I needed to respond to a threat to my safety. I always watched an individual's hands for illegal contraband, but most importantly for a weapon that could cause me harm.

Contrary to the plaintiff's allegation that the only minor criminal offense Mr. Barnes committed was driving a motor vehicle that is restricted on the tollway, it should be noted that Mr. Barnes was detained for other possible criminal violations as well. Deputy Felix stopped and detained Mr. Barnes for driving a vehicle that is restricted on the tollway, which is a Class C misdemeanor, for not have having or presenting a Texas Driver's license upon request, and for probable cause to believe his motor vehicle contained the strong odor of marijuana.

When Mr. Barnes consciously made the irrational decision to flee the scene with Deputy Felix attached to his vehicle, he committed 3 felony violations of the Texas Penal Code, Aggravated Assault and felony fleeing a police officer and for illegal possession of a firearm.

Mr. Barnes was not truthful when he told Deputy Felix that he rented the vehicle and when he said his girlfriend rented the vehicle, because Mr. Barnes grandmother was the person who rented the Toyota Corolla. Mr. Barnes told Deputy Felix that he didn't have a license on him, but he lied to the deputy when he told him his license was in the trunk. There was no license in the trunk, because Mr. Barnes was not in possession of his driver's license.

Mr. Barnes was aware that he didn't possess his driver's license, and he told Deputy Felix that his license was in the trunk as a ruse to get the deputy to walk back to the trunk while he decided to start the vehicle and drive away from the scene. Deputy Felix led Mr. Barnes to believe that he was going to look in the trunk, but he told Mr. Barnes to put the paperwork he was holding on the dashboard; he then opened the driver's door and asked Barnes to step outside.

It should be noted that no such thing as a routine safe traffic stop by a peace officer, because the involved officer has absolutely no idea what the identity or criminal history of the vehicle occupants, what the vehicle contains in terms of dangerous weapons or drugs, and what the state of mind of the vehicle occupants are.

*Amended Expert Opinion Report – Barnes v. Harris County*

If a peace officer were to identify the odor of the presence of illegal contraband, combined with the driver's failure to validate their legal right to possess the vehicle, and then fails to produce their driver's license or proof of identity while acting suspiciously as Mr. Barnes was described as doing, it would be reasonable for the officer to remove the driver from the vehicle for further investigation. (*Pennsylvania v. Mimms*, 434 U.S. 106 (1977)

It would also be reasonable for the officer to conduct a pat frisk of the driver's person for any dangerous weapons, and then place the driver in the officer's patrol car until it can be determined the drivers identify, criminal history, and determine legal ownership or legal possession of the motor vehicle. (*Terry v Ohio*, 392 US 1 (1968)

Deputy Felix had probable cause to believe contraband was concealed and or was illegally transported in Mr. Barnes' vehicle, Mr. Barnes' vehicle may be searched without a warrant. (*Carroll v United States*, 267 US 132, 153 (1925)

If Deputy Felix suspected that Mr. Barnes, through rational inferences that he may be dangerous and may gain immediate control of weapons, he could conduct a protective search for weapons in the vehicle. (*Terry v Ohio*, 392 US 1; 88 S Ct 1868 (1968)

The plaintiff infers, that just because marijuana was not found in the Mr. Barnes's vehicle, on Mr. Barnes' person, or in his digestive system, Deputy Felix is lying about smelling marijuana at the time of the traffic stop. There is uncontroverted video evidence that when Deputy Felix leaned towards the open driver's door window of Mr. Banes vehicle, he told Mr. Barnes twice that he could smell the odor of marijuana coming from the vehicle. Mr. Barnes did not challenge the deputy's assertion nor did the plaintiff or the plaintiff's expert produce any evidence to support their opinions that Deputy Felix lacked the expertise to recognize the odor of marijuana or to offer any logical reason why he would fabricate such a statement.

It should be noted that at the time of this incident, Deputy Felix had 13 years law enforcement experience as a law enforcement officer at the time of this incident and is a licensed peace officer in Texas and he held an Advanced Officer Certificate. There is no evidence that TCOLE has ever suspended or cancelled Deputy Felix's license for his lack of maintaining his level of professional training.

During his tenure with the Harris County Constable's Office Precinct 5, Deputy Felix has been provided training that exposed him to the identification of dangerous restricted drugs, including marijuana and the fresh and burn odors associated with marijuana. Deputy Felix has made numerous arrests of individuals for possession of marijuana prior to his encounter with Mr. Barnes, where individuals were prosecuted or given diversion sentences for the quantity of marijuana that they possessed.

Prior to this incident, Deputy Felix has identified, marijuana odors on multiple occasions where drug taskforce personnel confiscated and stored marijuana in the Precinct 5 evidence room, including large and small quantities of marijuana that enabled him to identify the unique and distinct odor that marijuana omits.

*Amended Expert Opinion Report – Barnes v Harris County*

In addition, there is no evidence that when Deputy Felix told Mr. Barnes that he smelled the odor of marijuana coming from the vehicle, that Mr. Barnes challenged the deputy's assertion.  If Mr. Barnes felt that Deputy Felix fabricated smelling the strong odor of an illegal drug in his vehicle, one would expect to hear his denial on the video footage.

According to Deputy Felix, Mr. Barnes did not deny being in possession of illegal drugs, nor did he deny that the odor of marijuana was present in the vehicle.  In addition, according to the medical examiner, toxicology results showed that Mr. Barnes had tetrahydrocannabinol (THC) in his blood.  It is, however, unknown as to what Mr. Barnes tolerance level to the drug was to determine how the drug affected him, how much marijuana he consumed, and when he either voluntarily smoked marijuana or was present where marijuana was consumed prior to his death.

Based on my law enforcement training and experience as a dangerous drug expert, it should be noted that THC is the chemical that is responsible for most of marijuana's psychological effects. THC attaches to the receptors of the brain and affects a person's memory, pleasure, movements, thinking, concentration, coordination, and sensory and time perception. THC can induce hallucinations, change thinking and cause delusions.  According to the national Highway Safety Administration on marijuana, THC can affect cognitive skills like judgement, anticipation, and divided attention, and executive functions like route planning and risk taking.

According to the National Highway Traffic Safety studies, on average, the effects of marijuana intoxication last about 2 hours and takes effect in 10-30 minutes after ingestion.  Due to the fact that there are no current testing standards to determine what the level of being under the influence of THC is to constitute a criminal violation of driving under the influence (DUI), one can only question whether Mr. Barnes committed a DUI violation, because there wasn't an opportunity for Deputy Felix to conduct a nystagmus examination or blood toxicology testing at the time of his contact with him.

It is also impossible at this point to determine why Mr. Barnes's reckless decision to flee the scene was affected by being under the influence of marijuana, or possibly due to the fact that he was a convicted felon and was concerned he would be prosecuted for being in possession of an illegal firearm under the driver's seat.

There is uncontroverted evidence in this case that Deputy Felix was highly suspicious of Mr. Barnes, based on the odor of marijuana coming from the vehicle, his unusual behavior after Mr. Barnes changed his explanation of who owned the vehicle, and whether or not he had a valid driver's license.  Mr. Barnes fumbled through paperwork in his vehicle while pretending to look for the vehicle registration or proof of insurance, he began reaching towards the floorboard, and when he told Deputy Felix that his license was in the trunk led Deputy Felix to further suspect Mr. Barnes was in possession of drugs or weapons in the vehicle.

All of these objective facts caused Deputy Felix to become seriously concerned for his safety and prompted Deputy Felix to command Mr. Barnes on 4 separate occasions to stop digging around the interior of the vehicle.

*Amended Expert Opinion Report – Barnes v. Harris County*

After opening the driver's door and watching Mr. Barnes grab the ignition key and start the vehicle,  Deputy Felix instinctively drew his firearm and stepped towards the vehicle in an attempt to prevent Mr. Barnes from leaving the scene through his command presence and the presence of his firearm.

**Deputy Felix's Perspective of the Facts**

On March 1, 2019, Harris County Attorney Mary Baker and I met with Deputy Felix to clarify what specific red flags he identified when he evaluated Mr. Barnes' behavioral cues that caused him to be concerned for his personal safety, and to determine what led him to be highly suspicious that Mr. Barnes's vehicle may contain illegal contraband or weapons.

When Deputy Felix located Mr. Barnes' vehicle and drove behind him in the number 1 traffic lane, he immediately activated the emergency lighting equipment on his vehicle.  Mr. Barnes immediately pulled to the left shoulder of the tollway and stopped adjacent to the cement K-Rail divider separating the north and southbound lanes of the tollway.

Deputy Felix had not seen any of Mr. Barnes driving behavior  prior to the time that he observed his vehicle on the tollway, to have any objective decision as to Mr. Barnes ability to safely operate a motor vehicle.  Deputy Felix parked his vehicle at a safe distance behind the Toyota Corolla and turned his front tires to the left as a safety measure in the event his vehicle is rear ended.

The 1st red flag that concerned Deputy Felix was the fact that Mr. Barnes said he rented the vehicle a week prior, but then told Deputy Felix that the vehicle was rented in his girlfriend's name.

The 2nd  red flag that caused him concern was when Deputy Felix said he leaned his head closer to the open driver's door window to better hear what the Mr. Barnes was saying, due to the loud traffic noise, and smelled the strong odor of marijuana coming from the vehicle, and when Mr. Barnes couldn't produce his driver's license; those concerns caused him to contact the dispatcher to request a cover unit to assist him in his investigation.

Deputy Felix watched Mr. Barnes intently as he communicated with him, and when he told him to stop digging around the interior of the vehicle, because he smelled the strong odor of marijuana coming from the interior of the vehicle.  Deputy Felix was alert to any potential threats any peace officer may face when approaching or interacting with a subject or a potentially dangerous situation. Deputy Felix was practicing the three basic principles that make up the foundation of arrest and control strategies, such as awareness, balance and control. All other skills or techniques will be reduced or neutralized if an officer does not practice control in a stressful situation.

The 3rd red flag moment of concern that occurred was when Deputy Felix asked Mr. Barnes if there was anything in the vehicle that he should be concerned about.  Mr. Barnes replied no, but when his right hand reached towards the right front passenger's floorboard and seat, and suspiciously fumbled through papers while he made eye contact with the deputy instead of focusing on what he was looking for.

*Amended Expert Opinion Report – Barnes v Harris County*

Mr. Barnes behavior caused Deputy Felix to move his right hand onto the grip of his firearm, because he suspected there may be a weapon in the vehicle. Deputy Felix told Mr. Barnes that he smelled marijuana in the vehicle and to stop digging around, but Barnes continued to fumble through the paperwork, causing the deputy to repeat his request to stop digging around with his hands 3 additional times in rapid succession.

Mr. Barnes reached over towards a red plastic cup with his right hand on the passenger's right front floorboard that appeared to have trash in it. When Deputy Felix told Barnes not to reach over in that area, he went back to pretend to look through the paperwork.

Deputy Felix stated he felt Mr. Barnes attempted to look though the paperwork as a ruse to distract him from watching him carefully. He suspected the Mr. Barnes was possibly trying to distract him to create an opportunity for him to gain access to a weapon or hide contraband when he wasn't looking at him. Deputy Felix is aware that peace officers are vulnerable to potential harm when contacting a subject and he is aware of specific hazards that could place him in danger. Typically, it is the subject's hands (or what may be in them) that can cause harm. Peace officers are trained to remain constantly alert, to be aware of the surrounding environment and to be conscious of an individual's actions, no matter how slight.

The 4th  red flag moment of concern occurred when Deputy Felix asked Mr. Barnes a second time if he had a driver's license and he said no; he then said his girlfriend rented the vehicle. Deputy Felix asked Mr. Barnes if he had anything in the vehicle that he should know about, because he smelled the strong odor of marijuana coming from the vehicle. Mr. Barnes said he did not.

The 5th red flag of concern occurred when Mr. Barnes stated he did not have his license with him, and then said his driver's license was in the trunk where Deputy Felix could get it if  he wanted to. Deputy Felix suspected that Mr. Barnes wanted him to walk to the rear of the vehicle and retrieve the license to give him the opportunity to arm himself and assault him. He said he had no intention of turning his back to Barnes or to leave him in the driver's seat while he opened the trunk; to do so would have violated the basic tenants of officer safety.

Deputy Felix said he told Mr. Barnes to pop the trunk open to give Barnes the impression that he was going to leave him seated in the vehicle while he checked the trunk. He told Mr. Barnes to put the paperwork on the dashboard, which he complied, and Barnes turned the engine off, he removed the ignition key and placed the key on the center console.

Deputy Felix stated that the reason why he removed his firearm so quickly from his holster, is because he placed his right hand on his firearm in preparation for drawing firearm. He said he understands the concept of action vs. reaction (Commonly known as Hick's Law) and has routinely stayed attentive to the behavior clues of individuals he encounters, and he said he routinely practices drawing his firearm from his level 3 holster.

*Amended Expert Opinion Report – Barnes v. Harris County*

Hick's Law (or the Hick-Hyman Law) is named after a British and an American psychologist team of William Edmund Hick and Reay Hyman. In 1952, this pair set out to examine the relationship between the number of stimuli present and an individual's reaction time to any given stimulus. As you would expect, the more stimuli to choose from the longer it takes the user to make a decision on which one to interact with. Users bombarded with choices have to take time to interpret and decide, giving them work they don't want.

Generally, the application of Hick's Law is simple, reduce the number of stimuli and get a faster decision-making process, but there are exceptions to the rule. For example, a peace officer may anticipate the stimulus and already have made a decision before seeing the threatening stimuli as Deputy Felix did in this incident. In that instance, the time it takes for him/her to act is likely to be less than if the event is unanticipated and he/she had not already determined a course of action.

The 6th and final red flag that caused Deputy Felix to become highly concerned about his personal safety, was when he opened the driver's door and asked Mr. Barnes to step out of the vehicle. The vehicle had already been started and was put in gear before Deputy Felix moved towards the door to attempt to stop Mr. Barnes from driving forward or to the rear, but because Deputy Felix was trying to react to an event that already occurred; he was behind the reactionary curve and could not stop Mr. Barnes.

Deputy Felix said as the Toyota accelerated from the scene, the driver's door immediately swung back into the left side of his body due to the forward inertia of the vehicle creating pressure against his torso. It was at this point that Deputy Felix said he feared that he was going to be seriously injured or possibly killed.

Deputy Felix can be heard on the video footage yelling at Mr. Barnes, "Don't fuckin Move" twice, and his right arm can be seen emerging from the interior of the vehicle to such a degree that his elbow was higher than his right shoulder and his firearm was adjacent to the right side of his face. This is the moment when Deputy Felix reported he felt pressure on his right hand and movement of his firearm.

Deputy Felix said he was looking at the roof of the Toyota, but he believed he intentionally positioned the muzzle of his firearm downward greater than a 45 degree angle before he discharged his firearm at Mr. Barnes in an effort to stop Mr. Barnes aggravated assault. The video footage appears to show Deputy Felix looking down in the vicinity of his firearm before he fired his first shot, to determine placement of the firearm, and then he looked forward before firing the second shot.

Approximately 2 seconds after the Toyota accelerated from the scene Deputy Felix felt what he described as pressure/movement on the interior portion of his right arm, and reasonably believed that Mr. Branes was attempting to grab his firearm. Photographic evidence shows that the driver's seat was not upright; it was positioned angled to the rear.

*Amended Expert Opinion Report – Barnes v Harris County*

The position of the driver's seat was highly unlikely as the source to cause pressure on Deputy Felix's arm. The door post separating the front and rear passenger's door on the driver's side could not have been the cause either for what Deputy Felix felt. The most logical source was Mr. Barnes who may have attempted to grab or push Deputy Felix's gun hand away from his upper body.

Video evidence clearly shows that Deputy Felix's right hand was removed from the interior of the vehicle and positioned near his face before being thrust back into the vehicle at a downward angle. Deputy Felix discharged his firearm the first time and then a second time within a second. Approximately 1/2 of a second after the second shot was fired, the rear brake lights on the Toyota were activated, and 1 ½ seconds later the vehicle came to a stop.

Deputy Felix stepped off of the door sill and held Mr. Barnes at gunpoint as he told the dispatcher that shots had been fired twice. He then commanded Mr. Barnes several times to put the car in park, which he did, and he requested the Houston Fire Department to respond to the scene. Deputy Felix provided his location and then checked with the dispatcher to confirm that the Houston Fire Department was responding to provide Mr. Barnes medical care. Due to the fact that the scene was not secure, Deputy Felix remained in a guarded position until additional patrol units arrived at the scene.

There is no evidence that the direction of Deputy Felix's bullets was fired at such an angle that jeopardized the safety of other motorists on the tollway. The autopsy report clearly supports Deputy Felix's statements that the muzzle of his weapon was positioned at a downward angle, because the path of both bullets fired at Mr. Barnes traveled at a downward angle. One entrance wound was located on the central chest, centered 18 inches below the top of the head. The direction of the wound path is front to back, left to right and downward. The bullet remained in the body in the lateral right lower back.

The second gunshot entrance wound on the lateral left back, centered 18 inches below the top of the head. The direction of the wound path is left to right, back to front and slightly downward. The bullet was recovered from the eleventh thoracic vertebra.

## Ms. Maria Mora's Perspective of the Facts. PG 111 of IA

On April 26, 2016, at approximately 7:25 pm, investigators contacted Moria Mora who is employed with the Harris County Too Road Authority dispatch supervisor. She stated as she settled down and logged into her work station, she immediately heard the dispatcher on the emergency channels asking if a patrol unit was under control.

Ms. Mora stated that she instinctively felt that something was amiss and asked the patrol unit to in question in order to focus a video camera at that location. Ms. Mora told investigators that as she focused a video camera on Deputy Felix's traffic stop, she saw the deputy standing on the driver's side of a vehicle interacting with the driver.

*Amended Expert Opinion Report – Barnes v. Harris County*

Ms. Mora said she could see on the video surveillance that the driver's door was open and Deputy Felix was standing between the door and the car.  She said as she watched the video the vehicle began to drive away the driver's door closed and trapped Deputy Felix between the door and the sill of the vehicle. Ms. Mora stated she freaked out and started telling the other units that the car is taking off with the deputy hanging on the door.

Ms. Mora stated that she feared that Deputy Felix could possibly be run over by the vehicle.  She said she tried to keep the camera on the incident unfolding in front of her eyes when she heard Deputy Felix's radio transmission of "Shots fired."

## Deputy Constable Saavedra's Perspective of the Facts

On April 26, 2016, at approximately 2:48 pm, Deputy Saavedra was assigned to patrol duties for the Harris County Precinct 5 Constable's Office when he overheard Deputy Felix's radio broadcast that he had shots fired in the 66o block of the West Sam Houston Tollway South, in the southbound direction. He said he stopped on the southbound feeder road adjacent to a vehicle, described as a silver Toyota Corolla that Deputy Felix's stopped on the shoulder of the tollway.

Deputy Saavedra said he exited his patrol car and ran across the 4 lanes of traffic to the front of the Toyota Corolla and contacted Deputy Felix who had his firearm pointed at the driver who was seated in the driver's seat.  Deputy Saavedra said he drew his service pistol and pointed it at the driver who appeared to be shot and bleeding. He asked Deputy Felix if there were any weapons involved in the incident and Deputy Felix replied that he did not know.

Deputy Saavedra said when Deputies Fuselier and Mathis arrived at the incident scene, he holstered his service weapon and assisted his fellow deputies provide medical aid.  He said the driver was removed from the driver's seat and placed on the shoulder of the toll road where the deputies began giving the driver CPR.  Deputy Saavedra advised Deputy Felix to go sit in his patrol car and then he assisted his fellow deputies by applying direct pressure to the driver's wounds with cotton gauze.

## Deputy Constable Mathis's Perspective of the Facts

On April 26, 2016, at approximately 2:45 pm, Deputy Constable Mathis was assigned to the toll road division for traffic enforcement for the Harris County Precinct 5 Constable's Office when he was dispatched to assist Deputy Felix in the 7300 block of the West Sam Houston Parkway South.  When he arrived at the incident scene, approximately 3 minutes later, he observed Deputy Felix standing alongside a silver Toyota Corolla pointing his firearm at an individual, later identified as Mr. Barnes, seated in the driver's seat but leaning over onto the right front passenger's seat.  Deputy Mathis said he drew his weapon and checked on Deputy Felix who advised him that his leg was injured.

*Amended Expert Opinion Report – Barnes v Harris County*

Deputy Mathis stated that Deputy Fuselier arrived at the scene and cleared the passenger side of the Toyota and he assisted Deputy Fuselier remove Mr. Barnes onto the shoulder of the road to provide him with CPR compressions until Houston Fire personnel arrived at the scene.  He said he also applied direct pressure to Mr. Barnes' wound on is back with sterile gauze.

## Deputy Constable Fuselier's Perspective of the Facts

On April 26, 206, at approximately 2:45 pm Deputy Constable Fuselier was assigned patrol duties for the Precinct 5 Constable's Office when he responded to assist Deputy Felix within the 7300 block of the West Sam Houston Parkway South in the southbound lanes.  He arrived at the scene at approximately 2:48 pm and observed Deputy Felix next to a Toyota Corolla with his firearm pointed at the driver.  He said he noticed a black male, later identified as Mr. Barnes, in the driver's seat slouched over facing sough and his right arm towards the right front passenger's floorboard.

Deputy Fuselier moved to the right side of the Toyota and opened the front passenger's door to check for any weapons in or about Mr. Barnes.  After checking for weapons, Deputy Fuselier notified Sergeant Perry that he was going to start CPR, and with the assistance of Deputy Mathis Mr. Barnes was removed from the driver's seat and placed him on the shoulder of the tollway where began chest compressions until Houston Fire personnel arrived on the scene.

Deputy Fuselier checked with Deputy Felix who advised him that he did not have any life threatening injuries.  He instructed Deputy Felix to remain inside his patrol car and wait for instructions from his supervisor.

## Deputy Constable Thistle's Perspective of the Facts

On April 26, 2016, Deputy Constable Thistle was assigned to the toll road division for traffic enforcement for the Harris County Precinct 5 Constable's Office when he responded to a call to assist Deputy Felix in the 7300 block of the West Sam Houston Parkway South.  Deputy Thistle arrived at the scene at approximately 2:51 pm and found Deputies Mathis and Fuselier kneeling over an individual, later identified as Mr. Barnes, and assisted them perform CPR compressions.

After doing CPR compressions, Deputy Thistle checked to see if Mr. Barnes was breathing with negative results.  After obtaining more gloves from his patrol vehicle he returned to Deputies Mathis and Fuselier, and again resumed giving Mr. Barnes CPR chest compressions and noticed he was not breathing.  Deputy Thistle continued to provide CPR compressions with negative results until Houston Fire Department Engine 69 personnel arrived on the scene to take over the treatment for Mr. Barnes.

*Amended Expert Opinion Report – Barnes v. Harris County*

**OPINIONS:**

**ASHTIAN BARNES KNEW OR SHOULD HAVE REASONABLY KNOWN THAT HE WAS BEING CONTACTED AND DETAINED BY DEPUTY FELIX FOR A TOLLWAY VIOLATION AND HAD TO REMAIN AT THE SCENE UNTIL THE DEPUTY'S INVESTIGATION CONCLUDED.**

**MR. BARNES HAD A DUTY TO POSSESS A DRIVER'S LICENSE WHEN OPERATING A MOTOR VEHICLE ON THE HIGHWAY, AND TO COMPLY WITH THE DEPUTY'S COMMANDS TO PRESENT PROOF OF HIS IDENTITY UPON REQUEST.**

**DEPUTY FELIX REASONABLY BELIEVED HIS LIFE WAS IN IMMINENT THREAT OF DEATH OR GREAT BODILY INJURY WHEN MR. BARNES REFUSED TO FOLLOW THE DEPUTY'S COMMANDS TO STOP HIS VEHICLE.  A REFUSAL TO COMPLY WITH THE DEPUTY'S COMMANDS ADDS URGENCY AND A SENSE OF PERIL TO ANY ENCOUNTER.**

**THE AMOUNT AND THE TYPE OF FORCE USED BY DEPUTY FELIX TO PREVENT BEING SEVERELY INJURED OR KILLED WAS CONSISTENT WITH HIS TRAINING AND EXPERIENCE TO OVERCOME MR. BARNES DEADLY ASSAULT.**

**THE USE OF DEADLY FORCE BY DEPUTY FELIX IS CONSISTENT WITH THE HARRIS COUNTY CONSTABLE'S OFFICE PRECINCT 5'S USE OF FORCE STANDARD OPERATING PROCEDURES AND LAW ENFORCEMENT PROCEDURES AND PRACTICES.**

**ANY REASONABLE OFFICER, FACED WITH THE SAME OR SIMILAR FACTS AND CIRCUMSTANCES KNOWN TO DEPUTY FELIX AT THE TIME OF THIS INCIDENT, WOULD USE DEADLY FORCE TO PROTECT THEMSELVES FROM A CREDIBLE AND IMMEDIATE THREAT OF DEATH OR GREAT BODILY INJURY.**

After reviewing the totality of the facts and circumstances regarding the scope and time Deputy Felix's contact with Mr. Barnes the criminal investigation conducted by the Houston Police Department, determined that Deputy Felix had a reasonable belief that his life was in imminent threat of death or great bodily injury when he shot Mr. Barnes.  Mr. Barnes reckless decision to flee from the traffic stop, with Deputy Felix standing on the door sill, caused Deputy Felix to fear for his life and use deadly force to stop Mr. Barnes's deadly assault against him based on the following facts:

- Mr. Barnes was operating a motor vehicle on the tollway without authorization in violation of the Texas Transportation Code.

*Amended Expert Opinion Report – Barnes v Harris County*

- Mr. Barnes was asked for his driver's license and proof of insurance for his vehicle. He lied to Deputy Felix when he told him that he rented the vehicle approximately one week prior, and then said the vehicle was rented by his girlfriend; he said he was on his way to get the car washed and turn it in. Mr. Barnes lied to the deputy because the vehicle was actually rented by Mr. Barnes grandmother.
- Mr. Barnes was operating a motor vehicle without a license and led Deputy Felix to believe his license was located in the trunk of his vehicle. He told the deputy he could go to the trunk and search for it.
- Deputy Felix asked Mr. Barnes a second time for his driver's license and he replied something to the effect that he was cleaning out the car and said something about the license that was not audible on the in-car video footage.
- Deputy Felix became concerned about his safety and requested a cover unit to respond to assist him.
- Deputy Felix asked Mr. Barnes if he had anything in the car that he should be concerned about, and he replied no. Mr. Barnes pretended to look through paperwork while he looked at Deputy Felix instead of the paperwork and reached towards the right front passenger's floorboard.
- Deputy Felix told Mr. Barnes he smelled marijuana in the vehicle and told him 4 times to stop digging around the vehicle.
- Mr. Barnes pretended to search through paperwork located in the vehicle while he looked at and focused on Deputy Felix's face. His actions were unnatural and consistent with a person would do when looking for a specific document when requested to validate legal possession of a vehicle.
- Deputy Felix asked Mr. Barnes a second time if he had any identification with him. Mr. Barnes replied that the license was possibly in the trunk. He told the deputy that he could go look for it if he wanted to.
- Deputy Felix instructed Mr. Barnes to pop the trunk and to place his paperwork on the dashboard. Mr. Barnes put paperwork on the dashboard, he removed the key from the ignition and placed the key on the center console.
- Deputy Felix opened the driver's door as he stood in a position where he could closely look at Mr. Barnes as he anticipated him to exit the vehicle without incident. He asked Mr. Barnes to step out of the car.
- Deputy Felix remained facing Mr. Barnes at an angle and watched Barnes intently as he prepared to step out of the vehicle.
- Mr. Barnes turned his body to the right and leaned forward in what was later determined by Deputy Felix to be a ploy by Mr. Barnes to conceal his right hand from grabbing the ignition key off of the center console. Suddenly and without warning, Mr. Barnes inserted the key in the ignition, he stepped on the brake pedal.
- In less than ½ a second after Deputy Felix noticed the car was started, and the rear brake light illuminated, **14:45:48** on the patrol car video, Mr. Barnes put the vehicle in gear and accelerated forward. (see exhibit)
- In 1/3 of a second later Deputy Felix stepped towards the door sill. He drew his firearm and stepped up onto the door sill with his left foot and then his right foot just as the Toyota accelerated south bound on the tollway.

*Amended Expert Opinion Report – Barnes v. Harris County*

- Deputy Felix commanded the driver twice, "Don't fucking move." The driver's door immediately swung backwards due to the forward inertia of the vehicle, and applied pressure into the left side of Deputy Felix's body.
- At approximately **14:45:51** seconds on the patrol car video, Deputy Felix can be seen pulling his right arm backwards out of the window in response to feeling pressure/movement on the interior portion of his right forearm or right hand, which could only have come from Mr. Barnes trying to grab or deflect Deputy Felix's firearm.
- At approximately **14:45:51,** on the patrol car video, Deputy Felix began moving his arm forward into the driver's window while holding his firearm at a downward angle and discharged 1 round from his weapon, and within ½ to 1 second later, he discharged his second round at Mr. Barnes.
- Mr. Barnes applied the brakes to his vehicle, approximately 1/3 of a second after Deputy Felix fired his second round.  Mr. Barnes reportedly screamed and the vehicle came to a complete stop approximately 4 seconds after he started to drive forward.

**Analysis of the speed of Mr. Barnes' vehicle**

The plaintiff alleges that when Mr. Barnes placed the Toyota into drive, Deputy Felix leaned further into the car, he shouted "Don't fucking move!"  The plaintiff alleges the in car video footage shows the vehicle moving forward, slowly at first, but accelerated to a brisk jog.  Due to the fact that the plaintiff has not defined was the average speed of a brisk jog is, (possibly a 4-8 mile jog or less) there is no way two compare the non-described hypothetical human speed with a motor vehicle that was accelerating away from the incident scene with the driver intending to flee arrest.

It should be noted that Mr. Barnes' vehicle traveled approximately 100 feet from the point where he fled from the scene and stopped, starting at **14:45:49** on the patrol car's video, until he applied the brakes of the vehicle at **14:45:53** seconds on the patrol car's video.  The vehicle rapidly came to a complete stop at **14:45:54** seconds on the patrol car's video.

The top speed attained from the 2013 Toyota Corolla was calculated from the point where Mr. Barnes accelerated from a stopped position, until he applied the vehicle brakes, which occurred over a period of approximately 4 seconds.

The vehicle's estimated speed was accomplished by utilizing the published data of the 0 to 60 mile per hour acceleration times to ascertain acceleration rates of exemplar 2013 Toyota Corollas.  The acceleration rates were then used to calculate the top speed attained, at the approximate moment the brakes were applied by the driver.  The speed attained was calculated to fall in a range between 23.76 to 28.24 miles per hour.  The average speed attained during the 4 second period was approximately 25 miles per hour.

The equations that were used to compute the vehicle's speed were taken from the Northwestern University Traffic Institute's published works (Fricke, 1990).

*Amended Expert Opinion Report – Barnes v Harris County*

To calculate the top speed attained (final velocity), of the subject vehicle from a complete stop (an initial velocity of 0), until the moment the driver applied the brakes, it is necessary to know the acceleration rate of the vehicle and the elapsed time from the moment Mr. Barnes began acceleration until he applied the brakes.

There are numerous publicly available sources for calculating the acceleration rate of a 2013 Toyota Corolla. This analysis will use the published 0 to 60 miles-per-hour (MPH) times to calculate the acceleration rate of Mr. Barnes' vehicle. Once the acceleration rate is known, the final velocity of the Toyota at the time of brake application can be calculated. (See Exhibits)

The calculated top speed attained by Mr. Barnes' vehicle from the point he accelerated from a stop, until the point he applied the vehicle's brakes, which occurred over an approximate time of 4 seconds, was calculated to have been between approximately 24 and 28 miles per hour. There is no way that the recorded speed of the Toyota at the time Mr. Barnes was shot could adequately be compared to a brisk jog as the plaintiff describes in the original complaint.

In one traffic accident study, the risk of great bodily injury to a pedestrian struck by a car is approximately 25% at collision speeds of 23 miles per hour, and this risk rose to 50% at 31 miles per hour and reached 90% at 46 miles per hour. The risks of death were approximately 10% at a collision speed of 23 miles per hour, 25% at 32 miles per hour, and exceeded 90% approaching 60 miles per hour (Tefft, 2011).

In a review conducted of numerous other traffic accident studies, it was concluded that higher vehicle speeds resulted in more severe pedestrian injury. The review revealed an average likelihood of death at an approximate rate of 5% in collision speeds of 20 miles per hour. The risk of death sharply rose to 40% at 30 miles per hour and approached 100% at speeds of 50 miles per hour (Leaf & Preusser, 1999).

To be reasonable, to recommended that we base the approximate speed attained by Mr. Barnes' vehicle on the lower end of performance, and use an approximated speed of 24 miles per hour. The risk of great bodily injury or death is present, even at the lowest calculated speed. Of course, this does not take in account the increased likelihood of Deputy Felix from injury or death, given the composition of the roadway, or hazards presented by uninvolved vehicles traveling the affected portion of the roadway at excessive freeway speeds.

## Use of Force Options

Law enforcement personnel have a variety of force options available to them when dealing with dangerous, combative, and violent subjects they come in contact with. The type and amount of force used in any situation depends on reasonableness of the force, based on the totality of the facts and circumstances presented to the officer at the time of the incident.

*Amended Expert Opinion Report – Barnes v. Harris County*

An officer considers many facts and circumstances when deciding whether to resort to use deadly force.
- The individual's overall demeanor when contacted by law enforcement
- If the individual is hostile, assaultive or non-compliant
- Is the individual verbally or physically threatening officers or others?
- Is the individual responsive to verbal commands?
- Has the individual made aggressive motions toward the officer?
- Is the individual actively or passively resistant?
- Is the individual responding to an officer commands?
- Does the individual have the opportunity, the ability, the means and the intent to cause the officer great bodily injury or death?
- Is the individual armed or likely to be armed with an instrument capable of causing death or great bodily injury to a peace officer or citizen based on the totality of the facts and circumstances?

## The Purpose of Using Force is to Gain Control

General control is the degree of influence that peace officers must exert over an individual in order to take them safely into custody. The individual may still have options for movement while under the general control of a peace officer.

The primary objective of using controlling force is to gain compliance of a subject. Peace officers must be prepared to use physical force to overcome resistance and gain control of an individual. Basic use of force philosophy defines the degree or amount of force, which may be reasonable to overcome resistance, based on the totality of the facts and circumstances.

Once control is obtained, the degree of force used should be reevaluated. When using controlling force, officers must be constantly aware that they are close to the subject and therefore vulnerable to attack.

The primary goal of using force is to gain compliance and control of a subject. An officer's consideration for using force includes, but is not limited to:
- An individual's display of aggressive or assaultive behavior
- The type of weapon or instrumentality an individual possesses
- The physical size of the person as compared to the officer
- The need for immediate control of the subject due to tactical considerations
- An officer's perception of the subject's knowledge of the martial arts, other skills, assaultive behavior, or possession of dangerous weapons
- The inability to control an individual by other less intrusive means

Directional force, using stunning blows with an impact weapon to a body part, or applying pressure using a physical control hold are methods for physically controlling an individual by applying pressure on their upper body until the peace officer has control over the subject. The primary objective of applied force is to gain control of an out of control individual, using only that amount of force that is reasonable under the totality of the facts and circumstances.

*Amended Expert Opinion Report – Barnes v Harris County*

In this case, physical contact by Deputy Felix to control Mr. Barnes from evading arrest, and to prevent him from leaving the scene of a detention was not possible due to the amount of time that would be necessary to stop him from fleeing the scene.  Deputy Felix was unable to control Mr. Barnes active resistance through verbal commands, and he did not escalate to display his firearm until Mr. Barnes attempted to flee the scene and commit the crime of felony evading a peace officer and aggravated assault.

Deputy Felix did not resort to the use of deadly force until he reasonably believed Mr. Barnes suddenly, and without warning, accelerated away from the scene with Deputy Felix as an unwilling passenger, and not until Deputy Felix reasonably believed he feared for his life. Deputy Felix reasonable believed Mr. Barnes attempted to grab or deflect Deputy Felix's firearm, while he was standing on Mr. Barnes' vehicle as it was accelerated and attempted to merge from the emergency traffic lane into the number 1 traffic lane.

Any reasonably well trained peace officer, faced with the same or similar facts and circumstances known to Deputy Felix would have used deadly force to overcome Mr. Barnes aggressive, and assaultive and life threatening assault, if they reasonably believed Mr. Barnes actions posed an immediate and credible threat to their safety or the safety of others.

Each set of circumstances will require peace officers to exercise judgment in the decision of the type and amount force to use. Peace officers must be aware of and follow their agency's policies regarding the use of any force as Deputy Felix did in this matter.  In my opinion, Deputy Felix used only the level of force that was intended to overcome the Mr. Barnes's assaultive resistance.

From the vantage point of an officer whose personal safety is jeopardized, a potential arrestee who is neither physically subdued nor compliantly yielding remains capable of generating surprise, aggression, and even death.  Furthermore, government officials are not required to err on the side of caution.

The reasonableness inquiry in an excessive force claim is an objective one.  To evaluate the reasonableness of an officer's conduct, the amount of force used must be balanced against the need for that force, with reference to clearly established law at the time of the conduct in question.

The following facts should be considered, but not limited to when gauging reasonableness:
- The severity of the crime - violation of the Texas Transportation code, violation of the Texas Penal Code regarding an aggravated assault and felony evading.
- The nature and extent of the immediate and credible threat Mr. Barnes posed to Deputy Felix and to motorists driving on the tollway
- The degree to which the Mr. Barnes resisted detention or arrest
- Any attempt by Mr. Barnes to evade arrest by recklessly, without due regard for the safety of himself, Deputy Felix and other motorists on the tollway.

*Amended Expert Opinion Report – Barnes v. Harris County*

When the level of force applied in any given situation is reasonable, a peace officer should not be considered the aggressor.  A peace officer has a right to stand his/her ground against any aggressor, and is not required to retreat or desist.  Peace officers also have a legal right to use reasonable force to overcome resistance, to affect an arrest, and for protection; the right of self-defense is not lost. (*Scott v Heinrick 9th Cir 1994*)

The objective of using force by peace officers in any situation is to ultimately gain or maintain control of an individual and therefore the situation.  Peace officers are required to use force only when authorized to overcome resistance and gain or maintain control to a lawful process, and to use the type of force that is reasonable under the circumstances.  Further, peace officers should only use the amount and type of force permitted by law enforcement procedures, department standard operating procedures, state statute and case law.

**Reasonable Force Standard**

In 1989, the United States Supreme Court applied an objective standard (*Graham v Conner*) to a non-deadly force situation and further established how reasonable force must be judged objectively.  The Court's analysis began by considering the suspect's Fourth Amendment right to remain free from any unreasonable seizure against the government's interest in maintaining order through effective law enforcement.

The Court noted that determining the objective reasonableness for the use of force must be fact specific and established the following four components for determining reasonableness:
- Judged from the perspective of a reasonable officer based on the same or similar facts and circumstances
- Examined through the eyes of an officer on the scene at the time the force was applied rather than 20/20 hindsight
- Based on the facts and circumstances confronting the officer without regard to the officer's underlying intent or motivation
- Based on the knowledge that the officer acted properly under the established law at the time

In the 1995 case of *Tennessee v Garner*, the United States Supreme Court set a four-part legal standard based on a person's Fourth Amendment protection from unreasonable acts by Peace Officers. The court established the following components and prerequisites to an officer using lethal force in the line of duty.

In order for peace officers to employ deadly force, they must meet the following:
- The officer has probable cause to believe that the suspect poses a threat of serious physical harm either to the officer or to others
- If the suspect threatens the officer with a dangerous weapon or any instrumentality capable of causing great bodily injury or death.

*Amended Expert Opinion Report – Barnes v Harris County*

- The Court imposes a constitutional requirement that some warning be given, where feasible
- In order for lethal force to be constitutionally permissible there must be probable cause to believe that the use of lethal force is reasonable under the totality of the facts and circumstances

It is my professional opinion that Deputy Felix responded appropriately to his training and experience when he evaluated all of the facts and circumstances, before he made the decision to use deadly force to prevent the Mr. Barnes from causing him great bodily injury or death.

Due to the substantial rapid evolving threat that Mr. Barnes posed, Deputy Felix could not, and did not have the time to give a verbal warning that deadly force was going to be used before he discharged his firearm at Mr. Barnes. Once a potential deadly threat is perceived, the officer must decide within fractions of a second to decide what to do to stay ahead of the reactionary curve, leaving little if any time for reflective analysis.

**Under the Texas Penal Code Title 2 Chapter 9 Section 9.22**, homicide is justified if Deputy Felix reasonably believed the conduct is immediately necessary to avoid imminent harm; the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear.

**Under the Texas Penal Code Title 2, Chapter 9, Section 9.31**, a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force.

Homicide is justified and not unlawful when committed by a person who reasonably believes that he or someone else was in imminent danger of being killed or who will suffer great bodily injury. For a homicide to be in self-defense, the person must reasonably believe in the need to defend him or others with deadly force. If the belief both subjectively exists and is objectively reasonable, it constitutes self-defense and the homicide is considered legally justifiable. The test for determining whether a homicide committed by a law enforcement officer was justifiable is whether the circumstances reasonably created a real fear of death or serious bodily harm to the officer or to another person.

Reasonableness must be considered in the context of the "dangerous and complex world" peace officers face every day, because what constitutes reasonable actions might seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.

*Amended Expert Opinion Report – Barnes v. Harris County*

To my knowledge, and based on my 38 years of law enforcement experience there is no requirement for law enforcement officers to use all feasible alternatives to avoid a situation where deadly force can justifiably be used.  There are however, cases that support the assertion that where deadly force is otherwise justified under the Constitution, there is no constitutional duty to use non-injuring alternatives first.

## Peace Officers Must Use Reasonable Force

Peace officers are often forced to make split-second decisions that must be reasonable under the circumstances.  In my opinion, it was reasonable for Deputy Felix to escalate to use a firearm to control the Mr. Barnes, when his level of resistance rapidly elevated from being compliant and but evasive, to non-compliant and assaultive.  When a higher degree of risk to a peace officer or to the public exists, a greater use of force is justified by a peace officer.

It should be noted that Mr. Barnes could have followed Deputy Felix's requests to exit his vehicle, and submit to additional questioning to determine his true identify, and to verify if he was legally in possession of the Toyota Corolla.   Mr. Barnes could have exercised good judgment by cooperating with Deputy Felix instead of being evasive regarding his identity, and the location of his reported driver's license in the trunk of his vehicle.

Mr. Barnes could have left the ignition key on the center console instead of using his body to conceal the movement of his right hand so he could grab the ignition key and start the engine of his vehicle.  Mr. Barnes could have obeyed Deputy Felix's commands to stop his vehicle, when he saw Deputy Felix's firearm near his head, but instead he made a conscious decision to not stop and submit to arrest; Mr. Barnes rapidly accelerated while Deputy Felix was standing on the door sill.

As Mr. Barnes' vehicle continued to increase speed and attempt to merge into the number 1 traffic lane, Deputy Felix reasonably believed Mr. Barnes was attempting to grab or deflect his firearm.  Deputy Felix removed his firearm from the interior of the vehicle, and repositioned his firearm and discharged it twice at Mr. Barnes.

Any reasonable officer faced with the same or similar facts and circumstances known to Deputy Felix would have used deadly force to protect his/her life from great bodily injury or death.  .

Peace officers are vulnerable to potential harm when attempting to control a violent, resisting and out of control armed suspect.  The primary goal of using force is to gain compliance of a suspect, not to cause unreasonable pain, injury, death or to inflict punishment.

When using controlling force, peace officers must be constantly aware that when they attempt to verbally control a resisting and non-compliant suspect, and are extremely close to or physically engaged with the suspect, because they are vulnerable to attack.  Conducting an arrest where the individual is extremely unpredictable, assaultive, and non-compliant is a dangerous moment for peace officers.  A peace officer's actions and reactions in these situations should always allow for a margin of safety while maintaining a position of advantage over the suspect.

*Amended Expert Opinion Report – Barnes v Harris County*

While it makes sense for criminal law purposes to consider whether the criminal uses the force with the purpose of causing or knowingly create a substantial risk of causing death or serious bodily injury, the question is whether the officer's actions are "objectively reasonable" in light of the facts and circumstances confronting them.

Under the provisions of the Texas Code of Criminal Procedure 2.13, It is the duty of every peace officer to preserve the peace within the officer's jurisdiction. To effect this purpose, the officer shall use all lawful means.

The officer shall in every case authorized by the provisions of this Code, interfere without warrant to prevent or suppress crime; execute all lawful process issued to the officer by any magistrate or court; give notice to some magistrate of all offenses committed within the officer's jurisdiction, where the officer has good reason to believe there has been a violation of the penal law; and arrest offenders without warrant in every case where the officer is authorized by law, in order that they may be taken before the proper magistrate or court and be tried.

Deputy Felix properly relied on his training and experience when he made a split-second decision to defend himself, when it became obvious to him that Mr. Barnes would do anything to escape arrest, even if it meant that Deputy Felix would be injured or killed.  Deputy Felix did not have time to determine why Mr. Barnes was refusing to comply with his  command to exit the vehicle, and why Mr. Barnes refused to stop the car after being commanded to stop, and when the deputy reasonably believed Mr. Barnes was attempting to deflect or grab his firearm, because any delay in reacting quickly to the threat could have meant life or death to the deputy.  Deputy Felix believed the threat to his life was real and it was imminent. Mr. Barnes' actions demonstrated that he had the means, the opportunity, the ability and the specific intent to cause Deputy Felix great bodily injury or death by fleeing the scene with Deputy Felix standing on the door sill.

It is my professional opinion, based on my extensive experience and law enforcement training that any reasonably well trained peace officer, faced with the same or similar circumstances known to Deputy Felix would have reasonably believed that the use of deadly force to stop Mr. Barnes life threatening assault was consistent with the Harris County Constable's Office Precinct 5 operational procedures, law enforcement procedures and practices and the reasonable officer standard.

Deputy Felix quickly ran out of options as Mr. Barnes' vehicle rapidly accelerated southbound on the tollway without any signs that Mr. Barnes was willing to stop the vehicle and stop fleeing from arrest.  It would appear that Deputy Felix's verbal commands, the display of a firearm in close proximity of Mr. Barnes upper body, to prevent Barnes from fleeing the scene and to take him into custody proved ineffective.  The only reasonable force option left available to Deputy Felix when the Mr. Barnes attempted to assault the deputy was deadly force.

*Amended Expert Opinion Report – Barnes v. Harris County*

It is my opinion that Deputy Felix did not discharge his firearm at a moving vehicle as the plaintiff alleges, he intentionally discharged his firearm at Mr. Barnes while standing on the door sill while the driver's door was open, and the vehicle was in motion,  because it was immediately necessary to protect his life.

The evidence shows that Deputy Felix was aware of the angle that his firearm was pointed when it was discharged and where the bullets would strike Mr. Barnes, which the investigation proves was not in the direction of innocent citizens driving on the tollway as the plaintiff alleges.

It is my opinion that the legislative intent of the Harris County Constable's Office Precinct 5 Standard Operating Procedures regarding shooting at vehicles, was written to dissuade deputies from shooting at a motor vehicle fleeing the scene, intentionally standing in the path of an approaching vehicle or from shooting out of a motor vehicle while moving.  There is nothing in the procedures that addresses the type of circumstances Deputy Felix found was confronted with, other than the sections of the procedures that govern the use of deadly force.

Even if the actions of Deputy Felix fell under the provisions of Precinct 5 Standard Operating Procedures for shooting at a moving vehicle, Deputy Felix was still in compliance with department regulations, because there is a clause in the use of force operating procedure that says Deputy Felix can discharge his firearm at a vehicle if it is immediately necessary to protect himself from unlawful deadly force.   Deputy Felix  reasonably believed deadly force was immediately necessary to protect himself from unlawful deadly force caused by Mr. Barnes.

The plaintiff's expert provided a Rule 26 report that highlighted the recommended progressive policies of IACP, PERF and other large state and federal law enforcement agencies on the east coast and some agencies in California who have established policies regarding restricting police officers from using deadly force against motor vehicles.  None of those recommended policies are required to be adopted by a law enforcement agency in the United States, because they are recommended guidelines, and they have no legal mandate on individual state and federal law enforcement agencies.   The Harris County Constable's Office Precinct 5 developed their standard operating procedures, based on the legal requirements of the Texas Constitution and not based on requirements of the  LAPD, New York City or the Philadelphia Police Department, or from other law enforcement leadership groups.

I am not aware of any state and federal law enforcement agency in the United States that forbids the use of deadly force against a motor vehicle under any circumstance, because those policies would place a reasonable officer in a very tenable situation when confronted with a unique set of circumstance where deadly force is reasonable under the facts and circumstances, in a tense and rapid evolving violent incident, based on the reasonable officer standard.

Even the International Association of Chiefs of Police (IACP) model use of force procedure deals with the issue of restricting the use of deadly force, not banning the practice all togethers, because leadership recognizes the increased dangers of shooting at or from a motor vehicle. To prohibit such uses of force per se, would present an unreasonable risk to the peace officer or others.

*Amended Expert Opinion Report – Barnes v Harris County*

The recommend shooting procedures developed by Police Research Forum (PERF) and CLEA use of force procedures model that of the IACP, and that of Lexipol, which is a procedure making body for over 3,400 law enforcement, fire and correctional agencies in the 35 states.

All of the use of force procedures from the agencies listed above identify procedures restricting the use of using deadly force against a vehicle in certain circumstances, however, their procedures recognize they cannot identify every possible scenario that a police officer could face where the use of force is reasonable under the specific facts and circumstances.

Therefore, shooting policies do not ban the use of deadly force against or from a motor vehicle in all circumstances. The courts recognize deadly force should only be used when it is objectively reasonable, if the individual officer reasonably believes it is necessary to protect themselves or others from the threat of bodily injury or death.

In *Thomas v. Durastanti,* #07-3343, 607 F.3d 655 (10th Cir.2010), a federal Bureau of Alcohol Tobacco and Firearms (BATF) agent fired at a vehicle that was trying to elude a stop in a parking lot, narrowly missing another BATF agent, and actually colliding with the firing agent.

In *Jenkins v. Bartlett,* #06-2495, 487 F.3d 482 (7th Cir. 2007) is another case in which the court ruled that an officer did not use excessive force in shooting and killing a motorist who hit the officer with a car.

In *Cordova v. Aragon*, #08-1222, 569 F.3d 1183 (10th Cir. 2009), relatives of a motorist shot and killed by a police officer at the conclusion of a vehicular pursuit sued the officer and city for excessive use of force. During the pursuit, the motorist had run a red light, tried to ram a police vehicle, and drove on the wrong side of a highway. The officer was attempting to deploy drop sticks, and the motorist then swerved his vehicle towards him. This was followed by the officer firing four or five times, striking the motorist in the back of the head and killing him.

In *Marion v. City of Corydon*, #08-2592, 559 F.3d 693 (7th Cir. 2009), a federal appeals court rejected claims of excessive force against officers who shot at a fleeing grocery store shoplifter. The shoplifter had resisted an officer trying to detain him after he admitted stealing merchandise when confronted outside the store, prevented the officer from using a Taser on him, and fled in his car at high speed.

The suspect drove recklessly, and avoided a rolling police roadblock. Officers on foot shot him as his vehicle came towards them, and when they feared for their safety and the safety of others. The officers who shot mistakenly believed, based on radio transmissions, that the suspect was armed.

> "We conclude that, under the totality of the circumstances, it was reasonable for the officers to think that [the plaintiff] seriously endangered officers and innocent bystanders, and it was reasonable for the officers to discharge their firearms in [his] direction to stop him. Thus, there was no Fourth Amendment violation."

49

*Amended Expert Opinion Report – Barnes v. Harris County*

The court in *McCullough v. Antolini*, #08-10176, 559 F.3d 1201 (11th Cir. 2009), found that deputies were entitled to qualified immunity for shooting and killing a motorist who refused to pull his truck over, led them on a high speed chase, refused to show his hands after finally pulling over, and then drove his vehicle in the direction of a deputy standing nearby.

Mr. McCullough used his truck in an aggressive manner, justifying the belief that he posed a risk of death or serious physical harm to officers or the public. Deputies could also reasonably believe that he was trying to escape, and provided him with an adequate warning before firing.

In *Sanders v. City of Minneapolis, Minn.*, #06-1356, 474 F.3d 523 (8th Cir. 2007), the court held that an officer acted properly in shooting a man who ignored orders to show his hands, and instead backed his car into a security guard's vehicle, followed by accelerating down an alley towards other police officers in his path. The officer's actions were aimed at trying to prevent him from injuring the other officers, and were reasonable under the circumstances, even if the suspect was then experiencing a bipolar episode. Because of this, there was also no violation of the Americans with Disabilities Act (ADA).

In *Hathaway v. Bazany*, #06-50602, 507 F.3d 312 (5th Cir. 2007), the court concluded that a police officer acted reasonably within an extremely brief period of time in shooting and killing a teenage motorist whose car struck him as it drove away following a traffic stop.

The officer stated that he had seen the car accelerate towards him and a "determined look" on the face of the motorist, and decided to fire upon realizing that he could not get out of the way. The officer himself testified during his deposition, that he did not know if he fired before, during, or after he was hit by the vehicle.

The court found that it was reasonable to conclude that the shooting and the vehicle striking the officer happened at close to the same time. The trial court excluded offered expert witness testimony by the father of the motorist, who is a police officer, arguing that the defendant officer must have been behind the car at the time of the shooting.

In this incident Deputy Felix was faced with a tense and rapidly evolving dangerous situation involving the sudden and threatening actions of Mr. Barnes. Deputy Felix is not required to wait until the moment Mr. Barnes caused him great bodily injury before he acted to stop the threat to his life. Based on Mr. Barnes sudden and rapid deadly threat, a verbal warning was not given before deadly force was used, due to the imminent threat that Mr. Barnes posed to the deputy.

## Human Dynamics

It is my opinion, based on my past 38 years of law enforcement experience and training as a human factors analysist, in the science of human reaction involving peace officers in rapid and chaotic and life threatening critical situations, it is my opinion that it could have taken Deputy Felix approximately 1.5 seconds or longer to perceive, evaluate and determine the appropriate course of action in response to the Mr. Barnes grabbing the ignition key and starting the car.

*Amended Expert Opinion Report – Barnes v Harris County*

Deputy Felix prepared himself for a potential life-threatening assault by being attentive and by positioning his firearm towards Mr. Barnes in an effort to convince him that it was not in his best interests to flee from the scene.

Any reasonable person who saw Deputy Felix in uniform with his weapon drawn and pointed at them and ordering them to stop trying to flee the scene, would have immediately stopped their vehicle for fear of being injured or killed.

Deputy Felix's actions did not escalate the situation, because Mr. Barnes was already acting irrationally and recklessly, with the specific intent to fleeing the scene regardless what warning Deputy Felix gave. Mr. Barnes started the car, he placed the gear shift lever in gear, and began driving the car forward before Deputy Felix acted by drawing his firearm and pointing it at Mr. Barnes in an attempt to stop his flight from the scene.

It should be noted that scientific studies on human dynamics conducted by the Force Science Institute in Mankato Minnesota, documented that it would only take Mr. Barnes .100 to less than a second or more to rotate his upper body to his left after obtaining the ignition key, while it could have taken Deputy Felix 1.5 to 2.3 seconds to perceive, analyze, and determine the best course of action and then react to Mr. Barnes' movement.

The video footage on Deputy Felix's patrol car is evidence that Mr. Barnes moved unabated to insert the key in the ignition, start the car and prepare to put the vehicle in gear before Deputy Felix could react.

Based on my experience and training as a human factors analysist, and after reviewing thousands of use of force incidents, the "Average" deadly force encounter occurs within 2 to 3 yards or less, and occurs within a matter of 1 to 4 seconds or less. Most of the time, the attack on a peace officer will come as a surprise and without warning as it did in this incident. The perception/reaction time of the officer will always give the advantage to an adversary and not to the officer.

It is my belief that if had Deputy Felix not been prepared by removing his firearm from the holster and pointing it at the Mr. Barnes, and discharged his firearm at Mr. Barnes when he did, Deputy Felix could have been ejected off the vehicle into the K-rail separating the north and southbound lanes of traffic, or he could have ejected into the north or southbound lanes of traffic of the tollway and suffered serious bodily injury or death.

**Reaction Time Slows a Trained Response**

Reaction time, commonly known as "Hicks-Lyman Law" named after British and American psychologists William Edmund Hick and Ray Hyman, describes the time it takes for a person to make a decision as a result of the possible choices he or she has. Increasing the number of choices will increase the decision time logarithmically.

*Amended Expert Opinion Report – Barnes v. Harris County*

Simple reaction time is the time required for an observer to respond to the presence of a stimulus. The time it takes to make a decision increases as the number of alternatives increases. For example, the average reaction time of an individual driving a motor vehicle is between 1.5 to 2 to 2.3 seconds, but it depends on a variety of other human dynamic factors including the individual's attentiveness, training and experience.

Based on the OODA Loop concept (Colonel John Boyd developed the concept of Observe, Orientate, Decide and Act concept for military pilots) there are four steps of judgment that an officer must complete when confronted with a critical decision, each of them requires the consumption of time, especially when there is a consideration to use deadly force.

- The first step in the decision-making process deals with perceiving, receiving, processing and encoding the sensory information.
- The second step deals with analyzing the perception, and deciding what the information means.
- The third step is choosing the correct response and then deciding how to react to the information.
- The last step in the process deals with executing the response accurately and appropriately.

The following reaction types are listed as follows:

**Go/No-Go reaction time** tasks require that the subject press a button when one stimulus type appears and withhold a response when another stimulus type appears. For example, the subject may have to press the button when a green light appears and not respond when a blue light appears.

**Choice reaction time** tasks require distinct responses for each possible class of stimulus. For example, the subject might be asked to press one button if a red light appears and a different button if a yellow light appears.

**Discrimination reaction time** involves comparing pairs of simultaneously presented visual displays and then pressing one of two buttons according to which display appears brighter, longer, heavier, or greater in magnitude on some dimension of interest.

Due to momentary attentional lapses, there is a considerable amount of random variability in an individual's reaction time. To control attentional lapses researchers typically require a subject to perform multiple trials, which are then averaged to provide a more reliable measure.

Reaction time is related to how fast an individual's nervous system is able to gather, process, and respond to information in the environment. Signals from the eye pass down the optic nerve into the visual cortex of the brain where they are processed, and a response signal goes from the brain, down the spinal column, and into nerve cells telling the muscles to contract. All of this takes a measurable amount of time.

*Amended Expert Opinion Report – Barnes v Harris County*

The average reaction time is between 1.5 to 2.5 seconds,  and can vary with age, gender, muscle memory, degree of physical fitness, tiredness after physical and mental exertion, exhaustion, indecisiveness, apprehension and other variables. (The medium reaction time is 2.3 seconds)

Based on the most recent Force Science studies conducted at the Minnesota State University at Mankato, Minnesota, a trained peace officer can raise their firearm using one or two hands from a ready position, point and aim the firearm and pull the trigger within an average time of .83 to 1.71 seconds.  Deputy Felix was so mentally and physically prepared that he drew his firearm from his holster in less than 1/3 of a second as he moved towards Mr. Barnes.

Additional clinical studies have been conducted by the Force Science Institute and other experts that also identify officer reaction-response times in firing a handgun. (G Smith 1990 - Evaluation of law enforcement officer combat handgun skills. Smith and Wesson Academy Newsletter, November 7-8.) (Tobin, E.J. and Fackler, M.L. (1997) (Journal of the International Wound Ballistics Association, 3(1), 6-9.)

These studies established the average amount of time it takes for a person to pull the trigger of a firearm to be approximately .24 hundredth of a second and .32 to .35 hundredth of a second to stop firing.

The results of the above listed studies demonstrate that many variables go into an officer's ability to react to stimuli in a timely manner and that even in laboratory conditions, there is ample time for the threat picture to change before an officer can either turn on, or turn off, a decision to react by firing a weapon.

Deputy Felix's rate of fire with his pistol is consistent with the numerous action/reaction studies that have been conducted by the Force Science Institute, and E.J. Tobin and M.L. Fackler [Tobin, E.J. and Fackler, M.L. (1997) Officer reaction-response times in firing a handgun; Wound Ballistics Review: Journal of the International Wound Ballistics Association, 3(1), 6-9] and the training evaluations that I have personally conducted during my tenure as a law enforcement firearms trainer over the past 40 years.

The results of these human reaction studies help identify the time it could have taken for Deputy Felix to discharge two rounds using a one-hand hold on his weapon is approximately 1.5 seconds or less to react to the threat when he felt the pressure on his right hand that was holding his firearm.

## Harris County Constable's Office Precinct 5 Use of Force Standard Operating Procedures

It is my opinion that the use of deadly force by Deputy Felix was consistent with current law enforcement policies and procedures, and Harris County Constable's Office Precinct 5's Use of Force Standard Operating Procedures 200/2.14, if he reasonably believed that his life was in imminent jeopardy of being killed or seriously injured.

*Amended Expert Opinion Report – Barnes v. Harris County*

## Use of Force Standard Operating Procedures 200/2.14

The Harris County Constable's Office, Precinct 5 places the highest value on the life of the deputies and the public and the rules and procedures of the office are designed to ensure that this value guides the use of firearms by deputies.

A.   Use of Deadly Force

The basic responsibility of deputies to protect life also requires that they exhaust all other reasonable means for apprehension and control before resorting to the use of firearms. Deputies are equipped with firearms as a means of last resort to protect themselves and others from the imminent threat of death or serious injury.

Above all, this department values the safety of its employees and of the public.  Likewise, it is believed that deputies should use firearms with a high degree of restraint.

Therefore, it is the standard operating procedures of this department that the use of firearms is never to be considered routine, is permissible only in defense of life or serious bodily injury, and then only after other reasonable means have been exhausted, taking into consideration the information known or perceived by the officer at the time force was used.

B.   Rules

The standard operating procedures stated above is the basis of the following set of rules that have been designed to guide deputies in all cases involving the use of firearms:
1.   Deputies shall not discharge their firearms except to protect themselves or another person from imminent death or serious bodily injury.
2.   Deputies shall discharge their firearms only when doing so will not endanger innocent persons.
3.   Deputies shall not discharge their firearms to threaten or subdue persons whose actions are destructive to property or injurious to themselves, but which do not represent an imminent threat of death or serious bodily injury to the deputy or others.
4.   Deputies shall not discharge their firearms to subdue an escaping suspect who presents no imminent threat of death or serious bodily injury.
5.   Do not discharge a firearm from a moving vehicle or at a fleeing vehicle unless you reasonably believe that deadly force is immediately necessary to protect yourself or another person from unlawful deadly force.

*Amended Expert Opinion Report – Barnes v Harris County*

F.    Duty to Render Aid

Deputies shall ensure that any person injured or believed to be injured as a result of the use of force, receive appropriate first aid and/or professional medical attention.
Whenever a subject has visible injuries as a result of a use of force, or complains of injuries as a result of use of force, the deputy shall call EMS.

The number of rounds fired by Deputy Felix at Mr. Barnes is consistent with the firearms training objectives of the Harris County Constable's Office Precinct 5 training curriculum.  It is consistent with the manner in which all deputies in the Harris County Constable's Office Precinct 5 are trained to fire their firearm at a person that pose a substantial and immediate threat to their safety or the safety of others until the threat is stopped.

In my opinion the use of deadly force by Deputy Felix is consistent with law enforcement practices, and Texas Penal Code, Sections 9.51 and 9.52, which delineates the Texas law of justifiable homicide. The law specifies that a deputy must not use deadly force except in certain lawful or authorized situations. No deputy has the right to extend this power, but must decide his/her action in light of the circumstances confronting him/her within the limitations of his/her authority.

**Perception Differences of Officers and Civilians**

It has been my experience, based on 38 years of law enforcement experience, the training of thousands of peace officers, and researching thousands of law enforcement use of force incidents, that the perceptions of peace officers will vary in any situation based on the degree of stress they encounter.

The perceptions of witnesses will also be impacted depending on their state of mind at the time they witness a crime, their past history with law enforcement and their personal bias and knowledge of law enforcement tactics.  The location of the witness, distances and angle of viewing by witnesses in or about the incident scene will vary.  A person's eyesight, their hearing abilities and what they believe they hear or want to hear and their prejudices all enter into the equation.

The perceptions of the peace officer are also subject to judgment.  Perceptions, however, also must be judged according to timeliness. That is, the shorter the time period involved, the faster events occur, and the more confusion present in the environment, the less accurate the officer's probable total perception of the facts and circumstances will be.

Yet, typical depositions and testimonies of officers involved in use of force cases include answers of "I don't recall" to questions related to distances, clothing descriptions, positioning, exact distances from a suspect, sequencing of events, lighting conditions, who fired their weapon first, the number of rounds fired and the amount of time between shots fired, when handcuffs were applied and who applied them, and what the involved officer actually uttered during the event, etc.

*Amended Expert Opinion Report – Barnes v. Harris County*

Human perceptions are limited by scope, amount of information taken into account, and time. Therefore, mistakes in perception and resultant mistakes in actions are not just probable, but predictable during a critical situation.

Given that no human can be aware of all occurrences in the immediate environment, especially in a rapidly evolving and stressful situation, similar to that experienced by Deputy Felix in this incident, some allowance must be made for this human imperfection, even in the most serious cases. The peace officer should not be judged for acting upon an imperfect data base if other responsible officers in the situation may have come to similar inaccurate perceptions.

An officer's actions must be judged on his/her perception at the time of the incident, not on absolute fact. The training standards for judging the use of force and standards for judging the actual use of force should be synonymous.

The standards must allow latitude both for errors in perception and for less-than-perfect performance of complex open skills, especially when confronting a resisting suspect who is believed to have committed a crime, and is armed and committing a life-threating movement when ignoring an officer's commands to show their hands and to comply with their commands.

Each set of circumstances will require peace officers to exercise judgment in the decision of the force to use. Peace officers must be aware of and follow their agency's policies regarding the use of any force used to protect oneself and innocent citizens, as Deputy Felix did in this incident.

**Incapacitation and Knockdown Power**

Few, if any law enforcement shooting incidents will present a peace officer with an opportunity to take a careful, precisely aimed shot at a designated area of a person's body, especially when they are moving in tight confined spaces and open areas during the hours of darkness and ambient light.   Law enforcement involved shootings are characterized by their sudden, unexpected occurrence by rapid and unpredictable movement of both officer and adversary, by limited and partial target opportunities, by poor light and unforeseen obstacles, and by the life or death stress of sudden close and personal violence.

Law enforcement firearms training is properly orientated towards "Center of mass" shooting. That is to say, peace officers are trained to shoot at the center of whatever is presented for a target.   Proper shot placement is placement in the center of that part of the adversary that is presented, regardless of anatomy or angle or body positioning.

In order to predict the likelihood of incapacitation with any handgun round, an understanding of the mechanics of wounding is necessary.   There are four components of projectile wounding. Not all of these components relate to incapacitation, but each of them must be considered.

*Amended Expert Opinion Report – Barnes v Harris County*

They are:

1.   **Penetration**.  The tissue through which the projectile passes, and which it disrupts or destroys.

2.   **Permanent Cavity**.  The volume of space once occupied by tissue that has been destroyed by the passage of the projective.  This is a function of penetration and the frontal area of the projectile.  Quite simply, it is the hole left by the passage of the bullet.

3.   **Temporary Cavity**.  The expansion of the permanent cavity by stretching due to the transfer of kinetic energy during the projectile's passage.

4.   **Fragmentation**.  Projectile pieces or secondary fragments of bone which are impelled outward from the permanent cavity and may sever muscle tissues, blood vessels, etc., apart from the permanent cavity.  Fragmentation is not necessarily present in every projectile wound.  It may, or may not, occur and can be considered a secondary effect.

## Harris County Constable's Office Precinct 5 Firearms Training

On March 25, 2019, Harris County Senior Associate Attorney Mary Baker and I contacted Precinct 5 firearms instructor Sergeant Preston, an 18 year veteran with Precinct 5, to determine the type and amount of firearms training that is provided to all Constables in Precinct 5, and to identify the duties and responsibilities and the history of Constables in Texas that qualifies them to be licensed professional peace officers.

It was learned that the in 1836, the Constitution of the Republic of Texas provided for the election in each county of a sheriff and a sufficient number of Constables.  In 1876, there was an effort to decentralize control over state government, and the Texas Constitution mandated that constables would be elected at a precinct level.

The Texas Code of Criminal Procedure, Article 2.12 determined that constables, deputy constables, and those reserve deputy constables who hold a permanent peace officer license issued under Chapter 1701, Occupations Code, are peace officers. Constables are subject to the same training mandates for employment, and continued education for licensing, established by the Texas Commission on Law Enforcement for any peace officer in Texas.

The duties of Harris County Precinct 5 officers are not limited to primarily serve as officers of the courts, delivering subpoenas, citation and notices of civil suits and assist collecting judicial debts as the plaintiff's expert opines.

*Amended Expert Opinion Report – Barnes v. Harris County*

The primary function of Precinct 5 is the patrol division where officer enforce Texas Transportation Codes, including, but not limited to traffic infractions, misdemeanor and felonies, hit & run and accident investigations, reckless driving, driving under the influence of drugs and alcohol, and criminal acts on the tollway including vehicular manslaughter.

The plaintiff's expert opines that Constables have minimal experience in dealing with crimes and criminals, because they primarily deal with delivering subpoenas, citations and notices of lawsuits and collect judicial debts.  To suggest that the Constables for the most part only handle administrative type duties, ignores the rigorous requirements that Constables must maintain and the responsibilities they are required to perform to keep the public safe.

It should be noted that Constable 5 Deputies process civil writs, they enforce local state and local ordinances in the parks, and they conduct criminal investigations into human trafficking, and illegal gambling and environmental crimes. Precinct 5 supports a tactical support unit, a narcotic unit, a major offender unit, a special investigation unit, a K-9 Unit and a motorcycle selective enforcement unit.

Precinct 5 Constables detain and arrest individuals for violations of the Texas Transportation Code, the Texas Penal Code, Health & Safety Code, Code of Criminal Procedure, Texas Family Code and other related Texas Statutes subject to their jurisdiction.

Constables have to attend a certified peace officer academy, successfully pass all required curriculum and performance requirements, and then successfully complete a field training program before they are allowed to operate in a solo capacity for their precinct. A Precinct 5 Constable must continue to participate in TCOLE approved educational and perishable skills training courses throughout their career to maintain their peace officer certification.

Sergeant Preston stated Precinct 5 Constables are all certified and licensed peace officers in compliance with the Texas Commission on Law Enforcement (TCOLE ), that was established as a regulatory agency in 1965.  TCOLE serves as the regulatory agency for the certification and licensing of constables, marshals, state troopers, Texas Rangers, sheriffs and their deputies, police officers, agents of the Alcoholic Beverage Commission, the Attorney General and Game Wardens.  TCOLE grants certifications for peace officers after minimum standards are met or suspends or revokes licenses for noncompliance, and verifies that continuing education requirements are fulfilled for a Basic, Intermediate, Advanced and Master Peace Officer Proficiency certification.

Sergeant Preston advised Deputy Constable Felix's certification with TCOLE is current and that he has met all of the training requirements for proficiency with his firearm.  He said officers in Precinct 5 qualify with their firearms 40 hours every two years.  Precinct 5 has conducted firearms qualifications twice a year until the calendar year 2013, where a firearms training session was substituted for qualification training for all sworn personnel. The Constables are provided deadly force training, use of force standard operating procedures reviews, scenario training that includes decision making and computer generated training sessions.

*Amended Expert Opinion Report – Barnes v Harris County*

All Precinct 5 Constables participate in pistol and rifle training exercises during daytime and during low lighting conditions, that includes distances and close contact shooting, similar to the distances Deputy Felix discharged his firearm.  According to Sergeant Preston, Constables are trained to discharge their firearm at an individual until the threat has stopped, when they reasonably believe their life or the lives of another are in jeopardy of suffering great bodily injury or death.  The number of rounds fired are can vary from one to multiple times depending on the facts and circumstances.

Sergeant Preston said all of the firearms training objectives and lesson plans regarding the type of firearms training presented to Precinct 5 Constables are in compliance with TCOLE learning objectives.  He stated the command staff of Precinct 5 are familiar with the philosophy and the techniques that are presented during the training, due to the fact that each member of the staff is required to participate in mandatory qualifications and firearms training to maintain their proficiency and license certification.

Sergeant Preston is familiar with the facts and circumstances of Deputy Felix's shooting incident and said that in his opinion Deputy Felix did not violate Precinct 5 Use of Force/Deadly Force Standard Operating Procedures 200/22.14 by shooting at Mr. Barnes with his service weapon, and not at his vehicle when he tried to stop the Mr. Barnes from injuring him.  Sergeant Preston said Deputy Felix was shooting at Mr. Barnes while attached to his vehicle, and he does not agree with the plaintiff's assertion that Deputy Felix shot at the vehicle in violation of department standard .

The Harris County Constable's Office Precinct 5 requires their deputies they hire to demonstrate proficiency with their firearms during a variety of courses during daytime and low light conditions when they attended the Basic Peace Officer Academy training.

Precinct 5 Constables are exposed to a variety of basic firearm courses and combat training courses that require them to fire constantly at a target with multiple rounds during multiple strings of fire.  The objective of this training is to simulate moving targets, multiple threats, discrimination of the threat, and use of cover when available, and single and double handed shooting under timed fire.   Constables are taught to identify a credible threat and to discharge their firearm at that threat until the threat is stopped.  Constables are expected to continually access the threat during gunfire, and stop shooting when it becomes evident that the threat has been stopped.

Precinct 5 Constables are trained to give verbal warnings before deadly force is to be used, unless the threat is imminent and a verbal warning is not feasible as it was in this incident.

The majority of the firearms training courses that Constables must successfully pass in the peace officer academy, and that experienced peace officers must successfully demonstrate proficiency during in-service training, involves multiple shots fired at a stationary or moving target within a set period of time.

*Amended Expert Opinion Report – Barnes v. Harris County*

Various courses of qualification vary and may be used by the range officers during the scheduled firearms training sessions, however, when qualification is necessary for any firearm authorized by Precinct 5 only the specific course of fire designated for that firearm may be used.

Although speed is important to a combat shooter, the department emphasizes accuracy and proper safe handling techniques above all other aspects when firearms training is being conducted and they reinforce the department's use of force concepts.

Deputy Felix's training records indicate that he complied with the firearms training standards of the Harris County Constable's Office Precinct 5 when he successfully met TCOLE firearms training standards in the Basic Peace Officer Academy and during his tenure as a uniform patrol deputy prior to this incident.

When you consider the environmental factors, such as darkness and low visibility of an individual who is in motion, and the fact that peace officers frequently cannot determine the accuracy of their shots due to positioning and height differences, multiple shots are frequently discharged at suspects until the threat of his/her actions is eliminated.

If an individual threatens an officer and the officer reasonably believes his/her life is in imminent jeopardy of great bodily injury or death, it would not be unexpected for an officer to rapidly fire his/her weapon at the suspect in order to stop the immediate threat.

The number of rounds fired by a peace officer at any assailant in a deadly force encounter is directly proportionate to the level and intensity of the threat that an individual can pose or continues to pose to the peace officer.  Peace officers are not trained to fire 1 to 2 rounds and re-access the level of threat, they are trained to use deadly force until the threat is stopped as it was in this incident.

**Assessment of the MAV Video Camera Footage**

The interpretation of video evidence is always based on bias, and is best illustrated by sport's enthusiasts who view high resolution TV footage that is broadcast at 60 frames per second of a baseball player who appears to beat a throw running to first base.  As an example, if two individuals watch a video of a ball player who runs to first base and appears to reach the bag before being thrown out, one person will say the runner is safe and the other will say he was out.

There are many reasons why such indifference exists between viewers, some of which are due to the focus of the individuals viewing the video, the speed of the movements being captured, the number of times the footage is reviewed from the angle of the camera, the field of view of the camera lens and the speed that the action was recorded, lighting conditions and the clarity of the footage.  It isn't until instant replay is introduced to a viewer, using multiple camera angles, that clarity emerges to determine if the player is out or safe, or if the runner was so fast that the camera could not positively determine a result either way.

*Amended Expert Opinion Report – Barnes v Harris County*

Instant replay allows video footage to be viewed at a fraction of the video frame, rather than one frame at a time. The viewer of the TV footage concludes the runner is either safe or out based on looking at the event at 60 frames per second. The instant replay technicians, however, can evaluate the footage 1/60 of a second at a time to determine if the first baseman's foot was on the bag, and if the ball was in the first baseman's glove before the runner's foot touched the bag. That means that there are some of the 60 parts of the 1 second frame that occurs during the video footage that may be missed if it isn't reviewed frame by frame.

There are limitations with body and in-car cameras, because they record events while the officer is in motion, and it may not capture all of the events clearly from the officers' senses and perspective. The current prevailing thought in the United States is that once every patrol car and police officer is equipped with a camera, the controversy will be taken out of police shootings and other uses of force, because "What really happened" will be captured on video for all to see, but unfortunately that is not the case.

There is no doubt that body cameras and in-car video cameras, cell phone cameras, and surveillance video cameras, can provide a unique perspective on police encounters, and in most incidents involving a detention or an arrest, are likely to help officers demonstrate they were acting legally and reasonably.

But like other devices, a camera mounted on an officer's uniform installed in a vehicle has limitations that need to be understood and considered when evaluating the recorded images. A camera can provide more information about what happened during a police contact, but it cannot necessarily provide all the information needed to make a fair and impartial final judgement regarding the reasonableness of an officer's conduct. There still may be influential human factors involved, such as what has been outlined above, apart from what the camera sees.

At the current level of development, a portable and in-car video cameras are not capable of following the officer's eyes like the eye-tracker devices used by the Force Science Institute and Doctor Joan Victors at the University of Calgary, Canada, in their studies of officer perception, cognition and decision making. The complex apparatus they use in their research can follow the movement of an officer's eyes and superimpose small red circles on video that mark precisely where an officer is looking from one microsecond to the next.

A body camera records a broad scene in two dimensions, but it cannot document where within that scene an officer is looking at any given instant. If an officer glances away from where the camera is concentrating, the viewer may not see action within the camera frame that which appears to be occurring right before their eyes. The camera cannot record what the officer smells, feels or may or not hear.

The camera cannot acknowledge physiological and physiological phenomena that an officer may experience under high stress, such as auditory exclusion (tunnel hearing), cognitive dissonance (forgets most significant aspects of a critical incident-out of sequence) or selective attentiveness (tunnel vision).

*Amended Expert Opinion Report – Barnes v. Harris County*

As a survival mechanism, the human brain may suppress some incoming visual images that seem unimportant in a life-threatening situation so they can completely focus very narrowly on the threat.  The officer won't be aware of what their brain is screening out that is not important to their survival, because the process is automatic.

The human brain may also play visual tricks that the camera can't match. If a suspect is driving a vehicle towards an officer, for example, it will seem to be closer, larger, and faster than it really is, because of a phenomenon called "Looming."  Camera footage may not convey the same sense of threat that a person experienced.

To summarize, there can be a huge disconnect between a person's field of view and their visual perception and the camera's.  When someone reviews video footage recorded on a camera and then judges an officer's actions they could have a profoundly different sense of what happened than the officer had at the time the event was occurring.

Viewing video footage at 30 frames per second from a standard Microsoft Windows or AVI media players will not provide the viewer with an accurate assessment of the events that occurred.  If the motion or action occurred faster than what the camera could document, the brain cannot recognize it actually occurred (motion within 1/3 of a second), and in addition, the recording is viewed from the camera's perspective and not from the involved officer.

If a viewer relies totally on video footage, at the speed it was recorded, and not at a slower video speeds, they will have missed crucial evidence that could support the officer's assessment of the facts and circumstances, based on the officer's perspective.

I reviewed the video footage from Deputy Felix's patrol car camera extensively using a Microsoft Media Player, and an ALC Media Player software, without the capability of playing the footage at a slower speed.

I then used an EVE Media Player from Nework Optixs that can play any type of video format available, to review the video footage. Every container (or file extension type, i.e. .MOV, .3GP, .FLV, .MP4, .MKV) no matter how obscure or how old or new. The EVE Media Player will play them perfectly every time and allows the viewer to view the video frames at the rate it was recorded.

After an extensive review of the audio and video components of the Precinct 5 MAV video, it is my opinion that the amount of time that elapsed from when Deputy Felix opened the driver's door of Mr. Barnes' vehicle, to the time Mr. Branes' vehicle was put into motion was approximately 5 seconds.  While Deputy Felix was standing close to Mr. Barnes with his gun drawn in an attempt to convince him not to leave the scene, he had approximately ¼ of a second to react to the car starting to drive away.

*Amended Expert Opinion Report – Barnes v Harris County*

The amount of time that elapsed after the car accelerated from a dead stop to the point where Mr. Barnes was shot was approximately 2 seconds.  The amount of time that elapsed after Mr. Branes was shot, to the time Barnes brought his vehicle to a stop was approximately 2-3 seconds.  The following events occurred at the approximate time frames;

- Approximately ½ of a second after Deputy Felix opened the driver's door and stood and watched Mr. Barnes as he prepared to exit the vehicle, the left turn signal light was activated.
- Approximately 3/4 of a second after the left turn signal light activated, the 3rd brake light was activated, and then the right and left brake lights were activated.
- Approximately $1/30^{ths}$ of a second after the brake lights activated, Deputy Felix began moving towards the frame of the vehicle where he placed is left foot onto the door sill.
- Approximately $8/30^{ths}$ of a second later, (less than 1/3 of a second) Deputy Felix starts to draw his firearm from his holster and clears the holster in approximately $2/30^{ths}$ of a second.
- After the firearm clears the holster, Deputy Felix points his firearm into the driver's door window towards Mr. Barnes, in approximately $17/30^{ths}$ of a second ( slightly over ½ of a second).
- Approximately $5/30^{ths}$ of a second after Deputy Felix removed his firearm from the holster, the 3rd brake light goes off, and almost simultaneously, Deputy Felix's firearm is inside the vehicle and Deputy Felix yells at Mr. Barnes not to move.
- Approximately $3/30^{ths}$ of a second later the right and left brake lights went off.
-  In approximately $4/30^{ths}$ of a second after the brake lights went off,  the left rear portion of the Toyota can be seen moving downward, and in $1/30^{th}$  of a second later it began moving forward.
- Approximately $7/30^{ths}$ of a second later Deputy Felix's weight is seen shifting to his left foot as his right foot begins to move off of the ground onto the door sill.
- Approximately $13/30^{ths}$ of a second later Deputy Felix's right foot appears to step up on the door sill as the Toyota picks up speed.
- Approximately $8/30^{ths}$ of a second (less than 1/3 of a second) after the vehicle moves forward from a stopped position, the driver's door begins to close against Deputy Felix as the vehicle gains momentum.
- At approximately 1 & $9/30^{ths}$ of a second (less than 1 ½ a second) after the vehicle started moving forward, Deputy Felix's right arm can be seen moving backwards out of the driver's window.
- At approximately 1 second later, Deputy Felix's arm can be seen bent, elbow high, wrist bent holding the firearm near his face.
- At approximately $12/30^{ths}$ of a second Deputy Felix moves his arm forward into the vehicle and fires two rounds at Mr. Barnes.
- Approximately 1 second and $5/30^{ths}$ of a second after the 2nd shot was fired, the right and left brake lights illuminated and the Toyota rapidly slows and came to a stop in approximately 1/3 of a second.

*Amended Expert Opinion Report – Barnes v. Harris County*

## Chief Terry Allbritton's Perspective of the Facts

On April 12, 2019, I contacted Chief Terry Allbritton, the assistant Chief of the Toll Road and Parks Division regarding the identification of the MAV unit that is installed in Precinct 5 patrol vehicles, and to clarify his assessment of Deputy Felix's actions that led to the shooting incident.

Chief Allbritton stated that the in car video system used by Precinct 5 is the Arbitrator recording system that was purchased from Panasonic Security, and records video at 30 frames per second. A video player, that is propriety software from Panasonic Security, accompanies the recording system and allows Precinct personnel to review the video footage at slower speeds.

Chief Allbritton informed me that he has viewed the video footage from Deputy Felix's patrol vehicle at a normal speed and at a slower speed, which helped him better understand the use of force decisions that Deputy Felix made during his contact with Mr. Barnes. Chief Allbritton was critical of the plaintiff's expert's opinion regarding Deputy Felix's position at the driver's door. He stated the average speeds on the tollway are approximately 70 mph and the volume of vehicles traveling northbound and southbound on the tollway, create excessive noise that makes it extremely hard for his deputies to communicate with drivers that they stop. Deputies have to cautiously position themselves very close to the driver's window to speak with the driver and occupants of vehicles, and unfortunately place themselves in harm's way by doing so.

It was Chief Allbritton's opinion that Deputy Felix's was not relaxed or  inattentive during the contact with Mr. Barnes, as the plaintiff's expert opines. Deputy Felix was alert and appeared to be very cautious as he responded to Mr. Barnes furtive movements inside the vehicle. He said he personally became highly suspicious of Mr. Barnes' offer to allow Deputy Felix to walk to the back of his vehicle to look in the trunk for his driver's license, and suspected Mr. Barnes was planning on assaulting the deputy or fleeing from the scene.

Chief Allbritton said it was reasonable for Deputy Felix to ask Mr. Barnes to get out of his vehicle for further questioning due to the fact that he smelled the odor of marijuana coming from the vehicle and due to the fact that Mr. Barnes had no identification. He said when Mr. Barnes attempted to flee the scene of the detention, Deputy Felix tried to convince Mr. Barnes at gunpoint to stop trying to leave the scene, but the vehicle immediately accelerated away with Deputy Felix partially standing on the door sill.

Chief Allbritton noted that the driver's door on the Toyota Corolla immediately swung into the deputy's body as the Toyota fled the scene  He said it was his opinion that if Deputy Felix feared for his life, he discharged his firearm in accordance with Precinct 5's Use of Force Standard Operating Procedures, and does not believe any motorist was at risk of being injured by a stray bullet.

*Amended Expert Opinion Report – Barnes v Harris County*

**OPINIONS:**

**MR. BARNES RECKLESS ACTIONS, AND HIS WILLFULL AND WANTON DISREGARD FOR HIS SAFETY AND THAT OF THE DEPUTY FELIX, LEFT DEPUTY FELIX WITH NO OTHER REASONABLE ALTERNATIVE BUT TO USE DEADLY FORCE TO STOP MR. BARNES LIFE-THREATENING ASSAULT.**

**MR. BARNES HAD KNOWLEDGE, OR HE SHOULD HAVE HAD KNOWLEDGE THAT HE WAS BEING DETAINED BY A PEACE OFFICER, AND HE HAD A DUTY TO REFRAIN FROM USING FORCE OR ANY WEAPON TO RESIST SUCH DETENTION.**

**MR. BARNES HAD THE ABILITY TO SUBMIT TO ARREST AT ANY POINT WHILE BEING CONTACTED BY DEPUTY FELIX AND WHEN HE FOUND HIMSELF IN A POSITION WHERE HE COULDN'T ESCAPE FROM THE DETENTION.**

**ANY REASONABLY WELL TRAINED PEACE OFFICER FACED WITH THE SAME OR SIMILAR FACTS AND CIRCUMSTANCES KNOWN TO DEPUTY FELIX AT THE TIME OF THIS INCIDENT WOULD HAVE REASONABLY BELIEVED THAT USING DEADLY FORCE TO CONTROL A RESISTING AND DANGEROUS PERSON TO OVERCOME HIS VIOLENT AND LIFE THREATENING RESISTANCE WAS IMMEDIATELY NECESSARY UNDER THE FACTS AND CIRCUMSTANCES.**

**THERE IS NO EVIDENCE THAT THE TRAINING OPERATIONAL PROCEDURES OF THE HARRIS COUNTY CONSTABLE'S OFFICE PRECINCT REGARDING THE USE OF DEADLY FORCE WERE INADEQUATE IN THE CALENDAR YEAR 2015.**

It is my professional opinion, based on my training and extensive tactical experience as a peace officer, an arrest and control instructor for over forty-four years,  a SWAT officer, supervisor and SWAT Commander for over twenty years, that any reasonably well trained peace officer, faced with the same or similar facts and circumstances Deputy Felix faced, would have reasonably believed that the Mr. Barnes was armed with a deadly weapon, and the use of deadly force to stop the Mr. Barnes's perceived deadly assault was consistent with his department procedures.

In my opinion, the arrest and control tactics used by Deputy Felix to stop, control and arrest Mr. Barnes did not in any way force or contribute to Mr. Barnes motivation to flee from Deputy Felix in his vehicle.

There is no evidence that the actions and decisions of Deputy Felix fell below the established basic law enforcement professional standards, nor is there any corroborating evidence that his tactics and actions when he confronted Mr. Barnes were deliberately reckless and dangerous.

Mr. Barnes' death was not due to a lack of the number of law enforcement personnel on the scene, or failure to use a law enforcement canine, and waiting for trained crisis intervention personnel to arrive, or restricting Mr. Barnes movements, which he had no control over.

*Amended Expert Opinion Report – Barnes v. Harris County*

It is my opinion that it wasn't the deputy's tactics or the alleged lack thereof, before, during and after attempts were made to detain Mr. Barnes that caused Mr. Barnes to lose his life, it was Mr. Barnes's reckless and irrational decision making when he refused to follow Deputy Felix's commands to step out of the car for further investigation, and to recklessly accelerate onto the tollway at unsafe speeds while Deputy Felix was standing on his vehicle with a firearm pointed at him.

**OPINION:**

**THERE IS NO EVIDENCE THAT DEPUTY FELIX WAS IMPROPERLY TRAINED IN FIREARMS DISCIPLINE AND CRITICAL DECISION MAKING.**

Deputy Felix attended and graduated from the peace officer academy at the University of Houston Downtown, which is one of many organizations in Texas that offers a minimum of 643 hours of TCOLE required training for basic peace officer certification. The University of Houston also offers on-line and in-service training for peace officers in their respective agencies to maintain their professional license. All peace officers in Texas must meet the minimum training requirements to become licensed as a peace officer in compliance with TCOLE regulations 215.5. After Deputy Felix was hired by the Harris County Constable's Office Precinct 5, he successfully completed over 1,800 hours of TCOLE required training requirements during his tenure to maintain his professional license.

In my opinion there is absolutely no evidence that supports the plaintiff's allegation that Deputy Felix was inadequately prepared and trained by the Harris County Constable's Office Precinct 5. On the contrary, the training records of Deputy Felix indicate that the professional training that the Harris County Constables Office Precinct 5 provides is consistent with other law enforcement officers in the United States.

It should be noted that the ultimate goal of any viable and professional law enforcement training program is to prepare an officer to deal with extreme situations he is likely to encounter in the field. The best way to prepare an officer to deal effectively and professionally with extreme situations and their attendant hazards, stressors, and stress-induced affects, is to provide an officer with the fundamentals of marksmanship and effective decision making skills.

The cognitive and psychomotor or perishable skills training Precinct 5 Deputies receive in the basic peace officer academy, and through their in-service training programs teaches deputies to stay focused on the objective during a crisis, calmly analyze problems, assess their resources and use those resources to resolve the problem.

The Harris County Constable's Office Precinct 5 training TCOLE curriculum helps to further develop a Deputy's mental flexibility, critical decision-making and confidence so that they are able to solve issues and conflicts under stressful conditions.

*Amended Expert Opinion Report – Barnes v Harris County*

Deputy Felix fired his weapon only after he formed an objective belief that his life was in immediate threat of suffering great bodily injury or death at the hands of Mr. Barnes.  Deputy Felix was dressed in clearly identifiable uniform clothing that differentiated him from the public as a deputy, and he displayed his firearm after he noticed was in in the process of fleeing from a traffic stop.   The incident happened so quickly that Deputy Felix could only give Deputy Barnes several loud verbal commands to stop driving away while Deputy Felix was standing on the door driver's door sill before he discharged his vehicle.

A peace officer who makes or attempts to make an arrest or when being assaulted, need not retreat or desist from his/her efforts because of the resistance, or threatened resistance of the person he confronts.  An officer need not be deemed an aggressor, or lose his right to self-defense by the use of reasonable force to effect the arrest or to prevent escape or to overcome resistance.  A peace officer uses physical force to gain control of an out of control individual, or situation when objectively reasonable and necessary, based on the totality of the facts and circumstances.

I am prepared to testify to the opinions expressed in this report, in deposition or at trial if called upon to do so.  I may have additional opinions and reserve the right to augment my report if I am provided with further documentation for review.

**EXHIBITS:**

Speed Computation Formulas

Analysis of Deputy Felix's MAV Video

Texas Criminal Statutes

Action/Reaction Steps https://www.youtube.com/watch?v=fok2fd3IK7M
https://www.youtube.com/watch?v=PaKAd9DFUmA

Action Perception Video https://www.youtube.com/watch?v=xuHSjOx00fg
https://www.youtube.com/watch?v=HMlzW6iVrRA

OODA Loop Concept [https://www.youtube.com/watch?v=yfi3Ndh3n-g&frags=pl%2Cwn]

**QUALIFICATIONS:**

See Attached Vitae

**EXPERT TESTIMONY**

See Attached Vitae

*Amended Expert Opinion Report – Barnes v. Harris County*

**PUBLICATIONS:**

Peace Officer's Use of Force Reference Guide, 2006
Dog Sport Magazine, 1990-1993

**COMPENSATION:**

| | |
|---|---|
| Case Review | $150 per hour |
| Deposition Fee | $200 per hour |
| Court Testimony | $200 per hour |

*Jared L. Zwickey*

Jared L. Zwickey

*Amended Expert Opinion Report – Barnes v Harris County*

## ACCELLERATION RATE COMPUTATION FORMULAS

Acceleration rate is calculated from the existing public data for zero to 60 MPH times using the following equation: $a = \frac{V_f - V_i}{t}$

To find final velocity where initial velocity, acceleration and time are known, the following equation is used: $v_f = v_i + at$

Based on the crime scene investigation conducted by Houston Police Officer Leon, it is known that Mr. Barnes' vehicle traveled a total of approximately 100 feet in an elapsed time of approximately five seconds, from the initial acceleration, until the vehicle stopped. Although not necessary, an average speed can be obtained for comparative purposes, by utilizing the following equation: $v = \frac{d}{t}$ When converting measurements from miles per hour to feet per second, or vice versa, a conversion factor of 1.467 is used. This is derived from the number of feet in a mile, and the number of seconds in an hour: $\frac{5280}{3600} = 1.46\overline{66} \approx 1.467$

The following are calculations of acceleration rates based off public data of zero to 60 miles per hour (MPH), from exemplar 2013 Toyota Corollas, similar to the subject vehicle, with the exception being the vehicle tested by Zeroto60Times.com, which was tested with a manual transmission. The resultant acceleration rate was then applied to calculate the top speed attained by the subject vehicle for the period between initial acceleration, and brake application (a period of approximately four seconds):

1. Top Speed measured the zero to 60 MPH time to be 10.1 seconds (Cupler, 2013).

   $v_f$ =60 x 1.467 = 88.02fps

   $a = \frac{V_f - V_i}{t}$

   $a = \frac{88.02 fps - 0 fps}{10.1s}$ = 8.7149

   $v_f = v_i + at$

   $v_f = 0 + (8.7149 \times 4) = 34.8594 \, fps$

   $35.8594 \div 1.467 \approx 23.76 \, MPH$

2. Motor Trend measured the zero to 60 MPH time to be 9.8 seconds (Staff, 2013).

   $v_f$ =60 x 1.467 = 88.02fps

*Amended Expert Opinion Report – Barnes v. Harris County*

$$a = \frac{V_f - V_i}{t}$$

$$a = \frac{88.02fps - 0fps}{9.8s} = 8.9816$$

$$v_f = v_i + at$$

$$v_f = 0 + (8.9816 \times 4) = 35.9265 \, fps$$

$$35.9265 \div 1.467 \approx 24.49 \, MPH$$

3. Car Gurus measured the zero to 60 MPH time to be 9.5 seconds (Wardlaw, 2013).

$$v_f = 60 \times 1.467 = 88.02fps$$

$$a = \frac{V_f - V_i}{t}$$

$$a = \frac{88.02fps - 0fps}{9.5s} = 9.2653$$

$$v_f = v_i + at$$

$$v_f = 0 + (9.2653 \times 4) = 37.0611 \, fps$$

$$37.0611 \div 1.467 \approx 25.26 \, MPH$$

4. YouTube user 0 to 60 speeds measured the zero to 60 MPH time to be 9.5 seconds (Anonymous, 2013).

$$v_f = 60 \times 1.467 = 88.02fps$$

$$a = \frac{V_f - V_i}{t}$$

$$a = \frac{88.02fps - 0fps}{9.8s} = 9.2653$$

$$v_f = v_i + at$$

$$v_f = 0 + (9.2653 \times 4) = 37.0611 \, fps$$

$$37.0611 \div 1.467 \approx 25.26 \, MPH$$

5. Zero to 60 Times measured the zero to 60 MPH time to be 8.5 seconds (Unknown, 2019).

$$v_f = 60 \times 1.467 = 88.02fps$$

$$a = \frac{V_f - V_i}{t}$$

$$a = \frac{88.02fps - 0fps}{8.5s} = 10.3553$$

*Amended Expert Opinion Report – Barnes v Harris County*

$$v_f = v_i + at$$
$$v_f = 0 + (10.3553 \times 4) = 41.4212 \, fps$$
$$41.4212 \div 1.467 \approx 28.24 \, MPH$$

The average speed was then calculated by adding the five top speeds that were calculated:

$$\frac{23.76 + 24.49 + 25.26 + 25.26 + 28.24}{5} = 25.4 \, MPH$$

*Amended Expert Opinion Report – Barnes v. Harris County*

# Texas Code of Criminal Procedure - CRIM P Art. 2.13 Art. 2.13. [37] [44] [45] Duties and powers

(a)  It is the duty of every peace officer to preserve the peace within the officer's jurisdiction.   To effect this purpose, the officer shall use all lawful means.

(b)  The officer shall:

(1)  in every case authorized by the provisions of this Code, interfere without warrant to prevent or suppress crime;

(2)  execute all lawful process issued to the officer by any magistrate or court;

(3)  give notice to some magistrate of all offenses committed within the officer's jurisdiction, where the officer has good reason to believe there has been a violation of the penal law;  and

(4)  arrest offenders without warrant in every case where the officer is authorized by law, in order that they may be taken before the proper magistrate or court and be tried.

(c)  It is the duty of every officer to take possession of a child under Article 63.009(g) .
<Text of (d), as added by Acts 2017, 85th Leg., ch. 4 (S.B. 4), §  6.01>
(d)  Subject to Subsection (e), in the course of investigating an alleged criminal offense, a peace officer may inquire as to the nationality or immigration status of a victim of or witness to the offense only if the officer determines that the inquiry is necessary to:
(1)  investigate the offense;  or
(2)  provide the victim or witness with information about federal visas designed to protect individuals providing assistance to law enforcement.
<Text of (d), as added by Acts 2017, 85th Leg., ch. 34 (S.B. 1576), §  3>
(d)  On a request made by that office, a peace officer shall execute an emergency detention order issued by the Texas Civil Commitment Office under Section 841.0837, Health and Safety Code .
(e)  Subsection (d) does not prevent a peace officer from:
(1)  conducting a separate investigation of any other alleged criminal offense;  or
(2)  inquiring as to the nationality or immigration status of a victim of or witness to a criminal offense if the officer has probable cause to believe that the victim or witness has engaged in specific conduct constituting a separate criminal offense.

# Texas Transportation Code - TRANSP § 521.021. License Required

A person, other than a person expressly exempted under this chapter, may not operate a motor vehicle on a highway in this state unless the person holds a driver's license issued under this chapter.

*Amended Expert Opinion Report – Barnes v Harris County*

# Texas Transportation Code - TRANSP § 521.025. License to be Carried and Exhibited on Demand;  Criminal Penalty

(a)  A person required to hold a license under Section 521.021 shall:
(1)  have in the person's possession while operating a motor vehicle the class of driver's license appropriate for the type of vehicle operated;  and

(2)  display the license on the demand of a magistrate, court officer, or peace officer.

(b)  A peace officer may stop and detain a person operating a motor vehicle to determine if the person has a driver's license as required by this section.

(c)  A person who violates this section commits an offense.   An offense under this subsection is a misdemeanor punishable by a fine not to exceed $200, except that:

(1)  for a second conviction within one year after the date of the first conviction, the offense is a misdemeanor punishable by a fine of not less than $25 or more than $200;

(2)  for a third or subsequent conviction within one year after the date of the second conviction the offense is a misdemeanor punishable by:

(A)  a fine of not less than $25 or more than $500;

(B)  confinement in the county jail for not less than 72 hours or more than six months;  or

# Texas Penal Code - PENAL § 9.51. Arrest and Search

(a)  A peace officer, or a person acting in a peace officer's presence and at his direction, is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to make or assist in making an arrest or search, or to prevent or assist in preventing escape after arrest, if:

(1)  the actor reasonably believes the arrest or search is lawful or, if the arrest or search is made under a warrant, he reasonably believes the warrant is valid;  and

(2)  before using force, the actor manifests his purpose to arrest or search and identifies himself as a peace officer or as one acting at a peace officer's direction, unless he reasonably believes his purpose and identity are already known by or cannot reasonably be made known to the person to be arrested.

c)  A peace officer is justified in using deadly force against another when and to the degree the peace officer reasonably believes the deadly force is immediately necessary to make an arrest, or to prevent escape after arrest, if the use of force would have been justified under Subsection (a) and:

(1)  the actor reasonably believes the conduct for which arrest is authorized included the use or attempted use of deadly force;  or

(2)  the actor reasonably believes there is a substantial risk that the person to be arrested will cause death or serious bodily injury to the actor or another if the arrest is delayed.

(d)  A person other than a peace officer acting in a peace officer's presence and at his direction is justified in using deadly force against another when and to the degree the person reasonably believes the deadly force is immediately necessary to make a lawful arrest, or to prevent escape after a lawful arrest, if the use of force would have been justified under Subsection (b) and:

*Amended Expert Opinion Report – Barnes v. Harris County*

(1)  the actor reasonably believes the felony or offense against the public peace for which arrest is authorized included the use or attempted use of deadly force;  or

(2)  the actor reasonably believes there is a substantial risk that the person to be arrested will cause death or serious bodily injury to another if the arrest is delayed.

(e)  There is no duty to retreat before using deadly force justified by Subsection (c) or (d).

(f)  Nothing in this section relating to the actor's manifestation of purpose or identity shall be construed as conflicting with any other law relating to the issuance, service, and execution of an arrest or search warrant either under the laws of this state or the United States.

(g)  Deadly force may only be used under the circumstances enumerated in Subsections (c) and (d).

# Texas Code of Criminal Procedure - CRIM P Art. 14.01 Art. 14.01. [212] [259] [247] Offense within view

(a)  A peace officer or any other person, may, without a warrant, arrest an offender when the offense is committed in his presence or within his view, if the offense is one classed as a felony or as an offense against the public peace.

(b)  A peace officer may arrest an offender without a warrant for any offense committed in his presence or within his view.

# Texas Code of Criminal Procedure - CRIM P Art. 14.03 Art. 14.03. [214] [261] [249] Authority of peace officers

(a)  Any peace officer may arrest, without warrant:

(1)  persons found in suspicious places and under circumstances which reasonably show that such persons have been guilty of some felony, violation of Title 9, Chapter 42, Penal Code, breach of the peace, or offense under Section 49.02, Penal Code , or threaten, or are about to commit some offense against the laws;

# Texas Penal Code - PENAL § 22.01. Assault

(a)  A person commits an offense if the person:
(b)  An offense under Subsection (a)(1) is a Class A misdemeanor, except that the offense is a felony of the third degree if the offense is committed against:

(1)  a person the actor knows is a public servant while the public servant is lawfully discharging an official duty, or in retaliation or on account of an exercise of official power or performance of an official duty as a public servant;

# Texas Penal Code - PENAL § 22.02. Aggravated Assault

(a)  A person commits an offense if the person commits assault as defined in § 22.01 and the person:
(b)  An offense under this section is a felony of the second degree, except that the offense is a felony of the first degree if:

(1)  the actor uses a deadly weapon during the commission of the assault and causes serious bodily injury to a

*Amended Expert Opinion Report – Barnes v Harris County*
person whose relationship to or association with the defendant is described by Section 71.0021(b) , 71.003 , or 71.005, Family Code ;

# Texas Penal Code - PENAL § 46.04. Unlawful Possession of Firearm

(a)  A person who has been convicted of a felony commits an offense if he possesses a firearm:

(1)  after conviction and before the fifth anniversary of the person's release from confinement following conviction of the felony or the person's release from supervision under community supervision, parole, or mandatory supervision, whichever date is later;  or

(2)  after the period described by Subdivision (1), at any location other than the premises at which the person lives.

(e)  An offense under Subsection (a) is a felony of the third degree.   An offense under Subsection (b) or (c) is a Class A misdemeanor.

(f)  For the purposes of this section, an offense under the laws of this state, another state, or the United States is, except as provided by Subsection (g), a felony if, at the time it is committed, the offense:

(1)  is designated by a law of this state as a felony;

(2)  contains all the elements of an offense designated by a law of this state as a felony;  or

(3)  is punishable by confinement for one year or more in a penitentiary.

*Amended Expert Opinion Report – Barnes v. Harris County*





*Amended Expert Opinion Report – Barnes v Harris County*



*Amended Expert Opinion Report – Barnes v. Harris County*



Reaction time of the athlete in the sprint start

*Amended Expert Opinion Report – Barnes v Harris County*



*Amended Expert Opinion Report – Barnes v. Harris County*



## 2013 Toyota Corolla Sedan Sill Parts

#1.   A pillar or Hinge Pillar

#10.  Center Pillar

#13.  Rocker panel or Door Sill

| **ANALYSIS OF DEPUTY FELIX'S MAV VIDEO RECORDED AT 30 FRAMES PER SECOND** | | | | |
|---|---|---|---|---|
| **MAV** | **Video** | **EVE Video Player** | | **Events That Occurred** |
| **Time** | **Sec** | **Time** | **30th Sec** | |
| 14:42 | 44 | 00:00 | | Deputy Felix drives on the tollway looking for Mr. Barnes' vehicle |
| 14:43 | 31 | 00:47 | | Deputy Felix drives behind Mr. Barnes' vehicle and activates the emergency lights, Toyota brake lights activated |
| 14:43 | 48 | 01:03 | | Car stops.  Mr. Barnes moves around his seat to his right as if reaching at the left side of his body |
| 14:44 | 16 | 01:31 | | Deputy Felix comes into the frame of the video as he approaches Mr. Barnes' vehicle |
| 14:44 | 21 | 01:36 | | Deputy Felix contacts Mr. Barnes.  Greets by ID self, provides the reason for stopping him (toll violation on the vehicle) |
| 14:44 | 29 | 01:44 | | Deputy Felix asks Mr. Barnes for his DL & proof of insurance + inquired about ownership of the vehicle |
| 14:44 | 32 | 01:48 | | Mr. Barnes says it's a rental car, he got it a week ago, actually rented by his girlfriend/asks and gets her name |
| 14:44 | 59 | 02:14 | | Deputy Felix asks Mr. Barnes do you have your Driver's License? |
| 14:45 | 05 | 02:21 | | Deputy Felix keys his portable radio and speaks in his portable microphone |
| 14:45 | 08 | 02:23 | | Deputy Felix asks Mr. Barnes if there is anything in the vehicle that he should know about/Not that he knows of |
| 14:45 | 13 | 02:28 | | Deputy Felix tells Mr. Barnes "Don't go digging around" I smell marijuana in the car? |
| 14:45 | 14 | 02:29 | | Deputy Felix tells Mr. Barnes "I smell marijuana" "Is there any marijuana in the car?" |
| 14:45 | 16 | 02:31 | | Deputy Felix puts his hand on his gun and tell Barnes, "Don't go digging around" |
| 14:45 | 17 | 02:32 | | Deputy Felix tells Mr. Barnes, "Don't go digging around" "Don't go digging around" |
| 14:45 | 26 | 02:41 | | Deputy Felix asks Mr. Barnes if he had any identification on him |
| 14:45 | 31 | 02:46 | | Deputy Felix tells Mr. Barnes "Sure, go ahead and pop the trunk for me" |
| 14:45 | 33 | 02:48 | | The trunk lid is released by Mr. Barnes from inside his car |
| 14:45 | 36 | 02:51 | | Deputy Felix tells Mr. Barnes to put the papers up on the dashboard |
| 14:45 | 37 | 02:52 | | The left turn signal turns off when the ignition switch is turned off by Mr. Barnes |
| 14:45 | 43 | 02:58 | | Deputy Felix tells Mr. Barnes to step outside for him as he reaches for the door handle |
| 14:45 | 45 | 03:00 | | Deputy Felix opens the driver's door and looks at Mr. Barnes, who leans forward, grabs the key, inserts in ignition |
| 14:45 | 48 | 03:03 | 17/30 | Left turn signal light is activated indicating the key is positioned on the grip of his firearm |
| 14:45 | 48 | 03:04 | 6/30 | 3rd Brake light activates, Deputy Felix's R hand is on his firearm |
| 14:45 | 48 | 03:04 | 9/30 | Both Brakes lights are activated |
| 14:45 | 48 | 03:04 | 10/30 | Deputy Felix moves forward starting with his left foot towards the v of the door and the door frame |
| 14:45 | 48 | 03:04 | 18/30 | Deputy Felix starts to draw his firearm from his holster |
| 14:45 | 49 | 03:04 | 20/30 | Deputy Felix clears his firearm from the holster in 2/30 of a second |
| 14:45 | 49 | 03:04 | 25/30 | 3rd Break light goes off |
| 14:45 | 49 | 03:04 | 25/30 | Firearm is positioned in the vehicle and Mr. Barnes head moves to the right "Deputy rapidly said "Don't Fucking move" |
| 14:45 | 49 | 03:04 | 28/30 | Right & left brake lights go off |
| 14:45 | 49 | 03:05 | 4/30 | Mr. Barnes' vehicle weight shifts downward due to the vehicle being put into gear |
| 14:45 | 49 | 03:05 | 5/30 | Vehicle starts to move forward |
| 14:45 | 50 | 03:05 | 12/30 | Deputy Felix's shifts his weight to left foot as his right foot begins to move off of the ground onto the sill |
| 14:45 | 50 | 03:05 | 25/30 | Deputy Felix's right foot appears to step up on the door sill as the Toyota picks up speed |
| 14:45 | 51 | 03:06 | 9/30 | Deputy Felix's right arm begins to move backwards out of the driver's window |

| ANALYSIS OF DEPUTY FELIX'S MAV VIDEO RECORDED AT 30 FRAMES PER SECOND | | | | |
|---|---|---|---|---|
| **MAV Video** | | **EVE Video Player** | | **Events That Occurred** |
| **Time** | **Sec** | **Time** | **30th Sec** | |
| 14:45 | 51 | 03:06 | 28/30 | Deputy Felix's right arm is bent, elbow high, firearm at his face |
| 14:45 | 51 | 03:07 | 10/30 | Deputy Felix firearm moves into the driver's door window and discharges the 1st round at Mr. Barnes & 2nd Round |
| 14:45 | 53 | 03:08 | 15/30 | Brake lights on the Toyota are activated as the car rapidly slows |
| 14:45 | 54 | 03:08 | 19/30 | Toyota trunk lid begins to rise |
| 14:45 | 54 | 03:08 | 26/30 | Toyota comes to a stop and the driver's door swings forward |
| 14:45 | 54 | 03:10 | 8/30 | Deputy Felix's right foot steps off the vehicle onto the pavement |
| 14:45 | 55 | 03:11 | 9/30 | Deputy Felix's right foot steps backwards to establish a better stance |
| 14:45 | 58 | 03:14 | | Deputy Felix notifies dispatch of shots fired twice |
| 14:46 | 01 | 03:17 | | Deputy Felix orders Mr. Barnes to put the car in park twice |
| 14:46 | 09 | 03:24 | | Deputy Felix asks for immediate medical response |
| 14:46 | 29 | 03:44 | | Deputy Felix's left foot steps back onto the pavement |
| 14:47 | 04 | 04:20 | | Deputy Felix contacts the dispatcher and checks on the status of the medical response |
| 14:47 | 10 | 04:25 | | An unidentified person on the radio asks Deputy Felix if he is OK |
| 14:47 | 13 | 04:28 | | Deputy Felix advises his leg hurts! |
| 14:47 | 31 | 04:45 | | Deputy Felix responds to an inquiry from an unidentified person about who is shot, "Suspects been Shot" |
| 14:47 | 31 | 04:46 | | Ist responding deputy arrives at the incident scene and is seen on foot crossing the lanes of traffic |
| 14:47 | 50 | 05:06 | | Deputy Felix tells the 1st responding deputy that Barnes put the car in park |
| 14:48 | 30 | 05:46 | | 2nd & 3rd Responding deputies arrive at the incident scene driving a SUV and parks in the #1 traffic lane |
| 14:48 | 50 | 06:05 | | Deputy Felix tells fellow deputies that Barnes put the car in park and he drug him a little bit & said he was reaching for his gun |
| 14:49 | 05 | 06:21 | | 4th responding deputy arrives at the incident scene |
| 14:49 | 21 | 06:35 | | Deputy Felix tells a deputy he shot twice and says he is not shot and is good |
| 14:50 | 03 | 07:18 | | Deputy Felix walks from the area of the incident and is standing near his patrol vehicle as other officer assess Barnes |
| 14:50 | 26 | 07:42 | | A responding Deputy asks Deputy Felix what happened to his leg, Deputy Felix grabs his right leg |
| 14:50 | 35 | 07:51 | | Responding deputies responding to Mr. Barnes medical condition |
| 14:51 | 03 | 08:18 | | Deputy Felix is talking on his cellphone and says he is ok, "My leg, my leg a little bit" |
| 14:51 | 13 | 08:28 | | Responding deputies remove Mr. Barnes from the vehicle onto the pavement |
| 14:51 | 52 | 09:07 | | Responding deputies approach Deputy Felix he tells them he is okay, he says his leg hurts a little bit! |
| 14:55 | 49 | 13:04 | | 1st firefighter arrives on the scene in the video frame |