IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| Janice Hughes Barnes, | & |
| Individually and as | & |
| Representative of The Estate | & |
| of Ashtian Barnes, Deceased; | & |
| and Tommy Duane Barnes | & |
| | & |
|     Plaintiffs, | & |
| | & |
| vs. | &  CAUSE NO:  4:18-CV-00725 |
| | & |
| Roberto Felix, Jr., And the | & |
| County of Harris, Texas | & |
| | & |
|     Defendants. | & |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

ROBERTO FELIX

FEBRUARY 18, 2019

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF ROBERTO FELIX,
produced as a witness at the instance of the PLAINTIFFS,
and duly sworn, was taken in the above-styled and
numbered cause on FEBRUARY 18, 2019, from 10:00 a.m. to
3:23 p.m., before Aubrea Hobbs, CSR, RPR, in and for the
State of Texas, reported by computerized machine
shorthand, at the Harris County Attorney's Office, 1019
Congress Avenue, 15th Floor, Houston, Texas, pursuant to
the Federal Rules of Civil Procedure and the provisions
stated on the record or attached hereto.

2

A P P E A R A N C E S

FOR THE PLAINTIFFS:
  Mr Howard Fomby, Esq.
    -and-
  Mr. Adam W. Fomby, Esq.
  FOMBY LAW FIRM
  440 Louisiana Street, Suite 900
  Houston, Texas 77002
  E-mail:  hfomby@fombylaw.com
  E-mail:  adam@fombylaw.com

FOR THE DEFENDANTS:
  Ms. Mary E. Baker, Esq.
  THE OFFICE OF VINCE RYAN COUNTY ATTORNEY
  1019 Congress, 15th Floor
  Houston, Texas 77002
  E-mail:  mary.baker@cao.hctx.net

ALSO PRESENT:
  Mr. Zach Sigler, Videographer

3

INDEX

                                                  PAGE
Appearances .......................................... 2

Witness:  ROBERTO FELIX

    Examination by Mr. Fomby ...................... 6
    Examination by Ms. Baker ...................... 179

Signature and Changes ............................. 181

Reporter's Certificate ............................. 183

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 1 | Photograph | 6 |
| Exhibit 2 | Photograph | 6 |
| Exhibit 3 | Photograph | 6 |
| Exhibit 4 | Photograph | 6 |
| Exhibit 5 | Photograph | 6 |
| Exhibit 6 | Photograph | 6 |
| Exhibit 7 | Photograph | 6 |
| Exhibit 8 | Photograph | 6 |
| Exhibit 9 | Photograph | 6 |
| Exhibit 10 | Photograph | 6 |
| Exhibit 11 | Photograph | 6 |
| Exhibit 12 | Photograph | 6 |
| Exhibit 13 | Photograph | 6 |
| | (Continued) | |

4

EXHIBITS (Continued)

| NUMBER | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 14 | Photograph | 6 |
| Exhibit 15 | Photograph | 6 |
| Exhibit 16 | Photograph | 6 |
| Exhibit 17 | Photograph | 6 |
| Exhibit 18 | Photograph | 6 |
| Exhibit 19 | Photograph | 6 |
| Exhibit 20 | Photograph | 6 |
| Exhibit 21 | Photograph | 6 |
| Exhibit 22 | Photograph | 6 |
| Exhibit 23 | Photograph | 6 |
| Exhibit 24 | Photograph | 6 |
| Exhibit 25 | Photograph | 6 |
| Exhibit 26 | Photograph | 6 |
| Exhibit 27 | Photograph | 6 |
| Exhibit 28 | Not Introduced | |
| Exhibit 29 | Not Introduced | |
| Exhibit 30 | Texas Commission on Law Enforcement Personal Status Report | 18 |
| Exhibit 31 | Message from Terminal/Unit | 36 |
| Exhibit 32 | Houston Police Department Homicide Division Witness Statement | 76 |
| Exhibit 33 | Houston Police Department Records | 106 |
| | (Continued) | |

5

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 34 | Harris County Constable Precinct Five Documents | 112 |
| Exhibit 35 | Harris County Constable Precinct Five Documents | 130 |
| Exhibit 36 | Video | 139 |

**Southwest Reporting & Video Service, Inc.      Registration #189**
713-650-1800                                    swreptproduction@swreporting.com

## 6

1  P R O C E E D I N G S
2  (Exhibits Nos. 1-27 premarked.)
3  THE VIDEOGRAPHER:  Today's date is
4  February 18th, 2019.  The time is approximately
5  10:00 o'clock a.m.  We're on the record.  Will you
6  please swear in the witness.
7  ROBERTO FELIX,
8  Having been first duly sworn, testifies as follows:
9  DIRECT EXAMINATION
10  BY MR. FOMBY:
11  Q.  Officer Felix, is that the proper way to refer
12  to you?
13  **A.  It's Deputy Felix.**
14  Q.  Deputy Felix, okay.  I'm Howard Fomby.  I'll
15  be asking some questions today for the plaintiff in this
16  case, Janice Barnes, the mother of Ashtian Barnes.
17  **A.  Yes, sir.**
18  Q.  One of the things that --
19  MR. FOMBY:  Is this coming through okay?
20  Q.  (BY MR. FOMBY)  Before we get started, one of
21  the things I wanted to say is that this process is
22  really about getting to the truth, about finding out
23  what happened on the 28th of April, 2016.  And as
24  such --
25  MS. BAKER:  I'm going to object to the

## 7

1  narrative of this deposition.  Could you ask a question,
2  please?
3  Q.  (BY MR. FOMBY)  I -- well, my narrative is
4  that I -- because we're trying to get to that, I want to
5  be fair to you.  So I don't have any intention of
6  badgering you or trying to cut you off or change the
7  meaning of your words or any of that sort of thing.
8  Okay?
9  **A.  Okay.**
10  Q.  And occasionally my wife tells me that I say
11  things that I think I understand and she thinks it's all
12  garbled.  So with that being in mind, if I say something
13  you don't understand at any point, or that you need more
14  clarification, I want to ask you to just stop me and --
15  and let me know, okay?  If I say something that you
16  didn't hear completely, then stop me and let me know and
17  I'll repeat it, okay?
18  **A.  Okay.**
19  Q.  Because this process doesn't work well unless
20  we're fair with each other.  And at the end of this
21  whole process I'm going to give you an opportunity if
22  you want, in my experience people --
23  MS. BAKER:  Object to sidebar.  Please
24  ask a question, Mr. Fomby.
25  MR. FOMBY:  I am going to ask a question

## 8

1  but I want to set the predicate to let him know what the
2  process is.  That at the end of this I'm going to give
3  you an opportunity to correct anything that you think
4  needs to be corrected.
5  MS. BAKER:  You can do that.  I'm going
6  to object to your continuing sidebar.  You can do that
7  when you ask him a question at the end.
8  Q.  (BY MR. FOMBY)  Now, Deputy Felix, could
9  you -- I know that you've already given the name -- your
10  name to the court reporter, but for -- on the record
11  could you please tell us your full name?
12  **A.  Full name is Roberto Felix, Jr.**
13  Q.  Okay.  And Deputy, where do you reside
14  currently?
15  MS. BAKER:  I'm going to object to that
16  on the basis of the law enforcement privilege and
17  instruct the witness not to answer.  That matter is
18  privileged.
19  Q.  (BY MR. FOMBY)  Deputy, who do you currently
20  work for?
21  **A.  I currently work for the Harris County**
22  **Constable's Office, Precinct 5.**
23  Q.  And what is your title or position with the --
24  **A.  My title is deputy with Harris County Precinct**
25  **5.**

## 9

1  Q.  Now, I want to talk a little bit about your
2  training and preparation for the job that you're at.
3  **A.  Yes, sir.**
4  Q.  Did you have any opportunity to complete high
5  school?
6  **A.  Yes.**
7  Q.  And did you go to college on any kind of a
8  baccalaureate or junior baccalaureate program?
9  **A.  Yes.**
10  Q.  And what high school did you attend?
11  **A.  I attended Willowridge High School.**
12  Q.  And you graduated from that high school; is
13  that right?
14  **A.  I did.**
15  Q.  And how about college?  Which college did you
16  attend, or colleges?
17  **A.  I attended Houston Community College and San**
18  **Jacinto College.**
19  Q.  And did you receive a degree from either of
20  those?
21  **A.  Not -- not as of now, no.**
22  Q.  Okay.  So I have a -- sort of a resume that
23  was provided by the Texas Commission on Law Enforcement
24  and it says that you started work with the Harris County
25  Sheriff's Office in July of 2003; is that correct?

10

1  A. I believe it was June.
2  Q. Okay. And prior to working as a jailer, did
3  you have any other kinds of employment?
4  A. Yes.
5  Q. And -- and what were those jobs?
6  A. I -- a job prior to that was at an advertising
7  agency.
8  Q. And what did you do for them?
9  A. I did numerous different things including mail
10  room, answering phones and assisting in advertisement
11  approvals.
12  Q. And after you left the advertising agency, is
13  that when you went to work for the Harris County
14  Sheriff's Department?
15  A. Yes.
16  Q. And as -- it says here that you were a jailer.
17  Is that the correct title?
18  A. Detention officer.
19  Q. Detention officer. And as a detention
20  officer, what were your duties?
21  A. To maintain security of a facility and
22  supervise the inmates.
23  Q. And from that point what -- what was your next
24  position after you stopped being a jailer?
25  A. I was a deputy with Harris County Precinct 5.

11

1  Q. And approximately when did you start as a --
2  as a deputy?
3  A. I started with the Harris County Constable's
4  Office on October 2nd, 2004.
5  Q. When you first started with Harris County
6  Precinct 5, what was your title at that point?
7  A. It was a deputy.
8  Q. Okay. Are there levels of deputies?
9  A. Well, there's a deputy 5 I believe and then it
10  goes down in numbers as your years of service with the
11  department.
12  Q. Okay. When you say it goes down a number,
13  that means --
14  A. So deputy 4, 3 --
15  Q. -- is a 5 the highest or lowest?
16  A. The lowest.
17  Q. So when you started you would start as a level
18  5?
19  A. Give me a second. Actually I'm not too sure
20  about that at this time, but I believe that's how it --
21  how it descends.
22  Q. And what level are you currently?
23  A. I am a deputy 1, I believe.
24  Q. Okay. And have you earned -- at -- in the --
25  the Constable's Office, have you earned any particular

12

1  certificates?
2  A. I've received numerous certificates.
3  Q. Okay. So what kind of certificates have you
4  received in your career as a peace officer?
5  A. Too many to recall at this time, but I've
6  been -- advanced peace officer certification, I received
7  certifications in numerous other aspects, like DWI
8  investigation and -- just too many to -- to -- to name
9  or recall. I've done, you know, animal investigation,
10  K9 encounters is what it's called.
11  I've done field training officer. I've done
12  accident investigation, accident reconstruction along
13  with, like I said, numerous, numerous that don't come to
14  mind right now.
15  Q. Okay. So all of those, are those classes that
16  you took and completed to get the certificate?
17  A. That's correct.
18  Q. Okay. Now, did you take any classes at the
19  University of Houston downtown in training to be a peace
20  officer?
21  A. Yes. That was the police academy that I
22  attended for my certification.
23  Q. Okay. And how long is that particular course?
24  A. The course that I attended ran from January
25  through August.

13

1  Q. So approximately seven to eight months long?
2  A. That's correct.
3  Q. And do they track that by way of hours, course
4  hours that you took?
5  A. They do.
6  Q. Do you know how many course hours you took to
7  become a peace officer?
8  A. I cannot recall at this time.
9  Q. What kind of coursework did you take at the
10  University of Houston downtown to become a peace
11  officer?
12  A. The standards set by TCOLE, which is, you
13  know, Penal Code, you know, traffic, mechanics of
14  arrest, you know, building searches. There's a CCP and
15  anything else that's required by the TCOLE.
16  Q. Okay. And in taking those courses, did they
17  teach you any courses -- any -- was there any coursework
18  in that training on constitutional rights of citizens
19  and defendants?
20  A. There is a segment of when we're doing case
21  law per training to CCP and the Penal Code.
22  Q. Okay. And so in the course of that training,
23  did you receive any training specifically in
24  constitutional prohibition against illegal search and
25  seizure?

Southwest Reporting & Video Service, Inc.     Registration #189
713-650-1800                                    swreptproduction@swreporting.com

14

1    A. Yes.
2    Q. And what is your understanding about what the
3 constitution says about illegal searches?
4        MS. BAKER: Objection, vague, calls for a
5 legal conclusion, but you may answer.
6    A. For illegal search and seizures? Is that your
7 question?
8    Q. (BY MR. FOMBY) Yes.
9    A. Okay. We have the right to -- to -- give me a
10 second, sorry. The Fourth Amendment to unreasonable
11 searches and seizures.
12    Q. Okay. And in conducting a search, can you
13 conduct a search without a warrant?
14        MS. BAKER: Objection, calls for a legal
15 conclusion and vague and overly broad, but you may
16 answer.
17        THE WITNESS: Okay.
18    A. There are situations where you can conduct a
19 search without a warrant.
20    Q. (BY MR. FOMBY) As a police officer or deputy,
21 were you trained in what those exceptions are?
22    A. Yes.
23    Q. Do you recall what the exceptions were that
24 you were trained in?
25    A. Repeat your question.

15

1    Q. Do you recall what those exceptions are from
2 your training?
3    A. Well, there's just numerous that were gone
4 over, but it would be reasonable suspicion that, you
5 know, something is -- could or would -- would happen.
6    Q. And when you say that something could or would
7 happen --
8    A. A crime.
9    Q. -- do you mean a crime?
10    A. A crime.
11    Q. Okay. Deputy, have you ever taken a class on
12 escalation of force?
13    A. Yes.
14    Q. And when was -- when did you first take that
15 class?
16    A. I cannot recall at this time.
17        MS. BAKER: Was that escalation or
18 de-escalation?
19        MR. FOMBY: De-escalation.
20        THE WITNESS: I'm sorry.
21        MS. BAKER: Okay. You said escalation.
22        MR. FOMBY: Well, escalation and
23 deescalation would be opposite sides the same point.
24        MS. BAKER: Yes, I understand that.
25        MR. FOMBY: So de-escalation.

16

1        MS. BAKER: So what was your question?
2    A. De-escalation.
3    Q. (BY MR. FOMBY) De-escalation?
4    A. Yes.
5    Q. Would the date that you first took a class in
6 de-escalation techniques be somewhere around the end of
7 August of 2018?
8    A. That was the last class that we -- we took.
9    Q. I'm going to show you, Deputy, the document
10 that we were given by the Texas Commission on Law
11 Enforcement. This is their listing.
12        MR. FOMBY: I -- I'll get it.
13    Q. (BY MR. FOMBY) This is their listing of the
14 coursework that you've taken.
15        MR. FOMBY: I'll have to remember to
16 unclip this next time.
17        THE VIDEOGRAPHER: No problem.
18    A. (Witness examines document.)
19    Q. (BY MR. FOMBY) Okay. Have you had an
20 opportunity to review it?
21        MS. BAKER: Actually, for the record,
22 this document has our Bates number on it, so -- so you
23 may have gotten a separate document from the Texas
24 Commission on Law Enforcement. This -- this one that
25 you're showing the witness is Bates numbered with the

17

1 Harris County Bates numbers.
2        MR. FOMBY: Absolutely.
3    Q. (BY MR. FOMBY) To be clear, this document
4 comes from your attorneys.
5        MS. BAKER: Yes.
6    Q. (BY MR. FOMBY) And were provided as part of
7 discovery --
8        MS. BAKER: Yes.
9    Q. (BY MR. FOMBY) -- pursuant to our request for
10 information on your training.
11        MS. BAKER: Correct. I may have
12 misunderstood you, but I thought you said we obtained it
13 from the Texas Commission on Law Enforcement.
14        MR. FOMBY: Exactly.
15    Q. (BY MR. FOMBY) And I'm sorry for that, and my
16 co-counsel reminded me to make that clear.
17        MS. BAKER: Are you going to mark that?
18 Are you going to mark that?
19        MR. FOMBY: Yes, we will.
20        MS. BAKER: Okay.
21    A. (Witness examines document.) Okay.
22    Q. (BY MR. FOMBY) Okay, Deputy. Now I'm going
23 to ask you to -- starting with page 1, is there anything
24 on page 1 that talks about a class that you took in
25 de-escalation techniques?

18

1    MS. BAKER: I just -- I apologize for
2  objecting so much, but I just feel very uncomfortable
3  with being asked about page 1 without it being marked.
4  So could we mark this?
5    MR. FOMBY: Certainly. Can you have this
6  marked as Exhibit --
7    THE REPORTER: It's going to be 30.
8    MS. BAKER: Thank you. And how does it
9  get to be 30?
10    (Exhibit No. 30 marked.)
11    Q. (BY MR. FOMBY) On the page 1 of this where
12  it's Bates HC/Barnes-1721 at the bottom, is there
13  anything on that page that discusses classes in
14  de-escalation techniques?
15    **A. No, there's not.**
16    Q. Okay. Turning to the next page Bates marked
17  1722, is there anything there that lists a class that
18  you took in de-escalation techniques?
19    **A. Yes.**
20    Q. And is it -- does it list a particular date
21  you took that?
22    **A. Course date is August 23rd, 2018.**
23    Q. Are there any other references to
24  de-escalation techniques classes on that page?
25    **A. Specific for de-escalation, no, but the**

19

1  **class -- some classes that are taught, the de-escalation**
2  **technique is taught in those classes as well.**
3    Q. Okay. But in particular, de-escalation
4  techniques, are there any other classes that you took
5  specifically for de-escalation techniques listed on that
6  page?
7    **A. No.**
8    Q. Let's look at the next page Bates marked 1723.
9  Is -- are there -- is there any coursework on this page
10  that is specific to de-escalation techniques?
11    **A. That says a title or that corresponds with the**
12  **de-escalation techniques itself?**
13    Q. What's that?
14    **A. I said the title or the teaching of the**
15  **de-escalation techniques?**
16    Q. Any classes specifically oriented toward
17  de-escalation techniques?
18    **A. Yes.**
19    Q. Which class is that?
20    **A. It's going to be the less lethal electronic**
21  **control device.**
22    Q. And that, that would be taser training, is
23  that an easier way?
24    **A. Correct.**
25    Q. Okay. So in less lethal electronic control

20

1  device update, that is a -- is that a regular update
2  course?
3    **A. That's correct. That's the update after the**
4  **original -- the original taser class was done.**
5    Q. Okay. And that class would teach you on how
6  appropriately -- properly to use a taser as an
7  alternative to -- alternative to more lethal forms?
8    **A. Correct.**
9    Q. Correct, okay. Let's move to the next page,
10  1724. And again, the same question. Is there any class
11  listed, any training class listed on this page that's
12  specific to de-escalation techniques? And in this --
13  there is -- I know there are other classes on less
14  lethal content, the taser reoccurring training.
15    **A. Uh-huh (Affirmative.)**
16    Q. But other than that --
17    **A. Yes.**
18    Q. -- any other classes? What classes would that
19  be?
20    **A. It's going to be the baton.**
21    Q. Okay.
22    **A. The firearms.**
23    Q. And similar in those cases to the taser,
24  you're being taught how to use alternative weapons as --
25  weapons as an alternative to using lethal force?

21

1    **A. When appropriate.**
2    Q. And what were the dates of your baton and
3  firearms classes?
4    **A. That was in June 7, 2013 and February 11th of**
5  **2013.**
6    Q. Moving to the next page, 1725, again, the same
7  question. Are there any classes that are specific to
8  de-escalation techniques?
9    **A. Yes.**
10    Q. And what classes would those be?
11    **A. It's going to be the use of force,**
12  **intermediate core course.**
13    THE REPORTER: What was that second part?
14    THE WITNESS: Intermediate core course.
15    **A. I can say traffic as well, and...**
16    Q. (BY MR. FOMBY) Okay. And those classes, what
17  years were those classes taken in?
18    **A. The year is going to be in -- also, I'm sorry,**
19  **did I say use of force?**
20    THE REPORTER: Could you speak up,
21  please? I'm sorry.
22    **A. Did I say use of force? There's use of force**
23  **and then there's use of force intermediate, so there's**
24  **two classes. One in 2011 and one in 2010.**
25    Q. (BY MR. FOMBY) There's also -- there are

6 (Pages 18 to 21)

22

1 actually three use of force classes on that page written
2 on?
3 **A. Okay. There is.**
4 Q. Okay. Moving on to page 1726. Same question.
5 Any classes there that are specific to de-escalation
6 techniques?
7 **A. There's the use of force intermediate core**
8 **course, there is -- and the crisis intervention**
9 **training.**
10 Q. And what years were those courses?
11 **A. In 2009 and 2007.**
12 Q. And on page 17, Bates number 1727, same
13 question. Any classes that are specifically dedicated
14 to de-escalation techniques?
15 **A. There's the crisis intervention training in**
16 **2005.**
17 Q. Okay. Is that it?
18 **A. I believe so, yes.**
19 Q. So in looking at these, Deputy, you've
20 mentioned a number of classes that involve particular
21 types of weapons.
22 **A. Uh-huh (Affirmative.)**
23 Q. You've mentioned a number of classes that
24 involve a variety of situations, but how many classes
25 have you taken that are dedicated only to de-escalation

23

1 techniques?
2 MS. BAKER: Objection, vague.
3 Q. (BY MR. FOMBY) You can answer.
4 MS. BAKER: Oh, I'm sorry. Yes.
5 THE WITNESS: Okay, I apologize.
6 MS. BAKER: I'm sorry. Unless I instruct
7 you --
8 THE WITNESS: Okay.
9 MS. BAKER: I'm objecting for the record.
10 **A. That would be the class that was done in**
11 **August of 2018 as a mandated course by TCOLE.**
12 Q. (BY MR. FOMBY) Let's turn back to page 1723
13 and move down to the lower -- about two thirds of the
14 way down. This Ashtian Barnes, the shooting of Ashtian
15 Barnes occurred on April the 28th, 2016. What was the
16 next class that you took in terms of training after that
17 shooting?
18 **A. It was the Lidar radar training.**
19 Q. All right. After that what was the next class
20 that you took?
21 **A. It was the less lethal electronic control**
22 **device update.**
23 Q. And that again would be a taser update?
24 **A. Taser.**
25 Q. Okay. What was the next class?

24

1 **A. K9 encounters.**
2 Q. How about the next class?
3 **A. Field training officer.**
4 Q. Okay. So other than the training classes,
5 from the time of the shooting through the next year, are
6 there any classes that involve de-escalation of force,
7 de-escalation techniques?
8 MS. BAKER: Objection, vague. You may
9 answer if you understand the question.
10 **A. Can you repeat the question?**
11 Q. (BY MR. FOMBY) Sure. From 2010 [sic] 2016 to
12 June the 1st of 2017, other than the taser updates, did
13 you take any classes on de-escalation of force?
14 **A. No.**
15 Q. In that same time period, did you take any
16 classes about the policies of the use of force?
17 MS. BAKER: Objection, vague. I don't
18 know what you're talking about.
19 Q. (BY MR. FOMBY) Did you take any classes other
20 than the class on the taser update? Did you take any
21 classes during that period that involved the appropriate
22 use of force?
23 **A. Okay. Can you clarify that question again?**
24 **I'm sorry.**
25 Q. Sure. Okay. From 2010 -- 2000 -- sorry.

25

1 2-10-2016, which was before the shooting, to we'll take
2 it all the way out to the end of this course block,
3 August 7, 2017, other than your taser update class, did
4 you take any classes that involved the appropriate use
5 of force?
6 **A. Patrol rifle could be considered, you know, a**
7 **use of force class or --**
8 Q. What did you learn in patrol rifle?
9 MS. BAKER: Objection, vague.
10 Q. (BY MR. FOMBY) What was the nature of the
11 class -- of the coursework for patrol rifle?
12 **A. Patrol rifle was techniques, accuracy and**
13 **deploying a rifle in situations.**
14 Q. Okay. Other than that and the taser class, in
15 that period of time, did you take any classes that
16 specifically dealt with appropriate use of lethal force?
17 **A. No.**
18 Q. Now, Deputy, this particular incident on
19 April 28th, 2016 began with a traffic stop, right?
20 **A. That's correct.**
21 Q. Can you walk me through -- let's walk through
22 the phases of a traffic stop.
23 **A. Okay.**
24 Q. Okay? Starting with you have some -- you're
25 given some indication of a reason to pull someone over?

26

1  A. Yes.
2  Q. And that may be that you see them speeding,
3 you may see them driving erratically, but for whatever
4 reason, you observe or something is communicated with
5 you that says you need to pull this person over. What's
6 the next thing -- as soon as you do that and you know
7 that you need to pull someone over, what's the next
8 thing you do?
9  MS. BAKER: I'm going to object to that
10 question as vague, but that being said, you may answer.
11  THE WITNESS: Okay.
12  A. It depends.
13  Q. (BY MR. FOMBY) Okay.
14  A. Now, once the indication is given there by,
15 you know, myself or dispatch, then the next step is to
16 follow the vehicle, you know, run the license plate and,
17 you know, put yourself on the computer for a traffic
18 stop.
19  Q. So when you say that you run the license
20 plate -- excuse me -- and you put yourself on the
21 computer, do you -- do you have a computer in your squad
22 car?
23  A. Yes.
24  Q. Okay. And when you say "run the license
25 plate," what does that mean? What are you doing with

27

1 the license?
2  A. That means you're checking the license plate.
3  Q. Okay.
4  A. Whenever it's feasible or possible to do so at
5 that time.
6  Q. Okay. And when you run a license plate on
7 your computer, what kind of information does it give you
8 back?
9  A. It could be numerous types of information.
10 Registration, whether it's a stolen vehicle, if there's
11 any wanted hits or wanted persons depending on the type
12 of information that's entered by either a police agency
13 or -- or DPS.
14  Q. So you say it checks registration. Would that
15 generally tell you who owned the car?
16  A. It tells you who the car is registered to.
17  Q. Okay. Then you say "put yourself on the
18 computer for a traffic stop." What -- what is that
19 about?
20  A. Okay. So whenever we conduct a traffic stop,
21 that's how we dispatch to see your location, which could
22 include the license plate number of the vehicle, the
23 vehicle description and your location of the traffic
24 stop.
25  Q. So going back to this particular case, you

28

1 were given the identification of the -- of the license
2 plate; is that correct?
3  A. That's correct.
4  Q. And who gave that to you?
5  A. That was the Harris County Toll Road Authority
6 dispatch.
7  Q. Okay. And you were told -- were -- were you
8 given a description of the car as well to look for?
9  A. That's correct.
10  Q. Okay. So when you received that information
11 about Ashtian Barnes' Toyota, what did you do next?
12  A. When I received the information from dispatch
13 of the vehicle in question, I tried to look for the
14 vehicle in traffic and spotted the vehicle.
15  Q. And did you, in fact, locate the vehicle in
16 traffic?
17  A. Yes.
18  Q. And where was his car?
19  A. At the time of me locating the vehicle, the
20 vehicle was traveling southbound right around Bellaire,
21 I believe.
22  Q. Okay. What lane was he in?
23  A. I believe he was in lane one.
24  Q. And that would be the -- the lane closest to
25 the middle of the road, the middle -- the left-hand

29

1 side?
2  A. Lane one would be the left lane, and then any
3 lanes to the right of that would be sequential number
4 two, two to one.
5  Q. At what point in a traffic stop like this do
6 you turn on your lights -- your turn on your lights?
7  A. When I'm trying to get behind the vehicle or
8 when I'm directly behind the vehicle.
9  Q. Okay. And is it -- is it fair to say that the
10 reason for turning on the lights is to signal that
11 particular driver that you want -- that you're after
12 that person?
13  A. It's -- it's to make them aware I'm behind
14 them to either pull over or stop.
15  Q. Right. Okay. Now you also have a siren?
16  A. That's correct.
17  Q. So when would you -- did you use a siren in
18 this case?
19  A. No, I did not.
20  Q. Okay. When would you use a siren?
21  A. When the driver fails to pull over or stop or
22 to get their attention.
23  Q. Now in this particular case, you maneuvered
24 behind, you located Ashtian Barnes in the Toyota in lane
25 one on the tollway, and maneuvered behind him and turned

**Southwest Reporting & Video Service, Inc.**   **Registration #189**
713-650-1800                          swreptproduction@swreporting.com

30

1  on your lights; is that correct?
2  **A.  What I said was I believe he was in lane one,**
3  **yes.**
4  Q.  And so when you turned on your lights, did
5  Ashtian Barnes attempt to at that point speed up and
6  drive away?
7  **A.  No, he did not.**
8  Q.  Did Ashtian Barnes exhibit any kind of
9  movement within the lane that showed that he might not
10  be in complete control of his vehicle?
11  **A.  No.**
12  Q.  And by that I mean you've seen drunk drivers.
13  Did he drive like he was drunk or impaired at that
14  point?
15  **A.  No.**
16  Q.  Okay.  So you turned on your lights, how long
17  did it take for Ashtian Barnes to respond to your lights
18  coming on and start braking?
19      MS. BAKER:  Objection, calls for
20  speculation.
21  Q.  (BY MR. FOMBY)  Approximately.
22  **A.  Within seconds.**
23  Q.  Okay.  So in your experience that's a normal
24  response.  You see a flash, you check it, you go oh no,
25  I'm being pulled over and then you start pulling --

31

1  slowing down; is that --
2      MS. BAKER:  Object to the form.
3  **A.  Yes.**
4  Q.  (BY MR. FOMBY)  Okay.  And some drivers don't
5  do that; is that correct?
6  **A.  Correct.**
7  Q.  Okay.  But in this case, Ashtian Barnes
8  responded about as quickly as you're used to drivers
9  responding; is that right?
10  **A.  Yes.**
11  Q.  And once he started pulling over, did he --
12  which lane did he pull into to stop?
13  **A.  He pulled into the left shoulder.**
14  Q.  Okay.  And in fact, he came to a stop; is that
15  correct?
16  **A.  That's correct.**
17  Q.  So the two of you were stopped on the shoulder
18  of the road.  He's in front of you; is that correct?
19  **A.  That's correct.**
20  Q.  Okay.  About how far was his -- the rear of
21  his car from the front of your car at that point?
22  **A.  I would say about a car's length.**
23  Q.  Okay.  And that would be depending on the car,
24  ten, 12 feet?
25  **A.  Approximately.**

32

1  Q.  Okay.  It could be different if you have one
2  of those little squish cars, right?
3  **A.  Correct.**
4  Q.  Okay.  So at that point you've got a car
5  stopped, you've entered into the computer that you have
6  initiated a traffic stop.  What's the next thing that
7  you do before you would leave the car, the squad car?
8  **A.  I advise dispatch of my location.**
9  Q.  And at that point you would step out of the
10  squad car?
11  **A.  Yes.**
12  Q.  Are there some procedures that you are taught
13  to follow to protect you from traffic?
14      MS. BAKER:  Objection, vague.
15  Q.  (BY MR. FOMBY)  In approaching a stopped
16  vehicle on the side of the road with cars flying by at
17  65, 70 miles an hour, are there procedures that you're
18  taught to follow, to keep your -- you and the individual
19  in front of you from being hit?
20  **A.  We approached the --**
21      THE VIDEOGRAPHER:  I'm sorry, it was just
22  causing a lot of feedback.  Sorry.
23      MR. FOMBY:  Let me take this off.  This
24  might help you.
25  Q.  (BY MR. FOMBY)  I'm sorry, Deputy.

33

1  **A.  Okay.  So we exit the vehicle, we approach the**
2  **non traffic side when possible.**
3  Q.  Okay.  And is that what you did in this case?
4  **A.  Yes.**
5  Q.  Normally when you approach a driver, do you
6  try to get their attention?
7      MS. BAKER:  Objection, vague.
8  **A.  No.  When I approach a driver, I'm looking at**
9  **them, not them trying to look at me.**
10  Q.  (BY MR. FOMBY)  Okay.  How do you get their
11  attention to get them focused on you?
12  **A.  Well, once I approach the vehicle to the**
13  **either driver or passenger door, whatever side I'm**
14  **making contact with them, I look in the window or knock**
15  **on the window to make contact with them.**
16  Q.  And when you look in the window, are you
17  looking not just at the passenger but to get a sense of
18  what's going on in the car?
19  **A.  That's correct.**
20  Q.  That's part of your training?
21  **A.  That's correct.**
22      THE VIDEOGRAPHER:  Mr. Fomby, could you
23  just clip it on all the way.  I'm sorry.  That'll do it.
24  Perfect.  Thank you.
25      MR. FOMBY:  Okay.

**Southwest Reporting & Video Service, Inc.**     **Registration #189**
**713-650-1800**                    **swreptproduction@swreporting.com**

# Roberto Felix

**34**

1  Q. (BY MR. FOMBY) So in this case, you walk up
2  to the window and you get Ashtian Barnes' attention. Is
3  his window up or down at this point?
4  A. His window was down.
5  Q. Okay. Was it down the entire time that you
6  observed the vehicle or did he lower it?
7  A. It was down when I approached the vehicle.
8  I'm going to correct myself. I believe it was down, not
9  all the way, but it was down to where I could hear him,
10  he could hear me.
11  Q. Okay. When you approached the vehicle at that
12  point, did you happen to see any kind of smoke or
13  anything else coming out of the window?
14  A. No.
15  Q. As you're approaching the vehicle from the
16  rear of the vehicle, at that point did you happen to
17  smell any strange odors?
18  MS. BAKER: Objection, vague.
19  A. Not from approaching the vehicle, once I was
20  at the driver's side window.
21  Q. (BY MR. FOMBY) Okay. So you're standing
22  beside Ashtian Barnes at the driver's side window and
23  what's the first thing that you ask him for?
24  A. Well, the first thing I do is I introduce
25  myself, let him know who I was and why he was being

**35**

1  stopped. At that point I asked him -- he actually
2  interrupted and said that it was a rental car.
3  Q. Now, when you say that he interrupted you,
4  were you telling him that he was being stopped for a
5  toll tag violation?
6  A. That is correct.
7  Q. So when he responded then, it was not just a
8  random response, it was informing you that this was a
9  rental car so that might not -- that he might not be
10  responsible for the toll tag problem?
11  MS. BAKER: Objection, calls for
12  speculation.
13  Q. (BY MR. FOMBY) Is that fair to say?
14  MS. BAKER: Objection, calls for
15  speculation.
16  A. Okay. Repeat your question.
17  Q. (BY MR. FOMBY) Did it -- did it appear to you
18  that his interrupting you with oh, this is a rental car,
19  was unrelated to the -- to the -- what you were telling
20  him at the time?
21  A. No.
22  Q. Okay. Because if it was a rental car, that
23  would be directly related to whether or not he was
24  personally guilty of any outstanding tolls; is that
25  correct?

**36**

1  A. Not necessarily. The person responds
2  sometimes when you're getting the information, respond
3  by either saying it's not my car, it's a rental, but
4  until that fact is checked out, then we proceed with
5  the -- the investigation or issuing of any citations at
6  that point.
7  Q. Okay. Now you said that at the beginning of
8  this traffic stop, you would check on the registration
9  of the vehicle; is that correct?
10  A. When -- when possible.
11  Q. Okay. And did you, in fact, receive the
12  information before you left the vehicle as to who the --
13  who the car was registered to?
14  A. No.
15  Q. Did you check on that before you left?
16  A. No.
17  Q. Would that normally be available to you or on
18  your computer screen in your car?
19  A. Sometimes.
20  Q. Okay. I'm showing you what we have received
21  in discovery. It's Bates stamped -- it's upside down.
22  I think 198.
23  MR. FOMBY: Can we enter this as 31?
24  (Exhibit No. 31 marked.)
25  MS. BAKER: Can we -- could we go off the

**37**

1  record for one second? I have a question for you. So
2  can we go off the record?
3  THE VIDEOGRAPHER: Would you like to go
4  off the record, Mr. Fomby?
5  MR. FOMBY: Yes. That's fine.
6  THE VIDEOGRAPHER: The time is
7  approximately 10:45 a.m. We're off the record.
8  (Off the record.)
9  THE VIDEOGRAPHER: The time is
10  approximately 10:53 a.m. We're on the record.
11  Q. (BY MR. FOMBY) Now -- okay. Now before we
12  continue, some questions were raised -- a concern raised
13  about the premarked exhibits here. These are simple
14  screenshots taken off of a video that was provided under
15  discovery by opposing counsel. They have a copy of the
16  video, we have a copy of the video. The video is very
17  difficult to see from the standpoint of, you know, when
18  things specifically happened, so we've printed these
19  off. We are going to provide a copy of each of these
20  that we're going to show today to opposing counsel.
21  They're being offered for the purposes of not
22  necessarily evidentiary but for purposes of helping you
23  understand what's going on and explaining what's going
24  on at various points during the traffic stop and
25  thereafter. Okay.

**38**

1  MS. BAKER: Thank you for that
2  explanation, Mr. Fomby, and I appreciate that. And a
3  question I have is, are these in sequential order? Do
4  you have any representations about that? In other
5  words, do they skip around, is there some reference by
6  which we can understand like whether some parts were
7  skipped or they're nonsequential or are they sequential?
8  MR. FOMBY: These photos will be offered
9  in sequential order. There is a time stamp on the
10  bottom of each photograph --
11  MS. BAKER: Okay. Perfect.
12  MR. FOMBY: -- that shows that. In
13  addition, when any of the events happen within fractions
14  of a second, but by looking at the automobiles on the
15  opposite side of the road coming this way, you can
16  actually see the same car moving in sequence.
17  I haven't printed every single one of
18  these pictures that go through the entirety of the
19  timeframe because that would be several thousand photos,
20  but they are effectively for the times when the
21  timeframes were very tight there. Every fraction of a
22  second you'll see that.
23  Then later when several minutes go by
24  you'll see that, but the time stamp will be there. So
25  the fractions of a second at that point no longer matter

**39**

1  and the time stamps are there.
2  MS. BAKER: So if I understand what
3  you're saying, we'll be able to match it to the video by
4  the time stamping?
5  MR. FOMBY: Exactly.
6  MS. BAKER: Okay. Perfect. Thank you.
7  MR. FOMBY: Certainly.
8  Q. (BY MR. FOMBY) Getting back to this document,
9  we were talking about the -- who the -- the Toyota
10  Corolla that Ashtian Barnes was driving was registered
11  to.
12  A. Uh-huh (Affirmative.)
13  Q. And you said that you had an ability to pull
14  that information in your car, but for whatever reason
15  you did not do so in this case?
16  A. Yeah. It could be a reason where it doesn't
17  come through in a timely manner. Even though we run it,
18  it might take a few seconds or a few minutes sometimes
19  to actually get the return.
20  Q. Okay. If you're doing a traffic stop on the
21  side of the road, though, and you do not have a partner,
22  would it not be more prudent to wait until you got that
23  information so you understand who you're stopping?
24  A. Sometimes we cannot wait for -- for the return
25  because we have to make contact immediate -- there's

**40**

1  times that we've, you know -- that I don't get returned
2  until the end of the day sometimes or 30 minutes later,
3  depending on the way the computer system is running.
4  So I'm not going to have you standing on the
5  side of the road for 30 minutes, five minutes, making --
6  before making contact, you know, waiting on the return.
7  Q. Okay. In this case where you stopped someone
8  for a toll violation, was there any particular reason
9  why you needed to not wait, that you needed to take
10  action and make contact before you got the information
11  back?
12  A. There was no -- I'm sorry, repeat your
13  question.
14  Q. In this case where you're stopping someone for
15  a purported toll tag violation --
16  A. Uh-huh (Affirmative.)
17  Q. -- for unpaid toll, was there any particular
18  reason why you needed to immediately make con -- contact
19  with the driver?
20  A. The contact was made because when a vehicle is
21  put over our dispatch that's a prohibitive vehicle, they
22  have the information already, who the registered owner
23  is on their end. So we don't wait for the return
24  sometimes because the dispatch does have that
25  information already.

**41**

1  Q. Okay. So you're talking to the dispatcher at
2  this point, particular point, Deputy, and you say that
3  you -- they already have the information. Wouldn't it
4  be prudent at that point for you to simply ask them to
5  tell you the information?
6  A. Well, before making contact with the vehicle,
7  you know, I don't know if the person on the registration
8  is going to be the owner of the vehicle, the relative of
9  a vehicle, a friend of the person who owns the vehicle,
10  so it's not, you know, necessarily the information on
11  the registration that's always accurate. The
12  information that we go based on the registration is just
13  the -- the month and day of the expiration of the -- of
14  the registration.
15  Q. Okay. I understand that, Deputy. You are
16  suggesting that you might have to wait 30 minutes or
17  even till the end of the day to get the information on
18  who the car was registered to, but that's not true, is
19  it?
20  A. No. What I --
21  Q. Yes?
22  A. What I said was that sometimes the
23  registration doesn't come back, not that we wait for it.
24  Q. Did you ask the dispatcher what -- if they had
25  the information about who the car was registered to

**Southwest Reporting & Video Service, Inc.**     **Registration #189**
**713-650-1800**                           swreptproduction@swreporting.com

42

1  before you left your squad car?
2      A.  At that time it wasn't necessary for me to do
3  so.
4      Q.  Okay.  And according to the document that's
5  Bates stamped I think 198 in front of you that was
6  provided in discovery, who --
7          MR. ADAM FOMBY:  That's our discovery.
8          MR. FOMBY:  Excuse me?
9          MR. ADAM FOMBY:  That's our discovery.
10         MR. FOMBY:  Okay.
11     Q.  (BY MR. FOMBY)  And according to this
12  document -- document that's been marked 31, who would
13  that car be registered to?
14     A.  The owner is The Mint Leasing, Inc.
15     Q.  Okay.  And who is the current registration?
16     A.  That is the current registration owner.
17     Q.  How about the name underneath it, the rental
18  car agency?
19     A.  Okay.  It says "On Time Car Rental."
20     Q.  Okay.  So when you approached Ashtian Barnes
21  and he informed you that this was a rental car, that
22  would be consistent with what the Texas automobile
23  registration records show; is that correct?
24     A.  That's correct.
25     Q.  Do you know how old the toll violation was?

43

1      A.  I do not recall.
2      Q.  Before we go further into this, I want to talk
3  for a second about toll violations.  There are -- when
4  you drive on a -- on a tollway in Texas, EZ TAG on the
5  Sam Houston Tollway.
6      A.  Uh-huh (Affirmative.)
7      Q.  How many different ways are there for the EZ
8  TAG organization to identify a car?
9      A.  There's several ways.  By the license plate,
10  by an actual EZ TAG, by a Texas tag, by another region
11  EZ TAG that I do not recall the name right now.  I think
12  it's like north, northwest Dallas or something like
13  that, and then that -- those would be the most I guess
14  common.
15     Q.  And if you don't have a Tex tag or EZ TAG or
16  one of those RFID chips in your car, you're saying that
17  they can take a picture of your license plate?
18     A.  It takes a picture of your license plate, yes.
19     Q.  And once they have a picture of your license
20  plate and they catch you driving on the tollway, what
21  does the tollway authority do with that information?
22     A.  Repeat your question.
23     Q.  Once they have a picture of the license plate,
24  what does -- you know, okay.  If the -- if the -- I have
25  an EZ TAG, it automatically reads my EZ TAG, then I

44

1  imagine it goes against my EZ TAG account?
2      A.  That's correct.
3      Q.  And it's pulled.  If I don't have one of those
4  and it only reads my license plate, what does the toll
5  authority do with that information?
6      A.  To my knowledge what I understand happens is
7  they -- it goes into the system for -- as a toll
8  violation.
9      Q.  Does it go into the system as a toll
10  violation?  Because the sign up there says that I can
11  pay by -- by mail and it's -- it's taking a picture of
12  my plate; isn't that correct?
13     A.  I'm not sure what sign you're referring to.
14     Q.  Well, there are -- there are lanes that are
15  for EZ TAG?
16     A.  Correct.
17     Q.  And then there are other lines -- lanes where
18  I -- where it takes a picture of my plate and can charge
19  me because of my plate number; isn't that correct?
20         MS. BAKER:  Objection, vague.
21     A.  Each -- each lane, toll lane, whether it's EZ
22  TAG or pay later, has cameras.  Each vehicle that goes
23  through those -- those lanes, it takes a picture of your
24  license plate whether you have an EZ TAG or not.  Now if
25  you don't pay, then, you know, within ten days, then

45

1  you're -- you're sent a bill for that violation.
2      Q.  (BY MR. FOMBY)  Okay.  So if I don't have an
3  EZ TAG and I go through it, they look at my plate
4  information and they send me a bill for driving through
5  that?
6      A.  As I understand it, yes.
7      Q.  Okay.  And that's referred to up on the signs
8  as paid by mail?
9      A.  Once again, I don't know what sign you're
10  talking about.
11     Q.  So the -- so when someone drives through and
12  they don't have an EZ TAG and they get sent a bill, is
13  that a criminal violation or a civil violation?
14         MS. BAKER:  Objection, calls for a legal
15  conclusion, but you may answer if you know.
16     A.  Okay.  That's going to be a -- the fine itself
17  is a civil issue.
18     Q.  (BY MR. FOMBY)  And because they know about
19  the plate, wouldn't they then normally know who the
20  owner of that vehicle is?
21     A.  Yes.
22     Q.  And when they send the bill, they send the
23  bill to the owner?
24     A.  To the registered owner.
25     Q.  Okay.  So a person who violates the tollway

**Southwest Reporting & Video Service, Inc.      Registration #189**
713-650-1800                                          swreptproduction@swreporting.com

46

1  has committed a civil offense; is that correct?
2      **A.  That is incorrect.**
3      Q.  But you said it was a civil, not a criminal
4  offense?
5      **A.  The actual toll violation.  But once you have**
6  **tolls accumulated, then under Texas Transportation Code**
7  **you're operating a motor vehicle on the tollway when**
8  **prohibited because it becomes prohibited at that time.**
9      Q.  Okay.  So in this case the owner and
10  registered agents were not Ashtian Barnes?
11      **A.  That's correct.**
12      Q.  You have no information at all that Ashtian
13  Barnes was responsible for any toll violations; is that
14  correct?
15      **A.  Repeat your question, sir.**
16      Q.  You have no information -- at the time that
17  you stopped Ashtian Barnes, you had nothing, no evidence
18  whatsoever, no information that said Ashtian Barnes was
19  personally responsible for the toll violation; is that
20  correct?
21      **A.  The information that I had was that the**
22  **vehicle was prohibited and the operator of the vehicle**
23  **was operating the vehicle on the tollway while the**
24  **vehicle was prohibited.**
25      Q.  Okay.  Is there anything on the vehicle

47

1  that -- that pops up and tells you that this vehicle has
2  an existing -- is prohibited from using the tollway?
3      **A.  Will you repeat your question?**
4      Q.  Okay.  I'm renting a car, I'm renting a car
5  from Hertz or Avis or any other agency, and I drive on
6  the tollway and -- is there anything in that car that
7  flashes a light and says you can't use the tollway,
8  you're prohibited?
9          MS. BAKER:  Objection, calls for
10  speculation.
11      **A.  I don't -- I wouldn't know how to answer that**
12  **question.  I -- I don't know.**
13      Q.  (BY MR. FOMBY)  Do you know of any devices
14  that exist in normal cars that inform you whether or not
15  your car is prohibited from using the tollway?
16      **A.  No.**
17      Q.  Okay.  Is there any kind of flashing light
18  that occurs as you're using the tollway that says your
19  car is prohibited from using the tollway?
20      **A.  Yes.**
21      Q.  Where are those lights?
22      **A.  They're on the -- by the readers on the top,**
23  **there will be a red light that will go off if once you**
24  **passed the reader and you are a prohibited vehicle.**
25      Q.  Okay.  So what you -- what you just said,

48

1  Deputy, and correct me if I'm wrong, is that the light
2  goes off after you pass the reader?
3      **A.  That's correct.**
4      Q.  Okay.
5      **A.  I'm gonna clarify that.  Actually it depends.**
6  **If it's an EZ TAG lane, yes.  If it's a pay lane, no,**
7  **the reader is in front of you.  The light is in front of**
8  **you.  That would be the lanes with -- with the toll**
9  **collectors in them.  And that would be the lanes with --**
10  **with toll collectors.**
11      Q.  And these loans actually have arms that come
12  down to stop you from --
13      **A.  No.  Those are the automated coin machines.**
14  **The collector ones actually are the people inside the**
15  **booth that will provide change when paying a toll.**
16  **Those do not have the arms.**
17      Q.  Do you have any personal knowledge of what
18  lane Ashtian Barnes may have used to enter the tollway?
19      **A.  No.**
20      Q.  Okay.  Now, you stopped the person for a
21  traffic violation, you've walked up, you've made the
22  initial contact.  You said that you tell them -- you
23  introduce yourself, tell them why you made the stop.
24  What's the next step in the interaction?
25      **A.  The normal step is to ask him for a driver's**

49

1  **license, insurance or proof of financial responsibility.**
2      Q.  Now, if a car is a rental car, does it
3  normally come with proof of financial responsibility or
4  an insurance card?
5      **A.  Yes.**
6      Q.  Where would that be located?
7      **A.  Most of the time it is located in the glove**
8  **box.**
9      Q.  Are you sure about that?
10      **A.  In my experience when a vehicle, you rent a**
11  **vehicle, normally the insurance is in the glove box.**
12      Q.  Have you been trained on that particular
13  issue?
14      **A.  No, that's personal experience.**
15      Q.  Okay.  Now, in the State of Texas, you are
16  required to be licensed -- a licensed driver in order to
17  drive on -- on public roads; is that correct?
18      **A.  That's correct.**
19      Q.  But in the State of Texas, you are not
20  required to have a driver's license with you, are you?
21      **A.  You must provide identification.**
22      Q.  In the State of Texas, you're not required to
23  have a driver's license with you, are you?
24      **A.  You're supposed to have identification, which**
25  **if you have a driver's license, it would be your**

50

driver's license or a Texas ID.

Q. If a person -- if you stopped me on the side of the road and I rushed out of the house to make it to court, and I forgot my wallet, do you have any -- as -- as a police officer, do you have any ability to check on whether or not I am licensed by the State of Texas?

A. There is.

Q. And how is that?

A. Running your name, date of birth for a driver's license and comparing that driver's license return to a picture.

Q. And it actually shows you a picture of the person on -- that has that license? Did it show a picture?

A. Now it does.

Q. And on April 28th, 2016, did it show the driver's license in your car?

A. We never got to that point.

MS. BAKER: The picture? Did you mean the picture? Did it show a picture?

Q. (BY MR. FOMBY) The picture?

A. No.

Q. Okay. Would it tell that there's a person with that name and date of birth was licensed?

A. Yes.

Q. Did you ever run -- go back and run the

51

driver's license for Ashtian Barnes?

A. No.

Q. A lot of times my wife gets this these little insurance updates in the mail and she puts -- is supposed to put them in the cars but sometimes she forgets. If I pick up -- I'm stopped and I grabbed my insurance thing and it's out of date, do you have any way of checking to see whether or not I'm insured?

A. Now there is.

Q. Okay. Was there any way to check on whether or not someone had insurance on April 28th, 2016?

A. I don't believe so.

Q. Is that true globally or just for the Constable's Office?

MS. BAKER: Objection, calls -- vague.

A. I'm -- I'm not sure if it's globally, sir.

Q. (BY MR. FOMBY) Okay. From the standpoint of your squad car, you had no ability to access the Texas database for insurance, automotive insurance on that date?

A. On that date, I don't believe so. I don't think that was an option or something that we could access.

Q. Okay. Now, are you aware that under Texas law, you are not required to have that proof of

52

insurance with you?

A. As of now, yes. Before, you must provide proof of financial responsibility.

Q. Okay. When did that law change?

A. I believe it was in 2017 or 2018.

Q. And are you aware of what happens if you do have -- if you're cited for not having a driver's license, are you aware of how that -- the courts manage that particular issue?

A. No, I do not.

Q. Are you aware that you go and demonstrate to the courts that you are licensed and/or have insurance in order to make the citation go away?

A. Most likely, yes.

Q. Okay. So when you approached Ashtian Barnes, what did -- did you ask him for his driver's license?

A. Right off the bat, no, because he interrupted me, saying that it was a rental car and the vehicle -- he was on his way to wash it and return it.

Q. After that did you ask him for his driver's license?

A. I asked him who the vehicle -- where he rented the vehicle from or who the vehicle -- who rented the vehicle, and he stated that it was his girlfriend, had rented the vehicle.

53

Q. Okay.

A. And had had it for approximately a week.

Q. Okay. At any point did you ask him for his driver's license?

A. Yes. After -- after that initial encounter with the -- about the rental agreement, I did ask for his driver's license.

Q. Okay. Was he able to locate it?

A. No. He said he didn't have it with him.

Q. Did he attempt to be looking for a driver's license or the rental agreement while you encountered -- during the encounter?

A. He grabbed a stack of papers and was fumbling through them but not actually looking at the papers.

Q. Okay. In other words, he was looking off and fumbling through them?

A. Yes.

Q. Okay. Where did he get that stack of papers?

A. From the floorboard of the vehicle.

Q. Which floorboard?

A. The passenger floorboard.

Q. And during that encounter, was he able to find the rental agreement for you?

A. He never was looking for it. He was just having the papers in his hand fumbling through it and

**54**

1 looking towards my -- looking in my direction.

2 Q. I understand, Deputy. My question was: Did

3 he ever locate that rental agreement for you?

4 A. He never attempted to look for it in the first

5 place.

6 Q. Did he ever suggest where his driver's license

7 might be?

8 A. At one point he did say that his ID or

9 driver's license was in the trunk.

10 Q. Did he say that it was in the trunk or it

11 might be in the trunk?

12 A. He said it was in the trunk.

13 Q. Did he offer to allow you to look in the trunk

14 to see if his license was back there? Did he offer to

15 let you look in the trunk?

16 A. Yes.

17 Q. Did he open the trunk for you?

18 A. He maneuvered the switch inside the vehicle to

19 open the trunk.

20 Q. Okay. He pushed the button and the trunk

21 popped open?

22 A. Correct.

23 Q. Is that fair?

24 A. Correct.

25 Q. Now let's rotate back a little bit to driver's

**55**

1 license and insurance. You say that you had no ability

2 in your squad car to look up a driver's license. Was

3 dispatch able --

4 A. That -- that's not what I said.

5 Q. Okay.

6 A. I said we never got to that point to be able

7 to run the driver's license. I had no idea who I was

8 encountering at that time.

9 Q. Okay. So at no point during the encounter did

10 you go back to your car to run his driver's license?

11 A. No.

12 Q. And at no point during the encounter did you

13 go back to confirm that it was a rental car?

14 A. No. That opportunity never -- was never

15 given.

16 Q. When you say "that opportunity was never

17 given," did Ashtian Barnes prevent you specifically in

18 any way from going back to your squad car?

19 A. Yes. For officer safety when he was digging

20 around the vehicle, it was a -- it's a red flag for us

21 to maintain eyes on the individual for officer safety.

22 Q. So it was important for you to keep an eye on

23 him during this period for your safety?

24 A. Correct.

25 Q. Did you -- at what point did you call for

**56**

1 backup?

2 A. After I smelled the odor of marijuana in the

3 vehicle, that's when I radioed for backup.

4 Q. So you were -- explain to me, Deputy, so I can

5 understand. You're afraid for your safety so you will

6 not go back to your car. This is a car that's been

7 stopped for a toll tag violation. You're afraid for

8 your safety so you won't go and confirm his information,

9 but you don't call for backup until you think you need

10 to search the car?

11 MS. BAKER: I'm going to object to that

12 question on several grounds. Number one, it's very

13 argumentative, and number two, I believe it misstates

14 his testimony.

15 Q. (BY MR. FOMBY) So Deputy, let me understand.

16 THE REPORTER: Could you repeat that?

17 MR. FOMBY: Yes.

18 Q. (BY MR. FOMBY) You were afraid for your

19 safety, and because of that reason you didn't go back to

20 your car to check his driver's license?

21 A. No. I didn't go back to run his driver's

22 license because I didn't have the information to do so.

23 Q. Did you ask Mr. Barnes what his name was?

24 A. When he -- he said that the ID was -- or

25 driver's license was in the trunk and he popped the

**57**

1 trunk, in my experience that's deceptive behavior on an

2 individual to try to gain your focus away from what's

3 actually going on inside the vehicle.

4 Q. Deputy, the question I asked you was

5 specifically: Did you ask him what his name was?

6 A. We didn't get to that point.

7 Q. You had a long conversation with him, did you

8 not?

9 MS. BAKER: Objection, mischaracterizes

10 the evidence in this case.

11 A. The conversation we had, the encounter we had

12 was rapidly evolving, so the incidents that were

13 occurring, him fumbling on the floorboard, him digging

14 around, I did, you know, tell him on four different

15 occasions stop digging around. His hand, his left hand

16 was going towards the floorboard of the vehicle while

17 his right hand was, you know, reaching on the passenger

18 floorboard. So a rapidly evolving situation, my

19 priority was for my safety and to maintain visual of the

20 suspect.

21 Q. (BY MR. FOMBY) So you were afraid for your

22 safety at that point. Is that fair, Deputy?

23 A. There was flags that were raised for me to be

24 more concerned at that point.

25 Q. Is that a yes or a no, Deputy?

58

1  A. Yes.
2  Q. Okay. And you were so afraid for your safety
3  that you did not even -- that you did not ask him what
4  his name was?
5  MS. BAKER: Objection, argumentative,
6  misstates his testimony.
7  A. Repeat the question.
8  Q. (BY MR. FOMBY) You were so afraid for your
9  safety that you did not take the time to ask him what
10 his name was?
11 A. No, the rapidly evolving events that occurred
12 did not allow me to get to that point because the focus
13 was shifting from being a traffic stop to something else
14 being, you know, deceptive inside the vehicle.
15 Q. And at that point you were so afraid for your
16 safety you didn't -- did not ask Ashtian Barnes what his
17 date of birth was; is that correct?
18 A. I did not ask him for his information,
19 correct.
20 Q. And at that point you were so afraid for your
21 safety you did not return to your squad car to confirm
22 that it was, in fact, a rental car; is that correct?
23 A. At the point there was no time to, you know,
24 leave the vehicle to go run information.
25 Q. And yet, at this time that you were so afraid

59

1  for your safety that you would -- did not ask the basic
2  questions of a traffic stop, you did not yet call for
3  backup, did you?
4  A. Backup had already been called.
5  Q. It had been?
6  A. During the first initial conversation of me
7  asking who the -- for who I was and why he was being
8  stopped and him telling me that the -- it was a rental
9  car, that's when I had called for backup.
10 Q. We're gonna see -- Deputy, is it -- in your
11 experience, is it common for people who are looking for
12 their driver's license to dig around their wallets for
13 papers?
14 A. For their license?
15 Q. Yes.
16 A. It's uncommon.
17 Q. Is it common in your experience when people
18 have a rental car, for them to dig around in the papers
19 in the car to be able to show you the rental receipt?
20 A. That is common, but that's not what he was
21 doing.
22 Q. And Officer Felix, Deputy Felix, you have --
23 when did you pick up this ability to read his mind?
24 MS. BAKER: Objection, argumentative.
25 Q. (BY MR. FOMBY) Officer Felix, you said that

60

1  you know what he was thinking.
2  MS. BAKER: Objection --
3  Q. (BY MR. FOMBY) And what gave you --
4  MS. BAKER: -- argumentative and
5  misstates his testimony.
6  Q. (BY MR. FOMBY) What gave you the ability to
7  know what he was thinking at that particular time?
8  MS. BAKER: Same objection,
9  argumentative, misstates Deputy Felix's testimony. You
10 may answer.
11 THE WITNESS: Okay.
12 A. I never said that I read his mind. What I
13 said that his behavior wasn't common for someone who
14 would be looking for a rental agreement. He was -- he
15 had his hand, fumbling through it, but at the same time
16 looking at me. If you're looking at something, looking
17 for something you're going to be looking at that stack
18 of papers, you know, trying to find it, not grabbing it,
19 just moving it around and looking at me at the same
20 time.
21 Q. (BY MR. FOMBY) At some point in this
22 interaction, after the stop, you informed Ashtian Barnes
23 that you smelled a strong odor of marijuana; is that
24 correct?
25 A. That's correct.

61

1  Q. You asked him if there was anything in the car
2  that he needed to tell you about; is that correct?
3  A. That I need to know about.
4  Q. Was -- was it -- was that the point that you
5  called for backup?
6  A. No. Backup had already been called prior to
7  that.
8  Q. How long does it take for a backup car to
9  arrive normally?
10 A. It just depends. If there's a unit -- there's
11 several units on the tollway, so it could be seconds or
12 it could be a minute or two.
13 Q. At that point you opened the door and told
14 Ashtian Barnes that he needed to leave the vehicle; is
15 that correct?
16 A. When I told him to get out of the vehicle was
17 his -- his actions kept indicating to me that he was up
18 to something, either trying to hide something or reach
19 for something.
20 Q. To your knowledge and training as a deputy
21 constable, are you supposed to have a backup officer in
22 place before you remove an individual from the vehicle?
23 MS. BAKER: Objection, overbroad. You
24 may answer.
25 THE WITNESS: Okay.

16 (Pages 58 to 61)

62

1  A.  Every situation's different.  Sometimes
2  there's not time to, you know, separate the individual
3  from the vehicle, having to wait for backup.
4  Q.  (BY MR. FOMBY)  Other than shuffling papers,
5  did it appear to you that Ashtian Barnes was going
6  anywhere?
7  A.  No.
8  Q.  Okay.  In fact, didn't you state that at one
9  point Ashtian Barnes turned off his car?
10  A.  That is correct.
11  Q.  And that he removed the key from the ignition
12  and placed it down near the gearshift?
13  A.  Correct.
14  Q.  Are those the actions in your experience,
15  Deputy, of a person about to flee the scene?
16  A.  Those aren't common actions.  You know,
17  usually when someone gets pulled over the vehicle stays
18  running and in park.  Rarely does someone turn off the
19  vehicle and place the keys, you know, down or on the
20  dash, so that's not a common action for someone to take.
21  Q.  I understand that may not be common, and that
22  makes it more interesting to me.  Is that action
23  consistent with a person who is imminently ready to flee
24  the scene?
25  A.  No.

63

1  Q.  At any point in this interaction with Ashtian
2  Barnes, did you ever see him -- did you ever get an
3  indication of a weapon inside the car?
4  A.  Yes.
5  Q.  At what point was that?
6  A.  When he was digging around in the vehicle.
7  Q.  What did you see?
8  A.  I saw his hand, his left hand towards the
9  floorboard of the vehicle while his right hand was
10  extended over to the passenger floorboard.
11  Q.  His left hand was where?
12  A.  Down by his leg in -- in the seat area as he's
13  reaching forward.
14  Q.  So is the floorboard, the driver's side
15  floorboard of the car, a weapon?
16  A.  No, but it could potentially be a weapon
17  any -- anywhere in that area.
18  Q.  Okay.  That's not the question I asked you,
19  Deputy.  First of all, I asked you, at any point did you
20  see a weapon in his possession?
21  MS. BAKER:  I'm going to object to that
22  because I don't think that was your question.  We could
23  read it back but if that's your question now, you may
24  answer.
25  THE WITNESS:  Okay.

64

1  A.  The original question you asked was did I
2  believe or --
3  THE WITNESS:  Actually, can we read that
4  question back because I don't --
5  Q.  (BY MR. FOMBY)  Well, will you just answer
6  this question --
7  A.  Okay.
8  Q.  -- make it easier on the court reporter.  At
9  any point at -- before the car got turned back on, did
10  you see an actual weapon in the car?
11  A.  I did not see a weapon in the car.
12  Q.  Okay.  So getting back to the moment, your
13  statement was that Ashtian Barnes had been sitting in
14  the car with the engine running for the first part of
15  the inter -- of -- of your discussion, correct?
16  A.  First part of?
17  Q.  When you walked up and for the first part of
18  your conversation with him while he was shuffling
19  through the papers, the engine was running?
20  A.  At some point is when he turned it off.  Exact
21  point, I cannot recall.  But I did observe him turn off
22  the car and set the keys down.
23  Q.  And the keys are sitting down here by the
24  gearshift?
25  A.  Down in the center console gearshift area.

65

1  Q.  And you have opened -- did that happen before
2  or after you opened the car door?
3  A.  That happened as I was opening the car door.
4  Q.  Okay.  So you were opening the car door.  He
5  turns off his car and puts his key in there?
6  A.  No, no, I'm sorry.  Repeat that question
7  again.  At what point, what?
8  Q.  Did he turn off the car and put his key near
9  the gearshift?
10  A.  Prior to opening the vehicle.
11  Q.  Okay.
12  A.  The vehicle door.
13  Q.  So Deputy, you opened the door of the vehicle
14  and was the door open wide or open just partially?
15  A.  It was open enough for me to be in the doorway
16  area.
17  Q.  Okay.  At that point did you see a weapon in
18  the car?
19  A.  No, but I couldn't see his -- his hand as he
20  was leaning forward.
21  Q.  So you're saying at this point as you opened
22  the car door, he's leaning forward?
23  A.  He's leaning forward.  When I opened the car
24  door, he's leaning forward towards the console area.
25  Q.  Isn't it true in your statement that you said

Southwest Reporting & Video Service, Inc.      Registration #189
713-650-1800                                    swreptproduction@swreporting.com

## 66

1 at this point he was digging around in the red Solo cup
2 on the passenger side?
3   **A.  No, that was prior when he was -- he was**
4 **reaching in that area when I kept telling him to stop**
5 **digging around.**
6   Q.  Okay.  Now at this point your backup officer
7 has not yet arrived.  You have the door open, and you
8 tell Ashtian Barnes to step out of the vehicle?
9   **A.  Yes.**
10   Q.  What happens then?
11   **A.  When I opened the door and asked him to step**
12 **out he reaches -- leans forward and as I'm trying to see**
13 **what he's doing, I'm expecting him to step out, he's**
14 **grabbing the keys to -- to the vehicle and as he turned**
15 **the vehicle on, his left hand is down, like by the seat,**
16 **like his lap, so I'm looking and he turned the car and**
17 **quickly puts it in drive.**
18   Q.  Okay.  Is this a con -- console mounted
19 gearshift or is it on the --
20   **A.  I -- I don't recall.  I don't recall.  I know**
21 **it just happened so quick that, you know, the car was**
22 **put in drive.**
23   Q.  So he leans forward, Deputy, grabs the key.
24 Is it a key on a key chain or just a solo -- individual
25 key?

## 67

1   **A.  No, it's a key.  I can't tell you at this**
2 **point if it was one key or multiple keys but it was the**
3 **key to the ignition.**
4   Q.  And leaning forward toward the steering wheel,
5 he reaches down, grabs a key, puts it into the ignition,
6 turns it on, puts -- puts his foot on the brake, puts it
7 in gear.  Is that what you're saying?
8   **A.  That's -- that's correct.**
9   Q.  And approximately how long did it take for him
10 to lean forward and then go through all of those motions
11 to get --
12   **A.  Fraction of a second probably.**
13   Q.  So at that point, is it fair to say, Deputy,
14 that you were aware that the car was in gear, it was
15 probably going to go forward?
16   **A.  Well, at the same time that that was occurring**
17 **I was aware and was attempting to have him stop or stop**
18 **from leaving the scene.**
19   Q.  So let's -- Deputy, let's slow this down
20 again.  He's going through all these motions, leaning
21 forward, picking up a key, locating the -- the place to
22 insert the key, starting the car and then reaching down
23 and grabbing the gear and putting it into gear.  And
24 that happened in a fraction of a second?
25   **A.  That happened in -- so rapidly that it must**

## 68

1 have been a fraction of a second to a second.  I mean it
2 was that quick.
3   Q.  Okay.  And so you perceived, Deputy, at this
4 point, that he is preparing to leave the scene; is that
5 fair?
6   **A.  Correct.**
7   Q.  And so what do you tell him -- do you tell him
8 anything to try to stop him from leaving?
9   **A.  "Don't do it, don't do it."**
10   Q.  Did you say "don't do it"?
11   **A.  "Don't do it," as I'm drawing my weapon.**
12   Q.  Isn't it fair to say that what you told him
13 instead was don't fucking move?
14   **A.  That's incorrect.**
15   Q.  Do you recall at any particular point in the
16 next several seconds screaming don't fucking move at
17 least twice?
18   **A.  I said "fucking stop, fucking stop" when I was**
19 **on the vehicle, on the doorsill of the vehicle.  I was**
20 **moving.**
21   Q.  So at this point, if you had to list the
22 infractions -- if you were going to arrest Ashtian
23 Barnes before he picked up the key, if you were going to
24 arrest him, what would he be charged with?
25   **A.  At that point he -- he wasn't going to be**

## 69

1 arrested.  He was going to be detained.
2   Q.  Okay.  If you were going to detain him, what
3 would be the reason for detaining him at that point?
4   **A.  The reason for detaining him was that his**
5 **constant, you know, actions that he -- that he did while**
6 **looking at the pieces of paper and trying to find the**
7 **rental agreement but not looking at the stack at the**
8 **same time.  Him digging around in the vehicle asking --**
9 **and me asking him multiple times to stop digging in the**
10 **vehicle.  I had reasonable -- a suspicion that there was**
11 **something in that vehicle that he was either going for**
12 **or trying to conceal.**
13   Q.  Since he was playing with papers, are you
14 thinking, was it your reasonable suspicion that he had
15 something in those papers he was trying to conceal?
16   **A.  No.  My -- my belief was that as he was doing**
17 **that, was to distract me or, you know, keep my focus**
18 **on -- on that versus, you know, whatever else he -- was**
19 **going on in that vehicle.**
20   Q.  So at that point, Deputy, would it be fair to
21 say that you had no actual evidence of a crime that was
22 being committed or -- or was going to be committed?
23   **A.  I have reasonable suspicion that there was**
24 **marijuana in that vehicle.**
25   Q.  Okay.  And that's because, Deputy, you smelled

**Southwest Reporting & Video Service, Inc.     Registration #189**
713-650-1800                                    sweptproduction@swreporting.com

**70**

1  a strong odor of marijuana?
2  **A.  That's correct.**
3  Q.  And Deputy, we know that marijuana is legal in
4  I don't know how many states now, but in Texas,
5  possession of a small amount of marijuana is what kind
6  of crime?
7  **A.  Repeat your question.**
8  Q.  In Texas, on the -- on April 28th, 2016,
9  possession of less than two ounces of marijuana is what
10  kind of crime?
11  **A.  It's a misdemeanor crime.**
12  Q.  Is it a misdemeanor A, B or C?
13  **A.  For two ounces of marijuana it's a misdemeanor**
14  **B, I believe.**
15  Q.  So it's the -- the level just above a C which
16  is a fine only offense; is that correct?
17  **A.  A citation.**
18  Q.  So you're saying that you had at this point,
19  Deputy, and correct me if I'm wrong, when I asked you
20  why -- why you were thinking that you needed to prevent
21  him from leaving, you did not say anything about the
22  toll tag violation; is that correct?
23  **A.  At that point it was him fleeing the scene and**
24  **possibly causing, you know, a crash or causing injury to**
25  **someone else as well.**

**71**

1  Q.  Is there anything -- okay, going back earlier,
2  we talked about his conduct in operating his car when
3  you stopped him.
4  **A.  Correct.**
5  Q.  And you said that he reacted normally -- when
6  you turned on your lights, his response time was -- was
7  normal for -- for any individual you stopped; is that
8  correct?
9  **A.  That's correct.**
10  MS. BAKER:  Objection, asked and
11  answered.
12  Q.  (BY MR. FOMBY)  And then you told us that once
13  your lights came on and he realized you were behind you
14  [sic], he moved rapidly to -- to the side of the road
15  and stopped safely; is that right?
16  MS. BAKER:  Objection, asked and
17  answered.
18  Q.  (BY MR. FOMBY)  Is that correct?
19  MS. BAKER:  You can go ahead and answer.
20  **A.  Yes.**
21  Q.  (BY MR. FOMBY)  And you told us that at the --
22  all the -- the entire time that you observed him
23  driving, that never once did you see him swerving or
24  behaving in any way that would suggest that he was
25  impaired or not in full control of the vehicle; is that

**72**

1  true?
2  MS. BAKER:  Objection, asked and
3  answered.
4  **A.  That's correct.**
5  Q.  (BY MR. FOMBY)  So now he puts the car in
6  gear, and what is it specifically that makes you think
7  that his driving habits are going to change if he leaves
8  the scene?
9  **A.  At that point he's -- he's evading a lawful**
10  **stop which in my experience always leads to a chase,**
11  **someone driving erratically to get away.**
12  Q.  So what I'm hearing you say is that you had no
13  evidence that he was going to drive in a reckless
14  manner, but you presumed that he was going to drive in a
15  reckless manner?
16  **A.  That is correct.**
17  Q.  And based upon that presumption that you had
18  to stop this reckless behavior and dangerous behavior,
19  you felt it was important at that point to stop him from
20  leaving the scene?
21  **A.  That is correct.**
22  Q.  So your -- at this point your objective in --
23  in stopping him was to prevent him from endangering
24  other people on the highway with his driving?
25  **A.  That would be a part of it, yes.**

**73**

1  Q.  And so as you saw Ashtian Barnes starting the
2  car and putting it in gear, what was your next response?
3  **A.  My next response was to draw my weapon to gain**
4  **compliance of him not leaving the scene and at the same**
5  **time was to try to get him to not put the car in park --**
6  Q.  Okay.
7  **A.  I mean, excuse me, in drive.**
8  Q.  And at this point when he has the car in gear,
9  did you order him to stop the car?
10  **A.  I said "don't do it."  Or correction.  When I**
11  **said "don't do it" is when I actually saw him going**
12  **to -- at the same time as he's turning the vehicle.**
13  **Once the vehicle was in park --**
14  Q.  In gear?
15  **A.  In gear, I'm sorry, in gear, then at that**
16  **point it's, you know, rapid events happened and, you**
17  **know, you know, everything else transpired.**
18  Q.  Okay.  And at that point after he started the
19  car, do you recall what warnings you gave him at that
20  point?
21  MS. BAKER:  Objection, asked and
22  answered.
23  **A.  When the vehicle was in gear?**
24  Q.  (BY MR. FOMBY)  Yes.
25  **A.  As I was holding onto the vehicle, it was**

"fucking stop, fucking stop."

Q. The car is in gear and you draw your gun. Did you draw it with your left hand or your right hand?

A. I'm right-handed.

Q. So you pull up your gun with your right hand?

A. Correct.

Q. And do you continue to stand outside the vehicle and point the gun toward him to stop him?

A. As I drew my vehicle -- my -- my weapon, like I said, he was leaning forward towards the ignition so my view was obstructed. So when I realized what he was doing, I drew my weapon and said "don't do it." And as I'm reaching to try to keep him from putting the vehicle in drive, that's with my left hand, so I'm trying to keep that from happening as he's putting the car in gear.

Q. Okay. Deputy, you just said, and stop me if I'm wrong and I heard it wrong, that he was leaning forward and your view inside the car was -- was constricted, and so you did not actually have a view of him starting the car?

A. No, I saw him starting the car or putting the key in the ignition. Now what I couldn't see was -- was -- what was in the general floorboard area or right side of the -- of his area as he was doing that.

Q. Okay. And so as soon as you saw him lean forward and put the key in the ignition, could you see him start the car?

A. Yes.

Q. And that's when you drew your service weapon?

A. Correct, as he was doing it.

Q. Okay. Now again, we -- we started this with a question that you haven't answered yet, so let's skip back to that question.

At that point when you drew your service weapon, did you continue your stance outside the car and -- and point the gun inside the car?

A. No.

Q. Was one of the reasons why you felt he was behaving suspicious, that one of the reasons that caused you to draw your weapon, the fact that he leaned forward suddenly?

A. Repeat the question.

Q. You -- you testified that he -- before starting the car he leaned forward suddenly. Was that something that caused you at that point to alert that -- that something bad might be going on?

A. My weapon was drawn because I believed that he -- there was an obstruction of what was on his right side and the ability to rapidly, you know, go for a

weapon or -- or flee the scene. I mean there was multiple things that, you know, we think about as officers that could potentially happen.

Q. Okay. You realize that you have given a statement in this case, correct?

A. That's correct.

Q. And you gave that statement under oath?

A. Correct.

Q. And never previously have you talked about him leaning forward and fumbling for weapons. Do you recall that?

A. I never said he was fumbling for weapons.

Q. He was fumbling for something?

A. Correct.

Q. And never before have -- previously have you stated that he was behaving in such a manner?

MS. BAKER: Objection, vague.

Q. (BY MR. FOMBY) In -- in the statements that you gave --

MR. FOMBY: I'm going to ask you to mark this as Exhibit 32.

(Exhibit No. 32 marked.)

Q. (BY MR. FOMBY) Do you recall this statement?

A. Yes.

Q. Deputy? This is a statement that you gave

under oath?

A. That's correct.

Q. In this statement, at any point did you state that you were alarmed because of his furtive movements?

THE REPORTER: What kind of movements?

MR. FOMBY: Furtive.

THE REPORTER: Thank you.

A. I'm sorry, repeat your question.

Q. (BY MR. FOMBY) In this statement, at any point did you say that -- that his movements in the car alerted you that something suspicious was going on?

A. There's several times here where his actions led me to believe that.

Q. Deputy, that's not the question I asked.

MS. BAKER: Excuse me, it may not be the question that you asked him but please let him finish his answer. And then if you don't like it you can ask -- object to it or ask another question. Please don't interrupt him. He's answering.

MR. FOMBY: Okay.

A. Okay. So there's several times here where his actions led me to believe that his actions were I guess conducive of -- of something that could potentially be, you know, I guess evasive or, you know, an alarm to me.

Q. (BY MR. FOMBY) Officer -- but Deputy Felix,

### 78

1  again, my question was: In your statement that you gave
2  under oath, at any point did you make a statement, did
3  you say that his furtive behaviors, his movements inside
4  the car, alerted you that something suspicious was going
5  on?
6      **A. That statement is not directly in here, but**
7  **the actions that he conducted is what alerted me to, you**
8  **know, his behavior, him acting that way.**
9      Q. So Deputy, again, my question is a yes or no.
10  Is -- is that -- or did you make that statement, did you
11  put that in your statement that his furtive behaviors
12  alerted you that something suspicious was going on? Did
13  you make -- put that in your statement?
14      **A. That statement specifically, no. But his**
15  **actions were.**
16      Q. And Deputy, in your statement that you gave,
17  did you say anywhere in the statement that his leaning
18  forward and his motions with his hands caused you --
19  alerted you to try to stop him?
20      **A. I don't believe so.**
21      Q. In this statement that you gave under oath, at
22  any point did you say that the reason why you felt that
23  you needed to stop him was because his leaving the scene
24  would present a danger to the general public?
25      **A. That statement specifically, no, but his**

### 79

1  **actions were what I believe would happen. I mean his**
2  **actions that he took.**
3      Q. So Deputy, I understand that when you were
4  given an opportunity to provide a full statement, you
5  believe it to be true and correct to the best of my
6  knowledge, you did not say that his motions alerted you
7  to -- to reasonable suspicion; is that correct?
8      MS. BAKER: Objection, asked and
9  answered. Also it mixes up the legal -- the legal in my
10  opinion. You may answer if you understand the question.
11      **A. I -- I -- repeat the question.**
12      Q. (BY MR. FOMBY) Well, you know what reasonable
13  suspicion is?
14      **A. Yes.**
15      Q. And you can take certain kinds of actions
16  based upon reasonable suspicion; is that correct?
17      **A. Correct.**
18      Q. Did you in your statement ever make -- state
19  that -- that his movements inside the car gave you
20  reasonable suspicion to think that -- that a crime might
21  be occurring?
22      **A. I'm not understanding you. I'm sorry. Repeat**
23  **the question again.**
24      Q. Did you anywhere in your statement say that
25  his movements and moving the papers around gave you

### 80

1  reasonable suspicion that a crime might be occurring?
2      **A. Now his actions that led me to believe that**
3  **are in here, but that statement specifically, no, it's**
4  **not in this statement.**
5      Q. Okay. In your statement did you say that you
6  had reasonable suspicion that he was about to flee the
7  scene, and in so doing, put the general public at risk?
8      **A. In the statement, that specific statement,**
9  **it's not in here, but that's what the -- my concern was**
10  **due to the events that happened and he had posed.**
11      Q. Now, you have drawn your service weapon, and
12  you stated that you did not maintain your stance outside
13  the car but you instead lunged towards Ashtian Barnes to
14  get inside of the car; is that correct?
15      MS. BAKER: Objection, misstates his
16  testimony.
17      **A. No, I did not lunge in the car. What I did**
18  **was try to prevent from him to putting the car in drive**
19  **when I was made aware of what he -- his intention was.**
20      Q. (BY MR. FOMBY) And you said that you -- your
21  right hand was holding your gun?
22      **A. Correct.**
23      Q. And you were using your left hand to try to
24  put the gear lever in park?
25      **A. No, to try to keep him from putting the car in**

### 81

1  **drive. Like I said before, it happened so fast that**
2  **it -- it wasn't even an option as I was trying to do so.**
3      Q. So with his hand on the gearshift, how would
4  your left hand be able to stop him from putting the car
5  into drive?
6      **A. Well, originally what I was trying to do is**
7  **keep him from getting the car on, it actually turning**
8  **on. When I saw he was doing it is when I was reaching**
9  **in. Like I said before, it happened so fast. By the**
10  **time he turned it on, his hand was already going down**
11  **towards -- towards the shifter.**
12      Q. So let's go back up a little bit because the
13  timeframe just shifted a little bit. Now you're saying
14  that when he moved forward you thought he was about to
15  turn the car on, you -- that's when you first moved --
16  pulled your gun and moved into the vehicle?
17      **A. All this happened, I mean within a short**
18  **period -- period of timeframe, which was, you know, so**
19  **fast that my actions were to draw my weapon because I**
20  **already had a perception of maybe something, a weapon or**
21  **him trying to flee at the same -- same moment.**
22      Q. Now, Deputy, pause there for a second and get
23  back to that statement you just made. You had a
24  perception that there was a weapon in the vehicle. Any
25  place in your statement again, under oath, where you

82

1 stated that you had a perception there was a weapon in
2 the vehicle?
3 **A.   At the statement, not that -- that statement**
4 **itself, but everything else that was done led me to**
5 **believe that there could be possibly something in that**
6 **vehicle.**
7 Q.   Again, Deputy, you had an opportunity to give
8 your statement, your full and complete statement, and at
9 any point did you ever state that you thought there
10 might be a weapon in that vehicle?
11 MS. BAKER:  Objection, argumentative,
12 also asked and answered.
13 Q.   (BY MR. FOMBY)  You have not -- in -- in my
14 opinion you have not answered it, you are -- so answer
15 the question.  In your statement did you ever indicate
16 that there was a weapon in the vehicle?
17 **A.   Not that statement directly, but everything**
18 **else that led to my belief is -- is in here.**
19 Q.   So that statement that there was a weapon in
20 the vehicle was not -- you did not put that in your
21 statement?
22 **A.   I'll have to reread it again.  Give me a**
23 **minute.**
24 Q.   Take your time.
25 **A.   (Witness examines document.)  Repeat your**

83

1 **question, sir.**
2 Q.   At any point in the official statement you
3 gave under oath, did you say -- did you say that
4 there -- that you perceived that there was a weapon in
5 the vehicle?
6 **A.   Okay.  In that statement, no.**
7 Q.   Okay.  At any point in this same statement did
8 you say that prior to Ashtian Barnes turning the car
9 back on, that you feared for your safety?
10 **A.   His actions that were placed on here made me**
11 **believe so, yes.**
12 Q.   Deputy, again, I'm asking you, you read the
13 document.  Can you point to where in this statement you
14 said that you were afraid for your safety prior to
15 Ashtian Barnes turning the car back on?
16 **A.   Prior to turning the car back on?**
17 Q.   Yes.
18 **A.   That statement directly, no, but the actions**
19 **listed, yes.**
20 Q.   And if -- as you said, Deputy, the reason why
21 you didn't ask him his name was because you were so
22 frightened for your safety?
23 **A.   No, it was a rapidly series of events that**
24 **occurred that it didn't give the opportunity to be able**
25 **to do so.**

84

1 Q.   And again, that particular statement that it
2 was -- that you were faced with a rapidly evolving
3 situation, that also is not in the statement, is it?
4 **A.   That statement, no.**
5 MR. FOMBY:  Can we go off?
6 THE VIDEOGRAPHER:  The time is
approximately 12:01 p.m., we're off the record.
8 (Lunch recess from 12:01 to 12:46 p.m.)
9 THE VIDEOGRAPHER:  The time is
10 approximately 12:46 p.m.  We're on the record.
11 Q.   (BY MR. FOMBY)  Now Deputy, when we left we
12 were at the point where the car door, Ashtian Barnes'
13 car door was open and you were standing there.  And you
14 said that you leaned -- he leaned forward and started
15 the car.  You also mentioned at that point that he was
16 reaching down with his left hand toward the floorboard
17 of the driver's side floorboard?
18 **A.   His hand was by his lap towards the**
19 **floorboard.**
20 Q.   Now, in the -- in the statements that you gave
21 under oath, though, at no point here did you ever state
22 that you -- you saw him reaching down and fumbling
23 between his legs in the floorboard, did you?
24 MS. BAKER:  Objection, misstates his
25 testimony.  You may answer.

85

1 THE WITNESS:  Okay.
2 **A.   No, it's not in there, but the events leading**
3 **to that point are stated in here.**
4 Q.   (BY MR. FOMBY)  So the answer is at no point
5 did you state that he was fumbling for something in the
6 floorboard of his side of the car?
7 **A.   That's correct.**
8 Q.   Okay.  Now -- now you mentioned that you were
9 trying to stop him from leaving.  And I'm sorry if I
10 have to -- I'm mainly trying to get us back to the point
11 where we were at.  And you said that you had -- you
12 pull -- had pulled your service weapon and you had stuck
13 that forward; is that correct?
14 **A.   Well, I got it in a shooting stance, which is**
15 **when you draw your weapon you, you know, present it to,**
16 **if you need to fire it, then it's there, instead of**
17 **firing from a hip position or a -- a extended position.**
18 **It's total -- a different type of stance, so it was --**
19 **it was pulled out and extended out.**
20 Q.   Now, the weapon that -- your service weapon is
21 a .40 caliber weapon, wasn't it?
22 **A.   That's correct.**
23 Q.   When you talk about a shooting stance, you
24 were talking about where the arm position is?
25 **A.   Correct.**

22 (Pages 82 to 85)

**86**

1    Q.   And in a proper shooting stance, what is your
2   foot position?
3        **A.   It depends on the situation.**
4    Q.   Is a proper shooting position, as you've been
5   trained, leaning forward into a car?
6        **A.   There's -- I'm gonna say there's no such thing**
7   **as a proper shooting position.   When you're in a**
8   **situation, the situation dictates the way you stand, the**
9   **way you shoot, how you hold your weapon.   I mean, if I'm**
10  **at the range I'm, you know, that -- feet apart, hands,**
11  **gun raised, you know, directly in front of me and, you**
12  **know, slightly leaning forward.**
13   Q.   At the range do you ever practice lunging
14  forward and shooting from that position?
15       **A.   Yes.   Leaning forward.**
16   Q.   Leaning forward?
17       **A.   Leaning forward and shooting, yes, sir.**
18   Q.   So at this point the car is being placed in
19  gear.   The car has not yet started to leave.   Where is
20  your -- where is your body?   Where is your head and
21  where is your body, where are your arms?   Can you
22  explain that to me?
23       **A.   As the car is driving away or as it --**
24   Q.   No, as -- as the car is in gear but before it
25  departs.

**87**

1        **A.   The car's in gear before it departs.**
2   **Partially inside of the vehicle.**
3    Q.   Okay.
4        **A.   That I recall.**
5    Q.   When did you put -- which foot did you first
6   put on the sill of the car?
7        **A.   I don't recall at this point which foot it**
8   **was.   I believe it was my left foot.**
9    Q.   When did you put that first foot on the sill
10  of the car?
11       **A.   As the car was driving away.**
12   Q.   And Deputy, are you sure that you put that
13  first foot up as the car was driving away?
14       **A.   As I recall, yes.**
15   Q.   When did you put the second foot on the sill
16  of the car?
17       **A.   As I felt the vehicle started moving forward.**
18   Q.   But you just said the first foot went up as it
19  was driving away, now you're saying the second foot went
20  up as it's starting to move forward.   Which is that?
21       **A.   It's -- it was a simultaneous move --**
22  **simultaneously -- excuse me, simultaneous move.   As the**
23  **vehicle is starting to move, it's left foot, right foot,**
24  **and I'm holding on.**
25   Q.   Okay.   So now you're standing on the sill of

**88**

1   the car.   Where is your left arm?
2        **A.   My left arm is inside the vehicle.**
3    Q.   What are you holding onto to stay on the car?
4        **A.   My forearm against the roof of the car.**
5    Q.   So you're holding on -- into the car like
6   this?
7        **A.   This part (Indicating.)**
8    Q.   Or this part?
9        **A.   As -- as -- just to keep a point of contact**
10  **and trying to hold onto -- to the vehicle.**
11   Q.   Okay.   Just to be clear, this -- this part of
12  your arm is inside the car and pressed up against the
13  roof of the car?
14       **A.   No.   Only my -- this part of the forearm**
15  **against the -- the entryway of the vehicle, the door of**
16  **the vehicle.**
17   Q.   From inside?
18       **A.   Inside, correct.**
19   Q.   And where is your head?
20       **A.   My head's above the roof of the car.**
21   Q.   Where is your right arm?
22       **A.   My right hand is holding out to the outside of**
23  **the vehicle.**
24   Q.   Your right hand is holding onto the outside of
25  the vehicle?

**89**

1        **A.   No, left hand.**
2    Q.   Your left hand?
3        **A.   Left hand is holding --**
4    Q.   Let's back up because now you told me that you
5   were -- this part of your left arm was -- right?
6        **A.   No, right hand.**
7    Q.   Okay.   So your right hand is holding onto
8   what?
9        **A.   My weapon.**
10   Q.   Okay.   Where is your right hand?
11       **A.   It's inside the vehicle.**
12   Q.   And when you first start to move -- feel the
13  car moving forward, was it like a Ferrari taking off or
14  was it a gradual acceleration?
15       **A.   At that point I felt the vehicle take off, is**
16  **what I felt.   I just felt the motion and to me it seemed**
17  **like it was, you know, accelerating very quickly.**
18   Q.   And what happened as -- as the car started to
19  move forward and you're completely up on the sill with
20  this arm inside the car, this hand with the gun inside
21  the car, what -- what was the door doing behind you?
22       **A.   My left hand was never inside the car.**
23   Q.   Okay.   Let's back up again.   You said that you
24  were holding on with this part of your left arm
25  (Indicating) from inside the car?

## 90

1    A. Right hand, with my right hand, not my left
2 hand.
3    Q. What was your -- and I asked you what your
4 left hand was doing?
5    A. I was holding onto the outside of the car.
6    Q. Okay.
7    A. I'm sorry, I misunderstood you.
8    MS. BAKER: Yeah, he did ask you that.
9    A. Okay. It was my left hand was on the outside
10 of the vehicle.
11    Q. (BY MR. FOMBY) Okay.
12    A. My right hand was in the inside of the vehicle
13 holding my weapon.
14    Q. So you're standing, you've got your right --
15 your left arm holding onto the top of the car, your
16 right hand is inside?
17    A. Correct.
18    Q. Your right forearm is being pressed up against
19 the door frame?
20    A. The top part.
21    Q. Okay. From the inside?
22    A. From the inside.
23    Q. And at this point as the car is starting to
24 move, where was the car door behind you?
25    A. The car door was to my -- to my side.

## 91

1    Q. Okay. Would you say that as the car started
2 to move, you -- you -- the car door was pinning you in
3 position?
4    A. The car door was placed against my side.
5    Q. So did -- would you say that the car door was
6 pinning you in position at that point?
7    A. You said pinning?
8    Q. Yes.
9    A. It could be said that way.
10    Q. Okay. In your statement it says: As the
11 vehicle sped away, I felt the driver door closing on me
12 and started to feel that I was being pinned and going to
13 be drug.
14    Is that a correct statement?
15    A. Yes.
16    Q. Okay. And you felt that you were going to be
17 drug even though your feet were both on the -- on the
18 sill of the car?
19    A. As I noticed that he -- as I saw that he was
20 putting the vehicle in drive, I felt that if I did not
21 do what I did, which is to step on the doorsill, that
22 door could have closed me, it could have like closed on
23 me and potentially made me -- drug me -- drug -- the
24 vehicle drug me.
25    Q. Okay. Then let's move back again because now

## 92

1 you're talking about before the car started spinning --
2 started speeding away. At that point you were afraid of
3 getting pinned and drug. Is that what you're saying?
4    A. That's correct.
5    Q. And yet, at that point instead of standing
6 where you were and letting the car leave, you jumped up
7 on the sill of the car and shoved your body partially
8 inside the car?
9    A. That's correct.
10    Q. Even though you feared that you might get
11 pinned and drug?
12    A. Well, there's -- there's situations where
13 the -- other officers had occurred that I've seen videos
14 in training where an officer was actually drug getting
15 caught up on a seatbelt or the vehicle itself and drug
16 and caused serious bodily -- bodily injury to
17 themselves. So that was, you know, a fear that I had
18 that I would have been pinned or drug by the vehicle.
19    Q. And in that split second as your -- all this
20 is happening, that went through your mind and you -- you
21 used your training to jump up onto the car?
22    A. Yes. Time slows down and it seems like the
23 vehicle was in motion for a long period of time. So all
24 the training and -- and -- that we go through, it -- it
25 kind of kicks back in action and -- and you take action.

## 93

1    Q. Okay. So as you were afraid of getting pinned
2 and drug, the action you took was to jump onto the car
3 as it's starting to move away, and is that when the door
4 started closing on you?
5    A. As the vehicle started to go forward, yes, the
6 door is -- it closed or started to close.
7    Q. So in fact, the -- your fear of being pinned,
8 the door was starting to pin you because of the position
9 you were in with the car?
10    A. Repeat your question.
11    Q. You said you were afraid of being pinned by
12 the car door, in fact, because you jumped on the sill
13 when the car -- when the door started closing, that did,
14 in fact, pin you?
15    A. If -- if I had both feet on the ground, the
16 door could have pinned me and then drug me. That's why
17 I stepped onto the doorsill.
18    Q. If you had simply stepped back at the point
19 before -- instead of jumping forward, what -- could you
20 have been pinned by that door?
21    A. I could have been injured by the door, yes, I
22 believe so.
23    Q. The door, you -- you believe the door would
24 swing so violently that -- around as the car started to
25 accelerate, that you would get shoved against the door

**Southwest Reporting & Video Service, Inc.**     **Registration #189**
**713-650-1800**                    swreptproduction@swreporting.com

1 and drug?

2 A. **Everything happened so fast that that was a**
3 **thought.**

4 Q. Okay. So now the car is moving forward.
5 You're up on top of it. You've got one arm out, one arm
6 in with the gun. Where are you looking?

7 A. **I'm looking over the car.**

8 Q. Okay. You're -- are you looking forward to
9 see where you're going?

10 A. **I was just looking straight.**

11 Q. Looking straight?

12 A. **Just straight, yeah.**

13 Q. Did you have any visibility of Ashtian Barnes
14 at that point?

15 A. **No.**

16 Q. Did you have any idea where Ashtian Barnes was
17 in the -- in the front seat of that car?

18 A. **Yeah. He was right next to me inside the**
19 **vehicle.**

20 Q. And how --

21 A. **In the driver's seat.**

22 Q. How could you tell that?

23 A. **Because I could feel him.**

24 Q. Okay. What -- what could you feel him with?

25 A. **Well, I could feel him with, you know, my**

1 **knee, and I could feel when my gun went to the side,**
2 **pressure against my gun and hand.**

3 Q. Okay. So you could feel his body there with
4 your knee, and you felt some kind of pressure against
5 your gun and right hand?

6 A. **Uh-huh (Affirmative.)**

7 Q. But you can't see what's causing that
8 pressure; is that correct?

9 A. **That's correct.**

10 Q. So you don't know what was happening inside
11 the vehicle at that time?

12 A. **I do not.**

13 Q. Okay. And at that point is your gun roughly
14 in the vicinity of where you imagined Ashtian Barnes'
15 head to be?

16 A. **Yes.**

17 Q. So you felt the pressure and then, as I
18 understand it, you pulled your gun hand out of the car?

19 A. **That's correct.**

20 Q. And then at some point in here you shouted
21 instructions for Ashtian Barnes; is that correct?

22 A. **That was as the vehicle was driving away.**

23 Q. And what instructions did you shout to him?

24 A. **"Fucking stop, fucking stop."**

25 Q. Did you say stop or I'll shoot?

1 A. **No.**

2 Q. And -- and then you pushed your gun hand back
3 inside the car, correct?

4 A. **That's correct.**

5 Q. And you fired?

6 A. **When I felt the pressure on my hand and my**
7 **gun, that's when my hand came out and as I was doing**
8 **that, I was losing balance so my hand went back in**
9 **there.**

10 Q. Okay.

11 A. **At that point, you know, if I would have**
12 **discharged my weapon fully, it would have hit him in the**
13 **head. So I made the conscious decision to point**
14 **downward and shoot.**

15 Q. But you don't really know where his head was
16 at that point?

17 A. **I can assume that his head was right parallel**
18 **with me at that angle that I was holding my weapon at.**

19 Q. And for all you know, he could have been
20 leaning away from you and trying to get out of the
21 vicinity of that gun that had been pointed at his head
22 correctly, right?

23 A. **Didn't know what he was doing.**

24 Q. Okay. You didn't know?

25 A. **Didn't know what he was doing.**

1 Q. At that point with no visibility as to what
2 you were shooting at, you pulled the trigger?

3 A. **As I pointed downward, yes.**

4 Q. Okay. And then the car did not immediately
5 start slowing, continued and so you pulled the trigger
6 again?

7 A. **That's correct.**

8 Q. And at the point that you pull the trigger
9 again, what happened to the car?

10 A. **The car came to an abrupt stop.**

11 Q. Did you stop the car?

12 A. **No.**

13 Q. Who stopped the car?

14 A. **Mr. Barnes did.**

15 Q. Let's wind back up. The car's taking off, you
16 jump on board. Approximately how long is it between
17 when you're fully on top of the sill of the car and you
18 fire the first shot? Do you know?

19 A. **It must have been maybe two, three seconds,**
20 **possibly. At that moment it felt like it was longer**
21 **than that, though.**

22 Q. And how long was it between the first shot you
23 fired and the second shot you fired?

24 MS. BAKER: Objection, calls for
25 speculation. You may go ahead and answer.

**98**

1　　　　THE WITNESS: Okay.
2　　　**A.　After I shot the first -- shot once and didn't**
3　**feel the vehicle was stopping, it's when I shot again.**
4　**So if I had to guess, a second.**
5　　　Q.　(BY MR. FOMBY)　Okay.　A second.　The car
6　comes to a complete stop, as you said, and in your
7　statement, Deputy, correct me if I'm wrong, didn't you
8　say that the vehicle slowed almost to a stop before you
9　jumped off?
10　　　**A.　I don't recall.　(Witness examines document.)**
11　**This is a misstatement, yes.**
12　　　Q.　And at that point, you stepped back out of the
13　doorway and held your service weapon on Ashtian Barnes;
14　is that correct?
15　　　**A.　That is correct.**
16　　　Q.　Was Ashtian Barnes alive at that point?
17　　　**A.　Yes, he was.**
18　　　Q.　Was Ashtian Barnes saying help me, I can't
19　breathe at that point?
20　　　**A.　I don't know what he said.**
21　　　Q.　Is there a policy at the Constable's Office
22　for rendering aid when an individual has been shot?
23　　　**A.　Yes, there is.**
24　　　Q.　Did you at any point, after you fired your
25　service weapon, provide any kind of -- of assistance to

**99**

1　Ashtian Barnes?
2　　　**A.　I called for HFD to arrive on the scene.**
3　　　Q.　Did you check on his wounds?
4　　　**A.　No, I did not.　The scene was not clear.**
5　　　Q.　Approximately a minute and a half later when
6　the first deputy or police officer arrives on scene, and
7　at that point, according to a statement, he says Ashtian
8　Barnes was still alive.　Is that your recollection?
9　　　**A.　On his statement?**
10　　　Q.　Yes.
11　　　**A.　I've never seen his statement.**
12　　　Q.　Was -- a minute and a half to two minutes
13　after the car stopped, was it your -- is it your
14　recollection that Ashtian Barnes was still alive?
15　　　**A.　Yes.**
16　　　Q.　That he was unresponsive?　Would that be fair
17　to say?
18　　　**A.　We weren't asking him anything and he wasn't**
19　**saying anything, so -- but he was still alive.**
20　　　Q.　Was he sitting up and talking?
21　　　**A.　No.**
22　　　Q.　Was he shuffling papers around?
23　　　**A.　No.**
24　　　Q.　Was he reaching for anything?
25　　　**A.　Not at that point, no.**

**100**

1　　　Q.　Was he lying on his side bleeding?
2　　　**A.　No.**
3　　　Q.　He was sitting up bleeding?
4　　　**A.　He was sitting up.**
5　　　Q.　So we see in the dash cam video, other police
6　cars arriving, one after another.　How long was it
7　before anybody stopped to render aid to Ashtian Barnes?
8　　　**A.　I'm not sure.　After the third deputy arrived,**
9　**then I stepped back and moved away from the scene.**
10　　　Q.　Okay.　So why did you not immediately render
11　aid to Ashtian Barnes when the car stopped?
12　　　**A.　Because the scene wasn't clear.　I was -- he**
13　**could have gone for a weapon.　And still at that point,**
14　**you know, he still, you know, you know, his eyes open**
15　**and -- so for me the scene is not clear.**
16　　　Q.　There's a dash cam video in your car.　You're
17　aware of that?
18　　　**A.　Yes, sir.**
19　　　Q.　And it was operating the entire time?
20　　　**A.　Yes, sir.**
21　　　Q.　According to the dash cam video, you were --
22　you jumped out of the car, Ashtian Barnes' car at
23　14:45:52.　Does that sound about right?
24　　　**A.　I wouldn't -- I wouldn't know to tell you on**
25　**the exact time.**

**101**

1　　　Q.　That would be at least according to -- and we
2　know that these clocks are not always GPS accurate?
3　　　**A.　Right.**
4　　　　MS. BAKER: Object to sidebar.
5　　　Q.　(BY MR. FOMBY)　So we -- we can't map the time
6　on that necessarily completely accurately, but the --
7　the time on that is relatively accurate; is that
8　correct?
9　　　　MS. BAKER: Object to -- calls for
10　speculation, but you may answer.
11　　　**A.　I believe so.**
12　　　Q.　(BY MR. FOMBY)　Okay.　So at 14:45:52, which
13　is 2:45, almost 2:46, you -- you're out of the car
14　holding a gun on Ashtian Barnes.　The first time anyone
15　mentions in the video CPR, was at 14:50:31 which is
16　approximately five minutes later.　Does that sound about
17　right?
18　　　**A.　I would have to look at the video to know what**
19　**time it was, like I said, but if that's what you say, I**
20　**mean...**
21　　　Q.　We will look at the video and that sort of
22　thing.　And --
23　　　**A.　Right.　Now CPR started before I called it out**
24　**on the radio.　CPR already had a gun but I called in**
25　**ready from my position to make sure dispatch knew that,**

**Southwest Reporting & Video Service, Inc.**　　**Registration #189**
**713-650-1800**　　　　　　　　　　swreptproduction@swreporting.com

## 102

1  you know, CPR was -- CPR was in progress.
2      Q.  Okay.  And approximately how many police
3  officers were on the -- so you -- you were -- you were
4  securing the scene.  I'm looking at a photograph that
5  depicts the moment when the first officer says we need
6  to do CPR and I'm counting, not including you, at least
7  one, two, three, four, four or five officers on the
8  scene.  Does it require five officers -- other than you,
9  not including you, to secure the scene before you
10  perform CPR?
11     A.  Well, we're not trained medical professionals
12  so what we do is we call for HFD and let the medical
13  professionals -- I mean if we could render aid to a
14  certain point with where we know what we're doing, like
15  CPR, then we would do CPR.  But other than that, I'm not
16  a trained, you know, medical provider and I don't know,
17  you know, anything about, you know, doing first aid
18  on -- on a subject and I was -- I had already taken
19  myself out of that -- that spot.
20     Q.  Right.  Now Deputy, I -- I can understand
21  that, but I'm not asking about whether or not at that
22  point you performed CPR, but with a large number of
23  officers on the scene, it took over -- it took well over
24  five minutes for anybody to attempt CPR.
25         MS. BAKER:  I'm going to object to that

## 103

1  because it's argumentative and it doesn't seem to be a
2  question.
3      Q.  (BY MR. FOMBY)  Is there -- leading to the
4  question, is there a reason why all those officers would
5  stand around and watch Ashtian bleeding to death instead
6  of trying to render aid?
7          MS. BAKER:  Objection, calls for
8  speculation and also misstates the facts in evidence at
9  this time.
10     A.  I -- I wouldn't know how to answer that
11  because, like I said, I took myself out of the --
12  active scene and stepped back when the -- when the third
13  officer arrived.  So I can't, you know, say what time or
14  how long it was before they started CPR.  When I noticed
15  they were doing CPR, is when I called it over the radio.
16     Q.  (BY MR. FOMBY)  Okay.  Now before this officer
17  stopped -- stepped up and said we need to do CPR,
18  several other officers came up to you and asked you if
19  you were okay.  Do you recall that?
20     A.  Yes.
21     Q.  And you told them that you were -- you -- you
22  had banged your knee?
23     A.  My leg hurt.
24     Q.  So they were concerned about your wellbeing,
25  but they still had not tried to render any kind of aid

## 104

1  to Ashtian Barnes at that point?
2      A.  They were on that side of the -- the scene, so
3  I -- I don't know.
4      Q.  If that had been a colleague of yours in the
5  Toyota, a peace officer, who Ashtian Barnes had shot,
6  would you expect other police officers to come up and
7  inquire and ask Ashtian if he's feeling okay rather than
8  render aid to one of their fellow peace officers?
9          MS. BAKER:  Objection, argumentative,
10  hypothetical.
11     A.  I don't know how to answer that.  I know how I
12  would do I guess what I thought was reasonable to --
13  to -- while I could while HFD arrived.
14     Q.  (BY MR. FOMBY)  And by the time the first EMS
15  person showed up, you said that you had called that in?
16     A.  Correct.
17     Q.  You called in EMS.  The first EMS person
18  showed up at 14:56:12, which was a little less than
19  approximately ten minutes after Ashtian had been shot.
20  Are you aware of that?
21     A.  No.
22     Q.  And according to the EMS dispatch records, it
23  took them approximately two minutes to arrive on the
24  scene after they were notified.  So when was EMS
25  notified, actually notified that there was a person --

## 105

1  person who had been shot who was bleeding out?
2      A.  When -- after the incident the car came to a
3  stop, I was able to get down, I called on the radio,
4  "Shots fired, shots fired, get HFD en route now."
5      Q.  Okay.  And yet eight minutes went by before
6  they got the message.  And do you know -- have any
7  understanding of why it might have taken them eight
8  minutes to get around to showing up?
9          MS. BAKER:  Object to that question as
10  directed to this officer.  It calls for speculation.
11     Q.  (BY MR. FOMBY)  You know that particular
12  stretch of the road, Deputy.  How -- and -- and the
13  traffic that day was fairly light.  How long would you
14  expect knowing where the fire stations are before a
15  fire -- a fire engine to get there once they got the
16  notice?
17     A.  I wouldn't know how to answer that question.
18  I mean they -- they -- we don't deal with the HFD or the
19  Houston Fire Department part of dispatch or their --
20  their call center, so I wouldn't know to tell you if
21  they would be down the road, they would be done there
22  within a minute or they were at the station, they would
23  be there -- I -- I have no idea --
24     Q.  Okay.
25     A.  -- as far as, you know, the exact time that it

27 (Pages 102 to 105)

106

1  would have taken them at that time of day.  But within a
2  minute of -- about a minute of me requesting HFD the
3  first time, I keyed up again and said, you know,
4  "Confirming you have HFD in right -- en route" and our
5  dispatch confirmed that they were en route.
6          (Exhibit No. 33 marked.)
7      Q.  (BY MR. FOMBY)  Okay.  And that is 33.
8  Deputy, I'm showing you what has been marked as
9  Exhibit 33.  It's Bates number 77.  And the officer
10  writing this was a B A Roberts.  Do you know who B A
11  Roberts is?
12      A.  I do not.
13      Q.  In his report, the -- according to his report,
14  so if we look toward the end of this third paragraph in
15  his statement he says that:  The suspect attempted to
16  flee in the vehicle and drug Deputy Felix approximately
17  twenty yards.
18          Is that an accurate statement?
19      A.  Using the word "drug," no.
20      Q.  In fact, at no point were you ever drug during
21  this entire incident, did you?
22      A.  No, sir.
23      Q.  So you had mentioned earlier that the real
24  reason why you decided to pull your duty weapon and try
25  to stop Ashtian Barnes from leaving, is that you felt

108

1  definition of protecting another person from imminent
2  death or serious bodily injury?
3      A.  Myself or others.
4      Q.  Okay.  So you're standing there with a gun.
5  Was the tollway empty at that time?
6      A.  No.
7      Q.  Were there, in fact, a number of cars going
8  back and forth?
9      A.  There was traffic, yes.
10      Q.  And when you leaned forward with -- with your
11  body, with the gun, and before the car had left, did you
12  have any certainty that if you pulled the trigger, that
13  bullet would not have left the veh -- Ashtian's vehicle
14  and struck another vehicle?
15      A.  I wouldn't fire -- have fired at the vehicle
16  at that time unless I had direct sight of my target.
17      Q.  And is it, in fact, dangerous to fire in the
18  direction of a target when there are innocent third
19  parties that could be struck by the bullet?
20      A.  Repeat your question.
21      Q.  Isn't it, in fact, dangerous to fire a shot at
22  a -- at a target when there are innocent third parties
23  who could be struck by that bullet?
24      A.  Well, anytime you fire a weapon it's
25  dangerous, so whether there's an individual or not...

107

1  that he was a risk to the general public?
2      A.  That is correct.
3      Q.  Okay.
4      A.  Along with leaving the scene, you know, in a
5  motor vehicle is a felony charge.  You know, it is
6  evading, you know, so you know, not to, you know, go
7  that route, you know, that's why I drew my weapon.
8      Q.  Now, according to policies of the Constable's
9  Office, when are you allowed to draw your duty weapon,
10  your service weapon and under what circumstances are you
11  allowed to draw it and point it at a person?
12      A.  Anytime I think it's reasonable, I fear -- I'm
13  in fear for my safety or the safety of others.
14      Q.  Now you've been trained in the policies of
15  your department, haven't you?
16      A.  Yes, sir.
17      Q.  And in fact, haven't you been trained that it
18  is in -- inappropriate to draw -- to use any form of
19  deadly force unless the individual that you're pointing
20  the gun at -- unless it's to protect themselves or
21  another person from imminent death and serious bodily
22  injury?
23      A.  That's correct.
24      Q.  And you felt that with you standing beside the
25  car, Ashtian Barnes driving away, would meet that

109

1      Q.  That's not the question I'm asking you,
2  Deputy.  I'm saying that, isn't -- aren't you trained --
3  are you trained not to discharge a weapon where there are
4  innocent third parties that could be struck by the
5  bullet?
6      A.  We're trained and we're responsible for every
7  bullet that leaves that -- that weapon, so if your line
8  of sight is not clear, you do not discharge your weapon.
9      Q.  Okay.  At all.  Are you trained and is it the
10  policy of the department to -- that you should not fire
11  at a moving vehicle?
12      A.  I wasn't firing at a moving vehicle.  I fired
13  while the vehicle was in motion with me on it.
14      Q.  I'm sorry, Deputy.
15      A.  There's a difference.
16      Q.  You're in a car that is moving, and what are
17  you -- what are the policy -- why do you think the
18  policy guideline says you don't fire at a moving
19  vehicle?
20          MS. BAKER:  Objection, calls for
21  speculation.
22      Q.  (BY MR. FOMBY)  You have been trained, you say
23  you've been trained, that this department has trained
24  you in the policy, then they should have trained you in
25  the reason for that policy.  What reasons were you given

**Southwest Reporting & Video Service, Inc.      Registration #189**

713-650-1800                                    swreptproduction@swreporting.com

110

1  for not firing in a moving vehicle?
2      MS. BAKER:  Object to sidebar.
3      **A.  When you shoot at a vehicle that's either**
4  **coming towards you or moving away from you, you know,**
5  **a -- depending on -- on the type of ammunition that you**
6  **carry, depending on the position you're in, ricochets**
7  **can happen, meaning it can bounce off the vehicle and go**
8  **in the direction that wasn't intended, you know, because**
9  **it is metal or, you know, some type of composite that**
10 **will make a -- a bullet, you know, ricochet.  So that's**
11 **the reason why the policy says you don't discharge a**
12 **weapon at moving vehicles.**
13     Q.  (BY MR. FOMBY)  Is that the only reason?
14     **A.  I -- I can assume that that's what it is.**
15     Q.  Okay.  How about -- is a car moving at
16 reason -- reasonable speed considered a deadly weapon, a
17 potential deadly weapon?
18     **A.  If it's moving towards a person, yes.**
19     Q.  Why is that?
20     **A.  Because of the size of the vehicle and the --**
21 **the injury that could cause to someone, severely**
22 **injured, severely injure someone or kill them.**
23     Q.  Is a car that is moving obliquely to high
24 speed traffic dangerous to the -- to that traffic?
25     **A.  Yes.**

111

1      Q.  And why is that?
2      **A.  Because that you could cause, you know, injury**
3  **to someone else.**
4      Q.  So isn't it true that one of the reasons why
5  you don't fire at a moving vehicle, is that if you
6  disable the driver, you cannot guarantee what that car
7  is going to do?
8      **A.  That could be a part of it.**
9      Q.  Because you shoot that person and that doesn't
10 necessarily stop the car, does it?
11     **A.  That's correct.**
12     Q.  And the policy of not shooting from a moving
13 vehicle, why is -- what is the reason for that policy?
14     **A.  From a moving vehicle?**
15     Q.  Correct.
16     **A.  Which -- do you mind showing me the policy**
17 **you're referring to?**
18     Q.  I'll -- I'll dig it out, but there is a
19 general -- generalized policy of never shooting from a
20 moving vehicle.  Why is that?
21     **A.  And this is a Precinct 5 policy?**
22     Q.  It's a Precinct 5 policy.
23     **A.  Can I see that, please?**
24     Q.  Okay.  I am showing you -- okay.  I'm going to
25 reassemble this and show you the general policies.

112

1      MR. FOMBY:  Have you stamp it.
2      THE REPORTER:  Exhibit 34.
3      (Exhibit No. 34 marked.)
4      Q.  (BY MR. FOMBY)  I want you to turn to page 48.
5      **A.  (Witness complies.)**
6      Q.  And there's -- paragraph 5.
7      **A.  Okay.**
8      Q.  So paragraph 5, does it say -- that you asked
9  me where it says in the policy you shouldn't shoot from
10 a moving vehicle.
11     **A.  Right.**
12     Q.  You see that?
13     **A.  Uh-huh (Affirmative.)**
14     Q.  Would you agree that that -- that is the
15 policy of your force?
16     **A.  And this is referring to while you're**
17 **operating a motor vehicle and moving in a vehicle.**
18     Q.  I'm sorry, Deputy, I don't read that.  It
19 says:  Do not discharge it from a moving vehicle or at a
20 fleeing vehicle.
21     It doesn't have any conditions?
22     MS. BAKER:  Object to sidebar.
23     Q.  (BY MR. FOMBY)  So does it say do not fire
24 from a moving vehicle?
25     **A.  That's correct.  Do not discharge firearm from**

113

1  a moving vehicle.
2      Q.  I want you to move to the page before, No. 47.
3      **A.  There's no 47.**
4      Q.  There should be a page before it.
5      **A.  Okay.  It's out of order.  Okay.  47.**
6      Q.  Okay.  Paragraph one, what does that say?
7      **A.  Wait, I'm sorry, which section?**
8      Q.  Section B, Rules, paragraph 1.
9      **A.  Okay.  The policy stated above is the basis of**
10 **the following set of rules that have been designed to**
11 **guide deputies in cases involving the use of firearms.**
12     Q.  I said paragraph number 1.  They're numbered,
13 Deputy.
14     **A.  Line number 1?**
15     Q.  Yes, Deputy.
16     **A.  Deputies shall not discharge a firearm except**
17 **to protect themselves or another person from imminent**
18 **death or serious bodily injury.**
19     Q.  What does paragraph numbered 2 say?
20     **A.  Deputies shall discharge their firearm only**
21 **when doing so will not endanger innocent persons.**
22     Q.  How about the one numbered 3?
23     **A.  Deputies shall not discharge their firearms to**
24 **threaten or subdue persons whose actions are destructive**
25 **to property or injurious to themselves but which do not**

29 (Pages 110 to 113)

114

1   prevent -- represent an imminent threat of death or
2   serious bodily injury to the deputy or others.
3       Q.  How about paragraph numbered 4?
4       A.  Deputies shall not discharge their firearms to
5   subdue an escaping suspect who represents no imminent
6   threat of death or serious bodily injury.
7       Q.  And looking at all of those, what is the
8   reasoning behind those rules?
9       A.  It's a guideline for when to use your firearm.
10      Q.  And isn't the -- the basic reasoning behind
11  those, that the use of deadly force, discharging a
12  firearm, is a last resort option?
13          MS. BAKER:  I'm going to object to that
14  question as directed to this witness because this
15  witness, there's no evidence this witness prepared the
16  policies, so if you want to ask a Precinct 5 witness
17  about what the -- the basis is for the policy --
18          MR. FOMBY:  I understand your objection.
19  He took a class on de-escalation of force.  He's taken a
20  number of classes, as he has already pointed out, on the
21  proper use of firearms, tasers, batons and other uses of
22  force.  So I'm asking him if he took a class on
23  de-escalation of force, part of that class material
24  would have reasoning for why it is that using a --
25  firing a firearm is a last option.

115

1       Q.  (BY MR. FOMBY)  Why is that reasoning?
2       A.  Firing a firearm is not the last option.
3          MS. BAKER:  No.
4       A.  It's an option.
5          MS. BAKER:  It's an option.
6       Q.  (BY MR. FOMBY)  In this case, what is more
7   dangerous -- what is a higher level of escalation of
8   force than firing a firearm?
9       A.  The highest level is the firearm.
10      Q.  Okay.  So when Ashtian Barnes was putting the
11  car in gear to leave, you -- you drew your firearm and
12  pointed it at his head; is that correct?
13      A.  That is incorrect.
14      Q.  I think you have already said that you pointed
15  it at his head?
16      A.  When --
17          MS. BAKER:  I'm going to object to that
18  because it totally misstates his testimony.
19      A.  When I first drew my weapon, my weapon was not
20  pointed directly at his head.  It was pointed at him.
21      Q.  (BY MR. FOMBY)  Okay.  We have a video that
22  shows the weapon entering the back window, visibility --
23  visible back window with Ashtian's head leaning away
24  from it.  Have you seen the video?
25      A.  When I was on the -- on the doorsill?

116

1       Q.  When you were on -- on the ground, as you were
2   stepping onto the doorsill.
3       A.  That would be incorrect.
4       Q.  Where was your gun pointed at that particular
5   point?
6       A.  As I was reaching inside the vehicle my weapon
7   was back like this, and as I was reaching it, I'm not
8   going to leave my hand extended, you know, at that
9   point.  You -- you retract your gun, you retract your
10  hand and you keep it at this position until the threat
11  is -- is gone or threat is, you know, assessed.
12      Q.  So your testimony right now under oath is that
13  as you were reaching into the vehicle, you had your
14  firearm back in this position (Indicating)?
15      A.  As I was going into the vehicle, that's what I
16  recall, yes.
17          MR. FOMBY:  Do you mind if we take a
18  five-minute break?
19          MS. BAKER:  No.
20          THE VIDEOGRAPHER:  The time is 1:32 p.m.,
21  we're off the record.
22          (Off the record.)
23          THE VIDEOGRAPHER:  The time is
24  approximately 1:43 p.m., we're on the record.
25      Q.  (BY MR. FOMBY)  Deputy, previously we talked

117

1   about the whole issue of escalation of force, or
2   de-escalation of force, correct?
3       A.  Okay.
4       Q.  What -- and you took a class in 2018 on
5   de-escalation of force; is that correct?
6       A.  That's correct.
7       Q.  And in that class, why were you told
8   de-escalation of force was important?
9       A.  In certain situations you can use different
10  tactics to de-escalate the situation, either by, you
11  know, talking to someone or by, you know, to make sure
12  that they kind of -- to make sure that they, you know,
13  can calm down and bring the situation back to a level
14  where you can, you know, address the situation at hand.
15      Q.  Okay.  And in that class, were you taught that
16  de-escalation of force is an important tool to prevent
17  situations from going out of control?
18      A.  That's correct.
19      Q.  Okay.  And as part of that, you -- I think the
20  class was techniques.  So you were taught different
21  techniques for de-escalating a situation, correct?
22      A.  Different techniques were taught, yes.
23      Q.  In that -- all right.  You were also taught
24  the escalation levels of how and when it is appropriate
25  to go from one level of force or -- or authority to

Southwest Reporting & Video Service, Inc.      Registration #189
713-650-1800                              sweptproduction@swreporting.com

118

1 another level of force or authority. Is that fair to
2 say?
3 **A. Well, ideally, you know, yeah, if you can**
4 **follow the -- the levels, it would be, you know, a**
5 **perfect world. You know, this is not a perfect world,**
6 **so you can be speaking, you know, with someone one time**
7 **at the moment and have to use deadly force in the next,**
8 **or you could be talking to them and you go hands on.**
9 **So in a perfect world, you know, you could**
10 **use, you know, these low levels of -- of force, but, you**
11 **know, sometimes you can't. Sometimes you just have to,**
12 **you know, transition to a higher level of force.**
13 Q. Okay. A classic example where you might want
14 to de-escalate would be, say, a boyfriend and girlfriend
15 situation where they've got an argument going on. Would
16 that be a good example?
17 **A. Okay.**
18 Q. And where you want to separate the two of them
19 and calm them down, to calm down the situation. Is that
20 one of the techniques they taught you?
21 **A. Correct.**
22 Q. Or when we have someone who has mental illness
23 and you need to deal with their mental illness and calm
24 them down so that they don't spin out of control, would
25 that be another good example?

119

1 **A. Yes.**
2 Q. Now, but as you said, sometimes you can't --
3 the situation doesn't merit or doesn't work with -- you
4 can't de-escalate it. So certain circumstances you have
5 to use escalating levels of force and authority; is that
6 true?
7 **A. That's correct.**
8 Q. And one of the first levels would be simply
9 your presence on the scene. Would that be fair?
10 **A. Yes.**
11 Q. That a police officer or deputy constable by
12 the fact that they're there and have a uniform, that
13 usually warns people and gets them calmed down; is that
14 correct?
15 **A. Correct.**
16 Q. The second method might be using your
17 authoritative voice in orders, right?
18 **A. Uh-huh (Affirmative.) Yes.**
19 Q. So in this case telling someone stop shuffling
20 around, that would be a way of trying to control them
21 without having to use further levels of force?
22 **A. Correct.**
23 Q. Now, we've also talked about other tools that
24 you've been taught as part of that escalation,
25 de-escalation problem. You've been taught how to use a

120

1 baton; is that right?
2 **A. Correct.**
3 Q. You've been taught how to use a taser?
4 **A. Correct.**
5 Q. I'm sure that there are other similar tools
6 and skill sets that they've given you in these classes
7 so that you don't have to get to the lethal weapon
8 category. Is that -- is that fair?
9 MS. BAKER: Objection, vague.
10 **A. It -- there's situations where, you know, like**
11 **I said, ideally in a perfect world, you know, level of**
12 **escalation, but you know, real world is from one second**
13 **to another, it's, you know, it could be zero to a**
14 **hundred. You know, where you having to transition from**
15 **just presence to, you know, displaying a firearm or --**
16 **or...**
17 Q. (BY MR. FOMBY) And displaying a firearm by
18 itself is a level, is an escalation level to warn people
19 of imminent danger; is that right?
20 **A. That's correct.**
21 Q. Okay. So -- and -- and I understand what
22 you're saying, that you don't have to walk through the
23 steps, right?
24 **A. Correct.**
25 Q. Is that what you're saying?

121

1 **A. That's correct.**
2 Q. That you can go from step three to step ten if
3 you have to under the circumstances. Is that what
4 you're saying?
5 **A. That is correct.**
6 Q. But in this situation, when your command
7 arguments were not working, did you attempt to use your
8 baton?
9 **A. No.**
10 Q. Did you attempt to use your taser?
11 **A. If I recall I don't think tasers were issued**
12 **yet.**
13 Q. Okay.
14 **A. I don't recall, but...**
15 Q. But you've been trained on tasers for several
16 years?
17 **A. That's correct. The -- the -- just the way**
18 **the situation escalated and rapidly evolved, there was**
19 **no time -- there wasn't time to deploy those level of**
20 **force.**
21 Q. I noticed that your taser is mounted so that
22 your right hand can naturally fall on it and pull it
23 straight out; is that correct? Is that how it's
24 intended?
25 **A. No. No, there's a -- there's a locking**

## 122

1  mechanism and you have to rock back and then up in order
2  to --
3  Q. Okay.
4  A. -- to deploy it.
5  Q. Is there a locking mechanism on your firearm
6  to keep it from falling out?
7  A. Yes, there is.
8  Q. And your firearm is actually located where you
9  have to actually bend your elbow back to reach to it?
10  A. Correct.
11  Q. And in this particular instance when you were
12  concerned that Ashtian Barnes might leave, you did not
13  pull your taser; is that correct?
14  A. I don't recall if we were issued tasers at
15  that point yet.
16  Q. But no taser was pulled at that time?
17  A. That's correct.
18  Q. Let's return to the moment where you decided
19  to fire your weapon. You said that you had no
20  visibility as to what you were actually firing at; is
21  that correct?
22  A. That's correct.
23  Q. You thought you might be firing into his
24  body, Ashtian Barnes' body?
25  A. I did.

## 123

1  Q. But you -- you had no way of being sure?
2  A. That's correct.
3  Q. What would have happened if you had missed
4  Ashtian and the bullet ricocheted out into the tollway?
5  Would that put other people at danger?
6  MS. BAKER: Objection, irrelevant, calls
7  for speculation.
8  Q. (BY MR. FOMBY) Earlier you -- you said that
9  one of the reasons -- the primary reason you don't fire
10  at moving vehicles is a risk of ricochet. So in this
11  case, if it had ricocheted, would -- would that have put
12  people at risk?
13  A. The -- the way that I positioned the weapon,
14  there wasn't a chance for ricochet because it was a
15  straight downward motion, so anything that would have
16  been fired in that vehicle would have stayed in that
17  vehicle in a downward motion.
18  Q. All right. When you -- when you shoot an
19  individual who's operating a car at a reasonable rate of
20  speed, what happens if you disable that person while
21  they're driving the car?
22  A. At that point you would have to take, you
23  know, different measures to make sure you get, you know,
24  control of that vehicle, reaching for the emergency
25  brake, pressing the emergency brake, steering the

## 124

1  vehicle until the -- the -- you know, you can bring it
2  to a safe stop.
3  Q. I see. So your training is that you can,
4  sitting on the sill of the car with one arm out and the
5  other hand holding a gun, you can somehow, as the car
6  veers off into the tollway, jump down in there on top of
7  his body and push a foot out and hopefully -- where is,
8  by the way, the emergency brake on a Toyota Corolla?
9  MS. BAKER: Objection, argumentative.
10  Was the question where is the emergency brake on -- on a
11  Toyota Corolla?
12  MR. FOMBY: No, I would just -- just a
13  pause.
14  Q. (BY MR. FOMBY) Where is the emergency brake
15  on a Toyota Corolla?
16  A. Most brakes are located in the bottom left of
17  the driver side area.
18  Q. Most -- most brakes?
19  A. Most brakes.
20  Q. Do you know where -- where the brake was?
21  A. I do not.
22  Q. So what you're telling me is that if you had
23  immobilized Ashtian Barnes in the car had swerved under
24  condition, you actually did not have a plan for how to
25  stop the car from hitting everybody else?

## 125

1  A. At that moment that wasn't an issue. Once the
2  vehicle came to a stop, I was able to -- to get off the
3  vehicle and ordered him to put the car in park.
4  Q. As you said that you -- once you shoot
5  someone, if that person is immobilized and can no
6  longer -- is no longer driving the car, you said that
7  your job then is to get into the car somehow and figure
8  out a way to put the emergency brake on and -- and bring
9  it to a stop?
10  A. Well, you said what would I do and that would
11  be my next -- be my next form of action, is to try to
12  get that car to stop.
13  Q. So that's your plan of action after you shot
14  him, that if this thing veer -- his car veered into that
15  tollway traffic, that you were going to somehow pull a
16  Rambo move and get down into the car and bring it to a
17  stop?
18  MS. BAKER: I'm going to object to the
19  argumentative nature of that question, and also to vague
20  because I'm not clear what a Rambo move is.
21  MR. FOMBY: A Rambo is a character from
22  the movies.
23  MS. BAKER: You don't need to tell me.
24  Yes, sir, I know.
25  MR. FOMBY: You were not clear on it, so

Southwest Reporting & Video Service, Inc.      Registration #189
713-650-1800                                    swreptproduction@swreporting.com

126

1  I need -- you need --
2          MS. BAKER:  Okay.
3          MR. FOMBY:  -- you obviously need to be
4  educated about one of the most popular movies in the
5  history of filmdom.
6          MS. BAKER:  Oh, yeah, no, I know who
7  Rambo is, I just don't know which specific scene or move
8  you are referring to.
9      Q.  (BY MR. FOMBY)  So that -- that -- you
10  formulated this plan that if you shot him and
11  immobilized him, you were somehow going to get control
12  of this vehicle?
13      A.  My -- my actions were based on what was
14  happening at that time.  So I can speculate, I can, you
15  know, say that I would have done this or I could have
16  done that, but at that time when, you know, I discharged
17  my weapon, the vehicle did come to a stop and I was able
18  to at that point get out -- get off the vehicle.
19      Q.  When you fired the second time into Ashtian
20  Barnes, he brought the car to a stop?
21      A.  That's correct.
22      Q.  But what I'm saying is, what if he had been
23  immobilized, because you're traveling at high speed next
24  to a bunch of cars.  Did you actually have a plan when
25  you pulled that trigger to not put all of those people

127

1  on that tollway at grave risk of death or injury?
2          MS. BAKER:  Object to argumentative
3  nature, also asked and answered.
4      A.  That -- the vehicle at that point had began to
5  take off and that's why the -- the shots were made
6  there.  If he would have gone to a higher speed, it
7  would have been a different situation.  I could have
8  definitely been, you know, seriously injured or killed
9  at that point, you know, by any of, you know, his
10  further actions that, you know, he -- he intended to by
11  driving away from -- from the scene with me hanging onto
12  a vehicle.
13      Q.  (BY MR. FOMBY)  You stated before that you
14  felt that you were at risk because you were being pinned
15  and you didn't know what was going to happen.  If simply
16  being pinned to the car is a dangerous situation, how
17  does taking -- being in a car that's veering out of
18  control into a tollway put you in a better condition for
19  being able to get inside that car and change what's
20  happening?
21      A.  We can I guess sit here and assume all day
22  long and sit on something that, you know, could have
23  happened that didn't happen, you know.  I could have,
24  you know, stepped on the emergency brake or at that
25  point when there was no, you know, pressure or force

128

1  coming towards me from inside the vehicle, you know, to
2  attempt to get in the vehicle to steer the vehicle or,
3  you know, whatever needed to be done to get that vehicle
4  to stop.  But like I said, that didn't happen so we
5  can -- I can just assume what could have or I would have
6  done at that point.
7      Q.  Isn't that, Deputy, why we have policies, so
8  that people don't have to at that moment make crit --
9  split-second decisions about what they're going to do?
10          MS. BAKER:  Object to the argumentative
11  nature of that question, and also this is not a person
12  who makes policy -- who makes policies.  If you know, if
13  you can answer it, you can.
14      A.  I don't know.  I mean the policies are set for
15  a reason, you know.  At no time did I violate a Precinct
16  5 policy, you know, by attempting to -- fleeing -- you
17  know, this fleeing person.
18      Q.  (BY MR. FOMBY)  There's a policy that says
19  thou shalt not fire at a moving vehicle.  Did you fire
20  at a moving vehicle?
21      A.  Okay.  That -- that -- that question there
22  is -- I fired while being on a vehicle and the vehicle
23  was moving in a -- in a direction where it didn't put
24  anyone else in harm 's way, you know, shooting the
25  weapon in a direction where it would have struck someone

129

1  else.
2      Q.  You're saying that shooting the driver of the
3  car while it's op -- operating at a high speed, does not
4  put anyone in harm's way?
5          MS. BAKER:  Objection, misstates his
6  testimony.
7      A.  I'm not sure what the speed was, but it was
8  something that, you know, that shooting at Mr. Barnes
9  for him to stop the vehicle is -- was the intended, you
10  know, part was to stop the threat.
11      Q.  (BY MR. FOMBY)  One of the methods of -- one
12  of the levels of escalation is to issue a verbal
13  warning.  I believe in the policies it suggests that one
14  of the things you do before you fire is to give a
15  warning before you fire.  Did you warn him stop or I'll
16  shoot?
17      A.  There is no policy that says that you have to
18  give a warning to an individual before you fire a
19  weapon.
20      Q.  Did -- did you warn him stop or I'll shoot?
21      A.  I never warned him that I would shoot.
22      Q.  Okay.  Now, the reason -- we have these
23  policies and we have some policies that we've talked
24  with handguns there are other policies that are out
25  there.

130

1  MR. FOMBY: I'm going to hand this to
2  you.
3  (Exhibit No. 35 marked.)
4  Q. (BY MR. FOMBY) This is Exhibit 35 and these
5  are reprimand records from the Constable Precinct 5's
6  Office. Who's being reprimanded in these records?
7  **A. That's myself.**
8  Q. Okay. And in this case, May 18, 2005, the --
9  the first page here, which is Bates numbered 1729, it
10  said that -- what was it that you failed to do?
11  **A. Complete time sheets.**
12  Q. Okay. And what was the -- what was the
13  penalty for your failure to complete your time sheets?
14  **A. It says one-day suspension.**
15  Q. And in that paragraph that says one-day
16  suspension, what does that second paragraph say?
17  **A. The investigation revealed that you were**
18  **negligent in failing to complete several time sheets.**
19  **You have had ample time to conform to the requirement in**
20  **completing a time sheet.**
21  Q. Actually I told you -- I referred to the -- to
22  where you said there was a one-day suspension. What's
23  the second sentence in that paragraph?
24  **A. Any further such behavior will result in much**
25  **more severe disciplinary action, up to and including**

131

1  termination.
2  Q. So as I understand this, the improper
3  completion of time sheets led to a one-day suspension
4  and the threat of possible termination in the future
5  if -- if you're -- if you didn't correct your behavior;
6  is that correct?
7  **A. That -- that's standard for any disciplinary**
8  **actions.**
9  Q. Is that a yes?
10  **A. Yes.**
11  Q. Okay. On the next page, Bates number 1730,
12  dated August 8, 2006, who was this reprimand directed
13  toward?
14  **A. Myself.**
15  Q. Okay. And what is it that the reprimand says
16  that you failed to do?
17  **A. I didn't utilize my microphone as required,**
18  **according to policy and procedures for the mobile vision**
19  **in car video system dated May 3rd, 2004.**
20  Q. And in the third paragraph there, what was the
21  reprimand? What was the punishment for failing to do
22  so?
23  **A. One-day suspension.**
24  Q. Okay. And was there -- what's that second
25  paragraph? Is there a further warning?

132

1  **A. During the suspension you're not permitted to**
2  **represent yourself as a peace officer. Furthermore,**
3  **extra employment during suspension is disallowed.**
4  Q. And again it says: Any further such behavior
5  will result in more severe disciplinary action, up to
6  and including termination.
7  Is that correct?
8  **A. That's correct.**
9  Q. Okay. Let's turn to the next page, Bates
10  stamped 1731.
11  **A. (Witness complies.)**
12  Q. And who is this directed toward?
13  **A. Myself.**
14  Q. Okay. It's dated January 11th, 2008. And why
15  were you being reprimanded here?
16  **A. For loss of equipment.**
17  Q. And what was the punishment for this mistake?
18  **A. One-day suspension.**
19  Q. And again, they warned you that any further
20  such behavior could lead to termination?
21  **A. Correct.**
22  Q. Bates stamp 1732 references a violation of
23  S.O.P. 100-2.09. What was this incident about?
24  **A. It was showing myself out on a -- on a call**
25  **before arriving.**

133

1  Q. Okay.
2  **A. As I was turning the corner.**
3  Q. So what is that exactly? You didn't arrive
4  but you -- you wrote up that you had arrived?
5  **A. No. We have an arrive button on our -- on our**
6  **computer.**
7  Q. Uh-huh (Affirmative.)
8  **A. On our old system. So as I was turning the**
9  **corner to clear myself out, I hit the arrive button and**
10  **then I cleared it but stayed on scene talking to the --**
11  **to the resident.**
12  Q. And for this you received a temporary
13  suspension for two days; is that correct?
14  **A. That's correct.**
15  Q. And you were advised that you could not take
16  any kind of police action or carry or wear any
17  departmental-issued equipment?
18  **A. That's correct.**
19  Q. During this period?
20  **A. That's correct.**
21  Q. And again: Any further such behavior will
22  result in more severe disciplinary action, up to and
23  including termination.
24  Is that correct?
25  **A. That's correct.**

34 (Pages 130 to 133)

134

1    Q.  So we have here some situations where you
2  filled out a time -- timecard wrong, you forgot to turn
3  on the microphone, you misplaced your radar and you
4  pushed a button too early.  In each of these cases you
5  got written up and you received at least a one-day
6  suspension; is that correct?
7    **A.  That's correct.**
8    Q.  In this particular instance that we're talking
9  about, the shooting of Ashtian Barnes, did anyone talk
10  to you about your decision-making regarding pulling your
11  hand -- your service weapon to keep him from leaving?
12    **A.  No.**
13        MS. BAKER:  Do you mean anyone at
14  Precinct 5 or are you talking about during the
15  investigation?
16    Q.  (BY MR. FOMBY)  Anyone at Precinct 5?
17    **A.  No.**
18    Q.  Did anyone in the DA's office specifically
19  talk to you about your decision-making about why you did
20  that?
21    **A.  During the investigation, you know, just the
22  actions leading up to the incident.**
23    Q.  Did you have any further training regarding
24  that particular -- how to handle that particular
25  situation in the future?

135

1    **A.  No.**
2    Q.  Did -- were you at all reprimanded for pulling
3  your -- your service revolver to keep someone from
4  leaving the scene?
5    **A.  No.**
6    Q.  Same question with jumping on board a moving
7  vehicle.  Did anyone, Precinct 5 or Harris County in
8  your chain of command, talk to you about whether that
9  was appropriate?
10    **A.  No.**
11    Q.  And did you ever receive any training after
12  the fact about how to handle that situation in the
13  future?
14    **A.  We've -- the department has had training
15  involving high-risk stops, but nothing specific to that
16  incident.**
17    Q.  Okay.  The decision to fire your bullet, fire
18  your gun at the driver of a car on the tollway, did --
19  did anyone in your chain of command, anyone at the
20  Constable's Office speak to you about that decision
21  and -- and discuss whether that was a good idea?
22    **A.  No.**
23    Q.  And no -- no additional training on how to
24  handle that situation?
25    **A.  No.**

136

1    Q.  The decision to hold a gun on Ashtian Barnes
2  as he was bleeding out and asking for help, without
3  providing help, did anyone talk to you from the
4  Constable's Office, your chain of command, talk to you
5  about what your thinking was and whether that was
6  appropriate?
7        MS. BAKER:  Objection, mischaracterizes
8  his testimony, but you may answer.
9    **A.  That was never discussed because I did ask for
10  medical attention for Mr. Barnes right after the
11  shooting occurred and again about a minute later
12  confirmed that HFD was en route.**
13    Q.  (BY MR. FOMBY)  So to summarize, after this
14  incident did you receive any kind of specialized
15  training regarding what happened during this event?
16    **A.  No.**
17    Q.  Did you receive any kind of counseling
18  regarding this event?
19    **A.  Yes.**
20    Q.  Okay.  Psychological counseling?
21    **A.  It was a counseling dealing with the incident
22  itself.**
23    Q.  Okay.  And what was the nature of that
24  counseling?  And you don't have to go into anything
25  personal but --

137

1        MS. BAKER:  Yeah, we're getting pretty
2  close.
3    Q.  (BY MR. FOMBY)  Is it about your -- your
4  feelings or about preparing you for future situations?
5    **A.  It's just -- we talked about the incident and
6  just the way that things were I guess related to work
7  and just personal stuff.**
8    Q.  Okay.  After the shooting which occurred on
9  the afternoon of April 28th, 2016, when were you
10  released to return -- I -- I assume that there was a
11  temporary -- you were put on temporary leave; is that
12  correct?
13    **A.  No, that's incorrect.  I was never on leave.
14  I was offered a desk position for however amount of
15  time -- amount of time that, you know, I needed.**
16    Q.  And did you take that offer?
17    **A.  I did.**
18    Q.  And how long were you on the desk position?
19    **A.  About two weeks.**
20    Q.  Okay.  And was that a mandatory offer or was
21  that an offer to help you with the situation?
22    **A.  Well, the initial -- it would be three days is
23  mandatory from -- there's actually no policy, but three
24  days that they tell you to, you know, kind of I guess
25  for investigation purposes make sure that whatever they**

138

1 need to do on their end, but normally it's three days
2 after a shooting.
3     Q.  Okay.  Three days to be on desk duty?
4     A.  Right.
5     Q.  Okay.
6     A.  Desk duty or be off.
7     Q.  At this point we received a video from Harris
8 County that was the dash cam of your -- of your squad
9 car.
10     A.  Okay.
11     Q.  And I have some close-ups of this but I first
12 want to run through this.  Have you seen this video at
13 all before?
14     A.  Yes.
15     Q.  Have you seen it recently?
16     A.  Yes.
17     Q.  Okay.  So I want to kind of walk through here
18 and see this as -- without stopping it all the way
19 through.
20     A.  Right.
21     Q.  Because I think it helps us to put this in
22 context instead of chopping it up.
23         MS. BAKER:  Let me ask you this before we
24 get started with that.  Are you intending on attaching
25 it as an exhibit?  I know you have the separate

140

1     Q.  Okay.  I don't want to move in on you too
2 much, but let's see where it is.  Okay.  I'm just going
3 to be -- okay.  We can just see a little bit closer.
4 Okay.  Now, to set the scene, this is April 28, 2016.
5 The time on the dash cam is 14:42:46, and I believe when
6 this starts the audio is not on.
7     A.  That's correct.
8     Q.  What -- what causes the audio to come on in
9 this situation?
10     A.  The audio is -- or the video is recorded, I'm
11 not sure if it's 30 seconds or a minute prior to the
12 lights turning on, so it's a continuous recording as far
13 as when I hit my lights it goes back 30 seconds or a
14 minute and then it starts recording, and audio will come
15 on as the lights are -- are turned on.
16     Q.  Okay.  And what -- what would turn the -- the
17 video off at some point?
18     A.  The videos can be turned off by either memory
19 running out or me physically turning it off.
20     Q.  Okay.  How about the audio?  Can the audio be
21 turned off separately?
22     A.  The inner -- the inner audio will run as the
23 video's -- the camera's running.  The external mic will
24 run and can be turned off manually as well from a
25 control box that we carry.

139

1 pictures, but he's viewing it, so it seems like we
2 should also attach it.
3         MR. FOMBY:  Well, we could do that.  It's
4 a demonstrative at this point because I want to focus in
5 on this.  I just wanted him to get the overview as
6 demonstrative to get his -- and we're not going to focus
7 in -- really on the video.
8         MS. BAKER:  You know, I've done several
9 cases like this, and normally we go ahead and attach the
10 video because the witness is looking at it.
11         MR. FOMBY:  Okay.  Well, I don't have a
12 physical copy of the video at the moment.
13         MS. BAKER:  If we get you a physical
14 copy, can we attach it?
15         THE REPORTER:  Sure.  If it's agreeable.
16         MS. BAKER:  Okay.
17         MR. FOMBY:  Okay.  And why don't we call
18 that physical copy, I can send that to you by --
19         THE REPORTER:  E-mail.
20         MR. FOMBY:  E-mail.  And we'll call it
21 Exhibit 36.
22         MS. BAKER:  Perfect.  Thank you.
23         (Exhibit No. 36 marked.)
24     Q.  (BY MR. FOMBY)  So at the moment --
25     A.  I can't see that.  There's too much glare.

141

1     Q.  Okay.  And does everyone -- do the other
2 deputies and police officers have a control box that
3 could turn this particular mic off?
4     A.  No.
5     Q.  It's just you?
6     A.  That's correct.
7     Q.  Okay.  As I said, I'm going to run this up
8 until the point after the car stops because -- and then
9 we can go back and take a look at some -- at some
10 moments in time.
11         (Video playing.)
12         (Video stops.)
13     Q.  (BY MR. FOMBY)  And that would be Ashtian's
14 car, correct?
15     A.  That's correct.
16         MR. FOMBY:  Is the audio on?  There it
17 is.
18         (Video playing.)
19         (Video stops.)
20     Q.  (BY MR. FOMBY)  Okay.  And that's the same
21 video that you watched before, right?
22     A.  That's correct.
23     Q.  And there's more that goes on here with
24 officers showing up.  I think at some point 26 officers,
25 police officers or constables or deputy constables were

142

1  on the scene, but...
2         MS. BAKER: Object to sidebar.
3     Q.  (BY MR. FOMBY)  So we're not going to go all
4  the way into that, but I -- I just want to come back
5  here and look again at what was going on in those few
6  seconds, okay?
7         Okay.  So now we're at the 150 mark into the
8  video, and I think everything starts happening at 2:57,
9  but --
10        (Video playing.)
11        (Video stops.)
12    Q.  (BY MR. FOMBY)  Okay.  At this point I
13 don't -- what he's -- what you guys are talking about is
14 he tells you it's a rental car and you asked who rented
15 the car, when did you rent it, he says about a week ago,
16 right, and it's in his girlfriend's name, so you're
17 having that conversation.
18    A.  (Nods affirmatively.)
19        MS. BAKER: Object to sidebar.
20        (Video playing.)
21        (Video stops.)
22    Q.  (BY MR. FOMBY)  Okay.  I wanted to know, at
23 this point, up until this point, the blinker has been
24 going.  You notice that?
25    A.  Okay.

143

1         MS. BAKER: I guess there's a question?
2         MR. FOMBY: Yes.  That's the question.
3     Q.  (BY MR. FOMBY)  Did you notice the blinker has
4  been moving?
5     A.  Yes.
6     Q.  Okay.  So I don't drive that car but something
7  just changed and the blinker is no longer blinking at
8  this particular moment, correct?
9     A.  Right.
10    Q.  And this is at approximately the time that you
11 said that you saw him turn the car off and put the key
12 down, approximately the time?
13    A.  Yeah.
14    Q.  And all this happens in a few seconds.  I'm
15 just trying to get us into the context of what's
16 happening.
17        MS. BAKER: I -- I'm not trying to tell
18 you how to take a deposition, truly not.  You're
19 obviously very talented, but we generally proceed by
20 question and answer, so I think he needs --
21        MR. FOMBY: I've asked a question.  I
22 said that this has happened, is that your perception.
23        MS. BAKER: Okay.
24        MR. FOMBY: I'm asking him a question
25 whether he agrees with me.

144

1         MS. BAKER:  As long as you ask a question
2  he understands.  We don't even need to be oriented
3  because he was there.
4         MR. FOMBY:  Actually I think he will need
5  to be oriented and we will get to that very quickly
6  here.
7         (Video playing.)
8         (Video stops.)
9     Q.  (BY MR. FOMBY)  Okay.  So at this point the
10 trunk has been popped, right?
11    A.  That's correct.
12    Q.  And it's opened up and we notice the distance
13 between the cars, so the cars are still the same
14 distance apart, they haven't moved, correct?
15    A.  Correct.
16        (Video playing.)
17        (Video stops.)
18    Q.  (BY MR. FOMBY)  Okay.  Now something has
19 happened.  We see the blinkers, see -- did you notice
20 the blinkers came back on?
21    A.  Uh-huh (Affirmative.)
22    Q.  Okay.  Something going's on in the car that's
23 changed, and you have moved toward the car; is that
24 correct?
25    A.  That's correct.

145

1     Q.  Okay.
2         (Video playing.)
3         (Video stops.)
4     Q.  (BY MR. FOMBY)  Okay.  What were -- what was
5  it you said at that particular point?
6         MS. BAKER: Objection, vague.
7     Q.  (BY MR. FOMBY)  Do you want me to play it
8  again for you?
9         (Video playing.)
10        (Video stops.)
11    Q.  (BY MR. FOMBY)  Okay.  Did you hear it that
12 time?
13    A.  I heard it.
14    Q.  Okay.  So it wasn't, you know, stop or I'll
15 shoot, right?
16    A.  Right.
17    Q.  It wasn't stop, right?
18    A.  Right.
19    Q.  It was "don't fucking move, don't fucking
20 move"; is that correct?
21    A.  That's correct.
22    Q.  And then you fired your weapon?
23    A.  Correct.
24    Q.  And then almost immediately afterwards you
25 fired it again; is that fair?

Southwest Reporting & Video Service, Inc.     Registration #189
713-650-1800                          sweptproduction@swreporting.com

1     **A.  Correct.**
2     Q.  Okay.  And then the car stopped.  And as we
3 can see, and I have a photograph of that, that will show
4 it, the light -- brake light remains on which means
5 Ashtian's foot would be on the brake, correct?
6     **A.  Correct.**
7     Q.  You did not at this point make a move to get
8 inside the car to put it out of gear, did you?
9     **A.  No, I did not.**
10     Q.  Do you know where -- whether the car was
11 placed in park before the other officers arrived?
12     **A.  When I instructed him to do so.**
13     Q.  Okay.  So the car at this point and until the
14 next officers arrive, is in gear but Ashtian's holding
15 down the brake pedal?
16     **A.  When I instructed him to put the car in park**
17 **he put the car in park.**
18     Q.  Who was that, Ashtian?
19     **A.  Ashtian.**
20     Q.  So after he was shot and he was lying there,
21 you said put it in park and Ashtian put it in park?
22     **A.  Well, he wasn't -- I mean he was sitting there**
23 **and he was still conscious and able to -- to move and do**
24 **everything else and when I said put the car in park,**
25 **that's when he put the car in park.**

1     Q.  So Ashtian at that point was conscious of
2 the -- of the fact that he needed to make the situation
3 safe?
4     **A.  He was -- he was --**
5     Q.  Put the car in park?
6     MS. BAKER:  Objection, calls for
7 speculation.
8     **A.  He was doing what he was instructed to -- or**
9 **ordered to do.**
10         (Video playing.)
11         (Video stops.)
12     Q.  (BY MR. FOMBY)  It's not easy to hear on this
13 computer as -- the sound of Ashtian, but our recording
14 showed him talking to you at that point.  Do you
15 remember him ever talking to you?
16     **A.  He mumbled something or said something.**
17     Q.  Okay.
18     **A.  I was concerned about getting him medical**
19 **attention.  That's, you know, me talking over the radio.**
20     MR. FOMBY:  And we will get you this
21 video.
22     THE REPORTER:  Yes.
23     MR. FOMBY:  Actually, we can probably --
24 we can give to you right now, but okay.
25     THE VIDEOGRAPHER:  Don't forget your mic.

1     Q.  (BY MR. FOMBY)  Now Deputy, let's go through
2 this, I was able to use Microsoft's standard program to
3 run the video and have it take the little snapshots of
4 every frame, okay?  And we just saw the video and we can
5 go back to it if we need to, but before we get into
6 this, I wanted to ask again, I don't know if it got it
7 on the audio from me because I was standing over there,
8 that these statements that you made to Ashtian Barnes
9 was not don't do it or fucking stop, but in fact, was
10 don't fucking move, you repeated twice.
11     MS. BAKER:  Objection, asked and answered
12 several times.
13     MR. FOMBY:  Actually he never said that
14 except when I was up here and I wanted to make sure that
15 it's on the record because I don't have the -- the mic
16 on me.
17     Q.  (BY MR. FOMBY)  But is that an accurate
18 statement?
19     **A.  That would be.**
20     Q.  Okay.  Now I have these -- these stills that
21 are marked Exhibit 1 through 29.  I'm going to walk
22 through them slowly.  I have a copy.  They're all
23 identical.  And these we just saw, the first two of
24 these are actually just the moment when you pulled in
25 behind him at 14:43:32.

1     The second one is the moment where he finally
2 stopped, and that would be doing the math, some 14
3 seconds later, correct?
4     **A.  Yes.**
5     Q.  Now, I'm going to jump forward to 14:45:47,
6 which is approximately two minutes.  And we saw that you
7 had stepped up and you were asking him some questions,
8 and going back and forth and we saw you telling him not
9 to shuffle around.  By this point, you had opened the
10 door.  And the blinker was on on his car; is that
11 correct?
12     **A.  That's correct.**
13     Q.  Also at this point you're standing away from
14 the car, it's very hard to tell the distance but your
15 body is -- the door is open almost fully and your body
16 is halfway or more than halfway toward the outside of
17 the car door; is that correct?
18     **A.  Correct.**
19     Q.  Okay.  This one is only important because I
20 wanted you to notice that the blinker is blinking.  So
21 you see the change, the blinker -- you can see the cars
22 going on the other side of the road to notice the time
23 is changing, but we're talking about seconds and
24 fractions of seconds, correct?
25     MS. BAKER:  Mr. Fomby, I understood you

150

1  to say the blinker is blinking on the one 14:45:47 but
2  it looks like it's off to me. Did you mean to say off?
3      MR. FOMBY: It is blinking because the --
4  it's going on off on off which is blinking. It's not
5  on, it is blinking.
6      MS. BAKER: So you're asking the witness
7  to assume that the -- I mean it's not evident to me that
8  it's blinking. So you're asking the witness to assume
9  that?
10     MR. FOMBY: I think that we can look at
11  this and see that within a fraction of a second the
12  light comes on and off and on and off only on the
13  driver's side rear turn indicator.
14     MS. BAKER: Okay. So I'm going to object
15  to that as assuming facts not in evidence. Please
16  continue.
17     Q. (BY MR. FOMBY) And again, at this point I'm
18  putting a little bit more out than necessary, but I just
19  want to show that these fractions of a moment as these
20  cars are coming by, okay?
21     You are still standing there talking to him in
22  the same position you were in before; is that correct?
23     MS. BAKER: You're referring to Exhibit 6
24  for clarity of the record?
25     MR. FOMBY: On Exhibit 6.

151

1      A. That's correct.
2      Q. (BY MR. FOMBY) Okay. And between Exhibit 5
3  and Exhibit 6, the relative positions of cars have not
4  changed; is that correct?
5      A. That's correct.
6      Q. We have Exhibit 7. And Exhibit 7, and I want
7  you to compare that to Exhibit 6. The brake lights have
8  come on on the car, and your foot position has changed
9  from Exhibit 6, has it not?
10     A. Yes, or my stance from what I can see.
11     Q. So your right foot appears to be in the same
12  position, but your left foot has changed, correct?
13     A. Correct.
14     Q. And when we look at your elbow position for
15  your right arm, your right arm elbow appears to be
16  coming up on the car, and your hand is reaching down in the
17  direction of your service revolver; is that accurate?
18     A. My service weapon, yes.
19     Q. Yeah. This is Exhibit 8. At this point, your
20  service revolver, service weapon is pulled, the car is
21  still -- the brake lights are still on, the car has not
22  moved, your -- now your right foot has changed position;
23  is that correct?
24     A. It's come off, yeah.
25     Q. And we can no longer see your left foot and

152

1  left leg; is that correct?
2      A. That's correct.
3      Q. And your body has moved from the outer portion
4  of the driver's side door more to the inner portion of
5  that door, correct?
6      A. That's correct.
7      Q. This is exhibit -- Exhibit 9. Now, at
8  Exhibit 9, the brake lights are off, correct?
9      A. Correct.
10     Q. And that means that if the car is in gear, at
11  this point there's nothing stopping the car from moving
12  forward, correct? So we do notice that the blinker's
13  still on and the trunk, position of the trunk lid has
14  not changed. Do you see that?
15     A. Okay.
16     Q. Okay. Your body, meanwhile, your -- we can't
17  see your left foot. We can -- your right foot is
18  disappearing in the direction of the car, and your body
19  is moving further in to the interior of the car. You
20  can see more of the driver's side door, right? There's
21  exhibit --
22     MS. BAKER: Do you agree with that?
23     A. I -- it's about the same. I mean just my --
24  I'm turning towards the car.
25     Q. (BY MR. FOMBY) Okay.

153

1      MS. BAKER: Because he's trying to ask
2  you a question but they don't always come out questions.
3      THE WITNESS: Okay.
4      MS. BAKER: So we -- we're looking for a
5  question.
6      Q. (BY MR. FOMBY) So here is Exhibit 10. And at
7  this point, looking down, the -- your right foot now has
8  completely disappeared from the picture. The blinker
9  has blinked off, so it appears to still be blinking, but
10  it's now in the off position. There doesn't seem to be
11  any real difference in separation between the vehicles,
12  but at this point the trunk lid is starting to come up.
13  And from what you understand of that sort of mechanics,
14  as a car starts to lurch forward, that would possibly
15  cause the trunk lid to rise, correct?
16     A. That's correct.
17     Q. Okay. So in this picture, Exhibit 10, we
18  can't see your feet on the ground. Where are your feet?
19     A. I can't see my feet either, so I mean from
20  this picture, I can't tell you for sure.
21     Q. Okay. Looking back at picture 9 and picture
22  10, look at the -- at Ashtian's head, which is this dark
23  blob on -- in this rough center of the -- of the car
24  back window. Do you see the change in head position
25  relative to the rearview mirror?

154

1   A.  Okay.
2   Q.  It appears that Ashtian is pulling his head
3   off toward the right side of the car.  Is that what it
4   looks like to you?
5   A.  He's moving his body.
6   Q.  Yeah.  This is Exhibit 11.  Now, again, we
7   can't see your feet.  The blinker has blinked back on.
8   The trunk lid is starting to rise, and for the first
9   time if you look carefully at the difference between the
10  front of the squad car and the wheels, for instance, of
11  Ashtian's car, the car has apparently moved a foot or
12  so.  Hard to tell the actual distance?
13      MS. BAKER:  You know I'm going to object
14  to that because it's calling for speculation and I'm --
15  I'm going to ask you again, are you asking him to assume
16  that, are you representing that to him?  Have you done
17  some sort of study that would permit you to represent
18  that to him?
19      MR. FOMBY:  Represent what specifically?
20      MS. BAKER:  The -- the distance change.
21      MR. FOMBY:  I said that it's hard -- I
22  actually said it's hard to determine, but it appears to
23  have moved slightly at this particular point.
24      MS. BAKER:  And you're asking him if that
25  is his opinion?

155

1       MR. FOMBY:  And I'm asking him as the
2   person who has taken classes in accident reconstruction
3   and traffic reconstruction and all that, whether or not
4   that distance from that position would be consistent
5   with a foot or two.
6       MS. BAKER:  So in that context, if you
7   can answer.
8       THE WITNESS:  Okay.
9   A.  It's moved some.
10  Q.  (BY MR. FOMBY)  Okay.  Now, in this picture,
11  we can no longer see Ashtian's head, can we?
12      MS. BAKER:  We're talking Exhibit 11?
13      MR. FOMBY:  Exhibit 11.
14  Q.  (BY MR. FOMBY)  But we see some kind of dark
15  straight object just before the lid of the trunk.  Do
16  you see that, Officer -- Deputy?
17      MS. BAKER:  He's referring to 11 I think.
18      THE WITNESS:  Yeah, this is 11.
19  A.  You said dark object?
20  Q.  (BY MR. FOMBY)  Right in the very -- right
21  underneath the large light pole.
22  A.  Okay.
23  Q.  And just to the left of the rearview mirror
24  there is a straight dark object showing in the picture.
25  A.  Like a shadow?

156

1   Q.  Shadow of some sort, some object or whatever
2   in that particular point.
3   A.  Okay.
4   Q.  Okay.  At this point, which direction are you
5   facing?
6   A.  That direction is west.
7   Q.  Okay.  This is Exhibit 11.  Going back to 9
8   and 10, looking at them in sequence, at 9 the door has
9   not moved, or it's not visibly moved, and 10, the
10  driver's side door has not visibly moved, but by 11, the
11  door appears to be pulling closed.  Is that accurate?
12  A.  Closing on me, yes.
13  Q.  And then we get to 12.  And at this point, we
14  actually start seeing some significant separation
15  between the vehicles.  The blinkers are still on, and
16  the door has now kind of swung closed a little bit,
17  correct?
18  A.  In -- in --
19      THE REPORTER:  I'm sorry?
20  A.  Yes, in the -- in the car doorsill.
21  Q.  (BY MR. FOMBY)  Okay.  And you're standing at
22  this point on the sill of the car?
23  A.  I believe so.
24  Q.  And I'm sorry that these are duplicates -- oh,
25  I mean not duplicates but they're short timeframes, but

157

1   I just wanted to be fair to not, as you said, leap ahead
2   too fast because seconds are important.
3       This is Exhibit 13.  And again, there's an
4   increasing separation between the cars.  The blinker is
5   off.  And I'm going to stop talking about the blinker
6   because it blinks on and off, on and off all the way
7   through here.  Okay?
8       MS. BAKER:  13 is a dup of 12, is it not?
9   It's 14:45:50.
10      MR. FOMBY:  They are fractions of a
11  second apart.
12      MR. ADAM FOMBY:  Yeah, so you can't
13  always tell based on the seconds if they're the same.
14  Q.  (BY MR. FOMBY)  I think the key to looking at
15  the two of these, it to look at the relative positions
16  of.  This pickup truck from this point moves to
17  this position, this pickup truck, which has moved to
18  this position, this car, which has moved to this
19  position.  So looking at the vehicle positions gives us
20  a sense of what happened in what order.
21      MS. BAKER:  I'm going to -- I -- I'm
22  assuming that was intended to be helpful.  Anyway,
23  please continue.
24  Q.  (BY MR. FOMBY)  Since all this happened in --
25  in literally mere seconds, I'm trying to carve this down

**Southwest Reporting & Video Service, Inc.      Registration #189**
713-650-1800                                    swreptproduction@swreporting.com

158

1 into the tiniest pieces. Okay. We're looking at 14
2 now.
3         MR. FOMBY: Did I hand out 14 to you yet?
4         MS. BAKER: Yes.
5         MR. FOMBY: Okay.
6     Q. (BY MR. FOMBY) And then 15. At 14, you -- it
7 appears that your arm is inside the -- your right arm is
8 inside the vehicle, or at least partially, right?
9     A. Correct.
10    Q. By 15 it appears --
11        MS. BAKER: You can --
12        THE WITNESS: Yes.
13    Q. (BY MR. FOMBY) -- that's changing. By 16 we
14 see that your arm has come completely out of the
15 vehicle?
16    A. That's correct.
17    Q. Again, we're now -- you know, we were looking
18 at 50, we've gone through 1, 2, 3 shots and it's still
19 51 seconds. So these are portions of a second.
20        This is 17. And it appears at this point that
21 your arm is moving forward?
22    A. Correct.
23    Q. And by 18, your arm is now back into the car?
24    A. That's correct.
25    Q. So it is impossible at this point because we

159

1 don't have sound attached to these to know at what point
2 you fired, but you did -- we do know that you did not
3 fire your weapon until your arm was back in the car; is
4 that correct?
5     A. That's correct.
6     Q. Okay. Okay. Here's 19. And somewhere in
7 this timeframe, because we'll get to 20, the second shot
8 was fired?
9         MS. BAKER: I assume that was a question?
10    Q. (BY MR. FOMBY) Because we get to the next
11 slide, and we are -- when you see a little further down
12 the road, 21, that the car by this time has come to a
13 stop. So the time from Exhibit 8 where the brake lights
14 are on and you are moving into the vehicle until the
15 time of the first shot is roughly two seconds or so, and
16 then roughly one second or less for the second shot, and
17 then we have you in position by Exhibit 22 holding a gun
18 on Ashtian inside the car.
19        MS. BAKER: And again, are you asking him
20 if he agrees with this or are you representing to him?
21        MR. FOMBY: Yes, I'm asking if he agrees
22 with it.
23    Q. (BY MR. FOMBY) But -- and you note that
24 the -- in this one the brake light is on; is that
25 correct?

160

1         MS. BAKER: And when you say this one,
2 are you talking about Exhibit 22?
3         MR. FOMBY: Exhibit 22.
4         MS. BAKER: Okay. We just need to have
5 the record clear.
6     A. Well, from the picture that you provided,
7 Exhibit 20, you said that that was where the -- at that
8 point the second shot was -- was made and then the next
9 picture -- picture is about eight seconds later when the
10 vehicle is stopped. And then 28 seconds after that is
11 Exhibit 22 -- or actually, I'm sorry, a minute and 28
12 seconds later is when I'm waiting for -- for my backup.
13    Q. (BY MR. FOMBY) Right. And I -- I skipped
14 forward to there because I had intermediate shots of you
15 slowly getting out of the car which is unimportant. The
16 point that I was trying to demonstrate is the timeframe,
17 and you can see where the car wound up and where you are
18 at 14:45:52, and Ashtian, the car moved only slightly
19 before Ashtian brought it to a halt. So somewhere in
20 there around the 52 or 53 mark is when the second shot
21 was fired?
22        MS. BAKER: So do you -- can you answer
23 that? I believe that's a question.
24    A. I -- not -- well, not from just looking at the
25 picture.

161

1         MS. BAKER: Okay.
2     Q. (BY MR. FOMBY) Okay. As I said, this doesn't
3 have sound attached to it, but I'm just saying these --
4 these -- this is the timeframe we're talking about,
5 so --
6         MS. BAKER: To be honest with you,
7 Mr. Fomby, this sounds more like jury argument or
8 questions to be directed to an expert. I think it's
9 difficult for the deputy to be able to agree or disagree
10 with you.
11        MR. FOMBY: And he has -- he can say that
12 he can't tell from this.
13        MS. BAKER: Well, it's --
14        MR. FOMBY: That's -- and that's all
15 right.
16        MS. BAKER: It's also very difficult
17 because you don't appear to be asking -- you appear to
18 be explaining and demonstrating, which is well and good,
19 but here we're for a deposition, so, you know, we're not
20 in a jury trial right now at this moment so we need to
21 have a question and answer. Now I've asked him some of
22 what I perceive to be your questions. So if they're not
23 right, you're the one that needs to cover it.
24    Q. (BY MR. FOMBY) So in between -- and we can go
25 back and pull up the video and show you where the shots

41 (Pages 158 to 161)

Roberto Felix

162

1 fired. Would you like to do that? Let's do that.
2 Again, we're talking fractions of a second. So what I
3 will need to do here is spend more time listening and
4 watching the time, okay?
5        (Video playing.)
6        (Video stops.)
7    Q. (BY MR. FOMBY) So in there between 51, we'll
8 go back and watch that again.
9        (Video playing.)
10       (Video stops.)
11   Q. (BY MR. FOMBY) So in there between 51, we'll
12 go back and watch that again. Bang, bang. Do you need
13 to watch that again just to catch when that --
14       (Video playing.)
15       (Video stops.)
16   **A. I believe it was 52 and 53.**
17   Q. (BY MR. FOMBY) Okay. And as I said, and --
18 and correct me if I was wrong -- I told you that it's
19 very difficult to know exactly by looking at the videos
20 here, but somewhere around 52 and 53 is what you heard?
21   **A. Correct.**
22   Q. Okay. So looking back at the videos, at 49 is
23 when the car -- the trunk of the car starts rising and
24 the door starts closing and that's -- and at somewhere
25 around 52, three seconds or so later is when the first

163

1 shot was fired. Is that what you saw?
2   **A. 49 to 52.**
3   Q. Yes.
4   **A. Yeah, about three seconds.**
5   Q. And then another second and then the second
6 shot was fired?
7   **A. Correct.**
8   Q. Here is Exhibit 23. And this is at 47:31,
9 which is about a minute and a half after the car -- a
10 minute and a half after the car came to a stop is when
11 the first police officer, your first colleague shows up
12 on the scene; is that correct?
13   **A. Yes.**
14   Q. And then in Exhibit 24, somewhere around 12
15 seconds later, someone else shows up. And by
16 Exhibit 25, this would be another 45 seconds.
17   **A. 24 actually shows the fourth deputy arriving,**
18 **not the third.**
19   Q. Okay. So by the next exhibit, 25, we have
20 quite a number of deputies on the scene.
21       MS. BAKER: Object to relevance.
22   Q. (BY MR. FOMBY) So what I want you to look --
23 check and look down at the driver's side door, look down
24 on the ground there. Do you see Ashtian's body laid out
25 and CPR being performed at that point?

164

1   **A. No.**
2   Q. Okay. Now we can play the video, but 26 is
3 now another minute 20 -- minute and 10 seconds, and
4 still Ashtian is not receiving any kind of CPR at this
5 point, correct? You -- you could look at the --
6   **A. I mean there -- yeah, there's no one there but**
7 **I'm not aware of his medical state at that time, whether**
8 **he was still breathing or not. So, I mean, CPR wouldn't**
9 **have been appropriate at that time.**
10   Q. Right, but you -- by -- at this point he still
11 had not been removed from -- from his car, correct?
12   **A. That's correct. Waiting for Houston Fire**
13 **Department and ambulance to make the scene to provide**
14 **adequate medical attention.**
15   Q. Okay. And 27, this is some slightly less than
16 six, five and a half minutes later or thereabouts is, at
17 this point you see CPR being performed and the EMR --
18 EMS techs showing up on the scene; is that correct?
19   **A. Yeah, I believe CPR was --**
20   Q. Okay.
21   **A. -- started prior to that time.**
22   Q. And to your point, to be fair, their records
23 show that by the time they arrived, Ashtian had been
24 declared DOA. So --
25   **A. Who -- who -- I'm sorry?**

165

1   Q. EMS records show that he had been declared DOA
2 which is --
3        MS. BAKER: So the Constable's Office
4 doesn't make declarations like that. Are you telling
5 him that someone at EMS --
6   Q. (BY MR. FOMBY) Someone -- someone at the
7 scene before EMS showed up declared him DOA?
8   **A. No.**
9   Q. They said he's not responsive, not breathing,
10 no pulse?
11   **A. The only person that can declare is -- is a**
12 **medical attendant.**
13       MS. BAKER: Yeah.
14   **A. HFD is the only one that can do that, so... We**
15 **can give a status of his -- what we perceive to be his**
16 **medical condition but we can't declare someone --**
17   Q. Right.
18   **A. -- DOA.**
19   Q. And in fact, the only people who can really
20 declare him DOA are actual doctors or justice of the
21 peace?
22       MS. BAKER: I'm going to object to that
23 as misstating the statutory authorities.
24   Q. (BY MR. FOMBY) So Deputy, going back to --
25       MS. BAKER: Oh, yes, if you're at a

42 (Pages 162 to 165)

166

1    stopping point, could we take a quick restroom break,
2    bathroom break?
3            MR. FOMBY: No problem.
4            THE WITNESS: Restroom break.
5            MR. FOMBY: No problem.
6            THE VIDEOGRAPHER: The time is
7    approximately 2:56 p.m., we're off the record.
8            (Off the record.)
9            THE VIDEOGRAPHER: The time is
10   approximately 3:01 p.m., we're on the record.
11       Q. (BY MR. FOMBY) Deputy, I want to go back and
12   revisit these exhibits, particularly Exhibits 7 through
13   12. These particular exhibits are screenshots of the
14   moment when the car -- Ashtian stepped on the brakes of
15   the car, the car is on and everything starts to happen.
16           In your statement that you gave you said that
17   he turned on the vehicle and you still have your
18   statement, you said that I drew my weapon, told him
19   something like don't do it as he started to put the car
20   in drive.
21           MR. ADAM FOMBY: Wait for a second so he
22   can --
23           MR. FOMBY: Yeah.
24       A. (Witness examines document.)
25       Q. (BY MR. FOMBY) Then you say that: At that

167

1    point, my body was partially in the vehicle as he
2    accelerated away. As the vehicle sped away I felt the
3    driver door closing on me, started to feel I was being
4    pinned and going to be drug. I quickly jumped onto the
5    doorsill and held on so I wouldn't get run over.
6            But in these pictures we see you stepping onto
7    the car with the brake on and the car not moving. So
8    the car is not speeding away and accelerating away when
9    you jumped on the car, the door is still wide open and
10   your feet are off the ground?
11           MS. BAKER: I believe that is a question,
12   and I believe he's asking you if you agree with that.
13       A. I can't agree from the picture. I mean I know
14   my feet are closer to the vehicle, but I'm not sure from
15   the picture if my feet were actually on the doorsill at
16   that time.
17           MS. BAKER: And when you say that,
18   Deputy, just for clarity of the record, what particular
19   photograph are you looking at?
20           THE WITNESS: I'm looking at Exhibit 10,
21   10 and 11, I believe.
22       Q. (BY MR. FOMBY) I want you to look at
23   Exhibit 8, 9, 10 and 11 and 12. And look at your head
24   position. As you go through the sequence of those
25   exhibits, your head and shoulders actually appear --

168

1    your head appears to rise above the roof line, and your
2    shoulders appear to rise above the door line. At the
3    same time your feet go from a standing position in
4    Exhibit 7, to a position that's moved very rapidly in a
5    fraction of a second in the direction of the car.
6            Are you still comfortable with your statement
7    that the vehicle was speeding away as -- oh, and the
8    door by 7, 8, 9 and 10 is still wide open, has not
9    changed, slowly starting to close at 11 and only starts
10   to close at 12. Are you still comfortable with your
11   statement under oath that it was only when the vehicle
12   was speeding away and you felt the driver door closing
13   on you that you jumped on the door sills and held on so
14   you wouldn't get run over?
15           MS. BAKER: I'm going to object to that
16   question as extremely argumentative. Also as
17   multifarious and to the extent there is a question in
18   that line of dialogue or monologue, actually, do you
19   agree with Mr. Fomby's assessment?
20       A. At the time of the -- of my statement, that
21   was the best recollection of the incident without having
22   looked at the -- at the video.
23       Q. (BY MR. FOMBY) Now I can understand that,
24   Deputy, but when you made your oath, at any point in
25   your statements did you state that you are uncertain of

169

1    the details but you thought that might have been what
2    happened?
3        A. I don't believe that's in the statement. It's
4    the --
5        Q. And so when we look at photograph Exhibit 10,
6    and the car is still relatively -- positioned relatively
7    the same position to your squad car, the doors open,
8    your feet are nowhere to be seen, your head is now above
9    the roof line. Are you stating that at that point you
10   are not standing on top of the doorsill?
11       A. Well, from Exhibit 9 and 10, my head is
12   relatively positioned in the same manner, just my feet
13   are either out of the camera view. In Exhibit 11, at
14   that point I can say that my head is elevated prior to
15   Exhibit 9 and 10.
16       Q. So you would say that by 11, your feet are
17   firmly positioned on the sill of the door?
18       A. I can say that at least one of them might have
19   been in order for me to be elevated slightly.
20       Q. So in fact, this happened as the car was
21   beginning to move and not as it sped away?
22       A. From -- from the video, watching the video and
23   looking at the picture, as the vehicle was moving is
24   when -- at one point in one and at I guess by Exhibit 12
25   both feet were on at that time.

43 (Pages 166 to 169)

170

1    Q.  Deputy, did you place both of your feet on the
2  doorsill after the car started moving or before it
3  started moving?
4    **A.  I would say as it was moving, as it started to**
5  **move.**
6    Q.  Okay.  Now, in your statement you make a
7  statement and on the video you make a statement that
8  the -- that you detected a strong odor of marijuana
9  coming from Ashtian Barnes' vehicle; is that correct?
10    **A.  That's correct.**
11    Q.  Isn't, in fact, Deputy, that merely a
12  pretextual statement to allow you to illegally search
13  his vehicle?
14    MS. BAKER:  Objection, very
15  argumentative, assumes facts totally not in evidence.
16    **A.  That's incorrect.**
17    Q.  (BY MR. FOMBY)  You realize, Deputy, that no
18  other -- of the 26 other officers on the scene, not a
19  single one put in a statement that he detected the odor
20  of marijuana on -- in the vehicle?
21    MS. BAKER:  Objection, assumes facts not
22  in evidence.
23    **A.  I've never seen any statements or heard any**
24  **other statements from any other person.**
25    Q.  (BY MR. FOMBY)  Are you aware that when the

171

1  car was searched, no marijuana of any sort was found in
2  the car?
3    **A.  I'm not sure what was found in the car**
4  **completely as far as marijuana, but I guess it's my**
5  **understanding that there wasn't any marijuana found in**
6  **the vehicle.**
7    Q.  No drugs of any kind were found in the
8  vehicle?
9    **A.  I -- I don't know.**
10    Q.  Okay.  When you say you smelled marijuana, was
11  it fresh marijuana, dried marijuana, burnt marijuana or
12  edible marijuana that you smelled?
13    **A.  It was a odor of marijuana coming from the**
14  **vehicle.**
15    Q.  Is there --
16    **A.  So --**
17    Q.  -- a difference in odor between those four
18  types of apps?
19    **A.  Yeah, there could be, yes.**
20    Q.  And you -- you don't recall what particular --
21  which -- which particular odor you detected?
22    **A.  It was -- it was an odor of just marijuana**
23  **coming from the vehicle.  I can tell you that it wasn't**
24  **freshly burnt marijuana, but there was an odor of**
25  **marijuana coming from the vehicle.**

172

1    Q.  So Deputy, in your experience as a peace
2  officer, what is -- what is a necessary condition -- or
3  you say you smelled marijuana.  How can you spell --
4  smell marijuana that is not in the vehicle?
5    **A.  It can be many reasons.  It can be, you know,**
6  **residue from previous use, it could be, you know,**
7  **lingering odor, it was in the vehicle at one time or --**
8  **or early in the day.  When I stopped the vehicle, he**
9  **could have thrown it out.  But there was an odor of**
10  **marijuana in the vehicle.**
11    Q.  Did you detect anything being thrown from the
12  driver's side of the vehicle while -- during the stop?
13    **A.  Not that it was significant motion that --**
14  **that he had done.**
15    Q.  I want to go back to the beginning of this.
16  Well, I'm going to start with the end of it.  The end of
17  this, there was -- there were no drugs found in his car?
18    MS. BAKER:  Are you asking him to assume
19  that?
20    MR. FOMBY:  And I'm setting a predicate.
21    Q.  (BY MR. FOMBY)  At the end of this, there --
22  the toll tag violation, even if it was a serious crime,
23  was apparently not his fault.  And yet at the end of
24  this, Ashtian Barnes was killed.  Is there anything
25  looking back on this that you personally would have

173

1  changed, that you personally would have done differently
2  knowing how this all transpired?
3    MS. BAKER:  I'm going to object to that
4  question as extremely argumentative and more a lecturing
5  argument than an actual question, but that being said,
6  please go ahead and answer.
7    THE WITNESS:  Okay.
8    **A.  Anything that I could have changed in the**
9  **entire incident?**
10    Q.  (BY MR. FOMBY)  Any -- any one thing or any
11  several things that you believe that you would today
12  have done differently?
13    MS. BAKER:  That he would have done?
14    **A.  That I would have done?**
15    Q.  (BY MR. FOMBY)  Correct.
16    **A.  Okay.  No.  Everything that was done that day,**
17  **it would probably be the same situation, rapidly**
18  **involving events, you know, the threat to myself of**
19  **serious bodily injury or even death, you know, being,**
20  **you know, Mr. -- Mr. Barnes was driving away with me**
21  **holding onto the vehicle.  I think everything would have**
22  **been the exact same way.**
23    Q.  So as a result of this incident you would say
24  that your -- you have learned -- you would -- your
25  behavior and your patterns and your training have not

174

1   changed?
2       MS. BAKER: I'm going to object to that
3   question as vague. I'm not clear what is meant by your
4   behavior or your patterns. You asked him apparently a
5   very specific question and he answered it, but that
6   being said, for the record, purposes of the record,
7   please go ahead and answer.
8       THE WITNESS: Okay.
9       A.  My sense of awareness is -- I'm looking for --
10  for the same things and anything -- any situation like
11  that is still handled in the same way. If I feel that,
12  you know, there's, you know, a threat to myself or could
13  possibly be a threat, then an individual is going to be
14  asked to step out and that's going to be handled.
15      I can't say I'm going to have the exact same
16  situation happen ever again because no traffic stop is
17  the same. For -- you know, traffic stops are handled in
18  the same manner depending -- or in a manner depending on
19  the situation. So I can't, you know, answer for certain
20  if, you know, anything else would change the way I'm
21  doing it because that's how I'm trained to do it.
22      Q.  (BY MR. FOMBY) Deputy, the toll roads are
23  controlled access roads, are they not?
24      A.  They're controlled access highways, yes.
25      Q.  So that means that there are defined entrances

175

1   and exits to the toll roads; is that correct?
2       A.  That is correct.
3       Q.  And the toll roads have -- are constantly
4   being monitored by video cameras; isn't that true?
5       A.  There is video access to the tollway but not
6   constantly monitored.
7       Q.  An in fact, as we know, there was a video
8   monitoring of your traffic stop from the point that you
9   started the stop until everything ended; is that
10  correct?
11      A.  It was monitored but not recorded from the --
12  from the beginning.
13      Q.  Okay. And that was by the Toll Road
14  Authority?
15      A.  That is correct.
16      Q.  So had you decided to stand where you were
17  standing and let Ashtian drive off, would there have
18  been other mechanisms for apprehending him without
19  running the risk of firing a firearm?
20      A.  We can assume and it could be a yes or no
21  because -- except from my understanding, if let's say I
22  was in a position where I wasn't caught between the door
23  and --
24      THE REPORTER: You weren't what?
25      THE WITNESS: Caught between the door.

176

1       A.  And the vehicle and he would have been able to
2   just flee, he posed a threat to other motorists as well.
3   And my understanding is that they -- they did find a gun
4   in that vehicle and potentially could have used that to
5   shoot at myself or other officers, you know, while
6   trying to pursue and apprehend.
7       Q.  (BY MR. FOMBY) You don't know where that gun
8   came from, do you?
9       A.  I do not.
10      Q.  You don't know that that gun had any
11  association really to do with that -- Ashtian Barnes, do
12  you?
13      A.  Sir?
14      Q.  You don't know whether that gun had an
15  association with Ashtian Barnes, do you?
16      A.  I never saw the gun.
17      Q.  Okay. And at that time you had -- that wasn't
18  on your mind, was it?
19      A.  It's always on our mind when we conduct a
20  traffic stop or make contact with an individual that
21  they could be armed and potentially hurt my -- myself,
22  another deputy or others when their actions are a
23  certain way where they're either trying to elude, evade
24  or -- or conceal something.
25      Q.  So did he try to evade you when you turned on

177

1   your lights?
2       A.  No.
3       Q.  Did he try to evade you when he turned off the
4   engine and put his keys down in -- in the -- next to the
5   gearshift?
6       A.  No, but that was one of the indicators to me
7   that's not normal for a traffic stop that did raise a
8   flag, you know, that he stopped the vehicle.
9       Q.  Turning off the car and putting the key down
10  is a -- is a flag that he is not normal?
11      MS. BAKER: I assume that's a question.
12      Q.  (BY MR. FOMBY) Is that what you're saying?
13      MS. BAKER: And it misstates his
14  testimony.
15      MR. FOMBY: I just asked the question
16  now.
17      A.  Can you repeat the question?
18      Q.  (BY MR. FOMBY) Turning off the car and
19  putting the key down next to the gearshift is a -- to
20  you sends a red flag that he was up to something
21  possibly nefarious?
22      A.  With everything that had occurred, there were
23  something that wasn't right about that -- that incident,
24  yes.
25      Q.  Okay. You said that you would not change

Southwest Reporting & Video Service, Inc.     Registration #189
713-650-1800                                   sweptproduction@swreporting.com

178

1  anything because being trapped between the door and the
2  car put you in a dangerous situation, but had you stood
3  where you stood in Exhibit 7, where the door was away
4  from you, where you were approximately a foot or so away
5  from the car itself, had Ashtian moved forward at that
6  point, are you saying that that car -- that door would
7  have swung closed and trapped you at that spot?
8      **A. It could have hit me on the side and got me**
9  **off balance.**
10      Q. As the car moves forward, and we're seeing it
11 as you jump on, the car door still has not closed on you
12 by the time we get to Exhibit 10, right? And in
13 Exhibit 11, it still hasn't been closed on you. There's
14 still a lot of space.
15     So you're saying that if you had simply stood
16 your ground and let him drive away, if it had happened,
17 would that -- are you saying that the policies and your
18 training say that you are not allowed to do that, you're
19 not supposed to do that, that you're supposed to stop
20 him under those circumstances?
21     **A. My attempt was to stopping -- stop him from**
22 **fleeing, from causing injury to myself or others and**
23 **that was my actions on that day.**
24     Q. Okay. And so your training and experience
25 taught you that the way to deal with a fleeing suspect

179

1  for which you have no hard evidence that he's a
2  criminal, much less a violent criminal, is to pull your
3  service weapon, shove it in his face and jump on the
4  sill of his car. Is that what you're saying your
5  training tells you?
6      MS. BAKER: Objection, argumentative, and
7  assumes facts not in evidence.
8      **A. I had nothing on Mr. Barnes, not even a name,**
9  **so I didn't know who he was, what he was capable of or**
10 **what he could -- could do. So for him trying to flee**
11 **in -- in this situation definitely threw up a flag that**
12 **there was something that, you know, obviously he's gonna**
13 **run from or for and that needed to be stopped.**
14     **MR. FOMBY: Pass the witness.**
15     MS. BAKER: I have only just a couple
16 questions, Deputy Felix.
17     EXAMINATION
18 BY MS. BAKER:
19     Q. Can you tell us what TCOLE stands for?
20     **A. TCOLE is the Texas Commission Law**
21 **Enforcement -- of Law Enforcement Education.**
22     Q. And what is TCOLE's role?
23     **A. TCOLE is the authority to license officers and**
24 **keeps track of training mandates for the State of Texas.**
25     Q. And you've talked today about the DS -- with

180

1  Mr. Fomby about the de-escalation course that you took
2  in 19 -- in 2018; is that correct?
3      **A. That's correct.**
4      Q. Is that course mandated by TCOLE?
5      **A. It is now.**
6      Q. And when did it become mandated by TCOLE?
7      **A. I believe it became mandated in 2017 or 2018.**
8      Q. And what does it mean to be mandated by TCOLE?
9      **A. That means it's required to -- to -- to be**
10 **taken.**
11     Q. Was there any type of a mandate for a
12 de-escalation, specific de-escalation course before
13 TCOLE mandated it?
14     **A. No.**
15     Q. Any problem with having a de-escalation
16 course?
17     **A. No, there was no problem.**
18     Q. Okay.
19     MS. BAKER: I'm going to reserve the rest
20 of my questions until time of trial.
21     THE WITNESS: Okay.
22     MR. FOMBY: Done.
23     THE VIDEOGRAPHER: The time is
24 approximately 3:23 p.m. We're off the record.
25     (Proceedings concluded at 3:23 p.m.)

181

1          CHANGES AND SIGNATURE
2  WITNESS NAME: ROBERTO FELIX   DATE: FEBRUARY 18, 2019
3  PAGE LINE    CHANGE        REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

I, ROBERTO FELIX, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

______________________________
ROBERTO FELIX

THE STATE OF ________)
COUNTY OF ___________)

Before me, ___________________________, on this day personally appeared ROBERTO FELIX, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this ______ day of __________________, 2019.

______________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF __________________
COMMISSION EXPIRES:____________



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

Janice Hughes Barnes, &
Individually and as &
Representative of The Estate &
of Ashtian Barnes, Deceased; &
and Tommy Duane Barnes &
&
Plaintiffs, &
&
vs. & CAUSE NO: 4:18-CV-00725
&
Roberto Felix, Jr., And the &
County of Harris, Texas &
&
Defendants. &

REPORTER'S CERTIFICATION
DEPOSITION OF ROBERTO FELIX
FEBRUARY 18, 2019

I, Aubrea Hobbs, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, ROBERTO FELIX, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness to the best of my ability;

That the deposition transcript was submitted on ____________________ to the witness or to the attorney for the witness for examination, signature and return to me by ____________________;

That the amount of time used by each party at the deposition is as follows:



MR. HOWARD FOMBY: 4 hours, 13 minutes
MS. MARY E. BAKER: 1 minute

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

Mr. Howard Fomby and Mr. Adam W. Fomby, Attorneys for Plaintiffs

Ms. Mary E. Baker, Attorney for Defendants

That $____________ is the deposition officer's charges to the Plaintiffs for preparing the original deposition transcript and any copies of exhibits;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this _______ of __________________, 2019.

Aubrea Hobbs, TX CSR # 7143
Expiration Date: 1/31/21

Exhibit 1



24743@Toll
B    RF
04/28/2016  14:43:32

Exhibit 2



Exhibit 3



Exhibit 4



Exhibit 5



Exhibit 6



Exhibit 7



Exhibit 8



Exhibit 9



Exhibit 10



24743@Toll
W U RF
04/28/2016 14:45:49

Exhibit 11



24743@Toll
W U RF
04/28/2016 14:45:50

Exhibit 12



24743@Toll
W U RF
04/28/2016  14:45:50

Exhibit 13



Exhibit 14



24743@Toll
W U RF
04/28/2016 14:45:51

Exhibit 15



24743@Toll
W  U  RF
04/28/2016  14:45:51

Exhibit 16



24743@Toll
W U RF
04/28/2016 14:45:51

Exhibit 17



Exhibit 18



Exhibit 19



24743@Toll
W U RF
04/28/2016  14:45:52

Exhibit 20



24743@Toll
W U RF
04/28/2016 14:45:52

Exhibit 21



Exhibit 22



24743@Toll
W  U  RF
04/28/2016  14:47:28

Exhibit 23



Exhibit 24



24743@Toll
W U RF
04/28/2016 14:48:43

Exhibit 25



Exhibit 26



Exhibit 27



24743@Toll
RF
04/28/2016  14:56:12

# Texas Commission On Law Enforcement

## Personal Status Report

**Name**
ROBERTO FELIX JR

**TCOLE ID (P ID)**     **STATUS**

| Citizen | Race | Gender | Federal ID | State ID |
|---|---|---|---|---|
| Yes | Hispanic | Male | | |

## Education Information

**Institution**     **Hours**    **Education**

| | Hours | Education |
|---|---|---|
| | 0 | High School |
| | 0 | College Credits |
| **Total Hours** | 0 | |
| **Total Training Hours** | 0 | |

## Service History

| Appointed As | Department | Award | Service Start Date | Service End Date | Service Time |
|---|---|---|---|---|---|
| Peace Officer | HARRIS CO. CONST. PCT. 5 | Peace Officer License | 10/2/2004 | | 14 years, 0 months |
| Jailer | HARRIS CO. SHERIFF'S OFFICE | Jailer License | 7/12/2003 | 10/1/2004 | 1 years, 2 months |

## Total Service Time

| Description | Service Time |
|---|---|
| Jailer | 1 years, 2 months |
| Peace Officer | 14 years, 0 months |
| Total officer time | 14 years, 0 months |



EXHIBIT 30
WIT: Felix
DATE: 2|4|19
Aubrea Hobbs, CSR, RPR

HC/BARNES-1721

## Award Information

| Award | Type | Action | Action Date |
|---|---|---|---|
| Temporary Jailer License | License | | |
| | | Granted | 7/22/2003 |
| | | Expired - Time limit exceeded | 1/11/2007 |
| Jailer License | License | | |
| | | Granted | 12/3/2003 |
| | | Inactive – Out of Compliance | 9/1/2013 |
| Peace Officer License | License | | |
| | | Granted | 9/29/2004 |
| Basic Jailer | Certificate | | |
| | | Certification Issued | 7/12/2004 |
| Basic Peace Officer | Certificate | | |
| | | Certification Issued | 10/3/2005 |
| Intermediate Peace Officer | Certificate | | |
| | | Certification Issued | 7/27/2011 |
| Advanced Peace Officer | Certificate | | |
| | | Certification Issued | 9/15/2013 |

## Academy History

| | Date | Institution | Course Title |
|---|---|---|---|
| Completed | 7/27/2004 | University of Houston - Downtown LEA | Basic Peace Officer |
| Completed | 11/13/2003 | Harris County Sheriff's Academy | Basic County Jail Course |

## Courses Completed

### 09/01/2017 - 08/31/2019 *

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 2029 | Tech. Interviewing & Interrog. | 10/5/2018 | 24 | Houston Police Academy | |
| 3185 | 85th Legislative Session Legal Update | 9/13/2018 | 4 | Texas Municipal Police Association | 85th Session State and Federal Law Update |
| 1849 | De-escalation Tech (SB 1849) | 8/23/2018 | 8 | Combined Law Enforcement Asso. of Texas | De-escalation Tech (SB 1849) |
| 6011 | Alcohol/Drug Abuse Recognition | 8/13/2018 | 4 | Texas Municipal Police Association | |
| 8158 | Body Worn Camera | 7/25/2018 | 4 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | |
| 3854 | Computer Operations | 7/6/2018 | 16 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | |
| 3347 | Less Lethal Electronic Control Device Update | 3/13/2018 | 4 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | |
| 3849 | Post Critical Incident Training | 2/28/2018 | 24 | Bill Blackwood LEMI of Texas | |
| 8815 | Building Search | 2/23/2018 | 8 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | |
| 3404 | Traffic Stops | 2/22/2018 | 8 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | |

HC/BARNES-1722

# Courses Completed

09/01/2017 - 08/31/2019 *

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 2065 | Lidar Radar Training | 2/6/2018 | 2 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | |
| | | **Unit Hours** | 106 | | |

09/01/2015 - 09/30/2017

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 2024 | Narcotics/Dangerous Drug Inv. | 8/7/2017 | 4 | Houston Police Academy | |
| 3102 | Civil Process Exemption by Constable | 6/1/2017 | 0 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | Civil Process |
| 3403 | Selective Traffic Enforcement | 3/29/2017 | 8 | Texas Department of Motor Vehicles | |
| 3347 | Less Lethal Electronic Control Device Update | 3/2/2017 | 4 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | |
| 2049 | Report Writing - general | 2/13/2017 | 4 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | |
| 8813 | Below 100 | 1/12/2017 | 4 | Texas City Police Academy | |
| 3322 | Patrol Rifle | 10/14/2016 | 32 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | |
| 3702 | Field Training Officer | 10/9/2016 | 20 | OSS Academy | |
| 4065 | Canine Encounters (Intermediate/Advance) | 7/26/2016 | 4 | Harris County Sheriff's Academy | Canine Encounter (Intermediate) Canine Encouter (Advance) |
| 3347 | Less Lethal Electronic Control Device Update | 6/14/2016 | 4 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | |
| 2065 | Lidar Radar Training | 5/10/2016 | 2 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | |
| 3104 | Tire Deflation Device Training | 2/10/2016 | 4 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | |
| 3150 | Law Update | 1/7/2016 | 2 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | |
| 3334 | Firearms Electronic Simulator | 12/9/2015 | 2 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | |
| 3847 | Excited Delirium Syndrome | 12/3/2015 | 8 | Harris County Constable Pct. 4 | |
| 3184 | 84th Legislative Session Legal Update | 10/20/2015 | 4 | Hempstead Police Dept. | 84th Session State and Federal Law Update |
| 2071 | Accident Reconstruction | 9/4/2015 | 80 | Harris County Constable Pct. 8 | |
| | | **Unit Hours** | 186 | | |

HC/BARNES-1723

# Courses Completed

## 09/01/2013 - 08/31/2015

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 2070 | Accident Investigations | 8/21/2015 | 40 | Harris County Constable Pct. 8 | |
| 3344 | Less Lethal Electronic Control Device Training | 4/1/2015 | 16 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | |
| 2070 | Accident Investigations | 11/14/2014 | 24 | Harris County Constable Pct. 8 | |
| 2065 | Lidar Radar Training | 11/11/2014 | 2 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | |
| 3843 | CIT-Update | 10/10/2014 | 8 | Texas Municipal Police Association | Crisis Intervention Training (Intermediate) issued prior to 4-1-18 Peace Officer Intermediate Options Peace Officer Intermediate Options 2009-09 |
| 3881 | Emergency Management (General Number) | 7/31/2014 | 8 | Harris County Constable Pct. 8 | |
| 3100 | LAW | 3/31/2014 | 1 | Harris County Sheriff's Academy | |
| 3845 | CPR | 3/24/2014 | 4 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | |
| 1994 | Learn Our TCOLE Site | 3/1/2014 | 1 | TCOLE Online | |
| 2017 | Crime Scene Investigation | 2/20/2014 | 4 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | |
| 3183 | 83rd Legislative Session Legal Update | 2/20/2014 | 4 | Houston Community College Police Academy | 83rd Session State and Federal Law Update |
| 3313 | ALERRT Terrorism Response Tactics Active Shooter L | 9/22/2013 | 16 | Hays Co. Sheriff's Academy | |
| | | **Unit Hours** | **128** | | |

## 09/01/2011 - 08/31/2013

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 2049 | Report Writing - general | 8/6/2013 | 6 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | |
| 2053 | Baton (All) | 6/7/2013 | 8 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | |
| 2055 | Firearms | 2/11/2013 | 4 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | |
| 2046 | Driving | 1/20/2013 | 20 | Houston Community College Police Academy | |
| 3270 | Human Trafficking | 9/25/2012 | 4 | Houston Community College Police Academy | Human Trafficking |
| 2054 | Radar | 8/16/2012 | 2 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | |
| 66704 | FEMA NIMS Comm& Info Management (FEMA IS-704) | 7/16/2012 | 2 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | |

HC/BARNES-1724

# Courses Completed

## 09/01/2011 - 08/31/2013

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 3402 | DWI/DUI Detection and Enforcement | 6/15/2012 | 1 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | |
| 2178 | S.F.S.T. Practitioner Update | 4/30/2012 | 8 | Houston Community College Police Academy | |
| 3182 | 82nd Legislative Session Legal Update | 1/30/2012 | 4 | Houston Community College Police Academy | 82nd Session State and Federal Law Update |
| 3151 | Health and Safety Code | 9/19/2011 | 1 | Harris County Sheriff's Academy | |
| 3100 | LAW | 9/19/2011 | 1 | Harris County Sheriff's Academy | |
| 3102 | Civil Process Exemption by Constable | 9/1/2011 | 0 | TCLEOSE MITIGATING CIR. | Civil Process |
| | | **Unit Hours** | 61 | | |

## 09/01/2009 - 08/31/2011

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 3400 | Traffic | 8/12/2011 | 2 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | |
| 3270 | Human Trafficking | 7/24/2011 | 4 | Classen Buck Seminars, Inc. | Human Trafficking |
| 2106 | Crime Scene Investigation (Intermediate) | 6/28/2011 | 32 | Classen Buck Seminars, Inc. | Crime Scene Investigation (Intermediate) |
| 2107 | Use of Force (Intermediate) | 6/14/2011 | 13 | Classen Buck Seminars, Inc. | Use of Force (Intermediate) |
| 2105 | Child Abuse Prevention and Investigation (Interm.) | 4/2/2011 | 24 | Classen Buck Seminars, Inc. | Child Abuse Prevention and Investigation (Intermediate) |
| 3800 | Technical/Specialized | 1/24/2011 | 1 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | |
| 2054 | Radar | 10/7/2010 | 8 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | |
| 2095 | Use of Force (Non-Intermediate Core Course) | 8/15/2010 | 1 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | |
| 2046 | Driving | 8/11/2010 | 16 | Houston Community College Police Academy | |
| 3264 | Special Investigator Certification Course | 4/29/2010 | 24 | Texas Municipal Police Association | Special Investigative Topics (Intermediate) |
| 2095 | Use of Force (Non-Intermediate Core Course) | 3/19/2010 | 1 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | |
| 3181 | 81st Legislative Session Legal Update | 12/10/2009 | 8 | Houston Community College Police Academy | State and Federal Law Update |
| 3400 | Traffic | 12/6/2009 | 3 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | |
| 3358 | Police Bicycle | 10/9/2009 | 40 | Houston Police Academy | |
| 2108 | Arrest, Search, and Seizure (Intermediate) | 10/4/2009 | 15 | Classen Buck Seminars, Inc. | Arrest, Search, and Seizure (Intermediate) |
| | | **Unit Hours** | 192 | | |

**HC/BARNES-1725**

# Courses Completed

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 3305 | Active Shooter Response | 8/4/2009 | 16 | Houston Community College Police Academy | |
| 2095 | Use of Force (Non-Intermediate Core Course) | 5/29/2009 | 8 | Houston Community College Police Academy | |
| 3256 | Racial Profiling | 2/9/2009 | 7 | TCOLE Online | Racial Profiling (Intermediate) |
| 3255 | Asset Forfeiture | 2/3/2009 | 4 | TCOLE Online | Asset Forfeiture (Intermediate) |
| 3277 | Identity Theft | 1/28/2009 | 4 | TCOLE Online | Identity Theft (Intermediate) |
| 2110 | Spanish for Law Enforcement Distance (Intermed.) | 6/17/2008 | 32 | Classen Buck Seminars, Inc. | Spanish for Law Enforcement (Intermediate) Spanish for Telecommunicators (Intermediate) |
| 3939 | Cultural Diversity | 3/21/2008 | 4 | University of Houston - Downtown LEA | Cultural Diversity (Intermediate) |
| 3150 | Law Update | 3/21/2008 | 4 | University of Houston - Downtown LEA | |
| 3232 | Special Investigative Topics | 3/20/2008 | 8 | University of Houston - Downtown LEA | Special Investigative Topics (Intermediate) |
| 3800 | Technical/Specialized | 9/13/2007 | 4 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | |
| | | Unit Hours | 91 | | |

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 3200 | Investigations | 2/7/2007 | 8 | Houston Community College Police Academy | |
| 3841 | Crisis Intervention Training | 2/6/2007 | 16 | Houston Community College Police Academy | Crisis Intervention Training (AdvPOC) issued prior to 4-1-18 Crisis Intervention Training (Intermediate) issued prior to 4-1-18 Peace Officer Intermediate Options Peace Officer Intermediate Options 1987-01 Peace Officer Intermediate Options 2005-01 Peace Officer Intermediate Options 2006-01 Peace Officer Intermediate Options 2009-09 |
| 3800 | Technical/Specialized | 12/12/2006 | 8 | Harris County Sheriff's Academy | |
| 2108 | Arrest, Search, and Seizure (Intermediate) | 4/12/2006 | 16 | Houston Community College Police Academy | Arrest, Search, and Seizure (Intermediate) |

HC/BARNES-1726

# Courses Completed

## 09/01/2005 - 08/31/2007

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 2067 | S.F.S.T. Practitioner | 11/17/2005 | 24 | Houston Community College Police Academy | |
| 3102 | Civil Process Exemption by Constable | 9/1/2005 | 0 | TCLEOSE MITIGATING CIR. | Civil Process |
| | | **Unit Hours** | 72 | | |

## 09/01/2003 - 08/31/2005

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 3200 | Investigations | 6/23/2005 | 8 | Houston Community College Police Academy | |
| 3841 | Crisis Intervention Training | 6/22/2005 | 8 | Houston Community College Police Academy | Crisis Intervention Training (AdvPOC) issued prior to 4-1-18<br>Crisis Intervention Training (Intermediate) issued prior to 4-1-18<br>Peace Officer Intermediate Options<br>Peace Officer Intermediate Options 1987-01<br>Peace Officer Intermediate Options 2005-01<br>Peace Officer Intermediate Options 2006-01<br>Peace Officer Intermediate Options 2009-09 |
| 3102 | Civil Process Exemption by Constable | 6/16/2005 | 0 | TCLEOSE MITIGATING CIR. | Civil Process |
| 55021 | Computer Crimes | 2/15/2005 | 8 | Houston Community College Police Academy | |
| 3807 | TCIC/NCIC for Less than Full Access Operators | 12/8/2004 | 8 | Texas Department of Public Safety LEA | |
| 3722 | Peace Officer Field Training | 11/13/2004 | 240 | HARRIS CO. CONST. PCT. 5 (Training Rosters) | Peace Officer Field Training |
| 3800 | Technical/Specialized | 10/7/2004 | 4 | Harris County Sheriff's Academy | |
| 1000 | Basic Peace Officer | 7/27/2004 | 630 | University of Houston - Downtown LEA | Cultural Diversity (Mandate)<br>Special Investigative Topic (Mandate) |
| 3300 | Patrol/Tactical | 7/24/2004 | 8 | University of Houston - Downtown LEA | |
| 3300 | Patrol/Tactical | 7/10/2004 | 4 | University of Houston - Downtown LEA | |
| 3500 | Jail | 11/14/2003 | 8 | Harris County Sheriff's Academy | |

**HC/BARNES-1727**

# Courses Completed

**09/01/2003 - 08/31/2005**

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 1007 | Basic County Jail Course | 11/13/2003 | 106 | Harris County Sheriff's Academy | Cultural Diversity (Intermediate) |
| | | **Unit Hours** | 1032 | | |

**09/01/2001 - 08/31/2003**

| Course No. | Course Title | Course Date | Course Hours | Institution | Training Mandates |
|---|---|---|---|---|---|
| 1999 | Personnel Orientation by Dept. Basic Proficiency | 3/10/2003 | 0 | OTHER TRAINING | Personnel Orientation |
| | | **Unit Hours** | 0 | | |
| | | **Total Hours** | 1868 | | |

## Total Hours

| | |
|---|---|
| **TotalTraining Hours From Education** | 0 |
| **Total Course Hours** | 1868 |
| **Total Hours** | 1868 |

*Courses submitted between 09/01/2017 and 09/30/2017 will be credited to the 2015-2017 and 2017-2019 training unit, but will only count once toward total training hours.

HC/BARNES-1728

```
          961000 x118J'seweg
 Message From Terminal/Unit:  STER    Operator:  GATE
Date/Time Sent:  02-MAY-2016 15:15:38
 A3X1.HPD#3371.IUR0097.


67205731
REGX.TXMVDW000.A3X1.
TXT
LIC CBN6300 MAY/2016 OLD # CBN6300 MAY/2015 EWT  2900 GWT  .2900
PASSENGER-TRUCK PLT, STKR          REG CLASS 02  $ 78.50 HARRIS CNTY
TITLE 10101541602151551 ISSUED 12/06/2013 ODOMETER 7   REG DT 06/09/2015
2013,TOYT,COR,4D,5YFBU4EE7DP150577,PASS,COLOR: SIL, PRICE    $ 0.00
PREV OWN  FRED HAAS TOYOTA COUNTRY,HOUSTON,TX
OWNER     THE MINT LEASING INC,ID#=N/A,,
          323 NORTH LOOP W,,HOUSTON,TX,77008
VEHL LOC  323 NORTH LOOP W,,HOUSTON,TX,77008
RNWL RCP  ON TIME CAR RENTAL,25715 ABBOTGLEN LN,,KATY,TX,77494
LIEN      11/25/2013,RAVEN ASSET-BASED OPPORTUNITY,FUND I LP,110 GREENE STREE
          T SUITE 1102,,NEW YORK,NY,10012
PLATE AGE:  2  LAST ACTIVITY 06/20/2015 RENEW  OFC: 101
REMARKS ACTUAL MILEAGE.DATE OF ASSIGNMENT:2013/04/18.PAPER TITLE.
MRI: 67205731 IN: MVDWS 112113 AT 02MAY2016 15:15:38
OUT: A3X1 30419 AT 02MAY2016 15:15:38
```



EXHIBIT 31
WIT: Petty
DATE: 2/18/15
Aubrea Hobbs, CSR, RPR

Barnes,Felix 000100

# HOUSTON POLICE DEPARTMENT

## Homicide Division

## WITNESS STATEMENT

Incident Number: 54036616

EXHIBIT 32
WIT: Fel. Y
DATE: 8-16-19
Aubrea Hobbs, CSR, RPR

County of Harris                    State of Texas

Date: 4/28/2016                    Time: 7:10 PM

Before me, the undersigned authority, this day, personally appeared Roberto Felix, a DEPUTY/H C CONSTABLE believed by me to be a credible person, who after being sworn upon his oath, did depose and say:

My name is Roberto Felix. My payroll number is 906611 and I do not have a badge number. I am a DEPUTY/H C CONSTABLE and I am assigned to the Harris County Constables Pct 5 Toll Road Division on the Days shift. My office telephone number is 281-492-3600. My duty weapon is a Glock/ Mod 22C/ 40 cal, serial number HKD796. My duty weapon did discharge.

I, Deputy R .Felix Unit 85T14, while on patrol on 4/28/16 heard a call for a prohibited vehicle that HCTRA dispatched as traveling southbound from South Sam Plaza. I advised dispatch to send the call and began looking for the vehicle. I received the license plate for the vehicle a second time and checked it to obtain the color of the vehicle as silver. I continued southbound looking for the vehicle and was able to find it. I confirm the license plate with dispatch and advised them of my location of stopping the vehicle. I approached the suspect's vehicle and advised the suspect why he was being stopped and requested his driver license and insurance. He stated that it was a rental car and that he did not have his driver license. I smelled a strong odor of marijuana coming from the vehicle and requested a unit to check by as I knew I would have to get the suspect out of vehicle for further investigation. He then grabbed a handful of papers and started to go through them but only flipping through them and not actually looking at them. He then reached over towards the passenger floor board towards a red plastic cup that had what appeared to have trash in it. I told him not to reach over in that area and he then went back to look through the papers. He then reached over and turned off the ignition and placed his keys in the gear shift area. I asked him if he had anything in the vehicle I should know about because I smelled marijuana. He stated that he did not and said that his driver license was in the trunk and I could get it and search if I wanted to. I told him to go ahead and open the trunk as if I was going to look for it. I opened the driver door and told the suspect to step out. As I did so he grabbed his keys and turned on the vehicle. I drew my weapon and told him something like don't do it, as he started to put the car in drive. At the same time I was trying to keep him from doing so my body

I have read this portion of this, my statement, and find it to be true and correct to the best of my knowledge as typed by Roberto Felix

Signature

Notary Public



JASON ROBLES
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP. 08/04/2018

was partially in the vehicle as he accelerated away. As the vehicle sped away I felt the driver door closing on me and starting to feel that I was being pinned and going to be drug. I quickly jumped onto the door seal and held on so I wouldn't get run over. My left arm and upper torso was out of the vehicle with trying to keep a grip on the windshield fearing I would be thrown off. I was unable to see anything inside the vehicle but I could feel my right hand that was holding on to my duty weapon being moved and pressure on my gun. I believe I yelled for him to stop and at that point fearing that I would either get thrown from the vehicle or crushed by the retaining wall I fired my weapon once and it had no effect. The vehicle then sped up and fearing that the suspect could kill me by him taking my weapon or crushing me I fired a second time. The vehicle then slowed down almost to a stop and I jumped off and held the suspect at gun point. I advised dispatch that shots were fired and for them to send HFD. I held him at gun point and a secondary unit arrived to assist. We both maintained him at gun point until a third deputy showed up, which I then holstered my weapon and stood to the side because of leg pain I was feeling. When additional units arrived I went back to my patrol vehicle and sat down.

**I understand that this statement is voluntary and not required by departmental policy. I have made this statement voluntarily and have read this, my statement, and find it to be true and correct to the best of my knowledge as typed by Roberto Felix.**

Signature

Subscribed and sworn to before me, the undersigned authority, this the 28TH day of April, 2016

Notary Public

JASON ROBLES
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP. 08/04/2018

End of statement of Roberto Felix.

I have read this portion of this, my statement, and find it to be true and correct to the best of my knowledge as typed by Roberto Felix

Signature

Notary Public

Barnes.Felix 000077




**540366-16**  Suppl No 0013

# HOUSTON POLICE DEPARTMENT



Houston Police Department
1200 Travis Street
Houston, Texas 77002
713-884-3131 Emergency Dial 9-1-1

Reported Date
**05/02/2016**
Offense Report Title
**Aggravated Assault (Other Peace Officer)**
Officer Name
**ROBERTS, B A**

## Administrative Information

| Agency | | | | Incident # | | Suppl No | Reported Date | Reported Time | |
|---|---|---|---|---|---|---|---|---|---|
| HOUSTON POLICE DEPARTMENT | | | | 540366-16 | | 0013 | 05/02/2016 | 12:51 | |

| Status | | Offense Report Title | |
|---|---|---|---|
| Report Written or to Follow | | Aggravated Assault (Other Peace Officer) | |

| CAD Call Type |
|---|
| 1000 |

| Address | City |
|---|---|
| 6650 W BW 8 S | Houston |

| ZIP Code | Dist/Beat | Station | District | From Date | From Time | |
|---|---|---|---|---|---|---|
| 77072 | HCC5 | OJ | 00 | 04/28/2016 | 14:49 | |

| Officer Name / Employee# | Division |
|---|---|
| ROBERTS, B A / 151143 | North - Evenings - Patrol |

| Report Entered By / Employee# | Division |
|---|---|
| ROBERTS, B A / 151143 | North - Evenings - Patrol |

| Conf Wrk Group | RMS Transfer | Property Trans Stat | Approving Officer | Approval Date |
|---|---|---|---|---|
| HOMICIDE DIVISION | Successful | Successful | 119916 | 05/03/2016 |

| Approval Time |
|---|
| 06:38:13 |

## Modus Operandi

| Gang Act? | Property Targeted |
|---|---|
| No | Drugs - Narcotics |

## Brief Summary

*****Scene Log*****

## Narrative

Introduction:
=============================

I, Officer B. Roberts and currently assigned on a temporary rotation to the Houston Police Departments Homicide Division.

On Thursday, April 28th at 1520 hours, I was at 1200 Travis, on the sixth floor in the homicide division. I was informed by Sgt. Robles of an officer involved shooting at 7500 West Sam Houston Pkwy.

I learned that Deputy Felix 85T14 PR# 906611 was conducting a traffic stop on the southbound lanes of the West Sam Houston Pkwy. The Deputy noticed odor of marijuana in vehicle and ordered the suspect to exit the vehicle. The suspect refused and deputy tried to remove the suspect. The suspect attempted to flee in vehicle and drug Deputy Felix approximately twenty yards. Deputy Felix discharged his firearm once striking the suspect in the chest. HFD respond and pronounced the suspect DAO at 1458 hours.

Sgt. Robles instructed me to compose the scene log to this incident.

Scene Log:
=========================

**Houston Fire Department**

**Medic #75**

Erik Steen #119560
Reise Byrd #152480
Jordan Downing #126407

**Engine #69**



EXHIBIT 33
WIT: Felix
DATE: 5/18/16
Aubrea Hobbs, CSR, RPR

| Report Officer | Printed At | |
|---|---|---|
| 151143/ROBERTS, B A | 05/17/2016 16:51 | Page 1 of 3 |

# Harris County Constable Precinct Five

# Foreward

The Standard Operating Procedures are established and published by the Constable and is intended for the governing and guidance of all members of the Harris County Constable Office, Precinct Five. Its contents are confidential and shall not be divulged to any unauthorized person without the express permission and written consent of the Constable.

Each Procedure will be individually numbered and members shall acknowledge receipt in writing. Members will be required to maintain their Standard Operating Procedures in good condition at all times and will be responsible for any additions, deletions or amendments. Upon termination from the Department, members shall return their Standard Operating Procedures to the Constable in good condition and will be accountable for any loss or damage.

The Constable reserves the right to amend or rescind any portion of the Standard Operating Procedures. The Standard Operating Procedures supersedes any previously issued order, policy or procedure that is in conflict with any provision.

There is no employment tenure in the Constables office. Employment is for an indefinite period and both the Constable and the employee are free to terminate employment with or without formal notice for any reason. The Standard Operating Procedures is solely for information and does not constitute an employment contract or guarantee of continued employment.



EXHIBIT 34
WIT: Felix
DATE: 2/18/19
Aubrea Hobbs, CSR, RPR

Barnes.Felix 000219

Harris County Constable Precinct Five

# Administrative Rules

The Constable will establish any rule or regulation necessary or expedient for the smooth, efficient operation of the Harris County Constable's Office. Precinct Five.

These rules or regulations shall govern assignments, conduct, responsibilities, and authority of every member of the department. The Constable will specify the kind of uniforms to be worn and the equipment to be used as well as the conditions under which they will be worn or used.

The Constable shall also establish any rule or regulation needed to cover any other matter regarding the proper conduct or behavior of every member of this department he deems appropriate. It shall be the duty of every member to familiarize himself with the provisions of the Departments Standard Operating Procedure. He/she shall conform to, and abide by, such rules and regulations, observe the laws and render service to the county with enthusiasm, courage, discretion and loyalty. The failure of any member to properly and willingly abide by all of the rules and regulations of this Department can subject the member to disciplinary action or dismissal. Violations will not be tolerated.

# Law Enforcement Code of Ethics

As a law enforcement officer, my fundamental duty is to serve mankind; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder; and to respect the constitutional rights of all men to liberty, equality and justice.

I will keep my private life unsullied as an example to all; maintain courageous calm in the face of danger, scorn or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed in both my personal and official life, I will be exemplary in obeying the laws of the land and the regulations of my department. Whatever I see or hear of a confidential nature or what is confided to me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty.

I will never act officiously or permit personal feelings, prejudices, animosities, or friendship to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear of favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

I accept the badge of my office as a symbol of public faith, and I accept it, as a public trust to be held as long as I am true to the ethics of the police service. I will constantly strive to achieve these objectives and ideals, dedicating myself before God and to my chosen profession...........

LAW ENFORCEMENT.

# Harris County Constable Precinct Five
# Standard Operating Procedures

Section: Rules Manual

Issue Date: 04/01/08

Revision Date: 08/01/09

Revision number: 1

Procedure number: **2.27**

Subject: **Carrying of Firearms**

All deputies are required to carry their handgun while on duty. When off duty, they may use their own discretion as to whether or not to carry a handgun.

Barnes.Felix 000222

Harris County Constable Precinct Five

# Standard Operating Procedures

Section: Rules Manual

Issue Date: 04/01/08

Revision Date: 08/01/09

Revision number: 1

Procedure number: **2.28**

## Subject: **Registration of Firearms**

All firearms carried for the purpose of performing their official duties, whether on or off duty, must be registered with the department. Required registration information must be kept current.

Barnes Felix 000223

Harris County Constable Precinct Five

# Standard Operating Procedures

Section: Field Operations

Issue Date: 1/28/13

Revision Date:

Revision number:

Procedure number: **200/1.34**

## Subject: **Officer Involved Shooting**

PURPOSE: To establish guidelines to assist officers in managing officer involved shooting incidents. The aftermath of an officer involved shooting presents complex issues for the participating officer(s), the department, and the public. It is imperative that all department personnel coordinate their responses to shooting incidents, understand their roles and responsibilities and carry them out promptly and dispassionately. All personnel must firstly and most importantly summon medical aid, attend to the legal, investigative procedures, and assist involved officers in coping with the stress and perhaps trauma of what has occurred. A shooting involving the death or wounding of a citizen or officer may cause sever stress or disorientation among all participants. In taking prompt action at shooting scenes, officers not only ensure a proper legal follow up but also safeguard the mental health of their peers and of the citizens.

### I. PRE-INCIDENT PREPARATION

Firearms training should include what to expect personally, departmentally, and legally after a shooting or other significant event.

### II. ON SCENE AND IMMEDIATELY FOLLOWING

A. Summon medical assistance and provide first aid if possible.
B. Provide dispatch with any critical information.
C. Secure crime scene/evidence.
D. Notify on duty Supervisor (On duty Supervisor will contact their immediate supervisor, along with I.A.D.)
E. Contact the appropriate investigating agency (H.P.D or H.C.S.O. etc.)
F. Contact the Harris County District Attorney's Shooting Team.
G. If suspects are at large contact additional support (Canine, Air Support, etc.)
H. Communicate emotional support to officer(s) involved.

# Harris County Constable Precinct Five

I. Establish a crime-scene perimeter and cordon area.
J. If Necessary, establish a command post.
K. Support the officer's sense of safety at the scene.
L. The officer(s) involved in shooting should be encouraged to step away from the scene and away from media or other attention into safe supportive environment.
M. The officer(s) should not drive themselves, they should be provided transportation.
N. Do not isolate officer.
O. Officers should be encouraged to talk about the incident solely with individuals with whom they have legally privileged confidentiality.
P. Officer should be provided the opportunity to contact their family members as soon as practical.
    1. It is best for the officer themselves to contact their families.
    2. If injured or unable to contact their family, then an officer who preferably knows the family should call as soon as practical but only after receiving authorization from a supervisor. A deputy shall not contact the family of an injured or deceased officer without authorization from a supervisor.
Q. Do not speak or make any statement to the media.
R. Ensure the officer(s) involved do not consume depressants nor stimulants (including caffeine) unless ordered by medical personnel.
    1. Arrange for drug/alcohol screening if necessary.

III. INVESTIGATIVE PERIOD

A. Officers involved in shootings or other use of force incidents which result in heightened physical and emotional reactions should be provided:
    1. At minimum three days of Temporary Assignment Duty in order to cope and manage their emotions if needed.
    2. Monitor officer(s) for signs of stress, including post-traumatic stress disorder.

B. Officers may be asked to provide pertinent information by the investigator(s) soon after a shooting to aid the initial investigation.
    1. Officers often benefit from at least one night's sleep prior to being interviewed.

C. If available, the officer may be placed in an administrative temporary assignment which may lessen the likelihood that the officer will be involved in a subsequent use-of-force incident during the on-going investigation.

S.O.P. 200/1.34
Officer Involved Shootings

Barnes.Felix.000225

# Harris County Constable Precinct Five

## IV. POST SHOOTING INTERVENTIONS

A. Post shooting interventions should be conducted by only a licensed mental health professional trained and experienced in working with law enforcement personnel. Officers should be supplied with information about counseling and mental health services provided by Harris County.

1. Officers are not mandated to attend a session with a mental health professional.

2. Officers who choose not to attend a session with a mental health professional should be aware of the potential impact of the incident.

a. If not adequately addressed, these reactions may lead to severe and chronic problems requiring treatment services.

B. Post shooting intervention is a confidential and legally privilege communicated between the mental health professional and the officer(s) involved. No information about the content of these sessions should be released without the officer's written authorization.

## V. SUPERVISORS RESPONSIBILITIES

A. Make sure proper medical attention is being afforded to any injured persons.

B. Make necessary notification(s) as outlined in Section II of this order.

C. Coordinate documentation of the incident by all participants and responding units.

D. Confirm that the weapons used in the officer involved shooting are registered with the department.

E. Submit a letter detailing the principle information pertaining to the incident through their Chain of Command. The letter shall include but not be limited to:

1. Incident Summary
2. Primary Investigative Agency and associated case number
3. Number of Officers/Citizens involved injured or killed
4. Last known condition of injured Officer(s) or Citizens

S.O.P. 200/1.34
Officer Involved Shootings

Barnes.Felix 000226

# Harris County Constable Precinct Five

5. Location of Incident
6. Identify the Weapon used by the Officer(s)
7. Were department policies followed
8. Was the application of Deadly force justified in accordance with the departments use of force policy
9. Was the officer(s) provided with Mental Health Professional contact information
10. Any other information which the supervisor may deem appropriate

F. All administrative paperwork shall be completed and forwarded prior to going off duty or mutually agree with another supervisor to assume responsibility for the documentation and the submission of such.

SPECIAL EMPHASIS
No Deputy will release or make any comment to the media regarding officer involved shooting incidents and/or investigations. Such request shall be forwarded to a supervisor of the rank of Captain or higher. All media inquiries may be forwarded to the appropriate investigating agency.

S.O.P. 200/1.34
Officer Involved Shootings

Barnes,Felix 000227

Harris County Constable Precinct Five

# Standard Operating Procedures

Section: Investigations          Issue Date: March 30, 1989

Revision Date: February 13, 2009          Revision number: 3

Procedure number: **200/5.06**

## Subject: **Unlawful Carrying of a Weapon**

Purpose: To establish guidelines for investigating the Unlawful Carrying of a Weapon.

DEFINITIONS:

Prohibited Weapons- A person commits an offense if he intentionally or knowingly possesses, manufactures, transports, repairs, or sells:

> (1) an explosive weapon;
>
> (2) a machine gun;
>
> (3) a short-barrel firearm;
>
> (4) a firearm silencer;
>
> (5) a switchblade knife;
>
> (6) knuckles;
>
> (7) armor-piercing ammunition;
>
> (8) a chemical dispensing device; or
>
> (9) a zip gun.

Barnes.Felix 000228

# Harris County Constable Precinct Five

I. RESPONSIBILITIES:

A. Secure the weapon; if a firearm safely unload the weapon, noting the position of all live and/or spent rounds.

B. Maintain care, control and custody of the weapon throughout the investigation in order to maintain the chain of custody.

C. Conduct a search to determine if the weapon is stolen or wanted.

D. Call the District Attorney's office for acceptance of Criminal Charges.

E. File the appropriate charges. Refer to "Filing Criminal Charges" - S.O.P. 200/2.12.

F. Generate and complete the appropriate offense report.

G. Tag the evidence in the appropriate Property Room.

S.O.P 200/5.06
Unlawful Carrying of a Weapon

Barnes.Felix 000229

# Standard Operating Procedures

Section: Administration                    Issue Date: 02/19/1989

Revision Date: 01/21/13, 1/28/13          Revision number: 2

Procedure number: **30.14**

## Subject: **Reporting and Investigations of Firearms Discharges by Deputies**

PURPOSE: To establish guidelines for the reporting and investigation of all firearm discharges by deputies other than those for training or lawful recreational purposes.

I. RESPONSIBILITIES:

A. When a firearm is discharged by a deputy in the line of duty it shall be reported to a supervisor as soon as practical and an offense report will be completed and forwarded via the chain of command to the Division Commander before going off duty. If not immediately the Deputy shall also inform the supervisor of the delay in reporting the discharge. This report of a discharge should be by the most expedient means.

B. A supervisor will make the scene of all shooting incidents involving any employee of this agency. The on scene supervisor will be responsible for notifying the appropriate primary investigating agency, the appropriate District Attorney's Office and Precinct 5 Internal Affairs.

C. The on scene supervisor will have the responsibility of monitoring the investigation until relieved. The on scene supervisor shall determine the agency responsible for the offense report and if such responsibility lies with Precinct 5, he or she shall have the duty of assigning such offense report to the most qualified person who is available to that supervisor. Once completed, the on scene supervisor shall forward or cause to be forwarded a complete offense report to the division commander.

D. The on-scene supervisor will have the initial responsibility of reviewing and evaluating the investigation/incident and have the responsibility of

# Harris County Constable Precinct Five

determining whether departmental policies were followed. A complete report of the incident will be forwarded to the Assistant Chief Deputy for complete review.

E. The Division Commander shall immediately notify the appropriate Assistant Chief Deputy of any discharge of a firearm coming to his or her attention of personnel assigned under his or her command.

F. In the event of an intentional or accidental discharge of a registered weapon, when off duty, that results in property damage or injury, the Deputy shall as soon as practical notify a Patrol supervisor. The Patrol supervisor shall determine if the incident is reportable and what kind of documentation is necessary depending on the circumstances of the incident. The supervisor shall also notify via his chain of command the Captain of the concerned division.

Barnes.Felix 000231

# Standard Operating Procedures

Section: Equipment and Uniforms                    Issue Date: 02/19/1989

Revision Date: 01/27/09, 02/13/13, 03/11/13        Revision number: 1.2.3

Procedure number: **50.4**

## Subject: **FIREARMS IDENTIFICATION AND CONTROL**

PURPOSE: To establish guidelines for procedures and regulations governing firearms qualification and control.

### I. IDENTIFICATION OF FIREARMS

    A. A complete description of all firearms a deputy carries while acting in the capacity of a peace officer must be on file with the department.

    B. Firearms not on file with the department may not be carried by any deputy while he is acting in the capacity of a peace officer on or off duty. Only those firearms listed or described in the "Approved Duty-Weapons" section of this Standard Operating Procedure may be carried by deputies acting in the capacity of a peace officer.

    C. If a deputy wishes to carry a new weapon, he must first qualify with the weapon. The deputy must contact the department's Training Division to schedule a time.

    D. Qualification with a new weapon is required whether it is to be carried as a primary duty or off-duty weapon. The firearms instructor will verify the weapon information and document it accordingly on the weapon qualification form.

### II. APPROVED PRIMARY WEAPONS

    A. Primary Weapon

        1. While acting in the capacity of a peace officer, a deputy shall carry a handgun as his primary duty-weapon. Below is a description of the only firearms that have been approved for use as a primary duty-weapon by uniformed deputies, plainclothes deputies, and off-duty deputies.

Barnes.Felix 000232

# Harris County Constable Precinct Five

2. Uniformed deputies may carry a revolver or semi-automatic handgun as their primary duty-weapon. Revolvers must be double action and chambered for either a .38 special, or .357 caliber and must have a barrel length of at least three inches but not more than four inches. Semi-automatic handguns used as primary duty-weapons must be chambered for 9mm, .357 Sig, .40 S&W or .45 caliber.

3. Plainclothes deputies may carry a revolver or semi-automatic handgun as their primary duty-weapon. Revolvers must be double action and chambered for either a .38 special, or .357, caliber and must have a barrel length of at least two inches but not more than four inches. Semi-automatic handguns used as primary duty-weapons must be chambered for .380, 9mm, .357 Sig, .40 S&W or .45 caliber.

4. Deputies may carry firearms while off-duty but are not required to do so. If a deputy chooses to carry a firearm while off-duty, that firearm must meet the specifications described above, according to whether or not the deputy is in uniform.

5. All duty weapons will be blue, black or silver in color. Any deviation from these colors must be approved by the Constable.

6. Revolver handguns chambered in .41, .44, or .45 are authorized if the deputy has qualified with their handgun in that caliber during the 2012 qualifications and continues to qualify with that handgun during each required department qualification thereafter. Semi-automatic handguns in calibers not listed in Subsections 2 or 3 may be authorized if the deputy has qualified with their handgun in a caliber authorized during the 2012 qualifications and continues to qualify with that handgun during each required department qualification thereafter.

## III. SECONDARY WEAPONS

A deputy is authorized to carry a secondary weapon while on duty. The caliber must meet the specifications listed in Section II.A.3. of this policy. The deputy must have qualified with this weapon.

S.O.P. / 50.4
Firearms Identification and Control

Barnes.Felix 000233

# Harris County Constable Precinct Five

## IV. SHOTGUNS

A. The department-approved shotguns described below may be carried on-duty. Only shotguns that have all of the following features will be approved by the department:

1. Shotguns must be pump action or semi-automatic.

2. Must be 12 Gauge and tubular feed.

3. Barrel length of shotgun must be 18 or 20 inches and may not be modified in any way. Deputies who carry shotguns shall qualify in a manner dictated by range instructors and shall demonstrate to range instructors that they have a working knowledge of their specific shotgun.

4. All shotguns must be blue, black or silver in color. The shotgun stock shall be black, or brown wood grain.

5. The shotgun shall have a solid black tactical sling.

6. Less lethal shotguns must have orange stocks and fore grips.

7. Shotgun must have a full length stock (Expandable stocks are permitted).

## V. RIFLES

Refer to Standard Operating Procedure 50.9.

## VI. AMMUNITION

A. Except upon approval of the Constable, no deputy shall carry any of the following types of ammunition in any weapon that he is authorized to use on duty:

1. Armor Piercing
2. Tracer ammunition
3. Glazer safety slug
4. Wad-cutter
5. Aluminum Casing ammunition
6. Reloads

B. On duty ammunition must be factory loaded ammunition.

S.O.P. / 50.4
Firearms Identification and Control

3 of 7

# Harris County Constable Precinct Five

C. All shotguns must be loaded with either "OO" buck, 2 ¾ inch and containing eight or nine pellets or 2 ¾ slugs.

## VII. GRIPS

A. A deputy's on-duty weapon shall have the following types of grips.

1. Black or brown
2. Army Green
3. Ivory
4. Stag bone

## VIII. CARRYING OF FIREARMS

A. While on-duty or working extra employment all deputies must be properly armed as outlined in Section II. While off-duty and in plainclothes, each deputy may use his discretion in deciding whether or not to carry a firearm.

B. While on-duty and in plain clothes, all deputies should display their badge near their weapon.

C. If a deputy decides to carry a weapon while off duty and in plain clothes, the weapon must be concealed.

## IX. LIMITATIONS

A. The following limitations apply to the carrying of firearms:

1. Psychiatric Wards. Deputies may not enter any facility's psychiatric ward armed except under the most serious of circumstances.

2. Courts. While in court, deputies shall adhere to that body's policy regarding the carrying of firearms and shall surrender their firearms if a bailiff so requests.

3. Airports. Any deputy who wants to enter the sterile area of an airport should advise the proper authorities of his intentions to do so before or upon arriving at the airport terminal. The officer shall present any necessary documents or law-enforcement credentials necessary to verify his identity and shall comply with the decision of airport authorities to allow or deny access.

Barnes.Felix 000235

# Harris County Constable Precinct Five

4. Aircraft. Deputies should limit their requests to carry firearms aboard aircraft to those situations where a weapon is required to ensure the safe completion of a law-enforcement mission. If a deputy must travel with a firearm, the airline on which the deputy is a passenger shall be contacted for its policy on such matters. Deputies shall adhere to the rules and regulations of the airline and its pilot.

## X. QUALIFYING FOR FIREARMS USAGE

Each division commander or his designee must ensure that the deputies in his division comply with the firearms policy.

## XI. QUALIFYING

A. Each deputy of this department must qualify with each and every firearm the department authorizes him to carry.

B. Potential new hires shall qualify with a department approved weapon, for on or off duty use, prior to being sworn in. The potential new hire who fails to qualify on their first attempt will have two additional attempts to qualify prior to their swear-in date.

C. A Deputy who fails to qualify on his/her first attempt will have two additional attempts to qualify on that same day. The deputy may choose to reschedule the other two attempts at another time during the qualification period.

D. A Deputy who fails to qualify after their third attempt may not carry a firearm on-duty or off-duty until they have qualified under the requirements of Section XVI of this policy. If the deputy's regular duties include carrying a firearm then the deputy may be required to use paid or unpaid leave until they have qualified under Section XVI of this policy.

## XII. EXAMINATION CONTENT

Qualification includes a proficiency demonstration in the care and cleaning of a deputy's firearm(s) to range personnel. In addition, all deputies of the department shall be required to complete a designated course of fire with each weapon listed on the deputy's weapons qualification form.

Barnes.Felix 000236

# Harris County Constable Precinct Five

### XIII. QUALIFYING

To pass the qualification examination the deputy must attain a score of 200 points (80%) or greater. The result will be recorded as a pass or fail.

### XIV. MEDICAL RESTRICTIONS

A. If a deputy is medically restricted from qualifying, he must provide acceptable documentation to his divisional Assistant Chief.

B. The Assistant Chief will contact the department Firearms Proficiency Officer so that a record of the deputy's inability to qualify as scheduled can be created. The medically restricted deputy is responsible for making arrangements to qualify when released from the medical restriction.

C. A deputy who has been medically restricted from qualifying and has not met the TCLEOSE time requirements for demonstrating weapons proficiency may not carry a firearm on-duty or off-duty.

D. Reasonable accommodations will be made for Deputies who are pregnant but otherwise not medically restricted if the deputy so requests.

### XV. NO ATTEMPT

A. An "attempt to qualify" begins after discharging the first round in the course of fire during an official qualification. A "no attempt to qualify" is defined as refusing to shoot the course of fire. A deputy making no attempt to qualify may face disciplinary action up to and including termination.

B. A deputy who has a legitimate reason for not qualifying must notify his immediate supervisor prior to his scheduled date. (Examples of legitimate absences include, but are not limited to, authorized absences, documented illnesses, and special assignments. A deputy must attempt to qualify as soon as possible after returning to his normal duty assignment) Deputies who miss his/her scheduled qualification date may be reassigned to qualify on another day.

C. No extra job permits will be issued to or continued for any deputy who fails to comply with the departments firearms qualification requirements.

S.O.P. / 50.4
Firearms Identification and Control

5 of 7

# Harris County Constable Precinct Five

D. All records relating to the inability to qualify after the allowed number of attempts and no-attempts are to be maintained by the Training Division.

## XVI. FAILURE TO QUALIFY

A deputy must qualify as mandated by the department. A deputy who fails to qualify during the department qualification period shall meet with a firearms instructor to obtain supplementary training and will be allowed three (3) final attempts to pass the department's qualification course. The three final attempts must be made within two weeks following the date the deputy failed to pass their first set of attempts. If a deputy is still unable to qualify, the department Firearms Proficiency Officer shall notify the Training Division Assistant Chief in writing, documenting all training and failed attempts. Failure to qualify is a violation of this policy.

S.O.P. / 50.4
Firearms Identification and Control

Barnes.Felix 000238

# Harris County Constable Precinct Five
## Standard Operating Procedures

Section: Job Description

Issue Date: 04/01/06

Revision Date: 08/01/06

Revision number: 1

Procedure number: **100 / 1.07H**

Subject: **Deputy (Toll Road)**

POSITION SUMMARY: A deputy assigned to the Toll Road Division for the Constable's Department enforces the law, protects the rights and citizenry, and provides basic police service to the public.

IMMEDIATE SUPERVISOR: Sergeant of the Toll Road Division.

I. DEFINITIONS:

   A. Duties and Powers- It is the duty of every peace officer to preserve the peace within his jurisdiction. To effect this purpose, he shall use all lawful means. He shall in every case where he is authorized by the provisions of the Code, interfere without warrant to preserve or suppress crime. He shall execute all lawful process issued to him by any magistrate or court. He shall give notice to some magistrate of all offenses committed within his jurisdiction, where he has good reason to believe there has been a violation of the penal law. He shall arrest offenders without warrant in every case where he is authorized by law, in order that they may be taken before the proper magistrate or court and be tried. (CCP Art. 2.13. DUTIES AND POWERS)

II. RESPONSIBILITIES:

   A. To protect life and property.

   B. To preserve the peace and maintain order.

   C. To prevent or suppress crime.

   D. To investigate reports of crimes.

Barnes.Felix 000239

# Harris County Constable Precinct Five

E. To enforce all state laws and applicable county ordinances.

F. To document activities, investigations, other incidents, and make arrests as required.

III. DUTIES:

A. To operate a patrol vehicle in an assigned beat unless dispatched to a call outside of the assigned area.

B. To respond to calls for service.

C. To monitor vehicular traffic and issue citations to violators.

D. To observe business and residential properties for possible criminal activity.

E. To check buildings for unauthorized entry by searching structures and property for intruders, and investigating suspicious events.

F. To conduct interviews with complainants, victims, witnesses, and suspects to obtain relevant facts and information, and when necessary mediate and resolve complaints and/or disputes.

G. To make arrests, including subduing individuals with appropriate action and force necessary.

H. To take individuals into custody, searching vehicles and persons for weapons and contraband, and transporting arrested individuals to a detention facility.

I. To maintain a daily activity report and to assemble supporting documentation and prepare narrative reports, memorandums, and notes of accidents, incidents, and offenses which must be completed and submitted prior to ending tour of duty.

J. To conduct criminal history checks on computer terminals.

K. To maintain and update manuals, logs, and activity reports.

L. To maintain inventories of equipment, materials, and supplies required for daily operations, and having equipment serviced or repaired when inoperable.

S.O.P. 100 / 1.07 H
Deputy (Toll Road)

Barnes.Felix 000240

# Harris County Constable Precinct Five

M. To perform follow up investigations, to include verifying personal information and criminal histories.

N. To research other sources to confirm details determining value and reliability of physical evidence.

O. To identify and investigate inconsistencies in statements or information obtained during initial investigation.

P. To enforce court orders, including serving summons, subpoenas, and restraining orders, and executing search warrants.

Q. To give assistance to citizen's inquiries and requests, giving directions, assisting with disabled vehicles, etc.

R. To provide citizens with clarification of routine legal requirements.

S. To open lines of communications with citizens who reside and work within the beat.

T. To provide solutions to problems affecting the community.

U. To be vigilant to any unusual or hazardous situations that exists within the beat, and takes appropriate action to correct these situations.

V. To educate himself by attending in-service training classes or other institutions of higher education.

W. To provide sworn testimony in court proceedings.

X. To perform other duties as instructed by a supervisor.

Y. Perform tour of duty in uniform, unless otherwise instructed.

Z. Be prompt and present at roll-call and at all assignments, informing the Toll Road Sergeant at least 30 minutes prior to roll-call or S.O. time when unavailable or tardy due to illness or emergency.

AA. Maintain a neat and clean uniform appearance. Ensure service weapon is clean, loaded and in good mechanical condition.

# Harris County Constable Precinct Five

BB. Inform a Toll Road Sergeant when unable to end tour of duty on time due to any circumstances (i.e. court, special assignment, investigation etc).

CC. Report all on-duty injuries immediately to an on-duty Toll Road Supervisor.

DD. Sign-on (S.O.) and sign-off (O.D.) via police radio.

EE. Monitor the police radio at all times, and respond immediately to all calls for service.

FF. When possible use mobile computer to on-view, en route, arrive, and clear event status, keeping dispatch informed at all times via the police radio.

GG. Keep unnecessary talk and chatter off the police radio. Be brief and concise in messages.

HH. Do not use the police radio when another unit is on an emergency (i.e. chase, etc.) unless your message is of the same or greater emergency.

II. Notify dispatcher if undue delay is encountered in response to a call.

JJ. Other duties as may be assigned including, but not limited to, driving vehicles in high speed pursuits, physically subduing violent prisoners, performing physical rescues, etc.

S.O.P. 100 / 1.07 H
Deputy (Toll Road)

Barnes.Felix 000242

# Harris County Constable Precinct Five
## Standard Operating Procedures

Section: Field Operations

Issue Date: 04/01/06

Revision Date: 08/01/06  1/28/13

Revision number: 1, 2

Procedure number: **200/1.19**

Subject: **Traffic Enforcement**

PURPOSE: To Establish procedures for the enforcement of traffic laws to ensure public awareness and the safe use of public roadways within the jurisdiction of the Department. Deputies shall follow the appropriate course of action and maintain proper courtesy and demeanor.

I. RESPONSIBILITIES:

    A. Prior to approaching the violator's vehicle you will notify the dispatcher of your exact location and vehicle information. You must receive an acknowledgement from the dispatcher before making contact with a violator.

    B. The following are to be considered as specific Traffic Enforcement activities:

        1. Driving while intoxicated.

            a. Deputies shall arrest persons suspected of driving while intoxicated.

        2. Driving while license suspended.

            a. Deputies shall arrest persons suspected of driving while their license is suspended or revoked only after having a prior conviction or for D.W.I.

Barnes.Felix 000243

# Harris County Constable Precinct Five

3. Speeding violations.

    a. Speeding violations may be determined by the use of a certified speed-measuring device or by pacing.

    b. Speeding violations may be enforced by verbal, written warnings or written citations.

C. The following are to be considered guidelines of typical enforcement duties for generalized traffic offenses. Enforcement duties surrounding these types of violations should normally be handled by the issuance of a written citation:

1. Hazardous violations.

    a. Unsafe behavior and unsafe conditions, which may place persons or property in danger.

    b. In extreme situations, where the actions of the violator pose substantial risk to the safety of the general public and the Deputy feels an arrest is warranted, a supervisor must be contacted for authorization.

2. Equipment violations.

3. Public carrier/ commercial vehicle violations.

4. Non-hazardous violations (i.e., expired registration, expired motor vehicle inspection, expired driver's license, failure to maintain financial responsibility, etc.).

5. Off road violations.

6. Multiple violations.

7. Newly enacted laws or regulations.

    a. Upon enactment, the Deputy should initially use written warnings as an educational tool unless otherwise mandated, the violation is aggravated or circumstances require the issuance of a citation.

8. Pedestrian and bicycle violations.

Barnes.Felix 000244

# Harris County Constable Precinct Five

9. Parking violations.

   a. Parking violations should be enforced based upon state law only.

D. It is important that the Deputy demonstrate officer safety as well as professionalism when he initiates a traffic stop. Traffic stops can be categorized as follows:

   1. Low risk (standard) traffic stop.

      a. When a Deputy initiates a traffic stop, he shall advise Dispatch the license plate number of the vehicle and the location of the stop.

      b. The Deputy should position his vehicle behind the violator vehicle in a manner to protect the Deputy from approaching traffic.

      c. As the Deputy approaches the violator vehicle, he should scrutinize the actions of all occupants.

      d. Once the violator contact is made, the Deputy should utilize the *seven (7) step violator approach* technique:

         1) Greeting.

         2) Identify self and Department.

         3) Reason for stop.

         4) Legal justification.

         5) Request for driver's license and proof of financial responsibility.

         6) Decision/Action taken.

         7) Close.

   2. High risk vehicle stop.

      a. When a Deputy initiates a known felony traffic stop, he should immediately advise Dispatch the license plate number of the

Barnes.Felix 000245

# Harris County Constable Precinct Five

    vehicle, description of the vehicle, number of occupants, location of the stop and reason for the stop.

    b. The Deputy should position his vehicle behind the suspect vehicle in a manner to protect the Deputy. The Deputy should summon sufficient back-up units before extracting the occupants from the vehicle.

    c. The Deputy in charge of the scene should issue commands in a clear and concise manner in order to extract the suspects from the vehicle. The Deputy should not approach the suspect vehicle until all occupants have been extracted and secured.

E. Hazardous Road Conditions:

    1. When hazardous road conditions such as debris in the roadway, defects in the roadway and damaged or inoperable traffic control devices are observed, the Deputy shall immediately advise Dispatch to contact the appropriate Department and advise them of the hazards.

    2. It may become necessary in some hazardous situations for the Deputy to initiate traffic direction and control until the hazard is rectified.

F. Medical advisory:

    1. Upon encountering a driver suspected of having a mental or physical disability, disease, or other conditions that may prevent that person from safely operating a motor vehicle, the Deputy should complete and submit a Medical Evaluation Request form. This form is provided by the Texas Department of Public safety and should be submitted to the Medical Advisory Board for Driver Licensing.

    2. This form should be completed in its entirety and should state the actual or suspected impairments of the driver along with copies on any reports to the action or incident for which the driver was contacted.

Barnes.Felix 000246

# Harris County Constable Precinct Five

## G. Special Emphasis

   1. Traffic law enforcement practices shall include the following:

    a. Visible traffic patrol using marked vehicles

    b. Traffic stops using department approved, unmarked vehicles with emergency equipment, shall not be used on a regular basis for traffic enforcement.

    c. Both overt and covert stationary observation using marked vehicles.

    d. Roadside safety checks.

S.O.P. 200/1.19.
Traffic Enforcement

Barnes.Felix 000247

# Harris County Constable Precinct Five
## Standard Operating Procedures

Section: Field Operations                    Issue Date: 02/5/14

Revision Date:                               Revision number:

Procedure number: **200/1.37**

## Subject: **RACIAL PROFILING (BIAS-BASED PROFILING)**

PURPOSE: To establish policy to unequivocally state, that law enforcement activities resulting from biased-based profiling will not be condoned, are unacceptable, and will not be tolerated by the Precinct Five Constables Office. Bias-based profiling is unethical and illegal, and serves to foster distrust of law enforcement by the community we serve. This policy will serve as a guideline for the Constable's personnel to prevent such occurrences and to protect our personnel when they act within the provisions of the law and this policy from unwarranted accusations.

It is the policy of the Harris County Precinct Five Constable's Office to patrol in a proactive manner, to aggressively investigate suspicious persons and circumstances, and to actively enforce the motor vehicle laws, while insisting that citizens will only be stopped and/or detained when there exists reasonable suspicion to believe that they have committed, are committing, or are about to commit a violation of the law. It is the policy of the Precinct Five Constable's Office to protect the fundamental rights of all citizens, to equal protection under the law and to be free from unreasonable searches and seizures, as provided in the United States Constitution.

### DEFINITIONS:

Bias-Based Profiling: The selection of individuals based solely on a trait common to a group for enforcement action. This includes, but not limited to, race, ethnic background, gender, sexual orientation, religion, economic status, age, cultural group, or any other identifiable group.

Enforcement Activities: Activities both on and off duty, undertaken by Precinct Five Constable's Office personnel that arise from their authority related to employment, oath of office, State statute, Federal Law or

# Harris County Constable Precinct Five

County ordinance. Activities such as traffic stops/contacts, field contacts, arrests, investigations, asset seizures and forfeiture, and general law enforcement contacts with citizens.

Reasonable Suspicion: Articulable facts and circumstances that crime is afoot or facts and circumstances which taken together with reasonable inferences thereof, would cause a reasonable police officer to suspect that a person is, has been, or is about to be involved in criminal activity.

Probable Cause: Articulable facts and circumstances which taken together with reasonable inferences thereof, would cause a reasonable police officer to believe that a crime has been committed and that a particular person committed the crime.

I. Responsibilities:

    A. Traffic Stops and Field Contacts: The dispatcher will be notified and a MDS entry made for every traffic stop and/or field contact. Traffic stops and field contacts between Precinct Five Deputies and citizens will be conducted in a professional and courteous manner. Basic interpersonal communication protocol is:

        1. Greeting in a respectful manner.

        2. Identify self and Department.

        3. Reason for stop or temporary detention. (Legal justification)

        4. Politely ask the person if there was a reason for the violation.

        5. Politely request for driver's license and proof of financial responsibility and/or other documents.

        6. Inform the person as to what action is being taken, if any, and what actions they must perform as a result of the enforcement action.

        7. Give a professional closing statement. Do not argue or debate with the person or use trite or colloquial expressions.

S.O.P. 200/1.37
Racial Profiling (Biased-Based Profiling)

Barnes.Felix 000249

# Harris County Constable Precinct Five

B. Appropriate enforcement action should always be completed and documented, generally in the form of a written report, citation, field contact form or an arrest.

C. When enforcement action is taken, the appropriate documentation will be completed as required by the specific type of enforcement action and the guiding written directives pertaining to such enforcement action. All enforcement actions will include the gender, race, or ethnicity of a person stopped or contacted, if this information can reasonably be ascertained by physical appearance or from the driver's license or other documents provided by the individual.

D. No motorist, once cited or warned, will be detained beyond the point where there exists no reasonable suspicion of further criminal activity.

E. No person or vehicle will be searched in the absence of a search warrant, or a legally recognized exception to the search warrant requirement, or the person's voluntary consent. Specific guidelines pertaining to searches of vehicle, persons, or structures are outlined in the respective standard operating procedure.

F. In the absence of a specific, credible report containing a physical or vehicle description, a person's race, ethnicity, gender or sexual orientation or combination of these will not be a factor in determining probable cause for an arrest or reasonable suspicion for a stop.

G. The deliberate recording of any misleading information related to the actual or perceived race, ethnicity, gender or sexual orientation of a person stopped for investigative or enforcement purposes is strictly prohibited, and is cause for disciplinary action up to and including termination.

II. Investigations:

A. Criminal Profiling, in itself can be a useful tool to assist law enforcement officers in carrying out their duties to include the investigation of criminal activity and subsequent arrest as well as asset seizure and forfeiture efforts. Bias-based profiling, however, is the selection of individuals based solely

Barnes.Felix 000250

# Harris County Constable Precinct Five

on a common trait of a group as defined in this policy and is not an acceptable tool.

B. The Precinct Five Constable's Office does not condone and will not allow the use of biased-based profiling in its enforcement programs to include investigations both incidental and on-going as well as subsequent arrest and asset seizure and forfeiture.

C. Constable's personnel will focus on a person's conduct or other specific suspect information supported by articulable facts which indicate that the person has committed a crime, is about to commit a crime, or is presenting a threat to the safety of themselves or others.

D. All investigation will be carried out in accordance with established policies.

## III. Documentation required (Video):

A. All personnel operating marked Precinct Five Constable's Office vehicles used for law enforcement purposes and equipped with a digital video camera capable of recording video and sound will adhere to this policy.

1. The digital video camera will be activated prior to every traffic stop or suspicious person/vehicle encounter, to record the behavior of the vehicle or the person. The video recorder will remain activated until the person and/or vehicle is released. Failure to activate the video camera sound prior to the traffic stop and/or contact encounter may result in disciplinary action up to and including termination. In accordance with standard operating procedure 50.7.

## IV. Bias-based Profiling Complaints:

A. Any person may file a complaint with the Constable's Office if they feel that they have been stopped, detained or searched based solely on a bias-based profile.

4 of 6

S.O.P. 200/1.37
Racial Profiling (Biased-Based Profiling)

Barnes.Felix 000251

# Harris County Constable Precinct Five

B. No person will be discouraged, intimidated, or coerced from filing such a complaint, or discriminated against because they have filed such a complaint.

C. Any Constable's Office personnel contacted by a person who wishes to file such a complaint will be directed to contact the Internal Affairs Division.

D. All complaints of bias-based profiling, upon conclusion will be forwarded to the Constable and will contain findings. The complaint will then be forwarded to the Disciplinary Review Board for suggestions of disciplinary action, or changes in policy, training or tactics.

E. Depending on the findings of a complaint as well as the specific factors involved, corrective measures will be taken to remedy violations. Corrective measure may include but are not limited to, training counseling, and discipline up to and including termination.

F. The internal Affairs Division will compile statistical data of all bias-based profiling complaints which will include the findings as to whether each case was sustained, not sustained, or exonerated.

V. Supervisors Responsibilities:

A. Division Commanders will be apprised of all bias-based profile complaints involving personnel under their command.

B. It is the responsibility of each first line supervisors to monitor activities of their personnel and to identify potential bias-based profile activity.

C. All supervisors will be particularly alert to potential patterns and practices of their personnel that may indicate bias-based profiling and treatment of individuals.

D. All first line supervisors will monitor activities of their personnel to identify repeated violation(s) of Section III of this policy.

Barnes.Felix 000252

# Harris County Constable Precinct Five

VI. <u>Training</u> :

    A. Training related to bias-based profiling will be provided to sworn personnel. The training will be provided and coordinated through the department Training Division in accordance with TCOLE required curriculum.

Barnes.Felix 000253

# Harris County Constable Precinct Five
## Standard Operating Procedures

---

Section: Arrest & Apprehension

Issue Date: 04/01/06

Revision Date: 07/11/2013

Revision number: 3

Procedure Number: **200/2.14**

## Subject: Use of Force and Deadly Force

---

PURPOSE: It is the policy of the Harris County Constable's Office Pct. 5 to provide officers with guidelines for the use of force and deadly force in effecting a lawful arrest or search in accordance with:

TEXAS PENAL CODE § 9.51 Arrest and Search (Authorized Use of Force by Peace Officers); and
TEXAS PENAL CODE § 9.52 Prevention of Escape from Custody.

Arrest without warrant:
TEXAS CODE OF CRIMINAL PROCEDURE Art. 14.01 Offense within View;
TEXAS CODE OF CRIMINAL PROCEDURE Art. 14.03 Authority of Peace Officers;
TEXAS CODE OF CRIMINAL PROCEDURE Art. 14.04 When Felony has been Committed; and
TEXAS CODE OF CRIMINAL PROCEDURE Art. 14.05 Rights of Officer (to enter residence).

Arrest with Warrant:
TEXAS CODE OF CRIMINAL PROCEDURE Art. 15.16 How Warrant is Executed;
TEXAS CODE OF CRIMINAL PROCEDURE Art. 15.24 What Force May be Used; and
TEXAS CODE OF CRIMINAL PROCEDURE Art. 15.25 May Break Door (Felony Warrant).

This policy applies to all peace officers and part-time peace officers engaged in the discharge of official duties.

All personnel have received training in the use of force and must understand the application of force as detailed in Graham V. Conner (U.S. 1989).

Barnes.Felix 000254

# Harris County Constable Precinct Five

## I. DEFINITIONS:

A. Force- The amount of effort required by police to compel compliance by an unwilling subject.

B. Non-Deadly Force- all force used by an officer that does not create a substantial risk of causing death or serious bodily injury.

C. Deadly Force- all use of force techniques that an objectively reasonable officer would know creates a substantial risk of death or serious bodily injury.

D. Serious Bodily Injury- means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

E. Weapon- any instrument designed to be used to apply force or by its manner of use applies force to the person of another.

F. Approved Weapon- a device or instrument which an officer has received permission from the agency to carry and use in the discharge of that officer's duties, and for which the officer has demonstrated proficiency and developed a knowledge and understanding of the law, rules and regulations regarding the use of such weapons.

G. Impact Weapons- objects and instruments that are used, or are designed to be used, to apply force to the person of another by coming into physical contact with that person.

H. Chemical Agents- chemical irritants including CN/Chloracetophenone, OC/Oleoresin Capsicum, CS/Orthocholorobenzalmalononitrile or combinations of these chemical agents.

I. Probable Cause- is a "nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."[1] What is required is simply "a reasonable ground for belief of guilt,"[2] - a "probability, and not a prima facie showing, of criminal activity,"[3]. "A police officer may draw inferences based on his own experience in deciding whether probable cause exists,"[4]

---

[1] *Maryland v. Pringle,* 540 U.S. 366, 370, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003) (internal quotation marks omitted).

[2] *id.,* at 371, 124 S.Ct. 795 (same)

[3] *Illinois v. Gates,* 462 U.S. 213, 235, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (same)

[4] *Ornelas v. United States,* 517 U.S. 690, 700, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996),

Barnes.Felix 000255

officer may lack probable cause for an arrest" when justified by suspicion that criminal activity is afoot, (reasonably grounded, but short of probable cause). In these situations the officer must be positioned to act instantly on reasonable suspicion that the persons temporarily detained are armed and dangerous. Thus a limited search of outer clothing for weapons serves to protect both the officer and the public. And in this situation a pat-down search is reasonable under the Fourth Amendment.[6]

## II. RESPONSIBILITIES:

### A. Use of Deadly Force

This policy and set of rules provide clear guidelines for Harris County Constable's Office, Precinct Five, Deputies' use in making decisions regarding the use of their firearms. The policy was developed with serious consideration for the safety of both the deputies and the public, and with the knowledge that deputies must sometimes make split-second decisions in life and death situations. This policy and set of rules will be the standards by which the actions of deputies will be measured.

The Constable's Office Precinct Five places its highest value on the life of its deputies and the public. The Department's policies, rules and procedures are designed to ensure that this value guides the use of firearms by deputies.

The citizens of Harris County, State of Texas, and Precinct Five have vested in their deputies the power to carry and use firearms in the exercise of their service to society. This power is based on trust and therefore, must be balanced by a system of accountability. The serious consequences of the use of firearms by deputies necessitate the specification of limits for deputy        discretion: there is often no appeal from a deputy's decision to use a firearm. Therefore, it is imperative that every effort must be made to

---

[5] *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

[6] *See e.g. Arizona v. Johnson*, 129 S.Ct. 781, 786 (January 26, 2009) (citing *Terry v. Ohio*, 392 U.S. 1, 88 S Ct. 1868, 20 L.Ed.2d 889 (1968)).

S.O.P. 200/2.14
Use of Force and Deadly Force

Barnes.Felix 000256

# Harris County Constable Precinct Five

ensure that such use is not only legally warranted but also rational and humane.

The basic responsibility of deputies to protect life also requires that they exhaust all other reasonable means for apprehension and control before resorting to the use of firearms. Deputies are equipped with firearms as a means of last resort to protect themselves and others from the imminent threat of death or serious bodily injury.

Even though all deputies must be prepared to use their firearms when necessary, the utmost restraint must be exercised in their use. No deputy will be disciplined for not discharging a firearm if that discharge might threaten the life or safety of an innocent person, or if the discharge is not clearly warranted by the policy and rules of the department.

Above all, this Department values the safety of its employees and of the Public. Likewise, it is believed that deputies should use firearms with a high degree of restraint. Therefore, it is the policy of this Department that the use of firearms is never to be considered routine, is permissible only in defense of life or serious bodily injury, and then only after other reasonable means have been exhausted, taking into consideration the information known or perceived by the officer at the time force was used.

## B. RULES

The policy stated above is the basis of the following set of rules that have been designed to guide deputies in all cases involving the use of firearms:

1. Deputies shall not discharge their firearms except to protect themselves or another person from imminent death or serious bodily injury.

2. Deputies shall discharge their firearms only when doing so will not endanger innocent persons.

3. Deputies shall not discharge their firearms to threaten or subdue persons whose actions are destructive to property or injurious to themselves but which do not represent an imminent threat of death or serious bodily injury to the deputy or others.

4. Deputies shall not discharge their firearms to subdue an escaping suspect who presents no imminent threat of death or serious bodily injury.

Barnes.Felix 000257

# Harris County Constable Precinct Five

including inferences "that might well elude an untrained person."[5] The Constitution is satisfied so long as the officer has "probable cause" to believe that the suspect has committed or is committing a crime."

J. Reasonable Suspicion-permits an investigatory stop "in situations where the

# Harris County Constable Precinct Five

5. Do not discharge a firearm from a moving vehicle or at a fleeing vehicle unless you reasonably believe that deadly force is immediately necessary to protect yourself or another person from unlawful deadly force. (Refer to S.O.P. 200/2.14 Use of Force)

6. Deputies shall not fire warning shots.

7. Deputies shall not discharge their firearms at any animal unless it is absolutely necessary to do so to protect themselves or another person from imminent serious bodily injury or possible death. Deputies in making decisions regarding the use of firearms when confronted with animals that are injured, rabid, etc., shall have before resorting to the use of firearms:

   a. Authorization from a supervisor and

   b. Have exhausted all other reasonable means of control or confinement.

8. If reasonable, an officer should give a verbal warning before using or attempting to use deadly force. If an officer does not give a verbal warning, the officer will document the reason(s) a verbal warning was not reasonable.

C. Use of Non-Deadly Force

It is the policy of this agency to accord officers discretion in the use of non-deadly force to the extent permitted by the Fourth Amendment and Texas Penal Code § 9.51(a), which permits police officers to use reasonable force to:

1. make or assist in making a lawful arrest or search; or

2. prevent or assist in preventing escape after arrest, and

3. before using force the officer manifests his purpose to arrest or search and identifies himself as a peace officer, unless he reasonably believes his purpose and identity are already known by or cannot reasonably be made known to the person to be arrested.

In determining the degree of force that is reasonable under the circumstances, officers should consider and document these factors:

S.O.P. 200/2.14
Use of Force and Deadly Force

Barnes,Felix 000258

# Harris County Constable Precinct Five

1. whether the suspect is actively refusing to comply with lawful orders, or

2. whether the suspect is actively resisting arrest, or

3. whether the suspect poses an immediate or ongoing threat to the safety of the officers or others; or

4. Whether the suspect is attempting to evade arrest by flight.

There could be other non-listed factors to show that this use of force was objectively reasonable. Each use of force is different and fact-specific.

The officer's report should articulate the factor's the officer considered at the moment they used force. These factors will determine whether the degree of force was reasonably necessary. Answer the question: What makes this use of force reasonable under these circumstances?

D. General Rules Governing Use of Force

1. It is recognized that officers are expected to make split-second decisions in tense, uncertain and rapidly evolving circumstances and that the amount of time available to evaluate and respond to changing circumstances may impact the decision. While various degrees of force exist, each officer is expected to use that degree of force, which is reasonable under the circumstances, to successfully accomplish the legitimate law enforcement purpose in accordance with this policy. Factors which determine the reasonable use of force include, but are not limited to:

   a. The conduct of the individual being confronted (as reasonably perceived by the officer at the time)

   b. Multiple subjects

   c. Location, terrain, lighting conditions

   d. Officer/subject factors (age, size, relative strength, skill level, injury/exhaustion)

   e. Influence of drugs/alcohol (mental capacity, sensation of pain)

   f. Proximity of weapons or unknown weapons

Barnes.Felix 000259

# Harris County Constable Precinct Five

    g. Availability of other options (reasonably available to the officers under the circumstances)

    h. O. C., Electronic Control Device, Body Armor or Ballistic Shield, or Less lethal shotgun

    i. Seriousness of the suspected offense or reason for contact with the subject

    j. Special knowledge/imminent danger

    k. Training and experience of the officer

    l. Potential for injury to citizens, officers and suspects

    m. Risk of escape

    n. Other exigent circumstances

2. Officers should use the least amount of force reasonably necessary to accomplish the intended objective without impairing the safety of the officer or others. This provision should not be construed to require officers to first attempt using types and degrees of force that reasonably appear to be inadequate to accomplish the intended objective.

3. Protracted hand-to-hand combat may be harmful to the public safety, the safety of law enforcement personnel, and the safety of the person being arrested or captured. Accordingly, it shall be deemed reasonable for officers to use that type and degree of non-deadly force necessary to bring a subject whom the officer intends to arrest or capture quickly under control.

4. Officers will use only approved weapons unless circumstances exist which pose an imminent threat to the safety of the officer or the public requiring the immediate use of a non-approved weapon to counter such a threat. This provision should not be construed as authorizing officers to carry a non-approved weapon.

5. Any modification to approved weapons must be authorized by the department through the qualification process.

6. Displays of Firearms

S.O.P. 200/2.14
Use of Force and Deadly Force

Barnes.Felix 000260

# Harris County Constable Precinct Five

   a. Firearms may be drawn and held in a position that is not readily visible when it is reasonably anticipated that they may be required.

   b. Firearms may be brought to the ready position when there is cause to believe there is a threat to life, or serious bodily injury or in self-defense.

7. Threatening the Use of Force - an officer may announce to another his or her intention to use force that may reasonably be necessary under the circumstances.

E. Specific Rules Relating to the Use of Specific Weapons

   1. Impact Weapons (Refer to S.O.P. 200-2.15 & 200-2.19)

      a. Impact weapons should be used only where efforts involving the use of less force have failed or where it reasonably appears that such methods would be ineffective if attempted.

      b. Deputies should not intentionally target the head, neck, groin, spine, or sternum when using an impact weapon unless deadly force circumstances are present.

      c. Officers striking another person with an impact weapon should attempt to strike, if possible, bodily areas likely to result only in incapacitation. These areas include major muscle mass groups such as the forearms, thighs, calves, etc.

      d. Impact Weapons currently include but are not limited to the Less Lethal Shotgun and the Expandable Baton.

   2. Chemical Agents

   The provisions governing non-deadly force will govern the use of chemical agents. Only chemical agents that are approved will be used. (Refer to S.O.P 200-2.18)

      a. Officers will exercise reasonable care to ensure that only intended persons are sprayed or otherwise subject to the application of chemical agents.

Barnes.Felix 000261

# Harris County Constable Precinct Five

    b. Chemical agents will not be applied to any person for the purpose of effecting punishment.

    c. First aid or medical attention will be provided to all persons sprayed with chemical agents.

F. Duty to Render Aid

    a. Deputies shall ensure that any person injured or believed to be injured as a result of the use of force, receive appropriate first aid and/or professional medical attention.

    i. The injuries, or possible injuries, and the treatment administered shall be included in the appropriate report.

    ii. Whenever a subject has visible injuries as a result of a use of force, or complains of injuries as a result of use of force, the deputy shall

        1. Call E.M.S.
        2. Document the incident in the appropriate report.

SPECIAL EMPHASIS

It is our policy that before being authorized to carry a firearm, all officers shall receive training and instruction with regard to: the proper use of deadly force; the agency's policies and state statutes with regard to such force; and be provided with copies of said policies and statutes. Such training and instruction shall continue throughout the officer's duty career and on an annual basis and that any suspected deviation of such policy or law be immediately reported by any personnel having knowledge of such.

S.O.P. 200/2.14
Use of Force and Deadly Force

Barnes.Felix 000262



OFFICE OF

## Glen Cheek, Constable Precinct 5

HARRIS COUNTY, TEXAS

TO: DEPUTY R. FELIX
BADGE #968

DATE: MAY 18, 2005

FROM: M. COLEMAN
CAPTAIN

SUBJECT: SUSPENSION

THE INVESTIGATION REGARDING FAIL TO COMPLETE TIME SHEETS HAS
BEEN COMPLETED.

THE INVESTIGATION REVEALED THAT YOU WERE NEGLIGENT IN FAILING
TO COMPLETE SEVERAL TIME SHEETS. YOU HAVE HAD AMPLE TIME TO
CONFORM TO THE REQUIREMENT IN COMPLETING A TIME SHEET.

THEREFORE, YOU ARE TO BE SUSPENDED FOR 1 DAY FROM DUTY ON
THURSDAY, JUNE 9, 2005. ANY FURTHER SUCH BEHAVIOR WILL RESULT IN
MUCH MORE SEVERE DISCIPLINARY ACTION, UP TO AND INCLUDING
TERMINATION

YOUR SIGNATURE AFFIXED HERETO INDICATES THAT YOU HAVE BEEN
NOTIFIED OF THIS ACTION.

_____
R. FELIX

_____
M. COLEMAN
CAPTAIN



EXHIBIT 35
WIT: Felix
DATE: 2 11 2 19
Aubrea Hobbs, CSR, RPR

**17423 Katy Freeway, Houston, Texas 77094-1311\* Phone 281-492-3600**

SCANNE

HC/BARNES-1729



OFFICE OF

## Glen Cheek, Constable Precinct 5

HARRIS COUNTY, TEXAS

TO: DEPUTY R. FELIX
BADGE #968

DATE: AUGUST 8, 2006

FROM: M. COLEMAN
CAPTAIN

SUBJECT: SUSPENSION

THE INVESTIGATION REGARDING THE INCIDENT ON JUNE 20, 2006, HAS BEEN COMPLETED.

THE INVESTIGATION REVEALED THAT YOU DIDN'T UTILIZING YOUR MICROPHONE AS REQUIRED, ACCORDING TO POLICY AND PROCEDURES FOR THE MOBILE VISION IN CAR VIDEO SYSTEMS DATED MAY 3, 2004, SECTION 5 FIELD OPERATIONS C. **"THE DEPUTIES SHALL ACTIVATE THE CAMERA SYSTEM IN ANY SITUATION THAT THEY FEEL MAY REQUIRE VIDEOTAPE EVIDENCE IN A CRIMINAL OR INTERNAL AFFAIRE INVESTIGATION".**

THEREFORE, EFFECTIVE TUESDAY, AUGUST 22, 2006 YOU WILL BE SUSPENDED FOR ONE (1) DAY. ANY FURTHER SUCH BEHAVIOR WILL RESULT IN MUCH MORE SEVERE DISCIPLINARY ACTION, UP TO AND INCLUDING TERMINATION.

DURING THE SUSPENSION YOU ARE NOT PERMITTED TO REPRESENT YOURSELF AS A PEACE OFFICER. FURTHERMORE, EXTRA EMPLOYMENT DURING SUSPENSION IS DISALLOWED.

YOUR SIGNATURE AFFIXED HERETO INDICATES THAT YOU HAVE BEEN NOTIFIED OF THIS SUSPENSION.

R. FELIX

M. COLEMAN
CAPTAIN

SCANNED

**17423 Katy Freeway, Houston, Texas 77094-1311\* Phone 281-492-3600**

HC/BARNES-1730



**OFFICE OF**

## Philip Camus, Constable Precinct 5

HARRIS COUNTY, TEXAS

TO: DEPUTY R. FELIX
BADGE #968

DATE: JANUARY 11, 2008

FROM: M. COLEMAN
CAPTAIN

SUBJECT: SUSPENSION

THE INVESTIGATION REGARDING LOST EQUIPMENT (HAND HELD RADAR UNIT) HAS BEEN COMPLETED.

THE INVESTIGATION REVEALED THAT YOU WERE NEGLIGENT AND FAILED TO SECURE THE HAND HELD RADAR UNIT.

THEREFORE, YOU ARE TO BE SUSPENDED FOR 1 DAY FROM DUTY ON THURSDAY, JANUARY 31, 2008. ANY FURTHER SUCH BEHAVIOR WILL RESULT IN MUCH MORE SEVERE DISCIPLINARY ACTION, UP TO AND INCLUDING TERMINATION

YOUR SIGNATURE AFFIXED HERETO INDICATES THAT YOU HAVE BEEN NOTIFIED OF THIS ACTION.

R. FELIX

M. COLEMAN
CAPTAIN

**17423 Katy Freeway, Houston, Texas 77094-1311\* Phone 281-492-3600** SCANNE

HC/BARNES-1731



**OFFICE OF**

## Phil Camus, Constable Precinct 5

**HARRIS COUNTY, TEXAS**

To:   Robert Felix
       Deputy

Date:  April 17, 2013

From:  R. Chapa
         Captain

Subject: Disciplinary Action
         Two – Day Temporary
         Suspension

The Administrative investigation regarding you violating department policy on March 1, 2013 has been completed. It has been established that your actions were a violation of S.O.P. 100-2.09. The Discipline Review Board (DRB) recommended a suspension from duty; which has been upheld by the Constable.

Therefore, it is ordered that you be suspended from duty for two (2) working days. The date of suspension will begin May 9, 2013 and extend through May 10, 2013. During the suspension period you are not permitted to represent yourself as a peace officer.

### Notice of Temporary Suspension

**This temporary suspension will begin on Thursday May 9, 2013 at 0600 hours.**

**The temporary suspension will conclude on Friday May 10, 2013 at 1400 hours.**

This is to acknowledge that I, Robert Felix, being a Deputy with Harris County Constable Pct. 5 on this day have received a copy of a letter of a **two-day temporary suspension** from pay and benefits. By this letter, I am informed of the reason for the **two-day temporary suspension** from pay and benefits.

**I am hereby advised that I am not to take any Police action nor carry or wear any department issued equipment (i.e. badge, gun belt, official identification, uniform etc.) during the period of this temporary**

ىUANNL

**suspension from pay and benefits. This temporary suspension will begin on Thursday May 9, 2013 at 0600 hours and conclude on Friday May 10, 2013 at 1400 hours. In addition, I am hereby informed that I will not be allowed to work any extra employment during the time of this temporary suspension, as provided by General Order 300-7.**

Any further such behavior will result in much more severe disciplinary action, up to and including termination.

Your signature affixed hereto certifies that you have been notified of the disciplinary action against you.

Signed on this _18th_ day of _April_ , 2013    Time: _10:34_ hours

_____
Robert Felix

_____
Witness

_____
R. Chapa
Captain