## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **Janice Hughes Barnes, Individually and** | § | |
| **as a Representative of The Estate of** | § | |
| **Ashtian Barnes, Deceased; and Tommy** | § | |
| **Duane Barnes** | § | |
| *Plaintiffs* | § | |
| | § | |
| **VS.** | § | **C.A. NO.: 4:18-CV-00725** |
| | § | |
| **Roberto Felix, Jr.** | § | |
| **And the County of Harris, Texas** | § | |
| *Defendants.* | § | |

## PLAINTIFFS' SUPPLEMENTAL BRIEF REGARDING HARRIS COUNTY'S PURSUIT POLICY

On January 24, 2020, Plaintiffs were asked by this Court to provide background information on their understanding of Harris County's policy regarding active pursuit of fleeing detainees, and whether the subject of this policy had ever previously arisen in this case. Subsequently, counsel for Defendants has provided a similar response, one in which she included as an attachment the county's Standard Operating Procedure 200/1.31, labeled "Fresh Pursuit." This response marked the very first time Defendants have ever acknowledged the existence of this policy, despite the fact that Plaintiffs specifically requested production of said policy in their interrogatories:

> 4.    Identify and explain your policies, procedures, and practices relating to the actions by an officer in response to a fleeing suspect. This question refers to any relevant policy regardless of whether that is in relation to a routine traffic offense or a greater criminal offense. This includes but is not limited to: training materials, in-person training such as classes, certifications, and continuing training, supervision of officers relating to use of force, and any other written or non-written policy, procedure, or practice. (*See* Appendix A, attached.)

Plaintiffs then proceeded to depose four of Defendant's witnesses, despite having no knowledge of the existence of this policy, but did pursue the topic in our deposition of Chief Terry Allbritton on July 12, 2019.

In his deposition, Chief Allbritton describes a pursuit policy that is fully in agreement with the written policy that has now been provided by Defendants. In the case of a vehicle that refuses to pull over, he states that the policy is to "just stay behind them. We don't have any our procedures to perform any pit maneuver or shoot out tires or anything like that. We follow the vehicle until it stops. Hopefully we have more gas than they do." *See* Appendix B, Deposition of Terry Allbritton, p. 36.

Later, when asked about a scenario where a stopped vehicle then decides to take off, he answered:

> 21 · · · **A.· ·That's someone that's actively trying to get**
> 22 **away from you when they do something like that.· So the**
> 23 **only real difference I would see in that scenario is you**
> 24 **would probably go ahead and ask for backup at that point.**
> 25 **You know, you tell them what happened, I tried to stop and**
> ·1 **it took off, so they would know it's not a normal traffic**
> ·2 **stop.**
> ·3 · · · Q.· ·Otherwise the same policy of how you would
> ·4 follow them?
> ·5 · · · **A.· ·Oh, yes, all that would stay the same.**
> ·6 · · · Q.· ·But would it be fair to say that in that
> ·7 scenario, the pursuit would be elevated up a little bit
> ·8 more serious?
> ·9 · · · **A.· ·Just a heightened sense of awareness.**
> 10 · · · Q.· ·Okay.
> 11 · · · **A.· ·But all the procedures would still stay the**
> 12 **same.**

*See* Appendix B, Deposition of Terry Allbritton, pp. 38-39.

As for the scenario in this case where Deputy Felix jumped onto a moving vehicle, Allbritton answered:

> ·8· · · ·Q.· ·Would your training -- would the policy at the
> ·9 Constable's Office be that officers should typically jump
> 10 onto moving cars in order to effect an arrest?
> 11· · · **A.· ·That's what I was saying.· We would discharge**
> 12 **anyone running and jumping on top of a car because then**
> 13 **you're placing yourself into a dangerous situation.**

*See* Appendix B, Deposition of Terry Allbritton, pp p. 76.

Next, Allbritton agreed further that the Felix had ample alternatives to continue pursue Barnes using solutions more in keeping with Precinct 5's pursuit policies. *See* Appendix B, Deposition of Terry Allbritton, pp. 77-79.

In contrast to this policy, in his deposition on February 18, 2019, Deputy Roberto Felix gave this account of his motives at the time:

> Q. (BY MR. FOMBY) So now he puts the car in
> 6 gear, and what is it specifically that makes you think
> 7 that his driving habits are going to change if he leaves
> 8 the scene?
> 9 **A. At that point he's -- he's evading a lawful**
> 10 **stop which in my experience always leads to a chase,**
> 11 **someone driving erratically to get away.**
> 12 Q. So what I'm hearing you say is that you had no
> 13 evidence that he was going to drive in a reckless
> 14 manner, but you presumed that he was going to drive in a
> 15 reckless manner?
> 16 **A. That is correct.**
> 17 Q. And based upon that presumption that you had
> 18 to stop this reckless behavior and dangerous behavior,
> 19 you felt it was important at that point to stop him from
> 20 leaving the scene?
> 21 **A. That is correct.**
> 22 Q. So your -- at this point your objective in --
> 23 in stopping him was to prevent him from endangering
> 24 other people on the highway with his driving?
> 25 **A. That would be a part of it, yes.**

*See* Appendix C, Deposition of Roberto Felix, pp. 72.

So, even before Defendant turned over the relevant policy, the record had firmly established that Felix's actions were in clear violation with Harris County's existing policy regarding active pursuit of a suspect. Despite this, the Constable stated in their Internal Investigation Report that no policy was violated by Deputy Felix and the policy titled "Fresh Pursuit" was not even considered in this determination.

Respectfully submitted,

**FOMBY & FOMBY LLC.**

/s/ Adam Fomby_____
Adam W. Fomby
State Bar No.  24083006
Howard R. Fomby
State Bar No. 24069725
440 Louisiana Street, Suite 900
Houston, Texas 77002
(281) 846-4229 Telephone
(888) 588-4925 Facsimile
adam@fombylaw.com
hfomby@fombylaw.com
ATTORNEYS FOR PLAINTIFF

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been served on each attorney of record electronically on this 7th day of February, 2020.


/s/ Adam Fomby
Adam Fomby

**EXHIBIT 1**

Excerpts from Deposition of Chief Terry Allbritton
Pages 35-39,  76-80

**Pages 35-39:**

3      Q.   Okay.  What if you turn on your lights and the
4 person doesn't pull over, what do you do under that
5 circumstance?
 **6      A.   You notify dispatch that the person is not**
**7 stopping.**
8      Q.   Okay.
 **9      A.   And then stay behind them until hopefully they**
**10 do.**
11      Q.   Okay.  And try to stay behind them?
**12      A.   Yes, sir.  And that's just going to be from the**
**13 officer's experience to determine whether or not hey, this**
**14 person is probably looking for a different place to pull**
**15 over or this person is trying to get away from me. So if**
**16 they're trying to get away, you're going to ask for backup**
**17 units.**
18      Q.   In Houston quite often there's so much traffic,
19 someone might be looking to get off the exit instead of
20 being on the side of the road?
**21      A.   Right.**
22      Q.   Which is actually courteous to the officer,
23 although it might be annoying at the time because trying
24 to keep everybody safe.
**25      A.   Doesn't bother me one bit.  I'd rather not be**
36
 **1 stopped on a highway.**
 2      Q.   Okay.  So you try to stay behind them. And

 3 then dispatch would -- ultimately what would happen if
 4 they're not pulling over?
 **5      A.    You're asking a question what would**
 **6 ultimately --**
 7      Q.    You have their license plate number, you have a
 8 description of the car.  Ultimately would you try to pull
 9 up in front of them, push them off the road?
**10      A.    No, we would just stay behind them.  We don't**
**11 have any our procedures to perform any pit maneuver or**
**12 shoot out tires or anything like that.  We follow the**
**13 vehicle until it stops.  Hopefully we have more gas than**
**14 they do.**
**15                I'm sorry.  I'm leaving something out.  It**
**16 may go a little further.  If it actually turns into a**
**17 pursuit, we do have what's called stop stick devices that**
**18 we can deploy that causes the tires to flatten and come to**
**19 a controlled stop, depending on if this turns into a**
**20 pursuit where it puts the public's safety in danger, we'll**
**21 use those to bring the pursuit to an end.**
22      Q.    And in that case you would probably deploy
23 other units to clear the roadway to make sure other people
24 don't run over those?
**25      A.    Yes, sir.  Called a tire deflation device.**
37
 1      Q.    Now, if you were in certain city streets,
 2 there's a lot of opportunities for someone you're pursuing

 3 to go in and out of streets and hide and that sort
of
 4 thing, is that a concern that you would have often
off of
 5 a major highway about pursuing them?
 6                 MR. HATZEL:  Objection, vague.
 **7      A.   Yeah, you may have to repeat the concern.**
 8      Q.   (BY MR. HOWARD FOMBY)  Just that on
certain
 9 city streets with a lot of places to turn and
places, of
10 course, that your pursuant can hide, is that a
concern in
11 terms of pursuit, do you worry about that?
**12      A.   No.  Normally when you're pursuing
someone,**
**13 your concern is where they're going to stop and take
off**
**14 running from the vehicle.**
15      Q.   Okay.
**16      A.   If you're following at the distance you
should**
**17 be at, it would be very difficult for them to hide
that**
**18 car.**
19      Q.   Right.  But it's easier for them to hide
if
20 they're on foot theoretically?
**21      A.   Yes, running into an apartment complex or**
**22 something like that, yes.**
23      Q.   And if they are not in the car, it would
be
24 more difficult for you to identify that was the
person in
25 the car?
38
 **1      A.   Yes.**
 2      Q.   If you're on a highway, though, a major
highway
 3 like the tollway, then you don't have that concern
 4 typically, do you?

 5      **A.     Not typically, but I can't say no one has ever**
 6 **jumped out and took off running across the lanes, but not**
 7 **typically.**
 8      Q.   Okay.  And it has a controlled ingress and
 9 egress?
10      **A.   Yes.**
11      Q.   And you have cameras all along helping you to
12 monitor?
13      **A.   Yes, sir.**
14      Q.   Okay.  Let's talk about a situation where
15 you've got a car pulled over, they stop and for whatever
16 reason they take off, do the same rules apply?
17      **A.   No because now it's -- you're probably not**
18 **looking for someone with a safe place to stop at that**
19 **point.**
20      Q.   Okay.
21      **A.   That's someone that's actively trying to get**
22 **away from you when they do something like that.  So the**
23 **only real difference I would see in that scenario is you**
24 **would probably go ahead and ask for backup at that point.**
25 **You know, you tell them what happened, I tried to stop and**
39
 1 **it took off, so they would know it's not a normal traffic**
 2 **stop.**
 3      Q.   Otherwise the same policy of how you would
 4 follow them?
 5      **A.   Oh, yes, all that would stay the same.**
 6      Q.   But would it be fair to say that in that
 7 scenario, the pursuit would be elevated up a little bit

8 more serious?

**9      A.     Just a heightened sense of awareness.**

10      Q.     Okay.

**11      A.     But all the procedures would still stay the**

12 same.


**Pages 76-80:**


 8      Q.     Would your training -- would the policy at the

 9 Constable's Office be that officers should typically jump

10 onto moving cars in order to effect an arrest?

**11      A.     That's what I was saying.   We would discharge**

**12 anyone running and jumping on top of a car because then**

**13 you're placing yourself into a dangerous situation.**

14      Q.     If you have an officer who is standing --

15 there's a car coming towards an officer, but not directly

16 towards him, the officer is standing away from where the

17 car is coming, would your policy be that the officer would

18 be justified in stepping in front of that car and because

19 he's now at danger firing his duty weapon into the driver

20 to erase the threat?

**21      A.     Our training says you are not to place yourself**

**22 in front of a vehicle, yes, sir.**

23      Q.     And that is because you are not supposed to put

24 yourself in danger simply to stop a suspect?

**25      A.     Yes, sir.**

77

1      Q.    We talked earlier about your policies about

2 escaping.  If Ashtian Barnes had simply escaped, were

3 there procedures in place that would have been sufficient

4 to get him at some point?

5                MR. HATZEL:  Objection, vague.

6      Q.   (BY MR. HOWARD FOMBY)  Could Officer Felix have

7 pursued in his vehicle?

**8      A.    Yes, sir.**

9      Q.   Could Officer Felix have called in additional

10 support on the tollway?

**11      A.    Yes, sir.**

12      Q.   And, in fact, Officer Felix had already called

13 for a backup officer previously?

**14      A.    I believe so, yes, sir.**

15      Q.   And there are cameras monitoring Ashtian Barnes

16 as he travels down the tollway; correct?

**17      A.    Yes, there are a bunch of cameras along the**

**18 tollway, yes, sir.**

19      Q.   And Officer Felix already has an idea of who's

20 the owner of that car, right, from the license plate?

**21      A.    Yes, sir.**

22      Q.   And he already knows that the person sitting in

23 there has identified himself as Ashtian Barnes; is that

24 correct?

**25      A.    Verbally, yes, sir.  I don't think he ever got**

78

 **1 a driver's license.  So verbally, yes, sir.**

 2      Q.    And he has a visual ID of who that person is
 3 driving that car?
 **4      A.    Yes, sir.**
 5      Q.    So unlike the scenario where you're pursuing
 6 someone you don't know who's in the car -- remember we
 7 talked about someone jumps out and runs and hides?
 **8      A.    Yes, sir.**
 9      Q.    In this case Ashtian Barnes was very unlikely
10 to ever escape eventual arrest; right?
**11      A.    That would be difficult because I don't think**
**12 he ever positively ID'd him.**
13      Q.    But you knew who owned the car, so you check
14 back to who it was rented to; correct?
**15      A.    But I don't think -- was it rented to him?**
16      Q.    It was rented to his girlfriend.
**17      A.    So hopefully she would give you testimony to**
**18 tell you who was driving it that day.**
19      Q.    Right.  So what I'm saying is that compared to
20 a scenario where you don't know anything about it, though,
21 someone evading arrest for possible possession of
22 marijuana is not something that would call for an
23 exception to the normal policy of pursuit; right?
**24      A.    What do you mean?  I'm trying to follow.  What**
**25 do you mean by --**
79
 1      Q.    So we talked about the normal policy of
 2 pursuit, that you just follow them and you might call in
 3 other officers?
 **4      A.    This would have been a felony traffic**
**stop.  If**

 5 he would have gotten away, there would have been lots of
 6 guns pointed at him once we got him pulled over because
 7 now he has committed a felony.
 8      Q.   By leaving?
 9      A.   By leaving.
10      Q.   But before he left, would it have been a
11 felony?
12      A.   Before he drove off?
13      Q.   Yes.
14      A.   No, sir, because all he had suspected him for
15 at that point was possession of marijuana.
16      Q.   And, in fact, that at point, there was no
17 evidence that he had any marijuana in his possession;
18 correct?
19      A.   He hadn't searched the vehicle yet, so -- there
20 was some -- I believe Felix was working under the pretense
21 that there may be marijuana inside the vehicle.  He hadn't
22 determined whether or not there was any there or not.
23      Q.   In terms of putting the public at risk, what
24 is -- does jumping on a vehicle that's moving and shoving
25 a gun in someone's face put the general public at risk in
80
 1 any way?
 2      A.   I'm trying to work through this scenario.
 3      Q.   And we're talking about a tollway that's very
 4 active with lots of traffic?
 5      A.   A pursuit on the toll road definitely puts the
 6 public at risk.

**APPENDIX A**

Plaintiff's Interrogatory Requests of Defendant
September 18, 2018

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **Janice Hughes Barnes, Individually and** | § | |
| **as a Representative of The Estate of** | § | |
| **Ashtian Barnes, Deceased; and Tommy** | § | |
| **Duane Barnes** | § | |
| *Plaintiffs* | § | |
| | § | |
| **VS.** | § | **C.A. NO.: 4:18-CV-00725** |
| | § | |
| **Roberto Felix, Jr.** | § | |
| **And the County of Harris, Texas** | § | |
| *Defendants.* | § | |

### Plaintiffs' First Set of Requests for Production,
### Interrogatories, and Requests for Admissions

TO:   Defendant, Harris County, by and through its counsel of record Mary Baker, Senior Assistant County Attorney, 1019 Congress, 15th Floor, Houston, Texas 77002

Pursuant to FEDERAL RULES OF CIVIL PROCEDURE, Plaintiffs request that you produce the designated documents, responses, or tangible things within 30 days after the date of service of this request at the offices of Fomby Law Firm, 440 Louisiana Street Suite 900, Houston, Texas 77002, during its regular business hours.

This Request for Production is continuing in nature and should you, at a later date, come into possession, custody, or control of any of the documents or tangible things requested, then you shall produce such documents or tangible things to the undersigned attorneys.  You are under a duty to supplement your response to include information acquired at a later date if you obtain information upon the basis of which: (1) you know that your response was incorrect or incomplete when made; or, (2) you know that, although your response was correct and complete when made, the

response is no longer true and complete and the circumstances are such that failure to amend the response is in substance misleading.

If you contend that you are entitled to withhold from production any or all documents identified herein on the basis of privilege, then as provided for under Federal Rules of Civil Procedure, please state 1) that the information or material responsive to the request has been withheld, 2) the request to which the information or material relates, 3) the privilege asserted, and 4) a description of the withheld material or information.

Additionally, please allow this document to act as a written self-authenticating notification, as provided for under Federal Rules of Civil Procedure.  Plaintiffs intend to use some or all of the evidence produced by Defendant in response to written discovery, against the Defendant, either at the time of trial or during pretrial proceedings, regardless of whether this evidence is submitted in response to these Requests for Production.

Respectfully submitted,
FOMBY LAW FIRM

_____

Adam W. Fomby
State Bar No. 24083006
Howard R. Fomby
State Bar No. 24069725
440 Louisiana Street Suite 900
Houston, Texas 77002
(281) 846-4229 Telephone
(888) 588-4925 Facsimile
adam@fombylaw.com
hfomby@fombylaw.com
ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I, the undersigned attorney, do hereby certify that a true and correct copy of the foregoing document was forwarded to the following counsel of record on this the 18th day of September, 2018 pursuant to the Federal Rules of Civil Procedure:

_____

Adam Fomby

## DEFINITIONS AND INSTRUCTIONS

As used herein, the singular shall include the plural, and the plural the singular, whenever the effect of doing so is to increase the information in your responses.  As used herein, the words defined below shall be deemed to have the following meanings unless indicated otherwise in an individual Request or Interrogatory:

1.    "Communication" means any oral or written utterance, notation or statement of any nature whatsoever, by and to whomsoever made, including, but not limited to, correspondence, conversations, dialogues, discussions, interviews, accident reports, consultation, agreements, and all other understandings between or among two or more persons.

2.    "Plaintiffs" means either The estate of Ashtian Barnes, Tommy Barnes or Janice Barnes individually, and/or collectively.

3.    "Discovery request" includes, but is not limited to, an interrogatory, request for production, and request for production of documents.

4.    "Defendant" or "Defendants" refers to either Roberto Felix Jr. or Harris County, Texas. both individually and collectively, and when applicable, each and every agent, representative, attorney, employee, contractor, subcontractor or person acting or purporting to act on Defendant's behalf or under Defendant's control or direction.

5.    "Document" means any medium upon which intelligence or information can be recorded or retrieved and includes, without limitation, the original and each copy, regardless of origin and location, of any book, pamphlet, periodical, letter, memorandum (including any memorandum or report of a meeting or conversation), invoice, bill, order form, receipt, financial statement, accounting entry, diary, calendar, telex, telegram, cable, report, working paper, chart, paper, print, printout from any and all computer disks, tapes or records that may be produced from a computer or word,  processor, laboratory record, drawing, sketch, graph, index, list, tape, photograph, microfilm, data sheet, or data processing card, or any other written, recorded, transcribed, punched, taped, filmed, or graphic matter, however produced or reproduced, which is in your possession, custody or control or which was, but is no longer, in your possession, custody or control.  The term "document" as used herein, further means, without limiting the above, answers to interrogatories, depositions or other discovery material produced, disclosed or made in response to any discovery conducted in any legal proceeding, statements, pleadings, reports, citations or writings of any nature filed with any person or forwarded by any person to Plaintiff and any other writings of any nature, however produced or

reproduced, including all drafts and non-identical copies of such documents. Such term also includes all those "documents" in the possession, custody or control of any attorney or agent of the person or entity from whom discovery is sought. Any copy of any "document" contained therein or attached thereto, any alterations, notes, comments, or other material not included in the originals or copies referred to above shall be deemed a separate document.

6.    "Identify," "identity" or "identification," when used herein, include but are not limited to the following:

    a.    A natural individual - requires you to state his or her full name and residence and business addresses and telephone numbers;

    b.    A document - requires you to state the number of pages and the nature of the document (e.g letter or memorandum), its title, its content, its date, the name or names of its authors and recipients, and its present location and custodian. If you contend that you are entitled to withhold from production any or all documents identified herein on the basis of attorney/client privilege, the work-product doctrine, or other ground, then do the following with respect to each and every document

      i.    Describe the nature of the document;
      ii.    State the date of the document;
      iii.    Identify the person who sent and received the original and a copy of the  document;
      iv.    State the subject matter of the document; and
      v.    State the basis upon which you contend you are entitled to withhold the document from production."

    c.    A communication - requires you, if any of the communication was written, to identify the document or documents which refer to or evidence the communication; and to the portion that was non-written, to identify the person participating in the communication and to state the date, manner, place and substance of the communication; and

    d.    Any other entity - requires you to state the name and residence or business addresses and telephone number.

7.    "Or" appearing in a discovery request should not be read so as to eliminate any part of the request but, whenever applicable, it should be interpreted as "and/or". For example, an interrogatory stating "support or refer" should be read as "support and/or refer" if an answer that does both can be made.

8.    "Person" means any natural individual in any capacity whatsoever, including

employees, or any entity or organization, including divisions, departments and other units and shall include a public or private corporation, partnership, joint venture, voluntary or unincorporated association, organization, proprietorship, trust, state, governmental agency, commission, bureau or any other entity.

9.    "Representative" means any and all agents, employees, servants, officers, directors, attorneys or other persons acting or purporting to act on behalf of the person, entity or party in question.

10.    "Statement", pursuant to Tex. R. Civ. P. Rule 192.3(h), means (1) a written statement signed or otherwise adopted or approved in writing by the person making it, and/or (2) a stenographic, mechanical, electrical or other type of recording of a witness' oral statement, or any substantially verbatim transcription of such a recording.'

11.    "You," "your," or "yourself" refer to Defendant, Harris County, and when applicable, each and every agent, representative, attorney, employee, contractor, subcontractor, person acting or purporting to act on Defendant's behalf or under Defendant's control or direction, as well as any person or entity acting on behalf of any sub-entities which are party of Harris County and subject to its control. This includes but is not limited to Harris County Constable Office Precinct 5, Harris County District Attorney Office, Harris County Sheriff's Office, and any other entity.

## Plaintiffs' Requests for Production to Harris County

1.   All "documents" as defined above or tangible items you or your attorney may use as evidence or for demonstration at the trial of this cause.

2.   All documents, photographs or tangible things to which you referred to or identified in answering Plaintiffs' interrogatories.

3.   All documents relating to any communications between you and Plaintiffs.

4.   All documents relating to any investigation conducted by Harris County Constable Precinct Five offices relating to the incident which forms the basis of this lawsuit.

5.   All documents relating to any investigation conducted by Harris County relating to the incident which forms the basis of this lawsuit.

8.   All documents relating to any investigation conducted by the City of Houston Police Department relating to the incident which forms the basis of this lawsuit.

9.   All documents relating to any communication between you and the City of Houston Police Department relating to the incident which forms the basis of this lawsuit.

8.   The entire investigative file of the Harris County District Attorney's office which presented claims relating to the incident which forms the basis of this lawsuit to the grand jury.

10.  All document relating to any investigation conducted by Harris County District Attorney's offices relating to the incident which forms the basis of this lawsuit.

11.  All documents relating to any communication between you and Harris County District Attorney's office relating to the incident which forms the basis of this lawsuit.

12.   All documents relating to any investigation conducted by any third party relating to the incident which forms the basis of this lawsuit.

13.  Any photograph, media coverage, film, videotape, moving pictures, audiotape, electronic image or recording which depicts, includes, or contains the voice or image of any person or thing relating to this incident.

14. Any photograph, media coverage, film, videotape, moving pictures, audiotape, electronic image or recording which depicts, includes, or contains any statement made by you relating to any investigation conducted relating to the incident which forms the basis of this lawsuit. This includes but is not limited to: any statement made to a grand jury, any statement made to the District Attorney's office, any statement made to Houston Police Department, any statement made to Harris County Constable's Offices, or any statement made to any other law enforcement entity.

15. Produce any photograph, media coverage, film, videotape, moving pictures, audiotape, electronic image or recording which depicts, includes, or contains the voice or image of Ashtian Barnes. This includes but is not limited to dash cam video, body cam video, any body-mounted video, beltway video, autopsy video, or similar video.

16. Any photograph, media coverage, film, videotape, moving pictures, audiotape, electronic image or recording which depicts, includes, or contains the voice or image of you relating in any way to the incident which forms the basis of this lawsuit. This includes but is not limited to dash cam video, body cam video, any body-mounted video, beltway video, walkthrough video, formal or informal investigation by the Houston Police Department, Harris County District Attorney, Harris County Constable's Office, or similar entity, as well as any other similar recording.

17. Any document relating to the criminal investigation and/or indictment and/or grand jury investigation of Deputy Constable Roberto Felix relating to the incident which forms the basis of this lawsuit.

18. Any and all statements made by any current or former employees, agents, staff, or similar persons to the grand jury relating in any way to the incident which forms the basis of this lawsuit. Include written, recorded, or stenographic statements as well as any other form made.

19. Any and all documents relating to any previous shootings to which Deputy Constable Roberto Felix has been a party. Including but not limited to any investigative reports, written or recorded statements, written communication, electronic communication, or other documentation memorializing any information relating to those previous shootings.

20. Any and all documents which contain Deputy Constable Roberto Felix's personnel file or similar file with in conjunction with his employment by Harris County, including but not limited to all documentation of disciplinary proceedings and actions by Harris County in regards to Deputy Constable Roberto Felix's employment by the county.

21.      Any and all documents relating to any training Deputy Constable Roberto Felix received or was ordered to receive as a result of the incident which forms the basis of this lawsuit.

22.      Any and all documents relating to any punishment, fine, penalty, or other action taken by Harris County Constable Office which are the result of the actions of Deputy Constable Roberto Felix in the incident which forms the basis of this lawsuit.

23.      Any documents relating to the incident in January 2007 in which Deputy Constable Roberto Felix was involved in an officer involved shooting.

24.      Any incident reports, investigative report, or other document which is related to the incident in January 2007 in which Deputy Constable Roberto Felix was involved in an officer involved shooting.

25.      Any documents relating to any punishment, fine, penalty, or other action taken by Harris County Constable's Office or any supervising entity relating to the incident in January 2007 in which Deputy Constable Felix was involved in an officer involved shooting.

26.      Any and all indemnity or insurance agreements, including but not limited to the declarations page, under which any person may be liable to satisfy part or all of a judgment rendered in this action or to indemnify or reimburse for payments made to satisfy any judgment herein.

27.      Any and all insurance contracts, including but not limited to the declarations page, which provide secondary or excess coverage to Defendant(s) for any risk related to or stemming from the incident; this request specifically includes any motor vehicle insurance policy issued to Defendant(s) at the time of the incident.

28.      Any reservation of rights letter pertaining to the claim made the basis of this lawsuit.

29.      Any photograph, media coverage, film, videotape, moving pictures, audiotape, electronic image or recording which depicts, includes, or contains any 911 or emergency calls made as a result of the incident which makes the basis of this lawsuit.

30.      Any and all documents relating to your hiring policies and screening standards for police officers and constables, including but not limited to the application process, required testing, pre-hire investigations and final approval process.

31.    Any and all documents relating to your policies, procedures, and practices regarding supervision, training and possible suspension of officers/constables following an officer involved shooting. This includes but is not limited to: training materials; in-person training such as classes, certifications and continuing training; supervision of officers relating to use of force; and any other written or non-written policy, procedure, or practice.

32.    Any and all documents relating to your policies, procedures, and practices regarding returning officers/constables to the field following an officer involved shooting. This includes but is not limited to: training materials; in-person training such as classes, certifications and continuing training; supervision of officers relating to use of force; and any other written or non-written policy, procedure, or practice.

33.    In connection with your retained testifying expert(s), produce the following:

a.    A copy of his biography;

b.    Bibliography, including a list of all other cases in which he submitted an expert report within the last five years, and copies of his invoices showing the amounts of money that he received for his services at a deposition or trial;

c.    All documents, tangible things, physical models, reports, compilations of data, test results, or other material provided to, reviewed by, or prepared by or for the retained testifying expert in anticipation of the expert's testimony.

d.  A copy of the expert's file, communications with the parties and their attorneys, and drafts of reports prepared by the expert.

## Plaintiffs' Interrogatories to Harris County

1.   Identify and explain your policies, procedures, and practices relating to the use of force and/or escalation of force by an officer/constable. This includes but is not limited to: training materials; in-person training such as classes, certifications and continuing training; supervision of officers relating to use of force; and any other written or non-written policy, procedure, or practice.

2.   Identify and explain your policies, procedures, and practices relating to the use of a firearm by an officer/constable. This includes but is not limited to: training materials; in-person training such as classes, certifications, and continuing training; supervision of officers relating to use of force; and any other written or non-written policy, procedure, or practice.

3.   Identify and explain your policies, procedures, and practices relating to the use of a firearm by an officer/constable at, near, or in the direction of a moving vehicle. This includes but is not limited to: training materials; in-person training such as classes, certifications, and continuing training; supervision of officers relating to use of force; and any other written or non-written policy, procedure, or practice.

4.   Identify and explain your policies, procedures, and practices relating to the actions by an officer/constable in response to a fleeing suspect. This question refers to any relevant policy regardless of whether that is in relation to a routine traffic offense or a greater criminal offense. This includes but is not limited to: training materials; in-person training such as classes, certifications, and continuing training; supervision of officers relating to use of force; and any other written or non-written policy, procedure, or practice.

5.   Identify and explain your policies, procedures, and practices relating to supervision, training and possible suspension of officers/constables following an officer involved shooting. This includes but is not limited to: training materials; in-person training such as classes, certifications and continuing training; supervision of officers relating to use of force; and any other written or non-written         policy,         procedure,         or         practice.

6.   Identify and explain your policies, procedures, and practices relating to returning officers/constables to the field following an officer involved shooting. This includes but is not limited to: training materials; in-person training such as classes, certifications and continuing training; supervision of officers relating to use of force; and any other written or non-written policy, procedure, or                                                                practice.

7.    Identify and explain your hiring policies and screening standards for police officers and constables, including but not limited to the application process, required testing, pre-hire investigations and final approval process.

8.    List the names of all persons who provided testimony to the grand jury relating to the incident which forms the basis of this lawsuit.

9.    Do you contend that during the incident which forms the basis of this lawsuit, Deputy Constable Roberto Felix violated any policies, procedures, or practices in his actions taken prior to, during or following the incident? If so, describe and list which policies, procedures, and practices were violated.

10.   Do you contend that the actions taken by Deputy Constable Roberto Felix during the incident which forms the basis of this lawsuit were done in accordance with all of the policies, procedures, and practices of Harris County Constable Office?

11.   For each of the policies, procedures, and practices listed in Interrogatory 1, 2, 3, and 4, as well as any other policy, procedure, or practice which you believe is relevant to this case, list the name of the official policy maker at the time the incident occurred for each as well as that person's most recent contact information.

## <u>VERIFICATION</u>

THE STATE OF TEXAS      §
                                  §

COUNTY OF _____     §

        Before me, the undersigned authority, on this day personally appeared _____, known to me to be the person whose name is subscribed to the foregoing instrument, and after being duly sworn stated upon her oath that she has read the above and foregoing answers to interrogatories; and that the statements contained therein are true and correct and within her personal knowledge.


                      _____
                      Affiant


        Subscribed and sworn to before me by the said _____ on this _____ day of _____ 2018, to certify which witness my hand and official seal of office.


                      _____
                      Notary Public in and for the State of Texas

## **Plaintiffs' Requests for Admissions to Roberto Felix, Jr.**

1.    Admit that Deputy Constable Roberto Felix shot and killed Ashtian Barnes.

2.    Admit that Deputy Constable Roberto Felix by means of physical force or show of authority, had in some way restrained the liberty of Ashtian Barnes.

3.    Admit that Ashtian Barnes was not free to leave when Deputy Constable Roberto Felix shot and killed him.

4.    Admit that Deputy Constable Roberto Felix intentionally shot and killed Ashtian Barnes.

5.    Admit that Deputy Constable Roberto Felix's use of force by shooting and killing Ashtian Barnes was objectively unreasonable.

6.    Admit that Deputy Constable Roberto Felix violated Harris County's policies regarding the premature drawing of a firearm.

7.    Admit that Deputy Constable Roberto Felix violated Harris County's policies regarding use of deadly force.

8.    Admit that Deputy Constable Roberto Felix violated Harris County's policies regarding the discharge of a firearm.

9.    Admit that Deputy Constable Roberto Felix violated Harris County's policies regarding the discharge of a firearm toward a moving vehicle.

10.    Admit that Deputy Constable Roberto Felix violated Harris County's policies regarding the discharge of a firearm in such a manner that members of the general public were placed at undue risk.

11.    Admit that Deputy Constable Roberto Felix violated Harris County's policies regarding the pursuit of a non-violent fugitive.

12.    Admit that Deputy Constable Roberto Felix violated Harris County's policies regarding the removal of a suspect from a vehicle prior to the arrival of a backup officer.

13.    Admit that Deputy Constable Roberto Felix violated Harris County's policies regarding rendering of aid to a wounded suspect.

14. Admit that Deputy Constable Roberto Felix acted recklessly by jumping onto Ashtian Barnes' vehicle while it was in motion.

15. Admit that Deputy Constable Roberto Felix acted recklessly by shooting the driver of a moving vehicle, thereby placing the driver, himself and the general public driving on the tollway at great risk.

16. Admit that Deputy Constable Roberto Felix acted recklessly by blindly firing your firearm in the direction of Ashtian Barnes.

17. Admit that Deputy Constable Roberto Felix made no attempt to provide medical assistance to Ashtian Barnes as he was dying.

18. Admit that Deputy Constable Roberto Felix failed to verify that medical care had been summoned for Ashtian Barnes after the shooting.

19. Admit that after he was shot, Ashtian Barnes himself brought the car to a stop without any assistance from Deputy Constable Roberto Felix.

20. Admit that at no time prior to the shooting did Deputy Constable Roberto Felix personally perceive any type of dangerous weapon on or near Ashtian Barnes, other than potentially the car.

21. Admit that no trace of any kind of illegal drugs, including marijuana, were ever found on or near Ashtian Barnes or in his car following the shooting.

22. Admit that the car Ashtian Barnes was driving was a rental vehicle.

23. Admit that any toll tag violations related to the vehicle Ashtian Barnes was driving when he was shot were incurred prior to one week before the shooting.

**APPENDIX B**

Deposition of Chief Terry Allbritton
July 12, 2018

```
 1                UNITED STATES DISTRICT COURT

            FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    HOUSTON DIVISION
 3  Janice Hughes Barnes,        §
    Individually and as          §
 4  Representative of The        §
    Estate of Ashtian Barnes,    §
 5  Deceased; And Tommy Duane    §
    Barnes                       § CAUSE NO: 4:18-CV-00725
 6           Plaintiffs          §
                                 §
 7  vs.                          §
                                 §
 8  Roberto Felix, Jr., And      §
    the County of Harris,        §
 9  Texas                        §
    Defendants                   §
10
11
12        ORAL DEPOSITION OF CHIEF TERRY ALLBRITTON
13                    JULY 12, 2019
14
15
16        ORAL DEPOSITION of CHIEF TERRY ALLBRITTON,
17  produced as a witness at the instance of the Plaintiff,
18  and duly sworn, was taken in the above-styled and numbered
19  cause on the 12th day of July, 2019, from 9:57 a.m. to
20  12:31 p.m., before Heather Deiss, CSR in and for the State
21  of Texas, reported by machine shorthand, at the OFFICE OF
22  VINCE RYAN, 1019 Congress, 15th Floor, Houston, Texas
23  77002, pursuant to the Texas Rules of Civil Procedure and
24  the provisions stated on the record or attached hereto.
25                     JOB NO. 49790
 2
 1 A P P E A R A N C E S
 2
 3
 4 For the Plaintiffs:
 5      MR. HOWARD R. FOMBY
        MR. ADAM W. FOMBY
 6      FOMBY LAW FIRM
        440 Louisiana Street, Suite 900
 7      Houston, Texas 77002
        281-846-4229
 8      888-588-4925
        Adam@fombylaw.com
```

```
 9        Hfomby@fombylaw.com
10
11
12
   For the Defendants:
13
          MR. CAMERON HATZEL
14        MS. MARY BAKER
          HARRIS COUNTY ATTORNEY'S OFFICE
15        1019 Congress, 15th Floor
          Houston, Texas 77002
16        713-274-5133
          Mary.Baker@cao.hctx.net
17
18
19
20
                       *-*-*-*-*
21
22
23
24
25
 3
 1 INDEX
 2
                                              PG
 3
    Appearances...................................   2
 4
    CHIEF TERRY ALLBRITTON
 5
       Examination by Mr. Howard Fomby...............   4
 6
    Signature and Changes..........................  99
 7  Reporter's Certificate......................... 101
 8                       EXHIBITS
   Exhibit 1.........................................  16
 9    9/20/16 Letter from Terry Allbritton
   Exhibit 2.........................................  17
10    Disciplinary Review Board Summary Page - Deputy
      Roberto Felix
11 Exhibit 3.........................................  14
      Harris County Constable Precinct 5 SOP
12 Exhibit 4.........................................   4
      Plaintiff's Rule 30(B)(6) Deposition Notice of
13    Harris County
```

Exhibit 5........................................     50
14    9/15/16 Letter From Captain Steffenauer
Exhibit 6........................................     98
15    5/20/19 Letter From Mary Baker
Exhibit 7........................................     98
16    Defendant Harris County's Objections to
      Plaintiff's Rule 30(B)(6) Deposition Notice of
17    Harris County and Notice of Deposition of Harris
      County Precinct 5 Constable's Office
18                        *-*-*-*-*
19
20
21
22
23
24
25
4
 1                   **CHIEF TERRY ALLBRITTON,**
 2 **having been first duly sworn, testified as follows:**
 3                            EXAMINATION
 4 BY MR. HOWARD FOMBY:
 5       Q.   Do you go by Chief Allbritton or Officer
 6 Allbritton?
 7       **A.   Chief Allbritton.**
 8       Q.   Chief Allbritton, did you have an
opportunity
 9 to review our deposition notice in this case?
10       **A.   Yes, sir, I did.**
11       Q.   And is this the notice that you received?
12       **A.   Yes, sir, I recognize all this, yes, sir.**
13       Q.   Okay.
14                  MR. HOWARD FOMBY:  Can I admit that
as 4?
15                  (Off-the-record discussion)
16                  MR. HATZEL:  For the record Chief
17 Allbritton is only being offered on a certain number
of
18 those topics pursuant to our letter of May 20, 2019.
19                  MR. HOWARD FOMBY:  And for the record
some

20 of the questions that they have excluded actually may fall
21 within his personal knowledge and understanding.  So we'll
22 be exploring some of that.
23      Q.   (BY MR. HOWARD FOMBY)  Now, Chief Allbritton,
24 before we get started, have you ever done a deposition
25 before?
5
 **1      A.   Yes, sir.**
 2      Q.   So you understand what the purpose of the
 3 deposition is?
 **4      A.   Yes, sir.**
 5      Q.   While we're asking questions, if I -- sometimes
 6 I ask a question and I know what I'm asking, but it's kind
 7 of confusing when it comes out of my mouth, that's what my
 8 wife tells me all the time.  So if I ask you something and
 9 you don't understand the question or you don't hear it
10 correctly, can I ask that you just stop and let me know
11 and I will try and rephrase it and make it clear, okay?
**12      A.   Yes, sir.**
13      Q.   Because I want to be fair to you and what's
14 important here is getting to the truth of things and not
15 trying to trick somebody into saying something else, okay?
**16      A.   Yes, sir.**
17      Q.   So that's going to be my pledge to you that I'm
18 going to try to be as honest and direct with you as

19 possible; can I ask that you try to be the same with me?

**20      A.    Yes, sir.**

21      Q.    And at the end of this, you'll have a couple of

22 opportunities.  I know that sometimes when I'm asking

23 questions, you may not remember something, but another

24 question later may change -- may trigger something. Our

25 memories aren't perfect and that's just the way the brain

6

 1 works.  I'm going to give you an opportunity at the end of

 2 all of this to correct anything or change anything on the

 3 record that you may have come across later, okay?

 **4      A.    Okay.**

 5      Q.    You'll also have an opportunity once this is

 6 all done, the court reporter is going to send a copy of

 7 the deposition record that she's taking down and sometimes

 8 she may not hear a word that you say correctly or she may

 9 not know what that word is and so you'll have an

10 opportunity to go over that and offer any corrections into

11 that.  And I think you've seen this before, but I wanted

12 to clarify that for you.

13                  Before we get started, do you have any

14 other questions about the process?

**15      A.    No.**

16      Q.    This is a -- this entire case is about a

17 shooting that took place about two years ago on April

18 28th, 2016.  And that was a shooting where Deputy Roberto

19 Felix fired a weapon that led to the death of Ashtian

20 Barnes.  Now, do you know Roberto Felix?

**21     A.   Yes, sir.**

22     Q.   And Roberto Felix worked in your particular

23 constable's office?

**24     A.   Yes, sir.**

25     Q.   To be precise, what is your job, what is your

7

1 job?

**2     A.   I'm over our toll road division and our parks**

**3 division.**

4     Q.   Okay.  And that's in Precinct 5?

**5     A.   Yes, sir.  So I cover the toll road sections**

**6 that are within Precinct 5 and the Harris County parks**

**7 that are within Precinct 5.**

8     Q.   Okay.  So clearly we know what a constable is,

9 he's the head of that particular precinct?

**10     A.   Yes, sir.**

11     Q.   What does a chief do?

**12     A.   Manage the divisions that are assigned under**

**13 us.  So my role is to make sure that everyone under me is**

**14 doing what they should be doing within those divisions,**

**15 that their mission is being accomplished.**

16     Q.   Okay.  And that would be the deputies that are

17 running -- working the toll roads where the parks would be
18 under your manage?
**19      A.    Yes, sir, the deputies and their supervisors.**
20      Q.    Okay.  Other than the constables and s the
21 chief's deputies, what other levels would there be?
**22      A.    Below me is captains, lieutenants, sergeants,**
**23 and we didn't have them back then, but now we've added the**
**24 rank of corporal, and then you get down to deputy.**
25      Q.    So you talk about your responsibilities are the

8

 1 toll roads and the parks, what other departments are there
 2 within the constant's office Precinct 5?
 **3      A.    We have a patrol division, which is our largest**
 **4 division, which is mainly made up of contract patrol**
 **5 deputies.  We also have a -- what we call a special**
 **6 operations division that has our SRU units, special**
 **7 response units, that get sent to hot spot areas,**
 **8 motorcycle units.  We're only down to three of those now.**
 **9 We have a small narcotics division and a major offenders**
**10 division that are all part of that special operations**
**11 group.  And all that falls under a different chief. But**
**12 those divisions each have their own higher-ups that watch**
**13 them like I take care of the toll roads and the parks.**
14      Q.    And you mentioned patrol division.  I just
15 actually -- we were talking about this earlier.  I bought

16 a second house because I have a grandbaby that kicked
17 me --
**18      A.    Congratulations.**
19      Q.    -- out of the guest room.  And I noticed that
20 there are signs and everything else.  When you talk about
21 patrol, you guys hire contract patrol officers to patrol
22 certain neighborhoods; is that right?
**23      A.    They're actually hired by either the Municipal**
**24 Utilities District, MUD, or a homeowners association,**
**25 contracts with Harris County to provide for patrol**
9
 **1 services in that area.  So if you live in a subdivision**
 **2 and your HOA through the dues decided we want extra**
 **3 policing in our area, then that HOA enters into a contract**
 **4 with Harris County and they send money to Harris County in**
 **5 exchange for having a deputy patrol that area.  That is**
 **6 essentially what's happening on the toll road.  The toll**
 **7 road funds for those deputies to be on the toll road.**
 8      Q.    So when you say contract, it's actual official
 9 deputies, but they're being provided under a contract
10 rather than you're contracting that duty out?
**11      A.    Yes.**
12      Q.    Okay.
**13      A.    And it all runs through commissioner's court**

**14 through Harris County.   And there's some split in
there,
15 it varies depending on where it actually is, the
16 neighborhood carries some of the cost and the county
picks
17 up some of the cost.   But I'm not part of that
formula.**
18      Q.   Okay.  So certain other functions of day
to day
19 work, anytime anyone has a job normally working for
a
20 company that's usually an HR function, a finance
function,
21 who handles that for your precinct?
**22      A.   Which function?**
23      Q.   Well, do you have an HR department in your
24 precinct?
**25      A.   No, sir.  Harris County has an HR
department**
10
**1 within our division.  We don't really have a
division
2 called HR.**
3      Q.   Okay.
**4      A.   We have people that take care of
processing of
5 time sheets.  We have clerks that handle stuff like
that,
6 but they're not titled as HR people.**
7      Q.   By the way, not really on the record.
8           (Off-the-record discussion)
9      Q.   (BY MR. HOWARD FOMBY)  Now, as I
mentioned,
10 this incident happened approximately three years ago
11 actually, April 28, 2016.  We're now in July.  At
the time
12 Ted Heap wasn't the constable; is that correct?
**13      A.   Correct.**
14      Q.   That was Phil Camus?
**15      A.   He pronounced it Camus.**

16     Q.   Camus, okay.  And at that particular time were
17 you the chief of toll roads?
**18     A.   No, sir, I would have been a captain then.**
19     Q.   Okay.
**20     A.   I was on the toll road but as a captain. I had**
**21 an assistant chief over me.**
22     Q.   Who would have been the chief at that
23 particular point over the whole --
**24     A.   It was Randy Johnson.**
25     Q.   Okay.
11
 **1     A.   And he is now retired.**
 2     Q.   Going back to that particular incident, was
 3 Deputy Roberto Felix ever investigated for what happened
 4 on that day, investigated about the shooting, to your
 5 knowledge?
 **6     A.   Yes, sir.**
 7     Q.   And who handled that investigation?
 **8     A.   I think there were two investigations done.**
 9     Q.   Okay.
**10     A.   I guess if you want to say there would have**
**11 been actually three investigations done.  Sorry about**
**12 that.**
13     Q.   Sure.
**14     A.   HPD did their investigation, Houston Police**
**15 Department, I'm sorry, would have done their**
**16 investigation; the District Attorney's office would have**
**17 done one, as they do in, I think, any officer involved**

18 shooting; and then our Internal Affairs division would
19 have done an investigation.
20     Q.   Okay.  Let's talk about that last one, because
21 that's really the area that you have expertise in, not
22 necessarily Internal Affairs but constable's office
23 investigation?
24     A.   Right, but I've never been assigned to the
25 Internal Affairs division.
12
 1     Q.   But you couldn't talk to what happened within
 2 Houston Police Department or the DA's office?
 3     A.   Not beyond what's in the Houston Police
 4 Department's report.
 5     Q.   Okay.  So inside of Constable's Office Precinct
 6 5, do you have knowledge of how that investigation came --
 7 was -- what steps were taken in that investigation?
 8     A.   I've read over it, but I don't -- I wasn't part
 9 of it when it occurred.  So it wasn't -- the Internal
10 Affairs division is their own division.  So when they're
11 doing an investigation, they are handling it, there's not
12 a lot of back and forth.  They call the parties in and
13 they interview them.  The people over the division don't
14 sit in on those interviews.  They're done separately.  So
15 I wouldn't have been there while any questions were being
16 asked or statements were being made by Deputy Felix.

17      Q.   Do you know whether, in fact, anyone from the
18 precinct ever interviewed Deputy Felix in regards to what
19 happened?
**20      A.   I would need to pull the ID file, but I would**
**21 imagine they did.  But I would have to pull the ID file.**
**22 If your question is going to have I seen, can I quote**
**23 anything out of any statement that he's made, I can't**
**24 quote anything out of Deputy Felix's statement.  But when**
**25 an Internal Affairs investigation is done, the deputy is**
13
**1 always brought in and asked to give a statement.  So I'm**
**2 sure one exists; it would be in the ID file.**
 3                MR. HOWARD FOMBY:  Have we seen anything
 4 from that file?
 5                MS. BAKER:  That whole file has been
 6 produced.
 7                (Off-the-record discussion)
 8      Q.   (BY MR. HOWARD FOMBY)  Sir, I'm showing you a
 9 document that's dated September 15, 2016, from the office
10 of Phil Camus.
**11      A.   Yes, sir.**
12      Q.   Have you had an opportunity to view that
13 document?
**14      A.   Yes, sir, this looks familiar.**
15      Q.   Okay.  And that document is from Captain
16 Steffenauer from Internal Affairs?
**17      A.   Yes, sir.**
18      Q.   And the document basically states the --

19 Captain Steffenauer's understanding of what happened on
20 that day?
**21      A.   Yes, sir.**
22      Q.   But in this document, nowhere in this document
23 does it fully say that the captain personally interviewed
24 Felix -- Deputy Felix, does it?
**25      A.   No, sir.  This looks more like just a summation**
14
**1 of his actions without any -- I don't see a statement from**
**2 Deputy Felix in here, no, sir.**
 3      Q.   And at the end of this, it lists the
 4 attachments, and in that list of attachments there's
 5 nothing that shows that he is including a statement from
 6 Deputy Felix, is there?
**7      A.   No, sir.**
 8      Q.   And so at this point, you would say that you
 9 don't have any recollection -- would it be fair to say you
10 have no recollection of any document where your precinct
11 actually interviewed Deputy Felix?
12           MR. HATZEL:  Objection.
**13      A.   I would have to go read the file.**
14      Q.   (BY MR. HOWARD FOMBY)  Okay.  From your
15 knowledge of these kinds of records, would there be
16 anything else in that file that -- other than this
17 document and a cover letter that I'm about to present to
18 you that's been marked Exhibit 1, and possibly -- and
19 we'll get to these again, but Exhibit 2 and the policies
20 and procedures which we've marked as Exhibit 3?

21      A.    That's all these attachments.
22      Q.    Okay.
23      A.    The first glaring thing I see, there should be
24 an offense report in here that the city did, their report
25 of investigation should be in here and I don't see that in
15
 1 here.
 2      Q.    Okay.
 3      A.    And you're right I don't see a statement in
 4 this stack.  I don't know that this is the entire ID file
 5 that's housed at our agency.  So I can't say whether the
 6 file is -- whether a statement is missing out of the file
 7 without having the file in front of me.
 8      Q.    No, I think that's fair.  I was just asking if
 9 you could recall off the top of your head if anything is
10 missing from this?
11      A.    No, I cannot.
12      Q.    Now, I think I asked earlier that you've had an
13 opportunity to review all the statements and reports and
14 videos in this case; is that correct?
15      A.    Yes, sir.
16      Q.    And having reviewed all of that, is it your
17 opinion, is it the opinion of the constable's offense
18 Precinct 5, that Deputy Felix, his actions on that day
19 were proper and correct?
20      A.    Yes, sir.

21      Q.   Can you specifically when we talk about
22 individual actions and not the whole thing, can the
23 constable's office point to any particular action that he
24 took that you would find improper or in violation of the
25 precinct's policies?
16
 1      **A.   No, sir.**
 2      Q.   So in your opinion then, the constable's office
 3 Precinct 5 would fully ratify his actions as being correct
 4 on that day?
 5      **A.   Yes, sir.**
 6      Q.   Chief, I am showing you what has been marked as
 7 Exhibit 1.  I previously showed this to you, but I'll give
 8 you an opportunity to actually look at that.  Who is that
 9 document from?
10      **A.   This is from me.**
11      Q.   Okay.  And what was the date on that?
12      **A.   This one is September the 30th.**
13      Q.   20th?
14      **A.   I'm sorry, September 20th.**
15      Q.   This is September after the shooting?
16      **A.   Yes, sir.**
17      Q.   And it was sent to the then constable Phil
18 Camus of Precinct 5?
19      **A.   Yes, sir.**
20      Q.   Okay.  And I want you to look at the --
21 currently at the last paragraph.  Can you please read that
22 to us?
23      **A.   Sure.   "I cannot find where Deputy Felix's**
24 **actions were in violation of any department policy.**
**I**

**25 agree with the Disciplinary Review Board's recommendation**

17

**1 that no disciplinary action should be taken against him."**

2     Q.   Is that still your opinion?

**3     A.   Yes, sir.  And just to help with the time frame**

**4 on this, as you can see when the shooting occurred, I**

**5 wasn't captain, but by the time all the investigations**

**6 were complete, I had been promoted.  Chief Johnson had**

**7 retired.  It was around August.  It was somewhere around**

**8 August.**

9     Q.   And since then, you've been promoted again?

**10     A.   No, no.  You may find paperwork where I'm**

**11 listed as a captain and paperwork where I'm still listed**

**12 as this.**

13     Q.   He still has me listed as "of counsel" of our

14 law firm.

15           Now, Chief, you recommended that no

16 disciplinary action be taken against Deputy Felix; is that

17 correct?

**18     A.   Yes, sir.**

19     Q.   I'm going to show you what has been marked as

20 Exhibit 2 and it's labeled Disciplinary Review Board

21 Summary Page.  Again, I've previously shown that to you,

22 but we haven't gone into any depth on that?

**23     A.   Yes, sir.**

24     Q.   And this came from his Internal Affairs file,

25 as far as I know?
18
 **1       A.    Yes, sir.   It says here, "Review IAD**
 **2 Investigation #16.717."**
 3       Q.    Okay.   Now, in this list of disciplines --
and
 4 this goes up until May of 2016; is that correct?
 **5       A.    Yes, sir.**
 6       Q.    And so it basically covers the period up
to and
 7 shortly after the shooting?
 **8       A.    You're talking about his history?**
 9       Q.    Yes, sir.
**10       A.    It would go from his date of hire up to
this**
**11 event.**
12       Q.    Based on your experience with these kinds
of
13 reports, would this be an exhaustive listing of the
14 Internal Affairs investigations and discipline for
that
15 period of time?
**16       A.    Not all of these are Internal Affairs.**
17       Q.    Right.   The first two of them are IAD
18 investigations; correct?
**19       A.    Yes, sir.**
20       Q.    And the second is just marked "other"?
**21       A.    Right, and it lists what type there are in
22 there.   You can see one is involving a time sheet.**
23       Q.    Right.
**24       A.    I mean, these are just things that
happen.   So**
**25 I'd be guessing because he's been here a long time.
So**
19
 **1 the longer you're here, the more you're going to
make**
 **2 mistakes like not filling your time sheet out
correctly.**
 3       Q.    Okay.
 **4       A.    So that can cause that list to be longer.**

 5      Q.    And are you aware that on -- when you have
 6 these kinds of disciplinary actions, disciplinary actions
 7 state that any further disciplinary problem could lead to
 8 ultimately being fired?
 **9      A.    Yes, sir.**
10      Q.    And looking at this, clearly that's not true, I
11 mean, it didn't happen with Officer Felix, but you are
12 warned?
**13      A.    Yes, sir.  Normally that statement is part of**
**14 any further similar type violations could lead to your**
**15 termination.  As you can see, he's kind of all over here**
**16 with -- he doesn't seem to be repeating the same violation**
**17 over and over again.**
18      Q.    But it is clear that for actions such as
19 failure to complete time sheet, he did that twice and the
20 first time he got a letter of reprimand, the second time
21 he got a day of suspension?
**22      A.    Uh-huh.**
23      Q.    Violate mobile video system, what would that
24 sort of thing be?
**25      A.    That may have been not turning body microphone**
20
 **1 on on a traffic stop or something like that.  That thing**
 **2 is housed in a charging unit in a vehicle and if you get**
 **3 out and forget to take it with you, that's a violation.**

 4      Q.    Okay.  And he got a day of suspension for
that?
 **5      A.    Uh-huh.**
 6      Q.    Loss of county property, do you know what
that
 7 was in his case?
 **8      A.    No, sir.**
 9      Q.    Okay.
**10      A.    It could be many, many things.  He could
have**
**11 lost his badge, could have lost his wallet with his
badge**
**12 in it.  It could be many, many things for under
county**
**13 property.**
14      Q.    How about violate MDT procedures, what
sort of
15 thing is that?
**16      A.    I would have to look that one up.  That**
**17 procedure involves many things.  It could have been**
**18 something like he had the screen open checking say a**
**19 criminal history and a prisoner was in the back seat**
**20 within view of the screen.  That would be a
violation.  He**
**21 could have been driving and reading the computer
screen**
**22 and hit something, that would be a violation.  So I
don't**
**23 know without spelling out what part of that
procedure he**
**24 actually violated.**
25      Q.    When we get down toward the bottom,
there's an
21
 1 entry for 4/5, responsibility for county property
 2 counseling form.  What is that?
 **3      A.    That's probably a -- what we call a --
again,**
 **4 I'm guessing because I can't see what exactly
property he**

 5 damaged.  Usually that's -- when you see that one, it's
 6 involving some damage to county property, which most of
 7 the time is the vehicle they're driving.  So if they back
 8 up and bump into a pole and it puts a scratch on the
 9 bumper, that's usually what the policy violation is,
10 you're not taking good care of county property.  And when
11 it's something that minor, it's usually followed with a
12 counseling form.
13      Q.   What's a counseling form?
14      A.   We have a written counseling form that says we
15 noticed a deficiency in your performance and we'll quote
16 what it is the deficiency is.  In reference to this, it
17 would have been you damaged the car, if that's what
18 happened in this incident, and it says you need to correct
19 this by doing this.
20      Q.   Right.
21      A.   So kind of let you know if you continue doing
22 this, the next step will be a letter of reprimand.  And
23 that's only kept in their file for a 12 month period.  If
24 they don't continue to do whatever they were doing wrong,
25 then that counsel form is removed.
22
 1      Q.   Then we get to the last item, which is the only
 2 entry -- it's an entry within a month or so of the
 3 shooting, am I right there, from April 28 to May 29
Damage

 4 to Co Prop (Active Shooter); what would that be?
 5      A.    It looks like an abbreviation for damage to
 6 county property during an active shooter event.   If my
 7 memory serves me correctly, this would have been the
 8 shooting event that occurred on Memorial with the guy that
 9 had the rifle and fired many, many rounds.  Couple
10 civilians were hit.  Couple officers were hit.  Gas
11 station caught on fire.  And eventually HPD -- one of the
12 SWAT team members eventually was able to shoot the guy and
13 do away with that threat.  But he fired a lot of rounds
14 that day on Memorial.  I don't know if you remember the
15 incident or not.
16      Q.    I actually don't.
17      A.    The guy was --
18      Q.    We don't get Houston news up in Belton where I
19 live.
20      A.    -- former military.  Deputy Felix showed up,
21 one of the first units to come on scene and wound up
22 getting very close because we weren't sure exactly where
23 he was shooting from.  And when Deputy Felix pulled up,
24 the guy started shooting into Deputy Felix's car with a --
25 I believe it was an AR-15.
23
 1              So Deputy Felix is trying to back away
 2 while the rounds are going through his windshield.  And he

 3 was fortunately able to jump out of the car into a ditch

 4 because there's bullet holes all in the driver seat of the

 5 car.  And obviously, like it says here, no fault of his

 6 own.

 7      Q.   You mean no fault insurance?

 8      A.   Yeah.  We were glad he survived that incident.

 9      Q.   Absolutely.

10      A.   He was probably the closest unit to that

11 shooter.

12      Q.   But he didn't pull the act where the one guy

13 did down in Parkland where he just hid around the corner?

14      A.   No, he tried to get involved because we had

15 already had a couple citizens hit.

16      Q.   Okay.  There was an expert that was hired by

17 defense that wrote a report.  Did you get an opportunity

18 to examine that report?  It's like fifty pages or

19 something.  It's huge.

20      A.   I don't remember.  It seems like I did.

21           THE WITNESS:  Did y'all send me that, do

22 you remember?

23      Q.   (BY MR. HOWARD FOMBY)  Well, I'm not going to

24 ask you specifics about that.

25      A.   Okay.  I know an expert was hired.

24

 1           MR. HATZEL:  And just that's not within the

 2 scope of the 30(B)(6).

 3           MR. HOWARD FOMBY:  And I just told him I'm

 4 not going to ask him specific questions about that.
 5      Q.   (BY MR. HOWARD FOMBY)  In that report one of
 6 the things that the expert talked about was that one of
 7 the most dangerous things that an officer can face is
 8 doing a traffic stop, that that's a very dangerous
 9 scenario; would you agree with that?
**10      A.   I would agree.**
11      Q.   And what are the things that you worry about,
12 what are the kinds of dangers that you worry about when
13 you do a traffic stop?
**14      A.   Well, on a -- especially on a tollway, the very**
**15 first danger is getting hit by another vehicle. We've**
**16 only lost two officers in the line of duty in Precinct 5**
**17 and both of them were killed on the toll road, both of**
**18 them ran over by vehicles.  So that's the immediate threat**
**19 as soon as you step out of your car.  And then your focus**
**20 is also concerned with what's inside that car, what threat**
**21 may be coming from inside the vehicle.**
22      Q.   And by that, if I may, you could have a person
23 who is a violent criminal?
**24      A.   Yes.**
25      Q.   You could have an animal that's a violent
25
 1 animal.  I've seen cases where there were drugs, like
 2 methamphetamines were aerosolizing.  And so you're worried

 3 about that sort of thing; is that what you're talking
 4 about?
 **5        A.    Yes, sir.**
 6        Q.    Other than that, what are you worried about in
 7 terms of danger for a traffic stop?
 **8        A.    That's the two that I can sum up, you're in**
 **9 danger from the traffic and you're in danger from whatever**
 **10 that individual in the car wants to do to you.**
 11        Q.    Well, let's walk through a traffic stop and
 12 talk about what a typical officer would do to make sure
 13 he's got his job done and at the same time minimize the
 14 risk.
 **15        A.    Yes, sir.**
 16        Q.    So let's start with you've identified the
 17 suspect, the person you want to pull over; what is the
 18 first step you take?
 **19        A.    Well, you wouldn't identify the suspect, first**
 **20 you'd have to have a violation.  At that point you have no**
 **21 idea who's driving the car.**
 22        Q.    Or suspected violation?
 **23        A.    Male, female, what you've done is you've just**
 **24 witnessed a traffic violation.**
 25        Q.    Okay.
 26
 **1        A.    And then you make the decision to stop the**
 **2 vehicle.  And a lot of officers will, if time allows, run**
 **3 the license plate prior to turning their lights on so they**

 4 can get an idea of whether or not it might be a stolen
 5 vehicle.
 6      Q.   Okay.
 7      A.   Then you turn on your lights, the vehicle
 8 stops, you notify dispatch where you are so they can put
 9 you on that stop at that location.  And then you make your
10 approach to the violator.
11      Q.   Okay.  At the point where you notified
12 dispatch, dispatch knows where you are, would they also
13 have the information about the license plate of the car?
14      A.   They do now.  I don't know if they did then.
15 We've changed computer systems since then.  The one we
16 have now, every time you run something, it alerts on the
17 dispatch what you just ran.
18      Q.   Okay.
19      A.   The license plate information will be in your
20 call slip when you put yourself out on the traffic stop.
21 So the plate return may not be put in there yet.  But the
22 actual license plate will be on the slip.
23      Q.   Is there -- is there a reason why you would
24 step out of your vehicle without first running a license
25 plate check?
27
 1      A.   Yes, if the system was down.  I wouldn't advise
 2 doing it unless for there was an emergent circumstance or

 3 the computer wasn't letting you get returns at the
time.
 4     Q.    Okay.
 5     A.    **Because you want to know as much as you can**
 6 **about that car before you walk up to it.**
 7     Q.    Right.  So it could be stolen car?
 8     A.    **Yes.**
 9     Q.    Or it could be a car that's been known to be
10 involved in a crime?
11     A.    **Right.**
12     Q.    So lots of things you can find out from that?
13     A.    **Right.**
14     Q.    When you run the plate, does it give you any
15 information about who the owner is?
16     A.    **Yes, sir.**
17     Q.    And does your system back then when you run the
18 plate, does it automatically do an insurance check on the
19 car?
20     A.    **I don't remember if we did back then. Because**
21 **now there's a program called TexSure that runs it for us**
22 **now.  I don't remember the exact date that went live.  So**
23 **back then it may have just been you have to go get the**
24 **insurance policy and confirm with the insurance company**
25 **whether it's good or not, which we did for many, many**
28
 1 **years until TexSure came about.**
 2     Q.    And the nice thing about TexSure if I -- I know

 3 that I've been stopped and I don't have the current
 4 insurance information because my wife handles that, and
 5 sometimes she forgets to do that.  It's not against the
 6 law to not have that paper in your car; right?
 **7        A.    Correct.**
 8        Q.    But if you don't have it and it can't be
 9 confirmed, then you get a citation; right?
 **10       A.    We have to attempt to confirm before we can**
 **11 even issue a citation.**
 12       Q.    And that's the great thing about TexSure, is
 13 you can look it up?
 **14       A.    Uh-huh.**
 15       Q.    Chief, one other thing I would think about
 16 TexSure, this car was a rental car?
 **17       A.    Uh-huh.**
 18       Q.    And from my understanding, having rented
 19 thousands of cars over the years, I never have insurance
 20 information in the car.  So something like TexSure
 21 actually gives you more information about that this car
 22 is, in fact, insured; is that fair?
 **23       A.    I haven't seen an insurance return on a rental**
 **24 car with the way TexSure is.  I'm not sure how it's --**
 25       Q.    How it works?
 29
 **1        A.    Yes.  I don't make a lot of traffic stops**
 **2 anymore.**
 3        Q.    When you made traffic stops, though, would
 4 anything pop up that gave you information that this might
 5 be a rental car?
 **6        A.    It would have been on the license plate**
 **return.**

 7      Q.    License plate?
 **8      A.    Yes, sir.  Probably listed under the owner.**
 9      Q.    Okay.  And that gives you some information
10 about, going forward, that this person is renting the car,
11 that's helpful information?
**12      A.    Yes, sir.**
13      Q.    Okay.  So you've stopped the car, you've run
14 the plate.  The two of you are sitting on the side of the
15 road.  Let's put it in the same scenario as the Ashtian
16 Barnes thing.  You're on the left side of the road, so you
17 can step out of your car without stepping into traffic?
**18      A.    Yes, sir.**
19      Q.    What happens next?
**20      A.    You're going to make your approach to the
21 vehicle.**
22      Q.    Okay.
**23      A.    A lot of officers will put their hand on the
24 trunk of the vehicle or some part to make sure the trunk
25 is closed or to leave a print on the vehicle.  And you'll**
30
 **1 walk up to the driver's door, introduce yourself.  I was
 2 giving you time to write.**
 3      Q.    Okay.
 **4      A.    And explain why you made the traffic stop to
 5 the violator.**
 6      Q.    I can tell you unfortunately I'm familiar with

 7 all these steps.  Okay.  So you've introduced yourself.

 8 Normally you would expect the driver to lower their window

 9 when you're coming up?

**10      A.    Yes, sir.**

11      Q.    What happens if they don't?

**12      A.    We would ask them to.**

13      Q.    Okay.

**14      A.    Especially up there because you cannot hear**

**15 anything on that roadway.**

16      Q.    It's hard enough in the video we got with that

17 noise.  Just as an aside, when my wife was growing up in

18 Los Angeles, they had a problem with people pretending to

19 be police officers and pulling over young girls and taking

20 them out and raping them or killing them.  And the policy

21 back then from the LA Police Department was that if

22 someone was afraid or if they weren't comfortable with

23 that situation, that they could ask to be followed to a

24 station; is that policy here in Houston?

**25      A.    No, we don't have that in our policy.**

31

 1      Q.    Okay.

 **2      A.    It doesn't say the news hasn't said it once or**

 **3 twice, but it's not in our procedures anywhere.**

 4      Q.    It doesn't really apply to this case, but I was

 5 trying to walk through all the steps.

 **6      A.    If you go by what the lawbook says, you**

 **7 immediately pull over and come to a stop.**

 8      Q.   Okay.  So you've walked up to the door, made

 9 your introduction, explained why they were stopped, the

10 window is down, what's the next step?

**11      A.   You're going to ask for their driver's license**

**12 and proof of financial responsibility.**

13      Q.   Which is their insurance?

**14      A.   Yes, sir.**

15      Q.   And when you say proof of financial

16 responsibility, in Texas, you can also -- instead of

17 getting insurance, you can --

**18      A.   There's other ways you can do it, yes.**

19      Q.   In the case of a rental car, if you didn't know

20 it in advance, if someone showed you the rental document,

21 that would be sufficient?

**22      A.   Yes, sir.**

23      Q.   When you ask for a driver's license, is it a

24 law in Texas you have to have your driver's license on you

25 any time you're driving or you have to be licensed?

32

 **1      A.   You have to have it on you.**

 2      Q.   Okay.  But isn't it true that if you don't have

 3 it on you, you get a ticket, you can take that then and

 4 show that you are licensed to a judge and get it dismissed

 5 for $10.00?

 **6      A.   Up to the JP.**

 7      Q.   Okay.

 **8      A.   That driver violation is called no driver's**

 **9 license on demand, if you need it.**

10      Q.   Okay.  And what level of violation is no

11 driver's license on demand?

**12      A.    Class C.**

13      Q.    So a Class C is no jail time, but you have to

14 pay a fine?

**15      A.    Correct.  Fine only, yes.**

16      Q.    Okay.  And when you're talking about JP might

17 dismiss it, someone might go argue the extenuating

18 services and get that reduced down?

**19      A.    Yes, sir.**

20      Q.    Okay.

**21      A.    You might get a nice JP, you might not. They**

**22 have a lot of leeway.**

23      Q.    Okay.  So we're at the point where the person

24 has provided the driver's license and their proof of

25 financial responsibility.  What's the next step that you

33

 1 take in a normal traffic stop?

 **2      A.    I will tell them what they're going to be**

 **3 issued a citation for and to remain in their vehicle and I**

 **4 will be back with them in a few minutes.  Then I go back**

 **5 to our patrol car and complete the citation from the**

 **6 patrol car.**

 7      Q.    Okay.  Do you have some kind of printer in

 8 there?

 **9      A.    Yes, sir, everything now is electronic, yes,**

**10 sir.  You'll type all the information in your mobile data**

**11 terminal, our MDTs, laptops in the car.  And you tell it**

**12 to print, it will print out the citation.  And once that's**

13 done and now that you have their driver's license, you're

14 going to run a check on their driver's license and make

15 sure they don't have any warrants.  And if it shows

16 they're all clear, you move forward with just issuing the

17 citation, having them sign for their promise to appear.

18     Q.   What happens if they don't sign that promise?

19     A.   There's different scenarios in that.  But if

20 they don't sign their promise to appear, what you should

21 do is take them before a magistrate because they're

22 telling you I'm not agreeing to go on the date that you've

23 said here I need you just to sign this so that you say you

24 will go on this date.  And if they're refusing saying they

25 will not go on that date, then -- the term is called

34

 1 "instanter" -- you will instanter that person and take

 2 them before the judge.

 3     Q.   Okay.  Let's look at -- go back a couple of

 4 steps and you have someone who may have left their wallet

 5 at home accidentally or something, so they don't have

 6 their driver's license on them.  What do you do at that

 7 point?

 8     A.   You ask them for their name and their date of

 9 birth and whether or not they know their driver's license

10 number.

11      Q.    And with your computer and if you know
their

12 name and date of birth, is it possible then to look
up --

**13      A.    And get their driver's license
information,**

**14 yes, sir.**

15      Q.    And if you can do that and verify that
they

16 are, in fact, licensed, what's the next step?

**17      A.    Then you can still move forward with
issuing**

**18 that citation for no driver's license on demand
because**

**19 they were not carrying it with them.**

20      Q.    Okay.   Because that's a Class C?

**21      A.    Yes, sir.**

22      Q.    Or you might issue them a warning?

**23      A.    All officer discretion.**

24      Q.    Are you doing fine?

**25      A.    Oh, yes.**

35

 1      Q.    You need some coffee or water?

 **2      A.    I'm good.   Thank you, sir.**

 3      Q.    Okay.   What if you turn on your lights and
the

 4 person doesn't pull over, what do you do under that

 5 circumstance?

 **6      A.    You notify dispatch that the person is not**

 **7 stopping.**

 8      Q.    Okay.

 **9      A.    And then stay behind them until hopefully
they**

**10 do.**

11      Q.    Okay.   And try to stay behind them?

**12      A.    Yes, sir.   And that's just going to be
from the**

**13 officer's experience to determine whether or not
hey, this**

**14 person is probably looking for a different place to pull**

**15 over or this person is trying to get away from me. So if**

**16 they're trying to get away, you're going to ask for backup**

**17 units.**

18      Q.   In Houston quite often there's so much traffic,

19 someone might be looking to get off the exit instead of

20 being on the side of the road?

**21      A.   Right.**

22      Q.   Which is actually courteous to the officer,

23 although it might be annoying at the time because trying

24 to keep everybody safe.

**25      A.   Doesn't bother me one bit.  I'd rather not be**

36

 **1 stopped on a highway.**

 2      Q.   Okay.  So you try to stay behind them. And

 3 then dispatch would -- ultimately what would happen if

 4 they're not pulling over?

 **5      A.   You're asking a question what would**

 **6 ultimately --**

 7      Q.   You have their license plate number, you have a

 8 description of the car.  Ultimately would you try to pull

 9 up in front of them, push them off the road?

**10      A.   No, we would just stay behind them.  We don't**

**11 have any our procedures to perform any pit maneuver or**

**12 shoot out tires or anything like that.  We follow the**

13 vehicle until it stops.  Hopefully we have more gas than
14 they do.
15                   I'm sorry.  I'm leaving something out.  It
16 may go a little further.  If it actually turns into a
17 pursuit, we do have what's called stop stick devices that
18 we can deploy that causes the tires to flatten and come to
19 a controlled stop, depending on if this turns into a
20 pursuit where it puts the public's safety in danger, we'll
21 use those to bring the pursuit to an end.
22      Q.   And in that case you would probably deploy
23 other units to clear the roadway to make sure other people
24 don't run over those?
25      A.   Yes, sir.  Called a tire deflation device.
37
 1      Q.   Now, if you were in certain city streets,
 2 there's a lot of opportunities for someone you're pursuing
 3 to go in and out of streets and hide and that sort of
 4 thing, is that a concern that you would have often off of
 5 a major highway about pursuing them?
 6                   MR. HATZEL:  Objection, vague.
 7      A.   Yeah, you may have to repeat the concern.
 8      Q.   (BY MR. HOWARD FOMBY)  Just that on certain
 9 city streets with a lot of places to turn and places, of
10 course, that your pursuant can hide, is that a concern in
11 terms of pursuit, do you worry about that?
12      A.   No.  Normally when you're pursuing someone,

13 your concern is where they're going to stop and take off
14 running from the vehicle.
15      Q.   Okay.
16      A.   If you're following at the distance you should
17 be at, it would be very difficult for them to hide that
18 car.
19      Q.   Right.  But it's easier for them to hide if
20 they're on foot theoretically?
21      A.   Yes, running into an apartment complex or
22 something like that, yes.
23      Q.   And if they are not in the car, it would be
24 more difficult for you to identify that was the person in
25 the car?
38
 1      A.   Yes.
 2      Q.   If you're on a highway, though, a major highway
 3 like the tollway, then you don't have that concern
 4 typically, do you?
 5      A.   Not typically, but I can't say no one has ever
 6 jumped out and took off running across the lanes, but not
 7 typically.
 8      Q.   Okay.  And it has a controlled ingress and
 9 egress?
10      A.   Yes.
11      Q.   And you have cameras all along helping you to
12 monitor?
13      A.   Yes, sir.
14      Q.   Okay.  Let's talk about a situation where
15 you've got a car pulled over, they stop and for whatever

16 reason they take off, do the same rules apply?

**17      A.   No because now it's -- you're probably not**

**18 looking for someone with a safe place to stop at that**

**19 point.**

20      Q.   Okay.

**21      A.   That's someone that's actively trying to get**

**22 away from you when they do something like that.  So the**

**23 only real difference I would see in that scenario is you**

**24 would probably go ahead and ask for backup at that point.**

**25 You know, you tell them what happened, I tried to stop and**

39

**1 it took off, so they would know it's not a normal traffic**

**2 stop.**

3      Q.   Otherwise the same policy of how you would

4 follow them?

**5      A.   Oh, yes, all that would stay the same.**

6      Q.   But would it be fair to say that in that

7 scenario, the pursuit would be elevated up a little bit

8 more serious?

**9      A.   Just a heightened sense of awareness.**

10      Q.   Okay.

**11      A.   But all the procedures would still stay the**

**12 same.**

13      Q.   Okay.  Let's talk about you come up upon a car,

14 the window is down and you believe that you smell

15 marijuana coming out of the car.  And I use marijuana

16 because most other drugs don't have an odor issue with

17 them.  So commonly would it be fair to say the two smells
18 you normally come across in terms of intoxication are
19 alcohol and marijuana?
**20      A.   Yes, sir.**
21      Q.   And in that case when you believe that you
22 might smell marijuana coming from the car, what is your
23 next step?
**24      A.   I would tell the person in the car that I need**
**25 them to step out of the vehicle and detain them because it**
40
 **1 smells to me like you've been smoking marijuana in this**
 **2 vehicle and there may be marijuana in it.**
 3      Q.   Okay.  Now, when you say that you would ask
 4 them to step out of the vehicle, are there any concerns
 5 about bringing someone out of a vehicle without a backup
 6 officer in place?
 **7      A.   There's always concerns.  You could go from**
 **8 nothing happening to the person shooting at you.  There's**
 **9 always concerns.  Doesn't mean you don't do your job, but**
**10 there's always concerns, yes, sir.**
11      Q.   So if someone emerges from the vehicle who may
12 be high on drugs, what sort of dangers does that put on
13 you as an officer?
**14      A.   Again there's a long -- there's a range there.**

15 It could be someone that's happy high on drugs or it could
16 be someone that's violent high on drugs.  So there's a
17 large gamut of anything that could occur there.  You could
18 have someone that's very cooperative.  Or you could have
19 -- when you use the word "drugs," you could have someone
20 on PCP that just wants to fight you.  So many things could
21 happen.
22      Q.    Would you typically before you pull them out,
23 would you call for a backup officer?
24      A.    There's a lot of factors in there.  If you know
25 there's an officer close by, maybe you would.  But
41
 1 officers are expected quite often to handle things on
 2 their own.  So it's not a you can't remove someone from a
 3 vehicle without a second officer.
 4      Q.    What about for a situation where you had
 5 already called for a backup officer, would you then --
 6 because of the marijuana, would you then wait for that
 7 officer to arrive?
 8      A.    That's one of those totality of the
 9 circumstances things.
10      Q.    Sure.
11      A.    So I would have to be there and understand my
12 capabilities, what the person's capabilities might be and
13 weigh all those factors into yes, I can handle this on my

14 own or no.  You know, I'm 150 and he's 350 and you know if
15 I'm 60 years old and he's 25, maybe I'll wait for that
16 backup officer.  So there's many things that the officer
17 has to take into account before he makes that decision.
18 So it would just be his assessment of whether or not he
19 feels comfortable doing that.
20      Q.   Okay.
21      A.   Or her assessment, whether or not she feels
22 comfortable doing it.
23      Q.   Now, you said that you reviewed the facts of
24 the case.  You're aware that Officer Felix said that he
25 smelled marijuana in the car?
42
 1      A.   Yes, sir.
 2      Q.   And I imagine you've also reviewed the
 3 inventory of the car that showed that no drugs of any kind
 4 were actually found in the car?
 5      A.   I don't know if it's worded that way in there.
 6 I'd have to read that again.
 7      Q.   There's no listing of any drugs, any burnt
 8 roaches or any other kinds of material that could be
 9 identified as marijuana or other drugs.
10      A.   I'd have to read that report again word for
11 word to find out.  I don't recall whether or not any
12 marijuana or marijuana residue or marijuana seeds, I don't
13 remember if any of that was actually found in the car or
14 not.

15      Q.   Okay.  Now --

**16      A.   Or any marijuana paraphernalia.  I don't**
**17 remember what was in there.  There might have been a**
**pipe.**
**18 I'd have to read that offense report really closely**
**again.**

19      Q.   Just for the purposes of moving forward, I'll
20 tell you that the inventory that was given to us there
21 were no drugs or anything close to -- any paraphernalia or
22 seeds or anything like that.

**23      A.   Okay.**

24      Q.   Is part of your training you're trained in
25 search and seizure requirements, constitutional search and

43

 1 seizure?

 **2      A.   Yes, sir.**

 3      Q.   And normally you are not allowed to search a
 4 car for any reason without a search warrant; is that
 5 correct?

 **6      A.   No.  We can search if we have probable cause to**
 **7 believe something may be in that vehicle.**

 8      Q.   Okay.

 **9      A.   Or we can search it incident to an arrest.**

10      Q.   Okay.

**11      A.   So there are times we can search without a**
**12 warrant.**

13      Q.   And there's also exigent circumstances --

**14      A.   Yes, sir.**

15      Q.   -- where you're afraid something might be
16 destroyed or someone might be getting hurt so you can
17 enter the car?

**18      A.   Yes, sir.  Or the evidence may dissipate, such**

**19 as a blood draw or something like that.**
20      Q.   Okay.  But those are not normal, what I'm
21 saying if you pull me over for going ten miles over the
22 speed limit, you wouldn't have the constitutional right to
23 search my car just for that?
**24      A.   Right, just for the speeding, yes, sir.**
25      Q.   Okay.  So if you state that you believe a crime
44
 1 is being committed in the car, that, though, would give
 2 you the right to do a search; is that correct?
**3      A.   It would depend on the crime.**
 4      Q.   Possession of marijuana?
**5      A.   Yes.**
 6             MR. HOWARD FOMBY:  We can take a five or
 7 ten minute break.
 8             (Recess)
 9      Q.   (BY MR. HOWARD FOMBY)  Now, Chief, we were
10 talking -- before we took a short break, we were talking
11 about marijuana and what level of infraction is a small
12 personal amount of marijuana, what kind of crime is that?
**13      A.   Well, if you're looking at less than four**
**14 ounces, class A misdemeanor.**
15      Q.   Okay.  And less than two ounces?
**16      A.   I'd have to look at the schedule on that one, I**
**17 don't know if that's a B or not.**
18      Q.   That's a B.  I do that a lot.
**19      A.   There's a breakdown in there somewhere, yes,**
**20 sir.  What we've really been concerned with lately because**

**21 of the all the changes in misdemeanor marijuana possession**
**22 is if you have more than four ounces.**
23      Q.    Okay.  And that would take it into a felony
24 possession?
**25      A.    Yes, sir.**
45
 1      Q.    Because that amount is so large, it's not
 2 considered something than an individual would want to
 3 consume just by themselves?
 **4      A.    It would be hard to consume four ounces.**
 5      Q.    Likely distributing it?
 **6      A.    Yes.**
 7      Q.    Okay.  And a Class B misdemeanor, are most of
 8 the possession of marijuanas that you've seen the two
 9 ounce variety, four ounce variety or felony?
**10      A.    My personal experience would be the two ounce**
**11 variety.**
12      Q.    Which is still quite a bit of marijuana?
**13      A.    Yes, sir.**
14      Q.    And that would be a Class B misdemeanor, which
15 is punishable by up to six months in jail and up to, I
16 can't remember, $2,000 or something?
**17      A.    Yes, I can't remember it either right offhand.**
18      Q.    Now, you've watched the video, I take it?
**19      A.    Yes, sir.**
20      Q.    At the very beginning of the video, we have
21 Officer Felix turning on his lights, first he comes up,
22 gets the call and comes up.  He turns on his lights and

23 right in front of him is the Toyota Corolla driven by
24 Ashtian Barnes.  When the lights came on, did Ashtian
25 Barnes respond sluggishly to the lights, like he didn't
46
 1 notice it?
 **2       A.    Not that I recall.**
 3       Q.    Did he pull over quickly and efficiently?
 **4       A.    I would say he pulled over when he should have,**
 **5 yes.  It didn't appear he was trying to get away, no.**
 6       Q.    And he appeared to choose the closest margin of
 7 the road, safe margin of the road?
 **8       A.    Yes, sir.**
 9       Q.    And he didn't endanger anyone as he pulled over
10 to the side of the road?
**11       A.    Right.**
12       Q.    So there were no signs at that point that
13 Ashtian Barnes was in any way acting intoxicated; correct?
**14       A.    Correct.**
15       Q.    A person, in your experience who is drunk,
16 would it be fair to say that they would be slow to
17 respond?
**18       A.    Yes, sir, it usually takes longer for them to**
**19 pull over, yes, sir.**
20       Q.    And their movements are a little less steady?
**21       A.    Yes, sir.**
22       Q.    How about people high on marijuana, do they --
**23       A.    Depending on their level of intoxication from**

24 the marijuana, I would say they probably would exhibit

25 very similar signs of someone being intoxicated on

47

 1 alcohol.

 2      Q.    People who drink alcohol tend to drive faster,

 3 don't they?

 4      A.    No, there's a lot of times you find them going

 5 30 miles an hour on the roadway.

 6      Q.    How about marijuana, is the whole Cheech & 

 7 Chong album accurate that --

 8      A.    You know, I don't -- I'm trying to recall. I

 9 don't know that I've made an arrest -- I may have early on

10 in my career -- for intoxication because of marijuana, a

11 DWI based on intoxication due to marijuana.  So I couldn't

12 really give you an expert opinion on that from my

13 experience.

14      Q.    Okay.  And certainly you're aware of the things

15 the legislature has just done to us by making hemp legal?

16      A.    Yes, sir, I got educated on it last week, yes,

17 sir.

18      Q.    So Officer Felix stops -- Ashtian Barnes pulled

19 over fairly quickly and efficiently and stopped.  Officer

20 Felix stopped behind him, got out and walked up and

21 interacted with him.  During that inter -- and I know it's

22 hard to hear and it's hard -- you can't see Ashtian very

23 well.  But did it appear that Ashtian was in that

24 interaction overly agitated?

**25       A.   I can't remember his wording.   From watching**

48

 **1 the video, I could see him moving around in the car a lot.**

 2       Q.   Okay.   When you have pulled over in the past,

 3 pulled over people and they can't find their insurance, is

 4 it typical for them to dig through a bunch of papers in

 5 the glove box to try to find it?

 **6       A.   Not their driver's license.**

 7       Q.   But their insurance?

 **8       A.   Their insurance, yes, sir.**

 9       Q.   All right.   And do they tend to be somewhat

10 agitated when they're doing that because they can't find

11 it in your experience?

**12       A.   No, because it's usually not that big a deal**

**13 anyway.   I mean, if you can't find it, you can just take**

**14 it to the court and get that ticket dismissed later.   And**

**15 if anyone was upset about that, I would just say I'm just**

**16 going to write you the citation, take it -- this is before**

**17 TexSure.**

18       Q.   Do you think people are aware of that aspect of

19 the law that not having your insurance proof with you only

20 cost you a ten dollar fee?

**21       A.   No.   And I wasn't even aware of that. What our**

22 JP has done in the past, if you can prove that you had

23 insurance on that day, then the ticket is really dismissed

24 because you didn't really commit a violation that day.

25      Q.   So when you have a situation where someone

49

 1 doesn't have insurance, proof of financial responsibility,

 2 you make sure you inform them here's the citation, but

 3 here's how you can take care of it?

 4      A.   I always have, yes.

 5      Q.   Listening to Ashtian Barnes' responses to

 6 Officer Felix's questions, did he appear to be responsive?

 7      A.   If I recall the video, yes, they were talking

 8 back and forth.

 9      Q.   Did it appear that Ashtian was overly

10 argumentative?

11      A.   I remember there being certain demands that

12 Deputy Felix was asking him to do that he was not

13 following Deputy Felix's demands.  So if you want to

14 consider that argumentative, the answer would be yes.

15      Q.   But he was very open with explaining that this

16 is a rental car?

17      A.   I believe so, yes.

18      Q.   And he was explaining that he couldn't find his

19 driver's license?

20      A.   I believe he said it was in the trunk of the

21 car.

22      Q.   He kind of said it may be, but it's really hard

23 to tell with the sound.  But he definitely was having a
24 discussion about not being able to find it?
**25      A.    Yes, sir.**
50
 1      Q.    And that wasn't -- he wasn't yelling at Felix
 2 in the video or anything?
 **3      A.    I don't recall him yelling.**
 4      Q.    So when you say he was not being compliant,
 5 Officer Felix was telling him to stop digging around in
 6 the papers?
 **7      A.    I believe he said he was reaching for possibly**
 **8 under the seat area and Deputy Felix told him -- kept**
 **9 telling him stop reaching, because as an officer on a**
**10 traffic stop, you don't want someone reaching into an area**
**11 where you can't say.**
12      Q.    Okay.  And are you aware that that story has
13 changed from Deputy Felix's first statement until
14 currently?
**15      A.    No, I'm not aware of that.**
16      Q.    I'm going to show you Exhibit 5 and I would
17 point to the third paragraph down.  Can you please read
18 that third paragraph to us?
**19      A.    I'll try.**
**20            "Deputy Felix observed Mr. Barnes grab a**
**21 handful of papers and start to go through them, but only**
**22 flipping through them without actually looking at them.**

**23 Mr. Barnes reached over towards the passenger floorboard**
**24 and Deputy Felix told Mr. Barnes not to each over in that**
**25 area.  Mr. Barnes went back to look through the papers and**
51
**1 reached over and turned the ignition off and placed the**
**2 keys in the gearshift area."**
3      Q.    So in the very earlier statements, in the
4 statements that Captain Steffenauer used to make his
5 report from IAD, the understanding was that Deputy Felix
6 was reaching into the passenger area, not into his own
7 area; is that correct?
**8      A.    Mr. Barnes was reaching.**
9      Q.    Mr. Barnes was reaching.  Where he was reaching
10 was in the passenger area?
**11      A.    According to that, yes, sir.**
12      Q.    So if someone making -- if I say someone is
13 making furtive movements in the car, what does that mean
14 to you?
**15      A.    It would mean they're moving towards an area,**
**16 like I said earlier, that you can't see, they're trying to**
**17 reach for something that's out of their current reach, it**
**18 would call that a furtive movement.**
19      Q.    Okay.  Would shuffling through papers looking
20 for insurance or whatever documents be a furtive movement?
**21      A.    Not if the papers were in their hand, but**

**22 perhaps if the papers were in a huge center console and**
**23 ruffling through all the papers at the bottom of the**
**24 console where I can't see, that would cause me some**
**25 concern, yes, sir.**
52
 1     Q.    Because you're afraid they may pull some other
 2 object like a gun out of there?
 **3        A.    A knife, pepper spray, could be anything.**
 4     Q.    I earlier showed you Exhibit 1.  That was the
 5 report you wrote to Phil Camus?
 **6        A.    Yes, sir.**
 7     Q.    Do you recall if Constable Camus agreed with
 8 your recommendation?
 **9        A.    Yes, sir.**
10     Q.    Did he agree?
**11        A.    When he agreed with the way a letter was**
**12 written, he would initial it.  If he did not agree, he**
**13 would return the letter to you and say he disagrees and a**
**14 different process would take place then.  But if he reads**
**15 it and says I'm okay with this, he will initial it and**
**16 send it back.**
17     Q.    So that little mark at the top in blue ink
18 looks like maybe a C is his way of initialing it?
**19        A.    Yes, sir.**
20     Q.    Okay.  Chief, I'm going to show you a document
21 that's been given to us and it's a fairly lengthy
22 document.  It's called Harris County Constable Precinct
23 Five, it says Foreward [sic], but then it says the
24 Standard Operating Procedures.  Are you aware of these

25 documents?
53
 **1        A.    Yes, sir, these appear to be taken from our**
 **2 standard operating procedures, yes, sir.**
 3        Q.    And where do those standard operating
 4 procedures come from?
 **5        A.    You mean like from a CD or from a file? What**
 **6 are you asking?**
 7        Q.    How are they created?  There had to be an Adam
 8 and Eve at some point.
 **9        A.    Okay.  I was wondering like what -- okay. Some**
 **10 of these have come from years and years ago. Depending on**
 **11 what policy it is, like this "All deputies are required to**
 **12 carry their handgun while on duty," that may have been**
 **13 there for many, many, many years and it would have -- may**
 **14 have been there from two or three constables ago. It just**
 **15 would have carried on to the next constable.**
 **16                When the new constable takes office, he can**
 **17 choose to keep all of these or change all of these. There**
 **18 are probably many of these that have been in effect for a**
 **19 long time, but there are occasionally times where a new**
 **20 policy needs to come in, a new procedure or a change to an**
 **21 existing one.**
 22        Q.    I was involved in a case -- actually, my son

23 was as well -- where a young woman was Tasered while she
24 was in a car that was in gear to unfortunate result.  And
25 so the Killeen Police Department immediately issued a
54
 1 change to the Taser policy.
 **2      A.    That's proving my point.  Yes, they are not --**
 **3 I would say I guess they're not permanent.  There's stuff**
 **4 that can change and then many times depending on what**
 **5 happens, new laws take effect that may require us to add**
 **6 to or take from one of these procedures.**
 7      Q.   Or we just learn from experience sometimes.  I
 8 remember seeing a tag on an iron that said do not iron
 9 clothes while wearing them?
**10      A.   So you know what happened, somebody did it.**
11      Q.    Somebody had to do that.  Okay.  But you said
12 every time there's a new constable, these can change?
**13      A.   Yes, sir.**
14      Q.    But typically, do they get thrown out and
15 entirely new policies get brought in or typically is that
16 change process fairly slow?
**17      A.    I'm on my third constable and I don't recall**
**18 any of them saying we're starting from scratch and doing**
**19 away with all of our procedures and I'm adding all new**
**20 ones.**

21      Q.   Okay.  And the person, though, that is -- if
22 they want to change it, it would take the constable to
23 okay the change?
**24      A.   Yes, sir.**
25      Q.   Okay.  If you wouldn't mind, I'd like to you to

55

 1 turn -- and it's marked down below as 152, which would
 2 give you a good reference.  It's standard operating
 3 procedure, officer involved shooting.
 **4      A.   I don't have that page.  Actually I got it.**
 5      Q.   Now, an officer involved shooting creates
 6 significant issues for all kinds of parties; isn't that
 7 correct?
 **8      A.   Yes, sir.**
 9      Q.   And I think it says up here that complex issues
10 for the participating officer, department, and the public;
11 right?
**12      A.   Yes, sir.**
13      Q.   And so this is the policy that was in place at
14 that particular point April 28, 2016, as far as you know?
**15      A.   Yes, sir.**
16      Q.   Okay.  And as I read down here, I'm just going
17 to pick off a few things.
18                    There's Section II, On Scene and
19 Immediately Following.
**20                    A. Summon medical assistance and provide**
**21 first aid if possible.**
**22      A.   Yes, sir.**

23     Q.    What is the reason for that particular
policy?
**24     A.    To protect a life.  Rendering aid is one
of the**
**25 things we're always taught to do.  So it's to
hopefully**
56
 **1 lessen an injury or try and save someone that's been
 2 injured.**
 3     Q.    So in looking at law enforcement in
general,
 4 would you agree that there are levels of concern --
and
 5 I'll explain this, levels of concern where one of
the most
 6 important thing is to protect life; right?
 **7     A.    Yes, sir.**
 8     Q.    Because once someone is dead, you can't
bring
 9 them back?
**10     A.    Yes, sir.**
11     Q.    Next would probably be protect someone
from
12 serious injury?
**13     A.    Uh-huh.**
14     Q.    Somewhere down that line would be property
15 damage and somewhere at the bottom of that line --
of that
16 thing would be technical violations like not
signaling
17 correctly?
**18     A.    Yes, sir.**
19     Q.    So part of what this is really meant to
address
20 is if someone is shot and is at risk of dying, it's
21 important right off the bat to step in and try to
protect
22 that person's life as much as possible; right?
**23     A.    Yes, sir.**
24     Q.    Are your deputies trained in first aid?

**25      A.   We have had first aid training in the past, but**

57

 **1 I can't tell you everyone at the agency has been trained.**

 2      Q.   Okay.

 **3      A.   It's not something that we do as part of a**
 **4 hiring process or anything like that, but we do**
 **5 occasionally have CPR classes.**

 6      Q.   Do you know if Deputy Felix --

 **7      A.   That's where I was going; I don't know where he**
 **8 would be in his -- some of those certifications require**
 **9 updates to them; I don't know where he would be on that.**

10      Q.   Okay.  Now, if you watch the video, after the

11 shooting -- well, there's a shooting and then clearly

12 Ashtian Barnes hits the brakes, because he's the only one

13 who could hit the brakes, and he brings the car to a full

14 stop.  And at that point Officer Felix stands back with

15 his gun still trained on Ashtian Barnes.  Ashtian Barnes

16 is heard in the video saying, "Help me, I can't breathe."

17 Did you catch all that?

**18      A.   I remember the car stopping.  I do remember**
**19 that.  But I don't remember Ashtian Barnes' exact words.**

20      Q.   I probably listened to that a couple thousand

21 times.  You probably listened to it a couple times.

**22      A.   Yes, sir.**

23      Q.    So I can appreciate how difficult it would be
24 to pick those things up.
**25      A.    Yes, sir.**
58
 1      Q.    But in that circumstance, Officer Felix appears
 2 to stand there with his gun pointed at Ashtian for over
 3 two minutes without rendering aid.  Would you say that's
 4 consistent with this policy?
 **5      A.    I would say it is because the policy doesn't**
 **6 give a time frame, it just says summon medical assistance,**
 **7 which he did.  I don't know what all was going on without**
 **8 being Deputy Felix, what all was going on in Deputy**
 **9 Felix's mind, whether or not he still perceived a threat.**
**10 I personally didn't interview him, so I don't know what's**
**11 going on in his mind that may have caused him to wait two**
**12 minutes before he summoned.**
13      Q.    Okay.
**14      A.    But I do recall he did summon medical aid.**
15      Q.    And then while that's going on, other officers
16 started arriving.  And over the next five minutes, we have
17 four or five more officers arrive on the scene.
**18      A.    Yes, sir.**
19      Q.    The video shows them looking inside the car and
20 checking, that's routine.  But none of those officers at
21 any point attempt to render any kind of first aid to
22 Ashtian Barnes, do they?

**23      A.   I recall seeing them taking him out of the car**
**24 and trying to do CPR, chest compressions.**
25      Q.   I'm talking about the first five to seven
59
 1 minutes, they're walking around, nobody is doing anything;
 2 is that correct?
 **3      A.   I'd have to watch it again, sir.  I don't know**
 **4 if it was five to seven minutes.  I wasn't watching the**
 **5 clock on it to see how many minutes transpired.  So I**
 **6 don't know -- I know that in an instance like that when**
 **7 you walk up to a car, your main concern is, is this scene**
 **8 safe.  And you're going to want to make sure it's safe**
 **9 before you start rendering any aid.  The officers, I**
**10 guess, are still concerned about their well-being. And**
**11 once they've established that, then I would imagine they'd**
**12 start rendering aid.**
13      Q.   So we have a scene where the individual,
14 there's no -- there had been no suggestion that Ashtian
15 Barnes exhibited any kind of weapon and a scene where he
16 has been shot twice and is slumped over somehow and is
17 bleeding out and is unconscious, is that a scene where
18 when you have four or five officers on the scene where
19 there's any reasonable expectation that he presents a
20 danger to them, that would keep them from at least

21 checking on the suspect's well-being?

**22         A.      Looking at it from the outside, no.  But I**
**23 would have to be in the mind of those officers to**
**24 determine that.  The video, going back to it, I'm trying**
**25 to recall if Deputy Felix ever got on the radio and said**

60

 **1 "shots fired."**

 2         Q.      He did immediately.

 **3         A.      When you hear that, you don't know if the**
 **4 deputy was firing shots or the suspect was firing shots.**

 5         Q.      Right.  I think that he immediately gave a
 6 clarification, but it's a little bit --

 **7         A.      When the officers arrived?**

 8         Q.      No, on the phone when he was making the call,
 9 he goes "shots fired, shots fired" and then said some
10 other stuff, but it's hard to tell.

**11         A.      I'm just trying to help you with the mindset of**
**12 those officers that arrived on scene --**

13         Q.      No, I appreciate it.

**14         A.      -- with whether or not all they heard on the**
**15 radio was shots fired.**

16         Q.      So what you're saying -- and correct me if I'm
17 wrong -- is that what the responding officers would be
18 responding to is the call of "shots fired"?

**19         A.      Yes, sir.**

20         Q.      And so they're walking in blindly?

**21         A.      Yes, sir.**

22         Q.      And that's true also of EMS people, they're
23 very concerned about walking into the middle of what could

24 be a crime screen --

**25      A.    Yes, sir.**

61

 1      Q.    -- where people are at risk?

**2       A.    Yes, sir.**

 3      Q.    Okay.  On the next page in the investigate

 4 period, down at (A)(1) it talks about minimum of three

 5 days of temporary assignment duty in order for the officer

 6 to cope and manage with their emotions?

**7       A.    Yes, sir.**

 8      Q.    Do you know what period Officer Felix was put

 9 on temporary assignment before he was put back on the

10 street?

**11      A.    I want to say it was -- I'd be guessing, I**

**12 think it was around two weeks.  We gave him some**

**13 assignments in the building where he wasn't out making**

**14 traffic stops.**

15      Q.    Okay.  And why did you choose two weeks instead

16 of three --

**17      A.    I don't remember if it was exactly two weeks.**

18      Q.    I'm not going to hold you to specific dates.

**19      A.    I recall having a conversation with Deputy**

**20 Felix of "Hey, are you ready?"**

21      Q.    Okay.

**22      A.    He obviously went through a very traumatic**

**23 event and I need to know mentally if he's okay to go out**

**24 on the streets.  I wouldn't put him out if he didn't say**

**25 he was.  So I would have kept him on, I guess what a lot**

62

 1 **of people think of as desk duty.  I would have had him**

 2 **doing administrative stuff until he told me "I think I'm**

 3 **ready to go back out there."**

 4     Q.   Did you ask him whether or not he was willing

 5 to be evaluated by a mental health professional to help

 6 with that determination?

 7     **A.   I asked him if he would like to go see one.**

 8 **And as far as I know, he did go see one of the ones that**

 9 **counsels a lot of DPS officers that are involved in**

10 **shootings.**

11     Q.   Okay.  And so he was allowed to go back on

12 duty.  Did he have his duty weapon with him when he went

13 back on duty?

14     **A.   He had a weapon with him.  Now I'm trying to**

15 **remember.  I don't remember if the city took his for their**

16 **investigation or not.**

17     Q.   Okay.  He would have had him a weapon?

18     **A.   Yeah, he would have had one, yeah, we would not**

19 **let him go out on the streets without one.**

20     Q.   And this is all during a period when, as far as

21 you were concerned, Officer Felix was being investigated

22 by Internal Affairs, the DA's office, and the Houston

23 Police Department -- is that correct?

24     **A.   Yes, sir.**

25     Q.   -- effectively for allegation of potential

63

 1 homicide in some form?

**2       A.    Yes, sir.**

 3       Q.    When we go to page 3 of this, which is the next

 4 page over, Supervisor's Responsibilities, it says the

 5 supervisor is responsible for making sure any proper

 6 medical attention is being afforded to any injured

 7 persons.  I have looked through what's been provided to us

 8 and I've seen no indication that a supervisor got involved

 9 in that decision.  Is there somebody specifically who

10 would have been making that call on the scene?

**11       A.    I don't know who the first supervisor was to**

**12 arrive on that scene.**

13       Q.    Okay.

**14       A.    But reading the way that is written, when the**

**15 supervisor arrives, he needs to make sure proper medical**

**16 attention is being afforded.**

17       Q.    Okay.  I'm going to skip ahead to page 167

18 which is deputy on a toll road.  And down in the area of

19 responsibilities, it lists actually four here and two more

20 on the next page.  Would you say that these are largely in

21 order of importance?  It doesn't specifically say that in

22 order of importance, but would you say that largely as we

23 discussed before?

24              MR. HATZEL:  Objection, vague.

25       Q.    (BY MR. HOWARD FOMBY)  That protecting life and

64

 1 property is more important than preserving peace and

2 maintaining order, which is more important than
3 suppressing crime, which is more important than
4 investigative reports, for instance?
**5       A.    I would agree with that statement, yes.**
6       Q.    Let's move ahead to 182, which is Use of
Force
7 and Deadly Force.  Chief, why do we have policies
and
8 procedures regarding the use of deadly force in
general?
**9       A.    To educate the officers here on the
seriousness**
**10 of using and what circumstances would allow for the
use of**
**11 deadly force.**
12      Q.    Would it be fair to say that when you use
13 deadly force, that should be one of the final steps
in the
14 escalation of force?
**15      A.    Yes, sir, nothing beyond that, yes, sir.**
16      Q.    So you'd want to, if ideally, step up to
that
17 point?
**18      A.    Yes, sir.**
19      Q.    Because once you pull the gun and pull the
20 trigger, it's kind of hard to pull that bullet back,
isn't
21 it?
**22      A.    Yes, sir.**
23      Q.    When you look at part B of rules, which is
4 of
24 9 of this section, but page 185, number one, it
says,
25                "Deputies shall not discharge their
65
 1 firearms except to protect themselves or another
person
 2 from imminent death or serious bodily injury?"
 3                Would you agree with that rule?
 **4       A.    Yes, sir.**

 5     Q.    Number 2 says you shall only discharge it when
 6 doing so will not endanger innocent persons?
 **7     A.    Yes, sir.**
 8     Q.    Number 3 says you should not discharge firearms
 9 to threaten or subdue persons unless people appear to be
10 -- represent imminent threat of death or serious bodily
11 injuries.  And I guess that is don't fire a gun into the
12 air, that sort of thing; right?  Firing a gun not at
13 someone, but to startle them?
**14     A.    Yes, something about that they're not -- that**
**15 they don't present an imminent threat of death or serious**
**16 bodily injury to the deputy or of others.**
17     Q.    Okay.  Number four says you can't fire at an
18 escaping suspect who presents no imminent threat of death
19 or serious bodily injury?
**20     A.    Yes, sir.**
21     Q.    Number five says you should not discharge a
22 firearm from a moving vehicle or at a fleeing vehicle
23 unless you reasonably believe that deadly force is
24 necessary under the same circumstances; correct?
**25     A.    Yes, sir.**
66
 1     Q.    And number 8 says, "If reasonable an officer
 2 should give a verbal balance warning before using or
 3 attempting to use deadly force."
 **4     A.    Yes, sir.**
 5     Q.    And if not, the officer will document the
 6 reason the verbal warning is not reasonable; right?

 7      **A.    Yes, sir.**
 8      Q.    Now, when we talk about verbal warning, is this
 9 a generic verbal warning or a verbal warning that you're
10 about to shoot, you know, "if you don't stop, I'm going to
11 shoot"?
**12      A.    It doesn't give direction to that in this SOP**
**13 as to what exactly a verbal warning has to contain.**
14      Q.    It's a little unclear?
**15      A.    Yes, sir.**
16      Q.    Your expectation, would a verbal warning of
17 "put that piece of paper down" be sufficient before
18 firing?
**19      A.    I'm sorry?**
20      Q.    If someone was holding a piece of paper and I
21 yelled "put that piece of paper down" and they didn't,
22 would that be sufficient to allow me to shoot you?
**23      A.    Not according to this policy -- this procedure,**
**24 no, sir.**
25      Q.    Well, this says actually --
67
 **1      A.    That paper wouldn't be threatening anyone with**
 **2 serious bodily injury or death.**
 3      Q.    But in this case it says from a verbal warning.
 4 So it's not clear specifically, but isn't it implied from
 5 this the verbal warning should have something to do with
 6 the fact that the officer is about to use deadly force?
 **7      A.    Yes, and I guess if you have your weapon**

 8 pointed at someone, a simple stop would be enough.
 9 Depending on what the circumstance is, you may need to
10 elaborate further.  I guess that's why it doesn't spell it
11 out in here because every circumstance would be different.
12      Q.   Okay.  Number C talks about the use of
13 nondeadly force.  And in that Number C on the next page,
14 which is page 187, it lists several factors that should be
15 considered in use of nondeadly force.  And those are
16 whether the suspect is actively refusing to comply with
17 orders, whether the suspect is actively resisting arrest,
18 whether the suspect poses an immediate or ongoing threat
19 to the safety of the officer, or whether the suspect is
20 attempting to arrest -- evade arrest by flight; correct?
21      A.   Yes, sir.
22      Q.   If a suspect is actively refusing to comply
23 with lawful orders, do you think that that is sufficient
24 cause to use deadly force?
25      A.   That's a very broad question.  If the order is
68
 1 "Put that weapon down that you're pointing at me" --
 2      Q.   Well, that would be --
 3      A.   I mean, it's very broad what you're asking me
 4 there.
 5      Q.   That would be posing an immediate or ongoing
 6 threat?

```
 7       A.    Yes.
 8       Q.    That would be number 3; right?
 9       A.    Well...
10       Q.    But by itself, just by itself without any
of
11 these other elements, if they're simply refusing to
12 comply, would that be sufficient reason to shoot
them?
13       A.    No, sir, depending on what you're asking
them
14 to comply with.
15       Q.    If they're actively resisting arrest just
by
16 itself, you're trying to arrest me and I'm
struggling with
17 you, is that a reason to --
18       A.    No, sir, it's not, no, sir.
19       Q.    Okay.  Number 3 is a little bit more
20 challenging, right, because it's a little broader,
but it
21 says --
22       A.    Right.
23       Q.    -- poses an immediate or ongoing threat to
the
24 safety of officers; if that threat is the immediate
25 potential of deadly or -- of death or serious bodily
69
 1 injury, that would be sufficient to kill someone;
correct?
 2       A.    Yeah, the wording of this, it just says a
 3 threat.  A threat could mean many things.  A threat
 4 doesn't mean serious bodily injury or death.  So if
a
 5 threat is at a level less than serious bodily injury
or
 6 death, then I could see where you would use
nondeadly
 7 force on something like that?
 8       Q.    Right.  And the idea is that you really
want to
```

 9 match levels of force with levels of force; is that
fair?
**10      A.   Levels of threat, you have to have the**
**11 appropriate level of force to challenge, yes, sir.**
12      Q.   Because you as a police officer are not
13 expected to allow yourself to get shot or knifed
simply
14 because you're walking down the street?
**15      A.   Right.  This guy could just want to fight**
**me,**
**16 that could be the threat.**
17      Q.   And that -- you have other ways of dealing
with
18 that?
**19      A.   Yes, sir.**
20      Q.   And whether the suspect is attempting to
evade
21 arrest by flight, is your understanding of the
policy that
22 you're allowed to shoot someone with a gun simply
because
23 they're evading arrest?
**24      A.   No, my understanding is that you should**
**not**
**25 shoot someone simply for evading arrest.**
70
 1      Q.   Okay.  At the time of the shooting,
Officer
 2 Felix had on his body a Taser weapon.  What is the
 3 purpose -- it's a fairly modern edition to your
armor?
 **4      A.   Yes, sir.**
 5      Q.   What is the reason why you would use a
Taser
 6 weapon versus a gun?
 **7      A.   It would depend on the level of threat.**
**If you**
 **8 feel like you're not in immediate threat of serious**
**bodily**
 **9 injury or death, then you wouldn't need to resort to**

**10 deadly force, so you would use an intermediate weapon like**

**11 a Taser or baton or pepper spray.**

12      Q.   So, for instance, if someone is coming at you

13 with a knife, they're still a distance away from you, a

14 Taser might immobilize them?

**15      A.   I would not use a Taser if someone was coming**

**16 at me with a knife.**

17      Q.   Okay.  That's fair.

**18      A.   There have been many studies that show you can**

**19 actually get to someone quicker with a knife than you can**

**20 with a gun.**

21      Q.   Okay.  If someone is coming at you with a

22 stick?

**23      A.   Total different scenario, yes, sir, depending**

**24 on the size of the stick, but yes, different scenario.**

25      Q.   Okay.  The former DA of Williamson County once

71

 1 indicted someone for assault with a deadly weapon where he

 2 pushed someone up against a tree.  That tree could be a

 3 deadly weapon.  Luckily that didn't stick.

 4                 So if someone is being -- you feel someone

 5 is being noncompliant to your orders, you feel that they

 6 are at risk of not attacking you but doing something else,

 7 would a Taser be a better option than pulling a handgun?

 8      **A.      According to our Taser procedures, they have to**

 9 **be -- there has to be active resistance.**

10      Q.   Okay.

11      **A.   More than just noncompliant; they have to be**

12 **actively resisting the arrest.**

13      Q.   Okay.  We're getting toward the end of this so

14 we can all have a reasonable lunch today.

15                 I want to walk through though pretty

16 quickly what happened in this particular circumstance.

17 And I know that you've seen the video probably a few

18 times, but you haven't seen it several thousand times.

19      **A.   It actually scares me when I watch it.**

20      Q.   We were talking before all this stuff started

21 that her father was an officer in New Orleans and was

22 involved in a shooting and that none of us take that

23 lightly, as we should never do.  My wife is a doctor.  She

24 gets upset when her hospice patients die.  It's just kind

25 of tough to handle.

72

 1                 But in this situation, Officer Felix comes

 2 up to the car.  Ashtian Barnes is having problems finding

 3 his documentation, digging through papers.  If you recall

 4 he was told stop digging around.

 5      **A.   Uh-huh.**

 6      Q.   And the -- at some point Officer Felix says

 7 that he smells the odor of marijuana.  And based upon

 8 that, there's a little delay, but then he tells
Ashtian he
 9 wants him to exit the vehicle.
**10      A.    Uh-huh.**
11      Q.    Presumably to put him under constraint and
then
12 check the car for contraband.
**13      A.    Yes, sir.**
14      Q.    And up to that point, Officer Felix says
that
15 for some reason Ashtian had turned off the car and
taken
16 his keys out and put them down on the console.  It's
17 not -- we don't have any other evidence of that, we
just
18 have Officer Felix's statement, but then Officer
Felix
19 says he saw Ashtian grab the keys -- when he was
told to
20 leave the vehicle, grab the keys, put them in the
21 ignition, start the car, put the car in gear.  And
when he
22 saw Ashtian grabbing for the keys, Officer Felix
says he
23 drew his duty weapon and you can see him in the
video
24 shoving it forward into the car right in Ashtian's
face.
25 And I don't know if you recall that because I've
seen it a
73
 1 lot, but there's Ashtian bent over with the gun in
his
 2 face.
 **3      A.    Uh-huh.**
 4      Q.    Under that scenario and the policies that
we
 5 talked about, do you think that that is the
appropriate

6 level of force to use to restrain Ashtian from
leaving?
 **7      A.    I don't -- again, I don't know Deputy
Felix's**
 **8 mindset as to what all was going on inside that
vehicle**
 **9 and all that reaching around.  If Deputy Felix
believed**
**10 there's a threat there, then it would have been**
**11 appropriate; if he did not believe there to be a
threat,**
**12 then it would not have been appropriate.**
13      Q.    In his statement Deputy Felix -- in all of
his
14 statements, it says simply that he never perceived
that
15 there was a weapon or specific threat inside the
car.  So
16 given that knowledge, would you think that it's
17 appropriate to pull your duty weapon and shove it
into a
18 person's face?
**19      A.    I don't believe it's the appropriate thing
to**
**20 do if there is no threat, no, sir.**
21      Q.    And earlier we talked about a Taser.  You
said
22 that even drawing a Taser, which is a nondeadly
weapon
23 under most circumstances, that the only time you
would do
24 so is if there was evidence the suspect was actively
25 resisting?
74
 **1      A.    Yes, sir.**
 2      Q.    So you would expect a much higher level to
pull
 3 a duty weapon; is that right?
 **4      A.    Yes, sir.**
 5      Q.    At the point that the car starts moving

 6 forward, Deputy Felix is standing in the doorway, the door
 7 is open behind him by a significant amount, and the car
 8 starts moving forward; what would the policy of Harris
 9 County Constable's Office be about what -- how Felix
10 should react at that particular point?
**11      A.   I don't think we have a specific -- you might**
**12 have to repeat that one again.  I don't think we have**
**13 specific wording for that exact standard.  But say it to**
**14 me again just to make sure.**
15      Q.   An officer is standing in the doorway with the
16 car door open behind him, the car starts moving forward,
17 what -- is there -- can you identify in that particular
18 moment, when you see the video, any real risk of injury or
19 death to Felix if he simply stepped back?
**20      A.   I didn't see any real risk until the door**
**21 closed on him.**
22      Q.   Okay.  And again, you haven't seen the video
23 several thousand times, but the door closes on him after
24 he's hanging on the car.  So if --
**25      A.   I thought it was simultaneous.  When I watched**
75
**1 it, it looks like -- like most cars, as soon as you**
**2 accelerate, the door closes.  And that's what it looked**
**3 like to me, the car accelerated, the door closed and**
**4 that's where Felix was standing.**

 5      Q.   So if you saw video evidence that showed that
 6 it was not until after he was well up on the car with his
 7 gun still inside the car, his feet -- both of his feet on
 8 the sill of the car, that the car door actually closed on
 9 him, would that affect your opinion about whether or not
10 he was at risk of imminent danger before -- at the time
11 that Ashtian Barnes started leaving?
12              MR. HATZEL:  Objection, asked and answered.
**13      A.   I'm trying to understand where -- if I saw a**
**14 video that showed Deputy Felix running after the car and**
**15 jumping on it, yes, it would change my opinion.**
16      Q.   (BY MR. HOWARD FOMBY)  If you saw where he was
17 standing that the car actually had to move forward several
18 feet before the car door ever closed to where he would be
19 located, would that affect your sense of his danger?
**20      A.   If I could position myself in a way where I**
**21 could see where he was in relation to the car door to**
**22 where he is outside of any kind of threat, then yes. I**
**23 watched it frame by frame and to me it looked like the car**
**24 door closed on him and it looks like he just lifts his**
**25 foot up as the car door is closing, not as if he made any**
76

 1 type of run towards the vehicle.
 2      Q.   He states that as the car started moving
 3 forward, he immediately put his left foot up and grabbed
 4 and braced himself up, and that's as the car starts
 5 moving?
 6      A.   And the door is closing as the car immediately
 7 starts moving forward, from what I remember seeing.
 8      Q.   Would your training -- would the policy at the
 9 Constable's Office be that officers should typically jump
10 onto moving cars in order to effect an arrest?
11      A.   That's what I was saying.  We would discharge
12 anyone running and jumping on top of a car because then
13 you're placing yourself into a dangerous situation.
14      Q.   If you have an officer who is standing --
15 there's a car coming towards an officer, but not directly
16 towards him, the officer is standing away from where the
17 car is coming, would your policy be that the officer would
18 be justified in stepping in front of that car and because
19 he's now at danger firing his duty weapon into the driver
20 to erase the threat?
21      A.   Our training says you are not to place yourself
22 in front of a vehicle, yes, sir.
23      Q.   And that is because you are not supposed to put
24 yourself in danger simply to stop a suspect?
25      A.   Yes, sir.
77

```
 1     Q.    We talked earlier about your policies about
 2 escaping.  If Ashtian Barnes had simply escaped, were
 3 there procedures in place that would have been sufficient
 4 to get him at some point?
 5               MR. HATZEL:  Objection, vague.
 6     Q.    (BY MR. HOWARD FOMBY)  Could Officer Felix have
 7 pursued in his vehicle?
 8     A.    Yes, sir.
 9     Q.    Could Officer Felix have called in additional
10 support on the tollway?
11     A.    Yes, sir.
12     Q.    And, in fact, Officer Felix had already called
13 for a backup officer previously?
14     A.    I believe so, yes, sir.
15     Q.    And there are cameras monitoring Ashtian Barnes
16 as he travels down the tollway; correct?
17     A.    Yes, there are a bunch of cameras along the
18 tollway, yes, sir.
19     Q.    And Officer Felix already has an idea of who's
20 the owner of that car, right, from the license plate?
21     A.    Yes, sir.
22     Q.    And he already knows that the person sitting in
23 there has identified himself as Ashtian Barnes; is that
24 correct?
25     A.    Verbally, yes, sir.  I don't think he ever got
78
 1 a driver's license.  So verbally, yes, sir.
```

 2      Q.    And he has a visual ID of who that person is

 3 driving that car?

 **4      A.    Yes, sir.**

 5      Q.    So unlike the scenario where you're pursuing

 6 someone you don't know who's in the car -- remember we

 7 talked about someone jumps out and runs and hides?

 **8      A.    Yes, sir.**

 9      Q.    In this case Ashtian Barnes was very unlikely

10 to ever escape eventual arrest; right?

**11      A.    That would be difficult because I don't think**

**12 he ever positively ID'd him.**

13      Q.    But you knew who owned the car, so you check

14 back to who it was rented to; correct?

**15      A.    But I don't think -- was it rented to him?**

16      Q.    It was rented to his girlfriend.

**17      A.    So hopefully she would give you testimony to**

**18 tell you who was driving it that day.**

19      Q.    Right.  So what I'm saying is that compared to

20 a scenario where you don't know anything about it, though,

21 someone evading arrest for possible possession of

22 marijuana is not something that would call for an

23 exception to the normal policy of pursuit; right?

**24      A.    What do you mean?  I'm trying to follow.  What**

**25 do you mean by --**

79

 1      Q.    So we talked about the normal policy of

 2 pursuit, that you just follow them and you might call in

 3 other officers?

 **4      A.   This would have been a felony traffic
stop.  If**
 **5 he would have gotten away, there would have been
lots of**
 **6 guns pointed at him once we got him pulled over
because**
 **7 now he has committed a felony.**
 8      Q.   By leaving?
 **9      A.   By leaving.**
10      Q.   But before he left, would it have been a
11 felony?
**12      A.   Before he drove off?**
13      Q.   Yes.
**14      A.   No, sir, because all he had suspected him
for**
**15 at that point was possession of marijuana.**
16      Q.   And, in fact, that at point, there was no
17 evidence that he had any marijuana in his
possession;
18 correct?
**19      A.   He hadn't searched the vehicle yet, so --
there**
**20 was some -- I believe Felix was working under the
pretense**
**21 that there may be marijuana inside the vehicle.  He
hadn't**
**22 determined whether or not there was any there or
not.**
23      Q.   In terms of putting the public at risk,
what
24 is -- does jumping on a vehicle that's moving and
shoving
25 a gun in someone's face put the general public at
risk in
80
 1 any way?
 **2      A.   I'm trying to work through this scenario.**
 3      Q.   And we're talking about a tollway that's
very
 4 active with lots of traffic?

```
 5      A.    A pursuit on the toll road definitely puts
the
 6 public at risk.
 7      Q.    If a car is moving and say they're at 20
miles
 8 an hour along the tollway, does shooting the
operator of
 9 that vehicle put the public at risk in any way?
10      A.    The far reach of a round ricocheting and
going
11 somewhere might.
12      Q.    How about the risk of taking out the
driver who
13 is the only person operating that vehicle and
keeping it
14 going straight?
15      A.    Yes, if the driver can no longer operate
that
16 vehicle, then you're going to have to take it over.
17      Q.    And if you're hanging on the side of a car
18 traveling 20 miles per hour right next to speeding
cars
19 with a body sitting in the driver's seat, that
presents
20 significant challenges to stopping the car?
21      A.    Yes, sir.
22      Q.    So, in fact, the best scenario that could
have
23 happened under the circumstances is if Ashtian
stayed
24 alive long enough to stop that car; right?
25      A.    After being shot?
81
 1      Q.    Yeah.
 2      A.    Yes, sir.
 3      Q.    Deputy Felix, when we did his deposition,
said
 4 that his plan that he had formulated in those few
seconds
```

 5 as he's racing down was that after he shot and killed
 6 Ashtian Barnes, he was going to then swing his body inside
 7 the car, activate the emergency brake while holding on to
 8 the steering wheel and keeping the car running along that
 9 narrow margin along the highway.  Do you feel that that is
10 a reasonable scenario for trying to stop a car?
11              MR. HATZEL:  Objection, mischaracterizes
12 prior testimony.
**13      A.   If he felt he could do it, I mean, if he felt**
**14 his -- he was capable of doing that, I guess in the, so to**
**15 say, heat of the moment, if that's the plan he could come**
**16 up with in those fractions of a second, it does sound like**
**17 he had a plan.  Whether or not he could have executed it**
**18 exactly the way he planned it, I can't say.**
19      Q.   Do you believe you could have executed it that
20 way under those circumstances?
**21      A.   Repeat the plan to me one more time.**
22      Q.   That after shooting Ashtian Barnes to death, he
23 was going to then dive -- from hanging on the car this way
24 with his gun in this hand, he was going to somehow then
25 dive into the car, activate the emergency brake while
82
 1 holding on to the steering wheel and maintaining it on the

2 margin of the road?

 3               MR. HATZEL:  Objection, mischaracterizes

 4 Deputy Felix's testimony.

 **5       A.    It would have been difficult for me to do; I**

 **6 can't say it would have been impossible.**

 7       Q.   (BY MR. HOWARD FOMBY)  In terms of firing a

 8 firearm, we talked about the policy about -- for obvious

 9 reasons, officers are taught not to fire a suspect in the

10 middle of a crowd of people; correct?

**11       A.    Yes, sir.**

12       Q.   You're not that good a shot?

**13       A.    Yes.**

14       Q.   You're not really supposed to shoot through

15 walls at a possible person, there may be exceptions to

16 that, SWAT team members, but in general the expectation

17 would be if you think someone is over there, you're not

18 going to be shooting blindly; right?

**19       A.    Right.**

20       Q.   And that's because?

**21       A.    You should know where your bullet is going to**

**22 travel.**

23       Q.   So in this case Deputy Felix is standing

24 precariously on top of a car holding on with his weak left

25 hand, because he's a right-handed person, with a gun with

83

 1 no visibility looking down the road when he's firing.  So

 2 he's firing blindly in direction.  What are the risks

 3 associated with firing a gun like that blindly and under

 4 those kinds of precarious circumstances?

 **5      A.   If you're firing blindly, you could hit**

 **6 something you don't intentionally want to hit.**

 7      Q.   Given that he's firing across the car and the

 8 tollway is filled with other cars on the other side, is

 9 there a risk that the bullet might strike another driver?

**10      A.   If he was firing across, yes.  I don't know**

**11 what angle the pistol was at when he fired those rounds.**

**12 If he was firing downward, I don't see how that would put**

**13 anyone at risk.  If he was firing outward upward, there's**

**14 no telling where the bullet was going to wind up, so it**

**15 could put someone at risk.  But I don't know the angle his**

**16 hand was at when he fired those rounds.**

17      Q.   Okay.

**18      A.   But I do know no one else was hit.**

19      Q.   Right.  As an officer, are you -- I'm sure you

20 have extensive training in the use of guns; correct?

**21      A.   We're required to qualify once a year, yes,**

**22 sir.**

23      Q.   You know, you see these movies where you have

24 these secret agents who -- or even Navy Seals who go

25 through all these scenarios where they're jumping over

84

 1 boxes and firing choosing between the terrorist and the
 2 baby, does your department get any of that kind of
 3 training?
 **4      A.   We have been through some active shooter-style**
 **5 training.  We were using airsoft guns.  It has been a**
 **6 number of years since we had training.  I don't know if**
 **7 Deputy Felix was in that or not.  Judging from his time**
 **8 frame, how long he's been here, he likely was in it.  And**
 **9 there are some no-shoot scenarios in there, but none where**
 **10 we're in a car going down the highway or hanging from a**
 **11 car going down the highway.  It was more along the lines**
 **12 of clearing buildings and what threats you may come across**
 **13 inside a building.**
 14      Q.   And all part of that is trying to learn how to
 15 make quick decisions, but isn't part of that to show you
 16 the scenario so that you can make proper decisions if
 17 you're faced with it?
 **18      A.   Yes, sir.**
 19      Q.   You walk into a school that there's an active
 20 shooter and you have to choose between the good kids and
 21 bad kids, those are realistic scenarios?
 **22      A.   Yes, sir.**
 23      Q.   But, as you say, there's no scenario for trying
 24 to fire from a moving -- on top of a moving vehicle?

**25**      **A.   Yes, sir.**
85
 1      Q.    Officer Felix in his later testimony claimed
 2 that he -- and we're talking from the point that he jumped
 3 on top of the car, there were just a few seconds before he
 4 fired the first shot and about a second before the second
 5 one.
 **6**      **A.   Yes, sir.**
 7      Q.    Bang, bang.  He says that he then had
 8 calculated the angle of his weapon and directed it at an
 9 angle that it couldn't possibly injure someone else.  Did
10 he have any prior training in trying to make that kind of
11 decision literally within a matter of a couple seconds?
**12**      **A.   I don't know.  That's what I was saying, I**
**13 haven't looked at his training file --**
14      Q.    Okay.
**15**      **A.    -- to see what all he's been to.  But I know**
**16 every officer should take into account where their round**
**17 is going to go.**
18      Q.    Right.  And does that require usually some
19 cognizant thinking?  Are you trained to make shooting
20 decisions as calmly as you can or -- I'm going to stop and
21 rephrase that.
**22**      **A.   Yes, sir.**
23      Q.    In a situation like this the person who is
24 shooting is highly agitated for various reasons.  Are you

25 given any training in whether or not it's appropriate to

86

 1 fire your weapon under those circumstances, what agitation
 2 could do to your decision making?
 **3      A.   No, I don't think it's ever been -- the**
 **4 training is more about threat or no threat, whether or not**
 **5 the use of force is justified or not justified.**
 6      Q.   Okay.  Officer Felix, after the first shooting,
 7 there's no record in his file that he received any
 8 follow-up training or retraining regarding the appropriate
 9 use of force?
**10      A.   Yes, sir.**
11      Q.   After this shooting, there again there's no
12 record up until about 18 months later, he took a class on
13 escalation of force that was mandated by TCOLE, I believe.
14 So is there anything in there missing in terms of
15 follow-up training with Officer Felix -- given the fact
16 that he was involved in two officer-involved shootings and
17 killings, follow-up training on the appropriate escalation
18 of force before that TCOLE?
**19      A.   Was he involved in two killings?**
20      Q.   Yes.
21           MS. BAKER:  No.
**22      A.   You're talking about the active shooter**
**23 event --**
24      Q.   (BY MR. HOWARD FOMBY)  Right.
**25      A.   -- where the SWAT officer shot him?**

87

 1      Q.   There was one on January 19, 2006.
 **2      A.   I wasn't aware of Deputy Felix actually**

**3 shooting and killing anyone else.**

4      Q.   Another officer-involved shooting?

5               MS. BAKER:  That guy didn't die.

6               MR. HOWARD FOMBY:  Okay.  He didn't die?

7 Well, it's not in the record.

8               MS. BAKER:  So it's not fair to represent

9 that he did die.

10              MR. HOWARD FOMBY:  It was represented in

11 the record as a suicide by cop.

12              MS. BAKER:  Correct, but it was an

13 unsuccessful suicide by cop.

**14      A.   I just wanted to make sure I wasn't missing**

**15 anything.  This is the only death that I recall Deputy**

**16 Felix being involved in.**

17      Q.   (BY MR. HOWARD FOMBY)  Okay.  But you do recall

18 the other shooting?

**19      A.   He has been involved in other incidents, yes,**

**20 sir.**

21              MR. HOWARD FOMBY:  And I'm sorry for that.

22 But it's not -- it's actually never been mentioned in the

23 record that the other person didn't die.

24              MS. BAKER:  No, he didn't die.  And of

25 course, Felix, as you know, was not the only one.

88

1               MR. HOWARD FOMBY:  Yes, I know.

**2      A.   You were going with the training question.**

3      Q.   (BY MR. HOWARD FOMBY)  Yeah, the training is up

4 until the TCOLE mandated escalation of force, the

5 Constable's Office never trained Officer Felix in

6 appropriate escalation of force; is that correct?

**7    A.    I don't know.  Again, I'd have to check his**

**8 training record to find out what he received from date of**

**9 hire in any type of use of force.**

10    Q.    Okay.  But would you agree that training in

11 escalation -- well, first let's start with deescalation?

**12    A.    That's a new thing.**

13    Q.    New thing?

**14    A.    Yes, sir.  Hasn't always been around.  So I**

**15 think when it became more of a universal thing, that TCOLE**

**16 decided that we should probably start mandating that and**

**17 that's probably when you saw him taking the course.**

18    Q.    And that would be like a man and a wife having

19 an argument that's escalating and you want to separate

20 them calmly?

**21    A.    Yes, sir.**

22    Q.    One might be a person who's severely mentally

23 ill or high on drugs and so you want to deescalate that

24 before anything else happens?

**25    A.    Yes, sir.**

89

 1    Q.    The idea again being, as we discussed, we've

 2 got to push that threat level down and we've got to do the

 3 least amount of damage to the situation; right?

 **4    A.    Yes, sir.**

 5    Q.    And with escalation of force, the opposite is

 6 true, isn't it, that you want to start with officer
 7 presence, your uniform, your badge and all that, verbal
 8 commands?
 **9      A.   Yes, sir.**
10      Q.   And walk up that ladder as slowly as you can
11 possibly to give the individual an opportunity to submit
12 to the authority; right?
**13      A.   Yes, sir.**
14      Q.   And in this case would you agree that Officer
15 Felix went from verbal orders almost immediately to threat
16 of deadly force by shoving a gun in his face?
**17      A.   I would say it was a very short time frame in**
**18 there that he went from one to the other, yes, sir.**
19      Q.   If Officer Felix -- and after having talked
20 about all this, in looking at the video you saw that
21 Officer Felix had a reasonable opportunity as Ashtian
22 started moving towards his keys to put himself in a safer
23 position and possibly let the individual drive away, would
24 -- in the policy of Harris County Precinct 5, would it be
25 your policy that that's how he should behave as an
90
 1 officer?
 **2      A.   We don't have a procedure that says word for**
 **3 word what exactly to do in that scenario.**
 4      Q.   Right.  But --
 **5      A.   I do know that if you have someone stopped,**

 6 it's better to keep them stopped.  If you can prevent them

 7 from driving off and going and causing a serious crash or

 8 injury to someone else, themselves, yourself, if you can

 9 prevent that, I believe you should.

10      Q.   Okay.  Was there any evidence in Ashtian

11 Barnes' prior driving activity that said he was an erratic

12 driver?

13      A.   No, sir.

14      Q.   Was there any evidence in even the speed with

15 which he took off, Officer Felix hanging on the car that

16 he was driving erratically?

17      A.   The simple fact of driving off on a traffic

18 stop to me would be erratic unusual driving.

19      Q.   But was he spinning his tires and driving fast?

20      A.   Yes, he took off in enough -- if I remember the

21 video correctly, he took off fast enough to slam the trunk

22 back down on the car and fast enough for the car door to

23 slam onto Deputy Felix.  And if you take off in a slow

24 roll, I don't think it'll cause a door to do that.

25      Q.   Do you know how far the car traveled in the few

91

 1 seconds we're talking about?

 2      A.   It went pretty far.  If you see on the dash

 3 cam, it looks like it traveled a distance.

 4      Q.   If he was accelerating at a high speed, Chief,

5 wouldn't he be traveling at a high speed at the end where
6 he put on the brakes?
 **7      A.   Not if the time frame shows that he only had a**
 **8 few seconds to do that and he's driving a Toyota Corolla.**
 **9 So while he could accelerate quickly, he didn't have time**
**10 to get to a high speed.**
11      Q.   And if the video shows he stopped within just a
12 couple feet, would that tell you that he was not traveling
13 at a high speed at the end?
**14      A.   Right, he wouldn't have had time to get to one**
**15 if he only went a few feet, yes, sir.**
16      Q.   We previously went over the policy that there's
17 a policy existing for officer-involved shootings; correct?
**18      A.   Yes, sir.**
19      Q.   And we're concerned about the officer, the
20 Constable's Office, and the general public, not
21 necessarily in any order; right?
**22      A.   Yes, sir.**
23      Q.   Was there any required retraining of Officer
24 Felix after the first shooting and after the second
25 shooting regarding that policy and what the expectations
92
 1 are as far as the Constable's Office records?
 **2      A.   I can't attest to the first shooting.  He**
 **3 wasn't working for me when that occurred.**
 4      Q.   Okay.
 **5      A.   I can tell you that as a result of this**
 **6 specific incident, there was no retraining that was**
 **7 required for him to go right after this occurred.**

 8     Q.   Okay.  We've gone over a lot of these
policies
 9 and we talked about how Officer Felix drew his
service
10 weapon instead of his Taser.  He escalated the use
of
11 force in a matter of seconds.  He made a decision to
jump
12 on a car that was moving.  He fired a weapon blindly
in
13 the direction of the general public.  He shot a
person who
14 was operating a car that was traveling at a fairly
15 reasonable speed that was right on the edge of the
tollway
16 and could have veered easily --
17                 MR. HATZEL:  Objection,
mischaracterizes
18 prior testimony.
19                 MR. HOWARD FOMBY:  I'm just
characterizing
20 my testimony right now.
21     Q.   (BY MR. HOWARD FOMBY)  So we've looked at
all
22 of those instances and even looking at all of that,
would
23 you say that it's your continuing belief that Officer
24 Felix made the correct decisions in every one of
those
25 steps?
93
 1                 MR. HATZEL:  Same objection.
 **2     A.   I disagree with some of what you just
said.**
 3     Q.   (BY MR. HOWARD FOMBY)  Okay.
 **4     A.   I did not see jump onto a police vehicle.**
 5     Q.   I said moving vehicle.
 **6     A.   I'm sorry.  I did not see him jump onto
the**

 7 vehicle Mr. Barnes was driving.  I simply saw him lift his

 8 leg.  I can't say where his pistol was pointed.  If he

 9 says it was pointed in a safe direction and no one was

10 struck by any bullets, I have to assume it was pointed in

11 a safe direction, no other vehicles wound up with --

12 stopped with bullet rounds in them or anything else, so it

13 must have been pointed in a safe direction.

14                 Knowing all of that, if a car door closed

15 on me and I felt like my life was in immediate danger, I

16 would have to do something to stop that threat.

17      Q.   Okay.

18      A.   And if it meant taking someone else's life to

19 protect my own, unfortunately I would make that decision.

20      Q.   So would you say then that your opinion about

21 the appropriateness of his actions after the point of

22 Ashtian Barnes putting the car in gear is based upon

23 whether or not the car door had closed on Officer Felix

24 who had to put his life in danger?

25      A.   Yes, sir, it appeared to me from watching the

94

 1 video he was placed into a situation where his life was in

 2 danger, yes.

 3      Q.   And if, in fact, that was not true, would you

 4 agree that the rest of the actions were inappropriate

5 because of the decision he made?

**6       A.    I would agree that if his life was not in**
**7 danger, he should not have made -- he should not take**
**8 someone else's life.  Can I -- let me specify that a**
**9 little bit.**

10       Q.    Sure.

**11       A.    I believe that at the time that he fired those**
**12 rounds, his life was in danger; at the point that he**
**13 actually had to take someone else's life, I feel like his**
**14 life was in danger.  And if I was in the same scenario and**
**15 I felt like my life is in danger, I would have had to have**
**16 done the same.**

17       Q.    Chief, one of the questions I often get about
18 this case from other people -- I happen to live literally
19 in the shadow of Fort Hood, Texas.  My backyard is Fort
20 Hood.  And I hear all day long -- I know when we're
21 getting ready for some military action because the
22 bombings pick up in my backyard.

23                   But one of the things -- and I also work
24 extensively in a special mental health clinic that's
25 designed particularly just for Veterans because they come

95

 1 home from wars and they are not ready for human -- normal
 2 interaction with society.

 **3       A.    I have been there.**

 4       Q.    But one of the things that we don't see that we
 5 see very rarely in the armed services is a soldier
 6 shooting a civilian.

 **7      A.    Except for the incident I just told you about**
 **8 on Memorial.**
 9      Q.    But we very seldom see that.  And part of the
10 reason for that -- my next door neighbor is a four star
11 general, used to be at West Point.  His take on that is
12 the Army and Air Force and Navy train and train and train
13 and train their soldiers about how to use their weapons
14 and when to use their weapons, because you kill too many
15 innocent Afghanis, you've got a bigger problem on your
16 hands.
**17      A.    Rules of engagement, yes, sir.**
18      Q.    Yeah.  Is it your opinion that we train our
19 police officers well enough the way the Army trains their
20 police officers to deal with these kinds of, sometimes
21 unexpected, situations?
**22      A.    I have no idea how the Army trains their police**
**23 officers.**
24      Q.    Okay.
**25      A.    I really don't.  I served from '88 to '92 and I**
96
 **1 was not a military police.**
 2      Q.    No, I'm not talking about police.  I'm talking
 3 about the way the Army trains their solders.  You put
 4 someone on the street in Iran or Iraq or Afghanistan,

 5 Syria, you're training about what their limitations of
 6 force are and how to deal with situations.  Do you believe
 7 that we here in the United States train our police to that
 8 same standard?
 **9      A.   Wow.**
10           MR. HATZEL:  Objection, relevance.
**11      A.   I don't -- without actually seeing what they're**
**12 doing today -- I know when I was in, I received more**
**13 training as a police officer than I did as an airman in**
**14 the Air Force.**
15      Q.   (BY MR. HOWARD FOMBY)  Okay.
**16      A.   I've shot my weapon a lot more as a police**
**17 officer training than I ever did as an airman in the Air**
**18 Force.**
19      Q.   What did you do as an airman?
**20      A.   I was assigned to the motor pool.  I was**
**21 stationed in Austin where we used to have an Air Force**
**22 base in Austin.**
23      Q.   Bergstrom?
**24      A.   Yes, sir.  I spent eight months in the Persian**
**25 Gulf War.  So we didn't have a lot of training then.  They**
97
 **1 may now.  My brother goes through a lot of training.  I**
 **2 have a brother that's fixing to be promoted to full bird**
 **3 colonel.  He's been in since '86.  He was a ranger and a**
 **4 ranger instructor.  So he's been through crazy amounts of**

 5 training.  But I'm sure he doesn't have to reach very far
 6 to find somebody else in the Army that hasn't been through
 7 hardly any.
 8                 So it's hard for me to make a comparison
 9 because you do have some peace officers that have been
10 through SWAT training and that SWAT training officer is
11 much better trained than some just basic infantry.  So
12 it's a wide question what you're asking me.  It's hard for
13 me to say who's got better.  Because there's -- we have
14 now in our armed forces, there's a lot of armed forces.
15     Q.   Too many.
16     A.   So to compare just generically someone to an
17 officer, you're rolling the dice; you may find an officer
18 that's better trained, you may find a military member
19 that's better trained, just depending on what they do.
20                 MR. HOWARD FOMBY:  Off the record for a
21 second.
22                 (Off-the-record discussion)
23     Q.   (BY MR. HOWARD FOMBY)  I'm done with my
24 questions for now.  Can I just say I appreciate your
25 honesty and candor.  As a witness sitting on that side, I
98
 1 do appreciate that I think that you've -- I may disagree

2 on this point or that point, but at the same time, I think
3 it's refreshing to see someone who takes the honor of
4 their uniform and their office so highly.
**5       A.    Thank you, sir.**
6       Q.    I told you I was going to give you an
7 opportunity to change your opinions or add anything.  And
8 again you can do that --
 9                  MR. HATZEL:  We'll read and sign.
10                  MR. HOWARD FOMBY:  Okay.  At this point, I
11 have nothing else.
12                  MR. HATZEL:  We'll just -- I don't know
13 what the next -- I think it's No. 6, but we'll mark the
14 letter of May 20th, 2019, as No. 6 and our objections as
15 No. 7 to the deposition and we'll reserve questions.
16                  (Deposition concluded at 12:31 p.m.)
17
18
19
20
21
22
23
24
25
99
 1                  CHANGES AND SIGNATURE
   WITNESS: CHIEF TERRY ALLBRITTON         DATE: JULY 12, 2019
 2
   PAGE    LINE    CHANGE                  REASON
 3 _____
 4 _____
 5 _____
 6 _____
 7 _____
 8 _____

```
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25
```

**100**

```
 1       I, CHIEF TERRY ALLBRITTON, have read the foregoing
 2  deposition and hereby affix my signature that same is true
 3  and correct, except as noted above.
 4
                           _____
 5                         CHIEF TERRY ALLBRITTON
    THE STATE OF _____)
 6
    COUNTY OF _____)
 7
            Before me, _____, on this
 8  day personally appeared CHIEF TERRY ALLBRITTON, known to
 9  me (or proved to me under oath of through
10  _____) (description of identity card or other
11  document) to be the person whose name is subscribed to the
12  foregoing instrument and acknowledged to me that they
13  executed the same for the purposes and consideration
14  therein expressed.
15          Given under my hand and seal of office this _____
16  day of _____, 2019.
17
                           _____
18                         NOTARY PUBLIC IN AND FOR
                           THE STATE OF _____
19
20          My Commission Expires: _____
21
22
23
```

24
25
101
1                    UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
2                       HOUSTON DIVISION
    Janice Hughes Barnes,        §
3    Individually and as          §
    Representative of The        §
4    Estate of Ashtian Barnes,    §
    Deceased; And Tommy Duane    §
5    Barnes                       § CAUSE NO: 4:18-CV-00725
          Plaintiffs              §
6                                 §
    vs.                          §
7                                 §
    Roberto Felix, Jr., And      §
8    the County of Harris,        §
    Texas                        §
9    Defendants                   §
10
                    REPORTER'S CERTIFICATION
11            DEPOSITION OF CHIEF TERRY ALLBRITTON
                         JULY 12, 2019
12
13            I, Heather Deiss, a Certified Shorthand Reporter
14  in and for the State of Texas, hereby certify to the
15  following:
16            That the witness, CHIEF TERRY ALLBRITTON, was
17  duly sworn by the officer and that the transcript of the
18  oral deposition is a true record of the testimony given by
19  the witness;
20            That the deposition transcript or a letter
21  advising the deposition is ready for signature was
22  submitted on _____, 2019, to the witness or
23  to the attorney for the witness for examination, signature
24  and return to me by _____, 2019;
25            That the amount of time used by each party at the
102
1   deposition is as follows:
2        Mr. Howard Fomby - 02:20 (hours and minutes)
        Mr. Adam Fomby - 00:00 (hours and minutes)
3        Mr. Cameron Hatzel - 00:00 (hours and minutes)
        Mr. Mary Baker - 00:00 (hours and minutes)
4            That pursuant to information given to the
5   deposition officer at the time said testimony was taken,
6   the following includes counsel for all parties of record:

```
 7        Mr. Howard Fomby, Attorney for Plaintiff
          Mr. Adam Fomby, Attorney for Plaintiff
 8        Mr. Cameron Hatzel, Attorney for Defendants
          Ms. Mary Baker, Attorney for Defendants
 9             I further certify that I am neither counsel for,
10  related to, nor employed by any of the parties or
11  attorneys in the action in which this proceeding was
12  taken, and further that I am not financially or otherwise
13  interested in the outcome of the action.
14             Further certification requirements pursuant to
15  Rule 203 of TRCP will be certified to after they have
16  occurred.
17             Certified to by me this 25th day of July, 2019.
18
            _____
19          HEATHER DEISS, CSR #8461
            My Commission Expires:  12/31/19
20          Southwest Reporting & Video Service, Inc.
            Firm Registration 189
21          Expires: 12/31/2020
            826 Heights Boulevard
22          Houston, Texas  77386
            (713) 650-1800
23          (713) 650-6245
24
25
```

**APPENDIX C**

Deposition of Deputy Roberto Felix
February 18, 2018

Roberto Felix
713-650-1800 sweptproduction@swreporting.com
Southwest Reporting & Video Service, Inc. Registration #189
1
IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION
Janice Hughes Barnes, &
Individually and as &
Representative of The Estate &
of Ashtian Barnes, Deceased; &
and Tommy Duane Barnes &
&
Plaintiffs, &
&
vs. & CAUSE NO: 4:18-CV-00725
&
Roberto Felix, Jr., And the &
County of Harris, Texas &
&
Defendants. &
************************************
ORAL AND VIDEOTAPED DEPOSITION OF
ROBERTO FELIX
FEBRUARY 18, 2019
************************************
ORAL AND VIDEOTAPED DEPOSITION OF ROBERTO FELIX,
produced as a witness at the instance of the PLAINTIFFS,
and duly sworn, was taken in the above-styled and
numbered cause on FEBRUARY 18, 2019, from 10:00 a.m. to
3:23 p.m., before Aubrea Hobbs, CSR, RPR, in and for the
State of Texas, reported by computerized machine
shorthand, at the Harris County Attorney's Office, 1019
Congress Avenue, 15th Floor, Houston, Texas, pursuant to
the Federal Rules of Civil Procedure and the provisions
stated on the record or attached hereto.
Roberto Felix
713-650-1800 sweptproduction@swreporting.com
Southwest Reporting & Video Service, Inc. Registration #189
2
1 A P P E A R A N C E S
2
3 FOR THE PLAINTIFFS:
Mr Howard Fomby, Esq.
4 -and-

Mr. Adam W. Fomby, Esq.
5 FOMBY LAW FIRM
440 Louisiana Street, Suite 900
6 Houston, Texas 77002
E-mail: hfomby@fombylaw.com
7 E-mail: adam@fombylaw.com
8
9 FOR THE DEFENDANTS:
Ms. Mary E. Baker, Esq.
10 THE OFFICE OF VINCE RYAN COUNTY ATTORNEY
1019 Congress, 15th Floor
11 Houston, Texas 77002
E-mail: mary.baker@cao.hctx.net
12
13
ALSO PRESENT:
14 Mr. Zach Sigler, Videographer
15
16
17
18
19
20
21
22
23
24
25

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
3

1 INDEX
2 PAGE
3 Appearances ....................................... 2
4
Witness: ROBERTO FELIX
5
Examination by Mr. Fomby .................... 6
6 Examination by Ms. Baker .................... 179
7
Signature and Changes ........................... 181
8
Reporter's Certificate ........................... 183
9

```
10 EXHIBITS
11 NUMBER DESCRIPTION PAGE
12 Exhibit 1 Photograph 6
13 Exhibit 2 Photograph 6
14 Exhibit 3 Photograph 6
15 Exhibit 4 Photograph 6
16 Exhibit 5 Photograph 6
17 Exhibit 6 Photograph 6
18 Exhibit 7 Photograph 6
19 Exhibit 8 Photograph 6
20 Exhibit 9 Photograph 6
21 Exhibit 10 Photograph 6
22 Exhibit 11 Photograph 6
23 Exhibit 12 Photograph 6
24 Exhibit 13 Photograph 6
25 (Continued)
```

**Roberto Felix**

**713-650-1800 swreptproduction@swreporting.com**

**Southwest Reporting & Video Service, Inc. Registration #189**

```
4
1 EXHIBITS (Continued)
2 NUMBER DESCRIPTION PAGE
3 Exhibit 14 Photograph 6
4 Exhibit 15 Photograph 6
5 Exhibit 16 Photograph 6
6 Exhibit 17 Photograph 6
7 Exhibit 18 Photograph 6
8 Exhibit 19 Photograph 6
9 Exhibit 20 Photograph 6
10 Exhibit 21 Photograph 6
11 Exhibit 22 Photograph 6
12 Exhibit 23 Photograph 6
13 Exhibit 24 Photograph 6
14 Exhibit 25 Photograph 6
15 Exhibit 26 Photograph 6
16 Exhibit 27 Photograph 6
17 Exhibit 28 Not Introduced
18 Exhibit 29 Not Introduced
19 Exhibit 30 Texas Commission on Law Enforcement 18
Personal Status Report
20
Exhibit 31 Message from Terminal/Unit 36
21
Exhibit 32 Houston Police Department Homicide 76
22 Division Witness Statement
23 Exhibit 33 Houston Police Department Records 106
```

24
25 (Continued)
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
5
1 EXHIBITS
2 NUMBER DESCRIPTION PAGE
3 Exhibit 34 Harris County Constable Precinct 112
Five Documents
4
Exhibit 35 Harris County Constable Precinct 130
5 Five Documents
6 Exhibit 36 Video 139
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
6
1 P R O C E E D I N G S
2 (Exhibits Nos. 1-27 premarked.)
3 THE VIDEOGRAPHER: Today's date is
4 February 18th, 2019. The time is approximately
5 10:00 o'clock a.m. We're on the record. Will you
6 please swear in the witness.
7 ROBERTO FELIX,
8 Having been first duly sworn, testifies as follows:
9 DIRECT EXAMINATION
10 BY MR. FOMBY:
11 Q. Officer Felix, is that the proper way to refer
12 to you?
13 **A. It's Deputy Felix.**

14 Q. Deputy Felix, okay. I'm Howard Fomby. I'll
15 be asking some questions today for the plaintiff in this
16 case, Janice Barnes, the mother of Ashtian Barnes.
17 **A. Yes, sir.**
18 Q. One of the things that --
19 MR. FOMBY: Is this coming through okay?
20 Q. (BY MR. FOMBY) Before we get started, one of
21 the things I wanted to say is that this process is
22 really about getting to the truth, about finding out
23 what happened on the 28th of April, 2016. And as
24 such --
25 MS. BAKER: I'm going to object to the

1 narrative of this deposition. Could you ask a question,
2 please?
3 Q. (BY MR. FOMBY) I -- well, my narrative is
4 that I -- because we're trying to get to that, I want to
5 be fair to you. So I don't have any intention of
6 badgering you or trying to cut you off or change the
7 meaning of your words or any of that sort of thing.
8 Okay?
9 **A. Okay.**
10 Q. And occasionally my wife tells me that I say
11 things that I think I understand and she thinks it's all
12 garbled. So with that being in mind, if I say something
13 you don't understand at any point, or that you need more
14 clarification, I want to ask you to just stop me and --
15 and let me know, okay? If I say something that you
16 didn't hear completely, then stop me and let me know and
17 I'll repeat it, okay?
18 **A. Okay.**
19 Q. Because this process doesn't work well unless
20 we're fair with each other. And at the end of this
21 whole process I'm going to give you an opportunity if
22 you want, in my experience people --
23 MS. BAKER: Object to sidebar. Please
24 ask a question, Mr. Fomby.
25 MR. FOMBY: I am going to ask a question

1 but I want to set the predicate to let him know what the
2 process is. That at the end of this I'm going to give
3 you an opportunity to correct anything that you think
4 needs to be corrected.
5 MS. BAKER: You can do that. I'm going
6 to object to your continuing sidebar. You can do that
7 when you ask him a question at the end.
8 Q. (BY MR. FOMBY) Now, Deputy Felix, could
9 you -- I know that you've already given the name -- your
10 name to the court reporter, but for -- on the record
11 could you please tell us your full name?
12 **A. Full name is Roberto Felix, Jr.**
13 Q. Okay. And Deputy, where do you reside
14 currently?
15 MS. BAKER: I'm going to object to that
16 on the basis of the law enforcement privilege and
17 instruct the witness not to answer. That matter is
18 privileged.
19 Q. (BY MR. FOMBY) Deputy, who do you currently
20 work for?
21 **A. I currently work for the Harris County**
22 **Constable's Office, Precinct 5.**
23 Q. And what is your title or position with the --
24 **A. My title is deputy with Harris County Precinct**
25 **5.**
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
9
1 Q. Now, I want to talk a little bit about your
2 training and preparation for the job that you're at.
3 **A. Yes, sir.**
4 Q. Did you have any opportunity to complete high
5 school?
6 **A. Yes.**
7 Q. And did you go to college on any kind of a
8 baccalaureate or junior baccalaureate program?
9 **A. Yes.**
10 Q. And what high school did you attend?
11 **A. I attended Willowridge High School.**
12 Q. And you graduated from that high school; is
13 that right?
14 **A. I did.**
15 Q. And how about college? Which college did you
16 attend, or colleges?

17 **A. I attended Houston Community College and San**
18 **Jacinto College.**
19 Q. And did you receive a degree from either of
20 those?
21 **A. Not -- not as of now, no.**
22 Q. Okay. So I have a -- sort of a resume that
23 was provided by the Texas Commission on Law Enforcement
24 and it says that you started work with the Harris County
25 Sheriff's Office in July of 2003; is that correct?

Roberto Felix
713-650-1800 swreptproduction@swreporting.com
Southwest Reporting & Video Service, Inc. Registration #189
10

1 **A. I believe it was June.**
2 Q. Okay. And prior to working as a jailer, did
3 you have any other kinds of employment?
4 **A. Yes.**
5 Q. And -- and what were those jobs?
6 **A. I -- a job prior to that was at an advertising**
7 **agency.**
8 Q. And what did you do for them?
9 **A. I did numerous different things including mail**
10 **room, answering phones and assisting in advertisement**
11 **approvals.**
12 Q. And after you left the advertising agency, is
13 that when you went to work for the Harris County
14 Sheriff's Department?
15 **A. Yes.**
16 Q. And as -- it says here that you were a jailer.
17 Is that the correct title?
18 **A. Detention officer.**
19 Q. Detention officer. And as a detention
20 officer, what were your duties?
21 **A. To maintain security of a facility and**
22 **supervise the inmates.**
23 Q. And from that point what -- what was your next
24 position after you stopped being a jailer?
25 **A. I was a deputy with Harris County Precinct 5.**

Roberto Felix
713-650-1800 swreptproduction@swreporting.com
Southwest Reporting & Video Service, Inc. Registration #189
11

1 Q. And approximately when did you start as a --
2 as a deputy?
3 **A. I started with the Harris County Constable's**

4 **Office on October 2nd, 2004.**
5 Q. When you first started with Harris County
6 Precinct 5, what was your title at that point?
7 **A. It was a deputy.**
8 Q. Okay. Are there levels of deputies?
9 **A. Well, there's a deputy 5 I believe and then it**
10 **goes down in numbers as your years of service with the**
11 **department.**
12 Q. Okay. When you say it goes down a number,
13 that means --
14 **A. So deputy 4, 3 --**
15 Q. -- is a 5 the highest or lowest?
16 **A. The lowest.**
17 Q. So when you started you would start as a level
18 5?
19 **A. Give me a second. Actually I'm not too sure**
20 **about that at this time, but I believe that's how it --**
21 **how it descends.**
22 Q. And what level are you currently?
23 **A. I am a deputy 1, I believe.**
24 Q. Okay. And have you earned -- at -- in the --
25 the Constable's Office, have you earned any particular

1 certificates?
2 **A. I've received numerous certificates.**
3 Q. Okay. So what kind of certificates have you
4 received in your career as a peace officer?
5 **A. Too many to recall at this time, but I've**
6 **been -- advanced peace officer certification, I received**
7 **certifications in numerous other aspects, like DWI**
8 **investigation and -- just too many to -- to -- to name**
9 **or recall. I've done, you know, animal investigation,**
10 **K9 encounters is what's it's called.**
11 **I've done field training officer. I've done**
12 **accident investigation, accident reconstruction along**
13 **with, like I said, numerous, numerous that don't come to**
14 **mind right now.**
15 Q. Okay. So all of those, are those classes that
16 you took and completed to get the certificate?
17 **A. That's correct.**
18 Q. Okay. Now, did you take any classes at the
19 University of Houston downtown in training to be a peace

20 officer?
21 **A. Yes. That was the police academy that I**
22 **attended for my certification.**
23 Q. Okay. And how long is that particular course?
24 **A. The course that I attended ran from January**
25 **through August.**
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
13
1 Q. So approximately seven to eight months long?
2 **A. That's correct.**
3 Q. And do they track that by way of hours, course
4 hours that you took?
5 **A. They do.**
6 Q. Do you know how many course hours you took to
7 become a peace officer?
8 **A. I cannot recall at this time.**
9 Q. What kind of coursework did you take at the
10 University of Houston downtown to become a peace
11 officer?
12 **A. The standards set by TCOLE, which is, you**
13 **know, Penal Code, you know, traffic, mechanics of**
14 **arrest, you know, building searches. There's a CCP and**
15 **anything else that's required by the TCOLE.**
16 Q. Okay. And in taking those courses, did they
17 teach you any courses -- any -- was there any coursework
18 in that training on constitutional rights of citizens
19 and defendants?
20 **A. There is a segment of when we're doing case**
21 **law per training to CCP and the Penal Code.**
22 Q. Okay. And so in the course of that training,
23 did you receive any training specifically in
24 constitutional prohibition against illegal search and
25 seizure?
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
14
1 **A. Yes.**
2 Q. And what is your understanding about what the
3 constitution says about illegal searches?
4 MS. BAKER: Objection, vague, calls for a
5 legal conclusion, but you may answer.
6 **A. For illegal search and seizures? Is that your**

7 **question?**
8 Q. (BY MR. FOMBY) Yes.
9 **A. Okay. We have the right to -- to -- give me a**
10 **second, sorry. The Fourth Amendment to unreasonable**
11 **searches and seizures.**
12 Q. Okay. And in conducting a search, can you
13 conduct a search without a warrant?
14 MS. BAKER: Objection, calls for a legal
15 conclusion and vague and overly broad, but you may
16 answer.
17 THE WITNESS: Okay.
18 **A. There are situations where you can conduct a**
19 **search without a warrant.**
20 Q. (BY MR. FOMBY) As a police officer or deputy,
21 were you trained in what those exceptions are?
22 **A. Yes.**
23 Q. Do you recall what the exceptions were that
24 you were trained in?
25 **A. Repeat your question.**
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
15
1 Q. Do you recall what those exceptions are from
2 your training?
3 **A. Well, there's just numerous that were gone**
4 **over, but it would be reasonable suspicion that, you**
5 **know, something is -- could or would -- would happen.**
6 Q. And when you say that something could or would
7 happen --
8 **A. A crime.**
9 Q. -- do you mean a crime?
10 **A. A crime.**
11 Q. Okay. Deputy, have you ever taken a class on
12 escalation of force?
13 **A. Yes.**
14 Q. And when was -- when did you first take that
15 class?
16 **A. I cannot recall at this time.**
17 MS. BAKER: Was that escalation or
18 de-escalation?
19 MR. FOMBY: De-escalation.
20 THE WITNESS: I'm sorry.
21 MS. BAKER: Okay. You said escalation.
22 MR. FOMBY: Well, escalation and

23 deescalation would be opposite sides the same point.
24 MS. BAKER: Yes, I understand that.
25 MR. FOMBY: So de-escalation.

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
16
1 MS. BAKER: So what was your question?
2 **A. De-escalation.**
3 Q. (BY MR. FOMBY) De-escalation?
4 **A. Yes.**
5 Q. Would the date that you first took a class in
6 de-escalation techniques be somewhere around the end of
7 August of 2018?
8 **A. That was the last class that we -- we took.**
9 Q. I'm going to show you, Deputy, the document
10 that we were given by the Texas Commission on Law
11 Enforcement. This is their listing.
12 MR. FOMBY: I -- I'll get it.
13 Q. (BY MR. FOMBY) This is their listing of the
14 coursework that you've taken.
15 MR. FOMBY: I'll have to remember to
16 unclip this next time.
17 THE VIDEOGRAPHER: No problem.
18 **A. (Witness examines document.)**
19 Q. (BY MR. FOMBY) Okay. Have you had an
20 opportunity to review it?
21 MS. BAKER: Actually, for the record,
22 this document has our Bates number on it, so -- so you
23 may have gotten a separate document from the Texas
24 Commission on Law Enforcement. This -- this one that
25 you're showing the witness is Bates numbered with the

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
17
1 Harris County Bates numbers.
2 MR. FOMBY: Absolutely.
3 Q. (BY MR. FOMBY) To be clear, this document
4 comes from your attorneys.
5 MS. BAKER: Yes.
6 Q. (BY MR. FOMBY) And were provided as part of
7 discovery --
8 MS. BAKER: Yes.
9 Q. (BY MR. FOMBY) -- pursuant to our request for

10 information on your training.
11 MS. BAKER: Correct. I may have
12 misunderstood you, but I thought you said we obtained it
13 from the Texas Commission on Law Enforcement.
14 MR. FOMBY: Exactly.
15 Q. (BY MR. FOMBY) And I'm sorry for that, and my
16 co-counsel reminded me to make that clear.
17 MS. BAKER: Are you going to mark that?
18 Are you going to mark that?
19 MR. FOMBY: Yes, we will.
20 MS. BAKER: Okay.
21 **A. (Witness examines document.) Okay.**
22 Q. (BY MR. FOMBY) Okay, Deputy. Now I'm going
23 to ask you to -- starting with page 1, is there anything
24 on page 1 that talks about a class that you took in
25 de-escalation techniques?
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
18
1 MS. BAKER: I just -- I apologize for
2 objecting so much, but I just feel very uncomfortable
3 with being asked about page 1 without it being marked.
4 So could we mark this?
5 MR. FOMBY: Certainly. Can you have this
6 marked as Exhibit --
7 THE REPORTER: It's going to be 30.
8 MS. BAKER: Thank you. And how does it
9 get to be 30?
10 (Exhibit No. 30 marked.)
11 Q. (BY MR. FOMBY) On the page 1 of this where
12 it's Bates HC/Barnes-1721 at the bottom, is there
13 anything on that page that discusses classes in
14 de-escalation techniques?
15 **A. No, there's not.**
16 Q. Okay. Turning to the next page Bates marked
17 1722, is there anything there that lists a class that
18 you took in de-escalation techniques?
19 **A. Yes.**
20 Q. And is it -- does it list a particular date
21 you took that?
22 **A. Course date is August 23rd, 2018.**
23 Q. Are there any other references to
24 de-escalation techniques classes on that page?
25 **A. Specific for de-escalation, no, but the**

Roberto Felix
713-650-1800 sweptproduction@swreporting.com
Southwest Reporting & Video Service, Inc. Registration #189

19

1 **class -- some classes that are taught, the de-escalation**
2 **technique is taught in those classes as well.**
3 Q. Okay. But in particular, de-escalation
4 techniques, are there any other classes that you took
5 specifically for de-escalation techniques listed on that
6 page?
7 **A. No.**
8 Q. Let's look at the next page Bates marked 1723.
9 Is -- are there -- is there any coursework on this page
10 that is specific to de-escalation techniques?
11 **A. That says a title or that corresponds with the**
12 **de-escalation techniques itself?**
13 Q. What's that?
14 **A. I said the title or the teaching of the**
15 **de-escalation techniques?**
16 Q. Any classes specifically oriented toward
17 de-escalation techniques?
18 **A. Yes.**
19 Q. Which class is that?
20 **A. It's going to be the less lethal electronic**
21 **control device.**
22 Q. And that, that would be taser training, is
23 that an easier way?
24 **A. Correct.**
25 Q. Okay. So in less lethal electronic control

Roberto Felix
713-650-1800 sweptproduction@swreporting.com
Southwest Reporting & Video Service, Inc. Registration #189

20

1 device update, that is a -- is that a regular update
2 course?
3 **A. That's correct. That's the update after the**
4 **original -- the original taser class was done.**
5 Q. Okay. And that class would teach you on how
6 appropriately -- properly to use a taser as an
7 alternative to -- alternative to more lethal forms?
8 **A. Correct.**
9 Q. Correct, okay. Let's move to the next page,
10 1724. And again, the same question. Is there any class
11 listed, any training class listed on this page that's
12 specific to de-escalation techniques? And in this --

13 there is -- I know there are other classes on less
14 lethal control, the taser reoccurring training.
15 **A. Uh-huh (Affirmative.)**
16 Q. But other than that --
17 **A. Yes.**
18 Q. -- any other classes? What classes would that
19 be?
20 **A. It's going to be the baton.**
21 Q. Okay.
22 **A. The firearms.**
23 Q. And similar in those cases to the taser,
24 you're being taught how to use alternative weapons as --
25 weapons as an alternative to using lethal force?

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
21
1 **A. When appropriate.**
2 Q. And what were the dates of your baton and
3 firearms classes?
4 **A. That was in June 7, 2013 and February 11th of**
5 **2013.**
6 Q. Moving to the next page, 1725, again, the same
7 question. Are there any classes that are specific to
8 de-escalation techniques?
9 **A. Yes.**
10 Q. And what classes would those be?
11 **A. It's going to be the use of force,**
12 **intermediate core course.**
13 THE REPORTER: What was that second part?
14 THE WITNESS: Intermediate core course.
15 **A. I can say traffic as well, and...**
16 Q. (BY MR. FOMBY) Okay. And those classes, what
17 years were those classes taken in?
18 **A. The year is going to be in -- also, I'm sorry,**
19 **did I say use of force?**
20 THE REPORTER: Could you speak up,
21 please? I'm sorry.
22 **A. Did I say use of force? There's use of force**
23 **and then there's use of force intermediate, so there's**
24 **two classes. One in 2011 and one in 2010.**
25 Q. (BY MR. FOMBY) There's also -- there are

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**

22
1 actually three use of force classes on that page written
2 on?
3 **A. Okay. There is.**
4 Q. Okay. Moving on to page 1726. Same question.
5 Any classes there that are specific to de-escalation
6 techniques?
7 **A. There's the use of force intermediate core**
8 **course, there is -- and the crisis intervention**
9 **training.**
10 Q. And what years were those courses?
11 **A. In 2009 and 2007.**
12 Q. And on page 17, Bates number 1727, same
13 question. Any classes that are specifically dedicated
14 to de-escalation techniques?
15 **A. There's the crisis intervention training in**
16 **2005.**
17 Q. Okay. Is that it?
18 **A. I believe so, yes.**
19 Q. So in looking at these, Deputy, you've
20 mentioned a number of classes that involve particular
21 types of weapons.
22 **A. Uh-huh (Affirmative.)**
23 Q. You've mentioned a number of classes that
24 involve a variety of situations, but how many classes
25 have you taken that are dedicated only to de-escalation

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**

23
1 techniques?
2 MS. BAKER: Objection, vague.
3 Q. (BY MR. FOMBY) You can answer.
4 MS. BAKER: Oh, I'm sorry. Yes.
5 THE WITNESS: Okay, I apologize.
6 MS. BAKER: I'm sorry. Unless I instruct
7 you --
8 THE WITNESS: Okay.
9 MS. BAKER: I'm objecting for the record.
10 **A. That would be the class that was done in**
11 **August of 2018 as a mandated course by TCOLE.**
12 Q. (BY MR. FOMBY) Let's turn back to page 1723
13 and move down to the lower -- about two thirds of the
14 way down. This Ashtian Barnes, the shooting of Ashtian
15 Barnes occurred on April the 28th, 2016. What was the

16 next class that you took in terms of training after that
17 shooting?
18 **A. It was the Lidar radar training.**
19 Q. All right. After that what was the next class
20 that you took?
21 **A. It was the less lethal electronic control**
22 **device update.**
23 Q. And that again would be a taser update?
24 **A. Taser.**
25 Q. Okay. What was the next class?
**Roberto Felix**
**713-650-1800 sweptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
24
1 **A. K9 encounters.**
2 Q. How about the next class?
3 **A. Field training officer.**
4 Q. Okay. So other than the training classes,
5 from the time of the shooting through the next year, are
6 there any classes that involve de-escalation of force,
7 de-escalation techniques?
8 MS. BAKER: Objection, vague. You may
9 answer if you understand the question.
10 **A. Can you repeat the question?**
11 Q. (BY MR. FOMBY) Sure. From 2010 [sic] 2016 to
12 June the 1st of 2017, other than the taser updates, did
13 you take any classes on de-escalation of force?
14 **A. No.**
15 Q. In that same time period, did you take any
16 classes about the policies of the use of force?
17 MS. BAKER: Objection, vague. I don't
18 know what you're talking about.
19 Q. (BY MR. FOMBY) Did you take any classes other
20 than the class on the taser update? Did you take any
21 classes during that period that involved the appropriate
22 use of force?
23 **A. Okay. Can you clarify that question again?**
24 **I'm sorry.**
25 Q. Sure. Okay. From 2010 -- 2000 -- sorry.
**Roberto Felix**
**713-650-1800 sweptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
25
1 2-10-2016, which was before the shooting, to we'll take
2 it all the way out to the end of this course block,

3 August 7, 2017, other than your taser update class, did
4 you take any classes that involved the appropriate use
5 of force?
6 **A. Patrol rifle could be considered, you know, a**
7 **use of force class or --**
8 Q. What did you learn in patrol rifle?
9 MS. BAKER: Objection, vague.
10 Q. (BY MR. FOMBY) What was the nature of the
11 class -- of the coursework for patrol rifle?
12 **A. Patrol rifle was techniques, accuracy and**
13 **deploying a rifle in situations.**
14 Q. Okay. Other than that and the taser class, in
15 that period of time, did you take any classes that
16 specifically dealt with appropriate use of lethal force?
17 **A. No.**
18 Q. Now, Deputy, this particular incident on
19 April 28th, 2016 began with a traffic stop, right?
20 **A. That's correct.**
21 Q. Can you walk me through -- let's walk through
22 the phases of a traffic stop.
23 **A. Okay.**
24 Q. Okay? Starting with you have some -- you're
25 given some indication of a reason to pull someone over?

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
26
1 **A. Yes.**
2 Q. And that may be that you see them speeding,
3 you may see them driving erratically, but for whatever
4 reason, you observe or something is communicated with
5 you that says you need to pull this person over. What's
6 the next thing -- as soon as you do that and you know
7 that you need to pull someone over, what's the next
8 thing you do?
9 MS. BAKER: I'm going to object to that
10 question as vague, but that being said, you may answer.
11 THE WITNESS: Okay.
12 **A. It depends.**
13 Q. (BY MR. FOMBY) Okay.
14 **A. Now, once the indication is given there by,**
15 **you know, myself or dispatch, then the next step is to**
16 **follow the vehicle, you know, run the license plate and,**
17 **you know, put yourself on the computer for a traffic**
18 **stop.**

19 Q. So when you say that you run the license
20 plate -- excuse me -- and you put yourself on the
21 computer, do you -- do you have a computer in your squad
22 car?
23 **A. Yes.**
24 Q. Okay. And when you say "run the license
25 plate," what does that mean? What are you doing with

1 the license?
2 **A. That means you're checking the license plate.**
3 Q. Okay.
4 **A. Whenever it's feasible or possible to do so at**
5 **that time.**
6 Q. Okay. And when you run a license plate on
7 your computer, what kind of information does it give you
8 back?
9 **A. It could be numerous types of information.**
10 **Registration, whether it's a stolen vehicle, if there's**
11 **any wanted hits or wanted persons depending on the type**
12 **of information that's entered by either a police agency**
13 **or -- or DPS.**
14 Q. So you say it checks registration. Would that
15 generally tell you who owned the car?
16 **A. It tells you who the car is registered to.**
17 Q. Okay. Then you say "put yourself on the
18 computer for a traffic stop." What -- what is that
19 about?
20 **A. Okay. So whenever we conduct a traffic stop,**
21 **that's how we dispatch to see your location, which could**
22 **include the license plate number of the vehicle, the**
23 **vehicle description and your location of the traffic**
24 **stop.**
25 Q. So going back to this particular case, you

1 were given the identification of the -- of the license
2 plate; is that correct?
3 **A. That's correct.**
4 Q. And who gave that to you?
5 **A. That was the Harris County Toll Road Authority**

6 **dispatch.**
7 Q. Okay. And you were told -- were -- were you
8 given a description of the car as well to look for?
9 **A. That's correct.**
10 Q. Okay. So when you received that information
11 about Ashtian Barnes' Toyota, what did you do next?
12 **A. When I received the information from dispatch**
13 **of the vehicle in question, I tried to look for the**
14 **vehicle in traffic and spotted the vehicle.**
15 Q. And did you, in fact, locate the vehicle in
16 traffic?
17 **A. Yes.**
18 Q. And where was his car?
19 **A. At the time of me locating the vehicle, the**
20 **vehicle was traveling southbound right around Bellaire,**
21 **I believe.**
22 Q. Okay. What lane was he in?
23 **A. I believe he was in lane one.**
24 Q. And that would be the -- the lane closest to
25 the middle of the road, the middle -- the left-hand

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
29

1 side?
2 **A. Lane one would be the left lane, and then any**
3 **lanes to the right of that would be sequential number**
4 **two, two to one.**
5 Q. At what point in a traffic stop like this do
6 you turn on your lights -- your turn on your lights?
7 **A. When I'm trying to get behind the vehicle or**
8 **when I'm directly behind the vehicle.**
9 Q. Okay. And is it -- is it fair to say that the
10 reason for turning on the lights is to signal that
11 particular driver that you want -- that you're after
12 that person?
13 **A. It's -- it's to make them aware I'm behind**
14 **them to either pull over or stop.**
15 Q. Right. Okay. Now you also have a siren?
16 **A. That's correct.**
17 Q. So when would you -- did you use a siren in
18 this case?
19 **A. No, I did not.**
20 Q. Okay. When would you use a siren?
21 **A. When the driver fails to pull over or stop or**

22 **to get their attention.**
23 Q. Now in this particular case, you maneuvered
24 behind, you located Ashtian Barnes in the Toyota in lane
25 one on the tollway, and maneuvered behind him and turned

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
30
1 on your lights; is that correct?
2 **A. What I said was I believe he was in lane one,**
3 **yes.**
4 Q. And so when you turned on your lights, did
5 Ashtian Barnes attempt to at that point speed up and
6 drive away?
7 **A. No, he did not.**
8 Q. Did Ashtian Barnes exhibit any kind of
9 movement within the lane that showed that he might not
10 be in complete control of his vehicle?
11 **A. No.**
12 Q. And by that I mean you've seen drunk drivers.
13 Did he drive like he was drunk or impaired at that
14 point?
15 **A. No.**
16 Q. Okay. So you turned on your lights, how long
17 did it take for Ashtian Barnes to respond to your lights
18 coming on and start braking?
19 MS. BAKER: Objection, calls for
20 speculation.
21 Q. (BY MR. FOMBY) Approximately.
22 **A. Within seconds.**
23 Q. Okay. So in your experience that's a normal
24 response. You see a flash, you check it, you go oh no,
25 I'm being pulled over and then you start pulling --

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
31
1 slowing down; is that --
2 MS. BAKER: Object to the form.
3 **A. Yes.**
4 Q. (BY MR. FOMBY) Okay. And some drivers don't
5 do that; is that correct?
6 **A. Correct.**
7 Q. Okay. But in this case, Ashtian Barnes
8 responded about as quickly as you're used to drivers

9 responding; is that right?
10 **A. Yes.**
11 Q. And once he started pulling over, did he --
12 which lane did he pull into to stop?
13 **A. He pulled into the left shoulder.**
14 Q. Okay. And in fact, he came to a stop; is that
15 correct?
16 **A. That's correct.**
17 Q. So the two of you were stopped on the shoulder
18 of the road. He's in front of you; is that correct?
19 **A. That's correct.**
20 Q. Okay. About how far was his -- the rear of
21 his car from the front of your car at that point?
22 **A. I would say about a car's length.**
23 Q. Okay. And that would be depending on the car,
24 ten, 12 feet?
25 **A. Approximately.**

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
32

1 Q. Okay. It could be different if you have one
2 of those little squish cars, right?
3 **A. Correct.**
4 Q. Okay. So at that point you've got a car
5 stopped, you've entered into the computer that you have
6 initiated a traffic stop. What's the next thing that
7 you do before you would leave the car, the squad car?
8 **A. I advise dispatch of my location.**
9 Q. And at that point you would step out of the
10 squad car?
11 **A. Yes.**
12 Q. Are there some procedures that you are taught
13 to follow to protect you from traffic?
14 MS. BAKER: Objection, vague.
15 Q. (BY MR. FOMBY) In approaching a stopped
16 vehicle on the side of the road with cars flying by at
17 65, 70 miles an hour, are there procedures that you're
18 taught to follow, to keep your -- you and the individual
19 in front of you from being hit?
20 **A. We approached the --**
21 THE VIDEOGRAPHER: I'm sorry, it was just
22 causing a lot of feedback. Sorry.
23 MR. FOMBY: Let me take this off. This
24 might help you.

25 Q. (BY MR. FOMBY) I'm sorry, Deputy.

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**

33

1 **A. Okay. So we exit the vehicle, we approach the**
2 **non traffic side when possible.**
3 Q. Okay. And is that what you did in this case?
4 **A. Yes.**
5 Q. Normally when you approach a driver, do you
6 try to get their attention?
7 MS. BAKER: Objection, vague.
8 **A. No. When I approach a driver, I'm looking at**
9 **them, not them trying to look at me.**
10 Q. (BY MR. FOMBY) Okay. How do you get their
11 attention to get them focused on you?
12 **A. Well, once I approach the vehicle to the**
13 **either driver or passenger door, whatever side I'm**
14 **making contact with them, I look in the window or knock**
15 **on the window to make contact with them.**
16 Q. And when you look in the window, are you
17 looking not just at the passenger but to get a sense of
18 what's going on in the car?
19 **A. That's correct.**
20 Q. That's part of your training?
21 **A. That's correct.**
22 THE VIDEOGRAPHER: Mr. Fomby, could you
23 just clip it on all the way. I'm sorry. That'll do it.
24 Perfect. Thank you.
25 MR. FOMBY: Okay.

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**

34

1 Q. (BY MR. FOMBY) So in this case, you walk up
2 to the window and you get Ashtian Barnes' attention. Is
3 his window up or down at this point?
4 **A. His window was down.**
5 Q. Okay. Was it down the entire time that you
6 observed the vehicle or did he lower it?
7 **A. It was down when I approached the vehicle.**
8 **I'm going to correct myself. I believe it was down, not**
9 **all the way, but it was down to where I could hear him,**
10 **he could hear me.**
11 Q. Okay. When you approached the vehicle at that

12 point, did you happen to see any kind of smoke or
13 anything else coming out of the window?
**14 A. No.**
15 Q. As you're approaching the vehicle from the
16 rear of the vehicle, at that point did you happen to
17 smell any strange odors?
18 MS. BAKER: Objection, vague.
**19 A. Not from approaching the vehicle, once I was**
**20 at the driver's side window.**
21 Q. (BY MR. FOMBY) Okay. So you're standing
22 beside Ashtian Barnes at the driver's side window and
23 what's the first thing that you ask him for?
**24 A. Well, the first thing I do is I introduce**
**25 myself, let him know who I was and why he was being**
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
35
**1 stopped. At that point I asked him -- he actually**
**2 interrupted and said that it was a rental car.**
3 Q. Now, when you say that he interrupted you,
4 were you telling him that he was being stopped for a
5 toll tag violation?
**6 A. That is correct.**
7 Q. So when he responded then, it was not just a
8 random response, it was informing you that this was a
9 rental car so that might not -- that he might not be
10 responsible for the toll tag problem?
11 MS. BAKER: Objection, calls for
12 speculation.
13 Q. (BY MR. FOMBY) Is that fair to say?
14 MS. BAKER: Objection, calls for
15 speculation.
**16 A. Okay. Repeat your question.**
17 Q. (BY MR. FOMBY) Did it -- did it appear to you
18 that his interrupting you with oh, this is a rental car,
19 was unrelated to the -- to the -- what you were telling
20 him at the time?
**21 A. No.**
22 Q. Okay. Because if it was a rental car, that
23 would be directly related to whether or not he was
24 personally guilty of any outstanding tolls; is that
25 correct?
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**

**Southwest Reporting & Video Service, Inc. Registration #189**
36
1 **A. Not necessarily. The person responds**
2 **sometimes when you're getting the information, respond**
3 **by either saying it's not my car, it's a rental, but**
4 **until that fact is checked out, then we proceed with**
5 **the -- the investigation or issuing of any citations at**
6 **that point.**
7 Q. Okay. Now you said that at the beginning of
8 this traffic stop, you would check on the registration
9 of the vehicle; is that correct?
10 **A. When -- when possible.**
11 Q. Okay. And did you, in fact, receive the
12 information before you left the vehicle as to who the --
13 who the car was registered to?
14 **A. No.**
15 Q. Did you check on that before you left?
16 **A. No.**
17 Q. Would that normally be available to you or on
18 your computer screen in your car?
19 **A. Sometimes.**
20 Q. Okay. I'm showing you what we have received
21 in discovery. It's Bates stamped -- it's upside down.
22 I think 198.
23 MR. FOMBY: Can we enter this as 31?
24 (Exhibit No. 31 marked.)
25 MS. BAKER: Can we -- could we go off the
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
37
1 record for one second? I have a question for you. So
2 can we go off the record?
3 THE VIDEOGRAPHER: Would you like to go
4 off the record, Mr. Fomby?
5 MR. FOMBY: Yes. That's fine.
6 THE VIDEOGRAPHER: The time is
7 approximately 10:45 a.m. We're off the record.
8 (Off the record.)
9 THE VIDEOGRAPHER: The time is
10 approximately 10:53 a.m. We're on the record.
11 Q. (BY MR. FOMBY) Now -- okay. Now before we
12 continue, some questions were raised -- a concern raised
13 about the premarked exhibits here. These are simple
14 screenshots taken off of a video that was provided under

15 discovery by opposing counsel. They have a copy of the
16 video, we have a copy of the video. The video is very
17 difficult to see from the standpoint of, you know, when
18 things specifically happened, so we've printed these
19 off. We are going to provide a copy of each of these
20 that we're going to show today to opposing counsel.
21 They're being offered for the purposes of not
22 necessarily evidentiary but for purposes of helping you
23 understand what's going on and explaining what's going
24 on at various points during the traffic stop and
25 thereafter. Okay.

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
38
1 MS. BAKER: Thank you for that
2 explanation, Mr. Fomby, and I appreciate that. And a
3 question I have is, are these in sequential order? Do
4 you have any representations about that? In other
5 words, do they skip around, is there some reference by
6 which we can understand like whether some parts were
7 skipped or they're nonsequential or are they sequential?
8 MR. FOMBY: These photos will be offered
9 in sequential order. There is a time stamp on the
10 bottom of each photograph --
11 MS. BAKER: Okay. Perfect.
12 MR. FOMBY: -- that shows that. In
13 addition, when any of the events happen within fractions
14 of a second, but by looking at the automobiles on the
15 opposite side of the road coming this way, you can
16 actually see the same car moving in sequence.
17 I haven't printed every single one of
18 these pictures that go through the entirety of the
19 timeframe because that would be several thousand photos,
20 but they are effectively for the times when the
21 timeframes were very tight there. Every fraction of a
22 second you'll see that.
23 Then later when several minutes go by
24 you'll see that, but the time stamp will be there. So
25 the fractions of a second at that point no longer matter

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
39
1 and the time stamps are there.

2 MS. BAKER: So if I understand what
3 you're saying, we'll be able to match it to the video by
4 the time stamping?
5 MR. FOMBY: Exactly.
6 MS. BAKER: Okay. Perfect. Thank you.
7 MR. FOMBY: Certainly.
8 Q. (BY MR. FOMBY) Getting back to this document,
9 we were talking about the -- who the -- the Toyota
10 Corolla that Ashtian Barnes was driving was registered
11 to.
12 **A. Uh-huh (Affirmative.)**
13 Q. And you said that you had an ability to pull
14 that information in your car, but for whatever reason
15 you did not do so in this call?
16 **A. Yeah. It could be a reason where it doesn't**
17 **come through in a timely manner. Even though we run it,**
18 **it might take a few seconds or a few minutes sometimes**
19 **to actually get the return.**
20 Q. Okay. If you're doing a traffic stop on the
21 side of the road, though, and you do not have a partner,
22 would it not be more prudent to wait until you got that
23 information so you understand who you're stopping?
24 **A. Sometimes we cannot wait for -- for the return**
25 **because we have to make contact immediate -- there's**

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
40

1 **times that we've, you know -- that I don't get returned**
2 **until the end of the day sometimes or 30 minutes later,**
3 **depending on the way the computer system is running.**
4 **So I'm not going to have you standing on the**
5 **side of the road for 30 minutes, five minutes, making --**
6 **before making contact, you know, waiting on the return.**
7 Q. Okay. In this case where you stopped someone
8 for a toll violation, was there any particular reason
9 why you needed to not wait, that you needed to take
10 action and make contact before you got the information
11 back?
12 **A. There was no -- I'm sorry, repeat your**
13 **question.**
14 Q. In this case where you're stopping someone for
15 a purported toll tag violation --
16 **A. Uh-huh (Affirmative.)**
17 Q. -- for unpaid toll, was there any particular

18 reason why you needed to immediately make con -- contact
19 with the driver?
20 **A. The contact was made because when a vehicle is**
21 **put over our dispatch that's a prohibitive vehicle, they**
22 **have the information already, who the registered owner**
23 **is on their end. So we don't wait for the return**
24 **sometimes because the dispatch does have that**
25 **information already.**

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
41

1 Q. Okay. So you're talking to the dispatcher at
2 this point, particular point, Deputy, and you say that
3 you -- they already have the information. Wouldn't it
4 be prudent at that point for you to simply ask them to
5 tell you the information?
6 **A. Well, before making contact with the vehicle,**
7 **you know, I don't know if the person on the registration**
8 **is going to be the owner of the vehicle, the relative of**
9 **a vehicle, a friend of the person who owns the vehicle,**
10 **so it's not, you know, necessarily the information on**
11 **the registration that's always accurate. The**
12 **information that we go based on the registration is just**
13 **the -- the month and day of the expiration of the -- of**
14 **the registration.**
15 Q. Okay. I understand that, Deputy. You are
16 suggesting that you might have to wait 30 minutes or
17 even till the end of the day to get the information on
18 who the car was registered to, but that's not true, is
19 it?
20 **A. No. What I --**
21 Q. Yes?
22 **A. What I said was that sometimes the**
23 **registration doesn't come back, not that we wait for it.**
24 Q. Did you ask the dispatcher what -- if they had
25 the information about who the car was registered to

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
42

1 before you left your squad car?
2 **A. At that time it wasn't necessary for me to do**
3 **so.**
4 Q. Okay. And according to the document that's

5 Bates stamped I think 198 in front of you that was
6 provided in discovery, who --
7 MR. ADAM FOMBY: That's our discovery.
8 MR. FOMBY: Excuse me?
9 MR. ADAM FOMBY: That's our discovery.
10 MR. FOMBY: Okay.
11 Q. (BY MR. FOMBY) And according to this
12 document -- document that's been marked 31, who would
13 that car be registered to?
14 **A. The owner is The Mint Leasing, Inc.**
15 Q. Okay. And who is the current registration?
16 **A. That is the current registration owner.**
17 Q. How about the name underneath it, the rental
18 car agency?
19 **A. Okay. It says "On Time Car Rental."**
20 Q. Okay. So when you approached Ashtian Barnes
21 and he informed you that this was a rental car, that
22 would be consistent with what the Texas automobile
23 registration records show; is that correct?
24 **A. That's correct.**
25 Q. Do you know how old the toll violation was?

43
1 **A. I do not recall.**
2 Q. Before we go further into this, I want to talk
3 for a second about toll violations. There are -- when
4 you drive on a -- on a tollway in Texas, EZ TAG on the
5 Sam Houston Tollway.
6 **A. Uh-huh (Affirmative.)**
7 Q. How many different ways are there for the EZ
8 TAG organization to identify a car?
9 **A. There's several ways. By the license plate,**
10 **by an actual EZ TAG, by a Texas tag, by another region**
11 **EZ TAG that I do not recall the name right now. I think**
12 **it's like north, northwest Dallas or something like**
13 **that, and then that -- those would be the most I guess**
14 **common.**
15 Q. And if you don't have a Tex tag or EZ TAG or
16 one of those RFID chips in your car, you're saying that
17 they can take a picture of your license plate?
18 **A. It takes a picture of your license plate, yes.**
19 Q. And once they have a picture of your license
20 plate and they catch you driving on the tollway, what

21 does the tollway authority do with that information?
22 **A. Repeat your question.**
23 Q. Once they have a picture of the license plate,
24 what does -- you know, okay. If the -- if the -- I have
25 an EZ TAG, it automatically reads my EZ TAG, then I

1 imagine it goes against my EZ TAG account?
2 **A. That's correct.**
3 Q. And it's pulled. If I don't have one of those
4 and it only reads my license plate, what does the toll
5 authority do with that information?
6 **A. To my knowledge what I understand happens is**
7 **they -- it goes into the system for -- as a toll**
8 **violation.**
9 Q. Does it go into the system as a toll
10 violation? Because the sign up there says that I can
11 pay by -- by mail and it's -- it's taking a picture of
12 my plate; isn't that correct?
13 **A. I'm not sure what sign you're referring to.**
14 Q. Well, there are -- there are lanes that are
15 for EZ TAG?
16 **A. Correct.**
17 Q. And then there are other lines -- lanes where
18 I -- where it takes a picture of my plate and can charge
19 me because of my plate number; isn't that correct?
20 MS. BAKER: Objection, vague.
21 **A. Each -- each lane, toll lane, whether it's EZ**
22 **TAG or pay later, has cameras. Each vehicle that goes**
23 **through those -- those lanes, it takes a picture of your**
24 **license plate whether you have an EZ TAG or not. Now if**
25 **you don't pay, then, you know, within ten days, then**

1 **you're -- you're sent a bill for that violation.**
2 Q. (BY MR. FOMBY) Okay. So if I don't have an
3 EZ TAG and I go through it, they look at my plate
4 information and they send me a bill for driving through
5 that?
6 **A. As I understand it, yes.**
7 Q. Okay. And that's referred to up on the signs

8 as paid by mail?
9 **A. Once again, I don't know what sign you're**
10 **talking about.**
11 Q. So the -- so when someone drives through and
12 they don't have an EZ TAG and they get sent a bill, is
13 that a criminal violation or a civil violation?
14 MS. BAKER: Objection, calls for a legal
15 conclusion, but you may answer if you know.
16 **A. Okay. That's going to be a -- the fine itself**
17 **is a civil issue.**
18 Q. (BY MR. FOMBY) And because they know about
19 the plate, wouldn't they then normally know who the
20 owner of that vehicle is?
21 **A. Yes.**
22 Q. And when they send the bill, they send the
23 bill to the owner?
24 **A. To the registered owner.**
25 Q. Okay. So a person who violates the tollway

Roberto Felix
713-650-1800 swreptproduction@swreporting.com
Southwest Reporting & Video Service, Inc. Registration #189
46
1 has committed a civil offense; is that correct?
2 **A. That is incorrect.**
3 Q. But you said it was a civil, not a criminal
4 offense?
5 **A. The actual toll violation. But once you have**
6 **tolls accumulated, then under Texas Transportation Code**
7 **you're operating a motor vehicle on the tollway when**
8 **prohibited because it becomes prohibited at that time.**
9 Q. Okay. So in this case the owner and
10 registered agents were not Ashtian Barnes?
11 **A. That's correct.**
12 Q. You have no information at all that Ashtian
13 Barnes was responsible for any toll violations; is that
14 correct?
15 **A. Repeat your question, sir.**
16 Q. You have no information -- at the time that
17 you stopped Ashtian Barnes, you had nothing, no evidence
18 whatsoever, no information that said Ashtian Barnes was
19 personally responsible for the toll violation; is that
20 correct?
21 **A. The information that I had was that the**
22 **vehicle was prohibited and the operator of the vehicle**
23 **was operating the vehicle on the tollway while the**

24 **vehicle was prohibited.**
25 Q. Okay. Is there anything on the vehicle
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
47
1 that -- that pops up and tells you that this vehicle has
2 an existing -- is prohibited from using the tollway?
3 **A. Will you repeat your question?**
4 Q. Okay. I'm renting a car, I'm renting a car
5 from Hertz or Avis or any other agency, and I drive on
6 the tollway and -- is there anything in that car that
7 flashes a light and says you can't use the tollway,
8 you're prohibited?
9 MS. BAKER: Objection, calls for
10 speculation.
11 **A. I don't -- I wouldn't know how to answer that**
12 **question. I -- I don't know.**
13 Q. (BY MR. FOMBY) Do you know of any devices
14 that exist in normal cars that inform you whether or not
15 your car is prohibited from using the tollway?
16 **A. No.**
17 Q. Okay. Is there any kind of flashing light
18 that occurs as you're using the tollway that says your
19 car is prohibited from using the tollway?
20 **A. Yes.**
21 Q. Where are those lights?
22 **A. They're on the -- by the readers on the top,**
23 **there will be a red light that will go off if once you**
24 **passed the reader and you are a prohibited vehicle.**
25 Q. Okay. So what you -- what you just said,
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
48
1 Deputy, and correct me if I'm wrong, is that the light
2 goes off after you pass the reader?
3 **A. That's correct.**
4 Q. Okay.
5 **A. I'm gonna clarify that. Actually it depends.**
6 **If it's an EZ TAG lane, yes. If it's a pay lane, no,**
7 **the reader is in front of you. The light is in front of**
8 **you. That would be the lanes with -- with the toll**
9 **collectors in them. And that would be the lanes with --**
10 **with toll collectors.**

11 Q. And these loans actually have arms that come
12 down to stop you from --
13 **A. No. Those are the automated coin machines.**
14 **The collector ones actually are the people inside the**
15 **booth that will provide change when paying a toll.**
16 **Those do not have the arms.**
17 Q. Do you have any personal knowledge of what
18 lane Ashtian Barnes may have used to enter the tollway?
19 **A. No.**
20 Q. Okay. Now, you stopped the person for a
21 traffic violation, you've walked up, you've made the
22 initial contact. You said that you tell them -- you
23 introduce yourself, tell them why you made the stop.
24 What's the next step in the interaction?
25 **A. The normal step is to ask him for a driver's**

1 **license, insurance or proof of financial responsibility.**
2 Q. Now, if a car is a rental car, does it
3 normally come with proof of financial responsibility or
4 an insurance card?
5 **A. Yes.**
6 Q. Where would that be located?
7 **A. Most of the time it is located in the glove**
8 **box.**
9 Q. Are you sure about that?
10 **A. In my experience when a vehicle, you rent a**
11 **vehicle, normally the insurance is in the glove box.**
12 Q. Have you been trained on that particular
13 issue?
14 **A. No, that's personal experience.**
15 Q. Okay. Now, in the State of Texas, you are
16 required to be licensed -- a licensed driver in order to
17 drive on -- on public roads; is that correct?
18 **A. That's correct.**
19 Q. But in the State of Texas, you are not
20 required to have a driver's license with you, are you?
21 **A. You must provide identification.**
22 Q. In the State of Texas, you're not required to
23 have a driver's license with you, are you?
24 **A. You're supposed to have identification, which**
25 **if you have a driver's license, it would be your**

713-650-1800 swreptproduction@swreporting.com
Southwest Reporting & Video Service, Inc. Registration #189
50
1 **driver's license or a Texas ID.**
2 Q. If a person -- if you stopped me on the side
3 of the road and I rushed out of the house to make it to
4 court, and I forgot my wallet, do you have any -- as --
5 as a police officer, do you have any ability to check on
6 whether or not I am licensed by the State of Texas?
7 **A. There is.**
8 Q. And how is that?
9 **A. Running your name, date of birth for a**
10 **driver's license and comparing that driver's license**
11 **return to a picture.**
12 Q. And it actually shows you a picture of the
13 person on -- that has that license?
14 **A. Now it does.**
15 Q. And on April 28th, 2016, did it show the
16 driver's license in your car?
17 **A. We never got to that point.**
18 MS. BAKER: The picture? Did you mean
19 the picture? Did it show a picture?
20 Q. (BY MR. FOMBY) The picture?
21 **A. No.**
22 Q. Okay. Would it tell that there's a person
23 with that name and date of birth was licensed?
24 **A. Yes.**
25 Q. Did you ever run -- go back and run the
Roberto Felix
713-650-1800 swreptproduction@swreporting.com
Southwest Reporting & Video Service, Inc. Registration #189
51
1 driver's license for Ashtian Barnes?
2 **A. No.**
3 Q. A lot of times my wife gets this these little
4 insurance updates in the mail and she puts -- is
5 supposed to put them in the cars but sometimes she
6 forgets. If I pick up -- I'm stopped and I grabbed my
7 insurance thing and it's out of date, do you have any
8 way of checking to see whether or not I'm insured?
9 **A. Now there is.**
10 Q. Okay. Was there any way to check on whether
11 or not someone had insurance on April 28th, 2016?
12 **A. I don't believe so.**
13 Q. Is that true globally or just for the

14 Constable's Office?
15 MS. BAKER: Objection, calls -- vague.
16 **A. I'm -- I'm not sure if it's globally, sir.**
17 Q. (BY MR. FOMBY) Okay. From the standpoint of
18 your squad car, you had no ability to access the Texas
19 database for insurance, automotive insurance on that
20 date?
21 **A. On that date, I don't believe so. I don't**
22 **think that was an option or something that we could**
23 **access.**
24 Q. Okay. Now, are you aware that under Texas
25 law, you are not required to have that proof of

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
52

1 insurance with you?
2 **A. As of now, yes. Before, you must provide**
3 **proof of financial responsibility.**
4 Q. Okay. When did that law change?
5 **A. I believe it was in 2017 or 2018.**
6 Q. And are you aware of what happens if you do
7 have -- if you're cited for not having a driver's
8 license, are you aware of how that -- the courts manage
9 that particular issue?
10 **A. No, I do not.**
11 Q. Are you aware that you go and demonstrate to
12 the courts that you are licensed and/or have insurance
13 in order to make the citation go away?
14 **A. Most likely, yes.**
15 Q. Okay. So when you approached Ashtian Barnes,
16 what did -- did you ask him for his driver's license?
17 **A. Right off the bat, no, because he interrupted**
18 **me, saying that it was a rental car and the vehicle --**
19 **he was on his way to wash it and return it.**
20 Q. After that did you ask him for his driver's
21 license?
22 **A. I asked him who the vehicle -- where he rented**
23 **the vehicle from or who the vehicle -- who rented the**
24 **vehicle, and he stated that it was his girlfriend, had**
25 **rented the vehicle.**

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
53

1 Q. Okay.
2 **A. And had had it for approximately a week.**
3 Q. Okay. At any point did you ask him for his
4 driver's license?
5 **A. Yes. After -- after that initial encounter**
6 **with the -- about the rental agreement, I did ask for**
7 **his driver's license.**
8 Q. Okay. Was he able to locate it?
9 **A. No. He said he didn't have it with him.**
10 Q. Did he attempt to be looking for a driver's
11 license or the rental agreement while you encountered --
12 during the encounter?
13 **A. He grabbed a stack of papers and was fumbling**
14 **through them but not actually looking at the papers.**
15 Q. Okay. In other words, he was looking off and
16 fumbling through them?
17 **A. Yes.**
18 Q. Okay. Where did he get that stack of papers?
19 **A. From the floorboard of the vehicle.**
20 Q. Which floorboard?
21 **A. The passenger floorboard.**
22 Q. And during that encounter, was he able to find
23 the rental agreement for you?
24 **A. He never was looking for it. He was just**
25 **having the papers in his hand fumbling through it and**
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
54
1 **looking towards my -- looking in my direction.**
2 Q. I understand, Deputy. My question was: Did
3 he ever locate that rental agreement for you?
4 **A. He never attempted to look for it in the first**
5 **place.**
6 Q. Did he ever suggest where his driver's license
7 might be?
8 **A. At one point he did say that his ID or**
9 **driver's license was in the trunk.**
10 Q. Did he say that it was in the trunk or it
11 might be in the trunk?
12 **A. He said it was in the trunk.**
13 Q. Did he offer to allow you to look in the trunk
14 to see if his license was back there? Did he offer to
15 let you look in the trunk?
16 **A. Yes.**

17 Q. Did he open the trunk for you?
18 **A. He maneuvered the switch inside the vehicle to**
19 **open the trunk.**
20 Q. Okay. He pushed the button and the trunk
21 popped open?
22 **A. Correct.**
23 Q. Is that fair?
24 **A. Correct.**
25 Q. Now let's rotate back a little bit to driver's

1 license and insurance. You say that you had no ability
2 in your squad car to look up a driver's license. Was
3 dispatch able --
4 **A. That -- that's not what I said.**
5 Q. Okay.
6 **A. I said we never got to that point to be able**
7 **to run the driver's license. I had no idea who I was**
8 **encountering at that time.**
9 Q. Okay. So at no point during the encounter did
10 you go back to your car to run his driver's license?
11 **A. No.**
12 Q. And at no point during the encounter did you
13 go back to confirm that it was a rental car?
14 **A. No. That opportunity never -- was never**
15 **given.**
16 Q. When you say "that opportunity was never
17 given," did Ashtian Barnes prevent you specifically in
18 any way from going back to your squad car?
19 **A. Yes. For officer safety when he was digging**
20 **around the vehicle, it was a -- it's a red flag for us**
21 **to maintain eyes on the individual for officer safety.**
22 Q. So it was important for you to keep an eye on
23 him during this period for your safety?
24 **A. Correct.**
25 Q. Did you -- at what point did you call for

1 backup?
2 **A. After I smelled the odor of marijuana in the**
3 **vehicle, that's when I radioed for backup.**

4 Q. So you were -- explain to me, Deputy, so I can
5 understand. You're afraid for your safety so you will
6 not go back to your car. This is a car that's been
7 stopped for a toll tag violation. You're afraid for
8 your safety so you won't go and confirm his information,
9 but you don't call for backup until you think you need
10 to search the car?
11 MS. BAKER: I'm going to object to that
12 question on several grounds. Number one, it's very
13 argumentative, and number two, I believe it misstates
14 his testimony.
15 Q. (BY MR. FOMBY) So Deputy, let me understand.
16 THE REPORTER: Could you repeat that?
17 MR. FOMBY: Yes.
18 Q. (BY MR. FOMBY) You were afraid for your
19 safety, and because of that reason you didn't go back to
20 your car to check his driver's license?
21 **A. No. I didn't go back to run his driver's**
22 **license because I didn't have the information to do so.**
23 Q. Did you ask Mr. Barnes what his name was?
24 **A. When he -- he said that the ID was -- or**
25 **driver's license was in the trunk and he popped the**
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
57
1 **trunk, in my experience that's deceptive behavior on an**
2 **individual to try to gain your focus away from what's**
3 **actually going on inside the vehicle.**
4 Q. Deputy, the question I asked you was
5 specifically: Did you ask him what his name was?
6 **A. We didn't get to that point.**
7 Q. You had a long conversation with him, did you
8 not?
9 MS. BAKER: Objection, mischaracterizes
10 the evidence in this case.
11 **A. The conversation we had, the encounter we had**
12 **was rapidly evolving, so the incidents that were**
13 **occurring, him fumbling on the floorboard, him digging**
14 **around, I did, you know, tell him on four different**
15 **occasions stop digging around. His hand, his left hand**
16 **was going towards the floorboard of the vehicle while**
17 **his right hand was, you know, reaching on the passenger**
18 **floorboard. So a rapidly evolving situation, my**
19 **priority was for my safety and to maintain visual of the**

20 **suspect.**
21 Q. (BY MR. FOMBY) So you were afraid for your
22 safety at that point. Is that fair, Deputy?
23 **A. There was flags that were raised for me to be**
24 **more concerned at that point.**
25 Q. Is that a yes or a no, Deputy?
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
58
1 **A. Yes.**
2 Q. Okay. And you were so afraid for your safety
3 that you did not even -- that you did not ask him what
4 his name was?
5 MS. BAKER: Objection, argumentative,
6 misstates his testimony.
7 **A. Repeat the question.**
8 Q. (BY MR. FOMBY) You were so afraid for your
9 safety that you did not take the time to ask him what
10 his name was?
11 **A. No, the rapidly evolving events that occurred**
12 **did not allow me to get to that point because the focus**
13 **was shifting from being a traffic stop to something else**
14 **being, you know, deceptive inside the vehicle.**
15 Q. And at that point you were so afraid for your
16 safety you didn't -- did not ask Ashtian Barnes what his
17 date of birth was; is that correct?
18 **A. I did not ask him for his information,**
19 **correct.**
20 Q. And at that point you were so afraid for your
21 safety you did not return to your squad car to confirm
22 that it was, in fact, a rental car; is that correct?
23 **A. At the point there was no time to, you know,**
24 **leave the vehicle to go run information.**
25 Q. And yet, at this time that you were so afraid
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
59
1 for your safety that you would -- did not ask the basic
2 questions for a traffic stop, you did not yet call for
3 backup, did you?
4 **A. Backup had already been called.**
5 Q. It had been?
6 **A. During the first initial conversation of me**

7 **asking who the -- for who I was and why he was being**
8 **stopped and him telling me that the -- it was a rental**
9 **car, that's when I had called for backup.**
10 Q. We're gonna see -- Deputy, is it -- in your
11 experience, is it common for people who are looking for
12 their driver's license to dig around their wallets for
13 papers?
14 **A. For their license?**
15 Q. Yes.
16 **A. It's uncommon.**
17 Q. Is it common in your experience when people
18 have a rental car, for them to dig around in the papers
19 in the car to be able to show you the rental receipt?
20 **A. That is common, but that's not what he was**
21 **doing.**
22 Q. And Officer Felix, Deputy Felix, you have --
23 when did you pick up this ability to read his mind?
24 MS. BAKER: Objection, argumentative.
25 Q. (BY MR. FOMBY) Officer Felix, you said that

1 you know what he was thinking.
2 MS. BAKER: Objection --
3 Q. (BY MR. FOMBY) And what gave you --
4 MS. BAKER: -- argumentative and
5 misstates his testimony.
6 Q. (BY MR. FOMBY) What gave you the ability to
7 know what he was thinking at that particular time?
8 MS. BAKER: Same objection,
9 argumentative, misstates Deputy Felix's testimony. You
10 may answer.
11 THE WITNESS: Okay.
12 **A. I never said that I read his mind. What I**
13 **said that his behavior wasn't common for someone who**
14 **would be looking for a rental agreement. He was -- he**
15 **had his hand, fumbling through it, but at the same time**
16 **looking at me. If you're looking at something, looking**
17 **for something you're going to be looking at that stack**
18 **of papers, you know, trying to find it, not grabbing it,**
19 **just moving it around and looking at me at the same**
20 **time.**
21 Q. (BY MR. FOMBY) At some point in this
22 interaction, after the stop, you informed Ashtian Barnes

23 that you smelled a strong odor of marijuana; is that
24 correct?
25 **A. That's correct.**
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
61
1 Q. You asked him if there was anything in the car
2 that he needed to tell you about; is that correct?
3 **A. That I need to know about.**
4 Q. Was -- was it -- was that the point that you
5 called for backup?
6 **A. No. Backup had already been called prior to**
7 **that.**
8 Q. How long does it take for a backup car to
9 arrive normally?
10 **A. It just depends. If there's a unit -- there's**
11 **several units on the tollway, so it could be seconds or**
12 **it could be a minute or two.**
13 Q. At that point you opened the door and told
14 Ashtian Barnes that he needed to leave the vehicle; is
15 that correct?
16 **A. When I told him to get out of the vehicle was**
17 **his -- his actions kept indicating to me that he was up**
18 **to something, either trying to hide something or reach**
19 **for something.**
20 Q. To your knowledge and training as a deputy
21 constable, are you supposed to have a backup officer in
22 place before you remove an individual from the vehicle?
23 MS. BAKER: Objection, overbroad. You
24 may answer.
25 THE WITNESS: Okay.
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
62
1 **A. Every situation's different. Sometimes**
2 **there's not time to, you know, separate the individual**
3 **from the vehicle, having to wait for backup.**
4 Q. (BY MR. FOMBY) Other than shuffling papers,
5 did it appear to you that Ashtian Barnes was going
6 anywhere?
7 **A. No.**
8 Q. Okay. In fact, didn't you state that at one
9 point Ashtian Barnes turned off his car?

10 **A. That is correct.**
11 Q. And that he removed the key from the ignition
12 and placed it down near the gearshift?
13 **A. Correct.**
14 Q. Are those the actions in your experience,
15 Deputy, of a person about to flee the scene?
16 **A. Those aren't common actions. You know,**
17 **usually when someone gets pulled over the vehicle stays**
18 **running and in park. Rarely does someone turn off the**
19 **vehicle and place the keys, you know, down or on the**
20 **dash, so that's not a common action for someone to take.**
21 Q. I understand that may not be common, and that
22 makes it more interesting to me. Is that action
23 consistent with a person who is imminently ready to flee
24 the scene?
25 **A. No.**
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
63
1 Q. At any point in this interaction with Ashtian
2 Barnes, did you ever see him -- did you ever get an
3 indication of a weapon inside the car?
4 **A. Yes.**
5 Q. At what point was that?
6 **A. When he was digging around in the vehicle.**
7 Q. What did you see?
8 **A. I saw his hand, his left hand towards the**
9 **floorboard of the vehicle while his right hand was**
10 **extended over to the passenger floorboard.**
11 Q. His left hand was where?
12 **A. Down by his leg in -- in the seat area as he's**
13 **reaching forward.**
14 Q. So is the floorboard, the driver's side
15 floorboard of the car, a weapon?
16 **A. No, but it could potentially be a weapon**
17 **any -- anywhere in that area.**
18 Q. Okay. That's not the question I asked you,
19 Deputy. First of all, I asked you, at any point did you
20 see a weapon in his possession?
21 MS. BAKER: I'm going to object to that
22 because I don't think that was your question. We could
23 read it back but if that's your question now, you may
24 answer.
25 THE WITNESS: Okay.

Roberto Felix
713-650-1800 sweptproduction@swreporting.com
Southwest Reporting & Video Service, Inc. Registration #189

64

1 **A. The original question you asked was did I**
2 **believe or --**
3 THE WITNESS: Actually, can we read that
4 question back because I don't --
5 Q. (BY MR. FOMBY) Well, will you just answer
6 this question --
7 **A. Okay.**
8 Q. -- make it easier on the court reporter. At
9 any point at -- before the car got turned back on, did
10 you see an actual weapon in the car?
11 **A. I did not see a weapon in the car.**
12 Q. Okay. So getting back to the moment, your
13 statement was that Ashtian Barnes had been sitting in
14 the car with the engine running for the first part of
15 the inter -- of -- of your discussion, correct?
16 **A. First part of?**
17 Q. When you walked up and for the first part of
18 your conversation with him while he was shuffling
19 through the papers, the engine was running?
20 **A. At some point is when he turned it off. Exact**
21 **point, I cannot recall. But I did observe him turn off**
22 **the car and set the keys down.**
23 Q. And the keys are sitting down here by the
24 gearshift?
25 **A. Down in the center console gearshift area.**

Roberto Felix
713-650-1800 sweptproduction@swreporting.com
Southwest Reporting & Video Service, Inc. Registration #189

65

1 Q. And you have opened -- did that happen before
2 or after you opened the car door?
3 **A. That happened as I was opening the car door.**
4 Q. Okay. So you were opening the car door. He
5 turns off his car and puts his key in there?
6 **A. No, no, I'm sorry. Repeat that question**
7 **again. At what point, what?**
8 Q. Did he turn off the car and put his key near
9 the gearshift?
10 **A. Prior to opening the vehicle.**
11 Q. Okay.
12 **A. The vehicle door.**

13 Q. So Deputy, you opened the door of the vehicle
14 and was the door open wide or open just partially?
15 **A. It was open enough for me to be in the doorway**
16 **area.**
17 Q. Okay. At that point did you see a weapon in
18 the car?
19 **A. No, but I couldn't see his -- his hand as he**
20 **was leaning forward.**
21 Q. So you're saying at this point as you opened
22 the car door, he's leaning forward?
23 **A. He's leaning forward. When I opened the car**
24 **door, he's leaning forward towards the console area.**
25 Q. Isn't it true in your statement that you said

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**

66

1 at this point he was digging around in the red Solo cup
2 on the passenger side?
3 **A. No, that was prior when he was -- he was**
4 **reaching in that area when I kept telling him to stop**
5 **digging around.**
6 Q. Okay. Now at this point your backup officer
7 has not yet arrived. You have the door open, and you
8 tell Ashtian Barnes to step out of the vehicle?
9 **A. Yes.**
10 Q. What happens then?
11 **A. When I opened the door and asked him to step**
12 **out he reaches -- leans forward and as I'm trying to see**
13 **what he's doing, I'm expecting him to step out, he's**
14 **grabbing the keys to -- to the vehicle and as he turned**
15 **the vehicle on, his left hand is down, like by the seat,**
16 **like his lap, so I'm looking and he turned the car and**
17 **quickly puts it in drive.**
18 Q. Okay. Is this a con -- console mounted
19 gearshift or is it on the --
20 **A. I -- I don't recall. I don't recall. I know**
21 **it just happened so quick that, you know, the car was**
22 **put in drive.**
23 Q. So he leans forward, Deputy, grabs the key.
24 Is it a key on a key chain or just a solo -- individual
25 key?

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**

67
1 **A. No, it's a key. I can't tell you at this**
2 **point if it was one key or multiple keys but it was the**
3 **key to the ignition.**
4 Q. And leaning forward toward the steering wheel,
5 he reaches down, grabs a key, puts it into the ignition,
6 turns it on, puts -- puts his foot on the brake, puts it
7 in gear. Is that what you're saying?
8 **A. That's -- that's correct.**
9 Q. And approximately how long did it take for him
10 to lean forward and then go through all of those motions
11 to get --
12 **A. Fraction of a second probably.**
13 Q. So at that point, is it fair to say, Deputy,
14 that you were aware that the car was in gear, it was
15 probably going to go forward?
16 **A. Well, at the same time that that was occurring**
17 **I was aware and was attempting to have him stop or stop**
18 **from leaving the scene.**
19 Q. So let's -- Deputy, let's slow this down
20 again. He's going through all these motions, leaning
21 forward, picking up a key, locating the -- the place to
22 insert the key, starting the car and then reaching down
23 and grabbing the gear and putting it into gear. And
24 that happened in a fraction of a second?
25 **A. That happened in -- so rapidly that it must**
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
68
1 **have been a fraction of a second to a second. I mean it**
2 **was that quick.**
3 Q. Okay. And so you perceived, Deputy, at this
4 point, that he is preparing to leave the scene; is that
5 fair?
6 **A. Correct.**
7 Q. And so what do you tell him -- do you tell him
8 anything to try to stop him from leaving?
9 **A. "Don't do it, don't do it."**
10 Q. Did you say "don't do it"?
11 **A. "Don't do it," as I'm drawing my weapon.**
12 Q. Isn't it fair to say that what you told him
13 instead was don't fucking move?
14 **A. That's incorrect.**
15 Q. Do you recall at any particular point in the

16 next several seconds screaming don't fucking move at
17 least twice?
18 **A. I said "fucking stop, fucking stop" when I was**
19 **on the vehicle, on the doorsill of the vehicle. I was**
20 **moving.**
21 Q. So at this point, if you had to list the
22 infractions -- if you were going to arrest Ashtian
23 Barnes before he picked up the key, if you were going to
24 arrest him, what would he be charged with?
25 **A. At that point he -- he wasn't going to be**

1 **arrested. He was going to be detained.**
2 Q. Okay. If you were going to detain him, what
3 would be the reason for detaining him at that point?
4 **A. The reason for detaining him was that his**
5 **constant, you know, actions that he -- that he did while**
6 **looking at the pieces of paper and trying to find the**
7 **rental agreement but not looking at the stack at the**
8 **same time. Him digging around in the vehicle asking --**
9 **and me asking him multiple times to stop digging in the**
10 **vehicle. I had reasonable -- a suspicion that there was**
11 **something in that vehicle that he was either going for**
12 **or trying to conceal.**
13 Q. Since he was playing with papers, are you
14 thinking, was it your reasonable suspicion that he had
15 something in those papers he was trying to conceal?
16 **A. No. My -- my belief was that as he was doing**
17 **that, was to distract me or, you know, keep my focus**
18 **on -- on that versus, you know, whatever else he -- was**
19 **going on in that vehicle.**
20 Q. So at that point, Deputy, would it be fair to
21 say that you had no actual evidence of a crime that was
22 being committed or -- or was going to be committed?
23 **A. I have reasonable suspicion that there was**
24 **marijuana in that vehicle.**
25 Q. Okay. And that's because, Deputy, you smelled

1 a strong odor of marijuana?
2 **A. That's correct.**

3 Q. And Deputy, we know that marijuana is legal in
4 I don't know how many states now, but in Texas,
5 possession of a small amount of marijuana is what kind
6 of crime?
7 **A. Repeat your question.**
8 Q. In Texas, on the -- on April 28th, 2016,
9 possession of less than two ounces of marijuana is what
10 kind of crime?
11 **A. It's a misdemeanor crime.**
12 Q. Is it a misdemeanor A, B or C?
13 **A. For two ounces of marijuana it's a misdemeanor**
14 **B, I believe.**
15 Q. So it's the -- the level just above a C which
16 is a fine only offense; is that correct?
17 **A. A citation.**
18 Q. So you're saying that you had at this point,
19 Deputy, and correct me if I'm wrong, when I asked you
20 why -- why you were thinking that you needed to prevent
21 him from leaving, you did not say anything about the
22 toll tag violation; is that correct?
23 **A. At that point it was him fleeing the scene and**
24 **possibly causing, you know, a crash or causing injury to**
25 **someone else as well.**

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
71
1 Q. Is there anything -- okay, going back earlier,
2 we talked about his conduct in operating his car when
3 you stopped him.
4 **A. Correct.**
5 Q. And you said that he reacted normally -- when
6 you turned on your lights, his response time was -- was
7 normal for -- for any individual you stopped; is that
8 correct?
9 **A. That's correct.**
10 MS. BAKER: Objection, asked and
11 answered.
12 Q. (BY MR. FOMBY) And then you told us that once
13 your lights came on and he realized you were behind you
14 [sic], he moved rapidly to -- to the side of the road
15 and stopped safely; is that right?
16 MS. BAKER: Objection, asked and
17 answered.
18 Q. (BY MR. FOMBY) Is that correct?

19 MS. BAKER: You can go ahead and answer.
20 **A. Yes.**
21 Q. (BY MR. FOMBY) And you told us that at the --
22 all the -- the entire time that you observed him
23 driving, that never once did you see him swerving or
24 behaving in any way that would suggest that he was
25 impaired or not in full control of the vehicle; is that

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
72

1 true?
2 MS. BAKER: Objection, asked and
3 answered.
4 **A. That's correct.**
5 Q. (BY MR. FOMBY) So now he puts the car in
6 gear, and what is it specifically that makes you think
7 that his driving habits are going to change if he leaves
8 the scene?
9 **A. At that point he's -- he's evading a lawful**
10 **stop which in my experience always leads to a chase,**
11 **someone driving erratically to get away.**
12 Q. So what I'm hearing you say is that you had no
13 evidence that he was going to drive in a reckless
14 manner, but you presumed that he was going to drive in a
15 reckless manner?
16 **A. That is correct.**
17 Q. And based upon that presumption that you had
18 to stop this reckless behavior and dangerous behavior,
19 you felt it was important at that point to stop him from
20 leaving the scene?
21 **A. That is correct.**
22 Q. So your -- at this point your objective in --
23 in stopping him was to prevent him from endangering
24 other people on the highway with his driving?
25 **A. That would be a part of it, yes.**

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
73

1 Q. And so as you saw Ashtian Barnes starting the
2 car and putting it in gear, what was your next response?
3 **A. My next response was to draw my weapon to gain**
4 **compliance of him not leaving the scene and at the same**
5 **time was to try to get him to not put the car in park --**

6 Q. Okay.
7 **A. I mean, excuse me, in drive.**
8 Q. And at this point when he has the car in gear,
9 did you order him to stop the car?
10 **A. I said "don't do it." Or correction. When I**
11 **said "don't do it" is when I actually saw him going**
12 **to -- at the same time as he's turning the vehicle.**
13 **Once the vehicle was in park --**
14 Q. In gear?
15 **A. In gear, I'm sorry, in gear, then at that**
16 **point it's, you know, rapid events happened and, you**
17 **know, you know, everything else transpired.**
18 Q. Okay. And at that point after he started the
19 car, do you recall what warnings you gave him at that
20 point?
21 MS. BAKER: Objection, asked and
22 answered.
23 **A. When the vehicle was in gear?**
24 Q. (BY MR. FOMBY) Yes.
25 **A. As I was holding onto the vehicle, it was**

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
74

1 **"fucking stop, fucking stop."**
2 Q. The car is in gear and you draw your gun. Did
3 you draw it with your left hand or your right hand?
4 **A. I'm right-handed.**
5 Q. So you pull up your gun with your right hand?
6 **A. Correct.**
7 Q. And do you continue to stand outside the
8 vehicle and point the gun toward him to stop him?
9 **A. As I drew my vehicle -- my -- my weapon, like**
10 **I said, he was leaning forward towards the ignition so**
11 **my view was obstructed. So when I realized what he was**
12 **doing, I drew my weapon and said "don't do it." And as**
13 **I'm reaching to try to keep him from putting the vehicle**
14 **in drive, that's with my left hand, so I'm trying to**
15 **keep that from happening as he's putting the car in**
16 **gear.**
17 Q. Okay. Deputy, you just said, and stop me if
18 I'm wrong and I heard it wrong, that he was leaning
19 forward and so your view inside the car was -- was
20 constricted, and so you did not actually have a view of
21 him starting the car?

22 **A. No, I saw him starting the car or putting the**
23 **key in the ignition. Now what I couldn't see was --**
24 **was -- what was in the general floorboard area or right**
25 **side of the -- of his area as he was doing that.**

1 Q. Okay. And so as soon as you saw him lean
2 forward and put the key in the ignition, could you see
3 him start the car?
4 **A. Yes.**
5 Q. And that's when you drew your service weapon?
6 **A. Correct, as he was doing it.**
7 Q. Okay. Now again, we -- we started this with a
8 question that you haven't answered yet, so let's skip
9 back to that question.
10 At that point when you drew your service
11 weapon, did you continue your stance outside the car
12 and -- and point the gun inside the car?
13 **A. No.**
14 Q. Was one of the reasons why you felt he was
15 behaving suspicious, that one of the reasons that caused
16 you to draw your weapon, the fact that he leaned forward
17 suddenly?
18 **A. Repeat the question.**
19 Q. You -- you testified that he -- before
20 starting the car he leaned forward suddenly. Was that
21 something that caused you at that point to alert that --
22 that something bad might be going on?
23 **A. My weapon was drawn because I believed that**
24 **he -- there was an obstruction of what was on his right**
25 **side and the ability to rapidly, you know, go for a**

1 **weapon or -- or flee the scene. I mean there was**
2 **multiple things that, you know, we think about as**
3 **officers that could potentially happen.**
4 Q. Okay. You realize that you have given a
5 statement in this case, correct?
6 **A. That's correct.**
7 Q. And you gave that statement under oath?
8 **A. Correct.**

9 Q. And never previously have you talked about him
10 leaning forward and fumbling for weapons. Do you recall
11 that?
12 **A. I never said he was fumbling for weapons.**
13 Q. He was fumbling for something?
14 **A. Correct.**
15 Q. And never before have -- previously have you
16 stated that he was behaving in such a manner?
17 MS. BAKER: Objection, vague.
18 Q. (BY MR. FOMBY) In -- in the statements that
19 you gave --
20 MR. FOMBY: I'm going to ask you to mark
21 this as Exhibit 32.
22 (Exhibit No. 32 marked.)
23 Q. (BY MR. FOMBY) Do you recall this statement?
24 **A. Yes.**
25 Q. Deputy? This is a statement that you gave

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**

77

1 under oath?
2 **A. That's correct.**
3 Q. In this statement, at any point did you state
4 that you were alarmed because of his furtive movements?
5 THE REPORTER: What kind of movements?
6 MR. FOMBY: Furtive.
7 THE REPORTER: Thank you.
8 **A. I'm sorry, repeat your question.**
9 Q. (BY MR. FOMBY) In this statement, at any
10 point did you say that -- that his movements in the car
11 alerted you that something suspicious was going on?
12 **A. There's several times here where his actions**
13 **led me to believe that.**
14 Q. Deputy, that's not the question I asked.
15 MS. BAKER: Excuse me, it may not be the
16 question that you asked him but please let him finish
17 his answer. And then if you don't like it you can
18 ask -- object to it or ask another question. Please
19 don't interrupt him. He's answering.
20 MR. FOMBY: Okay.
21 **A. Okay. So there's several times here where his**
22 **actions led me to believe that his actions were I guess**
23 **conducive of -- of something that could potentially be,**
24 **you know, I guess evasive or, you know, an alarm to me.**

25 Q. (BY MR. FOMBY) Officer -- but Deputy Felix,

1 again, my question was: In your statement that you gave
2 under oath, at any point did you make a statement, did
3 you say that his furtive behaviors, his movements inside
4 the car, alerted you that something suspicious was going
5 on?
6 **A. That statement is not directly in here, but**
7 **the actions that he conducted is what alerted me to, you**
8 **know, his behavior, him acting that way.**
9 Q. So Deputy, again, my question is a yes or no.
10 Is -- is that -- or did you make that statement, did you
11 put that in your statement that his furtive behaviors
12 alerted you that something suspicious was going on? Did
13 you make -- put that in your statement?
14 **A. That statement specifically, no. But his**
15 **actions were.**
16 Q. And Deputy, in your statement that you gave,
17 did you say anywhere in the statement that his leaning
18 forward and his motions with his hands caused you --
19 alerted you to try to stop him?
20 **A. I don't believe so.**
21 Q. In this statement that you gave under oath, at
22 any point did you say that the reason why you felt that
23 you needed to stop him was because his leaving the scene
24 would present a danger to the general public?
25 **A. That statement specifically, no, but his**

1 **actions were what I believe would happen. I mean his**
2 **actions that he took.**
3 Q. So Deputy, I understand that when you were
4 given an opportunity to provide a full statement, you
5 believe it to be true and correct to the best of my
6 knowledge, you did not say that his motions alerted you
7 to -- to reasonable suspicion; is that correct?
8 MS. BAKER: Objection, asked and
9 answered. Also it mixes up the legal -- the legal in my
10 opinion. You may answer if you understand the question.
11 **A. I -- I -- repeat the question.**

12 Q. (BY MR. FOMBY) Well, you know what reasonable
13 suspicion is?
14 **A. Yes.**
15 Q. And you can take certain kinds of actions
16 based upon reasonable suspicion; is that correct?
17 **A. Correct.**
18 Q. Did you in your statement ever make -- state
19 that -- that his movements inside the car gave you
20 reasonable suspicion to think that -- that a crime might
21 be occurring?
22 **A. I'm not understanding you. I'm sorry. Repeat**
23 **the question again.**
24 Q. Did you anywhere in your statement say that
25 his movements and moving the papers around gave you
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
80
1 reasonable suspicion that a crime might be occurring?
2 **A. Now his actions that led me to believe that**
3 **are in here, but that statement specifically, no, it's**
4 **not in this statement.**
5 Q. Okay. In your statement did you say that you
6 had reasonable suspicion that he was about to flee the
7 scene, and in so doing, put the general public at risk?
8 **A. In the statement, that specific statement,**
9 **it's not in here, but that's what the -- my concern was**
10 **due to the events that happened and he had posed.**
11 Q. Now, you have drawn your service weapon, and
12 you stated that you did not maintain your stance outside
13 the car but you instead lunged towards Ashtian Barnes to
14 get inside of the car; is that correct?
15 MS. BAKER: Objection, misstates his
16 testimony.
17 **A. No, I did not lunge in the car. What I did**
18 **was try to prevent from him to putting the car in drive**
19 **when I was made aware of what he -- his intention was.**
20 Q. (BY MR. FOMBY) And you said that you -- your
21 right hand was holding your gun?
22 **A. Correct.**
23 Q. And you were using your left hand to try to
24 put the gear lever in park?
25 **A. No, to try to keep him from putting the car in**
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**

81
1 **drive. Like I said before, it happened so fast that**
2 **it -- it wasn't even an option as I was trying to do so.**
3 Q. So with his hand on the gearshift, how would
4 your left hand be able to stop him from putting the car
5 into drive?
6 **A. Well, originally what I was trying to do is**
7 **keep him from getting the car on, it actually turning**
8 **on. When I saw he was doing it is when I was reaching**
9 **in. Like I said before, it happened so fast. By the**
10 **time he turned it on, his hand was already going down**
11 **towards -- towards the shifter.**
12 Q. So let's go back up a little bit because the
13 timeframe just shifted a little bit. Now you're saying
14 that when he moved forward you thought he was about to
15 turn the car on, you -- that's when you first moved --
16 pulled your gun and moved into the vehicle?
17 **A. All this happened, I mean within a short**
18 **period -- period of timeframe, which was, you know, so**
19 **fast that my actions were to draw my weapon because I**
20 **already had a perception of maybe something, a weapon or**
21 **him trying to flee at the same -- same moment.**
22 Q. Now, Deputy, pause there for a second and get
23 back to that statement you just made. You had a
24 perception that there was a weapon in the vehicle. Any
25 place in your statement again, under oath, where you

82
1 stated that you had a perception there was a weapon in
2 the vehicle?
3 **A. At the statement, not that -- that statement**
4 **itself, but everything else that was done led me to**
5 **believe that there could be possibly something in that**
6 **vehicle.**
7 Q. Again, Deputy, you had an opportunity to give
8 your statement, your full and complete statement, and at
9 any point did you ever state that you thought there
10 might be a weapon in that vehicle?
11 MS. BAKER: Objection, argumentative,
12 also asked and answered.
13 Q. (BY MR. FOMBY) You have not -- in -- in my
14 opinion you have not answered it, you are -- so answer

15 the question. In your statement did you ever indicate
16 that there was a weapon in the vehicle?
17 **A. Not that statement directly, but everything**
18 **else that led to my belief is -- is in here.**
19 Q. So that statement that there was a weapon in
20 the vehicle was not -- you did not put that in your
21 statement?
22 **A. I'll have to reread it again. Give me a**
23 **minute.**
24 Q. Take your time.
25 **A. (Witness examines document.) Repeat your**
Roberto Felix
713-650-1800 swreptproduction@swreporting.com
Southwest Reporting & Video Service, Inc. Registration #189
83
1 **question, sir.**
2 Q. At any point in the official statement you
3 gave under oath, did you say -- did you say that
4 there -- that you perceived that there was a weapon in
5 the vehicle?
6 **A. Okay. In that statement, no.**
7 Q. Okay. At any point in this same statement did
8 you say that prior to Ashtian Barnes turning the car
9 back on, that you feared for your safety?
10 **A. His actions that were placed on here made me**
11 **believe so, yes.**
12 Q. Deputy, again, I'm asking you, you read the
13 document. Can you point to where in this statement you
14 said that you were afraid for your safety prior to
15 Ashtian Barnes turning the car back on?
16 **A. Prior to turning the car back on?**
17 Q. Yes.
18 **A. That statement directly, no, but the actions**
19 **listed, yes.**
20 Q. And if -- as you said, Deputy, the reason why
21 you didn't ask him his name was because you were so
22 frightened for your safety?
23 **A. No, it was a rapidly series of events that**
24 **occurred that it didn't give the opportunity to be able**
25 **to do so.**
Roberto Felix
713-650-1800 swreptproduction@swreporting.com
Southwest Reporting & Video Service, Inc. Registration #189
84
1 Q. And again, that particular statement that it

2 was -- that you were faced with a rapidly evolving
3 situation, that also is not in the statement, is it?
4 **A. That statement, no.**
5 **MR. FOMBY: Can we go off?**
6 THE VIDEOGRAPHER: The time is
7 approximately 12:01 p.m., we're off the record.
8 (Lunch recess from 12:01 to 12:46 p.m.)
9 THE VIDEOGRAPHER: The time is
10 approximately 12:46 p.m. We're on the record.
11 Q. (BY MR. FOMBY) Now Deputy, when we left we
12 were at the point where the car door, Ashtian Barnes'
13 car door was open and you were standing there. And you
14 said that you leaned -- he leaned forward and started
15 the car. You also mentioned at that point that he was
16 reaching down with his left hand toward the floorboard
17 of the driver's side floorboard?
18 **A. His hand was by his lap towards the**
19 **floorboard.**
20 Q. Now, in the -- in the statements that you gave
21 under oath, though, at no point here did you ever state
22 that you -- you saw him reaching down and fumbling
23 between his legs in the floorboard, did you?
24 MS. BAKER: Objection, misstates his
25 testimony. You may answer.

1 THE WITNESS: Okay.
2 **A. No, it's not in there, but the events leading**
3 **to that point are stated in here.**
4 Q. (BY MR. FOMBY) So the answer is at no point
5 did you state that he was fumbling for something in the
6 floorboard of his side of the car?
7 **A. That's correct.**
8 Q. Okay. Now -- now you mentioned that you were
9 trying to stop him from leaving. And I'm sorry if I
10 have to -- I'm mainly trying to get us back to the point
11 where we were at. And you said that you had -- you
12 pull -- had pulled your service weapon and you had stuck
13 that forward; is that correct?
14 **A. Well, I got it in a shooting stance, which is**
15 **when you draw your weapon you, you know, present it to,**
16 **if you need to fire it, then it's there, instead of**
17 **firing from a hip position or a -- a extended position.**

18 **It's total -- a different type of stance, so it was --**
19 **it was pulled out and extended out.**
20 Q. Now, the weapon that -- your service weapon is
21 a .40 caliber weapon, wasn't it?
22 **A. That's correct.**
23 Q. When you talk about a shooting stance, you
24 were talking about where the arm position is?
25 **A. Correct.**

1 Q. And in a proper shooting stance, what is your
2 foot position?
3 **A. It depends on the situation.**
4 Q. Is a proper shooting position, as you've been
5 trained, leaning forward into a car?
6 **A. There's -- I'm gonna say there's no such thing**
7 **as a proper shooting position. When you're in a**
8 **situation, the situation dictates the way you stand, the**
9 **way you shoot, how you hold your weapon. I mean, if I'm**
10 **at the range I'm, you know, that -- feet apart, hands,**
11 **gun raised, you know, directly in front of me and, you**
12 **know, slightly leaning forward.**
13 Q. At the range do you ever practice lunging
14 forward and shooting from that position?
15 **A. Yes. Leaning forward.**
16 Q. Leaning forward?
17 **A. Leaning forward and shooting, yes, sir.**
18 Q. So at this point the car is being placed in
19 gear. The car has not yet started to leave. Where is
20 your -- where is your body? Where is your head and
21 where is your body, where are your arms? Can you
22 explain that to me?
23 **A. As the car is driving away or as it --**
24 Q. No, as -- as the car is in gear but before it
25 departs.

1 **A. The car's in gear before it departs.**
2 **Partially inside of the vehicle.**
3 Q. Okay.
4 **A. That I recall.**

5 Q. When did you put -- which foot did you first
6 put on the sill of the car?
7 **A. I don't recall at this point which foot it**
8 **was. I believe it was my left foot.**
9 Q. When did you put that first foot on the sill
10 of the car?
11 **A. As the car was driving away.**
12 Q. And Deputy, are you sure that you put that
13 first foot up as the car was driving away?
14 **A. As I recall, yes.**
15 Q. When did you put the second foot on the sill
16 of the car?
17 **A. As I felt the vehicle started moving forward.**
18 Q. But you just said the first foot went up as it
19 was driving away, now you're saying the second foot went
20 up as it's starting to move forward. Which is that?
21 **A. It's -- it was a simultaneous move --**
22 **simultaneously -- excuse me, simultaneous move. As the**
23 **vehicle is starting to move, it's left foot, right foot,**
24 **and I'm holding on.**
25 Q. Okay. So now you're standing on the sill of

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
88
1 the car. Where is your left arm?
2 **A. My left arm is inside the vehicle.**
3 Q. What are you holding onto to stay on the car?
4 **A. My forearm against the roof of the car.**
5 Q. So you're holding on -- into the car like
6 this?
7 **A. This part (Indicating.)**
8 Q. Or this part?
9 **A. As -- as -- just to keep a point of contact**
10 **and trying to hold onto -- to the vehicle.**
11 Q. Okay. Just to be clear, this -- this part of
12 your arm is inside the car and pressed up against the
13 roof of the car?
14 **A. No. Only my -- this part of the forearm**
15 **against the -- the entryway of the vehicle, the door of**
16 **the vehicle.**
17 Q. From inside?
18 **A. Inside, correct.**
19 Q. And where is your head?
20 **A. My head's above the roof of the car.**

21 Q. Where is your right arm?
22 **A. My right hand is holding out to the outside of**
23 **the vehicle.**
24 Q. Your right hand is holding onto the outside of
25 the vehicle?

89

1 **A. No, left hand.**
2 Q. Your left hand?
3 **A. Left hand is holding --**
4 Q. Let's back up because now you told me that you
5 were -- this part of your left arm was -- right?
6 **A. No, right hand.**
7 Q. Okay. So your right hand is holding onto
8 what?
9 **A. My weapon.**
10 Q. Okay. Where is your right hand?
11 **A. It's inside the vehicle.**
12 Q. And when you first start to move -- feel the
13 car moving forward, was it like a Ferrari taking off or
14 was it a gradual acceleration?
15 **A. At that point I felt the vehicle take off, is**
16 **what I felt. I just felt the motion and to me it seemed**
17 **like it was, you know, accelerating very quickly.**
18 Q. And what happened as -- as the car started to
19 move forward and you're completely up on the sill with
20 this arm inside the car, this hand with the gun inside
21 the car, what -- what was the door doing behind you?
22 **A. My left hand was never inside the car.**
23 Q. Okay. Let's back up again. You said that you
24 were holding on with this part of your left arm
25 (Indicating) from inside the car?

90

1 **A. Right hand, with my right hand, not my left**
2 **hand.**
3 Q. What was your -- and I asked you what your
4 left hand was doing?
5 **A. I was holding onto the outside of the car.**
6 Q. Okay.
7 **A. I'm sorry, I misunderstood you.**

8 MS. BAKER: Yeah, he did ask you that.
9 **A. Okay. It was my left hand was on the outside**
10 **of the vehicle.**
11 Q. (BY MR. FOMBY) Okay.
12 **A. My right hand was in the inside of the vehicle**
13 **holding my weapon.**
14 Q. So you're standing, you've got your right --
15 your left arm holding onto the top of the car, your
16 right hand is inside?
17 **A. Correct.**
18 Q. Your right forearm is being pressed up against
19 the door frame?
20 **A. The top part.**
21 Q. Okay. From the inside?
22 **A. From the inside.**
23 Q. And at this point as the car is starting to
24 move, where was the car door behind you?
25 **A. The car door was to my -- to my side.**
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
91
1 Q. Okay. Would you say that as the car started
2 to move, you -- you -- the car door was pinning you in
3 position?
4 **A. The car door was placed against my side.**
5 Q. So did -- would you say that the car door was
6 pinning you in position at that point?
7 **A. You said pinning?**
8 Q. Yes.
9 **A. It could be said that way.**
10 Q. Okay. In your statement it says: As the
11 vehicle sped away, I felt the driver door closing on me
12 and started to feel that I was being pinned and going to
13 be drug.
14 Is that a correct statement?
15 **A. Yes.**
16 Q. Okay. And you felt that you were going to be
17 drug even though your feet were both on the -- on the
18 sill of the car?
19 **A. As I noticed that he -- as I saw that he was**
20 **putting the vehicle in drive, I felt that if I did not**
21 **do what I did, which is to step on the doorsill, that**
22 **door could have pinned me, it could have like closed on**
23 **me and potentially had me -- drug me -- drug -- the**

24 **vehicle drug me.**
25 Q. Okay. Then let's move back again because now

1 you're talking about before the car started spinning --
2 started speeding away. At that point you were afraid of
3 getting pinned and drug. Is that what you're saying?
4 **A. That's correct.**
5 Q. And yet, at that point instead of standing
6 where you were and letting the car leave, you jumped up
7 on the sill of the car and shoved your body partially
8 inside the car?
9 **A. That's correct.**
10 Q. Even though you feared that you might get
11 pinned and drug?
12 **A. Well, there's -- there's situations where**
13 **the -- other officers had occurred that I've seen videos**
14 **in training where an officer was actually drug getting**
15 **caught up on a seatbelt or the vehicle itself and drug**
16 **and caused serious bodily -- bodily injury to**
17 **themselves. So that was, you know, a fear that I had**
18 **that I would have been pinned or drug by the vehicle.**
19 Q. And in that split second as your -- all this
20 is happening, that went through your mind and you -- you
21 used your training to jump up onto the car?
22 **A. Yes. Time slows down and it seems like the**
23 **vehicle was in motion for a long period of time. So all**
24 **the training and -- and -- that we go through, it -- it**
25 **kind of kicks back in action and -- and you take action.**

1 Q. Okay. So as you were afraid of getting pinned
2 and drug, the action you took was to jump onto the car
3 as it's starting to move away, and is that when the door
4 started closing on you?
5 **A. As the vehicle started to go forward, yes, the**
6 **door is -- it closed or started to close.**
7 Q. So in fact, the -- your fear of being pinned,
8 the door was starting to pin you because of the position
9 you were in with the car?
10 **A. Repeat your question.**

11 Q. You said you were afraid of being pinned by
12 the car door, in fact, because you jumped on the sill
13 when the car -- when the door started closing, that did,
14 in fact, pin you?
15 **A. If -- if I had both feet on the ground, the**
16 **door could have pinned me and then drug me. That's why**
17 **I stepped onto the doorsill.**
18 Q. If you had simply stepped back at the point
19 before -- instead of jumping forward, what -- could you
20 have been pinned by that door?
21 **A. I could have been injured by the door, yes, I**
22 **believe so.**
23 Q. The door, you -- you believe the door would
24 swing so violently that -- around as the car started to
25 accelerate, that you would get shoved against the door

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
94

1 and drug?
2 **A. Everything happened so fast that that was a**
3 **thought.**
4 Q. Okay. So now the car is moving forward.
5 You're up on top of it. You've got one arm out, one arm
6 in with the gun. Where are you looking?
7 **A. I'm looking over the car.**
8 Q. Okay. You're -- are you looking forward to
9 see where you're going?
10 **A. I was just looking straight.**
11 Q. Looking straight?
12 **A. Just straight, yeah.**
13 Q. Did you have any visibility of Ashtian Barnes
14 at that point?
15 **A. No.**
16 Q. Did you have any idea where Ashtian Barnes was
17 in the -- in the front seat of that car?
18 **A. Yeah. He was right next to me inside the**
19 **vehicle.**
20 Q. And how --
21 **A. In the driver's seat.**
22 Q. How could you tell that?
23 **A. Because I could feel him.**
24 Q. Okay. What -- what could you feel him with?
25 **A. Well, I could feel him with, you know, my**

**Roberto Felix**

713-650-1800 swreptproduction@swreporting.com
Southwest Reporting & Video Service, Inc. Registration #189
95
1 **knee, and I could feel when my gun went to the side,**
2 **pressure against my gun and hand.**
3 Q. Okay. So you could feel his body there with
4 your knee, and you felt some kind of pressure against
5 your gun and right hand?
6 **A. Uh-huh (Affirmative.)**
7 Q. But you can't see what's causing that
8 pressure; is that correct?
9 **A. That's correct.**
10 Q. So you don't know what was happening inside
11 the vehicle at that time?
12 **A. I do not.**
13 Q. Okay. And at that point is your gun roughly
14 in the vicinity of where you imagined Ashtian Barnes'
15 head to be?
16 **A. Yes.**
17 Q. So you felt the pressure and then, as I
18 understand it, you pulled your gun hand out of the car?
19 **A. That's correct.**
20 Q. And then at some point in here you shouted
21 instructions for Ashtian Barnes; is that correct?
22 **A. That was as the vehicle was driving away.**
23 Q. And what instructions did you shout to him?
24 **A. "Fucking stop, fucking stop."**
25 Q. Did you say stop or I'll shoot?
**Roberto Felix**
713-650-1800 swreptproduction@swreporting.com
Southwest Reporting & Video Service, Inc. Registration #189
96
1 **A. No.**
2 Q. And -- and then you pushed your gun hand back
3 inside the car, correct?
4 **A. That's correct.**
5 Q. And you fired?
6 **A. When I felt the pressure on my hand and my**
7 **gun, that's when my hand came out and as I was doing**
8 **that, I was losing balance so my hand went back in**
9 **there.**
10 Q. Okay.
11 **A. At that point, you know, if I would have**
12 **discharged my weapon fully, it would have hit him in the**
13 **head. So I made the conscious decision to point**

**14 downward and shoot.**
15 Q. But you don't really know where his head was
16 at that point?
**17 A. I can assume that his head was right parallel**
**18 with me at that angle that I was holding my weapon at.**
19 Q. And for all you know, he could have been
20 leaning away from you and trying to get out of the
21 vicinity of that gun that had been pointed at his head
22 correctly, right?
**23 A. Didn't know what he was doing.**
24 Q. Okay. You didn't know?
**25 A. Didn't know what he was doing.**
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
97
1 Q. At that point with no visibility as to what
2 you were shooting at, you pulled the trigger?
**3 A. As I pointed downward, yes.**
4 Q. Okay. And then the car did not immediately
5 start slowing, continued and so you pulled the trigger
6 again?
**7 A. That's correct.**
8 Q. And at the point that you pull the trigger
9 again, what happened to the car?
**10 A. The car came to an abrupt stop.**
11 Q. Did you stop the car?
**12 A. No.**
13 Q. Who stopped the car?
**14 A. Mr. Barnes did.**
15 Q. Let's wind back up. The car's taking off, you
16 jump on board. Approximately how long is it between
17 when you're fully on top of the sill of the car and you
18 fire the first shot? Do you know?
**19 A. It must have been maybe two, three seconds,**
**20 possibly. At that moment it felt like it was longer**
**21 than that, though.**
22 Q. And how long was it between the first shot you
23 fired and the second shot you fired?
24 MS. BAKER: Objection, calls for
25 speculation. You may go ahead and answer.
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
98

1 THE WITNESS: Okay.
2 **A. After I shot the first -- shot once and didn't**
3 **feel the vehicle was stopping, it's when I shot again.**
4 **So if I had to guess, a second.**
5 Q. (BY MR. FOMBY) Okay. A second. The car
6 comes to a complete stop, as you said, and in your
7 statement, Deputy, correct me if I'm wrong, didn't you
8 say that the vehicle slowed almost to a stop before you
9 jumped off?
10 **A. I don't recall. (Witness examines document.)**
11 **This is a misstatement, yes.**
12 Q. And at that point, you stepped back out of the
13 doorway and held your service weapon on Ashtian Barnes;
14 is that correct?
15 **A. That is correct.**
16 Q. Was Ashtian Barnes alive at that point?
17 **A. Yes, he was.**
18 Q. Was Ashtian Barnes saying help me, I can't
19 breathe at that point?
20 **A. I don't know what he said.**
21 Q. Is there a policy at the Constable's Office
22 for rendering aid when an individual has been shot?
23 **A. Yes, there is.**
24 Q. Did you at any point, after you fired your
25 service weapon, provide any kind of -- of assistance to
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
99
1 Ashtian Barnes?
2 **A. I called for HFD to arrive on the scene.**
3 Q. Did you check on his wounds?
4 **A. No, I did not. The scene was not clear.**
5 Q. Approximately a minute and a half later when
6 the first deputy or police officer arrives on scene, and
7 at that point, according to a statement, he says Ashtian
8 Barnes was still alive. Is that your recollection?
9 **A. On his statement?**
10 Q. Yes.
11 **A. I've never seen his statement.**
12 Q. Was -- a minute and a half to two minutes
13 after the car stopped, was it your -- is it your
14 recollection that Ashtian Barnes was still alive?
15 **A. Yes.**
16 Q. That he was unresponsive? Would that be fair

17 to say?

18 **A. We weren't asking him anything and he wasn't**
19 **saying anything, so -- but he was still alive.**

20 Q. Was he sitting up and talking?

21 **A. No.**

22 Q. Was he shuffling papers around?

23 **A. No.**

24 Q. Was he reaching for anything?

25 **A. Not at that point, no.**

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**

100

1 Q. Was he lying on his side bleeding?

2 **A. No.**

3 Q. He was sitting up bleeding?

4 **A. He was sitting up.**

5 Q. So we see in the dash cam video, other police
6 cars arriving, one after another. How long was it
7 before anybody stopped to render aid to Ashtian Barnes?

8 **A. I'm not sure. After the third deputy arrived,**
9 **then I stepped back and moved away from the scene.**

10 Q. Okay. So why did you not immediately render
11 aid to Ashtian Barnes when the car stopped?

12 **A. Because the scene wasn't clear. I was -- he**
13 **could have gone for a weapon. And still at that point,**
14 **you know, he still, you know, you know, his eyes open**
15 **and -- so for me the scene is not clear.**

16 Q. There's a dash cam video in your car. You're
17 aware of that?

18 **A. Yes, sir.**

19 Q. And it was operating the entire time?

20 **A. Yes, sir.**

21 Q. According to the dash cam video, you were --
22 you jumped out of the car, Ashtian Barnes' car at
23 14:45:52. Does that sound about right?

24 **A. I wouldn't -- I wouldn't know to tell you on**
25 **the exact time.**

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**

101

1 Q. That would be at least according to -- and we
2 know that these clocks are not always GPS accurate?

3 **A. Right.**

4 MS. BAKER: Object to sidebar.
5 Q. (BY MR. FOMBY) So we -- we can't map the time
6 on that necessarily completely accurately, but the --
7 the time on that is relatively accurate; is that
8 correct?
9 MS. BAKER: Object to -- calls for
10 speculation, but you may answer.
11 **A. I believe so.**
12 Q. (BY MR. FOMBY) Okay. So at 14:45:52, which
13 is 2:45, almost 2:46, you -- you're out of the car
14 holding a gun on Ashtian Barnes. The first time anyone
15 mentions in the video CPR, was at 14:50:31 which is
16 approximately five minutes later. Does that sound about
17 right?
18 **A. I would have to look at the video to know what**
19 **time it was, like I said, but if that's what you say, I**
20 **mean...**
21 Q. We will look at the video and that sort of
22 thing. And --
23 **A. Right. Now CPR started before I called it out**
24 **on the radio. CPR already had a gun but I called in**
25 **ready from my position to make sure dispatch knew that,**

Roberto Felix
713-650-1800 swreptproduction@swreporting.com
Southwest Reporting & Video Service, Inc. Registration #189
102

1 **you know, CPR was -- CPR was in progress.**
2 Q. Okay. And approximately how many police
3 officers were on the -- so you -- you were -- you were
4 securing the scene. I'm looking at a photograph that
5 depicts the moment when the first officer says we need
6 to do CPR and I'm counting, not including you, at least
7 one, two, three, four, four or five officers on the
8 scene. Does it require five officers -- other than you,
9 not including you, to secure the scene before you
10 perform CPR?
11 **A. Well, we're not trained medical professionals**
12 **so what we do is we call for HFD and let the medical**
13 **professionals -- I mean if we could render aid to a**
14 **certain point with where we know what we're doing, like**
15 **CPR, then we would do CPR. But other than that, I'm not**
16 **a trained, you know, medical provider and I don't know,**
17 **you know, anything about, you know, doing first aid**
18 **on -- on a subject and I was -- I had already taken**
19 **myself out of that -- that spot.**

20 Q. Right. Now Deputy, I -- I can understand
21 that, but I'm not asking about whether or not at that
22 point you performed CPR, but with a large number of
23 officers on the scene, it took over -- it took well over
24 five minutes for anybody to attempt CPR.
25 MS. BAKER: I'm going to object to that

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**

103
1 because it's argumentative and it doesn't seem to be a
2 question.
3 Q. (BY MR. FOMBY) Is there -- leading to the
4 question, is there a reason why all those officers would
5 stand around and watch Ashtian bleeding to death instead
6 of trying to render aid?
7 MS. BAKER: Objection, calls for
8 speculation and also misstates the facts in evidence at
9 this time.
10 **A. I -- I wouldn't know how to answer that**
11 **because, like I said, I took myself out of the -- the**
12 **active scene and stepped back when the -- when the third**
13 **officer arrived. So I can't, you know, say what time or**
14 **how long it was before they started CPR. When I noticed**
15 **they were doing CPR, is when I called it over the radio.**
16 Q. (BY MR. FOMBY) Okay. Now before this officer
17 stopped -- stepped up and said we need to do CPR,
18 several other officers came up to you and asked you if
19 you were okay. Do you recall that?
20 **A. Yes.**
21 Q. And you told them that you were -- you -- you
22 had banged your knee?
23 **A. My leg hurt.**
24 Q. So they were concerned about your wellbeing,
25 but they still had not tried to render any kind of aid

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**

104
1 to Ashtian Barnes at that point?
2 **A. They were on that side of the -- the scene, so**
3 **I -- I don't know.**
4 Q. If that had been a colleague of yours in the
5 Toyota, a peace officer, who Ashtian Barnes had shot,
6 would you expect other police officers to come up and

7 inquire and ask Ashtian if he's feeling okay rather than
8 render aid to one of their fellow peace officers?
9 MS. BAKER: Objection, argumentative,
10 hypothetical.
11 **A. I don't know how to answer that. I know how I**
12 **would do I guess what I thought was reasonable to --**
13 **to -- while I could while HFD arrived.**
14 Q. (BY MR. FOMBY) And by the time the first EMS
15 person showed up, you said that you had called that in?
16 **A. Correct.**
17 Q. You called in EMS. The first EMS person
18 showed up at 14:56:12, which was a little less than
19 approximately ten minutes after Ashtian had been shot.
20 Are you aware of that?
21 **A. No.**
22 Q. And according to the EMS dispatch records, it
23 took them approximately two minutes to arrive on the
24 scene after they were notified. So when was EMS
25 notified, actually notified that there was a person --

**Roberto Felix**
**713-650-1800 sweptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
105
1 person who had been shot who was bleeding out?
2 **A. When -- after the incident the car came to a**
3 **stop, I was able to get down, I called on the radio,**
4 **"Shots fired, shots fired, get HFD en route now."**
5 Q. Okay. And yet eight minutes went by before
6 they got the message. And do you know -- have any
7 understanding of why it might have taken them eight
8 minutes to get around to showing up?
9 MS. BAKER: Object to that question as
10 directed to this officer. It calls for speculation.
11 Q. (BY MR. FOMBY) You know that particular
12 stretch of the road, Deputy. How -- and -- and the
13 traffic that day was fairly light. How long would you
14 expect knowing where the fire stations are before a
15 fire -- a fire engine to get there once they got the
16 notice?
17 **A. I wouldn't know how to answer that question.**
18 **I mean they -- they -- we don't deal with the HFD or the**
19 **Houston Fire Department part of dispatch or their --**
20 **their call center, so I wouldn't know to tell you if**
21 **they would be down the road, they would be done there**
22 **within a minute or they were at the station, they would**

23 be there -- I -- I have no idea --
24 Q. Okay.
25 A. -- as far as, you know, the exact time that it

1 would have taken them at that time of day. But within a
2 minute of -- about a minute of me requesting HFD the
3 first time, I keyed up again and said, you know,
4 "Confirming you have HFD in right -- en route" and our
5 dispatch confirmed that they were en route.
6 (Exhibit No. 33 marked.)
7 Q. (BY MR. FOMBY) Okay. And that is 33.
8 Deputy, I'm showing you what has been marked as
9 Exhibit 33. It's Bates number 77. And the officer
10 writing this was a B A Roberts. Do you know who B A
11 Roberts is?
12 A. I do not.
13 Q. In his report, the -- according to his report,
14 so if we look toward the end of this third paragraph in
15 his statement he says that: The suspect attempted to
16 flee in the vehicle and drug Deputy Felix approximately
17 twenty yards.
18 Is that an accurate statement?
19 A. Using the word "drug," no.
20 Q. In fact, at no point were you ever drug during
21 this entire incident, did you?
22 A. No, sir.
23 Q. So you had mentioned earlier that the real
24 reason why you decided to pull your duty weapon and try
25 to stop Ashtian Barnes from leaving, is that you felt

1 that he was a risk to the general public?
2 A. That is correct.
3 Q. Okay.
4 A. Along with leaving the scene, you know, in a
5 motor vehicle is a felony charge. You know, it is
6 evading, you know, so you know, not to, you know, go
7 that route, you know, that's why I drew my weapon.
8 Q. Now, according to policies of the Constable's
9 Office, when are you allowed to draw your duty weapon,

10 your service weapon and under what circumstances are you
11 allowed to draw it and point it at a person?
12 **A. Anytime I think it's reasonable, I fear -- I'm**
13 **in fear for my safety or the safety of others.**
14 Q. Now you've been trained in the policies of
15 your department, haven't you?
16 **A. Yes, sir.**
17 Q. And in fact, haven't you been trained that it
18 is in -- inappropriate to draw -- to use any form of
19 deadly force unless the individual that you're pointing
20 the gun at -- unless it's to protect themselves or
21 another person from imminent death and serious bodily
22 injury?
23 **A. That's correct.**
24 Q. And you felt that with you standing beside the
25 car, Ashtian Barnes driving away, would meet that

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
108
1 definition of protecting another person from imminent
2 death or serious bodily injury?
3 **A. Myself or others.**
4 Q. Okay. So you're standing there with a gun.
5 Was the tollway empty at that time?
6 **A. No.**
7 Q. Were there, in fact, a number of cars going
8 back and forth?
9 **A. There was traffic, yes.**
10 Q. And when you leaned forward with -- with your
11 body, with the gun, and before the car had left, did you
12 have any certainty that if you pulled the trigger, that
13 bullet would not have left the veh -- Ashtian's vehicle
14 and struck another vehicle?
15 **A. I wouldn't fire -- have fired at the vehicle**
16 **at that time unless I had direct sight of my target.**
17 Q. And is it, in fact, dangerous to fire in the
18 direction of a target when there are innocent third
19 parties that could be struck by the bullet?
20 **A. Repeat your question.**
21 Q. Isn't it, in fact, dangerous to fire a shot at
22 a -- at a target when there are innocent third parties
23 who could be struck by that bullet?
24 **A. Well, anytime you fire a weapon it's**
25 **dangerous, so whether there's an individual or not...**

Roberto Felix
713-650-1800 swreptproduction@swreporting.com
Southwest Reporting & Video Service, Inc. Registration #189
109
1 Q. That's not the question I'm asking you,
2 Deputy. I'm saying that, isn't -- aren't you trained --
3 are you trained not to discharge a weapon when there are
4 innocent third parties that could be struck by the
5 bullet?
6 **A. We're trained and we're responsible for every**
7 **bullet that leaves that -- that weapon, so if your line**
8 **of sight is not clear, you do not discharge your weapon.**
9 Q. Okay. At all. Are you trained and is it the
10 policy of the department to -- that you should not fire
11 at a moving vehicle?
12 **A. I wasn't firing at a moving vehicle. I fired**
13 **while the vehicle was in motion with me on it.**
14 Q. I'm sorry, Deputy.
15 **A. There's a difference.**
16 Q. You're in a car that is moving, and what are
17 you -- what are the policy -- why do you think the
18 policy guideline says you don't fire at a moving
19 vehicle?
20 MS. BAKER: Objection, calls for
21 speculation.
22 Q. (BY MR. FOMBY) You have been trained, you say
23 you've been trained, that this department has trained
24 you in the policy, then they should have trained you in
25 the reason for that policy. What reasons were you given

Roberto Felix
713-650-1800 swreptproduction@swreporting.com
Southwest Reporting & Video Service, Inc. Registration #189
110
1 for not firing in a moving vehicle?
2 MS. BAKER: Object to sidebar.
3 **A. When you shoot at a vehicle that's either**
4 **coming towards you or moving away from you, you know,**
5 **a -- depending on -- on the type of ammunition that you**
6 **carry, depending on the position you're in, ricochets**
7 **can happen, meaning it can bounce off the vehicle and go**
8 **in the direction that wasn't intended, you know, because**
9 **it is metal or, you know, some type of composite that**
10 **will make a -- a bullet, you know, ricochet. So that's**
11 **the reason why the policy says you don't discharge a**
12 **weapon at moving vehicles.**

13 Q. (BY MR. FOMBY) Is that the only reason?
14 **A. I -- I can assume that that's what it is.**
15 Q. Okay. How about -- is a car moving at
16 reason -- reasonable speed considered a deadly weapon, a
17 potential deadly weapon?
18 **A. If it's moving towards a person, yes.**
19 Q. Why is that?
20 **A. Because of the size of the vehicle and the --**
21 **the injury that could cause to someone, severely**
22 **injured, severely injure someone or kill them.**
23 Q. Is a car that is moving obliquely to high
24 speed traffic dangerous to the -- to that traffic?
25 **A. Yes.**

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
111
1 Q. And why is that?
2 **A. Because that you could cause, you know, injury**
3 **to someone else.**
4 Q. So isn't it true that one of the reasons why
5 you don't fire at a moving vehicle, is that if you
6 disable the driver, you cannot guarantee what that car
7 is going to do?
8 **A. That could be a part of it.**
9 Q. Because you shoot that person and that doesn't
10 necessarily stop the car, does it?
11 **A. That's correct.**
12 Q. And the policy of not shooting from a moving
13 vehicle, why is -- what is the reason for that policy?
14 **A. From a moving vehicle?**
15 Q. Correct.
16 **A. Which -- do you mind showing me the policy**
17 **you're referring to?**
18 Q. I'll -- I'll dig it out, but there is a
19 general -- generalized policy of never shooting from a
20 moving vehicle. Why is that?
21 **A. And this is a Precinct 5 policy?**
22 Q. It's a Precinct 5 policy.
23 **A. Can I see that, please?**
24 Q. Okay. I am showing you -- okay. I'm going to
25 reassemble this and show you the general policies.

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**

112
1 MR. FOMBY: Have you stamp it.
2 THE REPORTER: Exhibit 34.
3 (Exhibit No. 34 marked.)
4 Q. (BY MR. FOMBY) I want you to turn to page 48.
5 **A. (Witness complies.)**
6 Q. And there's -- paragraph 5.
7 **A. Okay.**
8 Q. So paragraph 5, does it say -- that you asked
9 me where it says in the policy you shouldn't shoot from
10 a moving vehicle.
11 **A. Right.**
12 Q. You see that?
13 **A. Uh-huh (Affirmative.)**
14 Q. Would you agree that that -- that is the
15 policy of your force?
16 **A. And this is referring to while you're**
17 **operating a motor vehicle and moving in a vehicle.**
18 Q. I'm sorry, Deputy, I don't read that. It
19 says: Do not discharge it from a moving vehicle or at a
20 fleeing vehicle.
21 It doesn't have any conditions?
22 MS. BAKER: Object to sidebar.
23 Q. (BY MR. FOMBY) So does it say do not fire
24 from a moving vehicle?
25 **A. That's correct. Do not discharge firearm from**
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
113
1 **a moving vehicle.**
2 Q. I want you to move to the page before, No. 47.
3 **A. There's no 47.**
4 Q. There should be a page before it.
5 **A. Okay. It's out of order. Okay. 47.**
6 Q. Okay. Paragraph one, what does that say?
7 **A. Wait, I'm sorry, which section?**
8 Q. Section B, Rules, paragraph 1.
9 **A. Okay. The policy stated above is the basis of**
10 **the following set of rules that have been designed to**
11 **guide deputies in cases involving the use of firearms.**
12 Q. I said paragraph number 1. They're numbered,
13 Deputy.
14 **A. Line number 1?**
15 Q. Yes, Deputy.

16 **A. Deputies shall not discharge a firearm except**
17 **to protect themselves or another person from imminent**
18 **death or serious bodily injury.**
19 Q. What does paragraph numbered 2 say?
20 **A. Deputies shall discharge their firearm only**
21 **when doing so will not endanger innocent persons.**
22 Q. How about the one numbered 3?
23 **A. Deputies shall not discharge their firearms to**
24 **threaten or subdue persons whose actions are destructive**
25 **to property or injurious to themselves but which do not**

Roberto Felix
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**

114

1 **prevent -- represent an imminent threat of death or**
2 **serious bodily injury to the deputy or others.**
3 Q. How about paragraph numbered 4?
4 **A. Deputies shall not discharge their firearms to**
5 **subdue an escaping suspect who represents no imminent**
6 **threat of death or serious bodily injury.**
7 Q. And looking at all of those, what is the
8 reasoning behind those rules?
9 **A. It's a guideline for when to use your firearm.**
10 Q. And isn't the -- the basic reasoning behind
11 those, that the use of deadly force, discharging a
12 firearm, is a last resort option?
13 MS. BAKER: I'm going to object to that
14 question as directed to this witness because this
15 witness, there's no evidence this witness prepared the
16 policies, so if you want to ask a Precinct 5 witness
17 about what the -- the basis is for the policy --
18 MR. FOMBY: I understand your objection.
19 He took a class on de-escalation of force. He's taken a
20 number of classes, as he has already pointed out, on the
21 proper use of firearms, tasers, batons and other uses of
22 force. So I'm asking him if he took a class on
23 de-escalation of force, part of that class material
24 would have reasoning for why it is that using a --
25 firing a firearm is a last option.

Roberto Felix
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**

115

1 Q. (BY MR. FOMBY) Why is that reasoning?
2 **A. Firing a firearm is not the last option.**

3 **MS. BAKER: No.**
4 **A. It's an option.**
5 MS. BAKER: It's an option.
6 Q. (BY MR. FOMBY) In this case, what is more
7 dangerous -- what is a higher level of escalation of
8 force than firing a firearm?
9 **A. The highest level is the firearm.**
10 Q. Okay. So when Ashtian Barnes was putting the
11 car in gear to leave, you -- you drew your firearm and
12 pointed it at his head; is that correct?
13 **A. That is incorrect.**
14 Q. I think you have already said that you pointed
15 it at his head?
16 **A. When --**
17 MS. BAKER: I'm going to object to that
18 because it totally misstates his testimony.
19 **A. When I first drew my weapon, my weapon was not**
20 **pointed directly at his head. It was pointed at him.**
21 Q. (BY MR. FOMBY) Okay. We have a video that
22 shows the weapon entering the back window, visibility --
23 visible back window with Ashtian's head leaning away
24 from it. Have you seen the video?
25 **A. When I was on the -- on the doorsill?**
Roberto Felix
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
116
1 Q. When you were on -- on the ground, as you were
2 stepping onto the doorsill.
3 **A. That would be incorrect.**
4 Q. Where was your gun pointed at that particular
5 point?
6 **A. As I was reaching inside the vehicle my weapon**
7 **was back like this, and as I was reaching it, I'm not**
8 **going to leave my hand extended, you know, at that**
9 **point. You -- you retract your gun, you retract your**
10 **hand and you keep it at this position until the threat**
11 **is -- is gone or threat is, you know, assessed.**
12 Q. So your testimony right now under oath is that
13 as you were reaching into the vehicle, you had your
14 firearm back in this position (Indicating)?
15 **A. As I was going into the vehicle, that's what I**
16 **recall, yes.**
17 **MR. FOMBY: Do you mind if we take a**
18 **five-minute break?**

19 **MS. BAKER: No.**
20 THE VIDEOGRAPHER: The time is 1:32 p.m.,
21 we're off the record.
22 (Off the record.)
23 THE VIDEOGRAPHER: The time is
24 approximately 1:43 p.m., we're on the record.
25 Q. (BY MR. FOMBY) Deputy, previously we talked

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
117

1 about the whole issue of escalation of force, or
2 de-escalation of force, correct?
3 **A. Okay.**
4 Q. What -- and you took a class in 2018 on
5 de-escalation of force; is that correct?
6 **A. That's correct.**
7 Q. And in that class, why were you told
8 de-escalation of force was important?
9 **A. In certain situations you can use different**
10 **tactics to de-escalate the situation, either by, you**
11 **know, talking to someone or by, you know, to make sure**
12 **that they kind of -- to make sure that they, you know,**
13 **can calm down and bring the situation back to a level**
14 **where you can, you know, address the situation at hand.**
15 Q. Okay. And in that class, were you taught that
16 de-escalation of force is an important tool to prevent
17 situations from going out of control?
18 **A. That's correct.**
19 Q. Okay. And as part of that, you -- I think the
20 class was techniques. So you were taught different
21 techniques for de-escalating a situation, correct?
22 **A. Different techniques were taught, yes.**
23 Q. In that -- all right. You were also taught
24 the escalation levels of how and when it is appropriate
25 to go from one level of force or -- or authority to

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
118

1 another level of force or authority. Is that fair to
2 say?
3 **A. Well, ideally, you know, yeah, if you can**
4 **follow the -- the levels, it would be, you know, a**
5 **perfect world. You know, this is not a perfect world,**

6 **so you can be speaking, you know, with someone one time**
7 **at the moment and have to use deadly force in the next,**
8 **or you could be talking to them and you go hands on.**
9 **So in a perfect world, you know, you could**
10 **use, you know, these low levels of -- of force, but, you**
11 **know, sometimes you can't. Sometimes you just have to,**
12 **you know, transition to a higher level of force.**
13 Q. Okay. A classic example where you might want
14 to de-escalate would be, say, a boyfriend and girlfriend
15 situation where they've got an argument going on. Would
16 that be a good example?
17 **A. Okay.**
18 Q. And where you want to separate the two of them
19 and calm them down, to calm down the situation. Is that
20 one of the techniques they taught you?
21 **A. Correct.**
22 Q. Or when we have someone who has mental illness
23 and you need to deal with their mental illness and calm
24 them down so that they don't spin out of control, would
25 that be another good example?

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
119
1 **A. Yes.**
2 Q. Now, but as you said, sometimes you can't --
3 the situation doesn't merit or doesn't work with -- you
4 can't de-escalate it. So certain circumstances you have
5 to use escalating levels of force and authority; is that
6 true?
7 **A. That's correct.**
8 Q. And one of the first levels would be simply
9 your presence on the scene. Would that be fair?
10 **A. Yes.**
11 Q. That a police officer or deputy constable by
12 the fact that they're there and have a uniform, that
13 usually warns people and gets them calmed down; is that
14 correct?
15 **A. Correct.**
16 Q. The second method might be using your
17 authoritative voice in orders, right?
18 **A. Uh-huh (Affirmative.) Yes.**
19 Q. So in this case telling someone stop shuffling
20 around, that would be a way of trying to control them
21 without having to use further levels of force?

22 **A. Correct.**
23 Q. Now, we've also talked about other tools that
24 you've been taught as part of that escalation,
25 de-escalation problem. You've been taught how to use a

1 baton; is that right?
2 **A. Correct.**
3 Q. You've been taught how to use a taser?
4 **A. Correct.**
5 Q. I'm sure that there are other similar tools
6 and skill sets that they've given you in these classes
7 so that you don't have to get to the lethal weapon
8 category. Is that -- is that fair?
9 MS. BAKER: Objection, vague.
10 **A. It -- there's situations where, you know, like**
11 **I said, ideally in a perfect world, you know, level of**
12 **escalation, but you know, real world is from one second**
13 **to another, it's, you know, it could be zero to a**
14 **hundred. You know, where you having to transition from**
15 **just presence to, you know, displaying a firearm or --**
16 **or...**
17 Q. (BY MR. FOMBY) And displaying a firearm by
18 itself is a level, is an escalation level to warn people
19 of imminent danger; is that right?
20 **A. That's correct.**
21 Q. Okay. So -- and -- and I understand what
22 you're saying, that you don't have to walk through the
23 steps, right?
24 **A. Correct.**
25 Q. Is that what you're saying?

1 **A. That's correct.**
2 Q. That you can go from step three to step ten if
3 you have to under the circumstances. Is that what
4 you're saying?
5 **A. That is correct.**
6 Q. But in this situation, when your command
7 arguments were not working, did you attempt to use your
8 baton?

9 **A. No.**
10 Q. Did you attempt to use your taser?
11 **A. If I recall I don't think tasers were issued**
12 **yet.**
13 Q. Okay.
14 **A. I don't recall, but...**
15 Q. But you've been trained on tasers for several
16 years?
17 **A. That's correct. The -- the -- just the way**
18 **the situation escalated and rapidly evolved, there was**
19 **no time -- there wasn't time to deploy those level of**
20 **force.**
21 Q. I noticed that your taser is mounted so that
22 your right hand can naturally fall on it and pull it
23 straight out; is that correct? Is that how it's
24 intended?
25 **A. No. No, there's a -- there's a locking**

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
122
1 **mechanism and you have to rock back and then up in order**
2 **to --**
3 Q. Okay.
4 **A. -- to deploy it.**
5 Q. Is there a locking mechanism on your firearm
6 to keep it from falling out?
7 **A. Yes, there is.**
8 Q. And your firearm is actually located where you
9 have to actually bend your elbow back to reach to it?
10 **A. Correct.**
11 Q. And in this particular instance when you were
12 concerned that Ashtian Barnes might leave, you did not
13 pull your taser; is that correct?
14 **A. I don't recall if we were issued tasers at**
15 **that point yet.**
16 Q. But no taser was pulled at that time?
17 **A. That's correct.**
18 Q. Let's return to the moment where you decided
19 to fire your weapon. You said that you had no
20 visibility as to what you were actually firing at; is
21 that correct?
22 **A. That's correct.**
23 Q. You thought you might be firing it into his
24 body, Ashtian Barnes' body?

25 **A. I did.**
Roberto Felix
713-650-1800 swreptproduction@swreporting.com
Southwest Reporting & Video Service, Inc. Registration #189
123
1 Q. But you -- you had no way of being sure?
2 **A. That's correct.**
3 Q. What would have happened if you had missed
4 Ashtian and the bullet ricocheted out into the tollway?
5 Would that put other people at danger?
6 MS. BAKER: Objection, irrelevant, calls
7 for speculation.
8 Q. (BY MR. FOMBY) Earlier you -- you said that
9 one of the reasons -- the primary reason you don't fire
10 at moving vehicles is a risk of ricochet. So in this
11 case, if it had ricocheted, would -- would that have put
12 people at risk?
13 **A. The -- the way that I positioned the weapon,**
14 **there wasn't a chance for ricochet because it was a**
15 **straight downward motion, so anything that would have**
16 **been fired in that vehicle would have stayed in that**
17 **vehicle in a downward motion.**
18 Q. All right. When you -- when you shoot an
19 individual who's operating a car at a reasonable rate of
20 speed, what happens if you disable that person while
21 they're driving the car?
22 **A. At that point you would have to take, you**
23 **know, different measures to make sure you get, you know,**
24 **control of that vehicle, reaching for the emergency**
25 **brake, pressing the emergency brake, steering the**
Roberto Felix
713-650-1800 swreptproduction@swreporting.com
Southwest Reporting & Video Service, Inc. Registration #189
124
1 **vehicle until the -- the -- you know, you can bring it**
2 **to a safe stop.**
3 Q. I see. So your training is that you can,
4 sitting on the sill of the car with one arm out and the
5 other hand holding a gun, you can somehow, as the car
6 veers off into the tollway, jump down in there on top of
7 his body and push a foot out and hopefully -- where is,
8 by the way, the emergency brake on a Toyota Corolla?
9 MS. BAKER: Objection, argumentative.
10 Was the question where is the emergency brake on -- on a
11 Toyota Corolla?

12 MR. FOMBY: No, I would just -- just a
13 pause.
14 Q. (BY MR. FOMBY) Where is the emergency brake
15 on a Toyota Corolla?
16 **A. Most brakes are located in the bottom left of**
17 **the driver side area.**
18 Q. Most -- most brakes?
19 **A. Most brakes.**
20 Q. Do you know where -- where the brake was?
21 **A. I do not.**
22 Q. So what you're telling me is that if you had
23 immobilized Ashtian Barnes in the car had swerved under
24 condition, you actually did not have a plan for how to
25 stop the car from hitting everybody else?

1 **A. At that moment that wasn't an issue. Once the**
2 **vehicle came to a stop, I was able to -- to get off the**
3 **vehicle and ordered him to put the car in park.**
4 Q. As you said that you -- once you shoot
5 someone, if that person is immobilized and can no
6 longer -- is no longer driving the car, you said that
7 your job then is to get into the car somehow and figure
8 out a way to put the emergency brake on and -- and bring
9 it to a stop?
10 **A. Well, you said what would I do and that would**
11 **be my next -- be my next form of action, is to try to**
12 **get that car to stop.**
13 Q. So that's your plan of action after you shot
14 him, that if this thing veer -- his car veered into that
15 tollway traffic, that you were going to somehow pull a
16 Rambo move and get down into the car and bring it to a
17 stop?
18 MS. BAKER: I'm going to object to the
19 argumentative nature of that question, and also to vague
20 because I'm not clear what a Rambo move is.
21 MR. FOMBY: A Rambo is a character from
22 the movies.
23 MS. BAKER: You don't need to tell me.
24 Yes, sir, I know.
25 MR. FOMBY: You were not clear on it, so

**Southwest Reporting & Video Service, Inc. Registration #189**
126
1 I need -- you need --
2 MS. BAKER: Okay.
3 MR. FOMBY: -- you obviously need to be
4 educated about one of the most popular movies in the
5 history of filmdom.
6 MS. BAKER: Oh, yeah, no, I know who
7 Rambo is, I just don't know which specific scene or move
8 you are referring to.
9 Q. (BY MR. FOMBY) So that -- that -- you
10 formulated this plan that if you shot him and
11 immobilized him, you were somehow going to get control
12 of this vehicle?
13 **A. My -- my actions were based on what was**
14 **happening at that time. So I can speculate, I can, you**
15 **know, say that I would have done this or I could have**
16 **done that, but at that time when, you know, I discharged**
17 **my weapon, the vehicle did come to a stop and I was able**
18 **to at that point get out -- get off the vehicle.**
19 Q. When you fired the second time into Ashtian
20 Barnes, he brought the car to a stop?
21 **A. That's correct.**
22 Q. But what I'm saying is, what if he had been
23 immobilized, because you're traveling at high speed next
24 to a bunch of cars. Did you actually have a plan when
25 you pulled that trigger to not put all of those people
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
127
1 on that tollway at grave risk of death or injury?
2 MS. BAKER: Object to argumentative
3 nature, also asked and answered.
4 **A. That -- the vehicle at that point had began to**
5 **take off and that's why the -- the shots were made**
6 **there. If he would have gone to a higher speed, it**
7 **would have been a different situation. I could have**
8 **definitely been, you know, seriously injured or killed**
9 **at that point, you know, by any of, you know, his**
10 **further actions that, you know, he -- he intended on by**
11 **driving away from -- from the scene with me hanging onto**
12 **a vehicle.**
13 Q. (BY MR. FOMBY) You stated before that you
14 felt that you were at risk because you were being pinned

15 and you didn't know what was going to happen. If simply
16 being pinned to the car is a dangerous situation, how
17 does taking -- being in a car that's veering out of
18 control into a tollway put you in a better condition for
19 being able to get inside that car and change what's
20 happening?
21 **A. We can I guess sit here and assume all day**
22 **long and sit on something that, you know, could have**
23 **happened that didn't happen, you know. I could have,**
24 **you know, stepped on the emergency brake or at that**
25 **point when there was no, you know, pressure or force**
Roberto Felix
713-650-1800 swreptproduction@swreporting.com
Southwest Reporting & Video Service, Inc. Registration #189
128
1 **coming towards me from inside the vehicle, you know, to**
2 **attempt to get in the vehicle to steer the vehicle or,**
3 **you know, whatever needed to be done to get that vehicle**
4 **to stop. But like I said, that didn't happen so we**
5 **can -- I can just assume what could have or I would have**
6 **done at that point.**
7 Q. Isn't that, Deputy, why we have policies, so
8 that people don't have to at that moment make crit --
9 split-second decisions about what they're going to do?
10 MS. BAKER: Object to the argumentative
11 nature of that question, and also this is not a person
12 who makes policy -- who makes policies. If you know, if
13 you can answer it, you can.
14 **A. I don't know. I mean the policies are set for**
15 **a reason, you know. At no time did I violate a Precinct**
16 **5 policy, you know, by attempting to -- fleeing -- you**
17 **know, this fleeing person.**
18 Q. (BY MR. FOMBY) There's a policy that says
19 thou shalt not fire at a moving vehicle. Did you fire
20 at a moving vehicle?
21 **A. Okay. That -- that -- that question there**
22 **is -- I fired while being on a vehicle and the vehicle**
23 **was moving in a -- in a direction where it didn't put**
24 **anyone else in harm 's way, you know, shooting the**
25 **weapon in a direction where it would have struck someone**
Roberto Felix
713-650-1800 swreptproduction@swreporting.com
Southwest Reporting & Video Service, Inc. Registration #189
129
1 **else.**

2 Q. You're saying that shooting the driver of the
3 car while it's op -- operating at a high speed, does not
4 put anyone in harm's way?
5 MS. BAKER: Objection, misstates his
6 testimony.
7 **A. I'm not sure what the speed was, but it was**
8 **something that, you know, that shooting at Mr. Barnes**
9 **for him to stop the vehicle is -- was the intended, you**
10 **know, part was to stop the threat.**
11 Q. (BY MR. FOMBY) One of the methods of -- one
12 of the levels of escalation is to issue a verbal
13 warning. I believe in the policies it suggests that one
14 of the things you do before you fire is to give a
15 warning before you fire. Did you warn him stop or I'll
16 shoot?
17 **A. There is no policy that says that you have to**
18 **give a warning to an individual before you fire a**
19 **weapon.**
20 Q. Did -- did you warn him stop or I'll shoot?
21 **A. I never warned him that I would shoot.**
22 Q. Okay. Now, the reason -- we have these
23 policies and we have some policies that we've talked
24 with handguns there are other policies that are out
25 there.
**Roberto Felix**
**713-650-1800 sweptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
130
1 MR. FOMBY: I'm going to hand this to
2 you.
3 (Exhibit No. 35 marked.)
4 Q. (BY MR. FOMBY) This is Exhibit 35 and these
5 are reprimand records from the Constable Precinct 5's
6 Office. Who's being reprimanded in these records?
7 **A. That's myself.**
8 Q. Okay. And in this case, May 18, 2005, the --
9 the first page here, which is Bates numbered 1729, it
10 said that -- what was it that you failed to do?
11 **A. Complete time sheets.**
12 Q. Okay. And what was the -- what was the
13 penalty for your failure to complete your time sheets?
14 **A. It says one-day suspension.**
15 Q. And in that paragraph that says one-day
16 suspension, what does that second paragraph say?
17 **A. The investigation revealed that you were**

18 **negligent in failing to complete several time sheets.**
19 **You have had ample time to conform to the requirement in**
20 **completing a time sheet.**
21 Q. Actually I told you -- I referred to the -- to
22 where you said there was a one-day suspension. What's
23 the second sentence in that paragraph?
24 **A. Any further such behavior will result in much**
25 **more severe disciplinary action, up to and including**

1 **termination.**
2 Q. So as I understand this, the improper
3 completion of time sheets led to a one-day suspension
4 and the threat of possible termination in the future
5 if -- if you're -- if you didn't correct your behavior;
6 is that correct?
7 **A. That -- that's standard for any disciplinary**
8 **actions.**
9 Q. Is that a yes?
10 **A. Yes.**
11 Q. Okay. On the next page, Bates number 1730,
12 dated August 8, 2006, who was this reprimand directed
13 toward?
14 **A. Myself.**
15 Q. Okay. And what is it that the reprimand says
16 that you failed to do?
17 **A. I didn't utilize my microphone as required,**
18 **according to policy and procedures for the mobile vision**
19 **in car video system dated May 3rd, 2004.**
20 Q. And in the third paragraph there, what was the
21 reprimand? What was the punishment for failing to do
22 so?
23 **A. One-day suspension.**
24 Q. Okay. And was there -- what's that second
25 paragraph? Is there a further warning?

1 **A. During the suspension you're not permitted to**
2 **represent yourself as a peace officer. Furthermore,**
3 **extra employment during suspension is disallowed.**
4 Q. And again it says: Any further such behavior

5 will result in more severe disciplinary action, up to
6 and including termination.
7 Is that correct?
8 **A. That's correct.**
9 Q. Okay. Let's turn to the next page, Bates
10 stamped 1731.
11 **A. (Witness complies.)**
12 Q. And who is this directed toward?
13 **A. Myself.**
14 Q. Okay. It's dated January 11th, 2008. And why
15 were you being reprimanded here?
16 **A. For loss of equipment.**
17 Q. And what was the punishment for this mistake?
18 **A. One-day suspension.**
19 Q. And again, they warned you that any further
20 such behavior could lead to termination?
21 **A. Correct.**
22 Q. Bates stamp 1732 references a violation of
23 S.O.P. 100-2.09. What was this incident about?
24 **A. It was showing myself out on a -- on a call**
25 **before arriving.**

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**

133
1 Q. Okay.
2 **A. As I was turning the corner.**
3 Q. So what is that exactly? You didn't arrive
4 but you -- you wrote up that you had arrived?
5 **A. No. We have an arrive button on our -- on our**
6 **computer.**
7 Q. Uh-huh (Affirmative.)
8 **A. On our old system. So as I was turning the**
9 **corner to clear myself out, I hit the arrive button and**
10 **then I cleared it but stayed on scene talking to the --**
11 **to the resident.**
12 Q. And for this you received a temporary
13 suspension for two days; is that correct?
14 **A. That's correct.**
15 Q. And you were advised that you could not take
16 any kind of police action or carry or wear any
17 departmental-issued equipment?
18 **A. That's correct.**
19 Q. During this period?
20 **A. That's correct.**

21 Q. And again: Any further such behavior will
22 result in more severe disciplinary action, up to and
23 including termination.
24 Is that correct?
25 **A. That's correct.**

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
134

1 Q. So we have here some situations where you
2 filled out a time -- timecard wrong, you forgot to turn
3 on the microphone, you misplaced your radar and you
4 pushed a button too early. In each of these cases you
5 got written up and you received at least a one-day
6 suspension; is that correct?
7 **A. That's correct.**
8 Q. In this particular instance that we're talking
9 about, the shooting of Ashtian Barnes, did anyone talk
10 to you about your decision-making regarding pulling your
11 hand -- your service weapon to keep him from leaving?
12 **A. No.**
13 MS. BAKER: Do you mean anyone at
14 Precinct 5 or are you talking about during the
15 investigation?
16 Q. (BY MR. FOMBY) Anyone at Precinct 5?
17 **A. No.**
18 Q. Did anyone in the DA's office specifically
19 talk to you about your decision-making about why you did
20 that?
21 **A. During the investigation, you know, just the**
22 **actions leading up to the incident.**
23 Q. Did you have any further training regarding
24 that particular -- how to handle that particular
25 situation in the future?

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
135

1 **A. No.**
2 Q. Did -- were you at all reprimanded for pulling
3 your -- your service revolver to keep someone from
4 leaving the scene?
5 **A. No.**
6 Q. Same question with jumping on board a moving
7 vehicle. Did anyone, Precinct 5 or Harris County in

8 your chain of command, talk to you about whether that
9 was appropriate?
10 **A. No.**
11 Q. And did you ever receive any training after
12 the fact about how to handle that situation in the
13 future?
14 **A. We've -- the department has had training**
15 **involving high-risk stops, but nothing specific to that**
16 **incident.**
17 Q. Okay. The decision to fire your bullet, fire
18 your gun at the driver of a car on the tollway, did --
19 did anyone in your chain of command, anyone at the
20 Constable's Office speak to you about that decision
21 and -- and discuss whether that was a good idea?
22 **A. No.**
23 Q. And no -- no additional training on how to
24 handle that situation?
25 **A. No.**
Roberto Felix
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
136
1 Q. The decision to hold a gun on Ashtian Barnes
2 as he was bleeding out and asking for help, without
3 providing help, did anyone talk to you from the
4 Constable's Office, your chain of command, talk to you
5 about what your thinking was and whether that was
6 appropriate?
7 MS. BAKER: Objection, mischaracterizes
8 his testimony, but you may answer.
9 **A. That was never discussed because I did ask for**
10 **medical attention for Mr. Barnes right after the**
11 **shooting occurred and again about a minute later**
12 **confirmed that HFD was en route.**
13 Q. (BY MR. FOMBY) So to summarize, after this
14 incident did you receive any kind of specialized
15 training regarding what happened during this event?
16 **A. No.**
17 Q. Did you receive any kind of counseling
18 regarding this event?
19 **A. Yes.**
20 Q. Okay. Psychological counseling?
21 **A. It was a counseling dealing with the incident**
22 **itself.**
23 Q. Okay. And what was the nature of that

24 counseling? And you don't have to go into anything
25 personal but --

1 MS. BAKER: Yeah, we're getting pretty
2 close.
3 Q. (BY MR. FOMBY) Is it about your -- your
4 feelings or about preparing you for future situations?
5 **A. It's just -- we talked about the incident and**
6 **just the way that things were I guess related to work**
7 **and just personal stuff.**
8 Q. Okay. After the shooting which occurred on
9 the afternoon of April 28th, 2016, when were you
10 released to return -- I -- I assume that there was a
11 temporary -- you were put on temporary leave; is that
12 correct?
13 **A. No, that's incorrect. I was never on leave.**
14 **I was offered a desk position for however amount of**
15 **time -- amount of time that, you know, I needed.**
16 Q. And did you take that offer?
17 **A. I did.**
18 Q. And how long were you on the desk position?
19 **A. About two weeks.**
20 Q. Okay. And was that a mandatory offer or was
21 that an offer to help you with the situation?
22 **A. Well, the initial -- it would be three days is**
23 **mandatory from -- there's actually no policy, but three**
24 **days that they tell you to, you know, kind of I guess**
25 **for investigation purposes make sure that whatever they**

1 **need to do on their end, but normally it's three days**
2 **after a shooting.**
3 Q. Okay. Three days to be on desk duty?
4 **A. Right.**
5 Q. Okay.
6 **A. Desk duty or be off.**
7 Q. At this point we received a video from Harris
8 County that was the dash cam of your -- of your squad
9 car.
10 **A. Okay.**

11 Q. And I have some close-ups of this but I first
12 want to run through this. Have you seen this video at
13 all before?
**14 A. Yes.**
15 Q. Have you seen it recently?
**16 A. Yes.**
17 Q. Okay. So I want to kind of walk through here
18 and see this as -- without stopping it all the way
19 through.
**20 A. Right.**
21 Q. Because I think it helps us to put this in
22 context instead of chopping it up.
23 MS. BAKER: Let me ask you this before we
24 get started with that. Are you intending on attaching
25 it as an exhibit? I know you have the separate

1 pictures, but he's viewing it, so it seems like we
2 should also attach it.
3 MR. FOMBY: Well, we could do that. It's
4 a demonstrative at this point because I want to focus in
5 on this. I just wanted him to get the overview as
6 demonstrative to get his -- and we're not going to focus
7 in -- really on the video.
8 MS. BAKER: You know, I've done several
9 cases like this, and normally we go ahead and attach the
10 video because the witness is looking at it.
11 MR. FOMBY: Okay. Well, I don't have a
12 physical copy of the video at the moment.
13 MS. BAKER: If we get you a physical
14 copy, can we attach it?
15 THE REPORTER: Sure. If it's agreeable.
16 MS. BAKER: Okay.
17 MR. FOMBY: Okay. And why don't we call
18 that physical copy, I can send that to you by --
19 THE REPORTER: E-mail.
20 MR. FOMBY: E-mail. And we'll call it
21 Exhibit 36.
22 MS. BAKER: Perfect. Thank you.
23 (Exhibit No. 36 marked.)
24 Q. (BY MR. FOMBY) So at the moment --
**25 A. I can't see that. There's too much glare.**

713-650-1800 swreptproduction@swreporting.com
Southwest Reporting & Video Service, Inc. Registration #189

140

1 Q. Okay. I don't want to move in on you too
2 much, but let's see where it is. Okay. I'm just going
3 to be -- okay. We can just see a little bit closer.
4 Okay. Now, to set the scene, this is April 28, 2016.
5 The time on the dash cam is 14:42:46, and I believe when
6 this starts the audio is not on.
7 **A. That's correct.**
8 Q. What -- what causes the audio to come on in
9 this situation?
10 **A. The audio is -- or the video is recorded, I'm**
11 **not sure if it's 30 seconds or a minute prior to the**
12 **lights turning on, so it's a continuous recording as far**
13 **as when I hit my lights it goes back 30 seconds or a**
14 **minute and then it starts recording, and audio will come**
15 **on as the lights are -- are turned on.**
16 Q. Okay. And what -- what would turn the -- the
17 video off at some point?
18 **A. The videos can be turned off by either memory**
19 **running out or me physically turning it off.**
20 Q. Okay. How about the audio? Can the audio be
21 turned off separately?
22 **A. The inner -- the inner audio will run as the**
23 **video's -- the camera's running. The external mic will**
24 **run and can be turned off manually as well from a**
25 **control box that we carry.**

Roberto Felix
713-650-1800 swreptproduction@swreporting.com
Southwest Reporting & Video Service, Inc. Registration #189

141

1 Q. Okay. And does everyone -- do the other
2 deputies and police officers have a control box that
3 could turn this particular mic off?
4 **A. No.**
5 Q. It's just you?
6 **A. That's correct.**
7 Q. Okay. As I said, I'm going to run this up
8 until the point after the car stops because -- and then
9 we can go back and take a look at some -- at some
10 moments in time.
11 (Video playing.)
12 (Video stops.)
13 Q. (BY MR. FOMBY) And that would be Ashtian's

14 car, correct?
15 **A. That's correct.**
16 **MR. FOMBY: Is the audio on? There it**
17 **is.**
18 **(Video playing.)**
19 **(Video stops.)**
20 Q. (BY MR. FOMBY) Okay. And that's the same
21 video that you watched before, right?
22 **A. That's correct.**
23 Q. And there's more that goes on here with
24 officers showing up. I think at some point 26 officers,
25 police officers or constables or deputy constables were

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
142

1 on the scene, but...
2 MS. BAKER: Object to sidebar.
3 Q. (BY MR. FOMBY) So we're not going to go all
4 the way into that, but I -- I just want to come back
5 here and look again at what was going on in those few
6 seconds, okay?
7 Okay. So now we're at the 150 mark into the
8 video, and I think everything starts happening at 2:57,
9 but --
10 (Video playing.)
11 (Video stops.)
12 Q. (BY MR. FOMBY) Okay. At this point I
13 don't -- what he's -- what you guys are talking about is
14 he tells you it's a rental car and you asked who rented
15 the car, when did you rent it, he says about a week ago,
16 right, and it's in his girlfriend's name, so you're
17 having that conversation.
18 **A. (Nods affirmatively.)**
19 MS. BAKER: Object to sidebar.
20 (Video playing.)
21 (Video stops.)
22 Q. (BY MR. FOMBY) Okay. I wanted to know, at
23 this point, up until this point, the blinker has been
24 going. You notice that?
25 **A. Okay.**

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
143

1 MS. BAKER: I guess there's a question?
2 MR. FOMBY: Yes. That's the question.
3 Q. (BY MR. FOMBY) Did you notice the blinker has
4 been moving?
5 **A. Yes.**
6 Q. Okay. So I don't drive that car but something
7 just changed and the blinker is no longer blinking at
8 this particular moment, correct?
9 **A. Right.**
10 Q. And this is at approximately the time that you
11 said that you saw him turn the car off and put the key
12 down, approximately the time?
13 **A. Yeah.**
14 Q. And all this happens in a few seconds. I'm
15 just trying to get us into the context of what's
16 happening.
17 MS. BAKER: I -- I'm not trying to tell
18 you how to take a deposition, truly not. You're
19 obviously very talented, but we generally proceed by
20 question and answer, so I think he needs --
21 MR. FOMBY: I've asked a question. I
22 said that this has happened, is that your perception.
23 MS. BAKER: Okay.
24 MR. FOMBY: I'm asking him a question
25 whether he agrees with me.

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**

144

1 MS. BAKER: As long as you ask a question
2 he understands. We don't even need to be oriented
3 because he was there.
4 MR. FOMBY: Actually I think he will need
5 to be oriented and we will get to that very quickly
6 here.
7 (Video playing.)
8 (Video stops.)
9 Q. (BY MR. FOMBY) Okay. So at this point the
10 trunk has been popped, right?
11 **A. That's correct.**
12 Q. And it's opened up and we notice the distance
13 between the cars, so the cars are still the same
14 distance apart, they haven't moved, correct?
15 **A. Correct.**
16 **(Video playing.)**

17 **(Video stops.)**
18 Q. (BY MR. FOMBY) Okay. Now something has
19 happened. We see the blinkers, see -- did you notice
20 the blinkers came back on?
21 **A. Uh-huh (Affirmative.)**
22 Q. Okay. Something going's on in the car that's
23 changed, and you have moved toward the car; is that
24 correct?
25 **A. That's correct.**

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
145
1 Q. Okay.
2 (Video playing.)
3 (Video stops.)
4 Q. (BY MR. FOMBY) Okay. What were -- what was
5 it you said at that particular point?
6 MS. BAKER: Objection, vague.
7 Q. (BY MR. FOMBY) Do you want me to play it
8 again for you?
9 (Video playing.)
10 (Video stops.)
11 Q. (BY MR. FOMBY) Okay. Did you hear it that
12 time?
13 **A. I heard it.**
14 Q. Okay. So it wasn't, you know, stop or I'll
15 shoot, right?
16 **A. Right.**
17 Q. It wasn't stop, right?
18 **A. Right.**
19 Q. It was "don't fucking move, don't fucking
20 move"; is that correct?
21 **A. That's correct.**
22 Q. And then you fired your weapon?
23 **A. Correct.**
24 Q. And then almost immediately afterwards you
25 fired it again; is that fair?

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
146
1 **A. Correct.**
2 Q. Okay. And then the car stopped. And as we

3 can see, and I have a photograph of that, that will show
4 it, the light -- brake light remains on which means
5 Ashtian's foot would be on the brake, correct?
6 **A. Correct.**
7 Q. You did not at this point make a move to get
8 inside the car to put it out of gear, did you?
9 **A. No, I did not.**
10 Q. Do you know where -- whether the car was
11 placed in park before the other officers arrived?
12 **A. When I instructed him to do so.**
13 Q. Okay. So the car at this point and until the
14 next officers arrive, is in gear but Ashtian's holding
15 down the brake pedal?
16 **A. When I instructed him to put the car in park**
17 **he put the car in park.**
18 Q. Who was that, Ashtian?
19 **A. Ashtian.**
20 Q. So after he was shot and he was lying there,
21 you said put it in park and Ashtian put it in park?
22 **A. Well, he wasn't -- I mean he was sitting there**
23 **and he was still conscious and able to -- to move and do**
24 **everything else and when I said put the car in park,**
25 **that's when he put the car in park.**

Roberto Felix
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
147
1 Q. So Ashtian at that point was conscious of
2 the -- of the fact that he needed to make the situation
3 safe?
4 **A. He was -- he was --**
5 Q. Put the car in park?
6 MS. BAKER: Objection, calls for
7 speculation.
8 **A. He was doing what he was instructed to -- or**
9 **ordered to do.**
10 **(Video playing.)**
11 **(Video stops.)**
12 Q. (BY MR. FOMBY) It's not easy to hear on this
13 computer as -- the sound of Ashtian, but our recording
14 showed him talking to you at that point. Do you
15 remember him ever talking to you?
16 **A. He mumbled something or said something.**
17 Q. Okay.
18 **A. I was concerned about getting him medical**

19 **attention. That's, you know, me talking over the radio.**
20 **MR. FOMBY: And we will get you this**
21 **video.**
22 THE REPORTER: Yes.
23 MR. FOMBY: Actually, we can probably --
24 we can give to you right now, but okay.
25 THE VIDEOGRAPHER: Don't forget your mic.

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
148

1 Q. (BY MR. FOMBY) Now Deputy, let's go through
2 this, I was able to use Microsoft's standard program to
3 run the video and have it take the little snapshots of
4 every frame, okay? And we just saw the video and we can
5 go back to it if we need to, but before we get into
6 this, I wanted to ask again, I don't know if it got it
7 on the audio from me because I was standing over there,
8 that these statements that you made to Ashtian Barnes
9 was not don't do it or fucking stop, but in fact, was
10 don't fucking move, you repeated twice.
11 MS. BAKER: Objection, asked and answered
12 several times.
13 MR. FOMBY: Actually he never said that
14 except when I was up here and I wanted to make sure that
15 it's on the record because I don't have the -- the mic
16 on me.
17 Q. (BY MR. FOMBY) But is that an accurate
18 statement?
19 **A. That would be.**
20 Q. Okay. Now I have these -- these stills that
21 are marked Exhibit 1 through 29. I'm going to walk
22 through them slowly. I have a copy. They're all
23 identical. And these we just saw, the first two of
24 these are actually just the moment when you pulled in
25 behind him at 14:43:32.

**Roberto Felix**
**713-650-1800 swreporting@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
149

1 The second one is the moment where he finally
2 stopped, and that would be doing the math, some 14
3 seconds later, correct?
4 **A. Yes.**
5 Q. Now, I'm going to jump forward to 14:45:47,

6 which is approximately two minutes. And we saw that you
7 had stepped up and you were asking him some questions,
8 and going back and forth and we saw you telling him not
9 to shuffle around. By this point, you had opened the
10 door. And the blinker was on on his car; is that
11 correct?
12 **A. That's correct.**
13 Q. Also at this point you're standing away from
14 the car, it's very hard to tell the distance but your
15 body is -- the door is open almost fully and your body
16 is halfway or more than halfway toward the outside of
17 the car door; is that correct?
18 **A. Correct.**
19 Q. Okay. This one is only important because I
20 wanted you to notice that the blinker is blinking. So
21 you see the change, the blinker -- you can see the cars
22 going on the other side of the road to notice the time
23 is changing, but we're talking about seconds and
24 fractions of seconds, correct?
25 MS. BAKER: Mr. Fomby, I understood you

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
150

1 to say the blinker is blinking on the one 14:45:47 but
2 it looks like it's off to me. Did you mean to say off?
3 MR. FOMBY: It is blinking because the --
4 it's going on off on off which is blinking. It's not
5 on, it is blinking.
6 MS. BAKER: So you're asking the witness
7 to assume that the -- I mean it's not evident to me that
8 it's blinking. So you're asking the witness to assume
9 that?
10 MR. FOMBY: I think that we can look at
11 this and see that within a fraction of a second the
12 light comes on and off and on and off only on the
13 driver's side rear turn indicator.
14 MS. BAKER: Okay. So I'm going to object
15 to that as assuming facts not in evidence. Please
16 continue.
17 Q. (BY MR. FOMBY) And again, at this point I'm
18 putting a little bit more out than necessary, but I just
19 want to show that these fractions of a moment as these
20 cars are coming by, okay?
21 You are still standing there talking to him in

22 the same position you were in before; is that correct?
23 MS. BAKER: You're referring to Exhibit 6
24 for clarity of the record?
25 MR. FOMBY: On Exhibit 6.

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
151
1 **A. That's correct.**
2 Q. (BY MR. FOMBY) Okay. And between Exhibit 5
3 and Exhibit 6, the relative positions of cars have not
4 changed; is that correct?
5 **A. That's correct.**
6 Q. We have Exhibit 7. And Exhibit 7, and I want
7 you to compare that to Exhibit 6. The brake lights have
8 come on the car, and your foot position has changed
9 from Exhibit 6, has it not?
10 **A. Yes, or my stance from what I can see.**
11 Q. So your right foot appears to be in the same
12 position, but your left foot has changed, correct?
13 **A. Correct.**
14 Q. And when we look at your elbow position for
15 your right arm, your right arm elbow appears to be
16 coming up and your hand is reaching down in the
17 direction of your service revolver; is that accurate?
18 **A. My service weapon, yes.**
19 Q. Yeah. This is Exhibit 8. At this point, your
20 service revolver, service weapon is pulled, the car is
21 still -- the brake lights are still on, the car has not
22 moved, your -- now your right foot has changed position;
23 is that correct?
24 **A. It's come off, yeah.**
25 Q. And we can no longer see your left foot and

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
152
1 left leg; is that correct?
2 **A. That's correct.**
3 Q. And your body has moved from the outer portion
4 of the driver's side door more to the inner portion of
5 that door, correct?
6 **A. That's correct.**
7 Q. This is exhibit -- Exhibit 9. Now, at
8 Exhibit 9, the brake lights are off, correct?

9 **A. Correct.**
10 Q. And that means that if the car is in gear, at
11 this point there's nothing stopping the car from moving
12 forward, correct? So we do notice that the blinker's
13 still on and the trunk, position of the trunk lid has
14 not changed. Do you see that?
15 **A. Okay.**
16 Q. Okay. Your body, meanwhile, your -- we can't
17 see your left foot. We can -- your right foot is
18 disappearing in the direction of the car, and your body
19 is moving further in to the interior of the car. You
20 can see more of the driver's side door, right? There's
21 exhibit --
22 MS. BAKER: Do you agree with that?
23 **A. I -- it's about the same. I mean just my --**
24 **I'm turning towards the car.**
25 Q. (BY MR. FOMBY) Okay.

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
153
1 MS. BAKER: Because he's trying to ask
2 you a question but they don't always come out questions.
3 THE WITNESS: Okay.
4 MS. BAKER: So we -- we're looking for a
5 question.
6 Q. (BY MR. FOMBY) So here is Exhibit 10. And at
7 this point, looking down, the -- your right foot now has
8 completely disappeared from the picture. The blinker
9 has blinked off, so it appears to still be blinking, but
10 it's now in the off position. There doesn't seem to be
11 any real difference in separation between the vehicles,
12 but at this point the trunk lid is starting to come up.
13 And from what you understand of that sort of mechanics,
14 as a car starts to lurch forward, that would possibly
15 cause the trunk lid to rise, correct?
16 **A. That's correct.**
17 Q. Okay. So in this picture, Exhibit 10, we
18 can't see your feet on the ground. Where are your feet?
19 **A. I can't see my feet either, so I mean from**
20 **this picture, I can't tell you for sure.**
21 Q. Okay. Looking back at picture 9 and picture
22 10, look at the -- at Ashtian's head, which is this dark
23 blob on -- in this rough center of the -- of the car
24 back window. Do you see the change in head position

25 relative to the rearview mirror?

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**

154

1 **A. Okay.**
2 Q. It appears that Ashtian is pulling his head
3 off toward the right side of the car. Is that what it
4 looks like to you?
5 **A. He's moving his body.**
6 Q. Yeah. This is Exhibit 11. Now, again, we
7 can't see your feet. The blinker has blinked back on.
8 The trunk lid is starting to rise, and for the first
9 time if you look carefully at the difference between the
10 front of the squad car and the wheels, for instance, of
11 Ashtian's car, the car has apparently moved a foot or
12 so. Hard to tell the actual distance?
13 MS. BAKER: You know I'm going to object
14 to that because it's calling for speculation and I'm --
15 I'm going to ask you again, are you asking him to assume
16 that, are you representing that to him? Have you done
17 some sort of study that would permit you to represent
18 that to him?
19 MR. FOMBY: Represent what specifically?
20 MS. BAKER: The -- the distance change.
21 MR. FOMBY: I said that it's hard -- I
22 actually said it's hard to determine, but it appears to
23 have moved slightly at this particular point.
24 MS. BAKER: And you're asking him if that
25 is his opinion?

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**

155

1 MR. FOMBY: And I'm asking him as the
2 person who has taken classes in accident reconstruction
3 and traffic reconstruction and all that, whether or not
4 that distance from that position would be consistent
5 with a foot or two.
6 MS. BAKER: So in that context, if you
7 can answer.
8 THE WITNESS: Okay.
9 **A. It's moved some.**
10 Q. (BY MR. FOMBY) Okay. Now, in this picture,
11 we can no longer see Ashtian's head, can we?

12 MS. BAKER: We're talking Exhibit 11?
13 MR. FOMBY: Exhibit 11.
14 Q. (BY MR. FOMBY) But we see some kind of dark
15 straight object just before the lid of the trunk. Do
16 you see that, Officer -- Deputy?
17 MS. BAKER: He's referring to 11 I think.
18 THE WITNESS: Yeah, this is 11.
19 **A. You said dark object?**
20 Q. (BY MR. FOMBY) Right in the very -- right
21 underneath the large light pole.
22 **A. Okay.**
23 Q. And just to the left of the rearview mirror
24 there is a straight dark object showing in the picture.
25 **A. Like a shadow?**
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
156
1 Q. Shadow of some sort, some object or whatever
2 in that particular point.
3 **A. Okay.**
4 Q. Okay. At this point, which direction are you
5 facing?
6 **A. That direction is west.**
7 Q. Okay. This is Exhibit 11. Going back to 9
8 and 10, looking at them in sequence, at 9 the door has
9 not moved, or it's not visibly moved, and 10, the
10 driver's side door has not visibly moved, but by 11, the
11 door appears to be pulling closed. Is that accurate?
12 **A. Closing on me, yes.**
13 Q. And then we get to 12. And at this point, we
14 actually start seeing some significant separation
15 between the vehicles. The blinkers are still on, and
16 the door has now kind of swung closed a little bit,
17 correct?
18 **A. In -- in --**
19 THE REPORTER: I'm sorry?
20 **A. Yes, in the -- in the car doorsill.**
21 Q. (BY MR. FOMBY) Okay. And you're standing at
22 this point on the sill of the car?
23 **A. I believe so.**
24 Q. And I'm sorry that these are duplicates -- oh,
25 I mean not duplicates but they're short timeframes, but
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**

**Southwest Reporting & Video Service, Inc. Registration #189**

157

1 I just wanted to be fair to not, as you said, leap ahead
2 too fast because seconds are important.
3 This is Exhibit 13. And again, there's an
4 increasing separation between the cars. The blinker is
5 off. And I'm going to stop talking about the blinker
6 because it blinks on and off, on and off all the way
7 through here. Okay?
8 MS. BAKER: 13 is a dup of 12, is it not?
9 It's 14:45:50.
10 MR. FOMBY: They are fractions of a
11 second apart.
12 MR. ADAM FOMBY: Yeah, so you can't
13 always tell based on the seconds if they're the same.
14 Q. (BY MR. FOMBY) I think the key to looking at
15 the two of these, it to look at the relative positions
16 of. This pickup truck which from this point moves to
17 this position, this pickup truck, which has moved to
18 this position, this car, which has moved to this
19 position. So looking at the vehicle positions gives us
20 a sense of what happened in what order.
21 MS. BAKER: I'm going to -- I -- I'm
22 assuming that was intended to be helpful. Anyway,
23 please continue.
24 Q. (BY MR. FOMBY) Since all this happened in --
25 in literally mere seconds, I'm trying to carve this down

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**

158

1 into the tiniest pieces. Okay. We're looking at 14
2 now.
3 MR. FOMBY: Did I hand out 14 to you yet?
4 MS. BAKER: Yes.
5 MR. FOMBY: Okay.
6 Q. (BY MR. FOMBY) And then 15. At 14, you -- it
7 appears that your arm is inside the -- your right arm is
8 inside the vehicle, or at least partially, right?
9 **A. Correct.**
10 Q. By 15 it appears --
11 MS. BAKER: You can --
12 THE WITNESS: Yes.
13 Q. (BY MR. FOMBY) -- that's changing. By 16 we
14 see that your arm has come completely out of the

15 vehicle?
16 **A. That's correct.**
17 Q. Again, we're now -- you know, we were looking
18 at 50, we've gone through 1, 2, 3 shots and it's still
19 51 seconds. So these are portions of a second.
20 This is 17. And it appears at this point that
21 your arm is moving forward?
22 **A. Correct.**
23 Q. And by 18, your arm is now back into the car?
24 **A. That's correct.**
25 Q. So it is impossible at this point because we
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
159
1 don't have sound attached to these to know at what point
2 you fired, but you did -- we do know that you did not
3 fire your weapon until your arm was back in the car; is
4 that correct?
5 **A. That's correct.**
6 Q. Okay. Okay. Here's 19. And somewhere in
7 this timeframe, because we'll get to 20, the second shot
8 was fired?
9 MS. BAKER: I assume that was a question?
10 Q. (BY MR. FOMBY) Because we get to the next
11 slide, and we are -- when you see a little further down
12 the road, 21, that the car by this time has come to a
13 stop. So the time from Exhibit 8 where the brake lights
14 are on and you are moving into the vehicle until the
15 time of the first shot is roughly two seconds or so, and
16 then roughly one second or less for the second shot, and
17 then we have you in position by Exhibit 22 holding a gun
18 on Ashtian inside the car.
19 MS. BAKER: And again, are you asking him
20 if he agrees with this or are you representing to him?
21 MR. FOMBY: Yes, I'm asking if he agrees
22 with it.
23 Q. (BY MR. FOMBY) But -- and you note that
24 the -- in this one the brake light is on; is that
25 correct?
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
160
1 MS. BAKER: And when you say this one,

2 are you talking about Exhibit 22?

3 MR. FOMBY: Exhibit 22.

4 MS. BAKER: Okay. We just need to have

5 the record clear.

6 **A. Well, from the picture that you provided,**

7 **Exhibit 20, you said that that was where the -- at that**

8 **point the second shot was -- was made and then the next**

9 **picture -- picture is about eight seconds later when the**

10 **vehicle is stopped. And then 28 seconds after that is**

11 **Exhibit 22 -- or actually, I'm sorry, a minute and 28**

12 **seconds later is when I'm waiting for -- for my backup.**

13 Q. (BY MR. FOMBY) Right. And I -- I skipped

14 forward to there because I had intermediate shots of you

15 slowly getting out of the car which is unimportant. The

16 point that I was trying to demonstrate is the timeframe,

17 and you can see where the car wound up and where you are

18 at 14:45:52, and Ashtian, the car moved only slightly

19 before Ashtian brought it to a halt. So somewhere in

20 there around the 52 or 53 mark is when the second shot

21 was fired?

22 MS. BAKER: So do you -- can you answer

23 that? I believe that's a question.

24 **A. I -- not -- well, not from just looking at the**

25 **picture.**

**Roberto Felix**

**713-650-1800 sweptproduction@swreporting.com**

**Southwest Reporting & Video Service, Inc. Registration #189**

161

1 MS. BAKER: Okay.

2 Q. (BY MR. FOMBY) Okay. As I said, this doesn't

3 have sound attached to it, but I'm just saying these --

4 these -- this is the timeframe we're talking about,

5 so --

6 MS. BAKER: To be honest with you,

7 Mr. Fomby, this sounds more like jury argument or

8 questions to be directed to an expert. I think it's

9 difficult for the deputy to be able to agree or disagree

10 with you.

11 MR. FOMBY: And he has -- he can say that

12 he can't tell from this.

13 MS. BAKER: Well, it's --

14 MR. FOMBY: That's -- and that's all

15 right.

16 MS. BAKER: It's also very difficult

17 because you don't appear to be asking -- you appear to

18 be explaining and demonstrating, which is well and good,
19 but here we're for a deposition, so, you know, we're not
20 in a jury trial right now at this moment so we need to
21 have a question and answer. Now I've asked him some of
22 what I perceive to be your questions. So if they're not
23 right, you're the one that needs to cover it.
24 Q. (BY MR. FOMBY) So in between -- and we can go
25 back and pull up the video and show you where the shots

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
162
1 fired. Would you like to do that? Let's do that.
2 Again, we're talking fractions of a second. So what I
3 will need to do here is spend more time listening and
4 watching the time, okay?
5 (Video playing.)
6 (Video stops.)
7 Q. (BY MR. FOMBY) So in there between 51, we'll
8 go back and watch that again.
9 (Video playing.)
10 (Video stops.)
11 Q. (BY MR. FOMBY) So in there between 51, we'll
12 go back and watch that again. Bang, bang. Do you need
13 to watch that again just to catch when that --
14 (Video playing.)
15 (Video stops.)
16 **A. I believe it was 52 and 53.**
17 Q. (BY MR. FOMBY) Okay. And as I said, and --
18 and correct me if I was wrong -- I told you that it's
19 very difficult to know exactly by looking at the videos
20 here, but somewhere around 52 and 53 is what you heard?
21 **A. Correct.**
22 Q. Okay. So looking back at the videos, at 49 is
23 when the car -- the trunk of the car starts rising and
24 the door starts closing and that's -- and at somewhere
25 around 52, three seconds or so later is when the first

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
163
1 shot was fired. Is that what you saw?
2 **A. 49 to 52.**
3 Q. Yes.
4 **A. Yeah, about three seconds.**

5 Q. And then another second and then the second
6 shot was fired?
7 **A. Correct.**
8 Q. Here is Exhibit 23. And this is at 47:31,
9 which is about a minute and a half after the car -- a
10 minute and a half after the car came to a stop is when
11 the first police officer, your first colleague shows up
12 on the scene; is that correct?
13 **A. Yes.**
14 Q. And then in Exhibit 24, somewhere around 12
15 seconds later, someone else shows up. And by
16 Exhibit 25, this would be another 45 seconds.
17 **A. 24 actually shows the fourth deputy arriving,**
18 **not the third.**
19 Q. Okay. So by the next exhibit, 25, we have
20 quite a number of deputies on the scene.
21 MS. BAKER: Object to relevance.
22 Q. (BY MR. FOMBY) So what I want you to look --
23 check and look down at the driver's side door, look down
24 on the ground there. Do you see Ashtian's body laid out
25 and CPR being performed at that point?

**Roberto Felix**
**713-650-1800 sweptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
164
1 **A. No.**
2 Q. Okay. Now we can play the video, but 26 is
3 now another minute 20 -- minute and 10 seconds, and
4 still Ashtian is not receiving any kind of CPR at this
5 point, correct? You -- you could look at the --
6 **A. I mean there -- yeah, there's no one there but**
7 **I'm not aware of his medical state at that time, whether**
8 **he was still breathing or not. So, I mean, CPR wouldn't**
9 **have been appropriate at that time.**
10 Q. Right, but you -- by -- at this point he still
11 had not been removed from -- from his car, correct?
12 **A. That's correct. Waiting for Houston Fire**
13 **Department and ambulance to make the scene to provide**
14 **adequate medical attention.**
15 Q. Okay. And 27, this is some slightly less than
16 six, five and a half minutes later or thereabouts is, at
17 this point you see CPR being performed and the EMR --
18 EMS techs showing up on the scene; is that correct?
19 **A. Yeah, I believe CPR was --**
20 Q. Okay.

21 **A. -- started prior to that time.**
22 Q. And to your point, to be fair, their records
23 show that by the time they arrived, Ashtian had been
24 declared DOA. So --
25 **A. Who -- who -- I'm sorry?**

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**

165
1 Q. EMS records show that he had been declared DOA
2 which is --
3 MS. BAKER: So the Constable's Office
4 doesn't make declarations like that. Are you telling
5 him that someone at EMS --
6 Q. (BY MR. FOMBY) Someone -- someone at the
7 scene before EMS showed up declared him DOA?
8 **A. No.**
9 Q. They said he's not responsive, not breathing,
10 no pulse?
11 **A. The only person that can declare is -- is a**
12 **medical attendant.**
13 MS. BAKER: Yeah.
14 **A. HFD is the only one that can do that, so... We**
15 **can give a status of his -- what we perceive to be his**
16 **medical condition but we can't declare someone --**
17 Q. Right.
18 **A. -- DOA.**
19 Q. And in fact, the only people who can really
20 declare him DOA are actual doctors or justice of the
21 peace?
22 MS. BAKER: I'm going to object to that
23 as misstating the statutory authorities.
24 Q. (BY MR. FOMBY) So Deputy, going back to --
25 MS. BAKER: Oh, yes, if you're at a

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**

166
1 stopping point, could we take a quick restroom break,
2 bathroom break?
3 MR. FOMBY: No problem.
4 THE WITNESS: Restroom break.
5 MR. FOMBY: No problem.
6 THE VIDEOGRAPHER: The time is
7 approximately 2:56 p.m., we're off the record.

8 (Off the record.)
9 THE VIDEOGRAPHER: The time is
10 approximately 3:01 p.m., we're on the record.
11 Q. (BY MR. FOMBY) Deputy, I want to go back and
12 revisit these exhibits, particularly Exhibits 7 through
13 12. These particular exhibits are screenshots of the
14 moment when the car -- Ashtian stepped on the brakes of
15 the car, the car is on and everything starts to happen.
16 In your statement that you gave you said that
17 he turned on the vehicle and you still have your
18 statement, you said that I drew my weapon, told him
19 something like don't do it as he started to put the car
20 in drive.
21 MR. ADAM FOMBY: Wait for a second so he
22 can --
23 MR. FOMBY: Yeah.
24 **A. (Witness examines document.)**
25 Q. (BY MR. FOMBY) Then you say that: At that

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
167

1 point, my body was partially in the vehicle as he
2 accelerated away. As the vehicle sped away I felt the
3 driver door closing on me, started to feel I was being
4 pinned and going to be drug. I quickly jumped onto the
5 doorsill and held on so I wouldn't get run over.
6 But in these pictures we see you stepping onto
7 the car with the brake on and the car not moving. So
8 the car is not speeding away and accelerating away when
9 you jumped on the car, the door is still wide open and
10 your feet are off the ground?
11 MS. BAKER: I believe that is a question,
12 and I believe he's asking you if you agree with that.
13 **A. I can't agree from the picture. I mean I know**
14 **my feet are closer to the vehicle, but I'm not sure from**
15 **the picture if my feet were actually on the doorsill at**
16 **that time.**
17 MS. BAKER: And when you say that,
18 Deputy, just for clarity of the record, what particular
19 photograph are you looking at?
20 THE WITNESS: I'm looking at Exhibit 10,
21 10 and 11, I believe.
22 Q. (BY MR. FOMBY) I want you to look at
23 Exhibit 8, 9, 10 and 11 and 12. And look at your head

24 position. As you go through the sequence of those
25 exhibits, your head and shoulders actually appear --

168
1 your head appears to rise above the roof line, and your
2 shoulders appear to rise above the door line. At the
3 same time your feet go from a standing position in
4 Exhibit 7, to a position that's moved very rapidly in a
5 fraction of a second in the direction of the car.
6 Are you still comfortable with your statement
7 that the vehicle was speeding away as -- oh, and the
8 door by 7, 8, 9 and 10 is still wide open, has not
9 changed, slowly starting to close at 11 and only starts
10 to close at 12. Are you still comfortable with your
11 statement under oath that it was only when the vehicle
12 was speeding away and you felt the driver door closing
13 on you that you jumped on the door sills and held on so
14 you wouldn't get run over?
15 MS. BAKER: I'm going to object to that
16 question as extremely argumentative. Also as
17 multifarious and to the extent there is a question in
18 that line of dialogue or monologue, actually, do you
19 agree with Mr. Fomby's assessment?
20 **A. At the time of the -- of my statement, that**
21 **was the best recollection of the incident without having**
22 **looked at the -- at the video.**
23 Q. (BY MR. FOMBY) Now I can understand that,
24 Deputy, but when you made your oath, at any point in
25 your statements did you state that you are uncertain of

169
1 the details but you thought that might have been what
2 happened?
3 **A. I don't believe that's in the statement. It's**
4 **the --**
5 Q. And so when we look at photograph Exhibit 10,
6 and the car is still relatively -- positioned relatively
7 the same position to your squad car, the doors open,
8 your feet are nowhere to be seen, your head is now above
9 the roof line. Are you stating that at that point you
10 are not standing on top of the doorsill?

**11 A. Well, from Exhibit 9 and 10, my head is**
**12 relatively positioned in the same manner, just my feet**
**13 are either out of the camera view. In Exhibit 11, at**
**14 that point I can say that my head is elevated prior to**
**15 Exhibit 9 and 10.**
16 Q. So you would say that by 11, your feet are
17 firmly positioned on the sill of the door?
**18 A. I can say that at least one of them might have**
**19 been in order for me to be elevated slightly.**
20 Q. So in fact, this happened as the car was
21 beginning to move and not as it sped away?
**22 A. From -- from the video, watching the video and**
**23 looking at the picture, as the vehicle was moving is**
**24 when -- at one point in one and at I guess by Exhibit 12**
**25 both feet were on at that time.**
Roberto Felix
713-650-1800 sweptproduction@swreporting.com
Southwest Reporting & Video Service, Inc. Registration #189
170
1 Q. Deputy, did you place both of your feet on the
2 doorsill after the car started moving or before it
3 started moving?
**4 A. I would say as it was moving, as it started to**
**5 move.**
6 Q. Okay. Now, in your statement you make a
7 statement and on the video you make a statement that
8 the -- that you detected a strong odor of marijuana
9 coming from Ashtian Barnes' vehicle; is that correct?
**10 A. That's correct.**
11 Q. Isn't, in fact, Deputy, that merely a
12 pretextual statement to allow you to illegally search
13 his vehicle?
14 MS. BAKER: Objection, very
15 argumentative, assumes facts totally not in evidence.
**16 A. That's incorrect.**
17 Q. (BY MR. FOMBY) You realize, Deputy, that no
18 other -- of the 26 other officers on the scene, not a
19 single one put in a statement that he detected the odor
20 of marijuana on -- in the vehicle?
21 MS. BAKER: Objection, assumes facts not
22 in evidence.
**23 A. I've never seen any statements or heard any**
**24 other statements from any other person.**
25 Q. (BY MR. FOMBY) Are you aware that when the
Roberto Felix

713-650-1800 swreptproduction@swreporting.com
Southwest Reporting & Video Service, Inc. Registration #189
171
1 car was searched, no marijuana of any sort was found in
2 the car?
3 **A. I'm not sure what was found in the car**
4 **completely as far as marijuana, but I guess it's my**
5 **understanding that there wasn't any marijuana found in**
6 **the vehicle.**
7 Q. No drugs of any kind were found in the
8 vehicle?
9 **A. I -- I don't know.**
10 Q. Okay. When you say you smelled marijuana, was
11 it fresh marijuana, dried marijuana, burnt marijuana or
12 edible marijuana that you smelled?
13 **A. It was a odor of marijuana coming from the**
14 **vehicle.**
15 Q. Is there --
16 **A. So --**
17 Q. -- a difference in odor between those four
18 types of apps?
19 **A. Yeah, there could be, yes.**
20 Q. And you -- you don't recall what particular --
21 which -- which particular odor you detected?
22 **A. It was -- it was an odor of just marijuana**
23 **coming from the vehicle. I can tell you that it wasn't**
24 **freshly burnt marijuana, but there was an odor of**
25 **marijuana coming from the vehicle.**
Roberto Felix
713-650-1800 swreptproduction@swreporting.com
Southwest Reporting & Video Service, Inc. Registration #189
172
1 Q. So Deputy, in your experience as a peace
2 officer, what is -- what is a necessary condition -- or
3 you say you smelled marijuana. How can you spell --
4 smell marijuana that is not in the vehicle?
5 **A. It can be many reasons. It can be, you know,**
6 **residue from previous use, it could be, you know,**
7 **lingering odor, it was in the vehicle at one time or --**
8 **or early in the day. When I stopped the vehicle, he**
9 **could have thrown it out. But there was an odor of**
10 **marijuana in the vehicle.**
11 Q. Did you detect anything being thrown from the
12 driver's side of the vehicle while -- during the stop?
13 **A. Not that it was significant motion that --**

14 **that he had done.**
15 Q. I want to go back to the beginning of this.
16 Well, I'm going to start with the end of it. The end of
17 this, there was -- there were no drugs found in his car?
18 MS. BAKER: Are you asking him to assume
19 that?
20 MR. FOMBY: And I'm setting a predicate.
21 Q. (BY MR. FOMBY) At the end of this, there --
22 the toll tag violation, even if it was a serious crime,
23 was apparently not his fault. And yet at the end of
24 this, Ashtian Barnes was killed. Is there anything
25 looking back on this that you personally would have

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
173

1 changed, that you personally would have done differently
2 knowing how this all transpired?
3 MS. BAKER: I'm going to object to that
4 question as extremely argumentative and more a lecturing
5 argument than an actual question, but that being said,
6 please go ahead and answer.
7 THE WITNESS: Okay.
8 **A. Anything that I could have changed in the**
9 **entire incident?**
10 Q. (BY MR. FOMBY) Any -- any one thing or any
11 several things that you believe that you would today
12 have done differently?
13 MS. BAKER: That he would have done?
14 **A. That I would have done?**
15 Q. (BY MR. FOMBY) Correct.
16 **A. Okay. No. Everything that was done that day,**
17 **it would probably be the same situation, rapidly**
18 **involving events, you know, the threat to myself of**
19 **serious bodily injury or even death, you know, being,**
20 **you know, Mr. -- Mr. Barnes was driving away with me**
21 **holding onto the vehicle. I think everything would have**
22 **been the exact same way.**
23 Q. So as a result of this incident you would say
24 that your -- you have learned -- you would -- your
25 behavior and your patterns and your training have not

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
174

1 changed?
2 MS. BAKER: I'm going to object to that
3 question as vague. I'm not clear what is meant by your
4 behavior or your patterns. You asked him apparently a
5 very specific question and he answered it, but that
6 being said, for the record, purposes of the record,
7 please go ahead and answer.
8 THE WITNESS: Okay.
9 **A. My sense of awareness is -- I'm looking for --**
10 **for the same things and anything -- any situation like**
11 **that is still handled in the same way. If I feel that,**
12 **you know, there's, you know, a threat to myself or could**
13 **possibly be a threat, then an individual is going to be**
14 **asked to step out and that's going to be handled.**
15 **I can't say I'm going to have the exact same**
16 **situation happen ever again because no traffic stop is**
17 **the same. For -- you know, traffic stops are handled in**
18 **the same manner depending -- or in a manner depending on**
19 **the situation. So I can't, you know, answer for certain**
20 **if, you know, anything else would change the way I'm**
21 **doing it because that's how I'm trained to do it.**
22 Q. (BY MR. FOMBY) Deputy, the toll roads are
23 controlled access roads, are they not?
24 **A. They're controlled access highways, yes.**
25 Q. So that means that there are defined entrances
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
175
1 and exits to the toll roads; is that correct?
2 **A. That is correct.**
3 Q. And the toll roads have -- are constantly
4 being monitored by video cameras; isn't that true?
5 **A. There is video access to the tollway but not**
6 **constantly monitored.**
7 Q. An in fact, as we know, there was a video
8 monitoring of your traffic stop from the point that you
9 started the stop until everything ended; is that
10 correct?
11 **A. It was monitored but not recorded from the --**
12 **from the beginning.**
13 Q. Okay. And that was by the Toll Road
14 Authority?
15 **A. That is correct.**
16 Q. So had you decided to stand where you were

17 standing and let Ashtian drive off, would there have
18 been other mechanisms for apprehending him without
19 running the risk of firing a firearm?
20 **A. We can assume and it could be a yes or no**
21 **because -- except from my understanding, if let's say I**
22 **was in a position where I wasn't caught between the door**
23 **and --**
24 THE REPORTER: You weren't what?
25 THE WITNESS: Caught between the door.
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
176
1 **A. And the vehicle and he would have been able to**
2 **just flee, he posed a threat to other motorists as well.**
3 **And my understanding is that they -- they did find a gun**
4 **in that vehicle and potentially could have used that to**
5 **shoot at myself or other officers, you know, while**
6 **trying to pursue and apprehend.**
7 Q. (BY MR. FOMBY) You don't know where that gun
8 came from, do you?
9 **A. I do not.**
10 Q. You don't know that that gun had any
11 association really to do with that -- Ashtian Barnes, do
12 you?
13 **A. Sir?**
14 Q. You don't know whether that gun had an
15 association with Ashtian Barnes, do you?
16 **A. I never saw the gun.**
17 Q. Okay. And at that time you had -- that wasn't
18 on your mind, was it?
19 **A. It's always on our mind when we conduct a**
20 **traffic stop or make contact with an individual that**
21 **they could be armed and potentially hurt my -- myself,**
22 **another deputy or others when their actions are a**
23 **certain way where they're either trying to elude, evade**
24 **or -- or conceal something.**
25 Q. So did he try to evade you when you turned on
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
177
1 your lights?
2 **A. No.**
3 Q. Did he try to evade you when he turned off the

4 engine and put his keys down in -- in the -- next to the
5 gearshift?
6 **A. No, but that was one of the indicators to me**
7 **that's not normal for a traffic stop that did raise a**
8 **flag, you know, that he stopped the vehicle.**
9 Q. Turning off the car and putting the key down
10 is a -- is a flag that he is not normal?
11 MS. BAKER: I assume that's a question.
12 Q. (BY MR. FOMBY) Is that what you're saying?
13 MS. BAKER: And it misstates his
14 testimony.
15 MR. FOMBY: I just asked the question
16 now.
17 **A. Can you repeat the question?**
18 Q. (BY MR. FOMBY) Turning off the car and
19 putting the key down next to the gearshift is a -- to
20 you sends a red flag that he was up to something
21 possibly nefarious?
22 **A. With everything that had occurred, there were**
23 **something that wasn't right about that -- that incident,**
24 **yes.**
25 Q. Okay. You said that you would not change

1 anything because being trapped between the door and the
2 car put you in a dangerous situation, but had you stood
3 where you stood in Exhibit 7, where the door was away
4 from you, where you were approximately a foot or so away
5 from the car itself, had Ashtian moved forward at that
6 point, are you saying that that car -- that door would
7 have swung closed and trapped you at that spot?
8 **A. It could have hit me on the side and got me**
9 **off balance.**
10 Q. As the car moves forward, and we're seeing it
11 as you jump on, the car door still has not closed on you
12 by the time we get to Exhibit 10, right? And in
13 Exhibit 11, it still hasn't been closed on you. There's
14 still a lot of space.
15 So you're saying that if you had simply stood
16 your ground and let him drive away, if it had happened,
17 would that -- are you saying that the policies and your
18 training say that you are not allowed to do that, you're
19 not supposed to do that, that you're supposed to stop

20 him under those circumstances?
21 **A. My attempt was to stopping -- stop him from**
22 **fleeing, from causing injury to myself or others and**
23 **that was my actions on that day.**
24 Q. Okay. And so your training and experience
25 taught you that the way to deal with a fleeing suspect

Roberto Felix
713-650-1800 swreptproduction@swreporting.com
Southwest Reporting & Video Service, Inc. Registration #189

179
1 for which you have no hard evidence that he's a
2 criminal, much less a violent criminal, is to pull your
3 service weapon, shove it in his face and jump on the
4 sill of his car. Is that what you're saying your
5 training tells you?
6 MS. BAKER: Objection, argumentative, and
7 assumes facts not in evidence.
8 **A. I had nothing on Mr. Barnes, not even a name,**
9 **so I didn't know who he was, what he was capable of or**
10 **what he could -- could do. So for him trying to flee**
11 **in -- in this situation definitely threw up a flag that**
12 **there was something that, you know, obviously he's gonna**
13 **run from or for and that needed to be stopped.**
14 **MR. FOMBY: Pass the witness.**
15 MS. BAKER: I have only just a couple
16 questions, Deputy Felix.
17 EXAMINATION
18 BY MS. BAKER:
19 Q. Can you tell us what TCOLE stands for?
20 **A. TCOLE is the Texas Commission Law**
21 **Enforcement -- of Law Enforcement Education.**
22 Q. And what is TCOLE's role?
23 **A. TCOLE is the authority to license officers and**
24 **keeps track of training mandates for the State of Texas.**
25 Q. And you've talked today about the DS -- with

Roberto Felix
713-650-1800 swreptproduction@swreporting.com
Southwest Reporting & Video Service, Inc. Registration #189

180
1 Mr. Fomby about the de-escalation course that you took
2 in 19 -- in 2018; is that correct?
3 **A. That's correct.**
4 Q. Is that course mandated by TCOLE?
5 **A. It is now.**
6 Q. And when did it become mandated by TCOLE?

7 **A. I believe it became mandated in 2017 or 2018.**
8 Q. And what does it mean to be mandated by TCOLE?
9 **A. That means it's required to -- to -- to be**
10 **taken.**
11 Q. Was there any type of a mandate for a
12 de-escalation, specific de-escalation course before
13 TCOLE mandated it?
14 **A. No.**
15 Q. Any problem with having a de-escalation
16 course?
17 **A. No, there was no problem.**
18 Q. Okay.
19 MS. BAKER: I'm going to reserve the rest
20 of my questions until time of trial.
21 THE WITNESS: Okay.
22 MR. FOMBY: Done.
23 THE VIDEOGRAPHER: The time is
24 approximately 3:23 p.m. We're off the record.
25 (Proceedings concluded at 3:23 p.m.)
**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
181
1 CHANGES AND SIGNATURE
2 WITNESS NAME: ROBERTO FELIX DATE: FEBRUARY 18, 2019
3 PAGE LINE CHANGE REASON
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____

23 _____
24 _____
25 _____

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
182
1 I, ROBERTO FELIX, have read the foregoing
2 deposition and hereby affix my signature that same is
3 true and correct, except as noted above.
4
5 _____
6 ROBERTO FELIX
7 THE STATE OF _____)
8 COUNTY OF _____)
9
10 Before me, _____, on this day
11 personally appeared ROBERTO FELIX, known to me to be the
12 person whose name is subscribed to the foregoing
13 instrument and acknowledged to me that they executed the
14 same for the purposes and consideration therein
15 expressed.
16 Given under my hand and seal of office this _____
17 day of _____, 2019.
18
19
20 _____
21 NOTARY PUBLIC IN AND FOR
22 THE STATE OF _____
23 COMMISSION EXPIRES:_____
24
25

**Roberto Felix**
**713-650-1800 swreptproduction@swreporting.com**
**Southwest Reporting & Video Service, Inc. Registration #189**
183
1 IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
2 HOUSTON DIVISION
3 Janice Hughes Barnes, &
Individually and as &
4 Representative of The Estate &
of Ashtian Barnes, Deceased; &
5 and Tommy Duane Barnes &
&
6 Plaintiffs, &
&

7 vs. & CAUSE NO: 4:18-CV-00725
&
8 Roberto Felix, Jr., And the &
County of Harris, Texas &
9 &
Defendants. &
10
REPORTER'S CERTIFICATION
11 DEPOSITION OF ROBERTO FELIX
FEBRUARY 18, 2019
12
13 I, Aubrea Hobbs, Certified Shorthand Reporter in
14 and for the State of Texas, hereby certify to the
15 following:
16 That the witness, ROBERTO FELIX, was duly sworn by
17 the officer and that the transcript of the oral
18 deposition is a true record of the testimony given by
19 the witness to the best of my ability;
20 That the deposition transcript was submitted on
21 _____ to the witness or to the attorney
22 for the witness for examination, signature and return to
23 me by _____;
24 That the amount of time used by each party at the
25 deposition is as follows:

**Roberto Felix**

**713-650-1800 swreptproduction@swreporting.com**

**Southwest Reporting & Video Service, Inc. Registration #189**

184
1 MR. HOWARD FOMBY: 4 hours, 13 minutes
2 MS. MARY E. BAKER: 1 minute
3 That pursuant to information given to the
4 deposition officer at the time said testimony was taken,
5 the following includes counsel for all parties of
6 record:
7 Mr. Howard Fomby and Mr. Adam W. Fomby, Attorneys
8 for Plaintiffs
9 Ms. Mary E. Baker, Attorney for Defendants
10 That $_____ is the deposition officer's
11 charges to the Plaintiffs for preparing the original
12 deposition transcript and any copies of exhibits;
13 I further certify that I am neither counsel for,
14 related to, nor employed by any of the parties or
15 attorneys in the action in which this proceeding was
16 taken, and further that I am not financially or
17 otherwise interested in the outcome of the action.
18 Certified to by me this _____ of

19 _____, 2019.
20
_____
21 Aubrea Hobbs, TX CSR # 7143
Expiration Date: 1/31/21
22
23
24
                              25