UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JANICE HUGHES BARNES, *et al*, | § § § | |
| Plaintiffs, | § | |
| VS. | § § | CIVIL ACTION NO. 4:18-CV-725 |
| ROBERTO FELIX JR., *et al*, | § § § | |
| Defendants. | § | |

## ORDER

Before the Court are Defendants' Consolidated Motion for Summary Judgment (the "Motion") (Doc. #42); Plaintiffs' Response (Doc. #44), and Defendants' Reply (Doc. #45). At issue is the lawfulness of an officer's actions during a traffic stop that ended, not more than three minutes after it began, with the officer having fatally shot the driver of the vehicle. The question is whether the Court can consider the officer's conduct precipitating the shooting—which included jumping onto a moving vehicle and blindly firing his weapon inside—in determining whether the officer used excessive force in violation of the Fourth Amendment. Under Fifth Circuit precedent, the answer is no. The Motion is therefore granted.

I. **Background**

    a. **The Shooting**

On April 28, 2016, Roberto Felix Jr., a traffic enforcement officer for the Harris County Precinct 5 Constable's Office, was patrolling the Sam Houston Tollway. Doc. #42, Ex. 1 ¶ 4. At about 2:40 p.m., he heard a radio broadcast from the Harris County Toll Road Authority regarding a prohibited vehicle on the Tollway. *Id.* After requesting more information, he received a license plate number for the vehicle and began looking for it. *Id.* He located the vehicle, a Toyota Corolla, and initiated the traffic stop by activating his emergency lights. *Id.* ¶ 5. The driver, Ashtian

Barnes, pulled over to the left shoulder of the Tollway, and Felix parked his car behind the Corrolla. *Id.*

At about 2:43 p.m., Felix exited his vehicle and approached Barnes. *Id.*, Ex. 3, Video 1 at 85T14. When Felix asked for Barnes's driver's license and proof of insurance, Barnes informed him that he did not have his license and that he had rented the vehicle a week earlier in his girlfriend's name. *Id.*, Ex. 1 ¶ 5. Felix stated that Barnes was reaching around the vehicle and rummaging through papers. *Id.* ¶ 7. Several times, Felix warned Barnes to stop "digging around." *Id.*, Ex. 3, Video 1 at 85T14. Felix also asked Barnes whether he had anything in the vehicle he should know about, claiming he smelled marijuana. *Id.* At some point, Barnes reached over and turned off the vehicle's ignition, placing his keys near the gear shift. *Id.*, Ex. 1 ¶ 7. Felix then told Barnes to open his trunk. *Id.*, Ex. 3, Video 1 at 85T14.

At about 2:45 p.m., Felix next asked Barnes to step out of the vehicle, his right hand guarding his holster as the driver's side door opened. *Id.* Felix stated that, instead, Barnes grabbed his keys and turned on the vehicle. *Id.*, Ex. 1 ¶ 9. At that time, Felix was standing next to the open driver's side door. *Id.*, Ex. 3, Video 1 at 85T14. Felix jumped onto the door sill of the vehicle, though it is unclear whether that occurred before or after the vehicle had already began accelerating. Doc. #42, Ex. 1 ¶ 10; *id.*, Ex. 5 ¶ 27; Doc. #44, Ex. 2 at 90:19–24. As the vehicle moved forward, Felix yelled, "Don't fucking move!" twice. Doc. #42, Ex. 3, Video 1 at 85T14. Felix briefly drew his right hand out of the vehicle, holding onto his gun, before reinserted toward Barnes. *Id.*; Doc. #44 at 96:11–16. One second later, Felix shot inside the vehicle, his gun pointed downward, with "no visibility" of where he was aiming. *Id.* at 94:13–15, 97:1–3; Doc. #42, Ex. 3, Video 1 at 85T14. The next second, he fired another shot. *Id.* After about two seconds, the vehicle came to halt, and Felix yelled, "Shots fired!" into his radio. *Id.* Felix held Barnes at

gunpoint until backup arrived, while Barnes sat bleeding in the driver's seat. *Id.*, Ex. 1 ¶ 12; Doc. #44, Ex. 2 at 100:1–4. At 2:57 p.m., Barnes was pronounced dead at the scene. Doc. #42, Ex. 5.

    **b.**   **The Suit**

Following the shooting, the Homicide Division of the Houston Police Department investigated the incident and presented a report to the Harris County District Attorney's Office. Doc. #44, Ex. 10 at 7. The District Attorney's Office presented the report to a grand jury on August 26 and August 31, 2016. *Id.* The grand jury ultimately returned a "no bill" in the case. *Id.* Harris County Precinct 5 Constable's Office also conducted an internal investigation and found no violations of its Standard Operating Procedures. *Id.*; *id.*, Ex. 11.

On December 29, 2017, Plaintiffs Janice Hughes Barnes and Tommy Duane Barnes filed an Original Petition in state court on behalf of Ashtian Barnes, asserting claims against Felix and Harris County, Texas (collectively "Defendants") under 42 U.S.C. § 1983 and the Texas Tort Claims Act.[1] Doc. #1, Ex. 2. Defendants removed the action to this Court on March 7, 2018. Doc. #1. Defendants now move for summary judgment on Plaintiffs' § 1983 claims, arguing that Felix did not violate Barnes's constitutional rights and is entitled to qualified immunity. Doc. #42. Defendants also seek judgment as a matter of law as to Plaintiffs' municipal liability claims against Harris County. Doc. #44.

**II.**   **Legal Standard**

    **a.**   **Federal Rule of Civil Procedure 56**

Summary judgment is proper if there is no genuine dispute of material fact and the moving

---

[1] Plaintiffs do not address their cause of action under the Texas Tort Claims Act in the Response to the Motion. *See* Doc. #44. Because Plaintiffs have presented no evidence to support such relief, those claims are hereby DISMISSED.

3

party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. When a public official raises "a good faith assertion of qualified immunity," the plaintiff has the burden of showing that the defense is not available. *Joseph on behalf of Est. of Joseph v. Bartlett*, 981 F.3d 319, 329–30 (5th Cir. 2020) (citing *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016)). To do so, the plaintiff must first demonstrate "that there is a genuine dispute of material fact and that a jury could return a verdict entitling the plaintiff to relief for a constitutional injury." *Id.* at 330. Once qualified immunity is involved, "the plaintiff's version of those disputed facts must also constitute a violation of clearly established law." *Id.*

As with any motion for summary judgment, the court "must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Newman v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012) (quoting *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009)). But the court will "assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene." *Id.* (quoting *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011)).

b. **Section 1983**

Section 1983 imposes liability for "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" caused by any person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State." 42 U.S.C. § 1983. The injured party may bring may a § 1983 claim against a state actor in their individual or official capacity or against a governmental entity of the state. *Salazar-Limon v. City of Houston*, 826 F.3d 272, 277 (5th Cir. 2016), *as revised* (June 16, 2016) (citing *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009)). To prevail on a claim under § 1983, the plaintiff must establish (1) a violation of a right secured by federal law (2) that "was committed by a person acting under color of state law." *Id.*

4

(quoting *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013)).

### 1. Qualified Immunity Defense

When a public official asserts qualified immunity against a § 1983 claim, the court must ask (1) whether the alleged conduct violated a constitutional right and (2) "whether the right in question was clearly established at the time of the alleged violation" as to put the official "on notice of the unlawfulness of his or her conduct." *Cole v. Carson*, 935 F.3d 444, 451 (5th Cir. 2019), *as revised* (Aug. 21, 2019), *cert. denied sub nom. Hunter v. Cole*, 141 S. Ct. 111, 207 L. Ed. 2d 1051 (2020) (citing *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (per curiam)) (internal quotation marks omitted). "The officer is entitled to qualified immunity if there is no violation, or if the conduct did not violate law clearly established at the time." *Id.*

The Supreme Court has walked back the requirement that a court must resolve the constitutional question first, leaving it to the sound discretion of the courts to decide "the order of decision-making that will best facilitate the fair and efficient disposition of each case." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *cf. Saucier v. Katz*, 533 U.S. 194, 201 (2001) (requiring courts considering qualified immunity claim to first address whether a violation occurred to promote "the law's elaboration from case to case"). Even so, the Fifth Circuit has recognized the "value in addressing the constitutional merits to develop robust case law on the scope of constitutional rights." *Joseph*, 981 F.3d at 332. Thus, the Court's analysis proceeds under the first prong—whether Felix violated Barnes's constitutional right to be free from excessive force.

### III. Analysis

Any claim "that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment and its reasonableness standard." *Graham v. Connor*, 490 U.S. 386,

5

395 (1989) (citing *Tennessee v. Garner*, 471 U.S. 1 (1985)). To establish a Fourth Amendment violation based on an officer's use of excessive force, the plaintiff must show (1) an injury, (2) "which resulted from the use of force that was clearly excessive to the need," (3) "the excessiveness of which was objectively unreasonable." *Ramirez v. Martinez*, 716 F.3d 369, 377 (5th Cir. 2013) (quoting *Rockwell v. Brown*, 664 F.3d 985, 991 (5th Cir. 2011)).

Ordinarily, a court considers three factors in determining whether an officer's use of force was reasonable: "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Joseph*, 981 F.3d at 332 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). But in cases involving the use of deadly force, the Fifth Circuit has developed a much narrower approach, effectively eschewing the first and third factors. In this Circuit, the use of deadly force is "presumptively reasonable when the officer has reason to believe that the suspect poses a threat of serious harm to the officer or to others." *Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 382 (5th Cir. 2009) (citing *Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir.2003)). And so, when an officer in this Circuit reasonably believes he has encountered such a threat, the constitutional inquiry ends there.[2] *See Manis v. Lawson*, 585 F.3d

---

[2] To be sure, this approach is not unform among the circuit courts of appeals. The Seventh, Six, and Tenth Circuits have adopted a more nuanced framework when the officer's own conduct exacerbates the excessiveness of the deadly force used. *See Est. of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993) ("If a fleeing felon is converted to a 'threatening' fleeing felon solely based on the actions of a police officer, the police should not increase the degree of intrusiveness.); *Kirby v. Duva*, 530 F.3d 475, 482 (6th Cir. 2008) ("Where a police officer unreasonably places himself in harm's way, his use of deadly force may be deemed excessive."); *Fogarty v. Gallegos*, 523 F.3d 1147, 1159–60 (10th Cir. 2008) (citation omitted) ("We also consider whether an officer's own 'reckless or deliberate conduct' in connection with the arrest contributed to the need to use the force employed."); *but see Cnty. of Los Angeles, Calif. v. Mendez*, 137 S. Ct. 1539, 1546, 198 L. Ed. 2d 52 (2017) (citing *Billington v. Smith*, 292 F.3d 1177, 1189 (9th Cir. 2002)) (striking down Ninth Circuit permitting excessive force claim under Fourth Amendment "where an officer

839, 843 (5th Cir. 2009) (citing *Ontiveros*, 564 F.3d at 382) ("An officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others.").

In evaluating the reasonableness of the officer's belief, the court must only ask "whether the officer or another person was in danger *at the moment of the threat* that resulted in the officer's use of deadly force." *Rockwell*, 664 F.3d at 991 (5th Cir. 2011) (quoting *Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 493 (5th Cir.2001)) (alterations omitted and emphasis in original); *Fraire v. City of Arlington*, 957 F.2d 1268, 1276 (5th Cir. 1992) (citing *Young v. City of Killeen*, 775 F.2d 1349, 1352 (5th Cir.1985)) ("[R]egardless of what had transpired up until the shooting itself, [the suspect's] movements gave the officer reason to believe, at that moment, that there was a threat of physical harm."). To that end, courts in this Circuit should focus on "the act that led the officer to discharge his weapon." *Amador v. Vasquez*, 961 F.3d 721, 728 (5th Cir. 2020), *cert. denied*, No. 20-585, 2021 WL 850625 (U.S. Mar. 8, 2021) (quoting *Manis*, 585 F.3d at 845) (alteration omitted). In doing so, the court must view the act "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," taking into account "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Id.* (quoting *Darden v. City of Fort Worth, Tex.*, 880 F.3d 722, 729 (5th Cir. 2018)); *see Ramirez v. Knoulton*, 542 F.3d 124, 129–30 (5th Cir. 2008) (quoting *Flores v. City of*

---

intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation"). Similarly, the Third Circuit considers the totality of the circumstances, even if deadly force is involved. *See Abraham v. Raso*, 183 F.3d 279, 289 (3d Cir.1999) ("Giving due regard to the pressures faced by the police, was it objectively reasonable for the officer to believe, in light of the totality of the circumstances, that deadly force was necessary to prevent the suspect's escape, and that the suspect posed a significant threat of death or serious physical injury to the officer or others?").

7

*Palacios*, 381 F.3d 391, 399 (5th Cir. 2004)) (internal quotation marks omitted) ("To gauge the objective reasonableness of the force used by a law enforcement officer, [the court] must balance the amount of force used against the need for force, paying careful attention to the facts and circumstances of each particular case.").

With that framework in mind, the Court now turns to the facts in the record, viewing them in the light most favorable to Plaintiffs. *See Newman*, 703 F.3d at 761. Because the record contains a dash cam recording of the incident, the Court starts there. *Id.* In chronological order, the dash cam video shows the following:

- Felix pulls over Barnes's vehicle at 2:43 p.m. and walks over to the vehicle about a minute later.
- Beginning at 2:45 p.m., Barnes orders Barnes to "stop digging around" at least three times.
- Barnes tells Felix that he has identification in the trunk.
- At about 2:45:33, the trunk opens.
- At about 2:45:43, Felix asks Barnes to step out of the vehicle, and it appears that Barnes opens the driver's-side door.
- As the door opens, Felix's right hand was on the holster of his gun.
- At about 2:45:48, the vehicle's taillights turn on.
- About one second later, Felix draws his gun, and the vehicle starts to move forward.
- Felix appears to step onto the door sill of the vehicle as the door begins to close.
- As the vehicle accelerates, Felix yells, "Don't fucking move!" twice.
- Felix briefly pulls his gun hand out of the vehicle.
- At about 2:45:52, Felix fires his first shot.
- Two seconds later, the vehicle comes to a complete stop.

Doc. #42, Ex. 3, Video 1 at 85T14.

Plaintiffs have not cited any evidence that would obfuscate the events depicted in the dash cam recording. Rather, Plaintiffs point to Felix's inconsistent testimony regarding the events leading up to the shooting. For instance, Felix stated that he jumped onto the door sill because he was afraid the door would close on him, causing him to be "pinned" and "drug" by the vehicle.

Doc. #44, Ex. 2 at 91:19–94:3, 178:8–9; *id.*, Ex. 3 at 12; *id.*, Ex. 7 at 3; *id.*, Ex. 8 at 2; *see also id.* at 11 ("[M]y initial reaction was, I'm going to get run over."); *id.* at 12 ("When he drove off and that door pinned me . . . I believed if I were to let go I would have got run over by the car."); *id.* at 14 ("The only option that I had at that point was to grab a hold of something and my body reacted to hold on and jump on."). Yet, Felix's testimony also suggests that he was determined to prevent Barnes from fleeing, even before the vehicle began to move, ostensibly to protect the general public. *Id.*, Ex. 2 at 80:17–19, 106:23–107:2; *see also id.* at 81:17–21 ("[M]y actions were to draw my weapon because I already had a perception of maybe something, a weapon or him trying to flee at the same [] moment."); *id.* at 178:21–23 ("My attempt was to . . . stop him from fleeing," from causing injury to myself or others and that was my actions on that day."); 107:4–7 ("Along with leaving the scene . . . in a motor vehicle is a felony charge . . . it is evading . . . that's why I drew my weapon."); *id.*, Ex. 3 at 10 ("At that point I reached in with my left hand to try to keep him from putting the car in gear and driving off and possibly causing another situation."); *id.* at 16 ("[W]hen he went for the key and my thought was, something is that severe that he's going to put my life in danger, he could easily put somebody else's life in danger as well."). Felix also conceded that

> I had nothing on Mr. Barnes, not even a name, so I didn't know who he was, what he was capable of or what he could [] do. So for him trying to flee [] in this situation definitely threw up a flag that there was something . . . that needed to be stopped.

*Id.*, Ex. 2 at 179:8–13. But this testimony, while relevant to Felix's decision-making and motivations, has no bearing on whether Felix was in danger "*at the moment of the threat*" that caused him to use deadly force against Barnes. *See Rockwell*, 664 F.3d at 991.

In fact, "the moment of the threat" occurred *after* Felix jumped onto the door sill at about 2:45:50, in the two seconds before Felix fired his first shot. Doc. #42, Ex. 3, Video 1 at 85T14; *see also id.*, Ex. 9 at 9. In that moment, Felix was still hanging onto the moving vehicle and

9

believed it would run him over.³ Doc. #44, Ex. 2 at 127:4–12; *id.*, Ex. 3 at 12; *id.*, Ex. 7 at 3. Additionally, Defendants' law enforcement expert Jared Zwickey stated that Felix "reasonably believed his life was in imminent danger of death or great bodily injury when Mr. Barnes refused to follow the deputy's commands to stop the vehicle from moving while the deputy's left foot was partially standing on the door sill of the vehicle." Doc. #42 at 33

Plaintiffs contend that any danger perceived by Felix was "created solely by himself, and not through the actions of [] Barnes." Doc.#44 at 18. But the Fifth Circuit does not consider "what had transpired up until the shooting itself" in assessing the reasonableness of an officer's use of deadly force, even when the officer's conduct departs from established police procedures. *See Fraire*, 957 F.2d at 1276 ("Even a negligent departure from established police procedure does not necessarily signal violation of constitutional protections."); *Rockwell*, 664 F.3d at 992 (finding argument that officers' breach of locked door "necessarily caused the shooting" was 'nothing more than speculation"). Likewise, it is immaterial that Felix fired the second shot "almost immediately after the first," as noted by Plaintiffs' law enforcement expert Todd Maloney. Doc. #44, Ex. 6 at 9. Once the use of deadly force is justified, nothing in the Fourth Amendment bars the officer from protecting himself, even if that means firing multiple rounds. *City & Cty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600 (2015).

---

³ Felix has also stated that, while standing on the door sill, he felt "pressure" or a "tug" against his gun holster and "had to discharge my weapon to stop that threat." Doc. #44, Ex. 2 at 95:3–9; *id.*, Ex. 3 at 11, 13. In other words, according to Felix, his use of deadly force was also justified by the "tug" or "pressure" he felt near his holster. Not only is this not depicted in the dash cam recording, but it also suggests that Barnes was attempting a maneuver of near stuntman proportions, attempting to disarm Felix while simultaneously operating the vehicle. Because the possibility of such danger is slight, and the evidence supporting it scant, the Court finds this purported feeling insufficient to give Felix "reason to believe, at that moment, that there was a threat of physical harm." *See Young*, 775 F.2d at 1352.

10

In short, viewing the evidence in Plaintiffs' favor, the Court finds Felix's use of deadly force "presumptively reasonable" under controlling Fifth Circuit precedent. *See Ontiveros*, 564 F.3d at 382. Once Felix decided to jump onto the door sill, escalating the encounter even further, Barnes's continued operation of the vehicle put Felix at risk of serious harm. Because it is this act—and this act alone—that the Fifth Circuit has instructed courts to evaluate, this Court's inquiry begins and ends there. *See Amador*, 961 F.3d at 724. Therefore, because Barnes posed a threat of serious harm to Felix, his use of deadly force was not excessive, and there can be no constitutional violation. *See Manis*, 585 F.3d at 843.

Accordingly, because Plaintiffs have failed to demonstrate a genuine dispute of material fact as to a constitutional injury, their § 1983 claim fails even without considering Felix's qualified immunity defense. *See Joseph*, 981 F.3d at 329–30. Barring a constitutional injury, Plaintiffs also cannot assert municipal liability against Harris County. *See Horvath v. City of Leander*, 946 F.3d 787, 793 (5th Cir. 2020), *as revised* (Jan. 13, 2020) (quoting *Rivera v. Hous. Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003)) ("Municipal liability under § 1983 requires proof of (1) a policymaker, (2) an official policy, and (3) a violation of constitutional rights whose moving force is the policy or custom.").

### IV. Conclusion

The Court is mindful that police officers often must "make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Amador*, 961 F.3d at 728. But as Judge Higginbotham wrote in *Mason v. Lafayette*,

> At some point, an officer crosses the line between setting up a risky situation and actually himself directly causing the "threat." Officers are at risk in nigh every traffic stop as they approach a vehicle, as are the persons in that vehicle—so also with street confrontations. Yet no one will maintain that an officer can lawfully avoid all risk by simply shooting and asking questions later.

*Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 288–89 (5th Cir. 2015) (Higginbotham, J., concurring in part and dissenting in part); *see also Kisela v. Hughes*, 138 S. Ct. 1148, 1162, 200 L. Ed. 2d 449 (2018) ("[The Court's decision] sends an alarming signal to law enforcement officers and the public. It tells officers that they can shoot first and think later, and it tells the public that palpably unreasonable conduct will go unpunished."). By limiting the focus of the judicial inquiry so narrowly as to only examine the precise moment the officer decided to use deadly force, the Fifth Circuit has effectively stifled a more robust examination of the Fourth Amendment's protections when it comes to encounters between the public and the police. The Court invites this Circuit to consider the approach applied by its sister courts, affording § 1983 claimants the opportunity to have each party's conduct reviewed objectively and, if appropriate, hold officers accountable when their conduct has directly resulted in the need for deadly force and infringed upon the rights secured by the Fourth Amendment.

But ultimately duty bound to faithfully apply current Fifth Circuit precedent in cases involving the use of deadly force, the Court determines that at the exact moment Felix was hanging onto Barnes's vehicle, and Barnes was attempting to flee, Barnes posed a serious threat of harm to Felix. Accordingly, the Motion is GRANTED. This case is hereby DISMISSED.

It is so ORDERED.

___MAR 3 1 2021___
Date

_____
The Honorable Alfred H. Bennett
United States District Judge